**Nos. 24-1799(L), 24-1827, 24-1834, 24-1836**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

————————————

SUSANNAH WARNER KIPKE, *et al.*,

*Plaintiffs-Appellants / Cross-Appellees*,

v.

WES MOORE, *et al.*,

*Defendants-Appellees / Cross-Appellants*,

————————————

KATHERINE NOVOTNY, *et. al.*,

*Plaintiffs-Appellants / Cross-Appellees*,

v.

WESLEY MOORE, *et al.*,

*Defendants-Appellees / Cross-Appellants*,

————————————

On Appeal from the United States District Court
for the District of Maryland
No. 1:23-cv-01293-GLR
No. 1:23-cv-01295-GLR

————————————

**PLAINTIFFS-APPELLANTS' PRINCIPAL BRIEF**

————————————

(Counsel listed on following page)

John Parker Sweeney
James W. Porter, III
William Chadwick Lamar, Jr.
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street NW, Suite 1350
Washington, DC 20036
Phone: (202) 719-8216
jsweeney@bradley.com
jporter@bradley.com
clamar@bradley.com

*Attorneys for Plaintiffs-Appellants /
Cross-Appellees Susannah Warner Kipke
and Maryland State Rifle and Pistol
Association, Inc.*

David H. Thompson
Peter A. Patterson
Megan Marie Wold
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Phone: (202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
mwold@cooperkirk.com
wbergstrom@cooperkirk.com

*Attorneys for Plaintiffs-Appellants /
Cross-Appellees Katherine Novotny,
Sue Burke, Esther Rossberg,
Maryland Shall Issue, Inc., Second
Amendment Foundation, and
Firearms Policy Coalition*

Mark W. Pennak
LAW OFFICES OF MARK W. PENNAK
7416 Ridgewood Ave.
Chevy Chase, MD 20815
Tel: (301) 873-3671
mpennak@marylandshallissue.org

*Attorney for Plaintiffs-Appellants /
Cross-Appellees Katherine Novotny,
Sue Burke, Esther Rossberg,
Maryland Shall Issue, Inc., Second
Amendment Foundation, and
Firearms Policy Coalition*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1799__       Caption: __Susannah Warner Kipke, et al. v. Wes Moore, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Susannah Warner Kipke__
(name of party/amicus)

_____

 who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                              ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                                ☐YES ☑NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ John Parker Sweeney                    Date: August 27, 2024

Counsel for: Appellants

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1799__     Caption: Susannah Warner Kipke, et al. v. Wes Moore, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Maryland State Rifle and Pistol Association, Inc.
(name of party/amicus)

who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

12/01/2019 SCC                    - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ John Parker Sweeney _____     Date: __August 27, 2024__

Counsel for: Appellants _____

- 2 -

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1827__    Caption: __Novotny v. Moore__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Firearms Policy Coalition__
(name of party/amicus)

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David H. Thompson          Date:    September 4, 2024

Counsel for: Plaintiffs-Appellants

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1827__        Caption: __Novotny v. Moore__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Maryland Shall Issue, Inc.__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      ☐YES ☑NO

2.      Does party/amicus have any parent corporations?      ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?      ☐YES ☑NO
        If yes, identify all such owners:

4.　Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?　☐YES ☑NO
If yes, identify entity and nature of interest:

5.　Is party a trade association? (amici curiae do not complete this question)　☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.　Does this case arise out of a bankruptcy proceeding?　☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.　Is this a criminal case in which there was an organizational victim?　☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David H. Thompson                    Date:　September 4, 2024

Counsel for: Plaintiffs-Appellants

- 2 -

[Print to PDF for Filing]

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1827     Caption: Novotny v. Moore

Pursuant to FRAP 26.1 and Local Rule 26.1,

Second Amendment Foundation
(name of party/amicus)

who is _____ appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?  ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?      ☐YES☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?      ☐YES☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?      ☐YES☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David H. Thompson                    Date:    September 4, 2024

Counsel for: Plaintiffs-Appellants

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1827      Caption: Novotny v. Moore

Pursuant to FRAP 26.1 and Local Rule 26.1,

Sue Burke
(name of party/amicus)


who is _____ appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2. Does party/amicus have any parent corporations?  ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:




3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
   If yes, identify all such owners:




12/01/2019 SCC                                    - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?      ☐YES☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)     ☐YES☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?     ☐YES☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?     ☐YES☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David H. Thompson       Date:    November 4, 2024

Counsel for: Plaintiffs-Appellants

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1827        Caption: Novotny v. Moore

Pursuant to FRAP 26.1 and Local Rule 26.1,

Katherine Novotny
(name of party/amicus)

who is _____ appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?                    ☐YES☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                ☐YES☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?        ☐YES☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David H. Thompson _____    Date: ___November 4, 2024___

Counsel for: Plaintiffs-Appellants _____

- 2 -

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1827          Caption: Novotny v. Moore

Pursuant to FRAP 26.1 and Local Rule 26.1,

Esther Rossberg
(name of party/amicus)

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.    Does party/amicus have any parent corporations?          ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?          ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David H. Thompson                    Date:    November 4, 2024

Counsel for: Plaintiffs-Appellants

- 2 -

[Print to PDF for Filing]

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................1

JURISDICTIONAL STATEMENT .................................................................4

STATEMENT OF THE ISSUE.......................................................................4

STATEMENT OF THE CASE ........................................................................5

    I.    Legal Background and Context...........................................5

    II.    Factual and Procedural Background .................................11

SUMMARY OF THE ARGUMENT ..............................................................14

STANDARD OF REVIEW ............................................................................16

ARGUMENT .................................................................................................16

    I.    Maryland's Carry Bans restrict conduct covered by the Second Amendment's plain text ...................................................17

    II.    Maryland failed to prove that any challenged restriction is consistent with our Nation's historical tradition ...................................................18

        A.    The Second Amendment's general principles ...........................18

        B.    The district court's sensitive places analysis was wrong..........27

        C.    Maryland failed to demonstrate a justifying historical tradition for any of the Carry Bans that the district court upheld ...................................................38

            1.    Museums ...............................................................38

            2.    Healthcare Facilities............................................41

            3.    Mass Transit .........................................................42

            4.    State Parks and Forests .......................................45

            5.    Entertainment Facilities ......................................49

            6.    School Grounds....................................................51

            7.    All Government Buildings ...................................53

CONCLUSION...............................................................................................54

STATEMENT REGARDING ORAL ARGUMENT ......................................57

i

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*B-21 Wines, Inc. v. Bauer,*
    36 F.4th 214 (4th Cir. 2022) ...................................................................16

*Bianchi v. Brown,*
    111 F.4th 438 (4th Cir. 2024) (en banc) ......................................21, 26

*Crawford v. Washington,*
    541 U.S. 36 (2004)........................................................................24

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)........................ 2, 17, 19, 22, 24, 32, 34, 52, 53, 54

*Erlinger v. United States,*
    602 U.S. 821 (2024)........................................................................38

*Espinoza v. Mont. Dep't of Rev.,*
    591 U.S. 464 (2020)................................................................23, 47

*Gamble v. United States,*
    587 U.S. 678 (2019)............................................................23, 24, 25

*Koons v. Platkin,*
    673 F. Supp. 3d 515 (D.N.J. 2023) .................... 32, 33, 41, 42, 46, 48

*Koppers Performance Chems., Inc. v. Argonaut-Midwest Ins. Co.,*
    105 F.4th 635 (4th Cir. 2024) ...................................................16

*Lara v. Commissioner Penn. State Police,*
    91 F.4th 122 (3d Cir. 2024) ........................................................26

*Mahoney Area Sch. Dist. v. B.L.,*
    594 U.S. 180 (2021)........................................................................35

*Maryland Shall Issue, Inc. v. Mongtomery Cnty.,*
    680 F. Supp. 3d. 567 (D. Md. 2023)...............................................21

*Maryland Shall Issue, Inc. v. Moore,*
    116 F.4th 211 (4th Cir. 2024) (en banc) .............................18, 52, 54

ii

*Matter of Rounds*,
255 Md. App. 205 (2022) ................................................................5, 6

*McDonald v. City of Chicago*,
561 U.S. 731 (2010)..................................................................19, 23

*Morse v. Frederick*,
551 U.S. 393 (2007)........................................................................35

*Nevada Comm'n on Gaming Ethics v. Carrigan*,
564 U.S. 117 (2011)........................................................................24

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
597 U.S. 1 (2022).....................................................................*passim*

*NRA v. Bondi*,
61 F.4th 1317 (11th Cir. 2023) .......................................................21

*Ramos v. Louisiana*,
590 U.S. 83 (2020)..........................................................................24

*Steel v. City of Boston*,
128 Mass. 583 (1880) .....................................................................46

*Timbs v. Indiana*,
586 U.S. 146 (2019)........................................................................23

*United States v. Rahimi*,
144 S. Ct. 1889 (2024)............................................................*passim*

*United States v. Spears*,
449 F.2d 946 (D.C. Cir. 1971).......................................................33

*Virginia v. Moore*,
553 U.S. 164 (2008)........................................................................24

*Wolford v. Lopez*,
116 F.4th 959 (9th Cir. 2024) .............................................36, 42, 45

*Worth v. Jacobson*,
108 F.4th 677 (8th Cir. 2024) ...................................................26, 35

iii

**Statutes, Codes, and Constitutional Provisions**

28 U.S.C.

§ 1291 ................................................................................4

§ 1331 ................................................................................4

§ 1343 ................................................................................4

54 U.S.C. § 104906 ...............................................................49

COMAR

04.05.01.01 ...................................................................10

04.05.01.03 .............................................................10, 53

08.01.07.04 ...................................................................45

08.01.07.14 ................................................................9, 45

08.07.01.03 ...................................................................45

08.07.01.04 ................................................................9, 45

08.07.06.03 ...................................................................45

08.07.06.04 ................................................................9, 45

11.04.07.01 .....................................................................9

11.04.07.12 .....................................................................9

14.25.01.01 ...............................................................10, 49

14.25.02.06 ...............................................................10, 49

36.03.10.48 ...............................................................10, 49

Md. Code, Crim. Law

§ 4-102 .............................................................10, 36, 51

§ 4-104 ..........................................................................6

§ 4-111 ..........................................................................1

§ 4-111(a)(2) .........................................6, 10, 36, 41, 51

§ 4-111(a)(3) ..................................................................6

§ 4-111(a)(4) .......................................................7, 10, 53

§ 4-111(a)(8) .......................................................7, 38, 49

iv

§ 4-111(b)(11) ............................................................................51

§ 4-111(f) ...................................................................................7

§ 4-203 .....................................................................................5, 8

§ 4-208 .....................................................................................11

§ 6-411 .......................................................................................1

§ 6-411(a)(2) ...............................................................................6

§ 6-411(a)(3) ...............................................................................6

§ 6-411(c) ....................................................................................7

§ 6-411(d) ....................................................................................8

§ 6-411(e) ....................................................................................8

MD. CODE, PUB. SAFETY

§ 5-306 .....................................................................................5, 6

§ 5-307(b) ....................................................................................9

MD. CODE, TRANSP.

§ 7-705(b)(6) ..........................................................................8, 9, 42

§ 7-705(e) ....................................................................................9

MD. CONST. art. 1

§ 3 ...........................................................................................31

§ 14 .........................................................................................31

U.S. CONST. amend. II ................................................................5

**Other Authorities**

1784–1785 N.Y. LAWS ..............................................................33

1786 VA. ACTS .........................................................................29

1813 KY. ACTS .........................................................................44

1819 IND. ACTS ........................................................................44

1821 TENN. PUB. ACTS .............................................................44

1868 PA. GEN. LAWS .................................................................47

1869 N.M. Laws ................................................................49

1870 Tenn. Acts ...............................................................49

1870 Tex. Gen. Laws ...............................................38, 49, 50

1871 Tex. Gen. Laws .......................................................44

1873 Chicago Laws ..........................................................47

1874 Mo. Laws ..........................................................38, 50

1889 Ariz. Terr. Sess. Laws .........................................39, 50

1890 Okla. Terr. Sess. Laws .......................................39, 50

1903 Mont. Gen. Laws .................................................39, 50

2 Edw. 3, 258, ch. 3 (1328),............................................29

2023 Md. Laws, ch. 651 ...................................................5, 6

2023 Md. Laws, ch. 680 ...................................................1, 6

A Collection of All Such Acts of the General Assembly of Virginia (1803) ................................................................31

A Compilation of the Laws of Georgia (Augustine Smith Clayton ed. Augusta, Adams & Duyckinck 1812) ............................30

A Digest of the Laws of Georgia (Robert & George Watkins eds. 1800) ...............................................................30, 32

A Manual of the Laws of North Carolina (John Haywood ed., 1814) ........................................................................32

A Museum of Art and Culture, Peabody Essex Museum .....................................40

Aaron Leaming, et al., The Grants, Concessions, and Original Constitutions of the Province of New Jersey (1881)................44

About Us, Charleston Museum ..........................................................40

*New-York Historical Society: Uncovering America's History*, N.Y.
HIST. SOC'Y MUSEUM & LIBR. ............................................................40

ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA
(Augustine Davis ed. 1796) ...............................................31

Act of March 2, 1799, ch. 43, § 15, 1 Stat. 736.......................................33

ACTS AND RESOLVES OF MASSACHUSETTS (Boston, Adams & Nourse
1893) ...................................................................................32

ACTS AND LAWS OF THE STATE OF CONNECTICUT (New London,
Timothy Green 1784)...........................................................32, 33

Amicus Br. of the Ctr. for Human Liberty, *Antonyuk v. Nigrelli*, No.
22-2908 (2d Cir. Feb. 9, 2023), Doc. No. 313....................................35

Amy Hetzner, Comment, *Where Angels Tread: Gun-Free School
Zone Laws and an Individual Right to Bear Arms*, 95 MARQ. L.
REV. 359 (2011). ...............................................................34, 51

Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and
Eighteenth-Century Boston, New York, and Philadelphia*, 40
LANDSCAPE J. 1 (2021). ......................................................46, 47

*Annual Reports of the Department of the Interior for the Fiscal Year
Ended June 30, 1905. Report of the Secretary of the Interior and
Bureau Officers, etc.* (Gov't Printing Office, 1905)...................48, 49

Barbra Mann Wall, *History of Hospitals*, Univ. of Pa. School of
Nursing....................................................................................41

*Bellevue History*, NYC Health + Hospitals ...............................................41

Benjamin Boyd, *Take Your Guns to Church: The Second Amendment
and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653 (2014) ...................33, 37

BOSTON, THIRTEENTH ANNUAL REPORT OF BD. OF COMM'RS, PARK
ORD. (1888)..............................................................................47

Candis McLean, *Insiders' guide to 22 essential Philadelphia
museums*, PHILA. INQUIRER (May 12, 2023).....................................40

Chesapeake Forests, MD. DEP'T OF NAT. RES...........................................45

Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. FIREARMS & PUB. POL'Y 1 (2004) .......................................37

10 COLONIAL RECORDS OF THE STATE OF GEORGIA (A. Candler ed. 1911 (pt. 1)) ...........................................33

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205 (2018) ...............................35, 37

Dorceta E. Taylor, *Central Park as a Model for Social Control: Urban Parks, Social Class and Leisure Behavior in Nineteenth-Century America*, 31 J. OF LEISURE RESEARCH 420 (1999)..............48

Ed Crews, *Gambling: Apple-Pie American and Older than the Mayflower*, COLONIAL WILLIAMSBURG (Autumn 2008). ..................51

G. Robert Blakey, *Gaming, Lotteries, and Wagering: The Pre-Revolutionary Roots of the Law of Gambling*, 16 RUTGERS L.J. 211 (1985)..........................................51

GEORGE A. THRUPP, THE HISTORY OF COACHES (London, Kerby & Endean 1887) .......................................43

GEORGIA CODE (1873) .......................................49, 50

IDAHO PENAL CODE (1901) .......................................50

Jay Young, *Infrastructure: Mass Transit in the 19th- and 20th-Century Urban America* (Mar. 2, 2015) ...........................43

John Adams, Argument for the Defense: 3-4 December 1770, Nat'l Archives Founders Online ...............................37

JOHNSON, ET AL., SECOND AMENDMENT: REGULATIONS, RIGHTS, AND POLICY (3d ed. 2021) .......................................43

JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW JERSEY (1835)...................................30

viii

KENNETH LAWING PENEGAR, THE NATIONAL POLITICAL TRIAL OF
    BENJAMIN FRANKLIN: A PRELUDE TO THE AMERICAN REVOLUTION
    (2011)............................................................................................47

Mark W. Smith, *Attention Originalists: The Second Amendment was
    Adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM
    (Dec. 7, 2022) ...............................................................................22

Maryland At A Glance, Parks & Recreation, State Parks, MD.
    MANUAL ONLINE.............................................................................45

Maryland's State Forests, MD. DEP'T OF NAT. RES ...............................45

MINUTES OF PROCEEDINGS OF THE BD. OF COMM'RS OF CENTRAL PARK
    (1858)......................................................................................47, 48

NATHANIEL B. SCHURTLEFF, RECORDS OF THE GOVERNOR AND
    COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND
    (William White Press 1853) ...........................................................33

2 LAWS OF DELAWARE (Samuel and John Adams eds. 1797) ...........30, 31

LAWS OF NEW HAMPSHIRE (1797) ........................................................32

LAWS OF NEW JERSEY (Joseph Bloomfield ed., Trenton, James J.
    Wilson 1811)..................................................................................31

1 LAWS OF NEW YORK (Webster & Skinner 2d ed. 1807)................30, 31

2 LAWS OF VERMONT (Randolph, Sereno Wright 1808) ..................30, 32

Oliver W. Holmes, *The Stage-Coach Business in the Hudson Valley*,
    12 Q.J. OF N.Y. STATE HIST. ASS'N 231 (1931).................................43

*Our History*, THE PEALE ......................................................................40

P. Holland & M. Patterson, *Eighteenth Century Theatre, in* THE
    OXFORD ILLUSTRATED HISTORY OF THEATRE (2001). ..................50, 51

10 PENNSYLVANIA STATUTES AT LARGE FROM 1682 TO 1801 (William
    Stanley Ray ed. 1904)...........................................................30, 31, 32

ix

PUBLIC RECORDS OF THE COLONY OF CONNECTICUT (Hartford, Brown Parsons 1850)............................................................................33

1 RECORDS OF MASS. BAY (1628–1641) (Nathaniel B. Shurtleff ed., 1853)............................................................................44

1 RECORDS OF THE COLONY OF RHODE ISLAND (John Russell Bartlett ed. 1856)............................................................................33

REV. ORD. ST. LOUIS (1881)............................................................47

RON VINEYARD, *STAGE WAGGONS AND COACHES*, COLONIAL WILLIAMSBURG FOUND. (2000)............................................................43

RULES & REGULATIONS OF PROSPECT PARK, Brooklyn (1868). ...............................48

*Saturday, December 20, 1783*, JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA; BEGUN AND HELD IN THE TOWN OF RICHMOND, IN THE COUNTRY OF HENRICO, ON MONDAY, THE SEVENTH DAY OF MAY, IN THE YEAR OF OUR LORD ONE THOUSAND SEVEN HUNDRED AND EIGHTY-ONE 77 (Thomas W. Whyte 1828)............................................................................30

9 STATUTES AT LARGE OF SOUTH CAROLINA (David J. McCord ed., 1841)............................................................................43

*The 150 Largest City Parks*, TRUST FOR PUBLIC LAND ............................................46

*The Earliest New York City Parks*, N.Y. CITY DEP'T OF PARKS & REC. .................46

THE LAWS OF MARYLAND, ch. 25 (1799)............................................................32

THE PUBLIC LAWS OF RHODE ISLAND (Providence, Carter & Wilkinson 1798)............................................................................29, 32, 33

The PUBLIC LAWS OF SOUTH CAROLINA (Philadelphia, R. Aitken & Son 1790)............................................................................30, 31

x

THE PUBLIC LAWS OF THE STATE OF SOUTH-CAROLINA, FROM ITS
FIRST ESTABLISHMENT AS A BRITISH PROVINCE DOWN TO THE YEAR
1790, INCLUSIVE, IN WHICH IS COMPREHENDED SUCH OF THE
STATUTES OF GREAT BRITAIN AS WERE MADE OF FORCE BY THE
ACT OF ASSEMBLY OF 1712, WITH AN APPENDIX CONTAINING SUCH
OTHER STATUTES AS HAVE BEEN ENACTED OR TO BE OF FORCE IN
THIS STATE, EITHER VIRTUALLY OR EXPRESSLY (ed. John
Faucheraud Grimke, 1790) ..................................................................................33

1 THE STATUTES AT LARGE OF VIRGINIA (William Waller Hening ed.,
1808) ............................................................................................33, 44

3 WILLIAM HAND BROWNE, ARCHIVES OF MARYLAND: PROCEEDINGS
OF THE COUNCIL OF MARYLAND 1636–1667 (Baltimore, Md. Hist.
Soc'y 1885) ....................................................................................33, 44

## INTRODUCTION

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court held that the Second Amendment protects an "individual's right to carry a handgun for self-defense outside the home." 597 U.S. 1, 10 (2022). That protection, *Bruen* emphatically declared, yields only to "historical tradition that delimits the outer bounds of the right." *Id.* at 19. Although the Supreme Court "assume[d]" that states historically could restrict carry in certain specified "sensitive places"—"legislative assemblies, polling places, and courthouses," *id.* at 30—it warned that "relatively few" of these "exceptional" locations exist and it forbade states from defining sensitive places "too broadly" or in any way that would "eviscerate the general right to publicly carry arms for self-defense," *id.* at 30, 31, 38.

These consolidated cases concern the State of Maryland's *Bruen*-defying enactment of the Gun Safety Act of 2023 ("GSA") which, along with preexisting locational restrictions, effectively prohibits law-abiding Marylanders from exercising their right to bear arms throughout the state. *See* 2023 MD. LAWS, ch. 680. The GSA sweepingly declared 15 categories of locations where firearms are now prohibited, MD. CODE, CRIM. LAW § 4-111, and also now prohibits bringing a firearm into any privately owned building unless the owner provides "express permission" or posts a "clear and conspicuous sign" authorizing armed entry, *id.* § 6-411(d). And

1

these restrictions only supplement Maryland's many other locational restrictions that prohibit armed self-defense at or in places such as state parks and forest lands, mass transit facilities and vehicles, casinos, public demonstrations, and the grounds of school properties, among others. These locational restrictions (collectively, "Maryland's Carry Bans") forbid law-abiding citizens from bringing a firearm to most places they go in their daily lives and cannot be reconciled with our Nation's historical tradition. *Bruen*, 597 U.S. at 17.

The district court upheld many of the Carry Bans—museums, healthcare facilities, mass transit, state parks, entertainment facilities, the grounds of schools, and all government buildings—based on its misplaced analogical reasoning and endorsement of the State's mistaken reliance on far-too-late and otherwise irrelevant historical evidence. It believed that Maryland may ban firearms virtually anywhere that "serve[s] a vulnerable population," *see* JA0980, based on a misreading of *Heller*'s dicta that restrictions on firearms in "schools" are "presumptively lawful." *District of Columbia v. Heller*, 554 U.S. 570, 626–27 & n.26 (2008). But schools are not one of the "relatively few" places where the "historical record" supports a blanket ban on firearms, and *Bruen* did not authorize analogical reasoning to schools. *Id.* at 30. The district court ignored the critical fact that schools, by reason of their *in loco parentis* authority over their students, are meaningfully different from

2

Maryland's litany of supposedly sensitive places. A modern ban on firearms in public locations is not lawful merely because children, vulnerable people, or crowds might be found there.

Compounding its analogical errors, the district court ignored *Bruen*'s demand for "affirmative[]" evidence of an "enduring," "representative," and "comparable tradition of regulation" to justify the challenged law. *Bruen*, 597 U.S. at 19, 27, 30, 69. Almost entirely ignoring that most of Maryland's locational restrictions ban firearms in places that existed at or before the Founding, the district court held that the State's historical evidence from Reconstruction and even later is "equally if not more probative" than Founding Era evidence. JA0975-0976. And it repeatedly relied on motley assortments of outlier jurisdictions from the mid-to-late-19th century that, in addition to being far too late, do not establish a justifying historical tradition of regulation for **any** of the Carry Bans.

The district court erred in rejecting the *Kipke* and *Novotny* Plaintiffs' challenges to Maryland's prohibitions at museums, healthcare facilities, mass transit, state parks, entertainment facilities, the grounds of schools, and all government buildings (except legislative assemblies, polling places, and courthouses). The Court should hold that each violates the Second Amendment,

3

reverse the district court's decision in relevant part, and remand with instruction to enter judgment for the Plaintiffs on those challenges.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. It granted partial summary judgment to the State, and it granted partial summary judgment to the *Kipke* and *Novotny* Plaintiffs, on August 2, 2024. JA1020-1022. On August 8, 2024, the Court amended its order granting partial summary judgment to the State and Plaintiffs. JA1023. Those orders disposed of all claims and are appealable final judgments. The *Kipke* Plaintiffs filed a notice of appeal on August 15, 2024. JA1024. The *Novotny* Plaintiffs filed a notice of appeal on August 27, 2024. JA1026. And the State cross-appealed in both cases on August 29, 2024. JA1029, JA1031. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court erred in denying Plaintiffs' motions for summary judgment and granting the State's motions for summary judgment as to Maryland's laws prohibiting the carrying of a handgun for self-defense at or in museums, healthcare facilities, mass transit facilities and vehicles, state parks, entertainment facilities, the grounds of schools, and all government buildings.

4

## STATEMENT OF THE CASE

### I.    Legal Background and Context

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. It has long been a crime in Maryland to "wear, carry, or transport a handgun, whether concealed or open, on or about the person" or "in a vehicle traveling on a road or parking lot," MD. CODE, CRIM. LAW § 4-203(a)(1)(i)–(ii), unless the person holds a Maryland carry permit or is otherwise exempt from permit requirements (such as law enforcement). *Id.* § 4-203(b)(1)–(2). Anyone who carries a handgun outside these exceptions "is guilty of a misdemeanor" and subject to imprisonment and fines. *Id.* § 4-203(c).

Until 2023, Maryland's carry-permit regime eviscerated the Second Amendment right to publicly carry firearms for self-defense by requiring applicants seeking a permit to prove a "good and substantial reason" to carry a handgun. MD. CODE, PUB. SAFETY § 5-306(a) (repealed 2023 MD. LAWS, ch. 651). In *Bruen*, the Supreme Court held unconstitutional New York's public-carry licensing regime (and those like it, such as Maryland's) that preconditioned armed self-defense upon a showing of "special need." 597 U.S. at 70; *see also id.* at 15 n.2 (likening Maryland's regime to New York's). One month after *Bruen*, the Appellate Court of Maryland invalidated the State's special-need requirement, *Matter of Rounds*, 255 Md. App.

205, 212 (2022), and the Maryland General Assembly deleted the requirement from the statutory scheme in 2023, *see* 2023 MD. LAWS, ch. 651 (amending MD. CODE, PUB. SAFETY § 5-306). In defiance of *Bruen*, however, the State then went on to replace one blatantly unconstitutional carry regime with another.

Maryland Governor Wes Moore signed into law the Gun Safety Act of 2023, which adds two new sections to the Maryland Code's Criminal Law Article. *See* 2023 MD. Laws, ch. 680 (effective Oct. 1, 2023). These new sections—Section 4-111 and 6-411—prohibit the wearing, carrying, or transporting of a firearm at a sweepingly broad array of locations, presumptively including every single privately owned building in the state. A "firearm" is defined by Section 4-111(a)(3) and Section 6-411(a)(3) to include all "firearms" as defined by Maryland Code, Criminal Law § 4-104, which includes all modern handguns and long guns.

Section 4-111 establishes three broad categories of locations where all non-exempt persons are forbidden from exercising their right to armed self-defense. The first category is what Section 4-111 calls an "[a]rea for children and vulnerable individuals," which includes: (i) "a preschool or prekindergarten facility or the grounds of the facility"; (ii) "a private primary or secondary school or the grounds of the school"; and (iii) "a health care facility." MD. CODE, CRIM. LAW § 4-111(a)(2). The second category is any "[g]overnment or public infrastructure area," which

includes: (i) "a building or any part of a building owned or leased by a unit of State or local government"; (ii) "a building of a public or private institution of higher education, as defined in § 10-101 of the Education Article"; (iii) "a location that is currently being used as a polling place in accordance with Title 10 of the Election Law Article or for canvassing ballots in accordance with Title 11 of the Election Law Article"; (iv) "an electric plant or electric storage facility, as defined in § 1-101 of the Public Utilities Article"; (v) "a gas plant, as defined in § 1-101 of the Public Utilities Article"; and (vi) "a nuclear power plant facility." *Id.* § 4-111(a)(4). And the third category is what Section 4-111 calls a "[s]pecial purpose area," which includes: (i) "a location licensed to sell or dispense alcohol or cannabis for on-site consumption"; (ii) "a stadium"; (iii) "a museum"; (iv) "an amusement park"; (v) "a racetrack"; or (vi) "a video lottery facility, as defined in § 9-1A-01 of the State Government Article." *Id.* § 4-111(a)(8). Anyone who unlawfully carries a firearm in any of these locations—regardless of whether that person has a carry license—"is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 1 year or a fine not exceeding $1,000 or both." *Id.* § 4-111(f).

Section 6-411 effectively enacts a no-carry default: it presumptively forbids carrying a firearm into others' dwellings or properties. Section 6-411(c) prohibits bringing a firearm "in the dwelling of another unless the owner or the owner's agent

7

has given express permission, either to the person or to the public generally, to wear, carry, or transport a firearm inside the dwelling." And Section 6-411(d) extends that no-carry default to all privately owned buildings open to the public:

> A person wearing, carrying, or transporting a firearm may not: (1) enter or trespass on property unless the owner or the owner's agent has posted a clear and conspicuous sign indicating that it is permissible to wear, carry, or transport a firearm on the property; or (2) enter or trespass on property unless the owner or the owner's agent has given the person express permission to wear, carry, or transport a firearm on the property.

Violation of these no-carry default provisions is also a misdemeanor that subjects the violator to "imprisonment not exceeding 1 year or a fine not exceeding $1,000 or both." *Id.* § 6-411(e).

Separately from the recently enacted GSA, Maryland also prohibits carry through other locational restrictions, some of which overlap with or are duplicative of the GSA's provisions:

Maryland has a "Mass Transit" ban, which prohibits "[c]arry[ing] or possess[ing] any . . . concealed weapons" "in any transit vehicle or transit facility, designed for the boarding of a transit vehicle, which is owned or controlled by the [Maryland Transit] Administration or a train owned or controlled by the Administration or operated by a railroad company under contract to the Administration to provide passenger railroad service." MD. CODE, TRANSP. § 7-

8

705(b)(6); *see also* MD. CODE, CRIM. LAW § 4-203; MD. CODE, PUB. SAFETY § 5-307(b) (categorically forbidding open carry). This ban applies to: (1) commuter and local bus transit services in the Baltimore area; (2) the Metro Subway services in Baltimore area; (3) Light Rail services in Baltimore; (4) weekday MARC commuter train service between Baltimore and Washington, D.C.; and (5) passenger railroad service on MARC commuter trains that travel through Frederick and Montgomery Counties, Maryland, with stops in Maryland. Any person who violates any provision of this section is guilty of a misdemeanor and is subject to a fine of not more than $500 for each offense. MD. CODE, TRANSP. § 7-705(e).

Maryland also bans firearms in State parks, State forests, and Chesapeake Forest Lands. Through three nearly identical regulations, the Maryland Department of Natural Resources generally bars citizens from "possessing a weapon" in those locations. COMAR 08.07.06.04 (State parks); COMAR 08.07.01.04 (State forests); COMAR 08.01.07.14 (Chesapeake Forest Lands). Other regulations restrict the arms-bearing conduct of law-abiding citizens at places like highway rest areas by prohibiting "[t]he display or discharge of firearms" at any "welcome centers, rest areas, scenic overlooks, roadside picnic areas, and other public use areas within interstate and State highway rights-of-way, and shall be posted on the bulletin board of each public use area." COMAR 11.04.07.01, 11.04.07.12.

In addition to the GSA's restrictions at entertainment venues, existing regulations prohibit armed self-defense at places like Camden Yards and in any casinos. One regulation prohibits "[t]he possession, carrying, or transporting, either openly with the intent to injure a person in an unlawful manner, or concealed, or the use or discharge of, a weapon" at the Camden Yards Sports Complex. COMAR 14.25.01.01, 14.25.02.06. Another prohibits "possess[ing]" any "firearm" in any casino. COMAR 36.03.10.48.

As mentioned above, the GSA prohibits citizens from bringing a firearm on the grounds of, or into, preschools and private schools. MD. CODE, CRIM. LAW § 4-111(a)(2)(i)–(ii). And a preexisting statute prohibits "carry[ing] or possess[ing] a firearm . . . on public school property." MD. CODE, CRIM. LAW § 4-102(b).

Similarly, the GSA now prohibits armed self-defense in various government buildings. MD. CODE, CRIM. LAW § 4-111(a)(4). But a preexisting regulation also prohibits "carry[ing] open or concealed firearms," other than "for official purposes and by authorized personnel," "on the property" of any "State public buildings, improvements, grounds, and multiservice centers under the jurisdiction of the Department of General Services." COMAR 04.05.01.01, 04.05.01.03.

A statute also prohibits firearm carry "within 1,000 feet of a demonstration in a public place," if "(i) the person has been advised by a law enforcement officer that

10

a demonstration is occurring at the public place; and (ii) the person has been ordered by the law enforcement officer to leave the area of the demonstration until the person disposes of the firearm." MD. CODE, CRIM. LAW § 4-208(b)(2).

## II.    Factual and Procedural Background

The same day that Maryland's Governor signed the sweepingly prohibitive GSA into law, Plaintiffs filed complaints in *Kipke* and *Novotny* to challenge many of those locational prohibitions, as well as other location-based restrictions, on Second Amendment and other grounds. JA0026, JA0050.

### A.    *Kipke*

The *Kipke* Plaintiffs are Susannah Kipke and the Maryland State Rifle & Pistol Association, Inc. ("MSRPA"). Kipke, a working mother of four young children, is an ordinary, law-abiding Maryland citizen who holds a carry permit and, but for the challenged Maryland laws, would carry her handgun for self-defense in many of the locations covered by the Carry Bans described above. JA0080, JA0100. MSRPA is a membership organization advocating on behalf of itself and individual law-abiding members—including Kipke and individual members Gabriel Dinkins, Michael Fryar, John Hurley, and Jonathan Smith—who, but for the threat of enforcement, would carry a handgun for self-defense at locations restricted by the Carry Bans. JA0084-0099.

11

The *Kipke* Plaintiffs asserted Second Amendment challenges to Maryland's statutes and regulations restricting their armed-self-defense rights at or in locations selling alcohol (but not those selling cannabis); State parks, forests, and rest areas; mass transit; entertainment venues like stadiums, racetracks, amusement parks, and casinos; museums, public demonstrations; healthcare facilities; school grounds (but not school buildings); and government buildings (except for legislative assemblies, polling places, and courthouses). JA0044-0046. They also challenged the no-carry default for private properties (but not for dwellings). JA0046.[1]

**B.    *Novotny***

The *Novotny* Plaintiffs are three Maryland citizens—Katherine Novotny, Sue Burke, and Esther Rossberg—and three membership organizations, Maryland Shall Issue, Inc. ("MSI"), the Second Amendment Foundation ("SAF"), and Firearms Policy Coalition ("FPC"), of which the *Novotny* individual plaintiffs are members. JA0101-0117. The *Novotny* Plaintiffs challenged many—though not all—of the Maryland laws challenged by the *Kipke* Plaintiffs: locations selling alcohol;

---

[1] The *Kipke* Plaintiffs also challenged: the no-carry private property default on First Amendment grounds; Maryland's carry-permit process on due process grounds; and the State's discriminatory treatment of the *Kipke* plaintiffs in comparison to retired law enforcement officers on Equal Protection Clause grounds. JA0046-0048.

museums; mass transit; State parks and forest; and the no-carry default as to private property open to the public. JA0071-0078.

## C.    Proceedings in the district court

The district court consolidated *Kipke* and *Novotny* on July 13, 2023. JA0118. By September 2023, the parties had fully briefed Plaintiffs' motions for preliminary injunction and for summary judgment as well as the State's cross-motions for summary judgment. JA0008-0010.

On September 29, 2023, the district court issued an opinion and order granting in part and denying in part Plaintiffs' preliminary-injunction motions. JA0963-1002. It began by finding "no dispute that Plaintiffs' conduct is covered by the plain text," *i.e.*, "carry[ing] a gun for self-defense outside the home." JA0977. At the historical-tradition stage, the court denied Plaintiffs' motions as to museums, healthcare facilities, mass transit, state parks, entertainment facilities, the grounds of schools, and all government buildings; it granted Plaintiffs' motions as to locations selling alcohol, public demonstrations, and the private-property no-carry default. JA0978-0999. In ruling on those motions, the district court denied without prejudice the parties' summary-judgment motions. JA1001. The parties then renewed their motions and, while awaiting a decision, periodically submitted notices of supplemental authority. JA0011-0012.

13

On August 2, 2024, the district court issued an opinion and order on summary judgment that essentially adopted its preliminary-injunction reasoning and dispositions. JA1006-1019. The only additional analysis the court undertook was to distinguish or reject each of Plaintiffs' notices of supplemental authority. JA1015-1017. The court then granted summary judgment to the State on all of Plaintiffs' claims, except for granting summary judgment to Plaintiffs on their claims challenging Maryland's carry restrictions at locations selling alcohol and at public demonstrations, as well as on the no-carry default for private property. JA1018-1019, JA1020-1022. These appeals timely followed.

## SUMMARY OF THE ARGUMENT

Maryland's Carry Bans violate the Second Amendment. The Second Amendment's plain text covers "carrying handguns publicly for self-defense," which presumptively protects an individual's right to carry arms wherever she goes. *See Bruen*, 597 U.S. at 32. And the State failed to meet its burden to affirmatively prove that any of its restrictions "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17; *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) (re-affirming the "analysis" just "explained in *Bruen*").

The district court erred in refusing to enjoin Maryland's ahistorical restrictions at museums, healthcare facilities, mass transit, state parks, entertainment

14

facilities, the grounds of schools, and government buildings. The district court's rationales for upholding Maryland's restrictions demonstrate the lack of real historical support. The court believed that Maryland may ban firearms anywhere that the "vulnerable" are present—trying to analogize to schools. *See* JA0978, JA0980, JA0985, JA0995. But this fails several times over. For one, schools are not among those "relatively few" places to which lower courts may reason by analogy—that is appropriate only for Founding Era "legislative assemblies, polling places, and courthouses." *Bruen*, 597 U.S. at 30. And at the Founding, those locations were protected by government-provided security that made self-defense unnecessary. For another, even if analogy to schools were appropriate, the district court ignored the justification and feature that makes schools meaningfully different: *in loco parentis* authority over students that is not applicable in other contexts. The State of Maryland cannot simply declare "sensitive" and restrict carry at any location where children, the vulnerable, or crowds might be found.

The court compounded its errors by erroneously holding that historical evidence from Reconstruction and later could justify Maryland's bans. Only Founding Era understandings can establish historical tradition. Although post-ratification history can **sometimes** confirm or clarify Founding Era understandings, evidence from Reconstruction or later cannot itself establish historical tradition or

contradict Founding Era evidence. Focusing on the history that controls under *Bruen*, the State's evidence falls well short.

This Court should reverse the judgment of the district court denying summary judgment to Plaintiffs and, for the reasons Plaintiffs will explain in their forthcoming response to the State's cross-appeals, affirm the district court's injunction of Maryland's carry restrictions at locations selling alcohol and public demonstrations, as well as its no-carry default for private property.

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's disposition of cross-motions for summary judgment." *Koppers Performance Chems., Inc. v. Argonaut-Midwest Ins. Co.*, 105 F.4th 635, 640 (4th Cir. 2024). It "also review[s] *de novo* a district court's ruling with respect to the constitutionality of a state statute." *B-21 Wines, Inc. v. Bauer*, 36 F.4th 214, 221 (4th Cir. 2022).

## ARGUMENT

Maryland's Carry Bans violate the Second Amendment. As *Bruen* made clear, the "standard for applying the Second Amendment" is straightforward: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and a law restricting that conduct is unconstitutional unless the government "demonstrate[s] that the regulation is

consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17, 24; *see Rahimi*, 144 S. Ct. at 1898. The plain text covers Plaintiffs' intended conduct: carrying a handgun for self-defense at various locations in Maryland. And the State has not met its burden to "affirmatively prove," based on "historical evidence," that an "enduring," "representative," and "comparable tradition of regulation" justifies any of them. *Bruen*, 597 U.S. at 19, 24, 27, 30, 69; *Rahimi*, 144 S. Ct. at 1898.

## I.    Maryland's Carry Bans restrict conduct covered by the Second Amendment's plain text

Plaintiffs are indisputably among "the people" who enjoy Second Amendment rights. *Heller*, 554 U.S. at 580 ("national community"); *Bruen*, 597 U.S. at 70 ("all Americans"). Handguns are protected "Arms." *Bruen*, 597 U.S. at 32. The only remaining question is whether the text covers Plaintiffs' conduct. The answer, as the district court correctly determined, is yes: the plain text protects carrying a handgun for self-defense at locations where Maryland has forbid doing so. JA0977.

The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. Because "confrontation can surely take place outside the home," the text presumptively protects the right to carry "in public for self-defense." *Bruen*, 597 U.S. at 33. And nothing in the text limits its scope based on where exactly a citizen seeks to carry

17

her firearm, just as "[n]othing in the Second Amendment's text draws a home/public distinction." *Id.* at 32. This Court, sitting en banc, explained that there is "no question" that the plain text is satisfied if a firearm law "prevent[s] individuals from exercising th[eir] rights" to keep and bear arms. *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 221 (4th Cir. 2024) (en banc), *cert. pet. docketed*, No. 24-373 (U.S. Oct. 2, 2024). Maryland's locational restrictions do just that. Therefore, any justification for those restrictions must come from affirmative proof of historical tradition—not the text. *Bruen*, 597 U.S. at 17, 24.

## II.  Maryland failed to prove that any challenged restriction is consistent with our Nation's historical tradition

The district court incorrectly upheld Maryland's restrictions for museums; healthcare facilities; parks; public transportation; entertainment venues; school grounds; and governmental buildings other than legislative assemblies, polling places, and courthouses. None of Maryland's restrictions at these historically non-sensitive locations is supported by an "enduring," "representative," and "comparable tradition of regulation." *Bruen*, 597 at U.S. 27, 30, 67.

### A.  The Second Amendment's general principles

To justify any firearm regulation, the State must "affirmatively prove," based on "historical evidence," that an "enduring," "representative," and "comparable tradition of regulation" justifies the challenged law. *Bruen*, 597 U.S. at 19, 24, 27,

18

30, 69. *Rahimi* reaffirmed and reiterated what *Bruen* had already explained: Modern firearm regulations must be "relevantly similar" to historical traditions in "[w]hy" and "how" they burden Second Amendment conduct. 144 S. Ct. at 1898. The district court did not adhere to this standard.

A modern restriction is "relevantly similar" to a historical analogue only if it burdens law-abiding citizens' right to keep and bear arms for comparable reasons ("why") and in a comparable way ("how"). *Id.* at 1898. For that reason, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Bruen*, 597 U.S. at 29.

A proffered historical tradition must also be "representative." *Id.* at 30. Regulations that come from "outliers," territorial governments, and municipalities should be ignored—especially if they contradict earlier evidence. *Id.* at 30, 55 n.22, 67–69, 70. Regulations enacted in only a handful of jurisdictions, or covering only a small portion of the population, or persisting only for a few years "are most unlikely to reflect 'the origins and continuing significance of the Second Amendment.'" *Id.* at 67 (quoting *Heller*, 554 U.S. at 614). For similar reasons, states cannot credibly rely on overtly racist laws enacted as part of "systematic efforts" to disarm "blacks." *McDonald v. City of Chicago*, 561 U.S. 742, 771 (2010). That is

why *Bruen* cautioned against reliance on laws where prosecutions were directed only against "black defendants who may have been targeted for selective or pretextual enforcement," for such a despicable practice is "surely too slender a reed on which to hang a historical tradition of restricting the right to public carry." 597 U.S. at 58. Such laws should be left in the dustbin of history, not used as tools to restrict rights in the modern day.

The historical analysis is most often "straightforward"—for example: "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a **distinctly similar** historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26 (emphasis added). In this case, the "lack" of Founding Era restrictions on carriage in places where "vulnerable populations" gathered should be determinative evidence of the unconstitutionality of Maryland's Carry Bans.

By contrast, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Rahimi*, 144 S. Ct. at 1898. Courts may resort to "more nuanced" analogical reasoning only in "cases implicating unprecedented societal concerns,"

20

"dramatic technological changes," and otherwise "*new*" issues. *Bruen*, 597 U.S. at 27, 30.[2]

Focusing on the Founding is critical because historical regulations are "well-established" and "enduring" only if they reflect the understandings of the Founders around 1791, not of the Reconstruction Era around 1868. *Bruen*, 597 U.S. at 30, 31. To justify resorting to historical evidence that only began to develop in the mid-to-late-19th century, the district court adopted the view that "historical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment." JA0975-0976.[3] That holding is wrong, defies controlling precedent, and should be corrected.

---

[2] The en banc Fourth Circuit recently called "for such a nuanced approach" in a challenge to Maryland's assault-weapons ban, based on the purported "ripples of fear reverberating throughout our nation in the wake of [certain] horrific mass shootings." *Bianchi v. Brown*, 111 F.4th 438, 463 (4th Cir. 2024) (en banc), *cert. pet. docketed*, No. 24-203 (U.S. Aug. 23, 2024). Whatever the viability of *Bianchi*'s invocation of nuanced analogical reasoning, it is inappropriate in this case, which deals with the *Heller*-and-*Bruen* style challenge seeking to have and carry a handgun for self-defense.

[3] The district court "agree[d] with the logic" (JA0976) of *Md. Shall Issue, Inc. v. Montgomery Cnty.*, 680 F. Supp. 3d 567, 582–83 (D. Md. 2023), which adopted the Eleventh Circuit's since-vacated decision in *NRA v. Bondi*, 61 F.4th 1317 (11th Cir. 2023), *op. vacated, reh'g en banc granted*, 72 F.4th 1346 (11th Cir. 2023).

Although *Bruen* and *Rahimi* noted an academic debate over whether the meaning of the Second Amendment turns on Founding Era or Reconstruction Era understandings, 597 U.S. at 37; 144 S. Ct. at 1898 n.1, Supreme Court precedent makes clear that the meaning and scope of the Second Amendment—whether applied against the federal government or states—is the public understanding of the right during the Founding Era surrounding 1791. Practices that arose around Reconstruction cannot establish historical tradition.

First, the Fourteenth Amendment "incorporate[d] the Second Amendment right recognized in *Heller*." *McDonald*, 561 U.S. at 791. *Heller* held that the Second Amendment "codified a *pre-existing* right," 554 U.S. at 592, and the scope of the individual right it recognized was grounded in Founding Era evidence and understandings, *see Bruen*, 597 U.S. at 37 (discussing *Heller*). The Fourteenth Amendment's ratifiers thus "adopted" the right to keep and bear arms as it was "understood" at the Founding—not at Reconstruction. *Id.* at 37, 45; Mark W. Smith, *Attention Originalists: The Second Amendment was Adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD.

Second, the Supreme Court has "made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597

U.S. at 37. "Thus, if a Bill of Rights protection is incorporated, there is **no daylight** between the federal and state conduct it prohibits or requires." *Timbs v. Indiana*, 586 U.S. 146, 150 (2019) (emphasis added). And *McDonald* already rejected the dangerous notion that "only a watered-down" version of the Second Amendment applies against the states. 561 U.S. at 786.

Third, the district court's rejection of Founding Era understandings in favor of Reconstruction Era restrictions would work a radical shift in constitutional jurisprudence. The Supreme Court has made clear that the Founding Era is the key period for determining the meaning of Bill of Rights guarantees. *See, e.g.*, *Gamble v. United States*, 587 U.S. 678, 683, 709 (2019) (relying primarily on Founding Era history to ascertain Double Jeopardy Clause "as originally understood" in a case against the federal government and noting that its interpretation would apply the same way against a state). That is equally true in cases challenging state laws. The Court recently rejected reliance on a practice followed by more than 30 states because it "arose in the second half of the 19th century," and therefore "cannot by itself establish an early American tradition . . . that should inform our understanding of the Free Exercise Clause." *Espinoza v. Mont. Dep't of Rev.*, 591 U.S. 464, 482 (2020). The Court reviewed 19th-century sources only to "confirm th[e] understanding" of the Sixth Amendment's unanimity requirement, which "applies

23

to state and federal criminal trials equally." *Ramos v. Louisiana*, 590 U.S. 83, 91–93 (2020). And the Court focused on the Founding for the Sixth Amendment right to confrontation, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004), the Fourth Amendment, *Virginia v. Moore*, 553 U.S. 164, 168 (2008), and free speech, *Nev. Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117, 122–25 (2011).

Fourth, the Supreme Court's Second Amendment cases demonstrate that proximity to the Founding is the controlling factor when weighing historical evidence. *Bruen*, 597 U.S. at 35, 45–46; *Heller*, 554 U.S. at 593. Both *Bruen* and *Heller* considered Colonial and early Republic sources, *Bruen*, 597 U.S. at 46–50; *Heller*, 554 U.S. at 581–86, 600–03, but *Bruen* made clear that the relevance of such evidence depends on its proximity to 1791, 597 U.S. at 49 (discounting a colonial statute from "roughly a century before the founding"). As for post-ratification, antebellum evidence, *Bruen* warned "against giving postenactment history more weight than it can rightly bear," *id.* at 35, forbade reliance on post-ratification understandings "that are *inconsistent* with the original meaning," *id.* at 36 (citation omitted), and dismissed an 1860 statute as "insubstantial" because it was enacted "nearly 70 years after the ratification of the Bill of Rights," *id.* at 55 n.22. *Heller* considered post-ratification evidence as "mere confirmation." *Gamble*, 587 U.S. at 702 (discussing *Heller*). As for Reconstruction Era evidence, *Bruen* explained that

24

this evidence is "secondary," reviewed for "mere confirmation," and "do[es] not provide as much insight into [the Second Amendment's] original meaning as earlier sources." *Bruen*, 597 U.S. at 36–37. And *Bruen* swiftly rejected late-19th-century and 20th-century sources where they contradicted earlier evidence. *Id.* at 66 & n.28. And most recently in *Rahimi*, the Supreme Court's analysis turned on the fact that both the surety and affray traditions were well-established "[b]y the 1700s and early 1800s." 144 S. Ct. at 1899.

"[W]hen it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 597 U.S. at 34. Consistently with the Supreme Court's constitutional jurisprudence, this Court should hold that the public understanding of the right to keep and bear arms in 1791 is the correct temporal reference point for all Second Amendment claims. Evidence from Reconstruction or later is "simply too late" to establish a historical tradition. *See id.* at 82 (Barrett, J., concurring). And other post-ratification (*i.e.*, post-1791) evidence can be considered only to the extent it is a permissible tool to confirm or clarify original public meaning in 1791. *See, e.g.*, *Gamble*, 587 U.S. at 702; *Rahimi*, 144 S. Ct. at 1915–16 (Kavanaugh, J., concurring); *id.* at 1924–25 (Barrett, J., concurring). Fourth Circuit precedent is not to the contrary. In *Bianchi*, the en banc Court found a historical tradition justifying Maryland's assault-weapons ban on the basis of "18th and 19th century" laws

25

restricting ownership of certain weapons—thus, the 19th-century laws were confirmatory of Founding Era understandings. *Bianchi*, 111 F.4th at 468.

A faithful application of Supreme Court precedent compels the conclusion that historical tradition must be based on Founding Era understandings. In keeping with this logic, two courts of appeals (one in a vacated but still persuasive opinion) have held that the Founding era is the critical period for understanding the scope of the Second Amendment. *See Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir. 2024) ("*Bruen* strongly suggests that we should prioritize Founding-era history."); *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 134 (3d Cir. 2024) ("[T]he Second Amendment should be understood according to its public meaning in 1791."), *cert. granted, judgment vacated in light of* Rahimi, 2024 WL 4486348 (Oct. 15, 2024) (Mem.).

The district court erred by relying on far-too-late historical evidence. And as discussed in detail below, even accepting that those later laws are relevant, the district court erred in relying on a handful of outliers' restrictive (and nevertheless incomparable) practices that arose in the mid-to-late-19th century when analyzing museums (five laws from 1870 to 1903), healthcare facilities (the same five laws), parks (five laws from 1858 to 1886), and entertainment venues (nine laws from 1869 to 1903). JA0979-0980, JA0982-0984, JA0996-97. These relatively few, late-in-

26

time restrictions cannot justify the Carry Bans, each regulating locations well known to the Founders.

## B.    The district court's sensitive places analysis was wrong

Like its erroneous consideration of belated historical evidence, the district court's ahistorical analysis and overexpansion of the "sensitive places" doctrine cannot be reconciled with the controlling methodology from *Bruen* and *Rahimi*. It latched onto analogies to schools, without regard to history and ignoring *Bruen*'s and *Rahimi*'s admonition that the "central" consideration is whether the modern and historic law have a similar "why" and "how." 597 U.S. at 29; 144 S. Ct. at 1898. And it excused bans in places merely because they were "crowded" and contained "vulnerable populations," though *Bruen* explicitly rejected the idea that Manhattan could be a sensitive place "simply because it is crowded and protected generally by the New York City Police Department." 597 U.S. at 31. Proper application of the Second Amendment to Maryland's Carry Bans must begin with a proper understanding of how "sensitive places" fit within the historical-tradition test.

1.    The Supreme Court has not comprehensively defined the "sensitive places" doctrine. *Bruen* merely "assume[d]" that firearms could be prohibited at a "relatively few," "exceptional" locations. *Id.* at 30, 38. The Court listed only three places that "the historical record" supported deeming "sensitive": "legislative

assemblies, polling places, and courthouses." *Id.* at 30. And *Bruen* authorized lower courts to analogize only to "those historical regulations"; schools and government buildings were not included. *Id. Bruen* also prohibited states from "defin[ing] the category of 'sensitive places' far too broadly"—such as "crowded" places—lest states "eviscerate the general right to publicly carry arms." *Id.* at 31. Sensitive places where arms can constitutionally be prohibited are "few" and "exceptional." *Id.* at 30, 38.

If any modern law is to be "relevantly similar" to bans on firearms at legislative assemblies, polling places, and courthouses, then it must share the characteristics that tether those places together as "sensitive." *Id.* at 29–30. And here, as in *Rahimi*, the Second Amendment history "confirm[s] what common sense suggests." 144 S. Ct. at 1901. Given that the Supreme Court has made clear "that the Second Amendment protected an individual right to armed self-defense," *Bruen*, 597 U.S. at 21, to restrict that right in public the government itself must take on the burden of securing a location such that individual armed self-defense is not necessary. Indeed, the distinguishing features of the "sensitive" places identified in *Bruen* was that they were enclosed, securable locations protected by government-provided security that made armed self-defense less necessary.

This principle "underpin[ning] our regulatory tradition," *Rahimi*, 144 S. Ct. at 1898, finds expression as far back as the Statute of Northampton, 2 Edw. 3, 258, ch. 3 (1328), which was codified, at the Founding, in Virginia law, *see* 1786 VA. ACTS 35, ch. 49. And these statutes were instances of the broader, generally applicable affray tradition—indeed, *Bruen* noted that the 1786 Virginia statute "all but codified the existing common law in this regard." 597 U.S. at 49 n.14. The 1786 Virginia statute forbade carriage of arms under two circumstances: (1) when the person carrying in public locations did so in a threatening way, *i.e.*, "in terror of the county," and (2) before courts, but with an exception for judges and officials assisting them. 1786 VA. ACTS 35, ch. 49. Thus, except in places where the government took on the burden of security, individuals were only barred from carrying if they did so in a terrifying manner.

The locations identified in *Bruen* are consistent with these principles, as substantial evidence shows that they were generally secured at the Founding. Begin with legislative assemblies. Rhode Island, Delaware, Pennsylvania, South Carolina, New York, Georgia, New Jersey, Virginia, and Vermont all enacted statutes compensating law enforcement to attend and secure their legislatures. *See* THE PUBLIC LAWS OF RHODE ISLAND 220, 222 (Providence, Carter & Wilkinson 1798) (providing "fees" for sheriffs, town sergeants, and constables to attend the general

29

assembly); 2 LAWS OF DELAWARE 1110, 1118 (Samuel and John Adams eds. 1797) (providing payment for "[d]oor-keepers of the respective Houses"); 10 PENNSYLVANIA STATUTES AT LARGE FROM 1682 TO 1801 378 (William Stanley Ray ed. 1904) (referencing 1781 provision of payment for sergeant-at-arms and door-keeper); The PUBLIC LAWS OF SOUTH CAROLINA 426–27 (Philadelphia, R. Aitken & Son 1790) (providing payment for door-keepers); 1 LAWS OF NEW YORK 534 (Webster & Skinner 2d ed. 1807) (similar); A COMPILATION OF THE LAWS OF GEORGIA 373 (Augustine Smith Clayton ed. Augusta, Adams & Duyckinck 1812) (similar); JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW JERSEY 239, 240 (1835) (similar); *Saturday, December 20, 1783*, JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA; BEGUN AND HELD IN THE TOWN OF RICHMOND, IN THE COUNTRY OF HENRICO, ON MONDAY, THE SEVENTH DAY OF MAY, IN THE YEAR OF OUR LORD ONE THOUSAND SEVEN HUNDRED AND EIGHTY-ONE 77 (Thomas W. Whyte 1828) (similar); 2 LAWS OF VERMONT 382, 387 (Randolph, Sereno Wright 1808) (similar).

Polling places were similarly secured by government security at the Founding in places like Georgia, Virginia, Maryland, New Jersey, Delaware, and South Carolina. A DIGEST OF THE LAWS OF GEORGIA 611 (Robert & George Watkins eds. 1800) ("[T]he sheriff of each county or his deputy, is required to attend at such

elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 325 (Augustine Davis ed. 1796) (similar); MD. CONST. art. 1, §§ 3, 14 (1776) (similar); LAWS OF NEW JERSEY 36 (Joseph Bloomfield ed., Trenton, James J. Wilson 1811) (providing security at polling places); 2 LAWS OF DELAWARE, *supra*, at 984 (similar); THE PUBLIC LAWS OF SOUTH CAROLINA, *supra*, at 386–88 (table of fees includes payment to sheriffs for polling-place-related duties).

And the same occurred with courthouses: South Carolina, Virginia, Delaware, New Jersey, New York, and Pennsylvania by statute required law enforcement officials to attend the courts. THE PUBLIC LAWS OF SOUTH CAROLINA, *supra*, at 271 ("The Said sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within their respective districts"); A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 69–71 (1803) (similar); 2 LAWS OF DELAWARE, *supra*, at 1088, 1091 (similar); LAWS OF NEW JERSEY, *supra*, at 49, 50, 58 (similar); 1 LAWS OF NEW YORK, *supra*, at 176 (requiring during court sessions "all justices of the peace, coroners, bailiffs, and constables within their respective counties, that they be then and there in their own persons. . . . And the said respective sheriffs and their officers shall then and there attend in their own proper persons."); 10 STATUTES AT LARGE

31

OF PENNSYLVANIA, *supra*, at 57 (similar). And beyond these statutory requirements, the legislative record in other states indicates that law enforcement officials were compensated for attending judicial proceedings. *See* ACTS AND LAWS OF THE STATE OF CONNECTICUT 63–65 (New London, Timothy Green 1784); A DIGEST OF THE LAWS OF GEORGIA, *supra*, at 471, 473–74, 478; THE LAWS OF MARYLAND, ch. 25 (1799); ACTS AND RESOLVES OF MASSACHUSETTS 235 (Boston, Adams & Nourse 1893); LAWS OF NEW HAMPSHIRE 112–16 (1797); A MANUAL OF THE LAWS OF NORTH CAROLINA 190–91, 196 (John Haywood ed., 1814); THE PUBLIC LAWS OF RHODE ISLAND, *supra*, at 220; 2 LAWS OF VERMONT, *supra*, at 382, 387.

Outside of legislative assemblies, polling places, and courthouses, law-abiding citizens were expected (or even required) to bear arms to maintain public safety, especially at places like public meetings and religious services where citizens were often required by law to bear arms, not just despite the facts that those places would be crowded and likely contain "vulnerable populations," but *because* of those facts. *Heller*, 554 U.S. at 601 (observing that "[m]any colonial statutes required individual arms bearing for public-safety reasons"); *id.* (citing 1770 Georgia law requiring men to carry firearms "to places of public worship"); *Koons v. Platkin*, 673

F. Supp. 3d 515, 638 (D.N.J. 2023), *appeals docketed*, No. 23-1900 (3d Cir.).[4] And

even when the Founders restricted firearms, they did so by preventing **misuse**

through discharge restrictions and enhanced penalties for using firearms in crimes.[5]

---

[4] *See* NATHANIEL B. SCHURTLEFF, RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 190 (William White Press 1853) (1636 Massachusetts law requiring that "all such persons . . . shall come to the publike assemblyes with their muskets, or other peeces fit for service"); PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 95 (Hartford, Brown & Parsons 1850) (similar); 1 RECORDS OF THE COLONY OF RHODE ISLAND 94 (John Russell Bartlett ed. 1856) (similar); 3 WILLIAM HAND BROWNE, ARCHIVES OF MARYLAND: PROCEEDINGS OF THE COUNCIL OF MARYLAND 1636–1667 103 (Baltimore, Md. Hist. Soc'y 1885) (requiring men to carry arms to church); 10 COLONIAL RECORDS OF THE STATE OF GEORGIA 137–139 (A. Candler ed. 1911 (pt. 1)) (similar); 1 THE STATUTES AT LARGE OF VIRGINIA 174, 263, 534 (William Waller Hening ed., 1808) (similar); THE PUBLIC LAWS OF THE STATE OF SOUTH-CAROLINA, FROM ITS FIRST ESTABLISHMENT AS A BRITISH PROVINCE DOWN TO THE YEAR 1790, INCLUSIVE, IN WHICH IS COMPREHENDED SUCH OF THE STATUTES OF GREAT BRITAIN AS WERE MADE OF FORCE BY THE ACT OF ASSEMBLY OF 1712, WITH AN APPENDIX CONTAINING SUCH OTHER STATUTES AS HAVE BEEN ENACTED OR TO BE OF FORCE IN THIS STATE, EITHER VIRTUALLY OR EXPRESSLY 185–86 (ed. John Faucheraud Grimke, 1790) (similar); *see also* Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 697–99 (2014) (reviewing Colonial- and Founding Era precedent for requiring firearms at church services).

[5] THE PUBLIC LAWS OF RHODE ISLAND, *supra*, at 568 (statute first enacted in 1731 prohibiting shooting at night in certain public areas); 1784–1785 N.Y. LAWS 152, ch. 81 (1785 statute restricting shooting near buildings around New Years Day); ACTS AND LAWS OF THE STATE OF CONNECTICUT, *supra*, at 18 (1783 statute providing enhanced punishment for being armed with a dangerous weapon in a manner that clearly indicated violent intent); Act of March 2, 1799, ch. 43, § 15, 1 Stat. 736 (federal statute originating in the early 1790s providing enhanced punishment for wounding or putting mail carrier's life in danger by using dangerous weapons while robbing the mail carrier, as discussed in *United States v. Spears*, 449 F.2d 946, 951 (D.C. Cir. 1971)).

33

The "traditions of the American people . . . that demand[] our unqualified deference," *Bruen*, 597 U.S. at 26, are that citizens were historically protected at "sensitive places" by comprehensive government-provided security, while at all other places they were protected by themselves, their fellow law-abiding citizens, and laws against firearm misuse. The government therefore cannot merely declare a place sensitive—it must make it so. Maryland has not done so here.

**2.** The district court believed that Maryland may ban firearms anywhere that "vulnerable" people (*e.g.*, children) gather because of *Heller*'s dicta that "schools" are sensitive places, JA0974-0975, JA0978, which *Heller* itself acknowledged was only a presumption untested against historical history, 554 U.S. at 635. *Bruen* did not authorize reasoning by analogy to schools. 597 U.S. at 30. And there is no historical tradition of categorically labeling schools as sensitive places where everyone is prohibited from exercising their right to armed self-defense.

Modern "gun free" restrictions did not appear until the 1990s. Amy Hetzner, Comment, *Where Angels Tread: Gun-Free School Zone Laws and an Individual Right to Bear Arms*, 95 Marq. L. Rev. 359, 360 (2011). Although the Founding Era shows **some** regulation of firearms at universities, those regulations are dispositively different from Maryland's Carry Bans in burden and justification. The burden is noncomparable because Founding Era restrictions at universities applied only to

students—not faculty, staff, or visitors. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 249–52 (2018); Amicus Br. of the Ctr. for Human Liberty at 20–22, *Antonyuk v. Nigrelli*, No. 22-2908 (2d Cir. Feb. 9, 2023), Doc. No. 313 (summarizing seven Founding Era restrictions at universities that applied only to students). Their justifications were also different: Unlike other places outside the home, schools exercise "*in loco parentis*" authority over children and stand in the place of a parent. *Morse v. Frederick*, 551 U.S. 393, 413 n.3 (2007) (Thomas, J., concurring); *id.* at 416 ("[T]he doctrine of *in loco parentis* limited the ability of schools to set rules and control their classrooms in almost no way."). The duty fell on schools to protect children on their premises during the day, and *in loco parentis* authority confers "leeway" in determining how best to fulfill that duty. *Mahoney Area Sch. Dist. v. B.L.*, 594 U.S. 180, 189–90 (2021). Restriction of firearms is a result of that duty and authority. *Worth*, 108 F.4th at 695. But Maryland has never claimed that any of its non-school locations exercises *in loco parentis* authority over anyone, and today, colleges and universities are no longer understood to have that authority. *See Mahoney*, 594 U.S. at 189 ("a school, in relation to off-campus speech, will rarely stand *in loco parentis*"). So none of Maryland's bans has a comparable justification (*i.e.*, why) to schools and none can be justified by analogy to schools.

35

There is no historical tradition even to support Maryland's **generally applicable** bans on public and private school grounds, MD. CODE, CRIM. L. § 4-102(b); *id.* § 4-111(a)(2)(ii), because history supports at most barring possession of firearms by students over whom schools have *in loco parentis* authority, *see Rahimi*, 144 S. Ct. at 1901 (explaining that individualized historical restrictions would not support modern laws that "broadly restrict arms use by the public generally"). And even if schools were places to which courts could analogize, the district court still erred by extrapolating from schools that states may ban firearms wherever the vulnerable are present or wherever "educational" purposes are served. That extrapolation ignores **how** firearms were regulated at schools (through laws applicable to students) and **why** they were regulated (*in loco parentis* authority). It also would fly in the face of the broader Founding Era tradition of permitting (indeed, sometimes requiring) the bearing of arms in public places where people gathered, including children and other vulnerable groups.

The vulnerable-people analogy also fails because it "defines the category of 'sensitive places' far too broadly." *Bruen*, 597 U.S. at 31. Children congregate in all manner of places—including sidewalks, where *Bruen* nevertheless recognized the right to carry. *See Wolford v. Lopez*, 116 F.4th 959, 1000 (9th Cir. 2024) (finding "unlikely" a historical tradition of banning "firearms at all places that contain a

vulnerable population"). And the Founders protected vulnerable populations in places lacking comprehensive government-provided security through our Nation's robust tradition of permitting or requiring firearm carry. Kopel & Greenlee, *supra*, at 232–34 & n.108, 244; Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. FIREARMS & PUB. POL'Y 1 (2004); Boyd, *supra*, at 653, 697–99. British soldiers opened fire on a crowd of colonists in 1770—now remembered as the Boston Massacre. In defending the soldiers at trial, John Adams proclaimed that, in this country, "every private person is authorized to arm himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence." John Adams, Argument for the Defense: 3-4 December 1770, Nat'l Archives Founders Online, https://bit.ly/35FCuRh. And these rules applied full force in places where "vulnerable" populations like children would be part of the gathering—indeed, several colonies *required* individuals to be armed in locations like churches. *Supra* at 33 & n.4. Vulnerability thus cannot provide a justification for forbidding arms in places where children might be found.

3.     The district court offered "crowds" as additional support for some bans. JA0974, JA0984-0985. But *Bruen* takes that justification off the table: a state cannot ban firearms in a location "simply because it is crowded." 597 U.S. at 31.

37

**C.    Maryland failed to demonstrate a justifying historical tradition for any of the Carry Bans that the district court upheld**

Maryland failed to demonstrate a justifying historical tradition of firearm regulation for any of the Carry Bans upheld by the district court.

**1.    Museums**

The district court upheld Maryland's museum ban, MD. CODE, CRIM. LAW § 4-111(a)(8)(iii), based on an inapt analogy to schools and a motley handful (five) of outlier, territorial, or otherwise irrelevant laws purporting to ban firearms at places serving "educational, literary, or scientific purposes." JA0978. Those rationales are plainly insufficient to uphold the museum ban. Plaintiffs have already shown that the museum ban cannot be justified by analogy to schools. *Supra* at 27–37. And Maryland does not purport, today, to provide comprehensive security at museums.

The State's "less than a handful" of far-too-late laws proving far too little also does not evidence a justifying historical tradition. *Erlinger v. United States*, 602 U.S. 821, 845 (2024).[6] The district court cited only two Reconstruction Era state laws: one from an "outlier" (Texas 1870) and another from Missouri (1874). It also cited two much-later territorial laws (Arizona 1889, Oklahoma 1890) and an even-later

---

[6] 1870 TEX. GEN. LAWS 63, ch. 46, § 1; 1874 MO. LAWS 43, § 1; 1889 ARIZ. TERR. SESS. LAWS 17, § 3; 1890 OKLA. TERR. SESS. LAWS 496, art. 47, § 7; 1903 MONT. GEN. LAWS 49, ch. 35, § 3. *See* JA0401-0418.

20th-century Montana law (1903). JA0979. These few and "belated innovations of the mid- to late-19th-century" and early-20th century come far "too late" to establish historical tradition, especially because they contradict the absence of any such restriction from the Founding Era. *Bruen*, 597 U.S. at 36–37 (citation omitted). And they suffer other "serious flaws even beyond their temporal distance from the founding." *Id.* at 66. Texas in the late-19th-century was an "outlier" for its limited view of the right to public carry. *Id.* at 64–65. Missouri's 1874 law does not impose any comparable burden because, unlike Maryland, Missouri permitted open carry throughout the state. *Id.* at 68 n.30. *Bruen* rejected reliance on Arizona's and Oklahoma's territorial laws because they "were irrelevant to more than 99% of the American population," "were rarely subject to judicial scrutiny" such that "we do not know the basis of their perceived legality," and ultimately are "most unlikely to reflect 'the origins and continuing significance of the Second Amendment.'" *Id.* at 67–68. Montana's 20th-century law is too late to be considered, regardless of whether the focus is on 1791 or 1868. *Id.* at 66 n.28. Under a standard application of *Bruen*, the district court was wrong to declare an enduring American tradition of banning firearms "in places of gathering for education, literary, or scientific purposes." JA0979.

The museum ban's unconstitutionality is even more apparent when considering Founding Era evidence—which the district court ignored. The State has never contested that museums date back to Colonial America. The Charleston Museum dates to 1773. *About Us*, CHARLESTON MUSEUM. Philadelphia opened the Nation's "first public museum" by 1782. Candis McLean, *Insiders' guide to 22 essential Philadelphia museums*, PHILA. INQUIRER (May 12, 2023). The Peabody Essex in Salem, Massachusetts, traces its founding to 1799. *A Museum of Art and Culture*, PEABODY ESSEX MUSEUM. New York's first museum opened in 1804. *New-York Historical Society: Uncovering America's History*, N.Y. HIST. SOC'Y MUSEUM & LIBR. And the Peale Center in Baltimore opened its doors in 1814. *Our History*, THE PEALE. Yet the State has presented no evidence whatsoever that firearms were ever banned at such locations at the Founding—which is unsurprising given the fact that, as discussed above, the Founders viewed government-provided security as a prerequisite for banning firearms. The utter "lack of" any evidence of firearm restrictions at museums provides compelling evidence that Maryland's museum ban is unconstitutional. *Bruen*, 597 U.S. at 26. The State's belated, unreliable, and contradictory evidence of a few bans at "educational, literary, or scientific" gatherings cannot sustain Maryland's museum ban.

## 2.   Healthcare Facilities

Maryland's ban at healthcare facilities, MD. CODE, CRIM. LAW § 4-111(a)(2)(iii), deserves the same fate. After faulting Plaintiffs for not proving that hospitals existed in their "modern form" at the Founding (whatever that might mean), the district court upheld the healthcare-facilities ban based on (1) the same inappropriate vulnerable-people analogy to schools and (2) the same assortment of late-19th- and early-20th-century laws banning firearms at "places for educational, literary, or scientific purposes." JA0980.[7] Again, the district court's failed analogy to schools cannot justify the ban, and the historical evidence it cited is too late and too unreliable to say anything about our historical tradition.

Hospitals and medical facilities existed at the Founding, serving the same populations and purposes. *Koons*, 673 F. Supp. 3d at 651. Bellevue Hospital in New York "is America's oldest operating hospital," and it opened in New York City in 1736. *Bellevue History*, NYC Health + Hospitals. Founded by Benjamin Franklin himself, Pennsylvania Hospital—still standing today—was founded in 1751. Barbra Mann Wall, *History of Hospitals*, Univ. of Pa. School of Nursing. Weill Cornell Medical Center opened as New York Hospital in 1791. *Koons*, 673 F. Supp. 3d at 651. And "Massachusetts opened the Boston Medical Dispensary in 1796—today

---

[7] *See supra* at 38 n.6.

41

Tufts Medical Center—and then the Massachusetts General Hospital in 1811." *Id.* The State presented no evidence that firearms were banned at any of them, *see also Wolford*, 116 F.4th at 999 (observing that California failed to show "any evidence of a historical ban on firearms in medical facilities of any type"), and such a ban would have been inconsistent with the principles underpinning the sensitive places doctrine, *see Rahimi*, 144 S. Ct. at 1898.

### 3.    Mass Transit

There is no historical basis to sustain Maryland's ban on carrying firearms in any mass transit facility or vehicle. MD. CODE, TRANSP. § 7-705(b)(6). After again faulting Plaintiffs for not proving that public transportation was ubiquitous at the Founding, the district court upheld the ban because mass transit facilities: (1) are "crowded" spaces that, "[l]ike schools," host "vulnerable populations"; and (2) are analogous to "government buildings, which are established sensitive places." JA0984-0986. That is not the "historical analysis" that *Bruen* demands, 597 U.S. at 31, and it cannot sustain the mass-transit ban.

This reasoning fails for reasons already explained. *Bruen* expressly held that "there is no historical basis" to declare a place sensitive "simply because it is crowded." 597 U.S. at 31. Schools are not permissible analogical comparators, and mass-transit does not exercise *in loco parentis* authority over anybody. *Supra* at 34–

37. And in the absence of adequate government security, there is no basis for holding that all "government buildings . . . are established sensitive places." JA0985. If that were the case, *Bruen*'s specific discussion of "legislative assemblies, polling places, and courthouses" would have been superfluous. 597 U.S. at 30.

Like hospitals and museums, mass transportation in the form of stagecoaches, riverboats, and ferries existed at the Founding. RON VINEYARD, *STAGE WAGGONS AND COACHES*, COLONIAL WILLIAMSBURG FOUND. (2000); GEORGE A. THRUPP, THE HISTORY OF COACHES 124 (London, Kerby & Endean 1887) (hackney coaches built in America by 1790); Oliver W. Holmes, *The Stage-Coach Business in the Hudson Valley*, 12 Q.J. OF N.Y. STATE HIST. ASS'N 231, 231–33 (1931) ("Staging had developed somewhat in the colonies before the Revolution, especially around Boston and Philadelphia."); Jay Young, *Infrastructure: Mass Transit in the 19th- and 20th-Century Urban America* (Mar. 2, 2015). Arms were carried while using mass transportation, too. *See, e.g.*, 9 STATUTES AT LARGE OF SOUTH CAROLINA 61 (David J. McCord ed., 1841) (establishing a "public ferry" as early as 1725 and mandating "free" "ferriage" for "all persons under arms in times of alarms and expresses"); JOHNSON, ET AL., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATIONS, RIGHTS, AND POLICY 2195 (3d ed. 2021) ("Stagecoach guards and travelers carried blunderbusses, or other short guns, such as traveling or coaching

43

carbines, or (most often) a pair of ordinary pistols."). And many laws over the course of American history even **required** travelers to bear arms,[8] while others **exempted** travelers from otherwise applicable firearm regulations.[9]

The district court incorrectly cast aside Plaintiffs' evidence because "State-operated transit" did not exist in modern form until later. But even if transportation lines were privately operated, it remains "relevant evidence" that the State cannot show a single Founding Era (or Reconstruction Era) law banning firearms in transit facilities or vehicles. *Bruen*, 597 U.S. at 26. And the ban's "categorical" nature—

---

[8] 1 RECORDS OF MASS. BAY (1628–1641) 85 (Nathaniel B. Shurtleff ed., 1853) (1631 Massachusetts law requiring traveler to Plymouth Colony to go with "some armes"); *id.* at 190 (1636 Massachusetts law requiring all persons who "travell above one mile from his dweling house" to go with "some armes"); 1 THE STATUTES AT LARGE OF VIRGINIA, *supra*, at 127 (1623 Virginia law providing "[t]hat no man go or send abroad without a sufficient partie will armed"); *id.* at 173 (1632 statute providing men to "goe or send abroade without a sufficient party well armed"); 3 BROWNE, *supra*, at 103 (1642 Maryland law forbidding going "any considerable distance from home without fixed gunn and 1 Charge at least of powder and Shott").

[9] New Jersey in a 1686 going-armed law exempted "all strangers, travelling upon their lawful occasions through this Province, behaving themselves peaceably." Aaron Leaming, *et al.*, THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY 290 (1881). An 1821 Tennessee law exempted "any person that may be on a journey to any place of his county **or state**." 1821 TENN. PUB. ACTS 15–16, ch. 13 (emphasis added). An 1813 Kentucky statute exempted those "travelling on a journey" from a concealed carry regulation. 1813 KY. ACTS 100, ch. 89, § 1. An 1819 Indiana statute similarly exempted "travelers." 1819 IND. ACTS 39, ch. 23, § 1. And as recently as 1871, a Texas law exempted "persons traveling" to and from Texas jurisdictions from the scope of a carry restriction. 1871 TEX. GEN. LAWS 25.

making no exception for the transport of unloaded or secured firearms—deprives individuals of armed self-defense on either side of their journeys and makes the mass-transit ban all the more unconstitutional. *Wolford*, 116 F.4th at 1000.

### 4.    State Parks and Forests

The State's regulations banning firearms in State parks, (COMAR 08.07.06.04), State forests (COMAR 08.07.01.04), and Chesapeake Forest Lands (COMAR 08.01.07.14) fare no better under a faithful application of the text-and-history standard.[10] These regulations deprive Marylanders of their Second Amendment self-defense rights on hundreds of thousands of acres of public land throughout the state,[11] even though the State permits hunting with firearms in many areas of these parks and forests.[12]  The district court upheld these bans based solely on a patchwork of localized restrictions from 1858 to 1936 that are too late—and

---

[10] The *Kipke* Plaintiffs also challenged the State's rest-area restriction. They do not press this challenge on appeal because the State admitted that this regulation does not forbid "carrying a concealed handgun." JA0977.

[11] The State Park System covers 142,384 acres as of 2023. *See* Maryland At A Glance, Parks & Recreation, State Parks, MD. MANUAL ONLINE. Maryland has over 214,000 acres of State Forest. Maryland's State Forests, MD. DEP'T OF NAT. RES. Chesapeake Forest Lands are an additional 75,376 acres. Chesapeake Forests, MD. DEP'T OF NAT. RES.

[12] COMAR 08.01.07.04, 08.07.01.03, 08.07.06.03 (State may authorize hunting in State parks, State forests, and Chesapeake Forest Lands); *see, e.g.*, MD. PARK SERV., HUNTING IN STATE PARKS (Sept. 2021) (State park areas where hunting permitted).

45

say far too little—to evidence a historical tradition. JA0983-0984. The district court's reliance on the State's belated historical evidence was incorrect. The parks and forests bans must be stricken.

Recreational parks (and, needless to say, forests accessible to the public) are older than America. *Koons*, 673 F. Supp. 3d at 640 (explaining the history of early American parks).[13] Many parks served recreational and social purposes. Boston Common, for example, served social and recreational purposes, Beamish, *supra*, at 3–6 (explaining that "[t]he Common also served as a site for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations"); *see also Steel v. City of Boston*, 128 Mass. 583, 583 (1880) (explaining that Boston Common served "as a place of public resort for the recreation of the people" since "time immemorial"). And it was assuredly not a place where firearms were prohibited: It even was commonly used for militia purposes, including training with firearms. Beamish, *supra*, at 3–6. Just as our Founders were familiar with parks themselves, they knew violence at them,

---

[13] Boston Common (America's oldest park) was established in 1634. Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1, 3 (2021). New York City's City Hall Park began as a "public common" in the 17th century while its Bowling Green Park began in 1733. *The Earliest New York City Parks*, N.Y. CITY DEP'T OF PARKS & REC. Many others, like the National Mall in Washington, D.C., existed before 1800. *See The 150 Largest City Parks* at 5, TRUST FOR PUBLIC LAND.

too. *Id.* at 13 (Colonial Americans "were very familiar with parks, especially London's royal parks, because many of them and their families were originally Londoners and the local newspapers were full of stories of celebrations, **murders**, **robberies**, new fashions, and exploits that occurred in them." (emphasis added)); KENNETH LAWING PENEGAR, THE POLITICAL TRIAL OF BENJAMIN FRANKLIN: A PRELUDE TO THE AMERICAN REVOLUTION 21–25 (2011) (discussing 1773 duel at London's Hyde Park); *see* JA0008 (Doc. 13-8).

Yet, neither the district court nor the State referenced a single law banning firearms at any park or forest area before 1858. *See* JA0983-0984. The district court believed the bans were supported by localized restrictions beginning in the mid-to-late 19th century,[14] but those are "simply too late" to justify Maryland's bans, *Bruen*, 597 U.S. at 82 (Barrett, J., concurring), no matter how many there are, *Espinoza*, 591 U.S. at 482 (holding that more-than-30-state development that "arose in the second half of the 19th century . . . cannot by itself establish an early American tradition"). Nor are those mostly urban, park-by-park restrictions even comparable to Maryland's **statewide** prohibitions that restrict conduct "beyond what was done

---

[14] MINUTES OF PROCEEDINGS OF THE BD. OF COMM'RS OF CENTRAL PARK 166 (1858) (Central Park, New York City); 1868 PA. GEN. LAWS 1088, § 21 (Fairmont Park, Philadelphia); 1873 CHICAGO LAWS 88, ch. 31, § 6; REV. ORD. ST. LOUIS, art. XI, § 3 (1881); BOSTON, THIRTEENTH ANNUAL REPORT OF BD. OF COMM'RS, PARK ORD. 86 (1888); *see* JA0482-0543; *see also* JA0009 (ECF No. 21-1 at 53–54).

at the founding." *Rahimi*, 144 S. Ct. at 1898. The evidence, rather, strongly suggests that these laws were a conscious **break** from our historical tradition, as urban planners like Frederick Law Olmsted (who designed Central Park) sought to create what amounted to European locations for aristocratic leisure, as evidenced by other unconstitutional rules preventing "convers[ing] with" construction workers, MINUTES OF PROCEEDINGS OF THE BD. OF COMM'RS OF CENTRAL PARK, *supra*, at 166, or "indecent language," RULES & REGULATIONS OF PROSPECT PARK, Brooklyn 24 (1868). *See also* Dorceta E. Taylor, *Central Park as a Model for Social Control: Urban Parks, Social Class and Leisure Behavior in Nineteenth-Century America*, 31 J. OF LEISURE RESEARCH 420, 442 (1999) ("Olmsted also wanted the parks to be taken seriously both as works of art and as public spaces where people followed prescribed behavior.").

Finally, although the federal government regulated firearms in National Parks between 1897 and 1936, those regulations "were specifically enacted to protect animals in the National Parks—not parkgoers," *Koons*, 673 F. Supp. 3d at 642, and were more akin to licensing schemes by permitting carry upon "written permission," JA0859, JA0937. Permission was granted where it was clear the purpose was for self-defense and not a ruse to sneak guns into the parks for hunting. *See Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1905.*

*Report of the Secretary of the Interior and Bureau Officers, etc.*, 697–98 (Gov't Printing Office, 1905) (discussing giving permits to "men when they were accompanied by women"). And today, federal law permits the carrying of firearms in National Parks if possession complies with applicable state law. 54 U.S.C. § 104906(b). Maryland's statewide parks and forests bans are incompatible with our Nation's historical tradition and must stricken. *Bruen*, 597 U.S. at 29.

### 5. Entertainment Facilities: Stadiums, Amusement Parks, Racetracks, and Casinos

Maryland's GSA bans firearms at stadiums, MD. CODE, CRIM. LAW § 4-111(a)(8)(ii), amusement parks, *id.* § 4-111(a)(8)(iv), racetracks, *id.* § 4-111(a)(8)(v), and casinos, *see id.* § 4-111(a)(8)(vi) ("video lottery facility"). Pre-existing regulations also ban firearms in the Camden Yards Sports Complex, COMAR 14.25.01.01(B)(14), 14.25.02.06, and in casinos, COMAR 36.03.10.48. Each is ahistorical and unconstitutional.

The district court upheld Maryland's entertainment-venue bans with another handful (nine) of inapposite laws between 1869 and 1903 from a patchwork of unreliable jurisdictions that banned firearms at places like fairs, race courses, balls, circuses, and other social functions. JA0996-0997.[15] That will not suffice.

---

[15] 1869 N.M. LAWS 312, ch. 32, § 5; 1870 TENN. ACTS 23, ch. 22, § 2; GA. CODE, pt. IV, tit. I, div. X, § 4528 (1873) (codifying 1870 act); 1870 TEX. GEN. LAWS 63,

Even if evidence from Reconstruction or later could establish historical tradition—it cannot—the State's meager evidentiary showing still could not justify Maryland's bans. The State cited—and the district court relied upon—five laws from around Reconstruction: Tennessee (1869), New Mexico (1869), Georgia (1870), Texas (1870), Missouri (1874). The court also relied on two much later territorial laws from Arizona (1889) and Oklahoma (1890). And it even relied on 20th-century laws from Idaho (1901) and Montana (1903). These include an "outlier" (Texas), several territories whose laws as such deserve little weight (New Mexico, Arizona, Oklahoma), two 20th-century laws that should be ignored outright (Idaho, Montana), and a Georgia law that says nothing about entertainment venues, GA. CODE, pt. IV, tit. I, div. X, § 4528 (1873). That leaves only two laws—Tennessee and Missouri—which are too few to justify anything. *Bruen*, 597 U.S. at 46 (doubting "that *three* colonial regulations could suffice").

The district court also ignored that entertainment locations like these are not modern inventions. Theaters began opening in the early 1700s. P. Holland & M. Patterson, *Eighteenth Century Theatre*, *in* THE OXFORD ILLUSTRATED HISTORY OF

---

ch. 46, § 1; 1874 MO. LAWS 43, § 1; 1889 ARIZ. TERR. SESS. LAWS 17, § 3; 1890 OKLA. TERR. SESS. LAWS 496, art. 47, § 7; IDAHO PENAL CODE 84, ch. 218, § 4781 (1901) (codifying 1889 act); 1903 MONT. GEN. LAWS 49, ch. 35, § 3. *See* JA0396-0418.

THEATRE 295 (2001). Gaming houses and betting on horses at racetracks were well known to the American colonists. *See* G. Robert Blakey, *Gaming, Lotteries, and Wagering: The Pre-Revolutionary Roots of the Law of Gambling*, 16 RUTGERS L.J. 211, 232–65 (1985) (detailing regulation of gambling in Colonial America); *see also* Ed Crews, *Gambling: Apple-Pie American and Older than the Mayflower*, COLONIAL WILLIAMSBURG (Autumn 2008). The absence of any Founding Era restriction on carrying firearms at these locations, coupled with the State's insufficient 19th- and 20th-century evidence, supports just one conclusion: entertainment venues are not among the "exceptional," "few" places where firearms can be prohibited. *Bruen*, 597 U.S. at 30, 38.

### 6.    School Grounds

Maryland criminalizes "carry[ing] or possess[ing] a firearm . . . on public school property." MD. CODE, CRIM. LAW § 4-102(b). It extended that prohibition to any "private" schools, including their school "grounds," in the GSA. *Id.* § 4-111(a)(2)(ii); *see id.* § 4-111(b)(11) (providing exception to private-school ban for a handgun lawfully carried or transported in a vehicle). The *Kipke* Plaintiffs do not challenge Maryland's prohibitions of firearms **inside** school buildings. But banning firearms on the **grounds** of schools—such as when attending an outdoor event or (for public schools) simply picking up a child from school—is unconstitutional.

51

The "sensitive places" doctrine is grounded in "the historical record," *Bruen*, 597 U.S. at 30, and locational restrictions can only be justified by a "historical tradition of firearm regulation," *id.* at 17. Moreover, whatever the policy prudence of forbidding firearms **inside** schools, neither schools nor school grounds are sensitive places as a matter of historical tradition. Restrictions on school properties did not appear until the 1990s. *See* Hetzner, *supra*, at 360. *Heller* (echoed by *McDonald*) presumed schools were sensitive places in dicta, but the Court expressly left open the "historical justification[]" for its statement. 554 U.S. at 626, 635.[16] At most, history supports barring possession of firearms by students over whom the school exercises *in loco parentis* authority. *Supra* at 34–37. The State offered no other evidence, so its school-grounds bans necessarily fail.

Even if school **buildings** are sensitive places, the State still failed to justify banning firearms on school **grounds**. *Heller* only discussed "laws forbidding the carrying of firearms **in** sensitive places such as schools"—not **around** them. 554 U.S. at 626 (emphasis added). The State presented zero evidence showing that the

---

[16] Although the en banc Fourth Circuit said in *Maryland Shall Issue* that it was "not free to ignore the Supreme Court's substantive dictum on 'shall-issue' licensing laws," 116 F.4th at 221, that case was decided as a matter of the Second Amendment's text—**not** historical tradition, *id.* at 229. If the Court cannot ignore *Bruen*'s dicta about certain licensing regimes, then neither can it ignore *Bruen*'s holding that only an "enduring American tradition" of firearm regulation can justify a prohibition at step two. 597 U.S. at 69.

Founders tolerated bans on the grounds of schools or on the grounds of any of the places *Bruen* deemed sensitive (*i.e.*, "legislative assemblies, polling places, and courthouses"). 597 U.S. at 30. And any interest-balancing desire to uphold so-called buffer zones outside of sensitive places is no replacement for the "test" that the Second Amendment "demands": "text, as informed by history." *Id.* at 19. The State failed to meet its burden to justify its bans on public and private school grounds.

### 7.    All Government Buildings

Maryland's **statewide** ban on carry within **all** government buildings (including inside buildings on college campuses), MD. CODE, CRIM. LAW § 4-111(a)(4)(i), as well as on the grounds of some, COMAR 04.05.01.03, violates the Second Amendment just like the rest of the Carry Bans.

The district court upheld Maryland's statewide, categorical ban in a single paragraph that merely recited *Heller*'s dicta that "government buildings" are sensitive places. JA0995. But, again, *Heller* reserved consideration of historical analysis for later cases. 554 U.S. at 635. In light of *Bruen*'s narrower reference to legislative assemblies, polling places, and courthouses as historical sensitive places, 597 U.S. at 30, it is clear that without government provided security, there is no basis for categorically banning firearms in government buildings. Neither the district court nor this Court is "free to ignore the Supreme Court's substantive dictum on" the

kinds of government buildings that qualify as sensitive. *Maryland Shall Issue*, 116 F.4th at 221. The district court was wrong to declare Maryland's ban constitutional on the basis of *Heller*'s dicta that the Court made clear was not tested against historical evidence and to reject *Bruen*'s refinement that was so-tested.

Maryland must prove that its **statewide** ban within **all** government buildings is justified by historical tradition. The State's only historical evidence was Northampton-style laws, held by *Bruen* disanalogous to modern restrictions that "impair[] the right of the general population to peaceable public carry," 597 U.S. at 50–51, and held by *Rahimi* unable to support laws that "broadly restrict arms use by the public generally," 144 S. Ct. at 1901. To the extent those laws support restricting carry in government buildings, they do so only where the government provides security. Maryland cannot point to a single application where a statewide ban applied to any building hosting any government operations. Nor can Maryland analogize a secure government building where governmental functions take place to any other building that just happens to be owned by the government. For these reasons, the Carry Bans fail with respect to government buildings.

## CONCLUSION

For the foregoing reasons, Plaintiffs-Appellants respectfully request that this Court reverse the judgment of the district court as to Maryland's bans at or within

museums; healthcare facilities; mass transit facilities and vehicles; state parks; entertainment facilities; the grounds of schools; and all government buildings excluding legislative assemblies, polling places, and courthouses; and that this Court remand the case with instruction to enter judgment for Plaintiffs-Appellants.

Dated: November 4, 2024

Respectfully Submitted,

/s/John Parker Sweeney
John Parker Sweeney
James W. Porter, III
William Chadwick Lamar, Jr.
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street NW, Suite 1350
Washington, DC 20036
Phone: (202) 719-8216
jsweeney@bradley.com
jporter@bradley.com
clamar@bradley.com

*Attorneys for Plaintiffs Appellants /
Cross-Appellees Susannah Warner Kipke
and Maryland State Rifle and Pistol
Association, Inc.*

/s/David H. Thompson
David H. Thompson
Peter A. Patterson
Megan Marie Wold
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Phone: (202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
mwold@cooperkirk.com
wbergstrom@cooperkirk.com

*Attorneys for Appellants / Cross-
Appellees Katherine Novotny, Sue
Burke, Esther Rossberg, Maryland
Shall Issue, Inc., Second Amendment
Foundation, and Firearms Policy
Coalition*

/s/Mark W. Pennak
Mark W. Pennak
LAW OFFICES OF MARK W. PENNAK
7416 Ridgewood Ave.
Chevy Chase, MD 20815
Tel: (301) 873-3671
mpennak@marylandshallissue.org

*Attorney for Appellants / Cross-
Appellees Katherine Novotny, Sue
Burke, Esther Rossberg, Maryland
Shall Issue, Inc., Second Amendment
Foundation, and Firearms Policy
Coalition*

56

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs respectfully request oral argument. These consolidated appeals present important questions of first impression in the Fourth Circuit concerning the constitutionality of Maryland's laws restricting the carrying of firearms for self-defense at a wide array of locations throughout the state. Plaintiffs believe that oral argument will assist the Court in resolving these issues.

Dated: November 4, 2024

/s/ *John Parker Sweeney*
John Parker Sweeney

Counsel for *Kipke* Plaintiffs

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32 because it contains 12,543 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface and type-style requirements of Rule 32(a) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: November 4, 2024

/s/ *John Parker Sweeney*
John Parker Sweeney

Counsel for *Kipke* Plaintiffs

58

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2024, a copy of the foregoing was served via electronic delivery to all parties' counsel via the Court's appellate CM/ECF system, which will forward copies to Counsel of Record.

/s/ John Parker Sweeney
John Parker Sweeney

Counsel for *Kipke* Plaintiffs