Nos. 24-1799(L), 24-1827, 24-1834, 24-1836

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

————————————

SUSANNAH WARNER KIPKE, *et al.*,

*Plaintiffs-Appellants / Cross-Appellees*,

v.

WES MOORE, *et al.*,

*Defendants-Appellees / Cross-Appellants*,

————————————

KATHERINE NOVOTNY, *et. al.*,

*Plaintiffs-Appellants / Cross-Appellees*,

v.

WESLEY MOORE, *et al.*,

*Defendants-Appellees / Cross-Appellants*.

————————————

On Appeal from the United States District Court
for the District of Maryland
No. 1:23-cv-01293-GLR
No. 1:23-cv-01295-GLR

————————————

**JOINT APPENDIX VOLUME I
(JA1-550)**

————————————

(Counsel listed on following page)

John Parker Sweeney
James W. Porter, III
William Chadwick Lamar, Jr.
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street NW, Suite 1350
Washington, DC 20036
Phone: (202) 719-8216
jsweeney@bradley.com
jporter@bradley.com
clamar@bradley.com

*Attorneys for Plaintiffs-Appellants /
Cross-Appellees Susannah Warner Kipke
and Maryland State Rifle and Pistol
Association, Inc.*

Ryan R. Dietrich
Assistant Attorney General
Office of the Attorney General
of Maryland
200 Saint Paul Place
Baltimore, MD 21202
Phone: (410) 576-7648
rdietrich@oag.state.md.us

*Attorney for Defendants-Appellees /
Cross-Appellants Wes Moore, Alison M.
Healy, Scott D. Shellenberger, Ivan J.
Bates, Col. Roland L. Butler, Jr., Paul J.
Wiedefeld, and Joshua Kurtz*

David H. Thompson
Peter A. Patterson
Megan Marie Wold
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Phone: (202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
mwold@cooperkirk.com
wbergstrom@cooperkirk.com

*Attorneys for Plaintiffs-Appellants /
Cross-Appellees Katherine Novotny,
Sue Burke, Esther Rossberg,
Maryland Shall Issue, Inc., Second
Amendment Foundation, and
Firearms Policy Coalition*

Mark W. Pennak
LAW OFFICES OF MARK W. PENNAK
7416 Ridgewood Ave.
Chevy Chase, MD 20815
Tel: (301) 873-3671
mpennak@marylandshallissue.org

*Attorney for Plaintiffs-Appellants /
Cross-Appellees Katherine Novotny,
Sue Burke, Esther Rossberg,
Maryland Shall Issue, Inc., Second
Amendment Foundation, and
Firearms Policy Coalition*

# INDEX OF APPENDIX

**Document**                                                    **Page of Joint Appendix**

## VOLUME I

District Court Docket,
*Kipke et al. v. Moore et al*, No. 1:23-cv-1293-GLR ................................ JA0001

District Court Docket,
*Novotny et al. v. Moore et al*, No. 1:23-cv-1295-GLR ............................ JA0015

*Kipke* Complaint (May 16, 2023) ....................................................... JA0026

*Novotny* Complaint (May 16, 2023) .................................................... JA0050

Decl. of Susannah Kipke (*Kipke*) ...................................................... JA0080

Decl. of Gabriel Dinkins (*Kipke*) ...................................................... JA0084

Decl. of Michael Fryar (*Kipke*) ........................................................ JA0088

Decl. of John Hurley (*Kipke*) ........................................................... JA0091

Decl. of Jonathan Smith (*Kipke*) ...................................................... JA0095

Supp. Decl. of Susannah Kipke (*Kipke*) ........................................... JA0100

Decl. of Katherine Novotny (*Novotny*) .............................................. JA0101

Decl. of Sue Burke (*Novotny*) .......................................................... JA0103

Decl. of Esther Rossberg (*Novotny*) .................................................. JA0106

Decl. of Daniel Carlin-Weber (*Novotny*) ........................................... JA0109

Decl. of Alan M. Gottlieb (*Novotny*) ................................................ JA0112

Decl. of Brandon Combs (*Novotny*) .................................................. JA0115

Order Consolidating *Kipke* and *Novotny* (July 13, 2023) ................... JA0118

Maryland Senate Bill 1 (2023) (State's Ex. 2) ...................................... JA0121

Expert Report and Decl. of Saul Cornell (State's Ex. 3) ................................ JA0147

Decl. of Patrick J. Charles (State's Ex. 4) ..................................................... JA0200

Decl. of Dr. Brennan Rivas (State's Ex. 5)..................................................... JA0343

Decl. of Thomas Randall (State's Ex. 6) ......................................................... JA0370

Decl. of Daryl Anthony (State's Ex. 7) ........................................................... JA0373

Decl. of Anita Kossof (State's Ex. 8) .............................................................. JA0375

Decl. of Mark J. Potter (State's Ex. 9)............................................................ JA0378

Decl. of Carter Arnot Polakoff (State's Ex. 10) .............................................. JA0381

Virginia, An Act Forbidding and Punishing Affrays, Ch. 49 (State's
Ex. 12)........................................................................................................ JA0387

Statutes of the Parliament of England in force in North Carolina, Ch. 3
(1792) (State's Ex. 13)................................................................................ JA0389

Acts of the State of Tennessee, Ch. 22 § 2 (1869) (State's Ex. 14) .............. JA0392

New Mexico Deadly Weapons Act, Ch. 32 §§ 1-6 (1869) (State's Ex.
15) .............................................................................................................. JA0396

Georgia Offenses Against the Public Morality, Health, Police, etc.
Part 5, Title 1, § 4528 (1870) (State's Exhibit 16) .................................... JA0399

Gen. Laws of the State of Texas, An Act Regulating the Right to Keep
and Bear Arms, Chapter 46. § 1 (1870) (State's Ex. 17)........................... JA0401

Laws of Missouri, An Act to Prevent the Carrying of Concealed
Weapons § 1 (1874) (State's Ex. 18).......................................................... JA0405

Session Laws of the Leg. Assembly of the Territory of Arizona (1889)
(State's Ex. 19)........................................................................................... JA0408

Statutes of Oklahoma, Crimes and Punishments, Ch. 25 §§7-10 (1890)
(State's Ex. 20)........................................................................................... JA0411

Penal Code of State of Idaho, Persons Other than Officers Carrying Certain weapons, Ch. 218 § 4781 (1901) (State's Ex. 21) ........................JA0414

Montana General Laws, An Act to Prohibit Unlawful Carrying of Concealed Weapons, Ch. 35 § 1 (1903) (State's Ex. 22) ..........................JA0418

Columbia, Missouri General Ordinances, Ch. 17 (1890) (State's Ex. 23) ................................................................................................JA0422

Maryland Assembly, An Act for the Speedy Trial of Criminals, and Ascertaining their Punishment, Ch. 26 (1715) (State's Ex. 24) ...............JA0425

The Statutes at Large of Pennsylvania, Vol. 3, Ch. 246 (1721) (State's Ex. 25) ...........................................................................................JA0430

Acts Passed by the General Assembly of the Province of New Jersey, Ch. 35 (1722) (State's Ex. 26) ....................................................JA0436

Laws of New York, An Act to prevent hunting with Fire-Arms in the City of New York, Ch. 1233 (1763) (State's Ex. 27) ...............................JA0441

Acts of the General Assembly of the Colony of New Jersey (1771) (State's Ex. 28) ............................................................................JA0446

Acts and Laws of Massachusetts, Ch. 28 (1789) (State's Ex. 29) .................JA0454

Acts of the State of Louisiana, An Act to Prohibit the Carrying of Firearms on Premises or Plantations, without the Consent of the Owner (1865) (State's Ex. 30) ....................................................JA0458

Laws of Texas, Offenses Against the Public Peace, Title II (1867) (State's Ex. 31) ...........................................................................JA0465

General Laws of Oregon, 79 § 1 (1893) (State's Ex. 32) ..............................JA0470

Minutes of the Proceedings of the Board of Commissioners of Central Park, New York (1858) (State's Ex. 37)....................................................JA0482

Annual Report of the Brooklyn Park Commissioners, Park Ordinance No. 1, Art. 1 (1867) (State's Ex. 38) .......................................................JA0487

Laws of the General Assembly of the State of Pennsylvania, No. 1020 § 21 (1868) (State's Ex. 39)........................................................JA0491

Annual Report of the Commissioners of Fairmount Park, § 21 (1869) (State's Ex. 40)..............................................................JA0498

Laws and Ordinances of the City of Chicago, Ch. 31 § 6 (1873) (State's Ex. 41)....................................................................JA0501

San Francisco Municipal Reports, Park Commissioners Ordinances, Ordinance No. 2 § 2 (1875) (State's Ex. 42)............................JA0507

Laws and Ordinances Governing the Village of Hyde Park, IL., South Park Ordinances § 6 (1876) (State's Ex. 43)..............................JA0513

Ordinances of the Town Council of the Borough of Phoenixville, Penn., Parks § 1 (1878) (State's Ex. 44)....................................JA0520

Municipal Code of Chicago, Art. 43 § 1690 (1881) (State's Ex. 45)............JA0525

The Revised Ordinance of the City of St. Louis, Art. 11 § 3 (1881) (State's Ex. 46)................................................................JA0529

The Revised Ordinance of the City of Danville, IL., § 4 (1883) (State's Ex. 47)................................................................JA0533

Rule and Regulations of Tower Grove Park of the City of St. Louis (1883) (State's Ex. 48)............................................................JA0538

City of Boston Department of Parks Ordinances (1887) (State's Ex. 49) ...................................................................................JA0543

The Revised Ordinances of Salt Lake City, Ch. 27 § 6 (1888) (State's Ex. 50)........................................................................JA0546

## VOLUME II

Rules and Regulations of the Public Parks and Grounds of the City of Saint Paul, MN. § 6 (1889) (State's Ex. 51)............................JA0551

Charter and Ordinances of the City of Trenton, N.J. (1890) (State's Ex. 52)...................................................................................JA0556

Ordinances of the City of Grand Rapids, Parks §432 (1891) (State's Ex. 53)........................................................................................JA0560

Laws and Ordinances of the City of Williamsport, Penn., Brandon Park § 21 (1891) (State's Ex. 54) .............................................JA0566

Annual Report of the Park Commissioners of the City of Lynn, MA., Ordinances § 3 (1892) (State's Ex. 55) .....................................JA0571

Laws and Ordinances of the City of Peoria, Il., Art. 35, Parks and Public Grounds §1724 (1892) (State's Ex. 56)...........................JA0574

Municipal Code of the City of Spokane, WA., Ordinance No. A170 § 4 (1892) (State's Ex. 57).............................................................JA0597

Rules and Regulations of the Board of Park Commissioners of City of Wilmington, DE, § 7 (1893) (State's Ex. 58).............................JA0585

Acts of Assembly Relating to and the General Ordinances of the City of Pittsburgh, PA, Bureau of Parks §5 (1883) (State's Ex. 59)................JA0589

Revised Ordinances of the City of Canton, IL., § 26 (1895) (State's Ex. 60)........................................................................................JA0596

Local Acts of the Legislature of the State of Michigan, No. 436 § 44 (1895) (State's Ex. 61) ..............................................................JA0602

Report of the Board of Park Commissioners of the City of Rochester, N.Y., § 4 (1896) (State's Ex. 62) ...............................................JA0610

The General Ordinances of the City of Indianapolis §1971 (1896) (State's Ex. 63)...............................................................................JA0615

Laws and Ordinances of the City of Reading, PA., Park Rules and Regulations § 20 (1897) (State's Ex. 64).....................................JA0618

Park Commissioners' Report for Springfield, MA., Park Ordinance No. 3 (1897) (State's Ex. 65)....................................................JA0625

Revised Ordinances of the City of Boulder, CO., Parks 511 § 1 (1898) (State's Ex. 66).............................................................................JA0629

Charter and Revised Ordinances of Kansas City, Ordinance No. 9637
§ 11 (1898) (State's Ex. 67).........................................................JA0633

Report of the Board of Commissioners of Wilmington DE., Park
Regulations (1898) (State's Ex. 68)............................................JA0640

Municipal Register of the City of Hartford, CT., Rules and
Regulations No. 9 (1902) (State's Ex. 69)..................................JA0643

Ninth Annual Report of the Department of Parks of the City of New
Bedford, Massachusetts (1902) (State's Ex. 70) .......................JA0649

First Annual Report of the Board of Park Commissioners of the City
of Lowell, Massachusetts (1903) (State's Ex. 71)......................JA0653

Proceedings of the Board of Alderman of the City of New York, New
York (1903) (State's Ex. 72)........................................................JA0657

Municipal Ordinances of the City of Troy, New York (1903) (State's
Ex. 73)............................................................................................JA0662

Revised Code of Ordinances of the City of Houston, Texas (1904)
(State's Ex. 74).............................................................................JA0668

The Ordinances of the City of Neligh, Nebraska (1904) (State's Ex.
75) ..................................................................................................JA0673

Ordinances of the City of Pueblo, Colorado (1904) (State's Ex. 76)............JA0679

A Digest of the Laws and Ordinances for the Government of the
Municipal Corporation of the City of Harrisburg, Pennsylvania
(1905) (State's Ex. 77)..................................................................JA0688

Annual Report of the Park Commissioners of the City of Haverhill,
Massachusetts (1905) (State's Ex. 78).......................................JA0694

General Laws of the State of Minnesota (1905) (State's Ex. 79).................JA0698

Charter of the City of Saginaw, Michigan (1905) (State's Ex. 80)................JA0703

Amendments to "The Revised Municipal Code of Chicago of 1905" and New General Ordinances (1905) (State's Ex. 81) ............................... JA0712

Municipal Code of the City and County of Denver, Colorado (1906) (State's Ex. 82) .......................................................................... JA0718

Penal Ordinances of the City of Los Angeles, California (1906) (State's Ex. 83) .......................................................................... JA0724

Ordinances of the City of Olean, New York (1907) (State's Ex. 84) ............ JA0730

The Charter of the City of Seattle and the Ordinances of the City of Seattle, Washington (1907) (State's Ex. 85) ............................................ JA0737

A Digest of the Laws Ordinances and Contracts of the City of Memphis, Tennessee (1909) (State's Ex. 86) ............................................ JA0745

General Municipal Ordinances of the City of Oakland, California (1909) (State's Ex. 87) ................................................................. JA0753

Constitution, Charter and Revision of the Ordinances and Municipal Laws of the City of Paducah, Kentucky (1909) (State's Ex. 88) ............. JA0758

The Code of the City of Staunton, Virginia (1910) (State's Ex. 89) .............. JA0767

The Code of Colorado Springs, Colorado (1913) (State's Ex. 90) ................. JA0773

Compiled Ordinances of the City of Grand Rapids, Michigan (1914) (State's Ex. 91) .......................................................................... JA0780

Charter and Ordinances of the City of New Haven, Connecticut (1914) (State's Ex. 92) ................................................................. JA0787

State of Connecticut Report of the State Park Commission for the Fiscal Year Ended September 30, 1914 (State's Ex. 93) .......................... JA0791

New Code of Ordinances of the City of New York, New York (1912) (State's Ex. 94) .......................................................................... JA0802

The Code of City of Birmingham, Alabama (1917) (State's Ex. 95) ............. JA0809

The Joplin, Missouri Code of 1917 (State's Ex. 96) ...................................... JA0814

Wisconsin Session Laws Acts, Resolutions and Memorials (1917)
(State's Ex. 97) ........................................................................... JA0820

State of Connecticut Report of the State Park Commission for the
Two Fiscal Years Ended September 30, 1918 (State's Ex. 98) ................ JA0827

Revised Ordinances of Salt Lake City, Utah (1920) (State's Ex. 99) ........... JA0831

Revised Ordinances of 1921 for the City of Burlington, Vermont
(State's Ex. 100) ........................................................................ JA0840

State of North Carolina Public Laws and Resolutions (1921) (State's
Ex. 101) .................................................................................... JA0844

Digest of the Charter and Ordinances of the City of Chattanooga,
Tennessee (1922) (State's Ex. 102) ............................................. JA0848

Guide to Connecticut State Parks and Forests (1924) (State's Ex. 103) ........ JA0853

National Park Service Publication on Firearm Regulations in the
National Parks, 1897-1936 (State's Ex. 104) ............................... JA0857

Federal Register- Rules and Regulations of National Park Service
(1936) (State's Ex. 105) ............................................................ JA0933

Maryland House Bill 824 (2023) (State's Ex. 106) ...................................... JA0940

Memorandum Opinion (Preliminary Injunction) (Sept. 29, 2023) ................ JA0963

Order (Preliminary Injunction) (Oct. 2, 2023) .............................................. JA1003

Order (Modifying Preliminary Injunction Order) (Sept. 29, 2023) ............... JA1005

Memorandum Opinion (Summary Judgment) (Aug. 2, 2024) ....................... JA1006

Order (Summary Judgment) (Aug. 2, 2024) ................................................. JA1020

Order (Modifying Summary Judgment Order) (Aug. 8, 2024) ...................... JA1023

*Kipke* Plaintiffs' Notice of Appeal (Aug. 15, 2024) ..................................... JA1024

*Novotny* Plaintiffs' Notice of Appeal (Aug. 27, 2024) .................................. JA1026

*Kipke* State's Notice of Appeal (Aug. 29, 2024) .............................................JA1029

*Novotny* State's Notice of Appeal (Aug. 29, 2024) ........................................JA1031

10/29/24, 9:01 AM                    District of Maryland (CM/ECF Live NextGen 1.7.1.1)

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

APPEAL,CLOSED,LEAD

# U.S. District Court
## District of Maryland (Baltimore)
## CIVIL DOCKET FOR CASE #: 1:23-cv-01293-GLR

| | |
|---|---|
| Kipke et al v. Moore et al | Date Filed: 05/16/2023 |
| Assigned to: Chief Judge George Levi Russell, III | Date Terminated: 08/02/2024 |
| Case in other court:  USCA, 24-01799 | Jury Demand: None |
|                   USCA, 24-01834 | Nature of Suit: 950 Constitutional - State |
| Cause: 42:1983 Civil Rights Act - Civil Action for Deprivation of | Statute |
| Rights | Jurisdiction: Federal Question |

**Plaintiff**

**Susannah Warner Kipke**                    represented by    **John Parker Sweeney**
Bradley Arant Boult Cummings LLP
1615 L Street, N.W.
Suite 1350
Washington, DC 20036
202-719-8216
Fax: 202-719-8316
Email: jsweeney@bradley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Connor Blair**
Bradley Arant Boult Cummings LLP
1615 L Street, N.W.
Suite 1350
Washington, DC 20036
202-719-8225
Email: cblair@bradley.com
*ATTORNEY TO BE NOTICED*

**James Wallace Porter , III**
Bradley Arant Boult Cummings
1819 Fifth Avenue North
One Federal Place
Birmingham, AL 35203
205-521-8285
Fax: 205-488-6285
Email: jporter@bradley.com
*ATTORNEY TO BE NOTICED*

**Marc A Nardone**
Bradley Arant Boult Cummings
1615 L St NW
Ste 1350
Washington, DC 20036

**JA0001**

2023937150
Fax: 2023471684
Email: mnardone@babc.com
*TERMINATED: 01/08/2024*

**Plaintiff**

**Maryland State Rifle and Pistol Association, Inc.**

represented by **John Parker Sweeney**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Connor Blair**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Wallace Porter , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc A Nardone**
(See above for address)
*TERMINATED: 01/08/2024*

V.

**Consol Plaintiff**

**Katherine Novotny**

represented by **David H Thompson**
Cooper and Kirk PLLC
1523 New Hampshire Ave NW
Washington, DC 20036
2022209659
Fax: 2022209601
Email: dthompson@cooperkirk.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark William Pennak**
Law Offices of Mark W. Pennak
7416 Ridgewood Ave
Chevy Chase, MD 20815
301 873 3671
Fax: 301 718 9315
Email: m.pennak@me.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter A Patterson**
Cooper and Kirk PLLC
1523 New Hampshire Ave. NW
Washington, DC 20036
2022209670
Fax: 2022209601

Email: ppatterson@cooperkirk.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**Sue Burke**                          represented by   **David H Thompson**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Mark William Pennak**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Peter A Patterson**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**Esther Rossberg**                    represented by   **David H Thompson**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Mark William Pennak**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Peter A Patterson**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**Maryland Shall Issue, Inc.**         represented by   **David H Thompson**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Mark William Pennak**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Matthew Larosiere**

**JA0003**

The Law Office of Matthew Larosiere
6964 Houlton Circle
Lake Worth, FL 33467
5614527575
Email: larosieremm@gmail.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Peter A Patterson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**Second Amendment Foundation**                    represented by   **David H Thompson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark William Pennak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter A Patterson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**Firearms Policy Coalition**                    represented by   **David H Thompson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark William Pennak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter A Patterson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**JA0004**

**Defendant**

**Wes Moore**
*in his official capacity as Governor of Maryland*

represented by **Robert A Scott**
Office of the Attorney General
Civil Division
200 St. Paul Place
20th Floor
Baltimore, MD 21202
14105767055
Email: rscott@oag.state.md.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Nelson Lewis**
Office of the Attorney General
Civil Division
200 Saint Paul Place
20th Floor
Baltimore, MD 21202
(410) 576-7005
Fax: (410) 576-6955
Email: jlewis@oag.state.md.us
*ATTORNEY TO BE NOTICED*

**Ryan Robert Dietrich**
Office of the Attorney General- State of Maryland
200 St. Paul Place
Baltimore, MD 21202
410-576-7648
Email: rdietrich@oag.state.md.us
*ATTORNEY TO BE NOTICED*

**Defendant**

**Roland L. Butler, Jr.**
*in his official capacity as Maryland State Police Superintendent and Secretary,*

represented by **Robert A Scott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Nelson Lewis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Robert Dietrich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Joshua Kurtz**
*in his official capacity as Secretary of Natural Resources*

represented by **James Nelson Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert A Scott**

**JA0005**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan Robert Dietrich**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Consol Defendant**

**Scott D. Shellenberger**                  represented by   **James Nelson Lewis**
*in his official capacity as States Attorney for*              (See above for address)
*Baltimore County, Maryland*                                  *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                             **Robert A Scott**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

                                             **Ryan Robert Dietrich**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

**Consol Defendant**

**Ivan J. Bates**                            represented by   **James Nelson Lewis**
*in his official capacity as States Attorney for*              (See above for address)
*Baltimore City, Maryland*                                    *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                             **Robert A Scott**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

                                             **Ryan Robert Dietrich**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

**Consol Defendant**

**Col Roland L. Butler, Jr.**                represented by   **James Nelson Lewis**
*in his official capacity as Superintendent of*               (See above for address)
*the Maryland State Police*                                   *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                             **Robert A Scott**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

**JA0006**

                                                       **Ryan Robert Dietrich**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consol Defendant**

**Paul J. Wiedefeld**
*in his official capacity as Secretary of Transportation*

represented by   **James Nelson Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

                                                       **Robert A Scott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

                                                       **Ryan Robert Dietrich**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consol Cross Defendant**

**Alison M. Healey**
*in her official capacity as States Attorney for Harford County, Maryland*

represented by   **James Nelson Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

                                                       **Robert A Scott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

                                                       **Ryan Robert Dietrich**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/16/2023 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number AMDDC-10602808.), filed by Maryland State Rifle and Pistol Association, Inc., Susannah Warner Kipke. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Summonses)(Sweeney, John) Modified on 5/16/2023 (ols, Deputy Clerk). (Entered: 05/16/2023) |
| 05/16/2023 | 2 | Local Rule 103.3 Disclosure Statement by Maryland State Rifle and Pistol Association, Inc. identifying Other Affiliate National Rifle Association of America, Inc. for Maryland State Rifle and Pistol Association, Inc..(Sweeney, John) (Entered: 05/16/2023) |
| 05/16/2023 | 3 | Summons Issued 21 days as to Roland L. Butler, Jr, Wes Moore. (ols, Deputy Clerk) (Entered: 05/16/2023) |
| 05/18/2023 | | Case Reassigned to Judge George Levi Russell, III. Judge Stephanie A. Gallagher no longer assigned to the case. (kns, Deputy Clerk) (Entered: 05/18/2023) |

**JA0007**

| | | |
|---|---|---|
| 05/18/2023 | 4 | (FILED IN ERROR)AFFIDAVIT of Service for Complaint, Summons and Disclosure Statement served on Col. Roland L. Butler, Jr and Wes Moore on May 17, 2023, filed by Susannah Warner Kipke, Maryland State Rifle and Pistol Association, Inc..(Sweeney, John) Modified on 5/19/2023 (kb3s, Deputy Clerk). (Entered: 05/18/2023) |
| 05/19/2023 | 5 | QC NOTICE: 4 Affidavit of Service, filed by Maryland State Rifle and Pistol Association, Inc., Susannah Warner Kipke was filed incorrectly. ***Please re-file documents by selecting Service of Process> Summons Returned Executed. *It has been noted as FILED IN ERROR, and the document link has been disabled.* (kb3s, Deputy Clerk) (Entered: 05/19/2023) |
| 05/22/2023 | 6 | SUMMONS Returned Executed by Maryland State Rifle and Pistol Association, Inc., Susannah Warner Kipke. Roland L. Butler, Jr served on 5/17/2023, answer due 6/7/2023; Wes Moore served on 5/17/2023, answer due 6/7/2023.(Sweeney, John) (Entered: 05/22/2023) |
| 05/31/2023 | 7 | Consent MOTION for Extension of Time to File Response/Reply *to Complaint* by Roland L. Butler, Jr, Wes Moore. (Attachments: # 1 Text of Proposed Order)(Scott, Robert) (Entered: 05/31/2023) |
| 05/31/2023 | 8 | MOTION to Consolidate Cases by Roland L. Butler, Jr, Wes Moore (Attachments: # 1 Text of Proposed Order)(Lewis, James) (Entered: 05/31/2023) |
| 05/31/2023 | 9 | ORDER granting 7 the Defendants' Consent Motion for Extension of Time to Respond *to Complaint*. Signed by Judge George Levi Russell, III on 5/31/2023. (ols, Deputy Clerk) (Entered: 05/31/2023) |
| 06/26/2023 | 10 | Joint MOTION for Extension of Time *to Respond to Plaintiffs Complaint and to Set Certain Briefing Deadlines* by Susannah Warner Kipke, Maryland State Rifle and Pistol Association, Inc. (Attachments: # 1 Attachment Text of Proposed Order)(Sweeney, John) (Entered: 06/26/2023) |
| 06/30/2023 | 11 | ANSWER to 1 Complaint, by Roland L. Butler, Jr, Wes Moore.(Scott, Robert) (Entered: 06/30/2023) |
| 07/03/2023 | 12 | MOTION for Preliminary Injunction by Susannah Warner Kipke, Maryland State Rifle and Pistol Association, Inc. (Attachments: # 1 Memorandum in Support of Plaintiffs Motion for Preliminary Injunction, # 2 Exhibit Declaration of Susannah Kipke, # 3 Exhibit Declaration of Gabriel Dinkins, # 4 Exhibit Declaration of Michael Fryar, # 5 Exhibit Declaration of John Hurley, # 6 Exhibit Declaration of Jonathan Smith, # 7 Exhibit Sismondo, America Walks into Bar, # 8 Exhibit Penegar, The Political Trial of Benjamin Franklin, # 9 Exhibit McCoy, Statutes at Large of SC, # 10 Exhibit Johnson et al. Firearms Textbook, # 11 Exhibit Kentucky Act, # 12 Exhibit Indiana Code, # 13 Exhibit Tenn. Code, # 14 Exhibit Iowa Code 1880, # 15 Exhibit J. Cont. Cong. 1774, # 16 Exhibit Benjamin Franklin-Library, # 17 Exhibit 1850 Census, # 18 Exhibit Council of Maryland, # 19 Text of Proposed Order)(Sweeney, John) (Entered: 07/03/2023) |
| 07/03/2023 | 13 | MOTION for Summary Judgment by Susannah Warner Kipke, Maryland State Rifle and Pistol Association, Inc. (Attachments: # 1 Memorandum in Support of Plaintiffs' Motion for Summary Judgment, # 2 Exhibit Declaration of Susannah Kipke, # 3 Exhibit Declaration of Gabriel Dinkins, # 4 Exhibit Declaration of Michael Fryar, # 5 Exhibit Declaration of John Hurley, # 6 Exhibit Declaration of Jonathan Smith, # 7 Exhibit Sismondo, America Walks into Bar, # 8 Exhibit Penegar, The Political Trial of Benjamin Franklin, # 9 Exhibit McCoy, Statutes at Large of SC, # 10 Exhibit Johnson et al. Firearms Textbook, # 11 Exhibit Kentucky Act, # 12 Exhibit Indiana Code, # 13 Exhibit Tenn. Code, # 14 Exhibit Iowa Code 1880, # 15 Exhibit J. Cont. Cong. 1774, # 16 Exhibit Benjamin |

| | | |
|---|---|---|
| | | Franklin-Library, # 17 Exhibit 1850 Census, # 18 Exhibit Council of Maryland, # 19 Text of Proposed Order)(Sweeney, John) (Entered: 07/03/2023) |
| 07/10/2023 | 14 | NOTICE of Appearance by Ryan Robert Dietrich on behalf of All Defendants (Dietrich, Ryan) (Entered: 07/10/2023) |
| 07/13/2023 | 15 | ORDER granting 8 Defendants' Motion to Consolidate Cases; consolidating cases GLR-23-1293 and GLR-23-1295 with Kipke as the lead case; denying as moot 10 Joint Motion for Extension of Time. Signed by Judge George Levi Russell, III on 7/13/2023. (ols, Deputy Clerk) (Entered: 07/13/2023) |
| 07/20/2023 | 16 | Consent MOTION for Leave to File Excess Pages by Roland L. Butler, Jr, Wes Moore (Attachments: # 1 Text of Proposed Order)(Scott, Robert) (Entered: 07/20/2023) |
| 07/20/2023 | 17 | Consent MOTION for Extension of Time to File Response/Reply *in further support of Motion to Dismiss* by Ivan J. Bates, Roland L. Butler, Jr, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wes Moore, Scott D. Shellenberger, Paul J. Wiedefeld (Attachments: # 1 Text of Proposed Order)(Scott, Robert) (Entered: 07/20/2023) |
| 07/20/2023 | 18 | MOTION for Summary Judgment , MOTION Briefing Schedule by Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, Second Amendment Foundation (Attachments: # 1 Text of Proposed Order Summary Judgment, # 2 Text of Proposed Order Briefing Schedule)(Thompson, David) (Entered: 07/20/2023) |
| 07/21/2023 | 19 | ORDER granting 16 Consent Motion for Leave to File Memorandum of Law Exceeding Page Limits. Signed by Judge George Levi Russell, III on 7/21/2023. (heps, Deputy Clerk) (Entered: 07/21/2023) |
| 07/21/2023 | 20 | ORDER granting 17 Motion for Extension of Time to File Response/Reply in further support of Motion to Dismiss. Signed by Judge George Levi Russell, III on 7/21/2023. (heps, Deputy Clerk) (Entered: 07/21/2023) |
| 07/28/2023 | 21 | MOTION for Summary Judgment *and opposition to motion for summary judgment and motion for preliminary injunction* by Roland L. Butler, Jr, Wes Moore. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit, # 34 Exhibit, # 35 Exhibit, # 36 Exhibit, # 37 Exhibit, # 38 Exhibit, # 39 Exhibit, # 40 Exhibit, # 41 Exhibit, # 42 Exhibit, # 43 Exhibit, # 44 Exhibit, # 45 Exhibit, # 46 Exhibit, # 47 Exhibit, # 48 Exhibit, # 49 Exhibit, # 50 Exhibit, # 51 Exhibit, # 52 Exhibit, # 53 Exhibit, # 54 Exhibit, # 55 Exhibit, # 56 Exhibit, # 57 Exhibit, # 58 Exhibit, # 59 Exhibit, # 60 Exhibit, # 61 Exhibit, # 62 Exhibit, # 63 Exhibit, # 64 Exhibit, # 65 Exhibit, # 66 Exhibit, # 67 Exhibit, # 68 Exhibit, # 69 Exhibit, # 70 Exhibit, # 71 Exhibit, # 72 Exhibit, # 73 Exhibit, # 74 Exhibit, # 75 Exhibit, # 76 Exhibit, # 77 Exhibit, # 78 Exhibit, # 79 Exhibit, # 80 Exhibit, # 81 Exhibit, # 82 Exhibit, # 83 Exhibit, # 84 Exhibit, # 85 Exhibit, # 86 Exhibit, # 87 Exhibit, # 88 Exhibit, # 89 Exhibit, # 90 Exhibit, # 91 Exhibit, # 92 Exhibit, # 93 Exhibit, # 94 Exhibit, # 95 Exhibit, # 96 Exhibit, # 97 Exhibit, # 98 Exhibit, # 99 Exhibit, # 100 Exhibit, # 101 Exhibit, # 102 Exhibit, # 103 Exhibit, # 104 Exhibit, # 105 Exhibit, # 106 Exhibit, # 107 Text of Proposed Order)(Dietrich, Ryan) (Entered: 07/28/2023) |
| 08/02/2023 | 22 | REPLY to Response to Motion re 8 MOTION to Consolidate Cases *Motion to dismiss* filed by Ivan J. Bates, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wes Moore, Scott D. Shellenberger, Paul J. Wiedefeld.(Dietrich, Ryan) (Entered: 08/02/2023) |

| | | |
|---|---|---|
| 08/03/2023 | 23 | MOTION for Summary Judgment *and opposition to motion for summary judgment* by Ivan J. Bates, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wes Moore, Scott D. Shellenberger, Paul J. Wiedefeld (Attachments: # 1 Text of Proposed Order)(Dietrich, Ryan) (Entered: 08/03/2023) |
| 08/09/2023 | 24 | MOTION for Leave to File by Susannah Warner Kipke, Maryland State Rifle and Pistol Association, Inc. (Attachments: # 1 Text of Proposed Order)(Sweeney, John) (Entered: 08/09/2023) |
| 08/10/2023 | 25 | ORDER granting 24 Plaintiffs' Consent Motion for Leave to File Consolidated Brief. Signed by Judge George Levi Russell, III on 8/10/2023. (ols, Deputy Clerk) (Entered: 08/11/2023) |
| 08/11/2023 | 26 | REPLY to Response to Motion re 18 MOTION for Summary Judgment MOTION Briefing Schedule *and Response in Opposition to Defendants' Motion for Summary Judgment* filed by Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, Second Amendment Foundation.(Thompson, David) (Entered: 08/11/2023) |
| 08/11/2023 | 27 | -FILED IN ERROR- RESPONSE in Support re 13 MOTION for Summary Judgment , 12 MOTION for Preliminary Injunction ,*and Opposition to Defendants' Cross-Motion for Summary Judgment* filed by Susannah Warner Kipke, Maryland State Rifle and Pistol Association, Inc.. (Attachments: # 1 Exhibit Supplemental Declaration of Susannah Kipke, # 2 Exhibit Records of the Governor and Company of the Massachusetts Bay in New England, # 3 Exhibit Laws of the State of Delaware)(Sweeney, John) Modified on 8/11/2023 (ols, Deputy Clerk). (Entered: 08/11/2023) |
| 08/11/2023 | 28 | QC NOTICE: 27 Response in Support of Motion,, filed by Maryland State Rifle and Pistol Association, Inc., Susannah Warner Kipke was filed incorrectly. **Incorrect event used. Please refile using the correct event under Responses and Replies > Reply to Response to Motion. It has been noted as FILED IN ERROR, and the document link has been disabled.* (ols, Deputy Clerk) (Entered: 08/11/2023) |
| 08/11/2023 | 29 | REPLY to Response to Motion re 13 MOTION for Summary Judgment , 12 MOTION for Preliminary Injunction *, and Opposition to Defendants' Cross-Motion for Summary Judgment* filed by Susannah Warner Kipke, Maryland State Rifle and Pistol Association, Inc.. (Attachments: # 1 Exhibit Supplemental Declaration of Susannah Kipke, # 2 Exhibit Records of the Governor and Company of the Massachusetts Bay in New England, # 3 Exhibit Laws of the State of Delaware)(Sweeney, John) (Entered: 08/11/2023) |
| 09/08/2023 | 30 | REPLY to Response to Motion re 21 MOTION for Summary Judgment *and opposition to motion for summary judgment and motion for preliminary injunction* filed by Roland L. Butler, Jr, Wes Moore.(Dietrich, Ryan) (Entered: 09/08/2023) |
| 09/29/2023 | 31 | MEMORANDUM OPINION. Signed by Judge George Levi Russell, III on 9/29/2023. (ols, Deputy Clerk) (Entered: 09/29/2023) |
| 09/29/2023 | 32 | ORDER granting in part and denying in part 12 (GLR-23-1293) (ECF 24 in GLR-23-1295) Plaintiffs Motions for Preliminary Injunction; further ordered that ECF 36 (GLR-23-1295) the State Defendants' Motion to Dismiss is denied without prejudice; denying without prejudice 13 18 21 23 Motions for Summary Judgment; further ordered that the parties shall file a joint status report within 14 days of this Order. Signed by Judge George Levi Russell, III on 9/29/2023. (ols, Deputy Clerk) (Entered: 09/29/2023) |
| 10/02/2023 | 33 | MOTION Rule 60 Motion for Relief from Order re (32 in 1:23-cv-01293-GLR, 32 in 1:23-cv-01293-GLR, 32 in 1:23-cv-01293-GLR, 32 in 1:23-cv-01293-GLR, 32 in 1:23-cv-01293-GLR, 32 in 1:23-cv-01293-GLR) Order on Motion for Summary Judgment,, Order on Motion for Miscellaneous Relief,,,,,, Order on Motion for Preliminary Injunction,,, (41 |

10/29/24, 9:01 AM                                    District of Maryland (CM/ECF Live NextGen 1.7.1.1)

| | | |
|---|---|---|
| | | in 1:23-cv-01295-GLR) Order,,, by Ivan J. Bates, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wesley Moore, Scott D. Shellenberger, Paul J. Wiedefeld, Ivan J. Bates, Roland L. Butler, Jr, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wes Moore, Scott D. Shellenberger, Paul J. Wiedefeld (Attachments: # 1 Text of Proposed Order)Associated Cases: 1:23-cv-01293-GLR, 1:23-cv-01295-GLR(Lewis, James) (Entered: 10/02/2023) |
| 10/02/2023 | 34 | QC NOTICE: 33 Motion for Miscellaneous Relief, filed by Wesley Moore, Alison M. Healey, Roland L. Butler, Jr., Wes Moore, Scott D. Shellenberger, Joshua Kurtz, Ivan J. Bates, Paul J. Wiedefeld was filed incorrectly. **PLEASE DO NOT SPREAD TEXT WHEN DOCKETING.** (ols, Deputy Clerk) (Entered: 10/02/2023) |
| 10/02/2023 | 35 | ORDER granting 33 Defendants' Motion for Relief from Order. Signed by Judge George Levi Russell, III on 10/2/2023. (ols, Deputy Clerk) (Entered: 10/02/2023) |
| 10/12/2023 | 36 | ANSWER to Complaint *of Novotny plaintiffs* by Ivan J. Bates, Roland L. Butler, Jr, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wes Moore, Scott D. Shellenberger, Paul J. Wiedefeld.(Scott, Robert) (Entered: 10/12/2023) |
| 10/13/2023 | 37 | STATUS REPORT by Susannah Warner Kipke, Maryland State Rifle and Pistol Association, Inc.(Sweeney, John) (Entered: 10/13/2023) |
| 11/17/2023 | 38 | ORDER directing that the Clerk shall renew the Motions for Summary Judgment (ECF Nos. 13, 18, 21, 23). Signed by Judge George Levi Russell, III on 11/17/2023. (ols, Deputy Clerk) (Entered: 11/17/2023) |
| 11/21/2023 | 39 | NOTICE by Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, Second Amendment Foundation *Notice of Supp. Authority* (Attachments: # 1 Attachment 4th Circuit decision in MSI v. Moore)(Pennak, Mark) (Entered: 11/21/2023) |
| 11/28/2023 | 40 | NOTICE by Susannah Warner Kipke, Maryland State Rifle and Pistol Association, Inc. *Notice of Supplemental Authority* (Attachments: # 1 Attachment Fourth Circuit decision in MSI v. Moore)(Sweeney, John) (Entered: 11/28/2023) |
| 12/05/2023 | 41 | UNREDACTED DOCUMENT (Attachments: # 1 Attachment Opinion in Brown v. ATF) (Pennak, Mark) (Entered: 12/05/2023) |
| 12/05/2023 | 42 | NOTICE by Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg *Notice of Supp. Authority* (Attachments: # 1 Attachment Opinion in Brown v. ATF)(Pennak, Mark) (Entered: 12/05/2023) |
| 12/07/2023 | 43 | RESPONSE re 39 Notice (Other), 40 Notice (Other) filed by Roland L. Butler, Jr, Wes Moore.(Dietrich, Ryan) (Entered: 12/07/2023) |
| 12/08/2023 | 44 | NOTICE by Sue Burke, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg *Notice of Supp. Authority* (Attachments: # 1 Attachment DCt Decision in Springer v. Grisham)(Pennak, Mark) (Entered: 12/08/2023) |
| 12/11/2023 | 45 | NOTICE by Roland L. Butler, Jr, Wes Moore *of supplemental authority* (Attachments: # 1 Attachment)(Dietrich, Ryan) (Entered: 12/11/2023) |
| 12/14/2023 | 46 | RESPONSE re 45 Notice (Other) *Response to Def. Notice of Supp. Authority* filed by Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, Second Amendment Foundation.(Pennak, Mark) (Entered: 12/14/2023) |
| 12/15/2023 | 47 | RESPONSE re 45 Notice (Other) *Response to Defendants' Notice of Supplemental Authority* filed by Susannah Warner Kipke, Maryland State Rifle and Pistol Association, |

JA0011

| | | |
|---|---|---|
| | | Inc..(Sweeney, John) (Entered: 12/15/2023) |
| 12/22/2023 | 48 | NOTICE by Susannah Warner Kipke, Maryland State Rifle and Pistol Association, Inc. *of Supplemental Authority* (Attachments: # 1 Attachment Opinion)(Sweeney, John) (Entered: 12/22/2023) |
| 12/28/2023 | 49 | MOTION to Withdraw as Attorney by Susannah Warner Kipke, Maryland State Rifle and Pistol Association, Inc. (Attachments: # 1 Text of Proposed Order)(Nardone, Marc) (Entered: 12/28/2023) |
| 01/08/2024 | 50 | ORDER granting 49 Motion to Withdraw as Attorney. Attorney Marc A Nardone terminated. Signed by Judge George Levi Russell, III on 1/8/2024. (ols, Deputy Clerk) (Entered: 01/08/2024) |
| 01/24/2024 | 51 | NOTICE by Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, Second Amendment Foundation *Notice of Supp. Authority* (Attachments: # 1 Attachment Opinion in Lara v. PA State Police Commissioner)(Pennak, Mark) (Entered: 01/24/2024) |
| 04/10/2024 | 52 | NOTICE by Susannah Warner Kipke, Maryland State Rifle and Pistol Association, Inc. *Notice of Supplemental Authority* (Attachments: # 1 Exhibit A Third Circuit Sur Petition for Rehearing, # 2 Exhibit B Third Circuit Opinion of the Court)(Sweeney, John) (Entered: 04/10/2024) |
| 06/24/2024 | 53 | NOTICE by Susannah Warner Kipke, Maryland State Rifle and Pistol Association, Inc. *Notice of Supplemental Authority* (Attachments: # 1 Attachment Slip Opinion United States v. Rahimi)(Sweeney, John) (Entered: 06/24/2024) |
| 07/16/2024 | 54 | NOTICE by Susannah Warner Kipke, Maryland State Rifle and Pistol Association, Inc. *Notice of Supplemental Authority* (Attachments: # 1 Exhibit A Summary Disposition Order)(Sweeney, John) (Entered: 07/16/2024) |
| 07/16/2024 | 55 | NOTICE by Roland L. Butler, Jr, Joshua Kurtz, Wes Moore re 53 Notice (Other) (Dietrich, Ryan) (Entered: 07/16/2024) |
| 07/16/2024 | 56 | NOTICE by Roland L. Butler, Jr, Joshua Kurtz, Wes Moore re 54 Notice (Other) (Dietrich, Ryan) (Entered: 07/16/2024) |
| 08/02/2024 | 57 | MEMORANDUM OPINION. Signed by Chief District Judge George Levi Russell, III on 8/2/2024. (ols, Deputy Clerk) (Entered: 08/02/2024) |
| 08/02/2024 | 58 | ORDER granting in part and denying in part 13 18 Plaintiffs' Motions for Summary Judgment; granting in part and denying in part 21 23 State Defendants' Cross Motions for Summary Judgment in case 1:23-cv-01293-GLR; further ordered that the Clerk shall close these consolidated cases. Signed by Chief District Judge George Levi Russell, III on 8/2/2024. Associated Cases: 1:23-cv-01293-GLR, 1:23-cv-01295-GLR (ols, Deputy Clerk) (Entered: 08/02/2024) |
| 08/07/2024 | 59 | Consent MOTION modify text of order re (58 in 1:23-cv-01293-GLR, 58 in 1:23-cv-01293-GLR, 58 in 1:23-cv-01293-GLR, 58 in 1:23-cv-01293-GLR, 58 in 1:23-cv-01293-GLR) Order on Motion for Summary Judgment,, Order on Motion for Miscellaneous Relief,,,,,, by Ivan J. Bates, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wesley Moore, Scott D. Shellenberger, Paul J. Wiedefeld, Roland L. Butler, Jr, Joshua Kurtz, Wes Moore (Attachments: # 1 Text of Proposed Order)Associated Cases: 1:23-cv-01293-GLR, 1:23-cv-01295-GLR(Dietrich, Ryan) (Entered: 08/07/2024) |
| 08/08/2024 | 60 | ORDER granting 59 Consent Motion in case 1:23-cv-01293-GLR (and ECF no. 46 in case 1:23-cv-01295-GLR) to modify the Orders granting Summary Judgment in each case as set forth. Signed by Chief District Judge George Levi Russell, III on 8/8/2024. Associated |

| | | Cases: 1:23-cv-01293-GLR, 1:23-cv-01295-GLR(dass, Deputy Clerk) (Entered: 08/08/2024) |
|---|---|---|
| 08/15/2024 | 61 | NOTICE OF APPEAL as to 58 Order on Motion for Summary Judgment, Order on Motion for Miscellaneous Relief, 60 Order on Motion for Miscellaneous Relief, by Susannah Warner Kipke, Maryland State Rifle and Pistol Association, Inc. Filing fee $ 605, receipt number AMDDC-11432245.(Sweeney, John) (Entered: 08/15/2024) |
| 08/19/2024 | 62 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 61 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Entered: 08/19/2024) |
| 08/22/2024 | 63 | USCA Case Number 24-1799 for 61 Notice of Appeal, filed by Maryland State Rifle and Pistol Association, Inc., Susannah Warner Kipke. Case Manager - Kirsten Hancock (av4s, Deputy Clerk) Modified on 8/23/2024 (av4s, Deputy Clerk). (Entered: 08/23/2024) |
| 08/28/2024 | 64 | MOTION *to Enter Final Judgment and to Stay Deadline to Seek Attorney Fees* by Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, Second Amendment Foundation (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Thompson, David) (Entered: 08/28/2024) |
| 08/29/2024 | 65 | NOTICE OF APPEAL as to 58 Order on Motion for Summary Judgment, Order on Motion for Miscellaneous Relief, 60 Order on Motion for Miscellaneous Relief, by Roland L. Butler, Jr, Wes Moore. Filing fee $ 605, receipt number AMDDC-11458559.(Dietrich, Ryan) (Entered: 08/29/2024) |
| 08/30/2024 | 66 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 65 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Entered: 08/30/2024) |
| 08/30/2024 | 67 | RESPONSE in Opposition re 64 MOTION *to Enter Final Judgment and to Stay Deadline to Seek Attorney Fees* filed by Ivan J. Bates, Roland L. Butler, Jr, Roland L. Butler, Jr, Joshua Kurtz, Wes Moore, Scott D. Shellenberger, Paul J. Wiedefeld. (Attachments: # 1 Text of Proposed Order)(Scott, Robert) (Entered: 08/30/2024) |
| 09/03/2024 | 68 | REPLY to Response to Motion re 64 MOTION *to Enter Final Judgment and to Stay Deadline to Seek Attorney Fees* filed by Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, Second Amendment Foundation. (Thompson, David) (Entered: 09/03/2024) |
| 09/03/2024 | 69 | USCA Case Number 24-1834 for 65 Notice of Appeal, filed by Roland L. Butler, Jr., Wes Moore. Case Manager - Kirsten Hancock (av4s, Deputy Clerk) (Entered: 09/04/2024) |
| 09/04/2024 | 70 | ORDER of USCA consolidating Case No. 24-1827 with Case No. 24-1799 and consolidating Case Nos. 24-1834 and 24-1836 with Case No. 24-1799 as cross-appeals as to 61 Notice of Appeal, filed by Maryland State Rifle and Pistol Association, Inc., Susannah Warner Kipke, 65 Notice of Appeal, filed by Roland L. Butler, Jr., Wes Moore (av4s, Deputy Clerk) (Entered: 09/05/2024) |
| 09/10/2024 | 71 | ORDER granting in part and denying in part 64 Plaintiffs' Motion to Enter Final Judgment and Stay Deadline to Seek Attorney Fees; further ordered that the parties shall file a joint status report within 90 days of the date of this Order. Signed by Chief District Judge George Levi Russell, III on 9/10/2024. (ols, Deputy Clerk) (Entered: 09/10/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/29/2024 10:01:33 | | | |
| **PACER Login:** | BABC.Birmingham | **Client Code:** | 206243-401012-00619 |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-01293-GLR |
| **Billable Pages:** | 14 | **Cost:** | 1.40 |

**JA0014**

**Query    Reports    Utilities    Help    Log Out**

APPEAL,CLOSED,MEM

# U.S. District Court
## District of Maryland (Baltimore)
### CIVIL DOCKET FOR CASE #: 1:23-cv-01295-GLR

Novotny et al v. Moore et al                                 Date Filed: 05/16/2023
Assigned to: Chief Judge George Levi Russell, III            Date Terminated: 08/02/2024
Lead case: 1:23-cv-01293-GLR                                 Jury Demand: None
Member case: (View Member Case)                              Nature of Suit: 440 Civil Rights: Other
Case in other court:  Fourth Circuit Court of Appeals, 24-01827   Jurisdiction: Federal Question
                      USCA, 24-01836
Cause: 42:1983 Civil Rights Act - Civil Action for Deprivation of
Rights

**Plaintiff**

**Katherine Novotny**                          represented by    **David H Thompson**
                                                                 Cooper and Kirk PLLC
                                                                 1523 New Hampshire Ave NW
                                                                 Washington, DC 20036
                                                                 2022209659
                                                                 Fax: 2022209601
                                                                 Email: dthompson@cooperkirk.com
                                                                 *PRO HAC VICE*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Peter A Patterson**
                                                                 Cooper and Kirk PLLC
                                                                 1523 New Hampshire Ave. NW
                                                                 Washington, DC 20036
                                                                 2022209670
                                                                 Fax: 2022209601
                                                                 Email: ppatterson@cooperkirk.com
                                                                 *PRO HAC VICE*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Mark William Pennak**
                                                                 Law Offices of Mark W. Pennak
                                                                 7416 Ridgewood Ave
                                                                 Chevy Chase, MD 20815
                                                                 301 873 3671
                                                                 Fax: 301 718 9315
                                                                 Email: m.pennak@me.com
                                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sue Burke**                                  represented by    **David H Thompson**
                                                                 (See above for address)
                                                                 *PRO HAC VICE*

**JA0015**

*ATTORNEY TO BE NOTICED*

**Peter A Patterson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark William Pennak**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Esther Rossberg**                    represented by **David H Thompson**
                                        (See above for address)
                                        *PRO HAC VICE*
                                        *ATTORNEY TO BE NOTICED*

                                        **Peter A Patterson**
                                        (See above for address)
                                        *PRO HAC VICE*
                                        *ATTORNEY TO BE NOTICED*

                                        **Mark William Pennak**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Maryland Shall Issue, Inc.**          represented by **David H Thompson**
                                        (See above for address)
                                        *PRO HAC VICE*
                                        *ATTORNEY TO BE NOTICED*

                                        **Matthew Larosiere**
                                        The Law Office of Matthew Larosiere
                                        6964 Houlton Circle
                                        Lake Worth, FL 33467
                                        5614527575
                                        Email: larosieremm@gmail.com
                                        *PRO HAC VICE*
                                        *ATTORNEY TO BE NOTICED*

                                        **Peter A Patterson**
                                        (See above for address)
                                        *PRO HAC VICE*
                                        *ATTORNEY TO BE NOTICED*

                                        **Mark William Pennak**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Second Amendment Foundation**         represented by **David H Thompson**
                                        (See above for address)
                                        *PRO HAC VICE*

**JA0016**

*ATTORNEY TO BE NOTICED*

**Peter A Patterson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark William Pennak**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Firearms Policy Coalition**              represented by   **David H Thompson**
                                                            (See above for address)
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Peter A Patterson**
                                                            (See above for address)
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Mark William Pennak**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Wesley Moore**                            represented by   **Robert A Scott**
*in his official capacity as Governor of*                   Office of the Attorney General
*Maryland*                                                  Civil Division
                                                            200 St. Paul Place
                                                            20th Floor
                                                            Baltimore, MD 21202
                                                            14105767055
                                                            Email: rscott@oag.state.md.us
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **James Nelson Lewis**
                                                            Office of the Attorney General
                                                            Civil Division
                                                            200 Saint Paul Place
                                                            20th Floor
                                                            Baltimore, MD 21202
                                                            (410) 576-7005
                                                            Fax: (410) 576-6955
                                                            Email: jlewis@oag.state.md.us
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Ryan Robert Dietrich**
                                                            Office of the Attorney General- State of

Maryland
200 St. Paul Place
Baltimore, MD 21202
410-576-7648
Email: rdietrich@oag.state.md.us
*ATTORNEY TO BE NOTICED*

**Defendant**

**Alison M. Healey**                                    represented by  **Robert A Scott**
*in her official capacity as States Attorney*                          (See above for address)
*for Harford County, Maryland*                                         *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **James Nelson Lewis**
                                                                       (See above for address)
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Ryan Robert Dietrich**
                                                                       (See above for address)
                                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**Scott D. Shellenberger**                             represented by  **Robert A Scott**
*in his official capacity as States Attorney for*                      (See above for address)
*Baltimore County, Maryland*                                           *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **James Nelson Lewis**
                                                                       (See above for address)
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Ryan Robert Dietrich**
                                                                       (See above for address)
                                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**Ivan J. Bates**                                      represented by  **Robert A Scott**
*in his official capacity as States Attorney for*                      (See above for address)
*Baltimore City, Maryland*                                             *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **James Nelson Lewis**
                                                                       (See above for address)
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Ryan Robert Dietrich**
                                                                       (See above for address)
                                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**Col Roland L. Butler, Jr.**                          represented by  **Robert A Scott**
*in his official capacity as Superintendent of*                        (See above for address)
*the Maryland State Police*                                            *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**James Nelson Lewis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Robert Dietrich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Paul J. Wiedefeld**
*in his official capacity as Secretary of Transportation*

represented by **Robert A Scott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Nelson Lewis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Robert Dietrich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Joshua Kurtz**
*in his official capacity as Secretary of Natural Resources*

represented by **Robert A Scott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Nelson Lewis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Robert Dietrich**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/16/2023 | 1 | COMPLAINT against Ivan J. Bates, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wesley Moore, Scott D. Shellenberger, Paul J. Wiedefeld ( Filing fee $ 402 receipt number AMDDC-10603576.), filed by Esther Rossberg, Sue Burke, Katherine Novotny, Second Amendment Foundation, Maryland Shall Issue, Inc., Firearms Policy Coalition.(Pennak, Mark) (Entered: 05/16/2023) |
| 05/16/2023 | 2 | NOTICE (of Summons) by Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, Second Amendment Foundation (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons)(Pennak, Mark) Modified on 5/17/2023 (dass, Deputy Clerk). (Entered: 05/16/2023) |
| 05/16/2023 | 3 | NOTICE (of Civil Cover Sheet) by Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, Second Amendment Foundation re 1 |

| | | |
|---|---|---|
| | | Complaint, (Pennak, Mark) Modified on 5/17/2023 (dass, Deputy Clerk). (Entered: 05/16/2023) |
| 05/16/2023 | 4 | NOTICE by Firearms Policy Coalition *Corp. Discl. Statement* (Pennak, Mark) (Entered: 05/16/2023) |
| 05/16/2023 | 5 | NOTICE by Second Amendment Foundation *Corp. Disclosure Statement* (Pennak, Mark) (Entered: 05/16/2023) |
| 05/16/2023 | 6 | NOTICE by Maryland Shall Issue, Inc. *Corp. Disclosure Statement* (Pennak, Mark) (Entered: 05/16/2023) |
| 05/16/2023 | 7 | NOTICE by Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, Second Amendment Foundation re 1 Complaint, *corrected* (Pennak, Mark) (Entered: 05/16/2023) |
| 05/17/2023 | 8 | Summons Issued 21 days as to Wesley Moore (main attachment), Alison M. Healey, Scott D. Shellenberger, Ivan J. Bates, Roland L. Butler, Jr, Paul J. Wiedefeld, Joshua Kurtz. (Attachments: # 1 Summons Healey, # 2 Summons Shellenberger, # 3 Summons Bates, # 4 Summons Butler, # 5 Summons Wiedefeld, # 6 Summons Kurtz) (dass, Deputy Clerk) (Entered: 05/17/2023) |
| 05/17/2023 | 9 | QC NOTICE re: 4 , 5 , and 6 "Notice (other)" filed by Second Amendment Foundation. ***Incorrect event used. The correct event is "Local Rule 103.3 Disclosure Statement". This event would have prompted you to add any entities listed on your documents. Since you have no disclosures listed on your documents, no further actions required. Please note for future.* Thank you. (dass, Deputy Clerk) (Entered: 05/17/2023) |
| 05/17/2023 | 10 | NOTICE of Case Assignment. This case has been assigned to Magistrate Judge Beth P. Gesner. Plaintiffs Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, and Second Amendment Foundation or counsel for Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, and Second Amendment Foundation are required to review and comply with the Magistrate Judge Pilot Project Procedures which can be downloaded here. Pursuant to Standing Order 2019-07, which can be downloaded here, counsel has 14 days from the date of this notice to file their consent, or decline to consent to proceed before a U.S. Magistrate Judge which can be downloaded here. To file your consent, go to *Civil > Other Filings > Other Documents > 25 Pct Mag - Consent to Proceed Before a Magistrate Judge*. To file your declination, go to *Civil > Other Filings > Other Documents > 25 Pct Mag - Decline to Proceed Before a Magistrate Judge*. Failure to file a consent or declination will result in issuance of an Order to Show Cause. Please review the case management order that has been issued in this case. Magistrate Election Form due by 5/31/2023. (dass, Deputy Clerk) (Entered: 05/17/2023) |
| 05/17/2023 | 11 | Case Management Order. Signed by Magistrate Judge Beth P. Gesner on 5/17/2023. (dass, Deputy Clerk) (Entered: 05/17/2023) |
| 05/17/2023 | 12 | SUMMONS Returned Executed by Esther Rossberg, Sue Burke, Katherine Novotny, Second Amendment Foundation, Maryland Shall Issue, Inc., Firearms Policy Coalition. All Defendants. (Attachments: # 1 Proof of Service, # 2 Proof of Servcie, # 3 Proof of Service, # 4 Proof of Service, # 5 Proof of Service, # 6 Proof of Service)(Pennak, Mark) (Entered: 05/17/2023) |
| 05/18/2023 | | Case Reassigned to Judge Richard D. Bennett. Magistrate Judge Beth P. Gesner no longer assigned to the case. (jf3s, Deputy Clerk) (Entered: 05/18/2023) |
| 05/22/2023 | 14 | MOTION to Appear Pro Hac Vice for David H. Thompson (Filing fee $100, receipt number AMDDC-10611801.) by Sue Burke, Firearms Policy Coalition, Maryland Shall |

| | | |
|---|---|---|
| | | Issue, Inc., Katherine Novotny, Esther Rossberg, Second Amendment Foundation(Pennak, Mark) (Entered: 05/22/2023) |
| 05/22/2023 | 15 | MOTION to Appear Pro Hac Vice for Peter A. Patterson (Filing fee $100, receipt number AMDDC-10611832.) by Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, Second Amendment Foundation(Pennak, Mark) (Entered: 05/22/2023) |
| 05/22/2023 | 16 | MOTION to Appear Pro Hac Vice for Matthew Larosiere (Filing fee $100, receipt number AMDDC-10611864.) by Maryland Shall Issue, Inc.(Pennak, Mark) (Entered: 05/22/2023) |
| 05/22/2023 | 17 | CORRECTED MOTION to Appear Pro Hac Vice for David H. Thompson by Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, Second Amendment Foundation. The fee has already been paid.(Pennak, Mark) (Entered: 05/22/2023) |
| 05/22/2023 | 18 | QC NOTICE: 14 Motion to Appear Pro Hac Vice, filed by Firearms Policy Coalition, Esther Rossberg, Katherine Novotny, Sue Burke, Maryland Shall Issue, Inc., Second Amendment Foundation needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 05/22/2023) |
| 05/22/2023 | 19 | PAPERLESS ORDER granting 15 Motion to Appear Pro Hac Vice on behalf of Peter A Patterson. Directing attorney Peter A Patterson to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 5/22/2023. (mh4s, Deputy Clerk) (Entered: 05/22/2023) |
| 05/22/2023 | 20 | QC NOTICE: 16 Motion to Appear Pro Hac Vice filed by Maryland Shall Issue, Inc. needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 05/22/2023) |
| 05/22/2023 | 21 | PAPERLESS ORDER granting 17 Corrected Motion to Appear Pro Hac Vice on behalf of David H Thompson. Directing attorney David H Thompson to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 5/22/2023. (mh4s, Deputy Clerk) (Entered: 05/22/2023) |
| 05/23/2023 | 22 | CORRECTED MOTION to Appear Pro Hac Vice for Matthew Larosiere by Maryland Shall Issue, Inc.. The fee has already been paid.(Pennak, Mark) (Entered: 05/23/2023) |
| 05/23/2023 | 23 | PAPERLESS ORDER granting 22 Corrected Motion to Appear Pro Hac Vice on behalf of Matthew Larosiere. Directing attorney Matthew Larosiere to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 5/23/2023. (mh4s, Deputy Clerk) (Entered: 05/23/2023) |
| 05/24/2023 | 24 | MOTION for Preliminary Injunction by Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, Second Amendment Foundation (Attachments: # 1 Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, # 2 Exhibit A - SB 1, # 3 Exhibit B - Novotny Declaration, # 4 Exhibit C - Burke Declaration, # 5 Exhibit D - Rossberg Declaration, # 6 Exhibit E - Carlin-Weber Declaration, # 7 Exhibit F - Gottlieb Declaration, # 8 Exhibit G - Combs Declaration, # 9 Text of Proposed Order, # 10 Certificate of Service)(Thompson, David) (Entered: 05/24/2023) |
| 05/25/2023 | | Case Reassigned to Chief Judge James K. Bredar. Judge Richard D. Bennett no longer assigned to the case. (chs, Deputy Clerk) (Entered: 05/25/2023) |

| 05/25/2023 | | Case Reassigned to Judge George Levi Russell, III. Chief Judge James K. Bredar no longer assigned to the case. (chs, Deputy Clerk) (Entered: 05/25/2023) |
|---|---|---|
| 05/30/2023 | 25 | Consent MOTION for Extension of Time to File Response/Reply *to Complaint* by Ivan J. Bates, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wesley Moore, Scott D. Shellenberger, Paul J. Wiedefeld. (Attachments: # 1 Text of Proposed Order)(Scott, Robert) (Entered: 05/30/2023) |
| 05/30/2023 | 26 | MOTION for Extension of Time to File Response/Reply *to Motion for Preliminary Injunction* by Ivan J. Bates, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wesley Moore, Scott D. Shellenberger, Paul J. Wiedefeld. (Attachments: # 1 Text of Proposed Order)(Scott, Robert) (Entered: 05/30/2023) |
| 05/30/2023 | 27 | ORDER granting 25 Consent MOTION for Extension of Time to File Response/Reply to Complaint; time to respond is extended to June 28, 2023. Signed by Judge George Levi Russell, III on 5/30/2023. (ybs, Deputy Clerk) (Entered: 05/30/2023) |
| 05/30/2023 | 28 | ORDER granting 26 MOTION for Extension of Time to File Response/Reply to Motion for Preliminary Injunction; deadline to respond is extended to June 28, 2023. Signed by Judge George Levi Russell, III on 5/30/2023. (ybs, Deputy Clerk) (Entered: 05/30/2023) |
| 05/30/2023 | 29 | NOTICE of Appearance by Ryan Robert Dietrich on behalf of All Defendants (Dietrich, Ryan) (Entered: 05/30/2023) |
| 05/31/2023 | 30 | MOTION to Consolidate Cases by Ivan J. Bates, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wesley Moore, Scott D. Shellenberger, Paul J. Wiedefeld (Attachments: # 1 Text of Proposed Order)(Lewis, James) (Entered: 05/31/2023) |
| 06/01/2023 | 31 | RESPONSE to Motion re 30 MOTION to Consolidate Cases filed by Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, Second Amendment Foundation. (Attachments: # 1 Text of Proposed Order Proposed Order, # 2 Certificate of Service)(Pennak, Mark) (Entered: 06/01/2023) |
| 06/01/2023 | 32 | ORDER: SCHEDULING TELEPHONE STATUS CONFERENCE on Friday June 9, 2023 at 11:00a.m. Plaintiff's counsel to initiate the call to chambers or circulate a conference call number to the parties. Signed by Judge George Levi Russell, III on 6/1/2023. (ats, Chambers) (Entered: 06/01/2023) |
| 06/01/2023 | 33 | RESPONSE to Motion re 30 MOTION to Consolidate Cases *Corrected* filed by Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, Second Amendment Foundation. (Attachments: # 1 Text of Proposed Order, # 2 certificate of service)(Pennak, Mark) (Entered: 06/01/2023) |
| 06/09/2023 | 34 | REPLY to Response to Motion re 30 MOTION to Consolidate Cases filed by Ivan J. Bates, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wesley Moore, Scott D. Shellenberger, Paul J. Wiedefeld.(Lewis, James) (Entered: 06/09/2023) |
| 06/26/2023 | 35 | Consent MOTION for Leave to File Excess Pages by Ivan J. Bates, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wesley Moore, Scott D. Shellenberger, Paul J. Wiedefeld (Attachments: # 1 Text of Proposed Order)(Lewis, James) (Entered: 06/26/2023) |
| 06/28/2023 | 36 | MOTION to Dismiss for Failure to State a Claim*and Opposition to Preliminary Injunction* by Ivan J. Bates, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wesley Moore, Scott D. Shellenberger, Paul J. Wiedefeld (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, |

**JA0022**

|  |  | # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit, # 34 Exhibit, # 35 Exhibit, # 36 Exhibit, # 37 Exhibit, # 38 Exhibit, # 39 Exhibit, # 40 Exhibit, # 41 Exhibit, # 42 Exhibit, # 43 Exhibit, # 44 Exhibit, # 45 Exhibit, # 46 Exhibit, # 47 Exhibit, # 48 Exhibit, # 49 Exhibit, # 50 Exhibit, # 51 Exhibit, # 52 Exhibit, # 53 Exhibit, # 54 Exhibit, # 55 Exhibit, # 56 Exhibit, # 57 Exhibit, # 58 Exhibit, # 59 Exhibit, # 60 Exhibit, # 61 Exhibit, # 62 Exhibit, # 63 Exhibit, # 64 Exhibit, # 65 Exhibit, # 66 Exhibit, # 67 Exhibit, # 68 Exhibit, # 69 Exhibit, # 70 Exhibit, # 71 Exhibit, # 72 Exhibit, # 73 Exhibit, # 74 Exhibit, # 75 Exhibit, # 76 Exhibit, # 77 Exhibit, # 78 Exhibit, # 79 Exhibit, # 80 Exhibit, # 81 Exhibit, # 82 Exhibit, # 83 Exhibit, # 84 Exhibit, # 85 Exhibit, # 86 Exhibit, # 87 Exhibit, # 88 Exhibit, # 89 Exhibit, # 90 Exhibit, # 91 Exhibit, # 92 Exhibit, # 93 Exhibit, # 94 Exhibit, # 95 Exhibit, # 96 Exhibit, # 97 Exhibit, # 98 Exhibit, # 99 Exhibit, # 100 Exhibit, # 101 Exhibit, # 102 Exhibit, # 103 Exhibit, # 104 Exhibit, # 105 Exhibit, # 106 Text of Proposed Order, # 107 Text of Proposed Order)(Dietrich, Ryan) (Entered: 06/28/2023) |
| 06/29/2023 | 37 | ORDER granting 35 Consent Motion for Leave to File Memorandum of Law Exceeding Page Limits. Signed by Judge George Levi Russell, III on 6/29/2023. (dass, Deputy Clerk) (Entered: 06/29/2023) |
| 07/12/2023 | 38 | REPLY to Response to Motion re 24 MOTION for Preliminary Injunction , 36 MOTION to Dismiss for Failure to State a Claim*and Opposition to Preliminary Injunction* filed by Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg, Second Amendment Foundation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC)(Thompson, David) (Entered: 07/12/2023) |
| 07/13/2023 | 39 | ORDER granting 30 Defendants' Motion to Consolidate Cases; consolidating cases GLR-23-1293 and GLR-23-1295 with Kipke as the lead case. Signed by Judge George Levi Russell, III on 7/13/2023. (ols, Deputy Clerk) (Entered: 07/13/2023) |
| 07/13/2023 |  | THIS IS A CONSOLIDATED CASE. PLEASE DO NOT ELECTRONICALLY FILE OR SPREAD TEXT IN THIS CASE. ALL SUBSEQUENT PLEADINGS ARE TO BE ELECTRONICALLY FILED ONLY IN THE LEAD CASE (GLR-23-1293). (ols, Deputy Clerk) (Entered: 07/13/2023) |
| 09/29/2023 | 40 | MEMORANDUM OPINION. Signed by Judge George Levi Russell, III on 9/29/2023. (dass, Deputy Clerk) (Entered: 09/29/2023) |
| 09/29/2023 | 41 | ORDER granting in part and denying in part 24 MOTION for Preliminary Injunction filed by Firearms Policy Coalition, Esther Rossberg, Katherine Novotny, Sue Burke, Maryland Shall Issue, Inc., Second Amendment Foundation as set forth (in Member Case 23-cv-1295); Enjoining State Defendants from enforcing the laws set forth; denying State Defendants' Motions for Preliminary Injunction in all other respects; denying without prejudice State Defendants' 36 Motion to Dismiss filed in "Novotny" (Member Case 23-cv-1295); denying without prejudice Motions for Summary Judgment filed in "Kipke" (Lead Case 23-cv-1293); setting deadline for parties to file a joint status report informing the court of matters set forth. Signed by Judge George Levi Russell, III on 9/29/2023. (dass, Deputy Clerk) (Entered: 09/29/2023) |
| 10/02/2023 | 42 | MOTION Rule 60 Motion for Relief from Order re (32 in 1:23-cv-01293-GLR, 32 in 1:23-cv-01293-GLR, 32 in 1:23-cv-01293-GLR, 32 in 1:23-cv-01293-GLR, 32 in 1:23-cv-01293-GLR, 32 in 1:23-cv-01293-GLR) Order on Motion for Summary Judgment,, Order on Motion for Miscellaneous Relief,,,,,, Order on Motion for Preliminary Injunction,,, (41 |

| | | |
|---|---|---|
| | | in 1:23-cv-01295-GLR) Order,,, by Ivan J. Bates, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wesley Moore, Scott D. Shellenberger, Paul J. Wiedefeld, Ivan J. Bates, Roland L. Butler, Jr, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wes Moore, Scott D. Shellenberger, Paul J. Wiedefeld (Attachments: # 1 Text of Proposed Order)Associated Cases: 1:23-cv-01293-GLR, 1:23-cv-01295-GLR(Lewis, James) (Entered: 10/02/2023) |
| 11/20/2023 | 43 | PAPERLESS ORDER granting 42 Motion as stated in Kipke, GLR-23-1293, ECF No. 35. Signed by Judge George Levi Russell, III on 11/20/2023. (cb6s, Chambers) (Entered: 11/20/2023) |
| 08/02/2024 | 44 | MEMORANDUM OPINION. Signed by Chief District Judge George Levi Russell, III on 8/2/2024. (ols, Deputy Clerk) (Entered: 08/02/2024) |
| 08/02/2024 | 45 | ORDER granting in part and denying in part 13 18 Plaintiffs' Motions for Summary Judgment; granting in part and denying in part 21 23 State Defendants' Cross Motions for Summary Judgment in case 1:23-cv-01293-GLR; further ordered that the Clerk shall close these consolidated cases. Signed by Chief District Judge George Levi Russell, III on 8/2/2024. Associated Cases: 1:23-cv-01293-GLR, 1:23-cv-01295-GLR (ols, Deputy Clerk) (Entered: 08/02/2024) |
| 08/07/2024 | 46 | Consent MOTION modify text of order re (58 in 1:23-cv-01293-GLR, 58 in 1:23-cv-01293-GLR, 58 in 1:23-cv-01293-GLR, 58 in 1:23-cv-01293-GLR, 58 in 1:23-cv-01293-GLR) Order on Motion for Summary Judgment,, Order on Motion for Miscellaneous Relief,,,,,, by Ivan J. Bates, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wesley Moore, Scott D. Shellenberger, Paul J. Wiedefeld, Roland L. Butler, Jr, Joshua Kurtz, Wes Moore (Attachments: # 1 Text of Proposed Order)Associated Cases: 1:23-cv-01293-GLR, 1:23-cv-01295-GLR(Dietrich, Ryan) (Entered: 08/07/2024) |
| 08/08/2024 | 47 | ORDER granting ECF no. 59 Consent Motion in case 1:23-cv-01293-GLR (and ECF no. 46 in 1:23-cv-01295-GLR) to modify the Orders granting Summary Judgment in each case as set forth. Signed by Chief District Judge George Levi Russell, III on 8/8/2024. Associated Cases: 1:23-cv-01293-GLR, 1:23-cv-01295-GLR(dass, Deputy Clerk) (Entered: 08/08/2024) |
| 08/27/2024 | 48 | NOTICE OF APPEAL as to 44 Memorandum Opinion by Sue Burke, Firearms Policy Coalition, Maryland Shall Issue, Inc., Katherine Novotny, Esther Rossberg and Second Amendment Foundation. Filing fee $ 605, receipt number AMDDC-11452549.(Thompson, David) (Entered: 08/27/2024) |
| 08/27/2024 | 49 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 48 Notice of Appeal,. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Entered: 08/27/2024) |
| 08/29/2024 | 50 | NOTICE OF APPEAL as to 47 Order on Motion for Miscellaneous Relief, 45 Order on Motion for Summary Judgment,, Order on Motion for Miscellaneous Relief,,,,,,, by Ivan J. Bates, Roland L. Butler, Jr, Alison M. Healey, Joshua Kurtz, Wesley Moore, Scott D. Shellenberger, Paul J. Wiedefeld. Filing fee $ 605, receipt number AMDDC-11458583. (Dietrich, Ryan) (Entered: 08/29/2024) |
| 08/29/2024 | 51 | USCA Case Number 24-1827 for 48 Notice of Appeal, filed by Firearms Policy Coalition, Esther Rossberg, Katherine Novotny, Sue Burke, Maryland Shall Issue, Inc., Second Amendment Foundation. Case Manager - Kirsten Hancock. (slss, Deputy Clerk) (Entered: 08/30/2024) |

| 08/30/2024 | 52 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 50 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Entered: 08/30/2024) |
| 09/04/2024 | 53 | USCA Case Number 24-1836 for 50 Notice of Appeal, filed by Roland L. Butler, Jr., Wesley Moore, Alison M. Healey, Ivan J. Bates, Scott D. Shellenberger, Paul J. Wiedefeld, Joshua Kurtz. Case Manager - Kirsten Hancock (av4s, Deputy Clerk) (Entered: 09/04/2024) |
| 09/04/2024 | 54 | ORDER of USCA consolidating Case No. 24-1827 with Case No. 24-1799 and consolidating Case Nos. 24-1834 and 24-1836 with Case No. 24-1799 as cross-appeals as to 48 Notice of Appeal, filed by Firearms Policy Coalition, Esther Rossberg, Katherine Novotny, Sue Burke, Maryland Shall Issue, Inc., Second Amendment Foundation, 50 Notice of Appeal, filed by Roland L. Butler, Jr., Wesley Moore, Alison M. Healey, Ivan J. Bates, Scott D. Shellenberger, Paul J. Wiedefeld, Joshua Kurtz (av4s, Deputy Clerk) (Entered: 09/05/2024) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 10/29/2024 10:01:57 | | |
| **PACER Login:** | BABC.Birmingham | **Client Code:** 206243-401012-00619 |
| **Description:** | Docket Report | **Search Criteria:** 1:23-cv-01295-GLR |
| **Billable Pages:** | 12 | **Cost:** 1.20 |

**JA0025**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| SUSANNAH WARNER KIPKE, | ) |
| 311 Eagle Hill Road | ) |
| Pasadena, Maryland 21122 | ) |
| Anne Arundel County | ) |
| | ) |
| *and* | ) |
| | ) |
| MARYLAND STATE RIFLE AND PISTOL | ) |
| ASSOCIATION, INC., | ) |
| 341 Whitfield Road | ) |
| Catonsville, Maryland 21228 | ) |
| Baltimore County | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| v. | )    Civil Action No. _____ |
| | ) |
| WES MOORE, in his official capacity | ) |
| as Governor of Maryland, | ) |
| 100 State Circle | ) |
| Annapolis, Maryland 21401 | ) |
| Anne Arundel County | ) |
| | ) |
| *and* | ) |
| | ) |
| ROLAND L. BUTLER, JR, in his official | ) |
| capacity as Maryland State Police | ) |
| Superintendent and Secretary, | ) |
| 1201 Reisterstown Road | ) |
| Pikesville, Maryland 21208 | ) |
| Baltimore County | ) |
| | ) |
| *Defendants.* | ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Susannah Warner Kipke ("Mrs. Kipke") and the Maryland State Rifle and Pistol

Association, Inc. ("MSRPA") (collectively "Plaintiffs"), by and through the undersigned

attorneys, file this Complaint against the above-captioned Defendants, in their official capacities

as state officials responsible under Maryland law for administering and enforcing the State's laws

and regulations governing the carrying of handguns outside the home. Plaintiffs seek a declaration that Maryland's restrictions and burdens on the right to carry a handgun outside the home for self-defense, as enacted in Senate Bill 1, House Bill 824, and under pre-existing Maryland law, are unconstitutional under the First, Second, and Fourteenth Amendments to the United States Constitution. Plaintiffs also seek an injunction barring Defendants from enforcing those unconstitutional restrictions. In support of their Complaint against Defendants, Plaintiffs hereby make the following allegations.

**INTRODUCTION**

1.      The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. Const. amend. II. In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court made clear that the text of the Second Amendment protects the right to keep arms in the home and the right to bear them outside the home equally. "Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id*. at 2134; *see also id*. at 2135 ("The Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' and confrontation can surely take place outside the home.") (quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)). This guarantee protects the right of "ordinary, law-abiding, adult citizens" to "carry[] handguns publicly for self-defense." *Id*. at 2134.

2.      At issue in *Bruen* was a New York law that prohibited the granting of licenses to carry a handgun outside the home for self-defense unless the applicant could demonstrate that they had "proper cause" for obtaining a permit to carry a handgun. *Id.* at 2122–23. *Bruen* struck down that requirement, holding that the Second Amendment precludes "licensing laws[] under which authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the

statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license." *Id*. at 2123–24.

3.       One month after the Supreme Court decided *Bruen*, the Maryland Appellate Court invalidated Md. Code Ann., Pub. Safety §  5-306(a)(6)(ii), which similarly required an applicant for a carry permit to demonstrate that he "has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger." *Matter of Rounds*, 255 Md. App. 205, 212 (2022). The court held that the similarities between the Maryland statute and the New York statute invalidated in *Bruen* were "self-evident" and that *Bruen* "expressly noted that Maryland was one of six states" with a law analogous to New York's. *Id*

4.       In response to—and in defiance of—*Bruen* and *Rounds*, Maryland enacted Senate Bill 1 and House Bill 824, both of which take effect on October 1, 2023. Through these bills, Maryland replaced one blatantly unconstitutional licensing regime with another blatantly unconstitutional licensing regime. The bills contain unconstitutional restrictions on where and how ordinary, law-abiding Maryland citizens with a carry permit may exercise their right to carry a handgun for self-defense outside the home, unconstitutional requirements for obtaining a carry permit, and provisions unconstitutionally compelling speech from property owners who do not wish to prohibit ordinary, law-abiding Maryland citizens with a carry permit from carrying a handgun on their property. These new laws, in addition to certain challenged restrictions that pre-existed Senate Bill 1 and House Bill 824 (collectively, the "Carry Permit Requirements"), destroy the right recognized in *Bruen*—the right of ordinary, law-abiding citizens to bear arms for self-defense outside the home—in the state of Maryland.

5.       Plaintiffs include an ordinary, law-abiding and responsible citizen of Maryland and an advocacy organization representing the interests of ordinary, law-abiding and responsible citizens in Maryland, who wish to exercise their fundamental, individual right to carry a handgun for self-defense outside the home and would do so but for the reasonable fear of prosecution as a result of Defendants' enforcement of the unconstitutional laws and regulations challenged in this lawsuit.

## JURISDICTION AND VENUE

6.       This Court has subject-matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331 and 1343.

7.       Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201, and 2202, and 42 U.S.C. §§ 1983 and 1988.

8.       Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (b)(2).

## PARTIES

9.       Plaintiff Susannah Warner Kipke is a citizen of the United States and a resident and citizen of the State of Maryland. She resides at 311 Eagle Hill Road, Pasadena, Maryland 21122. Mrs. Kipke is a federally licensed firearms dealer and Maryland regulated firearms dealer. She owns and operates a small business in Millersville, Maryland: Mrs. Kipke's Secure Gun Storage.

10.      Mrs. Kipke obtained her Maryland carry permit in or around 2021 and obtained a Florida carry permit in or around the same year that allows reciprocity in other states in which she travels. She lawfully owns a handgun that she keeps in her home to defend herself and her family. She desires to carry a handgun outside the home for the defense of herself and her family.

11.      Mrs. Kipke is not a law enforcement officer or a member of the armed forces, and she does not fall within any of the other exceptions to Maryland's restrictions on carrying a handgun outside the home.

12.     But for the reasonable fear of prosecution for violation of the challenged Carry Permit Requirements, Mrs. Kipke could and would exercise her right to carry a handgun in unconstitutionally restricted locations including the following: a state park, a state forest, a state highway rest area, on the grounds of a private primary school (but not in the school buildings themselves), the Camden Yards Sports Complex, a healthcare facility, a building owned or leased by a unit of state or local government, a restaurant that may serve alcohol for on-site consumption, a stadium, a museum, an amusement park, a racetrack, a demonstration in a public place (and/or in a vehicle that is within 1,000 feet of a demonstration in a public place), and in various other locations that do not prohibit firearms on their property including her grocery store, drug store, and gas station.

13.     Mrs. Kipke owns or leases property and wishes to allow individuals to possess firearms on that property without posting clear and conspicuous signage indicating that the carrying of firearms on her property is permitted (or otherwise providing express permission to individuals specifically or the public generally). But for the reasonable fear of prosecution for violation of the challenged Carry Permit Requirements, Mrs. Kipke could and would allow individuals to possess firearms on her property without posting clear and conspicuous signage indicating that the carrying of firearms is permitted on her property (or otherwise providing express permission to individuals specifically or the public generally).

14.     Plaintiff Maryland State Rifle and Pistol Association is an association organized to defend the right of ordinary, law-abiding Maryland residents to keep and bear arms. MSRPA is located at 341 Whitfield Road, Catonsville, Maryland 21228. MSRPA advocates on behalf of itself and its individual members. MSRPA is the flagship gun rights organization in and for the State of Maryland. MSRPA offers both individual and club memberships. MSRPA provides support for

the shooting disciplines and legislative activities primarily through a system of committees. All

staff and participants are volunteers. MSRPA's activities include:

  a.     Maintaining a statewide network of gun rights activists for informing

legislators, other public officials, and the media about the interests of the gun-owning community;

  b.     Promoting marksmanship and safe firearms handling via affiliated clubs

and statewide programs;

  c.     Organizing and sanctioning state championship matches in all shooting

disciplines;

  d.     Conducting Junior Programs in the shooting sports; and

  e.     Promoting hunter safety.

  15.    The Carry Permit Requirements at issue in this lawsuit compromise MSRPA's

central mission and directly harm MSRPA as an organization by undermining its message and

acting as an obstacle to the organization's objectives and purposes. MSRPA brings this action to

redress the ongoing injury caused by Defendants' frustration of its mission and the consequent

diversion of resources away from MSRPA's other projects, as well as to educate the public about

and advocate against legislative overreach such as the Carry Permit Restrictions it challenges here.

  16.    Plaintiff MSRPA has thousands of members who reside in Maryland and are not

active or retired law enforcement officers or members of the armed forces, and who do not fall

within any of the other exceptions to Maryland's restrictions on obtaining a carry permit or

carrying a handgun outside the home. Many of these MSRPA members will be deterred by the

challenged Carry Permit Requirements from exercising their right to carry a handgun for self-

defense outside of the home.

17.    Plaintiff MSRPA has at least one member who could and would, but for the reasonable fear of prosecution for violation of the challenged Carry Permit Requirements, exercise their right to carry a handgun for self-defense in unconstitutionally restricted locations, including the following: a state park, a state forest, a state highway rest area, a transit facility or transit vehicle owned or controlled by the Maryland Transit Administration, the grounds of public school property (but not in school buildings themselves), the grounds of a preschool or prekindergarten facility and on the grounds of a private primary and secondary school (but not in school buildings themselves), on the property and/or grounds under the jurisdiction of the Department of General Services, on the grounds of a facility under the jurisdiction of the Maryland Racing Commission, the Camden Yards Sports Complex, a healthcare facility, a property operated as a museum by the Department of Planning or a unit within the Department of Planning, a building owned or leased by a unit of state or local government, a location licensed to sell or dispense alcohol or cannabis for on-site consumption, a stadium, a museum, an amusement park, a racetrack, a video lottery facility, and a demonstration in a public place (and/or in a vehicle that is within 1,000 feet of a demonstration in a public place).

18.    Plaintiff MSRPA has at least one member who owns or leases property and wishes to allow individuals to possess firearms on their property without posting clear and conspicuous signage indicating that the carrying of handguns on their property is permitted on their property (or otherwise providing express permission to individuals specifically or the public generally). But for the reasonable fear of prosecution for violation of the challenged Carry Permit Requirements, MSRPA members could and would allow individuals to possess firearms on their property without posting clear and conspicuous signage indicating that the carrying of handguns is permitted on that

property (or otherwise providing express permission to individuals specifically or the public generally).

19.    Plaintiff MSRPA has at least one member who possesses all of the qualifications necessary to apply for and obtain a carry permit and who will be deterred from completing an application for a carry permit because of the expense, inconvenience, and other impermissible burdens of the application process and its constituent parts, as well as the restrictions on carry permit holders. But for Defendants' continued enforcement of the challenged Carry Permit Requirements, that member would forthwith complete an application for a carry permit.

20.    Defendant Moore is being sued in his official capacity. As Governor, he is the executive branch official with the ultimate responsibility for the enforcement of Maryland's laws and regulations governing the carrying of handguns outside the home. Together with the co-Defendant, Defendant Moore is ultimately responsible for executing and administering the State of Maryland's laws and policies at issue in this lawsuit. Defendant Moore has signaled his intention to enforce the challenged laws against Mrs. Kipke and MSRPA's members.

21.    Defendant Butler is being sued in his official capacity. Defendant Butler is directly responsible for executing and administering the State of Maryland's laws and policies at issue in this lawsuit. Together with the co-Defendant, Defendant Butler is ultimately responsible for executing and administering the State of Maryland's laws and policies at issue in this lawsuit. Defendant Butler has signaled his intention to enforce the challenged laws against Mrs. Kipke and MSRPA's members.

## FACTUAL ALLEGATIONS

22.     Maryland law generally forbids any person from "wear[ing], carry[ing], or transport[ing] a handgun, whether concealed or open, on or about the person." Md. Code Ann., Crim. Law § 4-203(a)(1). Violating this ban is a misdemeanor, punishable by a fine and/or imprisonment. *Id.* § 4-203(c). Maryland's ban is subject to exceptions for active-duty members of the military, police officers, and peace officers. *Id.* § 4-203(b)(1). Unlike the ordinary citizen, none of these special categories of individuals are required to obtain a carry permit to wear, carry, or transport a handgun on or about the person.

23.     An ordinary, law-abiding member of the general public who wishes to carry a handgun for self-defense outside the home can do so only if he obtains a carry permit under Title 5, Subtitle 3 of Maryland's Public Safety Article. *Id.* § 4-203(b)(2); *see also* Md. Code Ann., Pub. Safety § 5-303 ("A person shall have a permit issued under this subtitle before the person carries, wears, or transports a handgun.").

### The Carry Permit Requirements

24.     Under existing Maryland law, ordinary, law-abiding Maryland citizens with a carry permit may not carry a handgun for self-defense:

   a.      In a state park or state forest. COMAR 08.07.06.04; COMAR 08.01.07.14.

   b.      In a state highway rest area. COMAR 11.04.07.12.

   c.      In a transit facility or transit vehicle owned or controlled by the Maryland Transit Administration. Md. Code Ann., Transp. § 7-705(b)(6).

   d.      On public school property, including the grounds beyond the school buildings themselves. Md. Code Ann., Crim. Law § 4-102(b).

e.      On the property of state public buildings, improvements, grounds, and multiservice centers under the jurisdiction of the Department of General Services. COMAR 04.05.01.03.

f.      On the grounds of a facility under the jurisdiction of the Maryland Racing Commission. COMAR 09.10.03.03(A)(10).

g.      In the Camden Yards Sports Complex, including Oriole Park at Camden Yards and the Ravens' Stadium and offices, restaurants, stores, museums, parking facilities, and other facilities located on the Camden Yards Sports Complex, which include the grounds and walkways surrounding those facilities. COMAR 14.25.01.01; 14.25.02.06.

h.      In a video lottery facility. COMAR 36.03.01.02(B)(6); 36.03.10.48.

i.      Any property operated as a museum by the Department of Planning or a unit within the Department of Planning. COMAR 34.04.08.02; 34.04.08.04.

j.      At a demonstration in a public place or in a vehicle that is within 1,000 feet of a demonstration in a public place after having been advised by a law enforcement officer that a demonstration is occurring at the public place and having been ordered by the law enforcement officer to leave the area of the demonstration until the person disposes of the firearm. Md. Code Ann., Crim. Law § 4-208(b)(2). "Demonstration" means one or more persons demonstrating, picketing, speechmaking, marching, holding a vigil, or engaging in any other similar conduct that involves the communication or expression of views or grievances and that has the effect, intent, or propensity to attract a crowd or onlookers. *Id*. § 4-208(a)(2). "Public place" means a place to which the general public has access and a right to resort for business, entertainment, or other lawful purpose and includes the front or immediate area or parking lot of a store, restaurant, tavern, shopping center, or other place of business; a public building, including its grounds and curtilage;

a public parking lot; a public street, sidewalk, or right-of-way; a public park; and "other public grounds." *Id*. § 4-208(a)(6).

25.      Senate Bill 1 further restricts where ordinary, law-abiding Maryland citizens with a carry permit, including Mrs. Kipke and MSRPA's members, may exercise their fundamental right to carry a handgun for self-defense outside the home.

26.      Senate Bill 1 adds Section 4-111 to Title 4 of the Criminal Code, forbidding ordinary, law-abiding Maryland citizens with a carry permit from possessing or carrying a handgun for self-defense in:

    a.      An "area for children and vulnerable individuals," which is defined to include (i) preschool or prekindergarten facility or the grounds of the facility, including the grounds beyond the school buildings themselves; and (ii) a private primary or secondary school or the grounds of the school, including the grounds beyond the school buildings themselves.

    b.      A health care facility, as defined in § 15-10B-01(g)(1), (2), (3), and (4) of the insurance article.

    c.      A "government or public infrastructure area," which is defined in pertinent part to include (i) a building or any part of a building owned or leased by a unit of state or local government; or (ii) a building of a public or private institution of higher education, as defined in § 10-101 of the education article.

    d.      A "special purpose area," which is defined to include (i) a location licensed to sell or dispense alcohol or cannabis for on-site consumption; (ii) a stadium; (iii) a museum; (iv) an amusement park; (v) a racetrack; or (vi) a video lottery facility, as defined in § 9-1A-01 of the state government article.

27.     Senate Bill 1 exempts retired law enforcement officers from its restrictions on where law-abiding Maryland citizens with a carry permit may exercise their fundamental right to carry a handgun for self-defense outside the home.

28.     A violation of Section 4-111 is a misdemeanor punishable by imprisonment not exceeding one year and a fine not exceeding $1,000 or both. Md. Code Ann., Crim. Law § 4-111(f).

29.     Senate Bill 1 adds Section 6-411 to Title 4 of the Criminal Code, which is contrary to the presumptive right to carry outside the home on private property absent a posting to the contrary by forbidding ordinary, law-abiding Maryland citizens with a carry permit from possessing or carrying a firearm for self-defense in:

         a.     The Property of another unless the owner or the owner's agent has posted a clear and conspicuous sign indicating that it is permissible to wear, carry, or transport a firearm on the Property. "Property" means "a building" and is different than the separately defined "Dwelling," which is not at issue in this lawsuit.

         b.     The Property of another unless the owner or the owner's agent has given the person express permission to wear, carry, or transport a firearm on the Property.

30.     A violation of Section 6-411 is a misdemeanor punishable by imprisonment not exceeding one year and a fine not exceeding $1,000 or both. Md. Code Ann., Crim. Law § 6-411(e).

31.     A person seeking a carry permit must apply to Defendant Butler to do so. Md. Code Ann., Pub. Safety § 5-304. House Bill 824 raises the nonrefundable fee Defendant Butler may charge to file an application from $75 to $125 for an initial application and from $50 to $75 for a renewal application. *Id*. § 5-304(b)(2). As part of this application, the applicant must submit two

complete sets of the applicant's legible fingerprints taken on forms approved by the Director of the Central Repository and the Director of the Federal Bureau of Investigation. *Id*. § 5-305(c).

32.    To be eligible for a carry permit, an applicant must satisfy numerous criteria. For example, he must be at least 21 years old, must not have been convicted of any felony or serious offense (including certain misdemeanors), must not be an unlawful user of a controlled substance, and must not have any history of mental illness. Md. Code Ann., Pub. Safety § 5-306.

33.    Before the enactment of House Bill 824, Section 5-306(a)(5) of the Code of Public Safety required an applicant to "successfully complete[] prior to application and each renewal, a firearms training course approved by the Secretary that includes: (i) 1. for an initial application, a minimum of 16 hours of instruction by a qualified handgun instructor; or 2. for a renewal application, 8 hours of instruction by a qualified handgun instructor; (ii) classroom instruction on: 1. State firearm law; 2. home firearm safety; and 3. handgun mechanisms and operation; and (iii) a firearms qualification component that demonstrates the applicant's proficiency and use of the firearm." Md. Code Ann., Pub. Safety § 5-306(a)(5) (2013).

34.    Section 5-306(a)(5) now requires that the firearms training course be in person and include: "(i) State and federal firearm laws, including laws relating to: 1. Self-defense; 2. Defense of others; 3. Defense of property; 4. The safe storage of firearms; 5. The circumstances under which an individual becomes prohibited from possessing a firearm under state and federal law, including becoming a respondent against whom: A. A current non ex parte civil protective order has been entered under § 4-506 of the family law article; B. An order for protection, as defined in § 4-508.1 of the family law article, has been issued by a court of another state or a native American tribe and is in effect; or C. A current extreme risk protective order has been entered under subtitle 6 of this title; 6. The requirements and options for surrendering, transferring, or otherwise

disposing of a firearm after becoming prohibited from possessing a firearm under state or federal law; 7. The requirements for reporting a loss or theft of a firearm to a law enforcement agency as required by § 5-146 of this title; 8. The firearms and firearm accessories which are banned under state and federal law; 9. The types of firearms that require a special permit or registration to acquire or possess under state or federal law; 10. The law prohibiting straw purchases; 11. The law concerning armed trespass under § 6-411 of the criminal law article; and 12. The locations where a person is prohibited from possessing a firearm regardless of whether the person possesses a permit issued under this subtitle; (ii) home firearm safety; (iii) handgun mechanisms and operations; (iv) conflict de-escalation and resolution; (v) anger management; and (vi) suicide prevention; and (3) a firearm qualification component that includes live-fire shooting exercise on a firing range and requires the applicant to demonstrate: (i) safe handling of a handgun; and (ii) shooting proficiency with a handgun. Md. Code Ann., Pub. Safety § 5-306(a)(5). Many of these new requirements have nothing to do with the safe and lawful carry of a handgun outside of the home.

35.     Section 5-306(b) exempts retired law enforcement officers from completing the certified firearms training course requirement, and Section 5-304(d) exempts retired law enforcement officers from the carry permit application fee.

36.     The applicant must also satisfy subjective criteria: that the applicant "based on an investigation: has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another." Md. Code Ann., Pub. Safety § 5-306(a)(6). Maryland law does not define what the subjective criteria mean or how one avoids being disqualified to carry a handgun under it, or what the investigation may entail.

14
JA0039

37.    A carry permit expires on the last day of the permit holder's birth month following two years after the date the permit is issued. Md. Code Ann., Pub. Safety § 5-309(a). A carry permit may be renewed for successive periods of three years each if, at the time of an application for renewal, the applicant possesses the qualifications for the issuance of a permit, completes eight hours of instruction by a qualified handgun instructor, and pays the renewal fee. *Id*. §§ 5-306(a)(5), 309(b).

38.    Defendant Butler has no deadline to approve or deny a carry permit application. *See* Md. Code Ann., Pub. Safety § 5-306(a)(1) ("the Secretary shall issue a permit within a reasonable time . . ."). A person whose application for a carry permit or renewal of a carry permit is not acted on by Defendant Butler within 90 days after submission of the application may request a hearing before the Office of Administrative Hearings by filing a written request with Defendant Butler and the Office of Administrative Hearings. *Id*. § 5-312(a). A hearing shall be held within 60 days of the request for a hearing, and a decision must be rendered within 90 days of the hearing. *Id*. § 5-312(b). In addition to the time it takes to complete and submit a carry permit application, Section 5-312 allows Defendants to take up to 240 more days to approve or deny that application.

39.    It is unclear where, if anywhere, ordinary, law-abiding Maryland citizens with a carry permit may lawfully carry a handgun for self-defense. The restrictions imposed by the Carry Permit Requirements prohibit carrying a firearm in various places where it would be reasonable to expect to need to defend oneself, destroying the right to carry a handgun outside the home guaranteed by the Second Amendment.

**The Carry Permit Requirements Will Deter Mrs. Kipke and MSRPA's Members from Carrying Firearms Outside the Home for Self-Defense**

40.    Mrs. Kipke frequents many of the places that Maryland law prohibits (or will prohibit once Senate Bill 1 and House Bill 824 take effect) her and other carry permit holders from

carrying a handgun for self-defense. She frequently visits state parks and state forests. When traveling, she regularly stops at state highway rest areas. She drops off and picks up her children from a private school, requiring her to enter the grounds of a private primary school. She visits at least annually her physician, whose office is located in a healthcare facility. She also regularly takes her children to an amusement park and minor league baseball stadium. She also visits a racetrack annually. She visits Baltimore several times a year, where she visits the Camden Yards Sports Complex and various museums. She frequently dines at restaurants that serve alcohol for on-site consumption. Mrs. Kipke frequents these restaurants without consuming any alcohol and has no intention of carrying a firearm at any time when she may be consuming alcohol. Rather, she desires to carry a handgun in these locations while remaining a responsible, law-abiding, sober adult. She routinely visits various buildings that are owned or leased by a unit of state or local government. She also attends demonstrations in a public place (and/or in a vehicle that is within 1,000 feet of a demonstration in a public place). She also visits certain Property weekly without the express consent of the Property owner or owner's agent to carry a handgun, including her local grocery store, drug store, and gas stations. Mrs. Kipke lawfully carries a handgun in each of the aforementioned places that Maryland does not currently prohibit ordinary, law-abiding Maryland citizens with a carry permit from carrying a handgun. She will continue to do so until Senate Bill 1 takes effect.

41. But for the enactment and credible threat of Defendants' enforcement of Maryland's ban on carrying handguns outside the home in these locations, Mrs. Kipke would carry or continue to carry a handgun in each of these locations.

42. Plaintiff MSRPA has at least one member who could and would, but for the challenged Maryland laws restricting ordinary, law-abiding carry permit holders' ability to carry

a handgun for self-defense outside the home, exercise their right to carry a handgun for self-defense in unconstitutionally restricted locations including the following: a state park, a state forest, a state highway rest area, a transit facility or transit vehicle owned or controlled by the Maryland Transit Administration, public school property (but not in the school buildings themselves), the grounds of a preschool or prekindergarten facility and on the grounds of a private primary and secondary school (but not in the school buildings themselves), on the property and/or grounds under the jurisdiction of the Department of General Services, on the grounds of a facility under the jurisdiction of the Maryland Racing Commission, the Camden Yards Sports Complex, a healthcare facility, a building owned or leased by a unit of state or local government, property operated as a museum by the Department of Planning or a unit within the Department of Planning, a location licensed to sell or dispense alcohol or cannabis for on-site consumption, a stadium, a museum, an amusement park, a racetrack, a video lottery facility, on Property without the express consent of the Property owner or owner's agent, and at a demonstration in a public place (and/or in a vehicle that is within 1,000 feet of a demonstration in a public place).

43.     But for the enactment and credible threat of Defendants' enforcement of Maryland's ban on carrying handguns outside the home in these locations, at least one of MSRPA's members would carry or continue to carry a handgun in each of these locations.

**The Carry Permit Requirements Will Compel the Speech of Mrs. Kipke and MSRPA's Members**

44.     Mrs. Kipke owns or leases property and wishes to allow individuals to possess firearms on that property without posting clear and conspicuous signage indicating that the carrying of firearms on her property is permitted (or otherwise providing express permission to individuals specifically or the public generally). But for the reasonable fear of prosecution for violation of the challenged Carry Permit Requirements, Mrs. Kipke could and would allow

17

individuals to possess firearms on her property without posting clear and conspicuous signage indicating that the carrying of firearms is permitted on her property (or otherwise providing express permission to individuals specifically or the public generally).

45.     Plaintiff MSRPA has at least one member who owns or leases property and wishes to allow individuals to possess firearms on their property without posting clear and conspicuous signage indicating that the carrying of handguns on their property is permitted on their property (or otherwise providing express permission to individuals specifically or the public generally). But for the reasonable fear of prosecution for violation of the challenged Carry Permit Requirements, MSRPA members could and would allow individuals to possess firearms on their property without posting clear and conspicuous signage indicating that the carrying of handguns is permitted on that property (or otherwise providing express permission to individuals specifically or the public generally).

**The Carry Permit Requirements Will Deter At Least One of MSRPA's Members from Obtaining or Renewing a Carry Permit**

46.     Plaintiff MSRPA has at least one member who possesses all of the qualifications necessary to apply for and obtain a carry permit and who will be deterred from completing an application for a carry permit because of the expense, inconvenience, and other impermissible burdens of the application process and its constituent parts, as well as the restrictions on carry permit holders. But for Defendants' continued enforcement of the challenged Carry Permit Requirements, that member would forthwith complete an application for a carry permit.

**COUNT ONE**

**42 U.S.C. § 1983 Action for Deprivation of
Plaintiffs' Rights Under U.S. Const. amends. II and XIV**

47.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

48.     Plaintiffs, including Mrs. Kipke and MSRPA's ordinary, law-abiding members, are included in "the people" whose rights are protected by the Second Amendment.

49.     Maryland's objective and subjective requirements to obtain a carry permit burden conduct protected by the plain text of the Second Amendment and are not consistent with this Nation's historical tradition of firearm regulation.

50.     The Carry Permit Requirements burden conduct protected by the plain text of the Second Amendment. Plaintiffs' challenge Maryland's prohibitions on ordinary, law-abiding Maryland citizens with a carry permit from carrying a handgun for self-defense into or at:

      a.     A state park,

      b.     A state forest,

      c.     A state highway rest area,

      d.     A transit facility or transit vehicle owned or controlled by the Maryland Transit Administration,

      e.     Public school property (but not in the school buildings themselves),

      f.     The grounds of a preschool or prekindergarten facility and on the grounds of a private primary and secondary school (but not in the school buildings themselves),

      g.     The property and/or grounds under the jurisdiction of the Department of General Services,

      h.     Property operated as a museum by the Department of Planning or a unit within the Department of Planning,

       i.      The grounds of a facility under the jurisdiction of the Maryland Racing Commission,

       j.      The Camden Yards Sports Complex,

       k.      A healthcare facility,

       l.      A building owned or leased by a unit of state or local government,

       m.      A location licensed to sell or dispense alcohol or cannabis for on-site consumption,

       n.      A stadium,

       o.      A museum,

       p.      An amusement park,

       q.      A racetrack,

       r.      A video lottery facility,

       s.      On private Property (but not a "Dwelling") without the express consent of the Property owner or owner's agent, and

       t.      A demonstration in a public place (and/or in a vehicle that is within 1,000 feet of a demonstration in a public place).

51.      The Carry Permit Requirements are not consistent with this Nation's historical tradition of firearm regulation, unnecessarily and unreasonably burden the exercise of the right, and are unconstitutional.

52.      Maryland's prohibition on the carry of handguns for self-defense on all private Property—even Property otherwise open to the public—without express consent of the owner or its agent is a patent violation of the Second Amendment. There is no historical evidence that supports a default rule predicating the exercise of a fundamental constitutional right on a third

party's consent. Whether a Property owner or its agent may constitutionally restrict the permitted carry of a handgun by posting a sign prohibiting the carry of arms on the Property is a separate issue and not subject to this challenge

53.     By infringing the right to bear arms outside the home in these ways, the Maryland laws and regulations discussed in the foregoing allegations violate the Second Amendment, which applies to Defendants by operation of the Fourteenth Amendment, both facially and as applied to Mrs. Kipke and members of MSRPA, and they are therefore invalid and unenforceable.

**COUNT TWO**

**42 U.S.C. § 1983 Action for Deprivation of
Plaintiffs' Rights Under U.S. Const. amends. I and XIV**

54.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

55.     Maryland impermissibly compels the speech of property owners and lessees, including Mrs. Kipke and MSRPA's members, because it requires property owners and lessees to state one way or the other whether they will permit the public carriage of firearms by requiring them to post (or not post) on their property a "a clear and conspicuous sign indicating that it is permissible to wear, carry, or transport a firearm on the property" (or otherwise giving express consent to each individual person who desires to carry a firearm on their property).

56.     By compelling certain speech, the challenged sections of the Carry Permit Requirements, as set forth above violate the First Amendment, which applies to Defendants by operation of the Fourteenth Amendment, both facially and as applied to Mrs. Kipke and members of MSRPA, and they are therefore invalid and unenforceable.

## COUNT THREE

### 42 U.S.C. § 1983 Action for Deprivation of
### Plaintiffs' Rights Under U.S. Const. amends. II and XIV (Due Process Clause)

57.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

58.     To be eligible for a carry permit, an applicant must satisfy subjective criteria: that Defendant Butler determines, after conducting an investigation, that the applicant has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another. Maryland law does not define or limit what these criteria mean. Nor does Maryland law provide guidance to Defendant Butler for making these determinations, or set out the scope or requirements of, or limitations on, the required investigation.

59.     Maryland law does not contain minimal guidelines as to who "has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another." Maryland law does not provide explicit standards for those who apply these terms to avoid arbitrary and discriminatory application.

60.     The term "has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another" is impermissibly vague as it offers a person no guidance as to what behavior would render that person subjectively unfit to exercise a fundamental constitutional right. It therefore violates the due process clause of the Fourteenth Amendment and is void for vagueness—both as applied to members of MSRPA, and on its face.

61.     Maryland's subjective criteria to obtain a carry permit are not only impermissibly vague, they also impermissibly empower state officials with discretion that burdens conduct protected by the plain text of the Second Amendment and are not consistent with this Nation's

historical tradition of firearm regulation. They therefore violate the Second Amendment, both facially and as applied to members of MSRPA, and they are therefore invalid and unenforceable.

## COUNT FOUR

### 42 U.S.C. § 1983 Action for Deprivation of Plaintiffs' Rights Under U.S. Const. amend. XIV (Equal Protection Clause)

62.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

63.    Maryland law exempts retired law enforcement officers from its requirements to obtain a carry permit and its prohibitions where and how ordinary, law-abiding Maryland citizens with a carry permit may exercise their constitutional right to bear arms for self-defense outside the home.

64.    Mrs. Kipke and at least one member of MSRPA are not retired law enforcement officers.

65.    Retired law enforcement officers and ordinary, law-abiding Maryland citizens with a carry permit, like Mrs. Kipke and at least one member of MSRPA, are similarly situated insofar as they are both civilians and classes of State residents who, absent Senate Bill 1 and Md. Code Ann., Pub. Safety §§ 5-304(b), 306(b)(1), would generally have the right to carry firearms for self-defense outside the home. There is no constitutionally sufficient rationale that would justify this distinction.

66.    The retired law enforcement officer exception is a classification affecting Second Amendment rights, and Second Amendment rights are fundamental rights.

67.    Because Maryland law draws distinctions that fail any applicable level of scrutiny, it violates the Equal Protection Clause of the Fourteenth Amendment both facially and as applied.

68.    Maryland law violates the equal protection rights of Plaintiffs, and it is therefore facially unconstitutional, void, and invalid.

## PRAYER FOR RELIEF

69.    WHEREFORE, Plaintiffs Susannah Warner Kipke and MSRPA pray for an order and judgment:

70.    Declaring that the challenged sections of the Carry Permit Requirements, as set forth above, both on their face and as applied by Defendants, violate the First, Second, and Fourteenth Amendments of United States Constitution in violation of 42 U.S.C. § 1983;

71.    Enjoining, both temporarily and permanently, Defendants and their employees and agents from enforcing the challenged sections of the Carry Permit Requirements, as set forth above;

72.    Awarding Plaintiffs Mrs. Kipke and MSRPA their reasonable costs, including attorneys' fees, incurred in bringing this action, pursuant to 42 U.S.C. § 1988;

73.    Awarding Plaintiffs Mrs. Kipke and MSRPA nominal and compensatory damages pursuant to 18 U.S.C. § 1983; and

74.    Granting such other and further relief as this Court deems just and proper.

Dated: May 16, 2023                    Respectfully submitted,

/s/ *John Parker Sweeney*
John Parker Sweeney (Bar No. 08761)
James W. Porter, III (Bar No. 19416)
Marc A. Nardone (Bar No. 18811)
Connor M. Blair (Bar No. 20985)
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-347-1684
jsweeney@bradley.com

Counsel for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KATHERINE NOVOTNY
844 Aldino Stepney Rd.
Aberdeen, MD 21001

SUE BURKE
310 Janet Rd.
Reisterstown, MD 211366

ESTHER ROSSBERG                          Case No.
6311 Wallis Avenue
Baltimore, MD 21215

MARYLAND SHALL ISSUE, INC.
9613 Harford Rd., Ste C #1015
Baltimore, Maryland 21234-2150 20852

SECOND AMENDMENT
FOUNDATION
12500 N.E. Tenth Place,
Bellevue, WA 98005 and

FIREARMS POLICY COALITION
5550 Painted Mirage Rd.
STE 320
Las Vegas, NV 89149

   *Plaintiffs,*

        v.

WESLEY MOORE, in his official
capacity as Governor of Maryland,

ALISON M. HEALEY, in her official
capacity as State's Attorney for
Harford County, Maryland,

SCOTT D. SHELLENBERGER, in his
official capacity as State's Attorney for
Baltimore County, Maryland,

1

**IVAN J. BATES, in his official capacity as State's Attorney for Baltimore City, Maryland,**

**COL. ROLAND L. BUTLER, JR., in his official capacity as Superintendent of the Maryland State Police,**

**PAUL J. WIEDEFELD, in his official capacity as Secretary of Transportation, and**

**JOSHUA KURTZ, in his official capacity as Secretary of Natural Resources**

  *Defendants.*

### COMPLAINT FOR DECLARATORY AND EQUITABLE RELIEF AND ATTORNEY'S FEES AND COSTS

COME NOW, the Plaintiffs, through counsel, and sue the Defendants, and for cause state as follows:

### INTRODUCTION

1.    On, April 10, 2023, the General Assembly of Maryland enacted Senate Bill 1 ("SB1"), and Governor Wes Moore, signed SB1 into law on May 16, 2023. SB1 goes into effect on October 1, 2023. SB1 was enacted for the avowed purpose of responding to the Supreme Court's decision in *New York State Rifle Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022), by restricting the locations that persons with Maryland wear and carry permits may legally exercise their constitutional right to wear, carry, or transport firearms. It does so in ways that are fundamentally

2

inconsistent with the Second Amendment as clearly articulated in the Supreme Court's decision in *Bruen*.

2.      In addition to the most recent enactment in SB 1, Maryland already restricts the Second Amendment right of ordinary, law-abiding citizens to carry in other ways as well, including on and at State owned or controlled mass transit facilities and in State parks, State forests, and State Chesapeake forest lands.

3. The individual Plaintiffs are ordinary, law-abiding citizens. Each of the individual Plaintiffs has a wear and carry permit issued by the Maryland State Police. The organizational Plaintiffs each has members who likewise possess such carry permits. In this lawsuit, Plaintiffs focus on the provisions of SB1 or other State law that impose particularly egregious restrictions on the Second Amendment right to bear arms. To that end, Plaintiffs challenge SB1's restrictions on carrying on private property open to the public, restaurants that are licensed to serve alcohol, certain health care facilities, and museums, and Maryland's existing restrictions on carrying on or at mass transit facilities and in State parks, State forests, and State Chesapeake forest lands. The Second Amendment does not countenance these restrictions, and this Court should enter judgment enjoining them.

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, as this Complaint seeks relief afforded by 42 U.S.C. § 1983, for past, continuing, and imminent violations of Plaintiffs' rights arising under the United States Constitution. Defendants reside or are otherwise found in the District of Maryland. The events, actions, and omissions challenged in this Complaint arise in Maryland. Venue is properly in this Court in this matter pursuant to 28 U.S.C. § 1391.

3

**CHALLENGED PROVISIONS**

**SB 1**

5.      In Maryland, wearing, carrying and transporting any handgun "on or about the person" or in a vehicle is generally prohibited, subject to a few exceptions. *See* MD Code, Criminal Law, § 4-203(a), (b). One of the exceptions to this broad ban is a permit. *Id.* § 4-203(b)(2). Permit holders may "wear, carry, or transport [a] handgun" when they have a permit issued under "Title 5, Subtitle 3 of the Public Safety Article." *Id.* SB1 specifically targets permit holders and restricts where individuals—who have met Maryland's background check and training requirements—are allowed to carry.

6.      Maryland wear and carry permits are issued by the Maryland State Police pursuant to MD Code, Public Safety, § 5-306. All the individual plaintiffs in this suit are Maryland permit holders. The members of MSI, SAF, and FPC on whose behalf these organizations bring this suit are likewise Maryland permit holders. Permit holders in Maryland are fingerprinted, thoroughly investigated by the State Police and, unless training-exempt, receive at least 16 hours of training. MD Code, Public Safety, § 5-306(a)(5), (6). These training requirements include a mandatory course of live fire in which the applicant must achieve a specific minimum score. COMAR § 29.03.02.05 C.(4). Of the 43 "shall issue" States identified in *Bruen*, 142 U.S. at 2123 n.1, only Illinois requires as much training as Maryland. Permit holders, nationwide, are disproportionately law-abiding. *See* Philip J. Cook et al., *Gun Control After* Heller, 56 U.C.L.A. L. Rev. 1041, 1082 (2009). Maryland wear and carry permits may be and are issued by the State Police to non-Maryland residents, including to members of MSI, SAF and FPC.

7.      SB1 adds two new MD Code Sections to the MD Criminal Law Article of the Maryland Code, Section 4-111 and Section 6-411. These additional Sections regulate where permit

4

holders may wear, carry, or transport a firearm. A "firearm" is defined by Section 4-111(a)(3), and Section 6-411(a)(3), as enacted by SB1, to include all "firearms" as defined by MD Code, Criminal Law, § 4-104. That definition includes all modern handguns and long guns.

8.      In Section 4-111, the State has set out three categories of locations in which all non-exempt persons may not wear, carry or transport a firearm. The first category is what Section 4-111 defines as "area[s] for children and vulnerable individuals, which include "(1) a preschool or prekindergarten facility and its grounds, (2) a private primary or secondary school or its grounds, and (3) a health care facility." Section 4-111(a)(2). The second category is "government or public infrastructure area[s]." Section 4-111(a)(4). The third category is what Section 4-111 defines as "special purpose area[s]," which includes "(i) a location licensed to sell or dispense alcohol * * * for on–site consumption; (ii) a stadium; (iii) a museum; (iv) an amusement park, (v) a racetrack, or (vi) a video lottery facility, as defined in § 9–1A–01 of the state government article." Of these areas, plaintiffs challenge the bans on firearms in or at "(i) a location licensed to sell or dispense alcohol * * * for on–site consumption" and in or at "(iii) a museum." Section 4-111(a)(8).

9. Individuals may not wear, carry, or transport firearms in these three categories of locations. Section 4-111(c), (d)(1), (e). A person who willfully violates the prohibition on wearing, carrying or transporting a firearm in these areas "is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 1 year or a fine not exceeding $1,000 or both." Section 4-111(f).

10.     Subsection 4-111(b), as enacted by SB1, creates exceptions from the prohibitions set forth in Section 4-111. None of the individual plaintiffs in this case qualify for any exception set forth in Section 4-111(b), as enacted by SB1.

11.     Plaintiffs do not challenge the prohibitions in all these areas, instead, Plaintiffs challenge only a limited subset that impose particularly egregious restrictions on their Second Amendment right to bear arms.

12.     Plaintiffs challenge the prohibition on carrying in "a health care facility," which is included as an "area for children and vulnerable individuals" where firearms are prohibited. Section 4-111(a)(2)(iii), as enacted by SB1, defines health care facilities by cross-reference to Section 15-10B-01(g)(1), (2), (3) and (4), of the Insurance Article of the Maryland Code. Section 15-10B-01(g)(1) refers to a "hospital" which is defined by a cross-reference to § 19-301 of the Health-General Article to mean "an institution that: (1) Has a group of at least 5 physicians who are organized as a medical staff for the institution; (2) Maintains facilities to provide, under the supervision of the medical staff, diagnostic and treatment services for 2 or more unrelated individuals; and (3) Admits or retains the individuals for overnight care." Section 15-10B-01(g)(2) refers to a "related institution," which is defined by a cross-reference to § 19-301 of the Health-General Article as "an organized institution, environment, or home that: (i) Maintains conditions or facilities and equipment to provide domiciliary, personal, or nursing care for 2 or more unrelated individuals who are dependent on the administrator, operator, or proprietor for nursing care or the subsistence of daily living in a safe, sanitary, and healthful environment; and (ii) Admits or retains the individuals for overnight care." Section 15-10B-01(g)(3) refers to an "ambulatory surgical facility or center which is any entity or part thereof that operates primarily for the purpose of providing surgical services to patients not requiring hospitalization and seeks reimbursement from third party payors as an ambulatory surgical facility or center." Section 15-10B-01(g)(4) refers to "a facility that is organized primarily to help in the rehabilitation of disabled individuals."

6

13.     The ban on the wear, carry and transport in health care facilities widely and adversely affects the right to wear, carry, and transport a firearm publicly by physically vulnerable persons who may be least able to protect themselves and thus may be most in need of armed self-defense. It is for these reasons that these bans are singled out for challenge in this suit.

14.     Plaintiffs additionally challenge the prohibition on the wear, carry or transport of a firearm in two so-called "special purpose area[s]": locations licensed to sell or dispense alcohol for on-site consumption and museums. Section 4-111(a)(8). These two provisions most widely affect the fundamental constitutional right to carry in the everyday lives of Plaintiffs and thus are singled out for challenge in this suit.

15.     Section 6-411, as enacted by SB1, bans the wear, carry and transport of firearms in a different manner than the outright prohibitions in Section 4-111. This provision alters the default rules for carrying, wearing, or transporting firearms in Maryland for the first time in its history.

16.     Section 6-411(c) is the dwelling presumption. This subsection provides that "a person wearing, carrying, or transporting a firearm may not enter or trespass in the dwelling of another unless the owner or the owner's agent has given express permission, either to the person or to the public generally, to wear, carry, or transport a firearm inside the dwelling."  Section 6-411(a)(2)(i) defines "dwelling" for purposes of Section 6-411 to "mean[] a building or part of a building that provides living or sleeping facilities for one or more individuals." "[A] person who willfully violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 1 year or a fine not exceeding $1,000 or both." Section 6-411(e). Plaintiffs do not challenge Section 6-411(c).

17.     Section 6-411(d) extends the anti-carry default rule to all privately owned buildings open to the public in the State. This subsection provides that "a person wearing, carrying, or

7

transporting" a firearm may not: "(1) enter or trespass on property unless the owner or the owner's agent has posted a clear and conspicuous sign indicating that it is permissible to wear, carry, or transport a firearm on the property; or (2) enter or trespass on property unless the owner or the owner's agent has given the person express permission to wear, carry, or transport a firearm on the property." Section 6-411(a)(6) defines the term "property" for purposes of these provisions as "a building" and states that this term "does not include the land adjacent to a building." "[A] person who willfully violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 1 year or a fine not exceeding $1,000 or both." Section 6-411(e). Plaintiffs challenge the entirety of Section 6-411(d) as it makes public carry by permit holders impractical, extraordinarily burdensome, and unsafe. Section 6-411(d) effectively nullifies the "general right" to carry in public by permit holders protected by the Second Amendment.

**MD Code, Transportation, § 7-705(b)(6)**

18.    MD Code, Transportation, § 7-705(b)(6), provides that "[i]t is unlawful for any person to engage in any of the following acts in any transit vehicle or transit facility, designed for the boarding of a transit vehicle, which is owned or controlled by the [Maryland Mass Transit] Administration [of the Maryland Department of Transportation] or a train owned or controlled by the Administration or operated by a railroad company under contract to the Administration to provide passenger railroad service: * * * (6) Carry or possess any explosives, acids, concealed weapons or other dangerous articles." MD Code, Transportation, § 7-705(e), provides that "[e]xcept as provided in subsection (f) of this section, any person who violates any provision of this section is guilty of a misdemeanor and is subject to a fine of not more than $500 for each offense.

19.    Within the meaning of MD Code, Transportation § 7-705(b), the Maryland Department of Transportation, Mass Transit Administration owns or controls transit facilities and

8

transit vehicles used for (1) commuter and local bus transit services in the Baltimore area, (2) the Metro Subway services in Baltimore area, (3) Light Rail services in Baltimore, and (4) weekday MARC commuter train service between Baltimore and Washington, D.C. Within the meaning of MD Code, Transportation § 7-705(b), the Maryland Department of Transportation and Mass Transit Administration also contracts with a private railroad company to provide passenger railroad service on MARC commuter trains that travel through Frederick and Montgomery Counties, Maryland, with stops in Maryland. Plaintiffs challenge Section 7-705(b)(6) in so far as it denies ordinary, law-abiding citizens their Second Amendment right to carry firearms in public by forbidding permits holders from possessing, wearing, carrying or transporting a firearm in and at such transit vehicles or facilities.

**Department of Natural Resources Regulations[1]**

20.     The Maryland Department of Natural Resources has promulgated a regulation, codified at COMAR 08.07.01.04, which provides in subsection B. that "[e]xcept as provided in § C and § D of this regulation, possession or use of weapons or firearms by an individual other than a law enforcement officer is prohibited in all State forests."  Subsection C of this regulation provides that "[t]arget shooting is permitted only at designated shooting ranges. The regulations governing the use of these ranges shall be posted and strictly observed."  Subsection D of this regulation

---

[1] The Fourth Circuit's decision in *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011), which addressed restrictions on firearms in a national park area, is no longer controlling or persuasive precedent in light of the Supreme Court's decision in *Bruen. See Bruen*, 142 S.Ct. at 2124 (abrogating *Masciandaro* and decisions of other courts that had applied a "two step" means-ends or intermediate scrutiny to sustain restrictions on firearms). *See also Bruen*, 142 S.Ct. at 2126-27 & n.4 (rejecting this lower court line of cases and mode of analysis).

9

provides that "[e]xcept when legally hunting or legally target shooting, an individual may not discharge a firearm on land or waters owned or controlled by the Service." Subsection E of this regulation further provides that "[f]irearms shall be unloaded . . . when in a State forest campsite." Nothing in these regulations permits the carry of a firearm by a permit holder other than when legally hunting or legally target shooting. No provision in this regulation allows the wear and carry of a firearm for lawful self-defense by a permit holder. Plaintiffs challenge COMAR 08.07.01.04 in so far as it denies ordinary, law-abiding citizens their Second Amendment right to carry firearms in public by forbidding permits holders from possessing, wearing, carrying, or transporting a firearm in State forests. SB 1 does not purport to regulate or limit the wear, carry, transport or possession of firearms by permit holders in State forests.

21.    The Maryland Department of Natural Resources has promulgated a regulation, codified at COMAR 08.07.01.14, which provides in subsection B. that "[e]xcept as provided in §§ C and D of this regulation, possession or use of weapons or firearms by an individual other than a law enforcement officer is prohibited in Chesapeake Forest Lands."  Subsection C of this regulation provides that "[t]arget shooting is permitted only at designated shooting ranges. The regulations governing the use of these ranges shall be posted and strictly observed." Subsection D of this regulation provides that "[e]xcept when legally hunting or legally target shooting, an individual may not discharge a firearm on land or waters owned or controlled by the Service." Subsection E of this regulation further provides that "[f]irearms shall be unloaded . . . when in a Chesapeake Forest camping area in accordance with Regulation .07 of this chapter." Nothing in these regulations permits the carry of a firearm by a permit holder. No provision in this regulation allows the wear and carry of a firearm for lawful self-defense. Plaintiffs challenge COMAR 08.07.01.14 in so far as it denies ordinary, law-abiding citizens their Second Amendment right to carry firearms in public

10

by forbidding permits holders from possessing, wearing, carrying or transporting a firearm in State Chesapeake forest lands.

21.     The Maryland Department of Natural Resources has promulgated a regulation, codified at COMAR 08.07.06.04, which provides in subsection B. that "[e]xcept as provided in Regulation .03 of this chapter and in C and D of this regulation, an individual other than a law enforcement officer may not possess a weapon in a State park. The Service may approve an exception for an archery range, firearms range, or an exhibition."   Subsection C of this regulation provides that "[d]uring hunting season, a licensed hunter may carry firearms and bows and arrows across State parks in order to get to hunting areas or to other State or private property which is open to hunting. The firearms shall be carried unloaded and cased, or carried unloaded with breech open or broken. Arrows shall be carried in a quiver or case." Subsection D of this regulation provides that "[t]arget shooting is permitted at designated shooting ranges. The regulations governing the use of these ranges shall be posted and strictly observed." Nothing in these regulations permits the carry of a firearm by a permit holder. No provision in this regulation allows the wear and carry of a firearm for lawful self-defense. Plaintiffs challenge COMAR 08.07.06.04 in so far as it denies ordinary, law-abiding citizens their Second Amendment right to carry firearms in public by forbidding permits holders from possessing, wearing, carrying, or transporting a firearm in State parks. SB 1 does not purport to regulate or limit the wear, carry, transport or possession of firearms by permit holders in State parks.

**PARTIES**

**Plaintiffs**

22.     Plaintiff KATHRINE NOVOTNY is a Maryland resident and is a member, Vice President and Treasurer of Plaintiff Maryland Shall Issue, Inc. ("MSI"). She is also a member of

11

Plaintiff Second Amendment Foundation ("SAF") and Plaintiff Firearms Policy Coalition ("FPC").

Since March of 2022, she has possessed a Maryland wear and carry permit for the purpose of self-

defense and was issued that permit prior to the decision in *Bruen* for a "good and substantial reason"

by the Maryland State Police pursuant to MD Code, Public Safety, 5-306(b)(6)(ii). With her carry

permit, she has regularly carried her concealed firearm at and in multiple restaurants licensed to

serve alcohol for on-site consumption, including Texas Roadhouse in Fallston, Chili's in Bel Air,

Outback in Bel Air, Old South Smokehouse in Port Deposit, Great American Steakhouse in

Aberdeen, Bistro 91 in Finksburg, Main Street Tower in Bel Air, and Chopstix in Forest Hill, but

never consumes alcohol while doing so. With her permit, she regularly carries her personal firearm

when she enters stores and other privately owned buildings that are otherwise open to the public.

She has every intention and desire to continue to carry her personal firearm in and at all these

locations in the future but she will decline to do so because of the credible fear of arrest and

prosecution after October 1, 2023, the effective date of SB1.

23.     Plaintiff SUE BURKE IS a Maryland resident, the Secretary of MSI and an

individual member of Plaintiff MSI. She is also a member of Plaintiff SAF and Plaintiff FPC. Since

2022, she has possessed a Maryland wear and carry permit for the purpose of self-defense. With her

carry permit, she has regularly carried her concealed firearm at and in multiple restaurants licensed

to serve alcohol for on-site consumption, including without limitation Applebee's, Olive Garden,

and Forbidden City restaurants in Westminster, Bare Bones and Kelsey's Restaurant, Irish Pub &

Banquet Room, and La Palapa Grill & Cantina in Ellicott City, MD, Jarrettsville Manor Memorial

VFW Post 8672, Jarrettsville, MD, Lt. Peter G Zouck VFW Post 521, Owings Mills, MD, and

Yingling-Ridgely Post #7472, Elliott City, MD  American Legion Post #17 – Edgewood, MD, and

American Legion Harford Post #39, Bel Air, MD, but never consumes alcohol while doing so. With

12

her permit, she regularly carries her personal firearm when she enters stores and other privately owned buildings that are otherwise open to the public. With her permit, she regularly carries her personal firearm in multiple private museums, including the Annapolis Maritime Museum, Babe Ruth Birthplace and Museum, Baltimore Museum of Industry, Baltimore Streetcar Museum, B & O Railroad Museum, Calvert Marine Museum, the Baltimore Museum of Art, and the Chesapeake Maritime Museum. She has every intention and desire to continue to carry her personal firearm in and at all these locations in the future but she will decline to do so because of the credible fear of arrest and prosecution after October 1, 2023, the effective date of SB1.

24.     Plaintiff SUE BURKE has also regularly visited State parks, including Patapsco Valley State Park, Cunningham Falls State Park, Swallow Falls State Park, Assateague State Park, and Snow Hill State Park. She has also visited Pocomoke State Forest and Potomac-Garrett State Forest. She has visited Chesapeake forest lands, including Chesapeake Forest, Snow Hill (WR-27 and WR-40). She has not visited State parks, State forests, or State Chesapeake forest lands while armed because of the regulations promulgated by the Department of Natural Resources barring such carry but would do so but for those regulations. She fully intends to carry a firearm with her Maryland carry permit in State parks, State forests and State Chesapeake forest lands but has declined to do so because of the credible fear of arrest and prosecution for violating these regulations.

25.     Plaintiff ESTHER ROSSBERG is a Maryland resident, and is a member of MSI, SAF and FPC. Since 2022, she has possessed a Maryland wear and carry permit for the purpose of self-defense. With her carry permit, plaintiff Esther Rossberg has regularly carried her concealed firearm while at multiple "health care facilities" as that term is defined by SB1, including visits to her personal physician at a hospital in Baltimore and to her cardiologist at another hospital in

13

Baltimore. These hospitals are "health care facilities" within the meaning of MD Code, Insurance, § 15-10B-01(g)(1), as incorporated by Section 4-111(a)(2)(iii) and Section 4-111(c) of SB1. With her permit, she has regularly carried her personal firearm at multiple restaurants licensed to serve alcohol for on-site consumption, including Dougies Restaurant in Pikesville, MD, the Taam Thai Restaurant in Pikesville, the KB Grill and Wok restaurant in Baltimore, and the Serengeti restaurant in Baltimore, but when she does so she never consumes alcohol. With her permit, she regularly carries her personal firearm when she enters stores and other privately owned buildings that are otherwise open to the public. She has every intention and desire to continue to carry her personal firearm in and at all these areas in the future but she will decline to do so because of the credible fear of arrest and prosecution after October 1, 2023, the effective date of SB1.

26.    Plaintiff ESTHER ROSSBERG regularly uses the Baltimore Metro rail system to travel from the Reisterstown Plaza Station to various stations in the City of Baltimore, including the Charles Center and Johns Hopkins Hospital stations. But for the bans imposed by MD Code, Transportation, § 7-705(b)(6), challenged in this suit, she would travel on the Baltimore METRO rail system while armed and fully intends to do so in the future but has declined to do so because of the credible fear of arrest and prosecution due to these bans.

27.    Plaintiff MARYLAND SHALL ISSUE, INC., is a Maryland corporation, located at 9613 Harford Rd., Ste C #1015, Baltimore, MD 21234. MSI is an Internal Revenue Service Section 501(c)(4), non-profit, non-partisan, all-volunteer membership organization with approximately 3460 members statewide. MSI is dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public. The purposes of MSI include promoting the exercise of the right to keep and bear arms and education, research,

14

and legal action associated with the constitutional right to privately own, possess and carry firearms. Each of the named individual plaintiffs is a member of MSI.

28.    MSI has one or more members who live in Maryland and who travel throughout Maryland in the ordinary course of their lives, and who also possess a Maryland wear and carry permit issued by the Maryland State Police. MSI has at least one member who is a permit holder and regularly carry firearms in and at each of the locations challenged in this Complaint, including at a rehabilitation facility, as defined at MD Code, Insurance, § 15-10B-01(g)(4), and at a surgical center, as defined at MD Code, Insurance, § 15-10B-01(g)(3). These members of MSI with carry permits intend to continue to possess and carry firearms at such locations, but reasonably fear prosecution if they do so after October 1, 2023. MSI has one or more members with carry permits who regularly visit State parks and State forests, including State Chesapeake forest lands, and would carry a firearm at these locations but for the regulatory bans imposed by the Department of Natural Resources. MSI has at least one member with a carry permit who regularly uses public transportation facilities operated by the Department of Transportation, Mass Transit Administration and would possess, wear, carry or transport a firearm while doing so but for the ban imposed by MD Code, Transportation, § 7-705(b)(6). MSI brings this action on behalf of its members who have Maryland wear and carry permits, a class which includes each of the individual named plaintiffs in this case.

29.    Plaintiff SECOND AMENDMENT FOUNDATION is a nonprofit educational foundation incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF seeks to preserve the effectiveness of the Second Amendment through education, research, publishing, and legal action programs focused on the constitutionally protected right to possess firearms and firearm ammunition, and the consequences of gun control. SAF has over 720,000 members and supporters nationwide, including thousands of members in Maryland.

15

SAF brings this action on behalf of those members with a Maryland wear and carry permit, including the named Plaintiffs herein.

30.     SAF's members are adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein. SAF has at least one member who is a permit holder and who regularly carries firearms in and at each of the locations, challenged in this Complaint, at which firearms will be banned by SB1 as of October 1, 2023, the effective date of SB1. These SAF members reasonably fear prosecution if they do so after October 1, 2023. SAF has one or more members with carry permits who regularly visit State parks, State forests, and State Chesapeake forest lands, and would carry a firearm at these locations but for the administrative regulatory bans imposed by the Defendant Department of Natural Resources. SAF has members with carry permits who regularly use public transportation facilities operated by the Department of Transportation, Mass Transit Administration, and would possess, wear, carry or transport a firearm while doing so but for the ban imposed by MD Code, Transportation, § 7-705. Each of the individual plaintiffs is a member of SAF.

31.     Plaintiff FIREARMS POLICY COALITION, INC., is a non-profit organization incorporated under the laws of Delaware with its principal place of business in Clark County, Nevada. The purposes of FPC include defending and promoting the People's rights—especially the fundamental, individual Second Amendment right to keep and bear arms—advancing individual liberty and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC's members reside both within and outside the State of Maryland.

32.     FPC brings this action on behalf of those members with a Maryland wear and carry permit, including the named plaintiffs herein. FPC's members are adversely and directly harmed by

16

Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein. FPC has at least one member who is a permit holder and who carries firearms in and at each of the locations, challenged in this Complaint, at which firearms will be banned by SB1 as of October 1, 2023, the effective date of SB1. These FPC members fully intend to continue to carry at these locations challenged in this Complaint but reasonably fear prosecution if they do so after October 1, 2023. FPC has one or more members with Maryland carry permits who regularly visit Maryland State parks, State forests, and State Chesapeake forest lands, and would possess, wear, carry or transport a firearm at these locations but for the administrative regulatory bans imposed by the Defendant Department of Natural Resources. FPC has members with carry permits who regularly use public transportation facilities operated by the Maryland Department of Transportation and would carry a firearm while doing so but for the bans imposed by MD Code, Transportation, § 7-705. Each of the individual plaintiffs is a member of FPC.

**Defendants**

33.     The Defendant, WESLEY MOORE, is the Governor of Maryland and, as head of the executive branch of the State of Maryland, is responsible for the enforcement of State laws and regulations issued by State regulatory agencies, including the Department of Transportation and the Department of Natural Resources. Additionally, as Governor, Moore may direct the Attorney General to undertake criminal investigations and prosecutions. Md. Const. art V., § 3; *see also In re Special Investigation No. 244*, 459 A.2d 1111, 1115 (Md. 1983). The Defendant ALISON M. HEALEY is the State's Attorney for Harford County, Maryland, and as such, is tasked with "prosecut[ing] and defend[ing] on the part of the State all cases in which the State may be interested" in Harford County. Md. Code Ann., Crim. Proc. § 15-102. The Defendant SCOTT D. SHELLENBERGER is the State's Attorney for Baltimore County, Maryland, and as such, is tasked

17

with "prosecut[ing] and defend[ing] on the part of the State all cases in which the State may be interested" in Baltimore County. Md. Code Ann., Crim. Proc. § 15-102. The Defendant IVAN J. BATES is the State's Attorney for Baltimore City, Maryland, and as such, is tasked with "prosecut[ing] and defend[ing] on the part of the State all cases in which the State may be interested" in Baltimore City. Md. Code Ann., Crim. Proc. § 15-102. The Defendant COL. ROLAND L. BUTLER, JR., is the Superintendent of the Maryland State Police, and as such, "enforce[s] the laws and ordinances of the State, counties, and municipal corporation." MD Code, Public Safety § 2-301(a)(2)(iii). The Defendant, PAUL J. WIEDEFELD, is the Secretary of the Maryland Department of Transportation, and as such, is responsible for the administration and enforcement of provisions of law governing public transportation facilities owned or operated by or under the control of the Department of Transportation, Mass Transit Administration, including MD Code, Transportation, § 7-705. The Defendant, JOSH KURTZ, is the Secretary of the Maryland Department of Natural Resources and, as such, is responsible for the enforcement and promulgation of regulations issued by the Department of Natural Resources, including the regulations regulating weapons at State Parks, State forests, and State Chesapeake forest lands. All Defendants are sued in their official capacity. Defendants Moore, Butler, Wiedefeld, and Kurtz maintain their principal offices in Annapolis, Maryland. Defendants Healey, Shellenberger, Bates and Smith maintain their principal offices in the county or city in which they serve.

## THE SECOND AMENDMENT

34.    The Second Amendment is applicable to the States as incorporated through the Due Process Clause of Fourteenth Amendment because the right to "keep and bear Arms" is a fundamental constitutional right essential to ordered liberty. *McDonald v. City of Chicago*, 561 U.S. 742 (2010). "[T]he Second Amendment extends, prima facie, to all instruments that constitute

18

bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008).

35.    "[T]he Second Amendment guarantees a general right to public carry," meaning ordinary, law-abiding citizens may "'bear' arms in public for self-defense." *Bruen*, 142 S.Ct. at 2135. In *Bruen*, the Supreme Court held unconstitutional New York's "good cause" licensing requirement because a State may not condition the right to publicly carry handguns on a citizen's "special need for self-defense." *Bruen*, 142 S.Ct. at 2135 n.8. After *Bruen* was decided, Maryland promptly elected to stop requiring that applicants for a Maryland wear and carry permit demonstrate a "good and substantial reason" for a permit, as then required by MD Code, Public Safety, 5-306(a)(6)(ii), and SB1 repeals that "good and substantial reason" requirement in amendments made to Section 5-306(a)(6)(ii).

36.    The "general right to public carry" cannot be restricted absent "*exceptional* circumstances." *Bruen*, 142 S. Ct. at 2156 (emphasis added). This is because the Second Amendment "presumptively protects" carrying firearms. *Id.* at 2129. To determine whether a state's restriction is constitutional, the Court in *Bruen* explained that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S.Ct. at 2129.

37.    It is the State's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S.Ct. at 2127; *see also id.* at 2150 ("[W]e are not obliged to sift the historical materials for evidence to

sustain New York's statute. That is respondents' burden."). If the State fails to meet its burden, then the State's restrictions must be enjoined.

38.    The *Bruen* Court struck down as unconstitutional New York's "proper cause" requirement for issuance of a permit to carry a handgun in public. In doing so, *Bruen* explicitly rejected New York's attempt to justify its restriction as analogous to a historical "sensitive place" regulation. 142 S.Ct. at 2133-34. The Court explained that a state may not simply ban guns wherever people may "congregate" or assemble. A rule that "expand[ed] the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." 142 S.Ct. at 2134. As the Court explained, "[p]ut simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.*

39.    If a state seeks to restrict firearms in a particular location as a "sensitive place," then it must prove that its current restriction is sufficiently analogous to "well-established and representative historical analogue." In *Bruen*, the Court identified only five such locations: "schools and government buildings" as well as "legislative assemblies, polling places, and courthouses." *Id.* at 2133, citing *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). *Bruen* held that the lower "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.*

40.    *Bruen* further establishes several requirements to determine whether a historical regulation is sufficiently analogous. First, the relevant time period for the historical analogue must be the Founding, centering on 1791. *Bruen*, 142 S.Ct. at 2135-36. That is because "'[c]onstitutional

20

rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, 142 S.Ct. at 2136, quoting *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008). 20th century and late 19th century statutes and regulations "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S.Ct. at 2154 & n.28. Thus, restrictions on the right to keep and bear arms dating after the Civil War and after the adoption of the Fourteenth Amendment in 1868 may be confirmatory of earlier legislation but cannot be used alone to provide the appropriate historical analogue required by *Bruen*. In other words, only those restrictions with roots in the Founding are sufficiently "enduring" and "well-established" to comport with the Second Amendment's "unqualified command." *Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

41.     Second, the historical analogue must be "representative." Historical "outlier" requirements of a few jurisdictions or of the Territories are to be disregarded. *Bruen*, 142 S.Ct. at 2133, 2153, 2147 n.22 & 2156.

42.     Third, the historical analogue must be "relevantly similar," which is to say that it must burden ordinary, law-abiding citizens right to carry in a similar manner and for similar reasons. *Bruen*, 142 S. Ct. at 2132. *Bruen* thus held that the inquiry into whether a proper analogue exists is controlled by two "metrics" of "how and why" any restriction was historically imposed during the Founding era. *Id.* at 2133. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'*central*'" considerations when engaging in an analogical inquiry." *Id.* (emphasis in original). "[T]o the extent later history contradicts what the text says, the text controls." *Id.* at 2137. "Thus, 'post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the

21

constitutional text obviously cannot overcome or alter that text.'" *Id*., quoting *Heller v. District of Columbia*, 670 F.3d , 670 F.3d 1224, 1274, n.6 (Kavanaugh, J., dissenting).

43.     Fourth, the historical analysis required by the Supreme Court is fundamentally a legal inquiry that examines legal history, which is appropriately presented in briefs. See *Bruen*, 142 S. Ct. at 2130 n.6 (noting that the historical inquiry presents "legal questions" that judges can address) (emphasis in original); see also id. at 2135 n.8 (rejecting the dissent's suggestion that further fact-finding was needed and holding that its ruling did not "depend on any of the factual issues raised by the dissent"). Accordingly, the required analysis does not require fact-finding by a court.

44.     The text of the Second Amendment, as authoritatively interpreted by the Supreme Court, indisputably covers possession (keep) and the wear, carry, and transport (bear) of firearms, including handguns by ordinary, law-abiding citizens. Beyond the five locations specifically identified by the Supreme Court in *Bruen*, the State bears the burden to demonstrate that there is an enduring, well-established, representative historical analogue to the restriction imposed by the government. And the historical analogue must be "relevantly similar" to the contemporary restriction imposed by the government, burdening the Second Amendment right in a similar manner and for similar reasons. Under this test established in *Bruen*, the State cannot meet its burden to justify that its bans on the wear, carry, and transport of firearms in or at the locations regulated by the challenged provisions of SB1, by MD Code, Transportation, § 7-705(b)(6), and by the Department of Natural Resources regulations.

## COUNT I -- SECOND AMENDMENT

### SB1 Violations of the Second Amendment Right to Armed Self-Defense

45.     Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Complaint. This Count addresses violations of the Second Amendment to the United States

Constitution and is brought pursuant to and arises under 42 U.S.C. § 1983. For purposes of this Count, each of the Defendants have acted under "color of state law" within the meaning of Section 1983.

46.     The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Supreme Court has squarely held that the Second Amendment bestows an individual right to keep and bear arms and that right may be exercised by all responsible, law-abiding Americans. *District of Columbia v. Heller,* 554 U.S. 570 (2008). The Second Amendment is applicable to the States as incorporated through the Due Process Clause of Fourteenth Amendment because the right to "keep and bear Arms" is a fundamental constitutional right essential to ordered liberty. *McDonald v. City of Chicago*, 561 U.S. 742 (2010). In *Bruen*, the Supreme Court held that the Second Amendment right to keep and bear arms fully extends to general carry of arms in public.

47.     In *Bruen*, the Supreme Court articulated a framework for determining if firearms regulations are constitutional. It begins with the plain text. If the plaintiffs' proposed course of conduct falls within the Second Amendment's plain text, then "the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. The Supreme Court has defined all of the Second Amendment's key terms. "The people" means "all Americans"; "Arms" includes "all instruments that constitute bearable arms"; and, most relevant here, to bear simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008). "Nothing in the Second Amendment's text draws a home/public distinction," *Bruen*, 142 S. Ct. at 2134—or for that matter, any distinction between locations at all. That makes the Second Amendment unlike other Amendments. *See* U.S. Const. amend. III ("No Soldier shall, in time of peace be quartered in any house, without the consent

of the Owner, nor in time of war, but in a manner to be prescribed by law."); U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."). And it means that any locational restrictions on Second Amendment rights must come from history, not from the plain text.

48.     There is no "well-established, representative historical analogue" for the SB1 bans on firearms in and at (A), "health care facilities" as defined in MD Code, Insurance, § 15-10B-01(g)(1)-(4); (B) "a location licensed to sell or dispense alcohol * * * for on–site consumption;" or (C) "museums" as those terms are defined in and regulated by Section 4-111, as enacted by SB1. These bans imposed by Section 4-111, as enacted by SB1, are facially unconstitutional under the Second Amendment in so far as they ban the possession, wear, carry, or transport of firearms by permit holders at these locations.

49.     There are numerous "health care facilities" as defined in MD Code, Insurance, § 15-10B-01(g)(1)-(4), and the bans enacted by SB1 for these "health care facilities" extend across the board to visitors, employees, contractors, and health care professionals. Locations that are "licensed to sell or dispense alcohol * * * for on-site consumption" literally includes most restaurants, many private clubs, and locations operated by private associations in Maryland. There are thousands of such locations in Maryland and the bans at these places adversely affect virtually every permit holder who eats at restaurants or at private clubs. Under SB1, permit holders may not carry in such places, even if they do not consume a drop of alcohol or even if they enter such places merely to retrieve a carry-out order. These bans at such locations would also encompass events for which temporary, one-time licenses are granted, including at fund-raising events and events conducted outside. The bans imposed on carry by permit holders in and at "museums" is overwhelmingly applicable to private museums, of which there are many in

24

Maryland. See, e.g., https://bit.ly/40FkKPK. Under the "how and why" metrics established in *Bruen*, there is no "well-established, representative historical analogue" for banning "a person wearing, carrying, or transporting a firearm" at these locations.

50.    Likewise, there is no "well-established, representative historical analogue" for banning "a person wearing, carrying, or transporting a firearm" from entering "on property unless the owner or the owner's agent has posted a clear and conspicuous sign indicating that it is permissible to wear, carry, or transport a firearm on the property; or (2) enter . . .on property unless the owner or the owner's agent has given the person express permission to wear, carry, or transport a firearm on the property" as these provisions are defined in and regulated by Section 6-411(d), as enacted by SB1. These provisions of Section 6-411(d) are facially unconstitutional under the Second Amendment in so far as they ban the possession, wear, carry or transport of firearms by permit holders at these locations. The bans enacted by Section 6-411(d) effectively nullify the "general right" to carry in public as they preclude a permit holder from carrying into private property that is otherwise open to the public, including stores, shops, hotels, motels, restaurants, retail establishments, theatres and malls and other places of public accommodation throughout the State of Maryland.

51.    Each of the individual plaintiffs and MSI, SAF and FPC members with carry permits and who live in Maryland or who wear, carry, or transport firearms in or through Maryland are directly, substantially, and adversely affected by the foregoing violation of the Second Amendment. Such plaintiffs and MSI, SAF, and FPC members with wear and carry permits have, prior to the enactment of SB1 lawfully possessed and transported loaded firearms within the State at and in the locations that the challenged provisions of SB1 ban firearms. All the individual plaintiffs with carry permits intend to possess, wear, carry or transport firearms in one or more such locations in the

25

future. MSI, SAF and FPC have at least one member with a carry permit who has visited each of the locations challenged in this Count and each such member intends to wear, carry and transport firearms at such locations in the future. All these plaintiffs and MSI, SAF, and FPC members with Maryland carry permits have a reasonable fear of prosecution under SB1 if they do so.

**COUNT II -- SECOND AMENDMENT**

**Violation of the Second Amendment Right to Possess and Transport Firearms in and at**

**Mass Transit Facilities.**

52.     Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Complaint. This Count addresses violations of the Second Amendment to the United States Constitution and is brought pursuant to and arises under 42 U.S.C. § 1983. For purposes of this Count, defendants have acted under "color of state law" within the meaning of Section 1983 promulgating and enforcing MD Code, Transportation, § 7-705(b)(6).

53.     There is no "well-established, representative historical analogue" for the bans on firearms in a transit facility or transit vehicle owned or controlled by the Mass Transit Administration of the Maryland Department of Transportation as imposed by MD Code, Transportation, § 7-705(b)(6). Section 7-706(b)(6) is facially unconstitutional under the Second Amendment in so far as it bans the possession, wear, carry, or transport of firearms by permit holders on or at such mass transit facilities or transit vehicles.

54.     Each of the individual plaintiffs and MSI, SAF, and FPC members with carry permits who wear, carry, or transport firearms in Maryland and who use mass transit facilities owned or controlled by the Mass Transit Administration of the Maryland Department of Transportation are directly, substantially, and adversely affected by the foregoing violation of the Second Amendment. Specified plaintiffs with wear and carry permits have used such mass transit facilities in the past and

26

**JA0075**

will do so in the future but have been forced to travel in and at such mass transit facilities disarmed because of MD Code, Transportation, § 7-705(b)(6). MSI, SAF, and FPC have at least one member with a wear and carry permit who has used such mass transit facilities in the past and will do so in the future. Such plaintiffs and members fully intend to possess, wear, carry, and transport firearms at and in such mass transit facilities and vehicles but reasonably fear arrest and prosecution under MD Code, Transportation, § 7-705, if they do so.

**COUNT III -- SECOND AMENDMENT**

**Violation of the Second Amendment Right to Possess and Transport Firearms in and at State Parks, State Forests, and State Chesapeake Forest Lands**

55.    Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Complaint. This Count addresses violations of the Second Amendment to the United States Constitution and is brought pursuant to and arises under 42 U.S.C. § 1983. For purposes of this Count, defendants have acted under "color of state law" within the meaning of Section 1983 in promulgating, enforcing, or threatening to enforce COMAR § 08.07.01.04, COMAR § 08.07.01.14, and COMAR § 08.07.06.04, as issued and enforced by the Maryland Department of Natural Resources.

56.    There is no "well-established, representative historical analogue" for the bans on firearms in a State park, a State forest, or in a State Chesapeake forest, as imposed by COMAR § 08.07.01.04, COMAR § 08.07.01.14, and COMAR § 08.07.06.04, as issued and enforced by the Maryland Department of Natural Resources. These COMAR sections are facially unconstitutional under the Second Amendment in so far as they ban the possession, wear, carry or transport of loaded firearms in these locations by permit holders for self-defense.

57.     Each of the individual plaintiffs and MSI, SAF, and FPC members with carry permits and who live in Maryland and who visit a State park, a State forest, or a State Chesapeake forest are directly, substantially, and adversely affected by the foregoing violation of the Second Amendment. Specified plaintiffs with wear and carry permits have visited a State park, a State forest, or State Chesapeake forest lands in the past and will do so in the future. MSI, SAF, and FPC have members with carry permits who have visited a State park, a State forest, or State Chesapeake forest lands in the past and will do so in the future. The specified Plaintiffs and members of MSI, SAF, and FPC with a Maryland carry permit fully intend to possess, wear, carry, or transport loaded firearms at and in a State park, a State forest, or State Chesapeake forest lands for self-defense in the future but reasonably fear arrest and prosecution if they do so.

WHEREFORE, the Plaintiffs respectfully request:

A. That this Court issue a declaratory judgment that the specified provisions of SB1 are unconstitutional under the Second Amendment in so far as these provisions prohibit a carry permit holder from wearing, carrying, transporting, or possessing a firearm at the specified locations challenged in Count I, above and preliminarily and permanently enjoin the defendants Wesley Moore, Alison M. Healey, Scott D. Shellenberger, Ivan J. Bates, and Col. Roland L. Butler, Jr., from enforcing those provisions as against permit holders;

B.     That this Court issue a declaratory judgment that MD Code, Transportation, § 7-705(b)(6) is unconstitutional under the Second Amendment in so far as it prohibits a carry permit holder from wearing, carrying, transporting, or possessing a firearm in and at a transit facility or transit vehicle owned or controlled by the Mass Transit Administration of the Maryland Department of Transportation, as more fully set forth in Count II, above, and preliminarily and permanently enjoin defendants Wesley Moore, Paul J. Wiedefeld, Alison M. Healey, Scott D. Shellenberger,

28

Ivan J. Bates, and Col. Roland L. Butler, Jr., from enforcing those provisions as against permit holders;

C. That this Court issue a declaratory judgment that COMAR § 08.07.01.04, COMAR § 08.07.01.14, and COMAR § 08.07.06.04, as issued and enforced by the Maryland Department of Natural Resources are unconstitutional under the Second Amendment in so far as these provisions prohibit a carry permit holder from wearing, carrying, transporting, or possessing a firearm in and at a State Park, a State forest, and State Chesapeake forest land, as more fully set forth in Count III, above, and preliminarily and permanently enjoin the defendants Wesley Moore, Joshua Kurtz, Alison M. Healey, Scott D. Shellenberger, Ivan J. Bates, and Col. Roland L. Butler, Jr., from enforcing those provisions as against permit holders;

D. That this Court award attorneys' fees and costs against defendants, as authorized by 42 U.S.C. § 1988;

E. That this Court award the plaintiffs such other and further relief as in law and justice they may be entitled to receive.

Respectfully submitted,

*/s/ Mark W. Pennak*

David H. Thompson*
Peter A. Patterson*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com

Mark W. Pennak
MARYLAND SHALL ISSUE, INC.
9613 Harford Rd
Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
District Court Bar # 21033

Matthew Larosiere*
6964 Houlton Cir
Lake Worth FL 33467
Larosieremm@gmail.com

29

JA0078

1
2    *Application for admission *pro hac vice* to the Bar of this Court forthcoming.

3    Date: May 16, 2023                              *Counsel for Plaintiffs*

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JA0079**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SUSANNAH WARNER KIPKE, et al. | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-01293-GLR |
| | ) | |
| WES MOORE, in his official capacity | ) | Declaration of Susannah Kipke |
| as Governor of Maryland, et al. | ) | |
| | ) | |
| *Defendants.* | ) | |

## DECLARATION OF SUSANNAH KIPKE

I, Susannah Kipke, hereby declare under penalty of perjury, that the following information is true to the best of my knowledge and state the following:

1.    I am over 18 years old. I am competent to give this declaration. I am providing this declaration based on my personal knowledge and experience.

2.    I am a citizen of the United States. I am a resident and citizen of the State of Maryland. I currently reside in Pasadena, Maryland.

3.    I am a Senior Regional Director at Hillsdale College. As part of my duties as a Senior Regional Director, I routinely travel across the state to fundraise for Hillsdale College.

4.    I am not prohibited under state or federal law from acquiring or possessing firearms or ammunition.

5.    I have possessed a Maryland wear and carry permit, issued by the Maryland State Police, since 2021.

6.    I frequently carry my handgun and intend to continue carrying my handgun where it is permissible to do so to protect myself and my family, including my three young children. I intend to carry my handgun for self-defense in the locations I frequent but cannot (or will not be able to after SB1 takes effect) because of my credible fear of arrest and prosecution. Many of these

locations are generally open to the public but lack state-provided security—either at the entrance of the location or inside the location—sufficient to ensure my and family's safety at these locations. To enter and remain in these locations, patrons are not required to go through any form of security such as a metal detector or pat-down. Even where some security is provided no one is safe from physical attack, including especially a small woman like myself. The locations I frequent include:

    a.  I enjoy hiking and camping with my family. Through the Cottage Homeschool Co-Op and Charlotte Mason Moms Network, my children are involved in multiple hiking clubs in which they (and I) hike and have a picnic every month at various state parks, including Fort Frederick State Park, Rocky Gap State Park (where we hike the Evitts Homesite Trail and the Canyon Overlook Trail), Sandy Point State Park, Patapsco Valley State Park (where we hike the Cascade Falls loop), and South Mountain State Park. I chaperone these hikes and picnics, requiring me to visit these state parks. Apart from these hiking clubs, my family and I camp for a week every July at Rocky Gap State Park. We are continuing our tradition this July and intend to continue this tradition indefinitely. We also hike in the Savage River State Forest. These state parks and forests are heavily forested and are located in remote parts of the state. They lack state-provided security at the trail heads and in the wilderness, campgrounds, and picnic areas.

    b.  When traveling in my role at Hillsdale College, I visit the Chesapeake House Travel Plaza on I-95 rest area in Aberdeen. I visit this rest area several times each year.

    c.  My family and I visit the Camden Yards Sports Complex at least once each year.

d. I am at least monthly on the grounds of public schools in Anne Arundel County with my children for activities such as dance recitals, basketball games, and other sports events.

e. I dine at least weekly at restaurants licensed to serve alcohol for on-site consumption, including The Rumor Reel, Picantillo, Park Tavern, Garry's Grill, Tap House, and Two Rivers. I do not consume alcohol at these establishments but still wish to dine with my family.

f. Multiple times each week, I am on the grounds (but not in the school buildings themselves) two private primary schools to pick up and drop off my children from various activities, such as the American Heritage Girls and tutoring sessions, held at those schools. I have not seen any security on the grounds of either school.

g. I, with my children, regularly visit museums. We visit the Chesapeake Bay Maritime Museum in St. Michaels. We intend to return to this museum in November of this year. We visit the Fire Museum of Maryland in Lutherville. We intend to return to this museum this fall. We also visit several times each year Storyville at the Woodlawn Branch of the Baltimore County Public Library, and we intend to return this summer.

h. Various privately owned buildings otherwise open to the public that I visit at least weekly include: my church (Saint Jane Frances De Chantal Catholic Church in Riviera Beach); grocery store (Giant in Pasadena and Wegmans in Gambrils); pharmacy (CVS in Pasadena; Mike's Pharmacy in Pasadena); gas station (Exxon in Pasadena); and bowling alley (Severna Park Lanes in Severna

Park). I also visit grocery stores, gas stations, and other private property open to the public when I am traveling across the state for Hillsdale College.

    i. I go to the Anne Arundel County Public Library weekly to check out books. I take my family to Bowie Baysox games in Prince Georges Stadium in Bowie three to five times each year, oftentimes with my son and his Trail Life Troop. I also take my family to Six Flags America amusement park in Bowie. We last visited Six Flags this month.

7.    I am a member of Maryland Families for Safe Birth, and we publicly demonstrate in Lawyers Mall in Annapolis each year in February. I have participated in this public demonstration each year for the past several years and intend to continue doing so.

8.    As a result of SB1, I am now uncertain about where I will or will not be able to carry my handgun. I no longer know what my rights are. I do know that I will be prohibited from carrying my handgun in many of the places in which I currently do carry. For fear of arrest and prosecution, the uncertainties caused by SB1 will frustrate my right to exercise my right to bear arms almost entirely.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this _3_ day of _July_, 2023.

Susannah Kipke

IN THE UNITED STATES DISTRICT COURT
Case 1:23-cv-01293-GLR FOR THE DISTRICT OF MARYLAND 11/04/23   Page 2 of 5

| | | |
|---|---|---|
| SUSANNAH WARNER KIPKE, et al. | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-01293-GLR |
| | ) | |
| WES MOORE, in his official capacity | ) | Declaration of Gabriel Dinkins |
| as Governor of Maryland, et al. | ) | |
| | ) | |
| *Defendants.* | ) | |

## DECLARATION OF GABRIEL DINKINS

I, Gabriel Dinkins, hereby declare under penalty of perjury, that the following information is true to the best of my knowledge and state the following:

1.      I am over 18 years old. I am competent to give this declaration. I am providing this declaration based on my personal knowledge and experience.

2.      I am a citizen of the United States. I am a resident and citizen of the State of Maryland. I currently reside in Waldorf, Maryland.

3.      I am a member of the Maryland State and Rifle and Pistol Association, Inc.

4.      I am a Maryland State Police certified firearms instructor and am certified by the Maryland State Police to teach the training courses required to obtain a Handgun Qualification License and carry permit. I teach the Handgun Qualification License and carry permit training courses on Saturdays locations in District Heights and Upper Marlboro.

5.      I am not prohibited under state or federal law from acquiring or possessing firearms or ammunition.

6.      I have possessed a Maryland wear and carry permit, issued by the Maryland State Police, since July 2019.

7.      I frequently carry my handgun and intend to continue carrying my handgun where it is permissible to do so to protect myself and my family. I intend to carry my handgun for self-defense in the locations I frequent but cannot (or will not be able to after SB1 takes effect) because of my credible fear of arrest and prosecution. Many of these locations are generally open to the public but lack state-provided security sufficient—either at the entrance of the location or inside the location—sufficient to ensure my and family's safety at these locations. To enter and remain in these locations, patrons are not required to go through security such as a metal detector or pat-down. Even where some security is provided, no one is safe from physical attack. The locations I frequent include:

a.  My family and I take bi-annual road trips, and we stop at rest areas in Maryland during our travels. For example, in August 2022, we traveled to Nashville, TN and stopped at the US 301 Crane Memorial Welcome Center in Newburg. We are currently planning a road trip to Deep Creek Lake in December 2023, during which we will stop at the South Mountain I-70 East Welcome Center in Myersville, a rural location in the Northwest corner of the state. My wife is from New York, and we drive at least every other year to New York to visit her family. When we visit her family, we stop at the Chesapeake House Travel Plaza on I-95 rest area in Aberdeen.

b.  I have three school age children. My oldest attends a public high school. My middle child attends a public middle school. And my youngest will be in a public elementary school in the fall. I routinely pick up from my oldest two children from school when they have after school events, which is at least twice per month. I intend to also pick up my youngest child from school. Also,

because I work from home, I am the parent primarily responsible for picking up our children from school when they are sick or have any sort of emergency. For these reasons, I am often, and will often be, on the grounds of public schools. I would carry my firearm for self-defense on the grounds, i.e., the parking lot (but in the buildings) of the schools if the prohibition against doing so were stricken. While these schools have resource officers inside the buildings, I have never seen a resource officer outside the buildings on school grounds.

c.  I visit the MGM National Harbor Hotel & Casino video lottery facility in Oxon Hill. My friends and I visit this location several times per year to enjoy a night out. I intend to return to this location later this summer.

d.  I dine at least weekly at restaurants licensed to serve alcohol for on-site consumption, where I do not consume alcohol but still wish to dine out. On Saturdays after teaching a firearms course, for instance, I treat myself to dinner at Great American Steakhouse or TGI Fridays in Waldorf.

e.  My family and I go to Southern Maryland Blue Crabs games in Regency Furniture Stadium in Waldorf. We go to games on nights when ticket prices are discounted or when the team is offering some other promotion ("Beer and Wings" nights, for instance). We go to these games at least a couple games per year. We have plans to go to a game in July. We also visit the stadium to watch fireworks every July Fourth. To gain entrance inside the stadium, only a ticket is required. I do not go through a metal detector and am not patted-down.

f.  Various privately owned buildings otherwise open to the public that I visit at least weekly include: my church (Refuge Temple Worship Center in Marlow

Heights), grocery store (Safeway, Giant, or BJs in Waldorf), and pharmacy
(CVS or Walgreens in Waldorf).

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct to the best of my knowledge.

Executed this 3rd day of July, 2023.

Gabriel Dinkins

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SUSANNAH WARNER KIPKE, et al.    )
                                 )
    *Plaintiffs,*                   )
                                 )
    v.                           )    No. 1:23-cv-01293-GLR
                                 )
WES MOORE, in his official capacity )   Declaration of Michael Fryar
as Governor of Maryland, et al.  )
                                 )
    *Defendants.*                   )

### DECLARATION OF MICHAEL FRYAR

I, Michael Fryar, hereby declare under penalty of perjury, that the following information is true to the best of my knowledge and state the following:

I am over 18 years old. I am competent to give this declaration. I am providing this declaration based on my personal knowledge and experience.

I am a citizen of the United States. I am a resident and citizen of the State of Maryland. I currently reside in Gaithersburg, Maryland.

I am a member of the Maryland State and Rifle and Pistol Association, Inc.

I am not prohibited under state or federal law from acquiring or possessing firearms or ammunition.

I have possessed a Maryland wear and carry permit, issued by the Maryland State Police, since February 2019.

From 2007–2013, I was an active duty Connecticut Army National Guardsman. I served as member of the combat military police. In 2013, I was moved to inactive reserves. I served in that role until 2015, when I was honorably discharged by the US Army.

I frequently carry my handgun and intend to continue carrying my handgun where it is permissible to do so to protect myself and my family. I intend to carry my handgun for self-

defense in the locations I frequent but cannot (or will not be able to after SB1 takes effect) because of my credible fear of arrest and prosecution. Many of these locations are generally open to the public but lack state-provided security sufficient—either at the entrance of the location or inside the location—sufficient to ensure my and family's safety at these locations. To enter and remain in these locations, patrons are not required to go through any form of security such as a metal detector or pat-down. Even where some security is provided, no one is safe from physical attack. The locations I frequent include:

I hike, picnic, and fish with my family at Seneca Creek State Park. My family and I visit this park at least six to seven times each year. We intend to visit this park throughout this summer and fall. There is no security at the entrance to the park. The park is 6,300 acres and is certainly not comprehensively policed.

I use the weekday MARC commuter train service between Baltimore and Washington, D.C to travel into D.C. several times each month. I depart from the Gaithersburg station and ride into D.C. . To board the train, I am not required to go through any form of security, not even a metal detector.

Restaurants licensed to serve alcohol for on-site consumption, where I do not consume alcohol but still wish to dine out. I visit at least weekly one or more of Uncle Julios in Gaithersburg, Old Pour House in Gaithersburg, and Brews & Barrels in Gaithersburg.

Various privately owned buildings otherwise open to the public that I visit at least weekly include: my church (Saint Rose of Lima in Gaithersburg) and gas station (Marathon Gas in Gaithersburg).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SUSANNAH WARNER KIPKE, et al. | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| v. | ) No. 1:23-cv-01293-GLR |
| | ) |
| WES MOORE, in his official capacity | ) Declaration of John Hurley |
| as Governor of Maryland, et al. | ) |
| | ) |
| *Defendants.* | ) |

### <u>DECLARATION OF JOHN HURLEY</u>

I, John Hurley, hereby declare under penalty of perjury, that the following information is true to the best of my knowledge and state the following:

1.    I am over 18 years old. I am competent to give this declaration. I am providing this declaration based on my personal knowledge and experience.

2.    I am a citizen of the United States. I am a resident and citizen of the State of Maryland. I currently reside in Ridgely, Maryland.

3.    I am a member of the Maryland State and Rifle and Pistol Association, Inc.

4.    I am a retired Airport Fire Department firefighter at Baltimore/Washington International Thurgood Marshall Airport. I worked in this capacity for 30 years. I retired in December 2017.

5.    I am currently a volunteer firefighter with the Ridgely Volunteer Fire Company. I have been working in this capacity since the early 1990s. I am the Assistant Treasurer to the Ridgely Volunteer Fire Company.

6.    I am also President of the Town Commission for the Town of Ridgely. I was elected to this position in 2010 and am in my fourth term as President.

7.      I am not prohibited under state or federal law from acquiring or possessing firearms or ammunition.

8.      I have possessed a Maryland wear and carry permit, issued by the Maryland State Police, since 2017. In my application for the carry permit, I proffered a "good and substantial reasons" to carry a handgun: that as President of the Town Commission, I make large cash deposits at my bank. The Maryland State Police determined I had "good and substantial reason" to carry a firearm.

9.      I frequently carry my handgun and intend to continue carrying my handgun where it is permissible to do so to protect myself. I intend to carry my handgun for self-defense in the locations I frequent but cannot (or will not be able to after SB1 takes effect) because of my credible fear of arrest and prosecution. Many of these locations are generally open to the public but lack state-provided security sufficient—either at the entrance of the location or inside the location— sufficient to ensure my safety at these locations. To enter and remain in these locations, patrons are not required to go through security such as a metal detector or pat-down. Even where some security is provided no one is safe from physical attack. The locations I frequent include:

      a.  I fish at the Tuckahoe State Park at least once each month. I intend to visit this park next month. I also am called to this state park as a firefighter at least two to three times each year when there is a medical emergency on a hiking trail that is not accessible by ambulance. When this happens, I enter the park on an all-terrain vehicle and take the injured person to an ambulance. This happened, for instance, in March and June of this year.

      b.  Each year in February or March, Ridgely Elementary School hosts a "If I Were Mayor" event, in which students write a letter to the General Assembly and

Governor. I participate in this event every year. To participate in this event, I enter the grounds of the elementary school. I would carry my firearm for self-defense onto school grounds but not in the school buildings themselves. The school has some security measures to enter the school and once inside the building. But it generally does not have any security measures outside the school building on school grounds.

c.  Restaurants licensed to serve alcohol for on-site consumption, where I do not consume alcohol but still wish to dine out. I visit at least weekly one or more of Denton's Diner in Denton and Foster's Mini Mart in Ridgeley.

d.  Each year in June, the Maryland Municipal League hosts an association of elected officials from different towns to discuss ongoing legislation and various local political issues. I attend this conference each year. The conference is usually held at the Roland E. Powell Convention Center in Ocean City. At this conference, I am required to wear a badge to enter the Convention Center, but there is no armed security at the entrance of or inside the Convention Center to ensure my or the other attendees' safety. Also every June and also at the Roland E. Powell Convention Center, the Maryland State Fireman's Association hosts a convention for Maryland's volunteer fire companies. I attend this conference every year as well. At this conference, no badge or identification is required to enter the Convention Center, nor is there armed security ensuring my or the other attendees' safety once inside the Convention Center.

e.  Various privately owned buildings otherwise open to the public that I visit at least monthly include: my church (Ridgely United Methodist), grocery store

(Wal-Mart), pharmacy (Ridgely Pharmacy), and bank (Shore United Bank in Denton and Queenstown Bank).

    f.   During the course of my duties as a volunteer firefighter, I routinely bring patients into the Emergency Department at the University of Maryland Shore Medical Center at Easton, through the south side of the hospital. This medical center has just one security guard who patrols the entire medical center and is not assigned to the Emergency Department specifically.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 1st day of July, 2023.

_____
John Hurley

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SUSANNAH WARNER KIPKE, et al. | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-01293-GLR |
| | ) | |
| WES MOORE, in his official capacity | ) | Declaration of Jonathan Smith |
| as Governor of Maryland, et al. | ) | |
| | ) | |
| *Defendants.* | ) | |

## DECLARATION OF JONATHAN SMITH

I, Jonathan Smith, hereby declare under penalty of perjury, that the following information is true to the best of my knowledge and state the following:

1.    I am over 18 years old. I am competent to give this declaration. I am providing this declaration based on my personal knowledge and experience.

2.    I am a citizen of the United States. I am a resident and citizen of the State of Maryland. I currently reside in Ellicott City, Maryland.

3.    I am a member of the Maryland State and Rifle and Pistol Association, Inc., the Maryland Rifle Club, and the National Rifle Association of America, Inc.

4.    I am a NRA certified pistol instructor. I also possess a Qualified Handgun Instructor Certificate issued by the Maryland State Police that qualifies me to teach the training courses required to obtain a Maryland handgun permit and a Handgun Qualification License. I am also a NRA certified Range Safety Officer and have achieved the level of expert pistol marksman in the NRA Marksmanship Qualification Program.

5.    I am a former Assistant State's Attorney for Baltimore County. I currently own and manage my own law firm, Smith Law Firm, LLC. My law offices, which are open to the public,

are located in a privately owned office building in Columbia, Maryland adjacent to the Mall in Columbia and near Symphony Woods Park.

6.      I am not prohibited under state or federal law from acquiring or possessing firearms or ammunition.

7.      I have possessed a Maryland carry permit, issued by the Maryland State Police, since 2021. In my application for the carry permit, I proffered two "good and substantial reasons" to carry a handgun. First, I own and manage my law firm that is located in an area in which substantial amounts of violent crime have occurred. Second, I visit banks to make business deposits that included substantial sums. The Maryland State Police determined I had a "good and substantial reason" to carry a handgun.

8.      I also hold a Nonresident Concealed Handgun permit issued by the Commonwealth of Virginia and a Concealed Weapon or Firearm License issued by the state of Florida.

9.      I frequently carry my handgun and intend to continue carrying my handgun where it is permissible to do so to protect myself, my family members, and my business. I intend to carry my handgun for those purposes in the locations I frequent but cannot do so after SB1 takes effect because of my credible fear of arrest and prosecution. Most of these locations are generally open to the public but lack state-provided security sufficient—either at the entrance of the location or inside the location—to ensure my safety and the safety of others at these locations. To enter and remain in these locations, patrons are not required to go through any form of security such as a metal detector or pat-down. Even where some security is provided, that security is unarmed, and no one is safe from physical attack. The locations I frequent and intend to continue to frequent include:

a. Various privately owned shopping centers and buildings otherwise open to the public, including my law offices and the building in which they are located, and PNC Bank—the very places the State Police presumably deemed I had a good and substantial reason to carry a handgun. These include, but are not limited to, my church (Grace Community Church in Fulton, Maryland), gas stations (such as the 7-11 Fuel Station in Ellicott City, Maryland), and Wal-Mart in Ellicott City, Maryland.

b. I lawfully fly approximately every other month to Florida, where I own two homes, and other locations, with my handgun. I fly out of and into Baltimore/Washington International Thurgood Marshall Airport ("BWI"). I have taken the following trips with my handgun since the beginning of 2022: January, April, June, August 2022 (Ft. Myers, FL); October 2022 (Ft. Lauderdale, FL); November 2022 (Nashville, TN); and January and April 2023 (Ft. Myers, FL).

c. I have plans to fly out of BWI to Ft. Myers, FL with my handgun in July, 2023 and I likely will do so again later in 2023.

d. When I fly out of BWI, before arriving at the airport, I unload my handgun and place it in a Pelican handgun case, which is locked with two padlocks. I place my handgun case in my luggage. When I check that luggage, I "declare" to airline personnel that my checked luggage contains an unloaded handgun in a locked case. After checking my luggage, I then go through security. When I fly into BWI, I open my luggage to verify that my handgun case is still inside, but I typically do not open the handgun case until I arrive at my home.

10.    I currently allow any person who has the lawful right to carry a handgun, including those with a Maryland carry permit, into my law offices. These individuals include my past or existing clients, prospective clients, and their family members. I currently do not post a conspicuous sign indicating that it is permissible to wear, carry, or transport a handgun into my law offices. Nor do I provide express permission to individuals to carry a handgun into my law offices. I intend to allow any person who has the lawful right to carry a handgun, including those with a Maryland carry permit, to carry a handgun into my law offices after SB1 goes into effect.

11.    SB1 requires that I post a conspicuous sign indicating that it is permissible to wear, carry, or transport a handgun in my law offices *or* provide express permission to individuals to carry a handgun into my law offices. I do not want to engage in this compelled speech. If I do not engage in this compelled speech, the right to carry a handgun in my law offices is prohibited. SB1 requires me to engage in compelled speech to continue providing services to those who bring a handgun into my law offices. If I do not engage in this compelled speech, I will incur the risk of losing and will lose the business of handgun owners who wish to carry their handgun into my law offices but will not do so for fear of arrest and prosecution. If I do engage in this compelled speech, I will incur the risk of losing and will lose the business of those with political views that are hostile and opposed to firearm and handgun ownership or firearms generally. SB1 politicizes my law offices by requiring me to take a political stance: either that I welcome the right to carry handguns, or that I am hostile or opposed to that right. Either way, SB1 will cause me to incur the risk of losing, and the actual loss of business.

I declare under penalty of perjury under the laws of the United States of America and upon personal knowledge that the foregoing is true and correct to the best of my knowledge.

Executed this 1st day of July, 2023.

_____
Jonathan Smith

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SUSANNAH WARNER KIPKE, et al. | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-01293-GLR |
| | ) | |
| WES MOORE, in his official capacity | ) | Supplemental Declaration of |
| as Governor of Maryland, et al. | ) | Susannah Kipke |
| | ) | |
| *Defendants.* | ) | |

## SUPPLEMENTAL DECLARATION OF SUSANNAH KIPKE

I, Susannah Kipke, hereby declare under penalty of perjury, that the following information is true to the best of my knowledge and state the following:

1.    I hereby incorporate by reference, as if fully set forth herein, each of the paragraphs of my original declaration, submitted in *Kipke, et al. v. Moore, et al.*, No. 1:23-cv-01293-GLR (D. Md.).

2.    When participating in a public demonstration, such as the yearly demonstration in Lawyers Mall in Annapolis as part of my membership of Maryland Families for Safe Birth, but for my fear of prosecution I would not leave the area even after being advised by a law enforcement officer that a demonstration is occurring and being ordered by the law enforcement officer to leave the areas of the demonstration until I dispose of my firearm.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of August, 2023.

*Susannah Kipke*
Susannah Kipke

**JA0100**

UNITED STATES DISTRICT
COURT DISTRICT OF MARYLAND

---

KATHERINE NOVOTNY., et al.,

                Plaintiffs,

                                Case No.:  1:23-cv-01295

     v.

WESTLEY MOORE, et al.,

                Defendants.

---

## DECLARATION

    I, Katherine Novotny, hereby declare under penalty of perjury, that the following information is true to the best of my knowledge and state the following:

    1.      I am over 18 years old. I am competent to give this declaration. I am providing this declaration based on my personal knowledge and experience.

    2.      I am a citizen of the United States, and a resident and citizen of the State of Maryland, currently residing in Aberdeen, Maryland. I am a member of Maryland Shall Issue, Inc., Firearms Policy Coalition, Inc., and the Second Amendment Foundation.

    3.      I am not prohibited under state or federal law from acquiring or possessing firearms or ammunition.

    4.      Since March 2022, I have possessed a Maryland wear and carry permit, issued by the Maryland State Police.

1

5.      With my carry permit, I have regularly carried my personal firearm at and in multiple restaurants licensed to serve alcohol for on-site consumption, including Texas Roadhouse in Fallston, MD, Chili's in Bel Air, MD, Outback Steakhouse in Bel Air, MD, Old South Smokehouse in Port Deposit, MD, Great American Steakhouse in Aberdeen, MD, Bistro 91 in Finksburg, MD, Main Street Tower in Bel Air, MD, and Chopstix in Forest Hill, MD. When I visit these locations while carrying my personal firearm, I never consume alcohol.

6.      With my carry permit, I regularly carry my personal firearm when I enter stores and other privately owned buildings that are otherwise open to the public.

7.      I have every intention and desire to continue to carry in restaurants licensed to serve alcohol and in stores and other privately owned buildings otherwise open to the public and would continue to do so in the future, but I will decline to do so because of my credible fear of arrest and prosecution after October 1, 2023, the effective date of SB 1.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of May, 2023.

Katherine Novotny

2

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

KATHERINE NOVOTNY., et al.,

                              Plaintiffs,

                                                  Case No.:  l:23-cv-01295

        v.

WESTLEY MOORE, et al.,

                              Defendants.

## DECLARATION

I, Sue Burke, hereby declare under penalty of perjury, that the following information is true to the best of my knowledge and state the following:

1.      I am over 18 years old. I am competent to give this declaration. I am providing this declaration based on my personal knowledge and experience.

2.      I am a citizen of the United States, and a resident and citizen of the State of Maryland, currently residing in Reisterstown, Maryland. I am a member of Maryland Shall Issue, Inc., Firearms Policy Coalition, Inc., and the Second Amendment Foundation.

3.      I am not prohibited under state or federal law from acquiring or possessing firearms or ammunition.

4.      In 2022, I acquired a Maryland wear and carry permit, issued by the Maryland State Police.

1

5.      With my carry permit, I have regularly carried my personal firearm at and in multiple establishments licensed to serve alcohol for on-site consumption, including: Applebee's, Olive Garden, and Forbidden City restaurants in Westminster, MD; Bare Bones and Kelsey's Restaurant, Irish Pub & Banquet Room, and La Palapa Grill & Cantina in Ellicott City, MD; Jarrettsville Manor Memorial VFW Post 8672, Jarrettsville, MD; Lt. Peter G Zouck VFW Post 521, Owings Mills, MD; Yingling-Ridgely Post #7472, Ellicott City, MD; American Legion Post #17 – Edgewood, MD; and American Legion Harford Post #39, Bel Air, MD. When I visit these locations while carrying my personal firearm, I never consume alcohol.

6.      With my carry permit, I regularly carry my personal firearm when I enter stores and other privately owned buildings that are otherwise open to the public.

7.      With my carry permit, I regularly visit multiple private museums while carrying my personal firearm, including the Annapolis Maritime Museum, Babe Ruth Birthplace and Museum, Baltimore Museum of Industry, Baltimore Streetcar Museum, B & O Railroad Museum, Calvert Marine Museum, the Baltimore Museum of Art, and the Chesapeake Maritime Museum.

8.      I have every intention and desire to continue to carry in restaurants licensed to serve alcohol, in stores and other privately owned buildings otherwise open to the public, and private museums, and would continue to do so in the future, but I will decline to do so because of my credible fear of arrest and prosecution after October 1, 2023, the effective date of SB 1.

9.      I regularly visit Maryland State Parks, including Patapsco Valley State Park, Cunningham Falls State Park, Swallow Falls State Park, Assateague State Park, and Pocomoke River State Park, and plan to continue visiting these and other parks.

2

**JA0104**

10.     I have visited Maryland State Forests, including Pocomoke State Forest and Potomac-Garrett State Forest, and plan to continue visiting Maryland State Forests.

11.     I have visited Maryland Chesapeake Forest Lands, including Chesapeake Forest, Snow Hill (WR-27 and WR-40), and plan to continue visiting Maryland Chesapeake Lands.

12.     On my visits to State Parks, State Forests, and Chesapeake Forest Lands, I have declined to carry my personal firearm because of the regulations promulgated by the Department of Natural Resources, which prohibit carrying personal firearms. But for my credible fear of arrest and prosecution arising from the enforcement of these regulations, I would fully intend to carry a firearm in these locations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of May, 2023.

Sue Burke

3

**JA0105**

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

KATHERINE NOVOTNY., et al.,

                Plaintiffs,

                           Case No.:  1:23-cv-0 1295

     v.

WESTLEY MOORE, et al.,

                Defendants.

## **DECLARATION**

I, Esther Rossberg, hereby declare under penalty of perjmy, that the following information is true to the best of my knowledge and state the following:

1.     I am over 18 years old. I am competent to give this declaration. l am providing this declaration based on my personal knowledge and experience.

2.     I am a citizen of the United States, and a resident and citizen of the State of Maryland, currently residing in Baltimore, Maryland. I am a longtime member of Maryland Shall Issue, Inc. I am also a member of both Firearms Policy Coalition, Inc., and the Second Amendment Foundation.

3.     l am not prohibited under state or federal law from acquiring or possessing firearms or ammunition.

4.     In 2022, l acquired a Maryland wear and carry permit, issued by the Maryland State Police.

1

5.      With my carry permit, I have regularly carried my personal firearm at and in multiple restaurants licensed to serve alcohol for on-site consumption, including Dougie's in Pikesville, MD, Taam Thai in Pikesville, MD, KB Grill and Wok in Baltimore, MD, and Serengeti in Baltimore, MD. When I visit these locations while carrying my personal firearm, I never consume alcohol.

6.      With my carry permit, I regularly carry my personal firearm when I enter stores and other privately owned buildings that are otherwise open to the public.

7.      With my carry permit, I regularly carry my firearm while at health care facilities, including on visits to my personal physician at a hospital in Baltimore, MD. It is my understanding that a hospital is within the meaning of MD Code, Insurance, § 15-10B-01(g)(1), as incorporated by Section 4-111(a)(2)(iii) and Section 4-111(c) of SB1.

8.      I have every intention and desire to continue to carry in restaurants licensed to serve alcohol, in stores and other privately owned buildings otherwise open to the public, and health care facilities, and would continue to do so in the future, but I will decline to do so because of my credible fear of arrest and prosecution after October 1, 2023, the effective date of SB 1.

9.      I regularly use the Baltimore Metro rail system to travel from the Reisterstown Plaza Station to various stations in the City of Baltimore, including the Charles Center and Johns Hopkins Hospital stations. I have every intention of continuing to regularly use the Baltimore Metro rail system.

10.     While using the Baltimore Metro rail system, I have declined to carry my personal firearm because of the prohibition imposed by MD Code, Transportation, § 7-705(b)(6). But for

2

my credible fear of arrest and prosecution arising from the enforcement of this prohibition, I would fully intend to carry a firearm while using the Baltimore Metro rail system going forward.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of May, 2023.

_____
Esther Rossberg

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

KATHERINE NOVOTNY., et al.,

                    Plaintiffs,

    v.                             Case No.:  1:23-cv-01295

WESTLEY MOORE, et al.,

                    Defendants.

## <u>DECLARATION</u>

1.    COMES NOW, the declarant, DANIEL CARLIN-WEBER, and hereby solemnly declares under penalties of perjury and states that based upon personal knowledge that the contents of the following declaration are true:

2.    I am an adult over the age of 18, a Maryland resident and I am fully competent to give sworn testimony in this matter.

3.    I am the Chairman of the Board of Directors of MARYLAND SHALL ISSUE, INC., a named plaintiff in the above captioned matter.  I execute this declaration on behalf of MARYLAND SHALL ISSUE, INC.

4.    Plaintiff MARYLAND SHALL ISSUE, INC. ("MSI"), is a Maryland corporation, located at 9613 Harford Rd., Ste C #1015, Baltimore, MD 21234. MSI is an Internal Revenue Service Section 501(c)(4), non-profit, non-partisan, all-volunteer membership organization with approximately 3662 members statewide. MSI is dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm

in public. The purposes of MSI include promoting the exercise of the right to keep and bear arms and education, research, and legal action associated with the constitutional right to privately own, possess and carry firearms. Each of the named individual plaintiffs in this suit is a member of MSI.

5.      On May 16, 2023, the Defendant, Governor Wes Moore, signed Senate Bill 1 ("SB 1") into law. SB 1 goes into effect on October 1, 2023. SB 1 implements expansive new restrictions on where ordinary, law-abiding citizens, including MSI's members who have a wear and carry permit issued by the Maryland State Police, may exercise their Second Amendment right to carry a firearm. Among the new restrictions are bans on carrying firearms by permit holders in privately owned buildings open to the public, locations licensed to sell or dispense alcohol for on-site consumption, private museums, and health care facilities.

6.      Maryland additionally bans wear and carry permit holders from carrying their personal firearm for self-defense in State Parks, State Forests, and State Chesapeake Forest Lands. *See* COMAR 08.07.01.04, 08.07.01.14, 08.07.06.04.

7.      Maryland also bans wear and carry permit holders from carrying their personal firearm for self-defense on mass transit in Maryland. *See* MD Code, Transportation, § 7-705(b)(6).

8.      MSI has one or more members who live in Maryland and who travel throughout Maryland in the ordinary course of their lives, and who also possess a Maryland wear and carry permit issued by the Maryland State Police. MSI has at least one member who is a permit holder and regularly carries firearms in and at each of the locations challenged in the Complaint filed in this case, including at a rehabilitation facility, as defined at MD Code, Insurance, § 15-10B-01(g)(4), and at a surgical center, as defined at MD Code, Insurance, § 15-10B-01(g)(3). These

2

members of MSI with carry permits intend to continue to possess and carry firearms at such locations, but reasonably fear prosecution if they do so after October 1, 2023.

9.      MSI has one or more members with carry permits who regularly visit State parks and State forests, including State Chesapeake Forest Lands, and would carry a firearm at these locations but for the regulatory bans imposed by the Department of Natural Resources.

10.     MSI has at least one member with a carry permit who regularly uses public transportation facilities operated or controlled by the Department of Transportation, Mass Transit Administration and would possess, wear, carry or transport a firearm while doing so but for the ban imposed by MD Code, Transportation, § 7-705(b)(6).

11.     MSI brings this action on behalf of its members who have Maryland wear and carry permits, a class which includes each of the individual named plaintiffs in this case.

12.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 24th day of May, 2023.

Daniel Carlin-Weber
Chairman of the Board
Maryland Shall Issue, Inc.

3

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

KATHERINE NOVOTNY., et al.,

                Plaintiffs,

                                   Case No.:  1:23-cv-01295

     v.

WESTLEY MOORE, et al.,

                Defendants.

## DECLARATION

      I, Alan M. Gottlieb, hereby declare under penalty of perjury, that the following information is true to the best of my knowledge and state the following:

      1.     I am over 18 years old. I am competent to give this declaration. I am providing this declaration based on my personal knowledge and experience.

      2.     I am the Executive Vice President of Second Amendment Foundation ("SAF"), a non-profit educational foundation incorporated under the laws of Washington with a principal place of business in Bellevue, Washington. In my role as Executive Vice President, I am familiar with SAF's purposes as an organization and SAF's membership.

      3.     SAF seeks to preserve the effectiveness of the Second Amendment through education, research, publishing, and legal action programs focused on the constitutionally protected right to possess firearms and firearm ammunition, and the consequences of gun control.

      4.     SAF has over 720,000 members and supporters nationwide, including thousands of members in Maryland. SAF's members include individuals and firearm owners who are not prohibited under state or federal law from possessing, receiving, owning, or purchasing a firearm

or ammunition. Each of the named individual plaintiffs in the above-captioned matter are members of SAF.

5.      On May 16, 2023, the Defendant, Governor Wes Moore, signed SB 1 into law. SB 1 goes into effect on October 1, 2023. SB 1 implements expansive new restrictions on where ordinary, law-abiding citizens, including SAF's members that have a wear and carry permit issued by the Maryland State Police, may exercise their Second Amendment right to carry a firearm. Among the new restrictions are bans on carrying firearms by permit holders in privately owned buildings open to the public, locations licensed to sell or dispense alcohol for on-site consumption, private museums, and health care facilities.

6.      Maryland additionally bans wear and carry permitholders from carrying their personal firearm for self-defense in State Parks, State Forests, and State Chesapeake Forest Lands. *See* COMAR 08.07.01.04, 08.07.01.14, 08.07.06.04.

7.      Maryland also bans wear and carry permitholders from carrying their personal firearm for self-defense on mass transit in Maryland. *See* MD Code, Transportation, § 7-705(b)(6).

8.      SAF has at least one member who is a permit holder and who carries firearms in and at buildings open to the public, locations licensed to sell alcohol for on-site consumption, private museums, and health care facilities. SB 1, as of its effective date of October 1, 2023, bans SAF's member(s) from carrying at the locations. These SAF members fully intend to continue to carry at these locations but reasonably fear arrest and prosecution if they do so after October 1, 2023.

9.      SAF has one or more members with Maryland carry permits who visit Maryland State Parks, State Forests, and State Chesapeake Forest Lands, and would possess, wear, carry or transport a firearm at these locations but for their reasonable fear of arrest and prosecution from

2

**JA0113**

the enforcement of the administrative regulatory bans imposed by the Department of Natural Resources.

10.     SAF has one or more members with Maryland carry permits who use mass transit and would carry a firearm while doing so but for their credible fear of arrest and prosecution from the enforcement of MD Code, Transportation, § 7-705.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 24Th day of May, 2023.

Alan M. Gottlieb
Executive Vice President
Second Amendment Foundation

3

**JA0114**

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

_____

KATHERINE NOVOTNY., et al.,

                Plaintiffs,

                              Case No.:  1:23-cv-01295

   v.

WESTLEY  MOORE, et al.,

                Defendants.

_____

## **DECLARATION**

    I, Brandon Combs, hereby declare under penalty of perjury, that the following information is true to the best of my knowledge and state the following:

    1.    I am over 18 years old. I am competent to give this declaration. I am providing this declaration based on my personal knowledge and experience.

    2.    I am the president of the Firearms Policy Coalition, Inc, ("FPC"), a non-profit organization incorporated under the laws of Delaware with a primary place of business in Clark County, Nevada. In my role as president, I am familiar with FPC's purposes as an organization and FPC's membership.

    3.    The purposes of FPC include defending and promoting the People's rights—especially the fundamental, individual Second Amendment right to keep and bear arms—advancing individual liberty and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

4.      FPC has members that reside in and that visit the State of Maryland. FPC's members include individuals and firearm owners who are not prohibited under state or federal law from possessing, receiving, owning, or purchasing a firearm or ammunition. Each of the named individual plaintiffs in the above-captioned matter are members of FPC.

5.      On May 16, 2023, the Defendant, Governor Wes Moore, signed SB1 into law. SB 1 goes into effect on October 1, 2023. SB 1 implements expansive new restrictions on where ordinary, law-abiding citizens, including FPC's members that have a wear and carry permit issued by the Maryland State Police, may exercise their Second Amendment right to carry a firearm. Among the new restrictions are bans on carrying firearms by permit holders in privately owned buildings open to the public, locations licensed to sell or dispense alcohol for on-site consumption, private museums, and health care facilities.

6.      Maryland additionally bans wear and carry permitholders from carrying their personal firearm for self-defense in State Parks, State Forests, and State Chesapeake Forest Lands. *See* COMAR 08.07.01.04, 08.07.01.14, 08.07.06.04.

7.      Maryland also bans wear and carry permitholders from carrying their personal firearm for self-defense on mass transit in Maryland. *See* MD Code, Transportation, § 7-705(b)(6).

8.      FPC has at least one member who is a permit holder and who carries firearms in and at buildings open to the public, locations licensed to sell alcohol for on-site consumption, private museums, and health care facilities. SB 1, as of its effective date of October 1, 2023, bans FPC's member(s) from carrying at the locations. These FPC members fully intend to continue to carry at these locations but reasonably fear arrest and prosecution if they do so after October 1, 2023.

2

**JA0116**

9.      FPC has one or more members with Maryland carry permits who visit Maryland State Parks, State Forests, and State Chesapeake Forest Lands, and would possess, wear, carry or transport a firearm at these locations but for their reasonable fear of arrest and prosecution from the enforcement of the administrative regulatory bans imposed by the Department of Natural Resources.

10.     FPC has one or more members with Maryland carry permits who use mass transit and would carry a firearm while doing so but for their credible fear of arrest and prosecution from the enforcement of MD Code, Transportation, § 7-705.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 24th day of May, 2023.

_____
Brandon Combs
President
Firearms Policy Coalition, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

Chambers of
**GEORGE L. RUSSELL, III**
United States District Judge

101 West Lombard Street
Baltimore, Maryland 21201
410-962-4055

July 13, 2023

MEMORANDUM TO COUNSEL RE:      Kipke, et al., v. Wes Moore, et al.,
Civil Action No. GLR-23-1293;
Novotny, et al., v. Wes Moore, et al.,
Civil Action No. GLR-23-1295

Dear Counsel:

Pending before the Court is Defendants Governor Wesley Moore, Alison M. Healey, Scott D. Shellenberger, Ivan J. Bates, Col. Roland L. Butler Jr., Paul J. Wiedefeld, and Joshua Kurtz's Motion for Consolidation. (GLR-23-1293, ECF No. 8; GLR-23-1295, ECF No. 30). The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2023). For the reasons set forth below, the Court will grant the Motion.

Senate Bill 1 ("SB1") prohibits, with specified exceptions, a person from wearing, carrying, or transporting a firearm in specified areas. Criminal Law – Wearing, Carrying, or Transporting Firearms – Restrictions (Gun Safety Act of 2023) Senate Bill 1. Further, SB1 prohibits a person from wearing, carrying, or transporting a firearm into the dwelling of another or onto real property and it establishes penalties for violations. Id. SB1 becomes effective on October 1, 2023.

Two separate lawsuits challenge the constitutionality of SB1 and seek preliminary injunctive relief. See Kipke, et al., v. Wes Moore, et al., No. GLR-23-cv-1293; Novotny, et al., v. Wes Moore, et al., No. GLR-23-cv-1295. Novotny and Kipke were both filed on May 16, 2023. In the Kipke Complaint, the Plaintiffs allege: violations of the Second and Fourteenth Amendments in that SB1 prohibits Maryland citizens with a carry permit from carrying a handgun for self-defense in specific areas under U.S.C. § 1983 (Count I); a violation of the First and Fourteenth Amendment under 42 U.S.C. § 1983 for compelling the speech of property owners and lessees (Count II); a violation of the Second and Fourteenth Amendment under 42 U.S.C. § 1983 and the Due Process Clause for prohibiting possession of a handgun to a person who has "exhibited a propensity of violence", as void for vagueness  (Count III); and a violation of the Fourteenth Amendment Equal Protection Clause under 42 U.S.C. § 1983 which exempts retired law enforcement officers from its requirement to obtain a carry permit (Count IV). (Kipke Compl. ¶¶ 47–68, ECF No. 1).

In the Novotny Complaint, the Plaintiffs allege: a violation of the Second Amendment for restricting the right to armed self-defense (Count I); a violation of the Second Amendment for banning possession and transportation of firearms in and at mass transit facilities (Count II); and a violation of the Second Amendment for banning possession and transportation of firearms in and

at State parks and forests, and in State Chesapeake forest lands (Count III). (Novotny Compl. ¶¶ 45–56, ECF No. 1).

On May 31, 2023, Defendants filed the instant Motion to Consolidate Cases. (Defs.' Mot. Consolidate ["Defs.' Mot"], ECF Nos. 8, 30). On June 1, 2023, Novotny Plaintiffs filed an Opposition to the Defendants' Motion to Consolidate. (Pls.' Opp'n Mot. Consolidate ["Opp'n"], ECF No. 31). Defendants filed a Reply on June 9, 2023. (Defs.' Reply, ECF No. 34).

The Defendants' Motion is governed by Federal Rule of Civil Procedure Rule 42(a)(2), which grants the Court discretion to consolidate actions involving common questions of law or fact. Fed.R.Civ.P. 42(a)(2). The Court "should weigh 'the interests of judicial convenience in consolidating the cases against delay, confusion, and prejudice consolidation might cause' to the parties." Aura Light US Inc. v. LTF International LLC, No. GLR-15-3198, 2016 WL 11481746, at *1 (D.Md. Apr. 25, 2016). Proper application of Rule 42(a) requires a district court to determine whether the specific risks of prejudice and confusion from consolidation are overborne by the risk of (1) inconsistent adjudications, (2) the burden on parties, witnesses, and available judicial resources posed by multiple lawsuits, (3) the length of time required to conclude multiple suits as against a single one, (4) and the relative expense to all concerned of the single-trial, multiple-trial alternatives. Campbell v. Boston Sci. Corp. 882 F.3d 70, 74 (4th Cir. 2018).

In the Motion, Defendants contend that consolidation is warranted because all the claims in Novotny are also in the Kipke Complaint. (Defs.' Mot. at 3). Defendants claim that there is no reason that consolidation would prevent the Novotny Plaintiffs' Motion for Preliminary Injunction from being granted before SB1 goes into effect on October 1, 2023. (Id. at 4). The comprehensive resolution of the two lawsuits, which challenge the constitutionality of the same Maryland law, would serve judicial economy. (Id. at 5).

In the Novotny Plaintiffs' Opposition to Defendants' Motion to Consolidate, they counter that the Second Amendment claims in Kipke are numerous and broad, so to that discovery would differ in each case. (Opp'n at 3). Kipke challenges the actions and policies of multiple government agencies which are not at issue in Novotny. (Id). Novotny Plaintiffs further claim that the many and varied constitutional claims presented in the Kipke Complaint present complexities that may cause delay. (Id. at 9).

At bottom, the Court agrees with the Defendants. First, the parties and the assigned U.S. District Court Judge are identical. Second, the actions involve common questions of law, namely whether SB1 is constitutional. Third, the actions involve common issues of fact as they arise out of the restrictions on handguns in locations identified in SB1. Accordingly, consolidation would serve the interest of judicial convenience and economy and promote a speedy resolution.

Here, although Kipke raises claims against different Defendants than Novotny, this is not a reason to deny consolidation. Complete identity of the same parties is not required where there are common question of law or fact. See Progress Solar Sols. v. Fire Prot., Inc., 2020 WL 5732621. at *3 (E.D.N.C. Sept. 24, 2020). Although both lawsuits name additional State Defendants, all Defendants in both lawsuits are sued in their official capacity, meaning that the State is the effective Defendant in both cases. See Will v. Michigan Dept. of State Police, 491 U.S. 58, 71

(1989) (holding that a suit against a state official in his official capacity is a suit against the official's office, not the individual).

Further, consolidation promotes judicial economy. Consolidation of similar cases allows judges to conscientiously resolve other pending cases, and a reduction in demand for judicial resources, such as jurors, benefits the community. Campbell, 882 F.3d 76. Further, the complete overlap of claims raised in Novotny that are asserted in Kipke will allow for a comprehensive resolution. While the Court notes that the Novotny Plaintiffs cite concerns for delayed rulings, they have not explained why consolidation is likely to cause delay. Both cases were filed on the same day and Plaintiffs in both cases have moved for preliminary injunctive relief. Additionally, the parties will benefit from decreased litigation costs. Accordingly, the Novotny Plaintiffs have failed to show that consolidation prejudices them and the Court concludes that consolidation is appropriate.

For the foregoing reasons, Defendants' Motion for Consolidation (ECF Nos. 8, 30) is GRANTED. The Clerk is directed to CONSOLIDATE these cases, with Kipke as the lead case. Further, because the Novotny Motion for Preliminary Injunction is already fully briefed, the Court adopts the following briefing schedule for the Kipke Motion for Preliminary Injunction:

Defendants' Opposition:        July 28, 2023
Plaintiffs' Reply:             August 11, 2023[1]

As for the Kipke Cross Motions for Summary Judgment, the briefing shall proceed as follows:

Defendants' Opposition/Cross-Motion:    July 28, 2023
Plaintiffs' Reply/Opposition:           August 18, 2023
Defendants' Reply:                      September 8, 2023

Accordingly, the Joint Motion to Extend Time (GLR-23-1293, ECF No. 10) is DENIED AS MOOT. Despite the informal nature of this memorandum, it shall constitute an Order of the Court, and the Clerk is directed to docket it accordingly.

Very truly yours,


_____/s/_____
George L. Russell, III
United States District Judge


_____

[1] The Court has advanced this deadline by one week. The parties' original request was for August 18, 2023.

# EXHIBIT 2

WES MOORE, Governor                          Ch. 680

Chapter 680

**(Senate Bill 1)**

AN ACT concerning

**Criminal Law – Wearing, Carrying, or Transporting Firearms – Restrictions
(Gun Safety Act of 2023)**

FOR the purpose of prohibiting a person from knowingly wearing, carrying, or transporting a firearm *in certain locations; prohibiting a person from wearing, carrying, or transporting a firearm onto certain property unless the owner or the owner's agent has given certain permission; altering certain provisions of law relating to the authority of the Secretary of State Police to limit the wearing, carrying, or transporting of a handgun at certain times and locations;* ~~onto the real property of another unless the other has given certain permission; prohibiting a person from knowingly wearing, carrying, or transporting a firearm within a certain distance of a certain place of public accommodation prohibiting a person from wearing, carrying, or transporting a firearm under certain circumstances and in certain locations; altering the circumstances under which a person is prohibited from possessing a regulated firearm; altering provisions of law relating to obtaining and revoking a permit to wear, carry, or transport a firearm;~~ and generally relating to restrictions on wearing, carrying, or transporting firearms.

BY adding to
     Article – Criminal Law
     Section 4–111 and ~~4–112~~ 6–411
     Annotated Code of Maryland
     (2021 Replacement Volume and 2022 Supplement)

*BY repealing and reenacting, with amendments,*
     *Article – Criminal Law*
     *Section 4–203(b)*
     *Annotated Code of Maryland*
     *(2021 Replacement Volume and 2022 Supplement)*

~~BY repealing and reenacting, without amendments,~~
     ~~Article – State Government~~
     ~~Section 20–301~~
     ~~Annotated Code of Maryland~~
     ~~(2021 Replacement Volume and 2022 Supplement)~~

~~BY repealing and reenacting, without amendments,~~
     ~~Article – Public Safety~~
     ~~Section 5–301(a), (b), (c), and (e), 5–303, and 5–309~~
     ~~Annotated Code of Maryland~~
     ~~(2022 Replacement Volume)~~

Ch. 680                          2023 LAWS OF MARYLAND

~~BY repealing and reenacting, with amendments,~~
~~Article – Public Safety~~
~~Section 5–306, 5–307, and 5–310 through 5–312~~
~~Annotated Code of Maryland~~
~~(2022 Replacement Volume)~~

*BY repealing and reenacting, with amendments,*
       *Article – Public Safety*
       *Section 5–307*
       *Annotated Code of Maryland*
       *(2022 Replacement Volume)*

        SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND,
That the Laws of Maryland read as follows:

**Article – Criminal Law**

~~4–111.~~

        ~~(A)    IN THIS SECTION, "FIREARM" HAS THE MEANING STATED IN § 4–104 OF
THIS SUBTITLE.~~

        ~~(B)    THIS SECTION DOES NOT APPLY TO:~~

        ~~(1)    THE WEARING, CARRYING, OR TRANSPORTING OF A FIREARM ON
A PORTION OF REAL PROPERTY SUBJECT TO AN EASEMENT, A RIGHT–OF–WAY, A
SERVITUDE, OR ANY OTHER INTEREST THAT ALLOWS PUBLIC ACCESS ON OR
THROUGH THE REAL PROPERTY;~~

        ~~(2)    THE WEARING, CARRYING, OR TRANSPORTING OF A FIREARM ON
A PORTION OF REAL PROPERTY SUBJECT TO AN EASEMENT, A RIGHT–OF–WAY, A
SERVITUDE, OR ANY OTHER INTEREST ALLOWING ACCESS ON OR THROUGH THE
REAL PROPERTY BY:~~

        ~~(I)    THE  HOLDER  OF  THE  EASEMENT,  RIGHT–OF–WAY,
SERVITUDE, OR OTHER INTEREST; OR~~

        ~~(II)    A GUEST OR ASSIGNEE OF THE HOLDER OF THE EASEMENT,
RIGHT–OF–WAY, SERVITUDE, OR OTHER INTEREST; OR~~

        ~~(3)    PROPERTY OWNED BY THE STATE OR A POLITICAL SUBDIVISION
OF THE STATE.~~

WES MOORE, Governor                    Ch. 680

(C)    A PERSON MAY NOT KNOWINGLY WEAR, CARRY, OR TRANSPORT A FIREARM ONTO THE REAL PROPERTY OF ANOTHER UNLESS THE OTHER HAS GIVEN EXPRESS PERMISSION, EITHER TO THE PERSON OR TO THE PUBLIC GENERALLY, TO WEAR, CARRY, OR TRANSPORT A FIREARM ON THE REAL PROPERTY.

(D)    A PERSON WHO VIOLATES SUBSECTION (C) OF THIS SECTION IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT EXCEEDING 1 YEAR.

4–112.

(A)    (1)    IN THIS SECTION THE FOLLOWING WORDS HAVE THE MEANINGS INDICATED.

(2)    "FIREARM" HAS THE MEANING STATED IN § 4–104 OF THIS SUBTITLE.

(3)    "PLACE OF PUBLIC ACCOMMODATION" HAS THE MEANING STATED IN § 20–301 OF THE STATE GOVERNMENT ARTICLE.

(B)    A PERSON MAY NOT KNOWINGLY WEAR, CARRY, OR TRANSPORT A FIREARM WITHIN 100 FEET OF A PLACE OF PUBLIC ACCOMMODATION.

(C)    A PERSON WHO VIOLATES SUBSECTION (B) OF THIS SECTION IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT EXCEEDING 1 YEAR.

Article – State Government

20–301.

In this subtitle, "place of public accommodation" means:

(1)    an inn, hotel, motel, or other establishment that provides lodging to transient guests;

(2)    a restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food or alcoholic beverages for consumption on or off the premises, including a facility located on the premises of a retail establishment or gasoline station;

(3)    a motion picture house, theater, concert hall, sports arena, stadium, or other place of exhibition or entertainment;

(4)    a retail establishment that:

– 3 –

Ch. 680                              2023 LAWS OF MARYLAND

~~(i)      is operated by a public or private entity; and~~

~~(ii)      offers     goods,     services,     entertainment,     recreation,     or
transportation; or~~

~~(5)      an establishment:~~

~~(i)      1.      that is physically located within the premises of any other
establishment covered by this subtitle; or~~

~~2.      within   the   premises   of   which   any   other   establishment
covered by this subtitle is physically located; and~~

~~(ii)      that   holds   itself   out   as   serving   patrons   of   the   covered
establishment.~~

4–111.

(A)      (1)      IN THIS SECTION THE FOLLOWING WORDS HAVE THE MEANINGS
INDICATED.

(2)      "AREA FOR CHILDREN AND VULNERABLE INDIVIDUALS" MEANS:

(I)      A   PRESCHOOL   OR   PREKINDERGARTEN   FACILITY   *OR THE
GROUNDS OF THE FACILITY*;

(II)      A   PRIVATE   PRIMARY   OR   SECONDARY   SCHOOL   *OR THE
GROUNDS OF THE SCHOOL*; *OR*

~~(III)      A YOUTH CAMP, AS DEFINED IN § 14–401 OF THE HEALTH –
GENERAL ARTICLE;~~

~~(IV)~~   A HEALTH CARE FACILITY, AS DEFINED IN ~~§ 15–10B–01~~ *§
15–10B–01(G)(1), (2), (3), AND (4)* OF THE INSURANCE ARTICLE~~; OR~~

~~(V)      A   LOCATION   THAT   IS   BEING   USED   AS   A   SHELTER   FOR
RUNAWAY YOUTH.~~

(3)      "FIREARM"   HAS   THE   MEANING   STATED   IN   §   4–104   OF   THIS
SUBTITLE.

(4)      "GOVERNMENT OR PUBLIC INFRASTRUCTURE AREA" MEANS:

WES MOORE, Governor                              Ch. 680

(I)   A BUILDING *OR ANY PART OF A BUILDING* OWNED OR LEASED BY A UNIT OF STATE OR LOCAL GOVERNMENT;

(II)   A BUILDING OF A PUBLIC OR PRIVATE INSTITUTION OF HIGHER EDUCATION, AS DEFINED IN § 10–101 OF THE EDUCATION ARTICLE;

(III)   A LOCATION THAT IS CURRENTLY BEING USED AS A POLLING PLACE IN ACCORDANCE WITH TITLE 10 OF THE ELECTION LAW ARTICLE OR FOR CANVASSING BALLOTS IN ACCORDANCE WITH TITLE 11 OF THE ELECTION LAW ARTICLE; ~~OR~~

(IV)   AN ELECTRIC PLANT OR ELECTRIC STORAGE FACILITY, AS DEFINED IN § 1–101 OF THE PUBLIC UTILITIES ARTICLE*;*

*(V)   A GAS PLANT, AS DEFINED IN § 1–101 OF THE PUBLIC UTILITIES ARTICLE; OR*

*(VI)   A NUCLEAR POWER PLANT FACILITY.*

*(5)   "LAW ENFORCEMENT OFFICIAL" HAS THE MEANING STATED IN § 4–201 OF THIS ARTICLE.*

*(6)   "POLICE OFFICER" HAS THE MEANING STATED IN § 3–201 OF THE PUBLIC SAFETY ARTICLE.*

~~(5)   "ORGANIZED SPORTING OR ATHLETIC ACTIVITY" MEANS AN ACTIVITY IN WHICH THREE OR MORE INDIVIDUALS WHO ARE PART OF THE SAME LEAGUE OR ASSOCIATION ARE COMPETING IN A SPORT OR ATHLETIC ACTIVITY TOGETHER AS PART OF THE SAME LEAGUE.~~

~~(6)~~ *(7)*   "ROTC" MEANS RESERVE OFFICER TRAINING CORPS.

~~(7)~~ *(8)*   "SPECIAL PURPOSE AREA" MEANS:

(I)   A LOCATION LICENSED TO SELL OR DISPENSE ALCOHOL OR CANNABIS FOR ON–SITE CONSUMPTION;

(II)   A STADIUM;

(III)   A MUSEUM;

(IV)   ~~A LOCATION BEING USED FOR:~~

~~1.   AN ORGANIZED SPORTING OR ATHLETIC ACTIVITY;~~

– 5 –

~~2.      A LIVE THEATER PERFORMANCE;~~

~~3.      A MUSICAL CONCERT OR PERFORMANCE FOR WHICH MEMBERS OF THE AUDIENCE ARE REQUIRED TO PAY OR POSSESS A TICKET TO BE ADMITTED; OR~~ *AN AMUSEMENT PARK;*

~~4.      A FAIR OR CARNIVAL;~~

(V)     A RACETRACK; *OR*

(VI)    A VIDEO LOTTERY FACILITY, AS DEFINED IN § 9–1A–01 OF THE STATE GOVERNMENT ARTICLE~~; OR~~

~~(VII)   WITHIN 100 YARDS OF A PLACE WHERE A PUBLIC GATHERING, A DEMONSTRATION, OR AN EVENT WHICH REQUIRES A PERMIT FROM THE LOCAL GOVERNING BODY IS BEING HELD, IF SIGNS POSTED BY A LAW ENFORCEMENT AGENCY CONSPICUOUSLY AND REASONABLY INFORM MEMBERS OF THE PUBLIC THAT THE WEARING, CARRYING, AND TRANSPORTING OF FIREARMS IS PROHIBITED.~~

(B)     THIS SECTION DOES NOT APPLY TO:

(1)     A LAW ENFORCEMENT OFFICIAL *OR A POLICE OFFICER* ~~OF THE UNITED STATES, THE STATE, OR A LOCAL LAW ENFORCEMENT AGENCY OF THE STATE;~~

*(2)     AN ON–DUTY EMPLOYEE OF A LAW ENFORCEMENT AGENCY AUTHORIZED BY THE AGENCY TO POSSESS FIREARMS ON DUTY OR WHOSE DUTY ASSIGNMENT INVOLVES THE POSSESSION OF FIREARMS;*

~~(2)~~ *(3)*     A MEMBER OF THE ARMED FORCES OF THE UNITED STATES, ~~OR~~ THE NATIONAL GUARD, *OR THE UNIFORMED SERVICES* ON DUTY OR TRAVELING TO OR FROM DUTY;

~~(3)~~ *(4)*     A MEMBER OF AN ROTC PROGRAM WHILE PARTICIPATING IN AN ACTIVITY FOR AN ROTC PROGRAM;

~~(4)     A LAW ENFORCEMENT OFFICIAL OF ANOTHER STATE OR SUBDIVISION OF ANOTHER STATE TEMPORARILY IN THIS STATE ON OFFICIAL BUSINESS;~~

WES MOORE, Governor                    Ch. 680

     **(5)**    A CORRECTIONAL OFFICER OR WARDEN OF A CORRECTIONAL FACILITY IN THE STATE;

     ~~(6)~~    ~~A SHERIFF OR FULL–TIME ASSISTANT OR DEPUTY SHERIFF OF THE STATE;~~

     *(6)*    *A RAILROAD POLICE OFFICER APPOINTED UNDER TITLE 3, SUBTITLE 4 OF THE PUBLIC SAFETY ARTICLE;*

     *(7)*    *AN EMPLOYEE OF AN ARMORED CAR COMPANY, IF THE PERSON IS ACTING WITHIN THE SCOPE OF EMPLOYMENT AND HAS A VALID PERMIT TO WEAR, CARRY, OR TRANSPORT A HANDGUN ISSUED UNDER TITLE 5, SUBTITLE 3 OF THE PUBLIC SAFETY ARTICLE;*

     ~~(7)~~ *(8)*    SUBJECT TO SUBSECTION (I) OF THIS SECTION, ~~AN OFF–DUTY LAW ENFORCEMENT OFFICIAL OR~~ A PERSON WHO HAS RETIRED AS A LAW ENFORCEMENT OFFICIAL IN GOOD STANDING FROM A LAW ENFORCEMENT AGENCY OF THE UNITED STATES, THE STATE *OR ANOTHER STATE*, OR A LOCAL UNIT IN THE STATE *OR ANOTHER STATE,* WHO POSSESSES A FIREARM, IF:

       (I)    1.    THE ~~OFFICIAL OR~~ PERSON IS ~~DISPLAYING~~ *CARRYING* THE ~~OFFICIAL'S OR~~ PERSON'S BADGE OR CREDENTIAL *IN COMPLIANCE WITH THE REQUIREMENTS OF THE BADGE OR CREDENTIAL*;

          2.    THE FIREARM CARRIED OR POSSESSED BY THE ~~OFFICIAL OR~~ PERSON IS CONCEALED FROM VIEW UNDER OR WITHIN AN ARTICLE OF THE ~~OFFICIAL'S OR~~ PERSON'S CLOTHING; AND

          3.    THE ~~OFFICIAL OR~~ PERSON IS AUTHORIZED TO CARRY A HANDGUN UNDER THE LAWS OF THE STATE OR THE UNITED STATES; OR

       (II)    1.    THE ~~OFFICIAL OR~~ PERSON POSSESSES A VALID PERMIT TO WEAR, CARRY, OR TRANSPORT A HANDGUN ISSUED UNDER TITLE 5, SUBTITLE 3 OF THE PUBLIC SAFETY ARTICLE; AND

          2.    THE FIREARM CARRIED OR POSSESSED BY THE ~~OFFICIAL OR~~ PERSON IS CONCEALED FROM VIEW UNDER OR WITHIN AN ARTICLE OF THE ~~OFFICIAL'S OR~~ PERSON'S CLOTHING;

     ~~(8)~~ *(9)*    FOR A LOCATION THAT IS NOT OWNED BY, LEASED BY, OR OTHERWISE UNDER THE CONTROL OF THE STATE OR A POLITICAL SUBDIVISION OF THE STATE:

       (I)    THE OWNER OR LESSEE OF THE LOCATION; OR

– 7 –

(II)   A PERSON WHO IS AUTHORIZED BY THE OWNER OR LESSEE OF THE LOCATION TO WEAR, CARRY, OR TRANSPORT A FIREARM AT THE LOCATION FOR THE PURPOSE OF:

1.   EMPLOYMENT AS A SECURITY GUARD LICENSED UNDER TITLE 19 OF THE BUSINESS OCCUPATIONS ARTICLE; OR

2.   PROTECTING ANY INDIVIDUAL OR PROPERTY AT THE LOCATION ~~WITHOUT~~ *WITH AN EXPRESS AGREEMENT BETWEEN THE PARTIES,* REMUNERATION, OR COMPENSATION; ~~*OR*~~

~~(9)~~ *(10)*   A LOCATION BEING USED WITH THE PERMISSION OF THE PERSON OR GOVERNMENTAL UNIT THAT OWNS, LEASES, OR CONTROLS THE LOCATION FOR:

(I)   AN ORGANIZED SHOOTING ACTIVITY FOR EDUCATIONAL PURPOSES;

(II)   A HISTORICAL DEMONSTRATION USING A FIREARM; OR

(III)   HUNTING OR TARGET SHOOTING*; OR*

*(11)   A FIREARM THAT IS CARRIED OR TRANSPORTED IN A MOTOR VEHICLE IF THE FIREARM IS:*

*(I)   LOCKED IN A CONTAINER; OR*

*(II)   A HANDGUN WORN, CARRIED, OR TRANSPORTED IN COMPLIANCE WITH ANY LIMITATIONS IMPOSED UNDER § 5–307 OF THE PUBLIC SAFETY ARTICLE, BY A PERSON TO WHOM A PERMIT TO WEAR, CARRY, OR TRANSPORT THE HANDGUN HAS BEEN ISSUED UNDER TITLE 5, SUBTITLE 3 OF THE PUBLIC SAFETY ARTICLE*~~; OR~~

~~(10)   A FIREARM THAT IS CARRIED OR TRANSPORTED IN A MOTOR VEHICLE IF THE FIREARM IS:~~

~~(I)   UNLOADED; AND~~

~~(II)   LOCKED IN A CONTAINER THAT IS SEPARATE FROM ANY AMMUNITION THAT IS SUITABLE FOR USE IN THE FIREARM.~~

WES MOORE, Governor                    Ch. 680

(C)    A PERSON MAY NOT WEAR, CARRY, OR TRANSPORT A FIREARM IN AN AREA FOR CHILDREN OR VULNERABLE INDIVIDUALS.

~~(D)~~ *(D)*    *(1)*    A PERSON MAY NOT WEAR, CARRY, OR TRANSPORT A FIREARM IN A GOVERNMENT OR PUBLIC INFRASTRUCTURE AREA.

*(2)    A GOVERNMENT OR PUBLIC INFRASTRUCTURE AREA SPECIFIED UNDER SUBSECTION (A)(4)(I) OF THIS SECTION MUST DISPLAY A CLEAR AND CONSPICUOUS SIGN AT THE MAIN ENTRANCE OF THE BUILDING OR THE PART OF A BUILDING THAT IS OWNED OR LEASED BY THE UNIT OF STATE OR LOCAL GOVERNMENT INDICATING THAT IT IS NOT PERMISSIBLE TO WEAR, CARRY, OR TRANSPORT A FIREARM IN THE BUILDING OR THAT PART OF THE BUILDING.*

(E)    ~~(1)    THIS SUBSECTION DOES NOT APPLY TO AN ORGANIZED SPORTING OR ATHLETIC ACTIVITY FOR WHICH THE WEARING, CARRYING, TRANSPORTING, OR USE OF A FIREARM IS A CUSTOMARY PART OF THE SPORT OR ATHLETIC ACTIVITY.~~

~~(2)~~    A PERSON MAY NOT WEAR, CARRY, OR TRANSPORT A FIREARM IN A SPECIAL PURPOSE AREA.

~~(F)    A PERSON MAY NOT VIOLATE SUBSECTION (C), (D), OR (E) OF THIS SECTION WITH INTENT TO CAUSE DEATH OR INJURY TO ANOTHER.~~

~~(G)~~  ~~(1)~~  *(F)*    A PERSON WHO *WILLFULLY* VIOLATES SUBSECTION (C), ~~(D)~~ *(D)(1)*, OR (E) OF THIS SECTION IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO~~:~~

~~(I)    FOR A FIRST CONVICTION,~~ IMPRISONMENT NOT EXCEEDING ~~90 DAYS~~ *1 YEAR* OR A FINE NOT EXCEEDING ~~$3,000~~ *$1,000* OR BOTH~~; AND~~

~~(II)    FOR A SECOND OR SUBSEQUENT CONVICTION, IMPRISONMENT NOT EXCEEDING 15 MONTHS OR A FINE NOT EXCEEDING $7,500 OR BOTH.~~

~~(2)    A PERSON WHO VIOLATES SUBSECTION (F) OF THIS SECTION IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT EXCEEDING 15 MONTHS OR A FINE NOT EXCEEDING $7,500 OR BOTH.~~

~~(H)~~ *(G)*    (1)    A CONVICTION UNDER THIS SECTION MAY NOT MERGE WITH A CONVICTION FOR ANY OTHER CRIME BASED ON THE ACT ESTABLISHING THE VIOLATION OF THIS SECTION.

Ch. 680                          2023 LAWS OF MARYLAND

**(2)    A SENTENCE IMPOSED UNDER THIS SECTION MAY BE IMPOSED SEPARATE FROM AND CONSECUTIVE TO OR CONCURRENT WITH A SENTENCE FOR ANY CRIME BASED ON THE ACT ESTABLISHING THE VIOLATION OF THIS SECTION.**

~~**(I)**~~ **_(H)_    FOR PURPOSES OF THIS SECTION, A REQUIREMENT TO KEEP A HANDGUN CONCEALED IS NOT VIOLATED BY:**

**(1)    THE MOMENTARY AND INADVERTENT EXPOSURE OF A HANDGUN; OR**

**(2)    THE MOMENTARY AND INADVERTENT EXPOSURE OF THE IMPRINT OR OUTLINE OF A HANDGUN.**

**_(I)    NOTHING IN THIS SECTION LIMITS THE POWER OF AN ADMINISTRATIVE HEAD OF A MARYLAND COURT TO PUNISH FOR CONTEMPT OR TO ADOPT RULES OR ORDERS REGULATING, ALLOWING, RESTRICTING, OR PROHIBITING THE POSSESSION OF WEAPONS IN ANY BUILDING HOUSING THE COURT OR ANY OF ITS PROCEEDINGS, OR ON ANY GROUNDS APPURTENANT TO THE BUILDING._**

_4–203._

_(b)    This section does not prohibit:_

_(1)    the wearing, carrying, or transporting of a handgun by a person who is authorized at the time and under the circumstances to wear, carry, or transport the handgun as part of the person's official equipment, and is:_

_(i)    a law enforcement official of the United States, the State, or a county or city of the State;_

_(ii)    a member of the armed forces of the United States or of the National Guard on duty or traveling to or from duty;_

_(iii)    a law enforcement official of another state or subdivision of another state temporarily in this State on official business;_

_(iv)    a correctional officer or warden of a correctional facility in the State;_

_(v)    a sheriff or full–time assistant or deputy sheriff of the State; or_

_(vi)    a temporary or part–time sheriff's deputy;_

_(2)    the wearing, carrying, or transporting of a handgun_**[**_, in compliance with any limitations imposed under § 5–307 of the Public Safety Article,_**]** _by a person to_

– 10 –

WES MOORE, Governor                    Ch. 680

*whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article;*

*(3)     the carrying of a handgun on the person or in a vehicle while the person is transporting the handgun to or from the place of legal purchase or sale, or to or from a bona fide repair shop, or between bona fide residences of the person, or between the bona fide residence and place of business of the person, if the business is operated and owned substantially by the person if each handgun is unloaded and carried in an enclosed case or an enclosed holster;*

*(4)     the wearing, carrying, or transporting by a person of a handgun used in connection with an organized military activity, a target shoot, formal or informal target practice, sport shooting event, hunting, a Department of Natural Resources–sponsored firearms and hunter safety class, trapping, or a dog obedience training class or show, while the person is engaged in, on the way to, or returning from that activity if each handgun is unloaded and carried in an enclosed case or an enclosed holster;*

*(5)     the moving by a bona fide gun collector of part or all of the collector's gun collection from place to place for public or private exhibition if each handgun is unloaded and carried in an enclosed case or an enclosed holster;*

*(6)     the wearing, carrying, or transporting of a handgun by a person on real estate that the person owns or leases or where the person resides or within the confines of a business establishment that the person owns or leases;*

*(7)     the wearing, carrying, or transporting of a handgun by a supervisory employee:*

*(i)     in the course of employment;*

*(ii)     within the confines of the business establishment in which the supervisory employee is employed; and*

*(iii)     when so authorized by the owner or manager of the business establishment;*

*(8)     the carrying or transporting of a signal pistol or other visual distress signal approved by the United States Coast Guard in a vessel on the waterways of the State or, if the signal pistol or other visual distress signal is unloaded and carried in an enclosed case, in a vehicle; or*

*(9)     the wearing, carrying, or transporting of a handgun by a person who is carrying a court order requiring the surrender of the handgun, if:*

*(i)     the handgun is unloaded;*

(ii)    *the person has notified the law enforcement unit, barracks, or station that the handgun is being transported in accordance with the court order; and*

(iii)    *the person transports the handgun directly to the law enforcement unit, barracks, or station.*

**6–411.**

(A)    (1)    IN THIS SECTION THE FOLLOWING WORDS HAVE THE MEANINGS INDICATED.

(2)    (I)    "DWELLING" MEANS A BUILDING OR PART OF A BUILDING THAT PROVIDES LIVING OR SLEEPING FACILITIES FOR ONE OR MORE INDIVIDUALS.

(II)    "DWELLING" DOES NOT INCLUDE:

1.    COMMON ELEMENTS OF A CONDOMINIUM, AS DEFINED IN § 11–101 OF THE REAL PROPERTY ARTICLE;

2.    PROPERTY OF A COOPERATIVE HOUSING CORPORATION OTHER THAN A UNIT AS DEFINED IN § 5–6B–01 OF THE CORPORATIONS AND ASSOCIATIONS ARTICLE; OR

3.    COMMON AREAS OF A MULTIFAMILY DWELLING AS DEFINED IN § 12–203 OF THE PUBLIC SAFETY ARTICLE.

(3)    "FIREARM" HAS THE MEANING STATED IN § 4–104 OF THIS ARTICLE.

*(4)    "LAW ENFORCEMENT OFFICIAL" HAS THE MEANING STATED IN § 4–201 OF THIS ARTICLE.*

*(5)    "POLICE OFFICER" HAS THE MEANING STATED IN § 3–201 OF THE PUBLIC SAFETY ARTICLE.*

*(6)    (I)    "PROPERTY" MEANS A BUILDING.*

*(II)    "PROPERTY" DOES NOT INCLUDE THE LAND ADJACENT TO A BUILDING.*

(B)    THIS SECTION DOES NOT APPLY TO:

WES MOORE, Governor                              Ch. 680

(1)   A LAW ENFORCEMENT OFFICIAL *OR POLICE OFFICER* ~~OF THE UNITED STATES, THE STATE, OR A LOCAL LAW ENFORCEMENT AGENCY OF THE STATE~~;

*(2)   AN ON–DUTY EMPLOYEE OF A LAW ENFORCEMENT AGENCY AUTHORIZED BY THE AGENCY TO POSSESS FIREARMS ON DUTY OR WHOSE DUTY ASSIGNMENT INVOLVES THE POSSESSION OF FIREARMS;*

~~(2)~~ *(3)*   A MEMBER OF THE ARMED FORCES OF THE UNITED STATES, ~~OR OF~~ THE NATIONAL GUARD, *OR THE UNIFORMED SERVICES* ON DUTY OR TRAVELING TO OR FROM DUTY;

~~(3)   A LAW ENFORCEMENT OFFICIAL OF ANOTHER STATE OR SUBDIVISION OF ANOTHER STATE TEMPORARILY IN THIS STATE ON OFFICIAL BUSINESS;~~

(4)   A CORRECTIONAL OFFICER OR WARDEN OF A CORRECTIONAL FACILITY IN THE STATE;

~~(5)   A SHERIFF OR FULL–TIME ASSISTANT OR DEPUTY SHERIFF OF THE STATE;~~

~~(6)~~ *(5)*   THE WEARING, CARRYING, OR TRANSPORTING OF A FIREARM ON A PORTION OF REAL PROPERTY SUBJECT TO AN EASEMENT, A RIGHT–OF–WAY, A SERVITUDE, OR ANY OTHER PROPERTY INTEREST THAT ALLOWS PUBLIC ACCESS ON OR THROUGH THE REAL PROPERTY; OR

~~(7)~~ *(6)*   THE WEARING, CARRYING, OR TRANSPORTING OF A FIREARM ON A PORTION OF REAL PROPERTY SUBJECT TO AN EASEMENT, A RIGHT–OF–WAY, A SERVITUDE, OR ANY OTHER PROPERTY INTEREST ALLOWING ACCESS ON OR THROUGH THE REAL PROPERTY BY:

(I)   THE HOLDER OF THE EASEMENT, RIGHT–OF–WAY, SERVITUDE, OR OTHER PROPERTY INTEREST; OR

(II)   A GUEST OR ASSIGNEE OF THE HOLDER OF THE EASEMENT, RIGHT–OF–WAY, SERVITUDE, OR OTHER PROPERTY INTEREST.

(C)   A PERSON WEARING, CARRYING, OR TRANSPORTING A FIREARM MAY NOT *ENTER OR TRESPASS IN THE DWELLING OF ANOTHER UNLESS THE OWNER OR THE OWNER'S AGENT HAS GIVEN EXPRESS PERMISSION, EITHER TO THE PERSON OR TO THE PUBLIC GENERALLY, TO WEAR, CARRY, OR TRANSPORT A FIREARM INSIDE THE DWELLING.*

– 13 –

Ch. 680                    2023 LAWS OF MARYLAND

*(D)    A PERSON WEARING, CARRYING, OR TRANSPORTING A FIREARM MAY NOT*:

*(1)    ENTER OR TRESPASS ON PROPERTY* ~~THAT IS POSTED CONSPICUOUSLY AGAINST WEARING, CARRYING, OR TRANSPORTING A FIREARM ON THE PROPERTY;~~ *UNLESS THE OWNER OR THE OWNER'S AGENT HAS POSTED A CLEAR AND CONSPICUOUS SIGN INDICATING THAT IT IS PERMISSIBLE TO WEAR, CARRY, OR TRANSPORT A FIREARM ON THE PROPERTY; OR*

*(2)    ENTER OR TRESPASS ON PROPERTY* ~~AFTER HAVING BEEN NOTIFIED BY THE OWNER OR THE OWNER'S AGENT THAT THE PERSON MAY NOT~~ *UNLESS THE OWNER OR THE OWNER'S AGENT HAS GIVEN THE PERSON EXPRESS PERMISSION TO* WEAR, CARRY, OR TRANSPORT A FIREARM ON THE PROPERTY~~; OR.~~

~~(3)    ENTER OR TRESPASS IN THE DWELLING OF ANOTHER UNLESS THE OTHER HAS GIVEN EXPRESS PERMISSION, EITHER TO THE PERSON OR TO THE PUBLIC GENERALLY, TO WEAR, CARRY, OR TRANSPORT A FIREARM INSIDE THE DWELLING.~~

~~(D)~~ *(E)*    A PERSON WHO *WILLFULLY* VIOLATES THIS SECTION IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO~~:~~

~~(1)    FOR A FIRST CONVICTION,~~ IMPRISONMENT NOT EXCEEDING ~~90 DAYS~~ *1 YEAR* OR A FINE NOT EXCEEDING ~~$500~~ *$1,000* OR BOTH~~;~~

~~(2)    FOR A SECOND CONVICTION OCCURRING WITHIN 2 YEARS AFTER THE FIRST CONVICTION, IMPRISONMENT NOT EXCEEDING 6 MONTHS OR A FINE NOT EXCEEDING $1,000 OR BOTH; AND~~

~~(3)    FOR EACH SUBSEQUENT CONVICTION OCCURRING WITHIN 2 YEARS AFTER THE PRECEDING CONVICTION, IMPRISONMENT NOT EXCEEDING 1 YEAR OR A FINE NOT EXCEEDING $2,500 OR BOTH.~~

*(F)    (1)    A CONVICTION UNDER THIS SECTION MAY NOT MERGE WITH A CONVICTION FOR ANY OTHER CRIME BASED ON THE ACT ESTABLISHING THE VIOLATION OF THIS SECTION.*

*(2)    A SENTENCE IMPOSED UNDER THIS SECTION MAY BE IMPOSED SEPARATE FROM AND CONSECUTIVE TO OR CONCURRENT WITH A SENTENCE FOR ANY CRIME BASED ON THE ACT ESTABLISHING THE VIOLATION OF THIS SECTION.*

**Article – Public Safety**

WES MOORE, Governor                    Ch. 680

*5–307.*

*~~(a)~~1   A permit is valid for each handgun legally in the possession of the person to whom the permit is issued.*

*(B)   (1)   SUBJECT TO SUBSECTION (C) OF THIS SECTION, A PERMIT ISSUED UNDER THIS SUBTITLE SHALL RESTRICT THE WEARING, CARRYING, AND TRANSPORTING OF A HANDGUN BY THE PERSON TO WHOM THE PERMIT IS ISSUED TO WEARING, CARRYING, OR TRANSPORTING A HANDGUN CONCEALED FROM VIEW:*

*(I)   UNDER OR WITHIN AN ARTICLE OF THE PERSON'S CLOTHING; OR*

*(II)   WITHIN AN ENCLOSED CASE.*

*(2)   THE REQUIREMENT IN PARAGRAPH (1) OF THIS SUBSECTION TO KEEP A HANDGUN CONCEALED IS NOT VIOLATED BY:*

*(I)   THE MOMENTARY AND INADVERTENT EXPOSURE OF A HANDGUN; OR*

*(II)   THE MOMENTARY AND INADVERTENT EXPOSURE OF THE IMPRINT OR OUTLINE OF A HANDGUN.*

*(C)   A PERSON IS NOT SUBJECT TO THE REQUIREMENT IN SUBSECTION (B) OF THIS SECTION TO KEEP A HANDGUN CONCEALED IF THE PERSON IS AUTHORIZED AT THE TIME AND UNDER THE CIRCUMSTANCES TO WEAR, CARRY, OR TRANSPORT THE HANDGUN AS PART OF THE PERSON'S OFFICIAL EQUIPMENT, AND IS:*

*(1)   A PERSON EXEMPTED UNDER § 4–203(B)(1) OF THE CRIMINAL LAW ARTICLE;*

*(2)   A SECURITY GUARD LICENSED UNDER TITLE 19 OF THE BUSINESS OCCUPATIONS ARTICLE ACTING WITHIN THE SCOPE OF EMPLOYMENT;*

*(3)   A CORRECTIONAL OFFICER OR WARDEN OF A CORRECTIONAL FACILITY IN THE STATE ACTING WITHIN THE SCOPE OF EMPLOYMENT;*

*(4)   A RAILROAD POLICE OFFICER APPOINTED UNDER TITLE 3, SUBTITLE 4 OF THIS ARTICLE ACTING WITHIN THE SCOPE OF EMPLOYMENT; OR*

*(5)   AN EMPLOYEE OF AN ARMORED CAR COMPANY ACTING WITHIN THE SCOPE OF EMPLOYMENT.*

*[(b)      The Secretary may limit the geographic area, circumstances, or times of the day, week, month, or year in which a permit is effective.]*

5–301.

(a)      In this subtitle the following words have the meanings indicated.

(b)      "Handgun" has the meaning stated in § 4–201 of the Criminal Law Article.

(c)      "Permit" means a permit issued by the Secretary to carry, wear, or transport a handgun.

(c)      "Secretary" means the Secretary of State Police or the Secretary's designee.

5–303.

A person shall have a permit issued under this subtitle before the person carries, wears, or transports a handgun.

5–307.

(a)      A permit is valid for each handgun legally in the possession of the person to whom the permit is issued.

(b)      (1)      A PERMIT ISSUED UNDER THIS SUBTITLE SHALL RESTRICT THE WEARING, CARRYING, AND TRANSPORTING OF A HANDGUN BY THE PERSON TO WHOM THE PERMIT IS ISSUED TO WEARING, CARRYING, OR TRANSPORTING A HANDGUN CONCEALED FROM VIEW:

(1)      (I)      UNDER OR WITHIN AN ARTICLE OF THE PERSON'S CLOTHING; OR

(2)      (II)      WITHIN AN ENCLOSED CASE.

(2)      THE REQUIREMENT IN PARAGRAPH (1) OF THIS SUBSECTION TO KEEP A HANDGUN CONCEALED IS NOT VIOLATED BY:

(I)      THE MOMENTARY AND INADVERTENT EXPOSURE OF A HANDGUN; OR

(II)      THE MOMENTARY AND INADVERTENT EXPOSURE OF THE IMPRINT OR OUTLINE OF A HANDGUN.

WES MOORE, Governor                                     Ch. 680

~~(C)    The Secretary may limit the geographic area, circumstances, or times of the day, week, month, or year in which a permit is effective.~~

~~5–309.~~

~~(a)    Except as provided in subsection (d) of this section, a permit expires on the last day of the holder's birth month following 2 years after the date the permit is issued.~~

~~(b)    Subject to subsection (c) of this section, a permit may be renewed for successive periods of 3 years each if, at the time of an application for renewal, the applicant possesses the qualifications for the issuance of a permit and pays the renewal fee stated in this subtitle.~~

~~(c)    A person who applies for a renewal of a permit is not required to be fingerprinted unless the Secretary requires a set of the person's fingerprints to resolve a question of the person's identity.~~

~~(d)    The Secretary may establish an alternative expiration date for a permit to coincide with the expiration of a license, certification, or commission for:~~

~~(1)    a private detective under Title 13 of the Business Occupations and Professions Article;~~

~~(2)    a security guard under Title 19 of the Business Occupations and Professions Article; or~~

~~(3)    a special police officer under § 3–306 of this article.~~

~~5–310.~~

~~(a)    The Secretary [may revoke a permit on a finding that the holder] SHALL:~~

~~(1)    REVOKE A PERMIT ON A FINDING THAT THE HOLDER does not meet the qualifications described in § 5–306 of this subtitle; [or] AND~~

~~(2)    REGULARLY REVIEW INFORMATION REGARDING ACTIVE PERMIT HOLDERS USING THE CRIMINAL JUSTICE INFORMATION SYSTEM CENTRAL REPOSITORY OF THE DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES TO DETERMINE WHETHER ALL PERMIT HOLDERS CONTINUE TO MEET THE QUALIFICATIONS DESCRIBED IN § 5–306 OF THIS SUBTITLE.~~

~~(B)    THE SECRETARY MAY REVOKE A PERMIT ON A FINDING THAT THE HOLDER violated § 5–308 of this subtitle.~~

Ch. 680                     2023 LAWS OF MARYLAND

~~(C)   IF THE SECRETARY REVOKES A PERMIT UNDER THIS SECTION FROM A PERSON THE SECRETARY DETERMINES IS PROHIBITED FROM POSSESSING A REGULATED FIREARM UNDER § 5–133 OF THIS TITLE, THE SECRETARY SHALL TAKE REASONABLE STEPS TO ENSURE THE SURRENDER OF ANY REGULATED FIREARMS IN THE PERSON'S POSSESSION.~~

~~[(b)] (D)   A holder of a permit that is revoked by the Secretary shall return the permit to the Secretary within 10 days after receipt of written notice of the revocation.~~

~~5–311.~~

~~(A)   IF THE SECRETARY DENIES A PERMIT OR RENEWAL OF A PERMIT OR REVOKES OR LIMITS A PERMIT, THE SECRETARY SHALL PROVIDE WRITTEN NOTICE OF THAT INITIAL ACTION TO THE APPLICANT, INCLUDING A DETAILED EXPLANATION OF THE REASON OR REASONS FOR THE INITIAL ACTION.~~

~~[(a)] (B)   A person who is denied a permit or renewal of a permit or whose permit is revoked or limited may request the Secretary to conduct an informal review by filing a written request within 10 days after receipt of THE written notice of the Secretary's initial action UNDER SUBSECTION (A) OF THIS SECTION.~~

~~[(b)] (C)   An informal review:~~

~~(1)   may include a personal interview of the person who requested the informal review; and~~

~~(2)   is not subject to Title 10, Subtitle 2 of the State Government Article.~~

~~[(c)] (D)   (1)   In an informal review, the Secretary shall sustain, reverse, or modify the initial action taken and notify the person who requested the informal review of the decision in writing within 30 days after receipt of the request for informal review.~~

~~(2)   THE WRITTEN NOTICE OF THE RESULTS OF THE SECRETARY'S INFORMAL REVIEW UNDER PARAGRAPH (1) OF THIS SUBSECTION SHALL INCLUDE A DETAILED EXPLANATION OF THE REASON OR REASONS FOR THE SECRETARY'S DECISION TO SUSTAIN, REVERSE, OR MODIFY THE INITIAL ACTION.~~

~~[(d)] (E)   A person need not file a request for an informal review under this section before requesting review under § 5–312 of this subtitle.~~

~~5–312.~~

~~(a)   (1)   A person who is denied a permit or renewal of a permit or whose permit is revoked or limited may request to appeal the decision of the Secretary to the Office of~~

– 18 –
**JA0139**

WES MOORE, Governor                                   Ch. 680

~~Administrative Hearings by filing a written request with the Secretary and the Office of Administrative Hearings within 10 days after receipt of written notice of the Secretary's final action.~~

~~(2)    A person whose application for a permit or renewal of a permit is not acted on by the Secretary within 90 days after submitting the application to the Secretary may request a hearing before the Office of Administrative Hearings by filing a written request with the Secretary and the Office of Administrative Hearings.~~

~~(b)    (1)    Within 60 days after the receipt of a request under subsection (a) of this section from the applicant or the holder of the permit, the Office of Administrative Hearings shall schedule and conduct a de novo hearing on the matter, at which witness testimony and other evidence may be provided.~~

~~(2)    Within 90 days after the conclusion of the last hearing on the matter, the Office of Administrative Hearings shall issue a **WRITTEN** finding of facts and a decision.~~

~~(3)    A party that is aggrieved by the decision of the Office of Administrative Hearings may appeal the decision to the circuit court.~~

~~(c)    (1)    Subject to subsection (b) of this section, any hearing and any subsequent proceedings of judicial review shall be conducted in accordance with Title 10, Subtitle 2 of the State Government Article.~~

~~(2)    Notwithstanding paragraph (1) of this subsection, a court may not order the issuance or renewal of a permit or alter a limitation on a permit pending a final determination of the proceeding.~~

~~(d)    **(1)**    On or before [January 1, 2019, 2020, 2021, and 2022,] JANUARY 1 EACH YEAR, the SECRETARY SHALL REPORT TO THE GOVERNOR AND, IN ACCORDANCE WITH § 2–1257 OF THE STATE GOVERNMENT ARTICLE, THE GENERAL ASSEMBLY THE FOLLOWING INFORMATION DISAGGREGATED BY AN APPLICANT'S COUNTY OF RESIDENCE, RACE, ETHNICITY, AGE, AND GENDER:~~

~~(I)    THE TOTAL NUMBER OF PERMIT APPLICATIONS MADE UNDER § 5–304 OF THIS SUBTITLE WITHIN THE PREVIOUS YEAR;~~

~~(II)    THE TOTAL NUMBER OF PERMIT APPLICATIONS THAT THE SECRETARY GRANTED IN THE PREVIOUS YEAR;~~

~~(III)    THE TOTAL NUMBER OF PERMIT APPLICATIONS THAT THE SECRETARY DENIED IN THE PREVIOUS YEAR;~~

~~(IV)    THE TOTAL NUMBER OF PERMITS THAT WERE REVOKED IN THE PREVIOUS YEAR; AND~~

~~(V)     THE  TOTAL  NUMBER  OF  PERMITS  THAT  ARE  PENDING BEFORE THE SECRETARY.~~

~~(2)     ON  OR  BEFORE  JANUARY  1  EACH  YEAR,  THE  Office  of Administrative Hearings shall report to the Governor and, in accordance with § 2–1257 of the State Government Article, the General Assembly THE FOLLOWING INFORMATION DISAGGREGATED BY AN APPLICANT'S COUNTY OF RESIDENCE, RACE, ETHNICITY, AGE, AND GENDER:~~

~~[(1)]  (I)     the  number  of  appeals  of  decisions  by  the  Secretary  that  have been filed with the Office of Administrative Hearings within the previous year;~~

~~[(2)]  (II)     the  number  of  decisions  by  the  Secretary  that  have  been sustained,  modified,  or  reversed  by  the  Office  of  Administrative  Hearings  within  the previous year;~~

~~[(3)]  (III)     the number of appeals that are pending; and~~

~~[(4)]  (IV)     the  number  of  appeals  that  have  been  withdrawn  within  the previous year.~~

~~SECTION 2. AND BE IT FURTHER ENACTED, That the Laws of Maryland read as follows:~~

~~**Article – Public Safety**~~

~~5–306.~~

~~(a)     Subject  to  [subsection]  SUBSECTIONS  (c)  AND  (D)  of  this  section,  the Secretary shall issue a permit within a reasonable time to a person who the Secretary finds:~~

~~(1)     (I)     is  [an adult] AT LEAST 21 YEARS OLD; OR~~

~~(II)     IS AN ADULT WHO:~~

~~1.     IS A MEMBER OF THE ARMED FORCES OF THE UNITED STATES OR THE NATIONAL GUARD; OR~~

~~2.     IS  REQUIRED  TO  WEAR,  CARRY,  OR  TRANSPORT  A HANDGUN IN THE REGULAR COURSE OF THE PERSON'S EMPLOYMENT;~~

~~(2)     (i)     has  not  been  convicted  of  a  felony  or  of  a  misdemeanor  for  which a sentence of imprisonment for more than 1 year has been imposed; or~~

– 20 –

WES MOORE, Governor                                   Ch. 680

~~(ii)      if convicted of a crime described in item (i) of this item, has been pardoned or has been granted relief under 18 U.S.C. § 925(c);~~

~~(3)      has not been convicted of a crime involving the possession, use, or distribution of a controlled dangerous substance;~~

~~(4)      is not presently an alcoholic, addict, or habitual user of a controlled dangerous substance unless the habitual use of the controlled dangerous substance is under legitimate medical direction;~~

~~**(5)      DOES NOT SUFFER FROM A MENTAL DISORDER AS DEFINED IN § 10-101(i)(2) OF THE HEALTH – GENERAL ARTICLE AND HAVE A HISTORY OF VIOLENT BEHAVIOR AGAINST THE PERSON OR ANOTHER;**~~

~~**(6)      IS NOT A RESPONDENT AGAINST WHOM:**~~

~~**(I)      A CURRENT NON EX PARTE CIVIL PROTECTIVE ORDER HAS BEEN ENTERED UNDER § 4-506 OF THE FAMILY LAW ARTICLE;**~~

~~**(II)      A CURRENT EXTREME RISK PROTECTIVE ORDER HAS BEEN ENTERED UNDER § 5-601 OF THIS TITLE; OR**~~

~~**(III)      ANY OTHER TYPE OF CURRENT COURT ORDER HAS BEEN ENTERED PROHIBITING THE PERSON FROM PURCHASING OR POSSESSING FIREARMS;**~~

~~**[(5)] (7)**      except as provided in subsection (b) of this section, has successfully completed prior to application and each renewal, a firearms training course approved by the Secretary that **[**includes:~~

~~(i)      1.      for an initial application, a minimum of 16 hours of instruction by a qualified handgun instructor; or~~

~~2.      for a renewal application, 8 hours of instruction by a qualified handgun instructor;~~

~~(ii)      classroom instruction on:~~

~~1.      State firearm law;~~

~~2.      home firearm safety; and~~

~~3.      handgun mechanisms and operation; and~~

Ch. 680                             2023 LAWS OF MARYLAND

~~(iii)   a firearms qualification component that demonstrates the applicant's proficiency and use of the firearm:]~~ MEETS THE MINIMUM CRITERIA SPECIFIED IN SUBSECTION (A–1) OF THIS SECTION; and

~~[(6)]~~ (8)   ~~based on an investigation:~~

~~(i)   has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another; and~~

~~(ii)   [has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger]~~ IS NOT PROHIBITED BY STATE OR FEDERAL LAW FROM PURCHASING OR POSSESSING A HANDGUN.

(A–1)   THE FIREARMS TRAINING COURSE REQUIRED UNDER SUBSECTION (A) OF THIS SECTION SHALL INCLUDE:

(1)   (I)   FOR AN INITIAL APPLICATION, A MINIMUM OF 16 HOURS OF INSTRUCTION BY A QUALIFIED HANDGUN INSTRUCTOR; OR

(II)   FOR A RENEWAL APPLICATION, 8 HOURS OF INSTRUCTION BY A QUALIFIED HANDGUN INSTRUCTOR;

(2)   CLASSROOM INSTRUCTION ON:

(I)   STATE AND FEDERAL FIREARM LAWS, INCLUDING LAWS RELATING TO:

1.   SELF–DEFENSE;

2.   DEFENSE OF OTHERS;

3.   DEFENSE OF PROPERTY;

4.   THE SAFE STORAGE OF FIREARMS;

5.   THE CIRCUMSTANCES UNDER WHICH AN INDIVIDUAL BECOMES PROHIBITED FROM POSSESSING A FIREARM UNDER STATE AND FEDERAL LAW, INCLUDING BECOMING A RESPONDENT AGAINST WHOM:

A.   A CURRENT NON EX PARTE CIVIL PROTECTIVE ORDER HAS BEEN ENTERED UNDER § 4–506 OF THE FAMILY LAW ARTICLE;

WES MOORE, Governor                    Ch. 680

B.    AN ORDER FOR PROTECTION, AS DEFINED IN § 4-508.1 OF THE FAMILY LAW ARTICLE, HAS BEEN ISSUED BY A COURT OF ANOTHER STATE OR A NATIVE AMERICAN TRIBE AND IS IN EFFECT; OR

C.    A CURRENT EXTREME RISK PROTECTIVE ORDER HAS BEEN ENTERED UNDER SUBTITLE 6 OF THIS TITLE;

6.    THE REQUIREMENTS AND OPTIONS FOR SURRENDERING, TRANSFERRING, OR OTHERWISE DISPOSING OF A FIREARM AFTER BECOMING PROHIBITED FROM POSSESSING A FIREARM UNDER STATE OR FEDERAL LAW;

7.    THE REQUIREMENTS FOR REPORTING A LOSS OR THEFT OF A FIREARM TO A LAW ENFORCEMENT AGENCY AS REQUIRED BY § 5-146 OF THIS TITLE;

8.    THE FIREARMS AND FIREARM ACCESSORIES WHICH ARE BANNED UNDER STATE AND FEDERAL LAW;

9.    THE TYPES OF FIREARMS THAT REQUIRE A SPECIAL PERMIT OR REGISTRATION TO ACQUIRE OR POSSESS UNDER STATE OR FEDERAL LAW;

10.    THE LAW PROHIBITING STRAW PURCHASES;

11.    THE LAW CONCERNING ARMED TRESPASS UNDER § 6-411 OF THE CRIMINAL LAW ARTICLE; AND

12.    THE LOCATIONS WHERE A PERSON IS PROHIBITED FROM POSSESSING A FIREARM REGARDLESS OF WHETHER THE PERSON POSSESSES A PERMIT ISSUED UNDER THIS SUBTITLE;

(II)    HOME FIREARM SAFETY;

(III)    HANDGUN MECHANISMS AND OPERATION;

(IV)    CONFLICT DE-ESCALATION AND RESOLUTION;

(V)    ANGER MANAGEMENT; AND

(VI)    SUICIDE PREVENTION; AND

– 23 –

Ch. 680                    2023 LAWS OF MARYLAND

~~**(3)    A   FIREARMS   QUALIFICATION   COMPONENT   THAT   INCLUDES LIVE–FIRE   SHOOTING   EXERCISES   ON   A   FIRING   RANGE   AND   REQUIRES   THE APPLICANT TO DEMONSTRATE:**~~

~~**(I)    SAFE HANDLING OF A HANDGUN; AND**~~

~~**(II)    SHOOTING PROFICIENCY WITH A HANDGUN.**~~

~~(b)    An applicant for a permit is not required to complete a certified firearms training course under subsection (a) of this section if the applicant:~~

~~(1)    is a law enforcement officer or a person who is retired in good standing from service with a law enforcement agency of the United States, the State, or any local law enforcement agency in the State;~~

~~(2)    is a member, retired member, or honorably discharged member of the armed forces of the United States or the National Guard;~~

~~(3)    is a qualified handgun instructor; or~~

~~(4)    has completed a firearms training course approved by the Secretary.~~

~~(c)    An applicant under the age of 30 years is qualified only if the Secretary finds that the applicant has not been:~~

~~(1)    committed   to   a   detention,   training,   or   correctional   institution   for juveniles for longer than 1 year after an adjudication of delinquency by a juvenile court; or~~

~~(2)    adjudicated delinquent by a juvenile court for:~~

~~(i)    an act that would be a crime of violence if committed by an adult;~~

~~(ii)    an act that would be a felony in this State if committed by an adult; or~~

~~(iii)    an act that would be a misdemeanor in this State that carries a statutory penalty of more than 2 years if committed by an adult.~~

~~**(D)    (1)    THE SECRETARY MAY NOT ISSUE A PERMIT TO A PERSON IF THE PERSON:**~~

~~**(I)    HAS   BEEN   CONVICTED   OF   A   SECOND   OR   SUBSEQUENT VIOLATION OF § 4–104 OF THE CRIMINAL LAW ARTICLE; OR**~~

WES MOORE, Governor                              Ch. 680

~~(II)   HAS BEEN CONVICTED OF A VIOLATION OF § 4–104 OF THE CRIMINAL LAW ARTICLE IF THE VIOLATION RESULTED IN THE USE OF A LOADED FIREARM BY A CHILD CAUSING DEATH OR SERIOUS BODILY INJURY TO THE CHILD OR ANOTHER PERSON.~~

~~(2)   SUBJECT TO PARAGRAPH (1) OF THIS SUBSECTION, THE SECRETARY MAY NOT ISSUE A PERMIT TO A PERSON WHO HAS BEEN CONVICTED OF A VIOLATION OF § 4–104 OF THE CRIMINAL LAW ARTICLE FOR 5 YEARS FOLLOWING THE DATE OF THE CONVICTION.~~

~~[(d)] (E)   The Secretary may issue a handgun qualification license, without an additional application or fee, to a person who:~~

~~(1)   meets the requirements for issuance of a permit under this section; and~~

~~(2)   does not have a handgun qualification license issued under § 5–117.1 of this title.~~

~~SECTION 3. AND BE IT FURTHER ENACTED, That Section 2 of this Act shall be construed to apply only to an initial application or renewal application for a permit to wear, carry, or transport a handgun that is submitted to the Secretary of State Police on or after the effective date of this Act. Section 2 may not be construed to affect the requirements to maintain a permit to wear, carry, or transport a handgun that was issued by the Secretary of State Police before the effective date of this Act until the permit is subject to renewal.~~

SECTION ~~4.~~ *2.* AND BE IT FURTHER ENACTED, That if any provision of this Act or the application thereof to any person or circumstance is held invalid for any reason in a court of competent jurisdiction, the invalidity does not affect other provisions or any other application of this Act that can be given effect without the invalid provision or application, and for this purpose the provisions of this Act are declared severable.

SECTION ~~2. 5.~~ *3.* AND BE IT FURTHER ENACTED, That this Act shall take effect October 1, 2023.

**Approved by the Governor, May 16, 2023.**

– 25 –

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SUSANNAH WARNER KIPKE,　　　*

ET AL.,　　　　　　　　　　　　　*

　　　　　　*Plaintiffs*,

　　　v.　　　　　　　　　　　　　*　　　No. 1:23-cv-01293-GLR

WESTLEY MOORE, ET AL.,　　　　*

　　　　　　*Defendants*.

　　　　　　　　　　　　　　　　*

*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*

### EXPERT REPORT AND DECLARATION OF SAUL CORNELL

I, Saul Cornell, declare that the following is true and correct:

1.　I have been asked by the Office of the Attorney General for the State of Maryland to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding era understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution. In *N.Y. State Rifle & Pistol Association, Inc. v. Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence. This modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past. My report explores these issues in some detail. Finally, I have been asked to evaluate the statute at issue in this case, particularly regarding its connection to the tradition of firearms regulation in American legal history.

2.　This declaration is based on my own personal knowledge, research and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.    I am the Paul and Diane Guenther Chair in American History at Fordham University.  The Guenther Chair is one of three endowed chairs in the history department at Fordham and the only one in American history.  In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School.  I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School.  I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[1]

4.    My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority and dissenting opinions in *Bruen*.[2]  My scholarship on this topic has appeared in leading law reviews and top peer-reviewed legal history journals.  I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3]  Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined.

_____

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Exhibit 1.

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

JA0149

5.      I have provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850 (D. Colo. 2014); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct., Boulder Cty. 2018), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal. 2014), *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill. 2018); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal. 2019); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal. 2019); *Worth v. Harrington,* No. 21-cv-1348 (D. Minn. 2021); *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal. 2019); *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal. 2017); *Renna v. Bonta*, No. 20-cv-2190 (S.D. Cal. 2020); *Boland v. Bonta*, No. 8:22-cv-1421-CJC-ADS (C.D. Cal. 2022); *Rupp v. Bonta*, No. 8:17-cv-746JLS-JDE (C.D. Cal. 2017); *B&L Productions, Inc. v. Newsom*, No. 21-cv-1718-AJB-DDL (S.D. Cal. 2021); *Nat'l Assoc. for Gun Rts. v. Campbell*, No.1:22-cv-11431-FDS (D. Mass. 2022); *Nat'l Assoc. for Gun Rts. v. Lamont*, No. 3:22-cv-0118 (D. Conn. 2022); *Nastri v. Dykes*, No. 3:23-cv-00056 (D. Conn. 2023); and *Nat'l Assoc. for Gun Rts. v. Lopez*, No. 1:22-cv-00404 (D. Haw. 2022).

**BASIS FOR OPINION AND MATERIALS CONSIDERED**

6.      The opinion I provide in this report is based on my review of the  complaint filed in this lawsuit, plaintiffs' motion for preliminary injunction,  the laws at issue in this lawsuit, my education, expertise, and research in the field of legal history.  The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

**SUMMARY OF OPINIONS**

7.      Understanding text, history, and tradition requires a sophisticated grasp of historical context. One must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment's original understanding.

3

**JA0150**

8.      It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way Americans in the Founding era approached legal questions and rights.  In contrast to most modern lawyers, the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas.  Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[4]  Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations.[5]  No legal principle was more important to the common law than the concept of the peace.[6]  As one early American justice of the peace manual noted:  "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[7]  Blackstone, a leading source of early American views about English law, opined that the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."[8]  Any approach to the Second Amendment that ignores the importance of the peace to Founding era constitutional and legal thought is both anachronistic and profoundly distorted.[9]

---

[4] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

[5] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

[6] LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (University of North Carolina Press, 2009).

[7] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

[8] 1 WILLIAM BLACKSTONE, COMMENTARIES *349.

[9] Edwards, *supra* note 6.

4

**JA0151**

9.      Early American constitutionalism built on Lockean theory; a fact evident in many early state constitutions.  Thus, Pennsylvania, the first state to assert a right to bear arms, also unambiguously preceded the statement of that principal with an assertion closely tracking Locke: "That all men are born equally free and independent, and have certain natural, inherent and inalienable rights, amongst which are, the enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining happiness and safety."[10] The right of self-defense and property rights were each viewed  as fundamental, inalienable, and foundational  in the Founding era.[11] Although the right associated with property and self-defense could  not be alienated (a term that was itself derived from English property law) both rights were subject to robust regulation.[12]

10.     In *Bruen*, Justice Kavanaugh reiterated *Heller*'s[13] invocation of Blackstone's authority as a guide to how early Americans understood their legal inheritance from England.[14] In the years following the adoption of the Second Amendment and its state analogues, firearm regulation increased, a natural response to new challenges posed by changes in technology and society. As had been true in England, the newly independent states exercised their broad police powers to address longstanding issues and any novel problems created by firearms in American society.

---

[10] 5 Federal and State Constitutions 568 (F. Thorpe ed. 1909) Pa. Const., Decl. of Rights, Art. IX (1776) at 3083; more generally, see Willi Paul Adams, The First American Constitutions: Republican Ideology and the Making of State Constitutions in the Revolutionary Era (1980).

[11] Jud Campbell, *Judicial Review and the Enumeration of Rights*, 15 GEO. J. L. & PUB. POL'Y 568 (2017).

[12] Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

[13] *District of Columbia v. Heller*, 554 U.S. 570 (2008).

[14] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775).  The modern terminology to describe this concept is "ordered liberty."  *See Palko v. Connecticut*, 302 U.S, 319, 325 (1937).

11.    American law, including the regulation of firearms, sought to protect ordered liberty. As one patriotic revolutionary era orator observed, almost a decade after the adoption of the Constitution:  "True liberty consists, not in having *no government*, not in a *destitution of all law*, but in our having an equal voice in the formation and execution of the laws, according as they effect [*sic*] our persons and property."[15]  By allowing individuals to participate in politics and enact laws aimed at promoting the health, safety, and well-being of the people, liberty flourished.

12.    The members of the Founding generation lived in a pre-modern rural society. There were no modern style police forces to keep the peace. Even after the creation of modern style police forces in the period before the Civil War, firearms were rarely carried routinely in public outside of the South and frontier regions.  Indeed, none of the nation's early police forces in Boston, New York, and Philadelphia issued firearms to those charged with enforcing the peace and protecting society from criminals.

13.    Few of the institutions modern Americans take for granted existed in Founding era America.   Outside of major cities there were few hospitals and even fewer museums, and these were private institutions that served the public. There was no modern-style mass transportation.   All forms of transport were privately owned.

14.    Although many public spaces existed in early America, modern style parks did not emerge until the nineteenth century.   The development of such spaces in period before the Civil War was itself a response to the greater urbanization of the nation and a perception that America needed to create havens of tranquility to offset the negative impacts of the market revolution.  From their inception, these new public spaces prohibited firearms.

---

[15] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799), (text available in the Evans Early American Imprint Collection) (emphasis in original).

JA0153

I.    **THE HISTORICAL INQUIRY REQUIRED BY *BRUEN, MCDONALD,* AND *HELLER*: RIGHTS AND REGULATION**

15.    The United States Supreme Court's decisions in *Heller*, *McDonald*,[16] and *Bruen* have directed courts to look to text, history, and tradition when evaluating the scope of permissible firearms regulation under the Second Amendment. In another case involving historical determinations, Justice Thomas, the author of the majority opinion in *Bruen*, has noted that judges must avoid approaching history, text, and tradition with an "ahistorical literalism."[17] Legal texts must not be read in a decontextualized fashion detached from the web of historical meaning that made them comprehensible to Americans living in the past. Instead, understanding the public meaning of constitutional texts requires a solid grasp of the relevant historical contexts.[18]

16.    Moreover, as *Bruen* makes clear, history neither imposes "a regulatory straitjacket nor a regulatory blank check."[19] The Court acknowledged that when novel problems created by firearms are at issue the analysis must reflect this fact: "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen* differentiates between cases in which contested regulations are responses to longstanding problems and situations in which modern regulations address novel problems with no clear historical analogues from the Founding era or the era of the Fourteenth Amendment.

17.    In the years between *Heller* and *Bruen*, historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-American legal tradition, but much more work needs to be done to fill out this picture.[20] Indeed, such research is still ongoing: new

---

[16] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

[17] *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019) (Thomas, J.) (criticizing "ahistorical literalism").

[18] S*ee* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

[19] *Bruen*, 142 S. Ct. 2111.

[20] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

JA0154

materials continue to emerge; and in the year since *Bruen* was decided, additional evidence about

the history of regulation has surfaced and new scholarship interpreting it has appeared in leading

law reviews and other scholarly venues.[21]

18.    Justice Kavanaugh underscored a key holding of *Heller* in his *Bruen* concurrence:

"Like most rights, the right secured by the Second Amendment is not unlimited.  From

Blackstone through the 19th-century cases, commentators and courts routinely explained that the

right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for

whatever purpose."  Crucially, the Court further noted that "we do think that *Heller* and

*McDonald* point toward at least two metrics:  how and why the regulations burden a law-abiding

citizen's right to armed self-defense."[22]

19.    The key insight derived from taking the Founding era conception of rights

seriously and applying the original understanding of the Founding era's conception of liberty is

the recognition that regulation and liberty are both hard wired into the Amendment's text.[23] The

inclusion of rights guarantees in Founding era constitutional texts was not meant to place them

beyond the scope of legislative control.  "The point of retaining natural rights," originalist

scholar Jud Campbell reminds us "was not to make certain aspects of natural liberty immune

---

[21] *Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2495 (2022); NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).

[22] *Bruen*, 142 S. Ct. at 2132–33.

[23] *See generally* QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998) (examining neo-Roman theories of free citizens and how it impacted the development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation). Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016). *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions).

---

8

**JA0155**

from governmental regulation. Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."[24]

20.    Rather than limiting rights, regulation was the essential means of preserving rights, including self-defense.[25]  In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues.  Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order.[26]  The individual states also imposed loyalty oaths, disarming those who refused to take such oaths.  No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties.  Thus, some forms of prior restraint, impermissible in the case of expressive freedoms protected by the First Amendment or comparable state provisions, were understood by the Founding generation to be perfectly consistent with the constitutional right to keep and bear arms.[27]

21.    "Constitutional rights," Justice Scalia wrote in *Heller*, "are enshrined with the scope they were thought to have when the people adopted them."[28]  The most basic right of all in Founding era constitutionalism was the right of the people to regulate their own internal police.  Although modern lawyers and jurists are accustomed to thinking of state police power, the

---

[24] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. OF CRIM. L. AND CRIMINOLOGY 203, 206 (2016).

[25] *See* Jud Campbell, *Republicanism and Natural Rights at the Founding*, 32 CONST. COMMENT. 85 (2017).

[26] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

[27] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 *CONSTITUTIONAL COMMENTARY* 988 (1999).

[28] *Heller*, 554 U.S. at 634–35; Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution,* 20 J. POL'Y HIST. 47 (2008).

9

JA0156

Founding generation viewed this concept as a right, not a power.[29]  The first state constitutions clearly articulated such a right — including it alongside more familiar rights such as the right to bear arms.[30]  Pennsylvania's Constitution framed this estimable right succinctly:  "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."  Although Justice Scalia's observation on the scope of the right to bear arms has figured prominently in recent Second Amendment jurisprudence, the equally important right of the people to regulate their internal police has not been similarly acknowledged by many lower courts. This asymmetry is not only inconsistent with Founding era conceptions of law and constitutionalism, but also not consistent with *Heller*, a point that Chief Justice Roberts and Justice Kavanaugh have each asserted in their interpretations of *Heller* and subsequent jurisprudence.  In short, an asymmetrical approach to gun rights and regulation, favoring the former over the latter is precluded by *Heller* and not consistent with *Bruen*'s focus on text, history, and tradition.  The history of gun regulation in the decades after the right to bear arms was codified in both the first state constitutions and the federal bill of rights underscores this key point. The right to bear arms was seldom interpreted, (outside of a few outlier cases in the South) as precluding robust regulation of arms and gun powder.

## II.    FROM MUSKETS TO PISTOLS: CHANGE AND CONTINUITY IN EARLY AMERICAN FIREARMS REGULATION

22.    Guns have been regulated from the dawn of American history.[31]  At the time *Heller* was decided, there was little scholarship on the history of gun regulation and a paucity of

---

[29] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," *See generally* Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS OF L. 64 (2015); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008).

[30] PA. CONST. of 1776, ch. I, art. III; MD. DECLARATION OF RIGHTS, art. IV (1776); N.C. DECLARATION OF RIGHTS, art. I, § 3 (1776); and VT. DECLARATION OF RIGHTS, art. V (1777).

[31] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

quality scholarship on early American gun culture.[32]  Fortunately, a burgeoning body of

scholarship has illuminated both topics, deepening scholarly understanding of the relevant

contexts needed to implement *Bruen*'s framework.[33] Indeed, in the year following *Bruen*, new

sources have come to light and new scholarship as well.[34]

23.    The common law that Americans inherited from England always acknowledged

that the right of self-defense was not unlimited but existed within a well-delineated

jurisprudential framework.  The entire body of the common law was designed to preserve the

peace and the right of self-defense existed within this larger framework.[35]  Statutory law, both in

England and America, functioned to further secure the peace and public safety.  Given these

indisputable facts, the Supreme Court correctly noted, the right to keep and bear arms was never

understood to prevent government from enacting a broad range of regulations to promote the

peace and maintain public safety.[36]

24.    Recent historical research has illuminated the nature of Founding era gun culture

and the history of regulation. There was no analogue to the types of gun violence that plague

modern America.  The nature of firearms technology and early American society militated

against guns as the preferred tool for most forms of interpersonal violence.[37]

---

[32] *Id.*

[33] Ruben & Miller, *supra* note 20, at 1.

[34] *See Atkinson v. Garland*, No. 22-1557, 2023 WL 4071542 (7th Cir. June 20, 2023) at 37 citing new scholarship by Andrew Willinger, *The Territories Under Text, History, and Tradition*, 101 Wash. U. L. Rev. __ (forthcoming 2023) at 27.

[35] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

[36] *McDonald*, 561 U.S. at 785 (noting "'[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment'").

[37] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

25.    Weapons in the Founding era were muzzle loaded guns that were not particularly accurate and took a long time to load.  The black powder used in these firearms was corrosive and attracted moisture like a sponge: two facts that militated against storing weapons loaded. Given the state of firearms technology in the Founding era, it is not surprising that recent scholarship has demonstrated that there was not a widespread gun violence problem in the era of the Second Amendment.[38]

26.    History is marked by change and the history of guns is no exception. Changes in firearms technology and American society in the nineteenth century led to the emergence of America's first gun violence problems.  The response of states to the emergence of new firearms that threatened the peace was a plethora of new laws.   The first notable expansion of regulation occurred during the period after the War of 1812, when cheap, reliable, and easily concealable pistols were produced for the first time in American history.  More than 90 percent of the firearms in circulation in the Founding era were long guns, so pistols were not a serious problem for the Founders.[39]

27.    In short, when addressing changes in technology, consumer behavior, and faced with novel threats to public safety, states used their ample authority under the police power to enact laws to address these problems.   Apart from a few outlier cases in the South, courts upheld such limits on the unfettered exercise of a right to keep and bear arms.[40]

---

[38] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0.

[39] Sweeney *supra* note 37.

[40] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015).

JA0159

28.     Weapons that posed a particular danger were regulated and, in some cases, prohibited.  Responding in this fashion was entirely consistent with Founding-era conceptions of ordered liberty and the Second Amendment.[41]

29.     Anglo-American law treated unusually dangerous weapons as legitimate targets for strong regulation. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation described these types of limits in slightly different terms. The two different formulations related to weapons described as "dangerous and unusual" and more typically  as "dangerous or unusual."   Although some modern commentary on the Second Amendment have misread the Blackstonian principle as asserting that weapons must be both dangerous and unusual to justify government regulation, the term dangerous and unusual was not conjunctive, but a Latinate construction familiar to early American lawyers, hendiadys. Thus, the best translation of the term in modern parlance would be "unusually dangerous."  Indeed, this reading is the only parsing of the texts of Blackstone and Hawkins that reconciles the two author's treatment of the scope of government authority to regulate arms.[42]

30.     As Justice Scalia noted in *Heller*, and Justice Thomas reiterated in *Bruen*, the original Second Amendment was a result of a form of interest balancing undertaken by the people themselves in framing the federal constitution and the first ten amendments. Thus, from its outset the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state. An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment. Although rights and regulation are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complimentary. Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point

---

[41] Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[42] This phrase was an example of an archaic grammatical and rhetorical form hendiadys; see Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA L. REV. 687 (2016). Thus, the term was not conjunctive and is best rendered as "unusually dangerous."

13

crystal clear. The First Amendment prohibits "abridging" the rights it protects. In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits the diminishment of the rights it protects. The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed." In Founding era American English, the word "infringement" meant to "violate" or "destroy." Richard Burns, in his influential eighteenth-century legal dictionary, illustrated the concept of infringement by discussing the differences between the anarchic liberty associated with the state of nature and the well regulated liberty associated with civil society and the rule of law. Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature. True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty.[43] Regulation was therefore not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[44] In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the text of the two Amendments was seen to set up very different frameworks for thinking about the rights they protect. Members of the Founding generation would have understood that legislatures could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions as long as such regulations did not negate the underlying *right*. In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues.[45] In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goals of promoting public safety.

---

[45] *Supra* note 26.

14

JA0161

### III.    THE POLICE POWER AND FIREARMS REGULATION, 1776-1868

31.    The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[46]  The phrase "internal police" had already become common, particularly in laws establishing towns and defining the scope of their legislative authority.[47]  By the early nineteenth century, the term "police" was a fixture in American law.[48]  Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[49]  The Founding era's conception of a basic police right located in legislatures was transmuted during the Marshall Court's era into the judicial doctrine of the police power and would become a fixture in American law.

32.    The power to regulate firearms and gunpowder has always been central to the police power and historically was shared among states, local municipalities, and the federal government when it was legislating conduct on federal land and in buildings.[50]  The adoption of

---

[46] PA. CONST. OF 1776, Ch. I, art iii.

[47] For other examples of constitutional language similar to Pennsylvania's provision, N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.  For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791).  For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[48] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

[49] 10 ENCYCLOPEDIA AMERICANA 214 new edition (Francis Lieber ed.).

[50] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

15

JA0162

the Constitution and the Bill of Rights did not deprive states of their police powers.  Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today.  Ratification was only possible because Federalists offered Anti-Federalists strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority, including the authority to regulate guns and gun powder.[51]

33.     Federalists and Anti-Federalists bitterly disagreed over many legal issues, but this one point of accord was incontrovertible.  Brutus, a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments to provide for the protection and defence [sic] of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other  . . . ."[52]  Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress."  States, he assured the American people during ratification, would continue to legislate on all matters related to the police power "such as unlicensed public houses, nuisances, and many other things of the like nature."[53]  State police power authority was at its pinnacle in matters relating to guns or gun powder.[54]

34.     Founding-era constitutions treated the right of the people to regulate their internal police separately from the equally important right of the people to bear arms.  These two rights were separate in the Founding era but were mutually reinforcing:  both rights were exercised in a manner that furthered the goal of ordered liberty.  Reconstruction-era constitutions adopted a new textual formulation of the connection between these two formerly distinct rights, fusing the

---

[51] Saul Cornell, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

[52] Brutus, *Essays of Brutus VII*, reprinted in 2 THE COMPLETE ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981).

[53] Tench Coxe, A Freeman, *Pa. Gazette*, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[54] CORNELL, *supra* note 35.

two together as one single constitutional principle. This change reflected two profound transformations in American politics and law between 1776 and 1868. First, the judicial concept of police power gradually usurped the older notion of a police right grounded in the idea of popular sovereignty. As a result, state constitutions no longer included free standing affirmations of a police right. Secondly, the constitutional "mischief to be remedied" that arms bearing provisions addressed had changed as well. Constitution writers in the era of the American Revolution feared powerful standing armies and sought to entrench civilian control of the military. By contrast, constitution writers in the era of the Fourteenth Amendment were no longer haunted by the specter of tyrannical Stuart Kings using their standing army to oppress American colonists. In place of these ancient fears, a new apprehension stalked Americans: the proliferation of unusually dangerous weapons and the societal harms they caused. The Reconstruction-era constitutional solution cast aside the eighteenth-century language that was steeped in fears of standing armies and substituted in its place new language affirming the state's police power authority to regulate arms, particularly in public. [55]

| Pennsylvania Constitution (1776) | Texas Constitution (1868) |
|---|---|
| "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."<br><br>"That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power."[56] | "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe.[57] |

---

[55] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. 65 (2022).

[56] PA. CONST. of 1776, amend. III, XIII.

[57] TEX. CONST. OF 1868, Art. I, § 13. For similarly expansive constitutional provisions enacted after the Civil War, see *infra-Table* 1.

**Private Property and the Founding Era's Default Rule about Arms**

35.    There was no right to carry firearms onto the property of others in the Founding era. Indeed, had such a right existed it would have undermined the peace, not preserved it. The castle doctrine, which included one's domicile and curtilage, meant individuals could respond with deadly force to perceived threats.[58]

36.    Anglo-American constitutionalism was founded on the Lockean trinity of life, liberty, and property. Property rights in the Founding era were not only highly esteemed, but English common law doctrine gave individuals broad authority over their lands and powerful tools to enforce their claims against those who committed trespass. It would have been unthinkable to members of the Founding generation that any person could enter another's land armed, without permission or appropriate legal authority. The limits on peace officers underscore this fact. Entry on private property by a constable, sheriff, or justice of the peace without proper legal authority was a trespass. Moreover, it is important to note that peace officers in the Founding era were not typically armed with firearms so even when serving legal process, justice of the peace, sheriffs, and constables did not typically enter private property armed. The most notable exceptions to this principle were the situation where one was in pursuit of a felon or a dangerous animal.[59]

37.    The default rule enacted by Maryland simply restores property to its rightful place alongside life and liberty in the Founding era's Lockean vision of liberty. Blackstone's discussion of the centrality of property to English common law is apposite and offers a foundation for

---

[58] On the history of stand your ground, see Richard Maxwell Brown, NO DUTY TO RETREAT: VIOLENCE AND VALUES IN AMERICAN HISTORY AND SOCIETY (1994).

[59] Stuart Bruchey, "The Impact of Concern for the Security of Property Rights on the L System of the Early American Republic," 1980 *Wisconsin Law Review* 1135, 1136; [23] James W. Ely, Jr., *The Guardian of Every Other Right: A Constitutional History of Property Rights,* 3rd ed (2008) 30-32; William J. Novak*, Common Regulation: Legal Origins of State Power in America,* 45 HASTINGS L.J. 1061, 1081–83 (1994)

18

**JA0165**

understanding why a restoration of the default rule prohibiting entering another's lands while armed is consistent with Founding era constitutionalism:

> The third absolute right, inherent in every Englishman, is that of property: which consists in the free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the laws of the land. . . . The laws of England are therefore, in point of honor and justice, extremely watchful in ascertaining and protecting this right.[60]

The practical implication of this robust view of property rights was considerable. In a celebrated English case where the Lord Chief Justice of the King's Bench summarized the implications of this view for English law: "our law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave; if he does he is a trespasser, though he does no damage at all; if he will tread upon his neighbor's ground, he must justify it by law."[61]

38.    The default rule prohibiting firearms on private property adopted by Maryland simply restores the legal rule in place at the Founding, a rule rooted in English common law. The prohibition on entering another's land without permission was part of the background assumptions against which the right to keep and bear arms would have been understood by those who wrote it and enacted the Second Amendment into law.

39.    Blackstone's extensive discussion of the law of trespass elaborated this understanding and was well known to members of the Founding generation, including those who wrote and enacted the Second Amendment and similar state analogues. Judge Zephaniah Swift, author of one of the first legal treatises written after the adoption of the Second Amendment, summarized this Blackstonian consensus when he wrote: "every unwarrantable entry upon the lands and tenements of another, without his consent, is deemed a breaking of his close, and is an injury."[62]

---

[60] William Blackstone, COMMENTARIES 1:134—35.

[61] *Entick v. Carrington*, 95 Eng. Rep. 807 (K.B. 1765).

[62] Zephaniah, Swift, 2 A SYSTEM OF THE LAWS OF THE STATE OF

(continued…)

JA0166

40.    Pennsylvania and New Jersey each enacted laws drawing on this tradition to pass

broad restrictions on traveling armed on to private lands without permission:

> Be it enacted, That if any person or persons shall presume, at any time after the
> publication of this act, to carry any gun, or hunt on any enclosed or improved lands
> of any of the inhabitants of this province, other than his own, unless he shall have
> license or permission from the owner of such lands, or shall presume to fire a gun on
> or near any of the king's highways, and shall be thereof convicted, either upon view
> of any Justice of the Peace within this province, or by the oath or affirmation of any
> one or more witnesses, before any Justice of the Peace, he shall, for every such
> offence, forfeit the sum of forty shillings.[63]

41.    The restoration of the common law default rule by Maryland therefore fits

squarely within the long tradition of the regulation of arms under Anglo-American law.

**The Historical Meaning of Sensitive Places and Limits on Arms**

42.    The sensitive places doctrine described in *Heller* derives from well-established

principles in Anglo-American law, including the Statute of Northampton (and its many analogs)

and the common law itself.  The sensitive places doctrine did not, as some gun rights advocates

have erroneously suggested, depend on the fact that government could provide comprehensive

security, such as modern court houses which have metal detectors and armed guards.[64]  Founding

era court houses did not enjoy anything remotely analogous to these types of security measures.

The English tradition of bans on arms in fairs and markets singled out these locations because

they were sites of commerce, entertainment, and politics. Indeed, it was the very fact that

individuals congregated in large numbers and moved about freely, engaging in productive

_____

CONNECTICUT (1795) at 74.

[63] 1 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October,
One Thousand Seven Hundred, to the Twentieth Day of March, One Thousand Eight Hundred
and Ten 229(1810); Charles Nettleton, Laws of the State of New-Jersey (1821) at 26.

[64] David B. Kopel & Joseph G.S. Greenlee, The "Sensitive Places" Doctrine: Locational
Limits on the Right to Bear Arms, 13 CHARLESTON L. REV. 203, 290 (2018).

economic, cultural, and political activities that was the reason arms were prohibited from these locations.[65]

43.     A good illustration of how early American governments understood sensitive places is provided by an early Louisiana law, prohibiting "any person to enter into a public ball-room with any cane, stick, sword or any other weapon" and requiring weapons be checked before entering a ball room. A similar statute was enacted by New Mexico.  The law prohibited "any person to enter said Ball or room adjoining said ball where Liquors are sold, or to remain in said balls or Fandangos with firearms or other deadly weapons, whether they be shown or concealed upon their persons."[66]  In both cases the laws prohibited arms in places where people gathered in large numbers and engaged in forms of recreation.

44.     Public universities in the early republic offer another good example of the potential scope of permissible firearms regulations consistent with the notion of sensitive places. Bans on guns on college campuses were an example of the ancient principle that strict regulation of arms in places where large numbers of people congregated.  The University of Georgia, one of the nation's oldest public institutions of higher education, passed a sweeping prohibition of guns on its campus: "[N]o student shall be allowed to keep any gun, pistol, Dagger, Dirk[,] sword cane[,] or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever."[67]  The University of North Carolina, likewise, enacted a total prohibition on possessing firearms.  The

---

[65] Jerome Bayon, General Digest of the Ordinances and Resolutions of the Corporation of New Orleans 371 (1831) (art. 1).

[66] 1852 N.M. Laws 67, § 3.  Although *Bruen* suggested that evidence from the territories was not probative, subsequent research published after the decision has established that territories were in fact the only locations in nineteenth century America in which the Second Amendment applied prior to the Fourteenth Amendment, a fact that has gained judicial notice in the litigation spawned by Bruen, *see Atkinson v. Garland*, No. 22-1557, 2023 WL 4071542 (7th Cir. June 20, 2023) ("Taking the Court at its word, new historical research should be welcome.")

[67] The Minutes of the Senate Academicus, 17991842, Univ. of Ga. Librs. (2008), https://tinyurl.com/3nxp4uwv.

law provided, "No Student shall keep a dog, or firearms, or gunpowder.  He shall not carry, keep, or own at the College, a sword, dirk, sword-cane, or any deadly weapon."[68]    The regulations enacted by the University of Virginia are particularly telling in this regard. In 1819, Jefferson helped establish the state-supported University of Virginia.  University of Virginia, About the University, https://www.virginia.edu/aboutuva (last accessed Nov. 4, 2022).  While both Jefferson and Madison were serving on the six-person University of Virginia Board of Visitors—the decision-making body for the university—the Board took an exceedingly strict view of guns on the Virginia campus, resolving: "No Student shall, within the precincts of the University, introduce, keep or use any spirituous or vinous liquors, keep or use weapons or arms of any kind, or gunpowder, keep a servant, horse or dog, appear in school with a stick, or any weapon."[69]

**Reconstruction:  Constitutional Continuity and Social Change**

45.    During the Reconstruction era, many states enacted a variety of laws building on the history of sensitive place restrictions.   Thus, Reconstruction era laws did not represent a new constitutional principle different than the common law restrictions that existed for centuries, but an application of the same legal principals to new circumstances brought about by changes in firearms technology, consumer behavior, and the demographic changes associated with greater urbanization. The principle justifying such a decision, excluding arms from sensitive places such as fair and markets, was ancient and informed Founding era laws as well as those enacted in the era of the Fourteenth Amendment.

---

[68] Acts of the General Assembly and Ordinances of the Trustees for the Organization and Government of the University of North-Carolina 15 (Raleigh, Off. Of the Raleigh Reg. 1838), https://tinyurl.com/2p8cte3h.In 1859, the University of North Carolina expanded the reach of its prohibition on carrying deadly weapons, applying it not just to the college, but also "within the village of Chapel Hill."  Acts of the General Assembly and Ordinances of the Trustees for the Organization and Government of the University of North Carolina 31 (James M. Henderson 1859), ttps://docsouth.unc.edu/true/unc/unc.html.

[69] Meeting Minutes of the University Board of Visitors, Oct. 4, 1824, https://tinyurl.com/543s44xk; *see also* Laws & Regulations of the College of William & Mary 19 (1830), https://tinyurl.com/2p93s7hd

46.        One of the most comprehensive statutes enacted during the era of the

Fourteenth Amendment was adopted in Texas. The law prohibited firearms in a variety of public

venues, building on a tradition that had existed for centuries.

> Section 1:    If any person shall go into any church or religious
> assembly, any school-room or other place where persons assembled
> for educational, literary, or scientific purposes, or into a ball room,
> social party, or other social gathering, composed of ladies and
> gentle- men, or to any election precinct on the day or days of any
> election, where any portion of the people of this state are collected
> to vote at any election, or to any other place where people may be
> assembled to muster or to perform any other public duty, or any
> other public assembly, and shall have about his person a bowie-
> knife, dirk, or butcher-knife, or firearms, whether known as a six-
> shooter, gun, or pistol of any kind, such persons so offending shall
> be deemed guilty of a misdemeanor, and on conviction thereof shall
> be fined in a sum not less than fifty or more than five hundred
> dollars, at the discretion of the court or jury trying the same: *Pro-
> vided*, That nothing contained in this section shall ap- ply to
> locations subject to Indian depredations: *And provided further*,
> That this act shall not apply to any person or persons whose duty it
> is to bear arms on such occasions in discharge of duties imposed by
> law.[70]

47.        Texas not only adopted a broad range of modern style gun regulations, including

this law, but further noted that the state's highest court recognized that such an exercise of the

police power was entirely constitutional. The Texas regime was not an outlier, but was

consistent with the dominant conception of the right to bear arms in both the Founding era and

the period of Fourteenth Amendment. What distinguished Texas from other states was not its

robust use of the police power, but the level of gun violence that precipitated the need for such

regulations.[71]The first state constitutions enacted after the American Revolution typically

---

[70]  George Washington Paschal, 2 Reporter A Digest of the Laws of Texas: Containing
Laws in Force, and the Repealed Laws on Which Rights Rest. Carefully Annotated. 3rd ed. at
1322 (1873).

[71] Justice Thomas dismissed the probative value of any evidence from Reconstruction era
Texas as an outlier. But subsequent historical research has demonstrated that Texas was well
within the constitutional mainstream of post-Civil War America, Brennan Gardner Rivas,
*Enforcement of Public Carry Restrictions: Texas as a Case Study* 55 DAVIS, L. REV. (2022)
2603. The important evidence presented in this article only appeared after *Bruen* was argued.
Rivas has demonstrated that Republicans enacted tough gun laws that were enforced in a
racially neutral fashion until the Jim Crow era reversed the gains achieved during

(continued…)

separated the right of the people to regulate their internal police from specific statements about the right to bear arms.[72]  The Founding era formulation of the right to bear arms was distinct from the right of the people to regulate their internal police. The new state constitutions adopted during Reconstruction omit references to the dangers of standing armies and the need for civilian control of the military. In place of these textual references state constitutions fused the right to regulate arms and the right to bear them into a single constitutional principle.[73]

48.    The new textual formulation of the right to keep and bear arms did not alter the constitutional principles framing firearms regulation, these remained unchanged. What had changed were a new set of circumstances had created an unprecedented set of public safety concerns for states. The new danger Americans faced during and after Reconstruction was the proliferation of firearms and more aggressive cultural norms about carrying them in public, particularly in urban areas.[74]

49.    The debates in the Texas constitutional convention during Reconstruction illustrate the centrality of this concern which had no parallel in the Founding era. The palpable fear of gun violence among the delegates was so great the convention passed a resolution prohibiting weapons in the convention hall. "The convention do order that no person shall hereafter be allowed in this hall, who carries belted on his person, revolvers or other offensive weapons."[75] Another delegate reminded the convention's members that the constitutional right to bear arms ought not be confused with the pernicious practice of habitually arming. The right, he cautioned ought not "be construed as giving any countenance to the evil practice of carrying

---

Reconstruction. For additional support for Rivas' conclusions, see Saul Cornell, *The Long Arc of Arms Regulation in Public: From Surety to Permitting*, 1328–1928; *id.* at 2545.

[72] Cornell, *supra* note 55.

[73] *See, e.g.*, UTAH CONST. of 1896, art. I, § 6.

[74]  RANDOLPH ROTH, AMERICAN HOMICIDE 56, 315 (2009).

[75] 1 CONSTITUTIONAL CONVENTION, JOURNAL OF THE RECONSTRUCTION CONVENTION, WHICH MET AT AUSTIN, TEXAS, JUNE 1,1868 (Tracy, Siemering & Co.1870) at 248.

24

private or concealed weapons about the person.[76] Although the level gun violence in Texas was especially grave, other states, and the western territories were all dealing with problems posed by the proliferation of handguns.  As a result of this broad societal trend firearms regulation increased dramatically during the era of the Fourteenth Amendment across the nation.[77]

**Table One**
**Post-Civil War State Constitutional**
**Arms Bearing Provisions about Regulation**

| Date | State | Provision |
|---|---|---|
| 1868 | Georgia | GA. CONST. of 1868, art. I, § 14: [T]he right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe by law the manner in which arms may be borne. |
| 1868 | W. Texas | W. TEX. CONST. of 1868, Art. I, § 13: Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe. |
| 1869 | Texas | TEX. CONST. of 1869, art. I § 13: Every person shall have the right to keep and bear arms, in the lawful defense of himself or the State, under such regulations as the Legislature may prescribe. |
| 1870 | Tennessee | TENN. CONST. of 1870, art. I, § 26: That the citizens of this State have a right to keep and to bear arms for their common defense. But the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime. |
| 1875 | Missouri | MO. CONST. of 1875, art. II, § 17: That the right of no citizen to keep and bear arms in defense of his home, person and property, or in aid of the civil power, when thereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the practice of wearing concealed weapons. |
| 1875 | North Carolina | N.C. CONST. of 1875, art. I, § 24. A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed; and as standing armies in time of peace, are dangerous to liberty, they ought not to be kept up, and the military should be kept under strict subordination to, and governed by, the civil power.  Nothing herein contained shall justify the practice of carrying concealed weapon, or prevent the legislature from enacting penal statutes against said practice. |
| 1876 | Colorado | COLO. CONST. of 1876, art. II, § 13: That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons. |
| 1876 | Texas | TEX. CONST. of 1876, art. I, § 23: Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State; but the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime. |
| 1877 | Georgia | GA. CONST. of 1877, art. I, § 22: The right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe the manner in which arms may be borne. |

---

[76] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95 (2016).

[77] Spitzer, *supra* note 31.

| 1879 | Louisiana | LA. CONST. of 1879, art. III: A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed. |
| 1885 | Florida | FLA. CONST. of 1885, art. I, § 20: The right of the people to bear arms in defense of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne. |
| 1889 | Idaho | IDAHO CONST. of 1889, art. I, § 11: The people have the right to bear arms for their security and defense: but the legislature shall regulate the exercise of this right by law. |
| 1889 | Montana | MONT. CONST. of 1889, art. III, § 13: The right of any person to keep or bear arms in defense of his own home, person, and property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but nothing herein contained shall be held to permit the carrying of concealed weapons. |
| 1890 | Mississippi | MISS. CONST. of 1890, art. III, § 12: The right of every citizen to keep and bear arms in defense of his home, person or property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but the legislature may regulate or forbid carrying concealed weapons. |
| 1891 | Kentucky | KY. CONST. of 1891, § 1(7): The right to bear arms in defense of themselves and of the State, subject to the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons. |
| 1896 | Utah | UTAH CONST. of 1896, art. I, § 6: The people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law. |

50.     The new focus on regulation embodied in these revised state arms bearing provisions was not a departure from traditional views of the robust scope of police power authority to regulate arms in the interests of public safety.  This power was ancient and widely acknowledged as fundamental to Anglo-American law.  Nor did the adoption of the Fourteenth Amendment change this fact.  The recasting of these state constitutional texts represented an important shift in emphasis and a change in constitutional style, not substance.[78]

51.     One of the motivating forces behind the push for the Fourteenth Amendment was the enactment of repressive black codes across the South, which often included restrictions on the right to keep and bear arms.  Para-military violence against free people of color and Republicans in the South was among the most pressing threats to Reconstruction.[79]  In response

---

[78] John Bingham, Speech, in CINCINNATI DAILY GAZETTE (Sept. 2, 1867) as quoted in Saul Cornell & Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?* 50 SANTA CLARA L. REV. 1043, 1058 (2010).

[79] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION (2019.

to the South Carolina Black Codes, Union General Daniel Sickles issued General Order No 1.[80] Sickles not only affirmed a right to bear arms, but also reasserted the right to regulate arms, including bans on concealed carry.  Crucially, Sickles restated the prevailing consensus that the right to bear arms did not sanction a right to travel armed onto private property. In *Bruen*, Justice Thomas singled out Sickles General Order No 1. as the quintessential embodiment of the meaning of the right to keep and bear arms, noting that Sickles views were consistent with both the ideals of 1791 and 1868.[81] General Order No. 1 offers one of the clearest pieces of evidence that the Maryland default rule about private property reflected a constitutional consensus deeply rooted in text, history, and tradition.  Sickles language was unambiguous on this point:  "[t]he constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless this shall not be construed to sanction the unlawful practice of carrying concealed weapons, nor to authorize any person to enter with arms on the premises of another against his consent."[82]

52.    The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters in Ohio that after the adoption of this Amendment, states would continue to bear the primary responsibility for "local administration and personal security."[83] As long as state and local laws were racially neutral and favored no person over any other, the people themselves,

---

[80] *See* Darrell A. H. Miller, Peruta, *The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARV. L. REV. FORUM 238 (2014) at 241.

[81]  142 S. Ct. at 2152.

[82] Edward McPherson (ed.), A HANDBOOK OF POLITICS FOR 1868 (1868), 36-38.

[83] John Bingham, Speech, *in* CINCINNATI DAILY GAZETTE (Sept. 2, 1867) as quoted in Saul Cornell & Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?* 50 SANTA CLARA L. REV. 1043, 1058 (2010).

JA0174

acting through their representatives, were free to enact whatever reasonable measures were necessary to promote public safety and promote the common good.[84]

53.     The formulation of the right to bear arms adopted in post-Civil War state constitutions drew on antebellum jurisprudence and constitutional theory's robust view of state police power, including the right to regulate firearms. These post-war constitutional texts explicitly recognized broad legislative authority to regulate the right to bear arms. It would be difficult to understate the significance of this change: across the nation, state legislatures took advantage of the revised formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms, especially in public. Indeed, the number of laws enacted skyrocketed, as did the number of states passing such laws.[85] States fulfilled their role as laboratories of democracy by implementing a range of regulations aimed at curbing the problem of gun violence: limiting the sale of firearms, taxing particular types of weapons perceived to pose threats to public safety, imposing limits on the access of minors to weapons, and restricting the public places one might carry arms.[86] Texas banned "[a]ny person carrying on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing."[87] The law aimed to preserve the peace and prevent the intimidation of free persons, the exact opposite

---

[84] For a discussion of how the courts wrestled with the meaning of the Fourteenth Amendment, see WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE 148-51 (1998).

[85] Spitzer, *supra* note 31.

[86] *Id.*

[87] *An Act to Regulate the Keeping and Bearing of Deadly Weapons, Apr. 12, 1871*, *reprinted in* 2 GEORGE W. PASCHAL, A DIGEST OF THE LAWS OF TEXAS: CONTAINING THE LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST FROM 1864 TO 1872, at 1322 (1873).

of the claims of gun rights advocates who have insisted that gun control during Reconstruction was tainted by an insidious racist agenda.[88]

**Parks**

54.    There were no modern-style parks in the era of the Second Amendment. The oldest urban public space in America, the Boston Common, was used primarily as a pasture, a place of execution, and site for the militia to muster and drill.[89] Yet, even when used for militia purposes these public spaces were tightly regulated. Colonial Massachusetts prohibited coming to muster with a loaded firearm.[90] The Boston Commons and other similar urban spaces during the Founding era shared little with modern parks. There was little need in the sparsely settled colonies to set aside areas for preservation or recreation given that the population of the colonies was expanding rapidly and remained hemmed in by various Indian nations reluctant to cede any further territory to Europeans. Moreover, by the time of the adoption of the Second Amendment the nation was still 90% rural and majority of the population was engaged in agricultural pursuit.[91]

---

[88] Gun rights advocates have simply ignored the most recent scholarship on gun control and race relations during Reconstruction, including the new literature on gun regulation and enforcement. For more, see the discussion in Frassetto, *supra* note 76, at 102-04, and Rivas, *supra* note 71, at 287.

[89] Steven R. Pendery, *Probing the Boston Common* 43 ARCHAEOLOGY (1990) at 42–47; Suzanne Scheld et. al, RETHINKING URBAN PARKS: PUBLIC SPACE AND CULTURAL DIVERSITY (2009) at 19-20; Michael Rawson, EDEN ON THE CHARLES: THE MAKING OF BOSTON ( 2014) at 73.

[90] RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND (1853) at 98 and 1866 Mass. Acts 197, An Act Concerning The Militia, § 120. The prohibition on bringing a loaded gun to muster stretches from 1632 to 1866.

[91] Forrest McDonald, E PLURIBUS UNUM: THE FORMATION OF THE AMERICAN REPUBLIC, 1776-1790, (1965) at 72; Peter C. Mancall, *Economic History of the United States: Precolonial and Colonial Periods* OXFORD RESEARCH ENCYCLOPEDIA OF ECONOMICS AND FINANCE. 26 Apr. 2021; Accessed 24 Mar. 2023. https://oxfordre.com/economics/view/10.1093/acrefore/9780190625979.001.0001/acrefore-9780190625979-e-480.

55.      The creation of parks as we now know them began in the middle of the nineteenth century and was influenced by the slow impact of romanticism and the Transcendentalist ideas of visionaries such as Henry David Thoreau.  The new idea of parks as places of relaxation, repose, and recreation gradually inspired a new attitude toward nature and public spaces.  This new vision inspired urban planners, landscape architects, and government officials to embark upon an ambitious series of new parks. By the middle of the century these new public spaces, best exemplified by New York's Central Park, had become places of refuge from the congestion, grime, and stresses of city life. The creation of large urban public parks in the 1850s posed new challenges for those eager to preserve the peace and public safety: among the pressing issues were the regulation of firearms.[92]  The expansion of urban parks, the creation of new state parks, and eventually the involvement of the federal government in land preservation intensified in the post-Civil period.

56.      Millions of Americans, including the entire population of the nation's five largest cities, lived under a firearms regulatory regime  that prohibited firearms in parks.  During the era of the Fourteenth Amendment there was little disagreement that state and local governments had the authority under the police power to regulate and prohibit guns in parks.

**Table Two:  Post Civil War Limits on Public Carry in the Nation's Five Largest Cities**

| Rank | City | Population (1900)[93] | Date of Law | Gun Prohibition in Parks |
|---|---|---|---|---|
| 1 | N.Y. | 3,437,202 | 1861 | X |
| 2 | Chicago | 1,698,575 | 1881 | X |
| 3 | Phila. | 1,293,697 | 1869 | X |
| 4 | St. Louis | 575,238 | 1883 | X |
| 5 | Boston | 560,892 | 1886 | X |

---

[92] Galen Cranz, *The Politics of Park Design: A History of Urban Parks in America* (1989) at 19.

[93] 1 U.S. CENSUS OFF., CENSUS REPORTS 1xix tbl. XXII (1901).

JA0177

Nor were such bans limited to the nation's largest municipalities.[94]  For example, during this period, San Francisco enacted an ordinance prohibiting guns in its parks as did the cities of Boulder and St. Paul.[95] Statutes prohibiting possession of arms in these important public spaces were enacted in major urban areas of every region of the nation. As Table Two vividly illustrates, limits on arms in public parks was the norm in America in the era of the Fourteenth Amendment.

57.     There was a close connection between the urban park movement and the rise of state parks. The primary architect behind New York's Central Park, Frederick Olmstead, also took a leading role in the creation of California's Yosemite State Park in the 1860s.  Although Congress ceded the land to the state, the expense and difficulty of managing it led to the state returning control of the park to the federal government several decades later.[96] The federal government's decision to create Yellowstone in 1872 added yet another type of park to the America's roster of public spaces.

58.     The federal government also passed laws limiting firearms in its parks. Such regulations are especially important because federal lands were indisputably governed by the Second Amendment, irrespective of the incorporation doctrine.[97]  The Secretary of the Interior

---

[94] A Digest of the Laws and Ordinances of the City of Philadelphia from the Year 1701 to the 21 Day of June, 1887. (1887) at 513; The Revised Municipal Code of Ohio (1899) at 196; Report of the Board of Park Commissioners of the City of Rochester, N.Y.: 1888 to 1898. (1898) at 98; The Municipal Code of the City of Spokane, Washington: Comprising the Ordinances of the City ... Revised to October 22, 1896  (1896) at 316;; Annual Report of the Park Commissioners of the City of Lynn for the Year Ending (1893) at 45; Charter and Ordinances of the City of New Haven: Together with Legislative Acts Affecting Said City (1898) at 293; A Digest of the Acts of Assembly Relating to and the General Ordinances of the City Pittsburgh (1897) at 496; The Revised Ordinances of the City of Danville (1883);   Law and Ordinances governing the Village of Hyde Park (1875). The Municipal Code of Chicago (1881) at 391.

[95] San Francisco Municipal Reports  (1874) at 499; Ordinances of the City of Boulder, 157, (1899); Proceedings of the Common Council of the City of Saint Paul (1892)  at 133.

[96] Ney C. Landrum, THE STATE PARK MOVEMENT IN AMERICA: A CRITICAL REVIEW ( 2013). On the creation of Yellowstone, see https://www.loc.gov/collections/national-parks-maps/articles-and-essays/yellowstone-the-first-national-park/

[97] Report of the Department of the Interior ... [with Accompanying Documents](1899) at 499 and Report of the Secretary of the Interior for the Fiscal Year (1900) at 125.

31

underscored the danger posed by firearms in parks when he wrote this about Yellowstone, an "Absolute prohibition of firearms in the park is recommended."[98] The federal government prohibited guns in the park.[99]

59.    The emergence of modern style parks in the middle of the nineteenth century was response to profound changes in American society, particularly urbanization. These places of repose and recreation were designed to offer Americans places to escape the increasingly chaotic world they encountered in the expanding cities of the nineteenth century.  From the outset the regulations governing these spaces prohibited firearms.  State parks were motivated by similar impulses.  Indeed, Frederick Olmstead, one of the leading landscape architects of the period also took a prominent role in helping to create these important public spaces. When the federal government organized its first national parks, it also tightly regulated the carriage of arms in public lands. Given that arms have been tightly regulated, and in many instances prohibited in parks since their creation, Maryland's regulations limiting guns in parks are well withing the long history of firearms regulation in America.

---

[98] The Abridgment: Containing Messages of the President of the United States to the Two Houses of Congress with Reports of Departments and Selections from Accompanying Papers (1893) at 618.

[99] Annual Report of the Superintendent of the Yellowstone National Park to the Secretary of the Interior .... United States: U.S. Government Printing Office, (1898) at 19.

IV.   **CONCLUSION**

60.      The power to regulate and in some cases prohibit guns and gun powder has always been central to the police power authority of states and localities.  At different moments in American history communities have regulated weapons in a multitude of different ways. Political scientist Robert Spitzer's overview of the history of firearms regulation underscores a basic point about American law:  "the lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[100]  States and localities have regulated gunpowder and arms since the earliest days of the American republic.  The statutes at issue in this case are analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present.  This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day.  The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture.

---

[100] Willinger *supra* note 34; Spitzer, *supra* note 31.

**JA0180**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 26, 2023 at Redding, CT.

_Saul Cornell_
Saul Cornell

# EXHIBIT 1

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✻ Bronx, NY 10458 ✻ 203 826-6608 (c) ✻ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

| Prizes and Awards |
|---|

- 2006 Langum Prize in Legal History 2006
  2006 Pulitzer Nomination, History
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book
- 2000 Pulitzer Nomination History

| Book Publications |
|---|

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
New Histories of American Law, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell]
 (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000)
 (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy  and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 Hastings Constitutional  Law Quarterly (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" 55  University of California, Davis Law Review Online (2021): 65-90.

 "President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era", 89 Fordham Law Review  (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and Contemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after Heller," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law  107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal  Forum  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review Res Gestae  84 (2015):  1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29(2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism"  Fordham Law Review 82 (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary  Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

JA0185

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal  56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of  American Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment"  Albany Government Law  Review  2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," Maryland Law Review  (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion,"  Chicago-Kent Law Review  (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," Law and History Review (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review  47 (2006): 1123-55

"The Early American Origins of  the  Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History,"  Stanford Law and Policy Review  (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control,"  Fordham Law Review 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," Constitutional Commentary (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in Government Proscribed:  The Bill of Rights (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in  The Blackwell Companion to American Thought, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II:  The Return of  the Founders,"  Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:   The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of  the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

**Book Reviews:**

- Journal of American History
- William and Mary Quarterly
- American Studies Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History
- Law and History Review

**Journal Manuscript Referee:**

- <u>Journal of American History</u>
- <u>William and Mary Quarterly</u>
- <u>Diplomatic History</u>
- <u>Pennsylvania Magazine of History and Biography</u>
- <u>Law and History Review</u>
- <u>Harvard Law Review</u>
- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

**Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

**Invited Lectures:**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria: Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke: The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## Presentations:

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

8 | S a u l   C o r n e l l

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's Original Meanings, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism," Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

**Interviews, Editorials, Essays, Podcasts:**

---

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist" SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*," SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18, 2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*"* *Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online* 30, 2015 [with Eric Ruben]
- PBS, "Need to Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal" Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control,"   To the Point*, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment,"   *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World*  February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen,</u> 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

**Federal Courts:**

United States of America,  v. Graylan Steve Johnson,United States District Court, S.D. Florida. February 20, 2023 Slip Copy 2023 WL 2308792

United States v. Posey, United States District Court, N.D. Indiana, Hammond Division. February 09, 2023 Slip Copy 2023 WL 1869095

United States v. Combs, United States District Court, E.D. Kentucky, Central Division., (at Lexington). February 02, 2023 Slip Copy 2023 WL 1466614

United States v. Barber, United States District Court, E.D. Texas, Sherman Division. January 27, 2023 Slip Copy 2023 WL 1073667

Range v. Att'y Gen. United States, No. 21-2835, 2022 WL 16955670 (3d Cir. Nov. 16, 2022).

Antonyuk v. Hochul, No. 122CV0986GTSCFH, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022).

United States v. Bullock, No. 3:18-CR-165-CWR-FKB, 2022 WL 16649175 (S.D. Miss. Oct. 27, 2022).

United States of Am. v. Riley, No. 1:22-CR-163 (RDA), 2022 WL 7610264 (E.D. Va. Oct. 13, 2022).

United States v. Coombes, No. 22-CR-00189-GKF, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022) .

United States v. Medrano, United States District Court, N.D. West Virginia, Martinsburg. January 06, 2023 Slip Copy 2023 WL 122650

United States v. Coleman, United States District Court, N.D. West Virginia, Martinsburg. January 06, 2023 Slip Copy 2023 WL 122401

United States v. Goins, United States District Court, E.D. Kentucky, Central Division., Lexington. December 21, 2022 --- F.Supp.3d ---- 2022 WL 17836677

Reese v. Bureau of Alcohol Tobacco Firearms & Explosives, United States District Court, W.D. Louisiana, Lafayette Division. December 21, 2022 --- F.Supp.3d ---- 2022 WL 17859138

South Bay Rod & Gun Club, Inc. v. Bonta, United States District Court, S.D. California. December 19, 2022 --- F.Supp.3d ---- 2022 WL 17811113

Miller v. Bonta, United States District Court, S.D. California. December 19, 2022 --- F.Supp.3d ---- 2022 WL 17811114

Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose, No. 22-CV-00501-BLF, 2022 WL 3083715 (N.D. Cal. Aug. 3, 2022).

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

JA0196

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

**State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746


Amicus Briefs:

Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022)  [ISLT and Gerrymandering]

Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]

Amicus Brief, *NYSRPA v. Bruen*, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, *Young v. State of Hawaii* N O . 12-17808 (9th Cir. 2020) [2nd Amendment]

Amicus Brief, *Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]

Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case  (2018) [2nd Amendment]

Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017)  [Partisan Gerrymandering]

Amicus Brief, *Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera*  v. *Lockyer*, case on appeal( 9th  Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th  Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]

### Expert Witness Reports

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).
*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).
*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).
*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).
*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).
*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).
*Worth v. Harrington,* 21-cv-1348 (D. Minn.).

### Law Review Symposia Organized

**Second Amendment:**

 "The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev.* 487 (2004).

"Gun Control: Old Problems, New Paradigms"  17 *Stan. L. & Pol'y Rev.* 671 (2006).

"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev.* 292 (2008).

"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev.* 2545 (2022).

**New Originalism:**

"The New Originalism" 82 *Fordham L. Rev.* 721 (2013).

"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning"84 *Fordham L. Rev.* 915 (2015).

JA0199