# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Kipke,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **CASE NO.: 1:23-cv-01293** |
| **Wesley Moore,** *et al.*, | |
| **Defendants.** | |

### DECLARATION OF PATRICK J. CHARLES

Pursuant to 28 U.S.C. § 1746, I, Patrick J. Charles, declare and state as follows:

1.     I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration and testify based on my personal knowledge and information.

2.     I have been retained by the Office of the Attorney General for Maryland as a historical and constitutional expert on Second Amendment matters. I also have expertise in legal history and its multiple uses in adjudicating constitutional questions.

3.     Maryland is currently defending multiple lawsuits, including *Kipke v. Moore*, challenging Maryland laws and regulations that govern where individuals may legally wear, carry, and transport firearms.

4.     I have read the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)*,* and Maryland has asked me to expound on the history of the law restricting armed carriage in locations jurisprudentially referred to as "sensitive places," as well as the history of the law pertaining to firearms and liquor.

5.      Most of the information contained in this declaration is from research conducted

prior to having been retained by the Office of the Attorney General for Maryland on May 27,

2023.

<p style="text-align:center">Background and Qualifications</p>

6.      I am a historian, legal scholar, and author of dozens of articles and books on the

Constitution, legal history, and standards of review. I received my L.L.M. in Legal Theory and

History with distinction from Queen Mary University of London in 2014, J.D. from Cleveland-

Marshall College of Law in 2009, and B.A. in History and International Affairs with honors from

George Washington University in 2005. My writings on the history of the law have been cited by

the Supreme Court of the United States, federal Circuit Courts of Appeal, federal District Courts,

and State supreme courts. A true and correct copy of my curriculum vitae is attached as **Exhibit**

**1** to this declaration.

7.      For the past 13 years I have served as a historian for the United States Air Force

(USAF) in several capacities, including deploying several times with Special Operations Forces

(SOF) for contingency operations in Afghanistan and the Middle East. I currently serve as the

Research Division Supervisor for the Air Force Historical Research Agency (AFHRA) located at

Maxwell Air Force Base, Alabama, where I oversee all historical information requests and

archival research for the USAF.

8.      This declaration was compiled and completed outside my official duties for the

USAF. Moreover, the contents and opinions expressed in this declaration are solely my own, and

not those of the USAF, AFHRA, Department of Defense, or the federal government.

## I.     *Bruen* and the "Sensitive Places" Doctrine

9.     *Bruen* established a general test for the lower courts when examining the constitutionality of modern firearm regulations. First, the challenger must show that "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If the challenger succeeds in this pursuit, the "government must then justify its regulation by demonstrating that it is consistent with the Nation's tradition of firearm regulation." *Id*. at 2130. At this second step, the regulation is constitutional if the government can point to historical laws that are analogous—not identical—to the modern regulation. *Id*. at 2133. The *Bruen* Court went on to note that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*.

10.     One regulatory area that the *Bruen* Court expounded upon was that of "sensitive places," *i.e.*, locations "where arms carrying could be prohibited consistent with the Second Amendment." *Id*. (citations omitted). In expounding upon this rule, the Court singled out prohibitions on carrying in "schools and government buildings," "legislative assemblies, polling places, and courthouses" as constitutionally permissive examples. *Id*. (citations omitted). And the Court upheld arms carrying prohibitions at these locations despite "the historical record yield[ing] relatively few" examples. *Id*. (David. B. Kopel & Joseph S. Greenlee, *The "Sensitive Places" Doctrine: Location Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 229-36, 244-47 (2018); Brief of Amicus Curiae the Independent Institute in Support of Petitioners, New York State Rifle & Pistol Association, Inc. v. City of New York, New York, No. 18-280, at 11-17). In other words, the Court found it "settled" that "these locations were [indeed] 'sensitive places'" because it was not made "aware of *[any] disputes* regarding the lawfulness of such prohibitions." *Id*. (emphasis added).

3

**II.      The History of "Sensitive Places" Through the Nineteenth Century**

11.      For nearly five centuries in England, from the late thirteenth century through the late eighteenth century, what constituted a "sensitive place" in which arms bearing could be regulated and restricted was rather broad. It encompassed densely populated areas, as well as areas where people regularly congregated for lawful purposes or conducted commerce. The text "fairs" and "markets" language contained within the 1328 Statute of Northampton makes this abundantly clear. 2 Edw. 3, c. 3 (1328) (Eng.). So too do several other English legal sources. For instance, in 1351, Edward III issued a proclamation declaring it was unlawful to "go armed" with dangerous weapons "within the City of London, or within the Suburbs, or any other places between the said city and the Palace of Westminster…except the officers of the King…" *Royal Proclamation as to the Wearing of Arms in the City, and at Westminster; and as to Playing at Games in the Palace at Westminster*, MEMORIALS OF LONDON AND LIFE 268-69, 273 (H.T. Riley ed., 1868). Similarly, in John Carpenter's 1419 treatise *Liber Albus*, it stipulates that "no one, of whatever condition he be, go armed in the said *city [of London] or in the suburbs*, or carry arms, by day or by night, except the va[]lets of the great lords of the land, carrying the swords of their masters in their presence, and the serjeants-at-arms of his lordship the King, of my lady the Queen, the Prince, and the other children of his lordship the King, and the officers of the City, and such persons as shall come in their company in aid of them, at their command, for saving and maintaining the said peace; under the penalty aforesaid, and the loss of their arms and armour." JOHN CARPENTER, LIBER ALBUS: THE WHITE BOOK OF THE CITY OF LONDON (Henry Thomas Riley ed., 1861); *see also id*. at 229, 555, 556, 558, 560, 580 (providing other examples denoting that going armed in densely populated public places was unlawful).

4

12.     As it pertains to express restrictions on carrying dangerous weapons into specific locations, English law was relatively silent. This is because English restrictions on going armed in "sensitive places" were worded quite broadly, and therefore there was no need for the law to carve out individual locations. Churches or places of worship are one notable exception. *See* 4 Hen 4, c. 29 (1403) ("no Man be armed nor bear defensible armor to Merchant Towns Churches nor Congregations in the same, nor in the Highways, in affray of the Peace or the King's Liege people").

13.     The extent in which this broad, English understanding of what constituted a "sensitive place"—that is where arms bearing could be restricted—traveled across the Atlantic is unknown.  Local enforcement records did not survive for historical posterity, and therefore it is impossible for historians or anyone to reconstruct exactly how often, when, and where armed carriage restrictions were enforced. Most instances of legal enforcement were done at the local level, and, as a result, the records of said enforcement have been lost to time. And those records of enforcement that have miraculously survived often require time consuming, archival research, not ad hoc, keyword digital searches. *See, e.g.,* Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L. REV. 2603 (2022).

14.     What the historical record does unequivocally inform is that armed carriage restrictions and the English common law against 'going armed' in urban and densely populated locations indeed made their way into the American Colonies and subsequent United States. *See* Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 CLEV. ST. L. REV. 1, 31-32 (2012). Additionally, historians can state with certainty that state and local governments were well within their authority to prohibit armed assemblies circa the late eighteenth century, no matter whether said assemblies

were deemed the militia or not. *See* Patrick J. Charles, *The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective*, 9 GEO. J.L. & PUB. POL'Y 323, 326,-27, 374-90 (2011); AN ACT TO PREVENT ROUTS, RIOTS, AND TUMULTUOUS ASSEMBLIES, AND THE EVIL CONSEQUENCES THEREOF, SEPTEMBER SESSION, CHAPTER VIII (Mass. 1786); AN ACT FOR THE MORE SPEEDY AND EFFECTUAL SUPPRESSION OF TUMULTS AND INSURRECTIONS IN THE COMMONWEALTH, SEPTEMBER SESSION, CHAPTER IX (Mass. 1787); AN ACT TO PREVENT ROUTS, RIOTS, AND TUMULTUOUS ASSEMBLIES (N.J. 1797); AN ACT TO PREVENT HUNTING WITH FIRE-ARMS IN THE CITY OF NEW-YORK, AND THE LIBERTIES THEREOF (NY 1763); AN ACT AGAINST RIOTS AND RIOTERS (Pa. 1705); *see also* WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES 126 (2d ed., 1829) (noting that the Second Amendment "ought not…in any government…be abused to the disturbance of the public peace," which included the assembling "of persons with arms, for an unlawful purpose"). This is because it had long been understood that any armed assemblage required the consent of government officials.[1]

15.     It was not until the mid-to-late nineteenth century that state and local governments within the United States began enacting express, location specific armed carriage restrictions.[2] Beginning with state laws, in 1869 Tennessee enacted a law restricted the carrying of dangerous weapons into "any election…fair, race course, or other public assembly of the people." PUBLIC STATUTES OF THE STATE OF TENNESSEE SINCE THE YEAR 1858, at 108 (James H. Shankland ed.,

---

[1] This understanding of the law goes all the way back to the 1328 Statute of Northampton. *See* 2 Edw. 3, c. 3 (1328) (Eng.); *see also* 3 CALENDAR OF CLOSE ROLLS, RICHARD II, 1385-1389, at 399-400 (May 16, 1388, Westminster) (H.C. Maxwell-Lyte ed., 1914); 1 CALENDAR OF CLOSE ROLLS, RICHARD II, 1377-1381, at 34 (December 1, 1377, Westminster) (H.C. Maxwell-Lyte ed., 1914).

[2] There are, of course, a few exceptions, such as two mid-seventeenth century Maryland laws that prohibited dangerous weapons within legislative assemblies. 1647 Md. Laws 216; 1650 Md. Laws 273. But other than these two Maryland laws, the historical record until the mid-to-late nineteenth century provides very little in the way of express "sensitive" locations where armed carriage could be prohibited.

1871), *available at* https://catalog.hathitrust.org/Record/010432413. Not long thereafter, in 1870,

Texas enacted a law restricting the carrying of dangerous weapons "into any church or religious

assembly, any school-room or other place where persons assembled for educational, literary, or

scientific purposes, or into a ball room, social party, or other social gathering, composed of

ladies and gentlemen, or to any election precinct on the day or days of any election, where any

portion of the people of this state are collected to vote at any election, or to any other place

where people may be assembled to muster or to perform any other public duty, or any other

public assembly…" 2 GEORGE W. PASCHAL, A DIGEST OF THE LAWS OF TEXAS: CONTAINING THE

LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST FROM 1864 TO 1872, at 1322

(1873), *available at* https://catalog.hathitrust.org/Record/010448003. That very same year,

Georgia enacted a law providing that "no person in said State of Georgia be permitted or allowed

to carry about his or her person any . . . pistol or revolver, or any kind of deadly weapon, to any

Court of justice, or any election ground, or precinct, or any place of public worship, or any other

public gathering in this State…" ACTS AND RESOLUTIONS OF THE GENERAL ASSEMBLY OF THE

STATE OF GEORGIA PASSED…AT THE SESSION OF 1870, at 421 (1870), *available at*

https://catalog.hathitrust.org/Record/100143502.

     16.     In 1874, Missouri followed suit by enacting a restriction on carrying "any kind of

fire-arms…or other deadly weapon" into "any place where people may be assembled for

educational, literary or social purposes, or to any election precinct on any election day, or into

any court-room during the sitting of court, or into any other public assemblage of persons meet

for other than militia drill or meetings…" ACTS OF THE…GENERAL ASSEMBLY OF THE STATE OF

MISSOURI 43 (1874), *available at* https://catalog.hathitrust.org/Record/000534559; *see also*

LAWS OF MISSOURI: GENERAL AND LOCAL LAWS PASSED AT THE REGULAR SESSION OF THE

TWENTY-EIGHTH GENERAL ASSEMBLY 50-51 (1875), *available at*

https://catalog.hathitrust.org/Record/000534559 (same). In 1883, Missouri amended the law to

increase the fine. LAWS OF MISSOURI PASSED AT THE SESSION OF THE THIRTY-SECOND GENERAL

ASSEMBLY 76 (1883), *available at* https://catalog.hathitrust.org/Record/000534559.

17.    In 1889, Arizona enacted a law providing that "[i]f any person shall go into any

church or religious assembly, any school room, or other place where persons are assembled for

amusement or for educational or scientific purposes, or into any circus, show or public exhibition

of any kind, or into a ball room, social party or social gathering, or to any election precinct on the

day or days of any election, where any portion of the people of this Territory are collected to

vote at any election, or to any other place where people may be assembled to minister or to

perform any other public duty, or to any other public assembly, and shall have or carry about his

person a pistol or other firearm . . . he shall be punished by a fine not less than fifty nor more

than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his

person." ACTS, RESOLUTIONS AND MEMORIALS OF THE FIFTEENTH LEGISLATIVE ASSEMBLY OF

THE TERRITORY OF ARIZONA 30-31 (1889), *available at*

https://catalog.hathitrust.org/Record/010083734. Then there was the state of Oklahoma, which in

1890 restricted the carrying of dangerous weapons "into any church or religious assembly, any

school room or other place where persons are assembled for public worship, for amusement, or

for educational or scientific purposes, or into any circus, show or public exhibition of any kind,

or into any ball room, or to any social party or social gathering, or to any election, or to any place

where intoxicating liquors are sold, or to any political convention, or to any other public

assembly…" STATUTES OF OKLAHOMA 1890, at 495-96 (Will T. Little, L.G. Pitman, & R.J.

Barker eds., 1891), *available at* https://catalog.hathitrust.org/Record/010447936.

18.     In addition to the above state laws, there was an abundance of mid-to-late nineteenth century ordinances restricting the carrying of dangerous weapons in so-called "sensitive places."[3] The reason that so many localities enacted these ordinances was the prevalence of the legal concept of "firearms localism"—this concept being a preference among state and local lawmakers to regulate firearms and deadly weapons more strictly at the local rather than the state level. *See* Joseph Blocher, *Firearms Localism*, 123 YALE L.J. 82, 112-16 (2013).[4] One example is that of Columbia, Missouri, which in 1890 passed an ordinance expressly restricting the carrying of dangerous weapons "into any church, or place where people have assembled for religious worship; or into any school room, or place where people are assembled for educational, literary or social purposes; or into any court room, during the sitting

---

[3] *See, e.g., An Ordinance*, July 9, 1891, *reprinted in* WACO DAILY NEWS (Tx), July 12, 1891, at 8 (**Exhibit 2**) ("If any person shall go into any church or religious assembly, any schoolroom, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or social party or social gathering or to any election precinct on the day or the days of any election, where any portion of the people of the State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any public duty, or to any other public assembly, and shall have or carry about [their] person a pistol or other fire-arm…[they] shall be punished by a fine…").

[4] Many mid-to-late nineteenth century state laws and local government charters weigh this out. *See, e.g.,* THE LAWS OF THE STATE OF KANSAS 118, 134 (1871), *available at* https://catalog.hathitrust.org/Record/100836175 (providing all Kansas cities "of the third class" wide latitude to "prohibit and punish the carrying of firearms or other deadly weapons, concealed or otherwise"); LAWS OF THE STATE OF INDIANA PASSED AT THE FIFTY-FIRST REGULAR SESSION OF THE GENERAL ASSEMBLY 201, 202 (1879), *available at* https://catalog.hathitrust.org/Record/008892461 (1879 law providing all Indiana towns the authority "to regulate or prohibit the use of firearms, fireworks, or other things tending to endanger persons and property"); ACTS OF TENNESSEE: EXTRAORDINARY SESSION 48, 55 (1885), *available at* https://catalog.hathitrust.org/Record/100666682 (providing the mayor and alderman of the city of Knoxville the authority to "prevent and suppress the sale of fire-arms and carrying of concealed weapons'); ACTS OF THE ONE HUNDRED AND TWELFTH LEGISLATURE OF THE STATE OF NEW JERSEY AND THE FORTY-FOURTH UNDER THE NEW CONSTITUTION 483, 501 (1888), *available at* https://catalog.hathitrust.org/Record/010134285 (1888 law providing all New Jersey towns the authority "to regulate or prohibit the use of firearms and the carrying of weapons of any kind"); THE COMPLETE CODES AND STATUTES OF THE STATE OF MONTANA IN FORCE JULY 1, 1895, at 424, 427 (1895), *available at* https://catalog.hathitrust.org/Record/010447759 (providing all Montana "city or town council[s]" the authority to "prevent and suppress the sale of firearms the carrying of concealed weapons"); *see also* Patrick J. Charles, *The Fugazi Second Amendment:* Bruen*'s Text, History, and Tradition Problem and How to Fix It*, 71 CLEV. ST. L. REV. 623, 662 n.256, 685 n.406 (2023) (providing more than two dozen examples of firearms localism within state laws and local government charters).

of court, or to any election precinct on any election day; or into any other public assemblage of persons met for any lawful purpose…" *Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc.*, May 22, 1890, *reprinted in* GENERAL ORDINANCES OF THE TOWN OF COLUMBIA, IN BOONE COUNTY, MISSOURI 34, 35 (Lewis M. Switzler ed., 1890), *available at* https://catalog.hathitrust.org/Record/001754262.[5] The Columbia ordinance mirrored Missouri state law, and was not the only Missouri locality to do so. The localities of Gainesville (1896),[6] Huntsville (1894),[7] Leonard (1891),[8] Marceline (1892),[9] Ridgeway (1893),[10] Rocheport (1895*),[11] and Warrensburg (1890),[12] all enacted similar ordinances.  Meanwhile, other Missouri

---

[5] *See* LAWS OF MISSOURI: GENERAL AND LOCAL LAWS PASSED AT THE REGULAR SESSION OF THE TWENTY-NINTH GENERAL ASSEMBLY 158, 166 (1877), *available at* https://catalog.hathitrust.org/Record/000534559 (1877 Missouri state law empowering city and town councils, such as Columbia, with the authority to "prohibit and punish the carrying of firearms and other deadly weapons, concealed or otherwise"). Like Columbia, Webb City, Missouri and Huntsville, Missouri enacted similar laws. *See Ordinance No. 577: An Ordinance Defining What Shall constitute Misdemeanors or Offenses Against the City of Webb City, and Providing Penalties Therefor*, May 15, 1905, *reprinted in* REVISED ORDINANCES OF THE CITY OF WEBB CITY, MISSOURI, 1905, at 99, 100 (1905), *available at* https://catalog.hathitrust.org/Record/008604358; *An Ordinance in Relation to Carrying Deadly Weapons*, July 17, 1894, *reprinted in* THE REVISED ORDINANCES OF THE CITY OF HUNTSVILLE, MISSOURI OF 1894, at 58-59 (1894), *available at* https://everytownlaw.org/documents/2022/12/huntsville-mo-1894.pdf/.

[6] *Ordinances, of the Incorporation of the Town of Gainesville*, May 26, 1896, *reprinted in* OZARK COUNTY NEWS (Gainesville, MO), June 4, 1896, at 1 (**Exhibit 3**) ("It shall be unlawful for any person…to go into any public gathering or place where people are assembled for any lawful purpose, with any kind of fire-arms…or other deadly weapon…").

[7] *An Ordinance in Relation to Carrying Deadly Weapons*, July 17, 1894, *reprinted in* THE REVISED ORDINANCES OF THE CITY OF HUNTSVILLE, MISSOURI OF 1894, at 58-59 (1894), *available at* https://everytownlaw.org/documents/2022/12/huntsville-mo-1894.pdf/.

[8] *Ordinance No. 23: Ordinance Concerning the Carrying of Deadly Weapons*, July 6, 1891, *reprinted in* SHELBY COUNTY HERALD (Shelbyville, MO), July 29, 1891, at 4 (**Exhibit 4**).

[9] *Ordinance No. 9*, September 12, 1892, *reprinted in* MARCELINE JOURNAL-MIRROR (MO), October 28, 1892, at 8 (**Exhibit 5**).

[10] *Town Ordinance No, XXVIII: An Ordinance in Relation to Misdemeanors*, April 3, 1893, *reprinted in* RIDGEWAY JOURNAL (MO), April 6, 1893, at 4 (**Exhibit 6**).

[11] *An Ordinance: Misdemeanors*, undated, *reprinted in* ROCHEPORT COMMERCIAL (MO), September 20, 1895, at 8 (**Exhibit 7**) ("If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any court, or into any public assemblage of persons met for a lawful

localities, including Collins (1887),[13] Craig (1880*),[14] Cuba (1881),[15] Granby (1873)[16] just to name a few, enacted ordinances restricting the carrying of dangerous weapons within their "corporate" or "incorporate" limits, whether such carrying was open, concealed, or both. This meant that the carrying of dangerous weapons within these localities' commercial and public epicenters was legally deemed off limits.

19.    Localities throughout the state of Kansas enacted similar ordinances. Indeed, in the case of Stockton, Kansas, persons were prohibited from carrying dangerous weapons "into any church or place where the people have assembled for public worship, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons …or shall go upon the public streets or public places of the city…"

*Ordinance No. 76: An Ordinance Prohibiting Deadly Weapons*, July 1, 1887, *reprinted in*

---

purpose, having upon or about his person any kind of fire arms…or other deadly weapon…shall be deemed guilty of a misdemeanor…").

[12] *Concealed or Deadly Weapons*, June 5, 1890, *reprinted in* JOHNSON COUNTY STAR (Warrensburg, MO), June 7, 1890, at 4 (**Exhibit 8**).

[13] *Town Ordinances: Adopted by the Board of Trustees of the Town of Collins, Mo.: Ordinance No. 4*, May 2, 1887, *reprinted in* OSCEOLA ADVANCE (Osceola, MO), July 7, 1887, at 4 (**Exhibit 9**) ("Any person who shall carry any concealed weapon or any revolver, pistol, knife or dirk which may not be concealed within the corporate limits of the town of Collins, shall…be fined…except however, that upon good cause shown, the board may grant a permit to any citizen of good reputation to carry weapons for self defense.").

[14] *Ordinances of Craig, Mo.: Ordinance No. 8—Carrying Concealed Weapons*, undated, *reprinted in* CRAIG WEEKLY GAZETTE (MO), October 13, 1880, at 4 (**Exhibit 10**) ("Any person who shall within the corporate limits of said city of Craig, carry of have upon his person, any concealed weapon or weapons, shall be adjudged guilty of a misdemeanor…").

[15] *Revised Ordinances: Ordained and Established May 24, 1881: Chapter VIII: Misdemeanors*, May 24, 1882, *reprinted in* CRAWFORD MIRROR (Steelville, MO), July 27, 1882, at 1 (**Exhibit 11**) ("If any person be found carrying concealed about his person in the corporate limits, any kind of fire arms…or other deadly weapon, within the limits of said town he shall be fined....").

[16] *Ordinances of the Town of Granby: No. 8: An Ordinance Concerning the Carrying of Weapons*, October 30, 1873, *reprinted in* GRANBY MINER (Granby, MO), November 1, 1873, at 2 (**Exhibit 12**) ("That any person within the corporate limits of the town of Granby who shall be found carrying, either openly or concealed, any pistol…or any other offensive weapon…shall be fined…").

STOCKTON REVIEW AND ROOKS COUNTY RECORD (KS), July 1, 1887, at 1 (**Exhibit 13**).

However, most Kansas localities that enacted restrictions on the carrying of dangerous weapons

in "sensitive places" did so by making their entire "corporate" or "incorporate" area off limits,

whether such carrying was open, concealed, or both. Abilene (1870),[17] Arkansas City (1885),[18]

Beloit (1872),[19] Caldwell (1885),[20] Coolidge (1886),[21] Elk City (1898),[22] Harper (1887*),[23]

---

[17] *An Ordinance Relating to the Carrying of Fire Arms and Other Deadly Weapons*, to take effect on May 20, 1870, *reprinted in* ABILENE WEEKLY CHRONICLE (KS), May 12, 1870, at 1 (**Exhibit 14**) ("That any person who shall carry, within the limits of the town of Abilene, or commons, a pistol, revolver….or other dangerous weapon…either openly or concealed, except to bring the same and forthwith to deposit it or them at their house, boarding house, store room or residence, shall be fined…").

[18] *Ordinance No. 1*, May 11, 1885, *reprinted in* ARKANSAS CITY WEEKLY TRAVELER (KS), May 20, 1885, at 4 (**Exhibit 15**) ("That any person carrying any deadly or dangerous weapons, such as loaded fire-arms…or any other weapons which when used are liable to produce death or great bodily harm, unconcealed, within the corporate limits of the city" shall pay a fine of $1 to $10, and the carrying of said weapons "concealed" will pay a fine of $5 to $25).

[19] *An Ordinance in Relation to the Carrying of Fire-Arms or Other Weapons*, September 9, 1872, *reprinted in* BELOIT GAZETTE (KS), September 19, 1872, at 4 (**Exhibit 16**) ("That any person who shall be found within the corporate limits of this city with any revolver, pistol…or any other dangerous or deadly weapon concealed or otherwise shall be deemed guilty of a misdemeanor…").

[20] *Revised Ordinances of the City of Caldwell*, undated, *reprinted in* CALDWELL ADVANCE (KS), May 4, 1885, at 2 (**Exhibit 17**) ("Any person carrying any deadly or dangerous weapon, such as firearms…or any other weapon which when used is liable to produce death or great bodily harm, unconcealed, within the corporate limits of the city" shall pay a fine of $10 to $100, and carrying of said weapons "concealed" will pay a fine of $15 to $100).

[21] *An Ordinance Concerning Offenses in the Nature of Misdemeanors*, April 26, 1886, *reprinted in* BORDER RUFFIAN (Coolidge, KS), May 1, 1886, at 1 (**Exhibit 18**) ("It shall be unlawful for any person or persons to display or make any improper use of any deadly weapon withing the corporate limits of this city…Any person or persons, other than the duly appointed and commissioned officers of this city, or officers of this county or State, carrying concealed deadly weapons…within the corporate limits of the city, shall, upon conviction, be deemed guilty of a misdemeanor.").

[22] *Ordinance No. 165*, March 7, 1898, *reprinted in* ELK CITY ENTERPRISE (KS), March 11, 1898, at 2 (**Exhibit 19**) ("That any person within the corporate limits of said city of Elk City who…shall carry or have on his or her person in a concealed manner, or otherwise any pistol…or any deadly weapon…shall be deemed guilty of a misdemeanor…").

[23] *Ordinance No. 180*, undated, *reprinted in* HARPER DAILY SENTINEL (KS), August 23, 1887, at 2 (**Exhibit 20**) ("That is shall be unlawful for any person to carry any deadly or dangerous weapon, such as fire arms…within the incorporate limits of said city.").

Howard (1889),[24] Kendall (1887),[25] Meade Center1885),[26] Mount Hope (1887),[27] and Scandia (1893)[28] are just a few examples in this regard.

20.     Ordinances restricting the carrying of dangerous weapons in localities' entire "corporate" or "incorporate" areas were not limited to the states of Missouri and Kansas. Much like armed carriage licensing laws, Charles, *The Fugazi Second Amendment*, *supra*, at 569-65, ordinances restricting the carrying of dangerous weapons in "corporate" or "incorporate" areas proliferated across the United States during the mid-to-late nineteenth century, *id*. at 709-10. For instance, Ashville, North Carolina enacted an ordinance prohibiting the carrying of "pistols, bowie-knives, sling-shots, billeys, [and] other deadly weapons (officers excepted) within the corporate limits…" *Ordinances of the Town of Asheville*, in force as of June 1, 1882, *reprinted in* ASHEVILLE WEEKLY CITIZEN (NC), June 3, 1882, at 1 (**Exhibit 21**). Similarly, in 1874, Lake Charles, Louisiana passed an ordinance prohibiting the carrying of any "weapon or weapons…within the corporate limits…such as Bowie knives, pistols, revolvers, dirks…or any

---

[24] *Ordinance No. 72: An Ordinance to Prevent Carrying Concealed Weapons and the Discharge of Firearms*, May 16, 1889, *reprinted in* CITIZEN (Howard, KS), May 22, 1889, at 3 (**Exhibit 22**).

[25] *Ordinances: Of the City of Kendall, in the County of Hamilton, State of Kansas*, undated, *reprinted in* KENDALL FREE PRESS (KS), March 23, 1887, at 1 (**Exhibit 23**) ("It shall be unlawful for any person or persons to display or make any improper use of any deadly weapon withing the corporate limits of this city…Any person or persons, other than the duly appointed and commissioned officers of this city, or officers of this county or State, carrying concealed deadly weapons…within the corporate limits of the city, shall, upon conviction, be deemed guilty of a misdemeanor.").

[26] *City Ordinances*, November 23, 1885, *reprinted in* MEADE GLOBE (Meade Center, KS), November 28, 1885, at 2 (**Exhibit 24**) (prohibiting all persons "not authorized by the laws of the United States or the state of Kansas" from carrying a "pistol…or other deadly weapons" within the "incorporate limits").

[27] *Ordinance No. Twelve: Peace, Good Government and Welfare*, May 4, 1887, *reprinted in* MOUNT HOPE CLARION (KS), May 5, 1887, at 3 (**Exhibit 25**) (prohibiting all except officers and travelers from carrying "firearms…or other deadly weapons, concealed, within the corporate limits," and "any person under the age of twenty one years of age" from "carrying any deadly weapon, concealed or otherwise").

[28] *Ordinance No. 79*, December 27, 1893, *reprinted in* SCANDIA JOURNAL (KS), January 5, 1894, at 8 (**Exhibit 26**) (prohibiting the concealed carry of any "pistol…or other deadly weapon" within the "corporate limits" except for persons "engaged in a lawful occupation and of good moral character" who are "granted a permit to carry such concealed weapons").

other dangerous weapon…" *The Town Council*, June 20, 1874, *reprinted in* LAKE CHARLES

ECHO (Lake Charles, LA), July 18, 1894, at 4 (**Exhibit 27**). The same was true for the

Pennsylvania capital city of Harrisburg, which in 1873 enacted an ordinance prohibiting the

carrying of "any pistol, dirk-knife, slung-shot or deadly weapon, within the city limits…except

police officers…" LOUIS RICHARDS & JAMES M. LAMBERTON, A DIGEST OF LAWS AND

ORDINANCES FOR THE GOVERNMENT OF THE CITY OF HARRISBURG, PENNSYLVANIA IN FORCE

AUGUST 1, A.D. 1906, at 557-58 (1906), *available at*

https://catalog.hathitrust.org/Record/100565572.

     21.     There are indeed other local ordinance examples abound.[29] Historically speaking,

however, it is impossible to state with specificity just how many localities maintained "sensitive

---

[29] *See, e.g., Misdemeanors: Chapter 12, By Laws and Ordinances*, undated, *reprinted in* LAWRENCE
DEMOCRAT (Lawrenceburg, TN), July 26, 1895, at 4 (**Exhibit 28**) ("That is shall not be lawful for any
person to carry about their person any pistol…or other deadly weapon within this Corporation…"); *An
Ordinance Prohibiting the Carrying of Concealed Weapon and Fixing the Punishment Therefor*, January
23, 1895, *reprinted in* PERRY DAILY TIMES (OK), February 2, 1895, at 2 (**Exhibit 29**) (prohibiting the
concealed carry of dangerous weapons across the city of Perry, Oklahoma, and all carrying of dangerous
weapons within the "corporate limits"); THE REVISED ORDINANCES OF PROVO CITY, UTAH 96 (1893),
*available at* https://catalog.hathitrust.org/Record/009037720 ("Every person who shall wear, or carry
upon his person any pistol, or other fire arm, slungshot, false-knuckles, bowieknife, dagger or any other
dangerous or deadly weapon within the city limits of this city is guilty of an offence, and upon conviction
thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the
city jail not exceeding twenty-five days, or to both fine and imprisonment."); *Ordinance No. 2133*, July
23, 1889, *reprinted in* OMAHA WORLD-HERALD (NE), August 4, 1889, at 12 (**Exhibit 30**) ("It shall be
unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver,
colt, billy, slug-shot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie
knife, or any other dangerous or deadly weapon within the corporate limits of Omaha."); *Ordinance No.
11*, December 4, 1882, *reprinted in* BLACK HILLS WEEKLY JOURNAL (SD), December 8, 1882, at 1
(**Exhibit 31**) ("That is shall be, and it is hereby declared to be unlawful for any person to carry, openly or
concealed, any musket, rifle, shot gun, pistol…or any other dangerous or deadly weapon within the
corporate limits of the town of Rapid City, Dakota territory…me[re]…transportation from one place to
another" excluded); *Ordinance No. 44*, May 8, 1883, *reprinted in* ARIZONA DAILY STAR (Tucson, AZ),
May 19, 1883, at 3 (**Exhibit 32**) ("If any person within the corporate limits if the city of Tucson carry
concealed upon his person any gun, pistol, bowie-knife, dagger, or other deadly weapon, he shall be
deemed guilty of…a misdemeanor"); *An Ordinance (No. 18): Regulating the Keeping and Bearing of
Deadly Weapons*, August 19, 1873, *reprinted in* GALVESTON DAILY NEWS (TX), August 28, 1873, at 4
(**Exhibit 33**) ("That any person carrying on or about his person, saddle or vehicle, within the corporate
limits of the city of Galveston, any pistol [or other dangerous weapons]…for the purposes of offense or

places" ordinances by the close of the nineteenth century. Like most local government records up to the close of the nineteenth century, many local ordinances have been lost to time. Indeed, often localities published their ordinances in local newspapers, and, in fact, it is from local newspapers that I was able to locate many "sensitive places" ordinances. But as any professional historian or archivist can attest, the records of local ordinances that have survived for historical posterity are only a fragment of the whole.

22.     Despite being unable to fully reconstruct the exact number "sensitive places" laws, what is known upon examining all the state and local "sensitive places" laws from a macro level is that come the mid-to-late nineteenth century state and local governments maintained the authority to restrict the carrying of dangerous weapons in a variety of "sensitive places" where people were known to congregate. Such "sensitive places" categories included 1) churches and places of worship; 2) places where large public assemblies generally took place, *i.e.*, parks,[30] town squares, and the like; 3) polling places and other buildings where political activity generally took place; 4) schools and institutions of higher learning; 5) places where events of amusement took place, *i.e.*, places where people congregate for large planned events; and 6) bars, clubs, social venues, or anywhere in which alcohol or psychoactive or mood altering drugs were purchased or consumed.

---

defense….unless he has reasonable grounds for fearing an unlawful attack on his person, and that such attack shall be immediate and pressing" will be a pay between $25 and $100); *An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons*, undated, *reprinted in* NEBRASKA CITY NEWS (NE), July 7, 1869, at 3 (**Exhibit 34**) ("That it shall be, and it is hereby declared to be unlawful for any person to carry openly or concealed, any musket, rifle, shot gun, pistol…or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Nebraska…mere…transportation from one place to another" excluded).

[30] For some "park" examples, see Charles, *The Fugazi Second Amendment*, *supra*, at 710-12 and accompanying notes.

15

23.     What historically buttresses that each of these categories were generally understood to be "sensitive places" is the fact that there is no historical evidence that informs otherwise. As far as I am aware, not one nineteenth century court of law found any of these "sensitive places" categories to be unconstitutional.[31] The same is true for nineteenth century legal commentary—not one said commentary calls these "sensitive places" categories into constitutional question. This is rather important because *Bruen* denotes that when it comes to the "sensitive places" doctrine a *lack* of historical evidence disputing their lawfulness *presumes* their constitutionality. 142 S. Ct. at 2133.

**The History of Restrictions on Liquor and Arms Bearing**

24.     All the while armed carriage licensing laws and "sensitive places" laws were spreading across the country, so too were laws regulating liquor and arms bearing. *See infra* pp. 18-22. It is difficult to state with specificity when the first law restricting arms bearing and liquor came into existence in the American Colonies. *See, e.g., General Court for Elections, Boston*, May 28, 1679, *reprinted in* 2 MILITARY OBLIGATION: THE AMERICAN TRADITION: PART 6. MASSACHUSETTS ENACTMENTS 125 (1947), *available at* https://catalog.hathitrust.org/Record/100721030 (prohibiting the bringing to any militia muster or

---

[31] In fact, the opposite is true. *See* State v. Shelby, 90 Mo. 302, 468–69 (Mo. 1886); State v. Wilforth, 74 Mo. 528, 530–31 (Mo. 1881); Owens v. State, 3 Tex. App. 404 (Tex. App. 1878), *reprinted in* CASES ARGUED AND ADJUDGED IN THE COURT OF APPEALS OF THE STATE OF TEXAS 404–8 (Vol. 3, 1878); Hill v. State, 53 Ga. 472, 473–75 (Ga. 1874); English v. State, 35 Tex. 473, 473–74, 476 (Tex. 1873); Andrews v. State, 50 Tenn. 165, 168 (Tenn. 1871). *See also The Supreme Court: On Carrying Concealed Weapons*, STATE JOURNAL (Jefferson City, MO), April 12, 1878, at 2 (**Exhibit 35**) (copy of 1878 Missouri Supreme Court decision *State v. Reando*, upholding a constitutional challenge to the state's "sensitive places" law). The case cannot be found in the Missouri Supreme Court Historical Database but was briefly reported in a contemporaneous issue of *The Central Law Journal*. *See Abstract of Decisions of the Supreme Court of Missouri: October Term, 1877*, 6 CENTRAL L. J. 16, 16 (1878) ("The act of the legislature prohibiting the conveying of fire-arms into courts, churches, etc….is constitutional. It is a police regulation not in conflict with the provisions of the organic law…*State v. Reando*.").

training "any wine, strong liquor, cider, or any other inebriating" drinks). What is known is that

by the mid-eighteenth century, many colonial lawmakers viewed liquor and arms bearing as a

potentially dangerous combination. For instance, in 1746, New Jersey made it unlawful "to sell

any strong Liquor" to any militiaman during the "Days or Times that they are obliged to appear

in Arms at the Place of Mustering or Training, or within a Mile thereof, until after they are

dismissed for that day"—militiamen on leave from their commanding officers excluded. *An Act

for Better Settling and Regulating the Militia of the Colony of New-Jersey, for the Repelling of

Invasion, and Suppressing Insurrections and Rebellions*, May 8, 1746, *reprinted in* ACTS OF THE

GENERAL ASSEMBLY OF THE PROVINCE OF -JERSEY 139, 146 (1776), *available at*

https://catalog.hathitrust.org/Record/010448351. Similarly, in 1756, Delaware made it unlawful

to "expose to sale at or Bring on any Pretence whatsoever any strong Liquor" to any militia

muster or meeting. *An Act for the Establishing a Militia in this Government*, March 24, 1756,

*reprinted in* 2 MILITARY OBLIGATION: THE AMERICAN TRADITION: PART 3. DELAWARE ENACTMENTS

10, 12 (1947), *available at* https://catalog.hathitrust.org/Record/100721030; s*ee also An Act for

Regulating the Militia of the Province of Maryland*, May 22, 1756, *reprinted in* 2 MILITARY

OBLIGATION: THE AMERICAN TRADITION: PART 5. MARYLAND ENACTMENTS 83, 93 (1947), *available

at* https://catalog.hathitrust.org/Record/100721030 (prohibiting the selling, disposing, or vending

of "Strong Liquor" at "any place of training or at any other Place within Five Miles of any Place

of training").

     25.     After the ratification of the Constitution, many lawmakers continued to view

liquor and arms bearing as a potentially dangerous combination. *See, e.g., An Act for the

Regulation of the Militia of New-Jersey*, June 13, 1799, *reprinted in* LAWS OF THE STATE OF NEW

JERSEY 436, 444 (William Patterson ed., 1800), *available at*

https://catalog.hathitrust.org/Record/010448353 ("Any person, who shall bring any kind of spiritous liquors to the place of exercise, shall forfeit such liquors…"); *New Militia Law: An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania*, April 11, 1793, *reprinted in* INDEPENDENT GAZETTEER (Philadelphia, PA), April 20, 1793, at 1, 4 ("No company or regiment shall meet at a tavern on any of the days of exercise, nor shall march to any tavern before they are discharged, and any person who shall bring any kind of spiritous liquors to such place of training, shall forfeit such liquors so brought…");  AN ACT FOR THE BETTER REGULATION OF THE MILITIA, OF THE CITY OF BALTIMORE, PASSED BY THE LEGISLATURE OF MARYLAND, DECEMBER SESSION, 1817, at 15 (1818), *available at* https://archive.org/details/gpl_1337206/page/n9/mode/2up (law prohibiting militia members from "appear[ing] drunk"). Of course, not every state enacted liquor-related arms bearing restrictions, nor did every locality effectively enforce them. But this is in part why the state militias fell into such disrepute by the mid-nineteenth century. *See, e.g.,* Lena London, *The Militia Fine 1830-1860*, 15 MILITARY AFFAIRS 133, 136 (1951) ("The excessive consumption of liquor at militia musters resulted in more than just inebriation. Disorderly conduct and riots were often the outcome."); PATRICK J. CHARLES, ARMED IN AMERICA: A HISTORY OF GUN RIGHTS FROM COLONIAL MILITIAS TO CONCEALED CARRY 79, 130 (2018) (containing historical images of the militia drinking alcohol during musters).

26.      As far non-militia based restrictions on liquor and arms bearing, the territory of New Mexico appears to have been the forefront. Therein, in 1852, it was made unlawful for "any person" to carry "fire arms or other deadly weapons" into any "ball where Liquors are sold…" LAWS OF THE TERRITORY OF NEW MEXICO, PASSED BY THE SECOND LEGISLATIVE ASSEMBLY IN THE CITY OF SANTA FE 69 (1853), *available at* https://catalog.hathitrust.org/Record/010476920. However, it was not until after the Civil War—after lawmakers and public officials began to

18

increasingly witness the negative consequences of alcohol on war veterans[32]—that broad, general restrictions on liquor and arms bearing began to spread across the country. On the state level, Kansas (1867),[33] Mississippi (1878),[34] Missouri (1879),[35] Oklahoma (1890),[36] and Wisconsin (1883)[37] all enacted liquor-related arms bearing restrictions.

27.     And given the prevalence of firearms localism during the mid-to-late nineteenth century, *see supra* pp. 9-12, so too did many localities. Much like "sensitive places" and armed carriage licensing laws during this period, it is impossible to historically pinpoint just how many localities enacted ordinances governing liquor and arms bearing. Many localities made intoxication and unlawful arms bearing separate offenses, each with their own penalty or fine. Other localities, however, combined the two offenses into one. Such was the case for Grand Junction, Colorado circa 1899, which made it unlawful to not only "carry any…weapon or weapons when drunk or in a state of intoxication," and to "sell, barter, loan or deliver any such weapon or weapons to any drunk or intoxicated person." *Ordinance No. 83: Article VIII: Offensives Affecting the Public Safety*, June 30, 1899, *reprinted in* GRAND JUNCTION NEWS (CO),

---

[32] *"Half the Time Unfit for Duty": Alcoholism in the Civil War*, NATIONAL MUSEUM OF CIVIL WAR MEDICINE, September 2, 2021, *available at* https://www.civilwarmed.org/alcoholism/.

[33] *An Act to Prevent the Carrying of Deadly Weapons*, February 23, 1867, *reprinted in* LAWS OF THE STATE OF KANSAS 25 (1867), *available at* https://catalog.hathitrust.org/Record/100836175 (prohibiting any "person under the influence of intoxicating drink" from carrying dangerous weapons).

[34] *Laws of the State of Mississippi: An Act to Prevent the Carrying of Concealed Weapons, and For Other Purposes*, February 28, 1878, *reprinted in* CLARION-LEDGER (Jackson, MS), March 13, 1878, at 3 (**Exhibit 36**) ("That it shall not be lawful for any person to sell to…any person intoxicated, knowing him to be…in a state of intoxication, any" dangerous weapons).

[35] REVISED STATUTES OF THE STATE OF MISSOURI, 1879 at 224 (1879), *available at* https://catalog.hathitrust.org/Record/002030306 (law prohibiting any person from carrying any dangerous weapons "upon his person when intoxicated or under the influence of intoxicating drinks").

[36] STATUTES OF OKLAHOMA 1890, *supra*, at 496 (prohibiting the carrying of dangerous weapons "to any place where intoxicating liquors are sold").

[37] *An Act to Prohibit the Use and Sale of Pistols and Revolvers*, April 7, 1883, *reprinted in* LAWS OF WISCONSIN 290 (1883), *available at* https://catalog.hathitrust.org/Record/005877100 ("It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver.").

July 8, 1899, at 4, 7 (**Exhibit 37**). In 1895, Rocheport, Missouri enacted an ordinance, prohibiting the carrying of "any…weapon upon or about [their] person when intoxicated or under the influence of intoxicating drinks…" *And Ordinance: Misdemeanors*, undated, *reprinted in* ROCHEPORT COMMERCIAL (MO), September 20, 1895, at 8 (**Exhibit 7**). Meanwhile, in 1891, Lyons, Kansas enacted an ordinance prohibiting the carrying of any "pistol, bowie knife, dirk or other deadly weapon" with the city limits by anyone "not engaged in any legitimate business" or "under the influence of intoxicating drink…" *Ordinance No. 179*, September 7, 1891, *reprinted in* LYONS REPUBLICAN (KS), September 10, 1891, at 4 (**Exhibit 38**). There are indeed other examples to point to,[38] but none as broad as the prohibition adopted by two of the country's three most populous cities—New York and Brooklyn respectively. Both enacted prohibitions on the selling, loaning, or giving of any dangerous weapon to a person that posed "any danger to [the] life" of others, which naturally would have precluded the selling, loaning, or giving of any dangerous weapons to any intoxicated persons. *See* METROPOLITAN BOARD OF HEALTH: CODE OF HEALTH ORDINANCES, AND RULES AND SANITARY REGULATIONS 52 (1866), *available at* https://catalog.hathitrust.org/Record/008905639; *Sanitary Code*, July 15, 1873, *reprinted in* BROOKLYN UNION (NY), August 21, 1873, at 1 (**Exhibit 39**).

---

[38] *Town Ordinance No. 21*, August 7, 1894, *reprinted in* K COUNTY DEMOCRAT (Blackwell, OK), August 23, 1894, at 8 (**Exhibit 40**) (prohibiting the general carrying of dangerous weapons within the "corporate limits," but also prohibiting all "public officers" from carrying if "under the influence of intoxicating drinks"); *An Ordinance—To Prohibit Intoxication Breach of the Peace, Carrying of Deadly Weapons…and to Repeal Certain Ordinances in Said City*, December 22, 1887, *reprinted in* WALLACE COUNTY REGISTER (KS), December 24, 1887, at 7 (**Exhibit 41**) ("Any person who shall, while intoxicated be found carrying on his person, a pistol…or other deadly weapon, shall upon conviction be fined in a sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months."); *Ordinance No. 39*, January 4, 1886, *reprinted in* DADE COUNTY ADVOCATE (Greenfield, MO), January 21, 1886, at 4 (**Exhibit 42**) (prohibiting the carrying of dangerous weapons by those "intoxicated, or under the influence of intoxicating drinks").

28.     As far as I am aware, not one nineteenth century legal commentator or nineteenth century court of law found any liquor-related arms bearing restriction unconstitutional.[39]

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on ___12 July 2023___          _Pat J. Chm_

                                                    PATRICK J. CHARLES

---

[39] In fact, the opposite is true. *See Shelby*, 90 Mo. at 468–69; *see also* Tipler v. State, 57 M. 365 (1880), *reprinted in* 57 REPORTS OF CASES IN THE SUPREME COURT FOR THE STATE OF MISSISSIPPI (1880) (noting that the reasonableness exception to the state's armed carriage law could not apply to instances of "idle threats" or "the offspring of intoxication"); *Concealed Weapons: Judge Brannon's Decision on This Subject*, WHEELING REGISTER (WV), October 15, 1883, at 1 (**Exhibit 43**) (noting that the principal purpose of most armed carriage restrictions are to prevent an "armed riot or affray," particularly during "dangerous moments of anger or intoxication").

21

# EXHIBIT 1

## PATRICK J. CHARLES
www.patrickjcharles.com

---

**EDUCATION**

---

**Queen Mary-University of London School of Law**, LLM Legal Theory and History with Distinction, Dec 2014.
Legal Theory and History Full Scholarship Recipient
Peer Review Editor, Queen Mary Law Journal

**Cleveland-Marshall School of Law**, Juris Doctor, May 2009.
2008 Judge John R. Brown Award for Legal Writing ($10,000 award given annually to best student article, note, comment or paper in the United States)

**George Washington University**, B.A. History with Honors, International Affairs Conflict & Security, International Affairs European Affairs, Jun 2005.

---

**EXPERIENCE**

---

| | | | |
|---|---|---|---|
| **Air Force Historical Research Agency, USAF**, Maxwell AFB, AL | *Lead Research Team Archivist* | 04/22 – Pres |
| **U.S. Special Operations Command, Legislative Affairs, USAF**, Washington, DC | *Legislative Liaison* | 01/21 – 4/22 |
| **U.S. Senate, Office of U.S. Senator Martin Heinrich**, Washington, DC | *Legislative Fellow* | 01/20 – 01/21 |
| **Dept of State, Office of U.S. Foreign Assistance Resources**, Washington, DC | *Legislative Analyst* | 07/19 - 01/20 |
| **U.S. Special Operations Command, USAF**, MacDill AFB, FL | *Senior Historian* | 07/16 - 07/19 |
| **Journal of Immigration, Asylum, and Nationality Law**, London, UK | *Peer Review Editor* | 09/15 - 09/18 |
| **24th Special Operations Wing, USAF**, Hurlburt Field, FL | *Historian* | 08-14 - 07/16 |
| **352nd Special Operations Group, USAF**, Mildenhall, UK | *Historian* | 12/10 - 08/14 |
| **Immigration Reform Law Institute**, Washington, DC | *Legal Analyst/Legal Historian* | 5/09 - 12/10 |
| **United States Marine Corps**, Shanghai, China | *Sergeant/Assistant Detachment Commander* | 8/97 - 8/02 |

**FELLOWSHIPS AND GRANTS**

---

United States Air Force, Air Force Legislative Fellows Program, July 2019-April 2022.

Eisenhower Foundation Research Travel Grant 2019, Dwight D. Eisenhower Presidential Library, Abilene, KS.

Carl Albert Congressional Research Center Visiting Scholars Grant 2018, University of Oklahoma, Norman, OK.

Bordin-Gillette Research Fellowship 2018, University of Michigan Bentley Historical Library, Ann Arbor, MI.

Clark-Yudkin Research Fellowship 2013-14, United States Air Force Academy Library, Colorado Springs, CO.

**BOOK PUBLICATIONS AND BOOK CHAPTERS**

---

*Vote Gun: How Gun Rights Became Politicized in the United States* (Columbia University Press, forthcoming 2023).

"The 'Reasonable Regulation' Right to Arms: The Gun Rights Second Amendment Before the Standard Model," *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment*, Jennifer Tucker, Barton C. Hacker, and Margaret Vining eds. (Smithsonian Institution Press, 2019).

*Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (Prometheus Books, 2019) (paperback edition with new foreword).

*Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (Prometheus Books, 2018).

*United States Special Operations History, 1987-2017* (7th edition, USSOCOM History and Research Office, 2017) (contributor).

*Historicism, Originalism and the Constitution: The Use and Abuse of History in American Jurisprudence* (McFarland, 2014).

*The Second Amendment: The Intent and its Interpretation by the States and the Supreme Court* (McFarland, 2009).

*Irreconcilable Grievances: The Events that Shaped the Declaration of Independence* (Heritage Books, 2008).

## ARTICLES AND OTHER PRINT PUBLICATIONS

"The Fugazi Second Amendment: *Bruen*'s Test, History, and Tradition Problem and How to Fix It," 71 *Cleveland State Law Review* 623 (2023).

"Racist History and the Second Amendment: A Critical Commentary," 43 *Cardozo Law Review* 1343 (2022).

"The Invention of the Right to 'Peaceable Carry' in Modern Second Amendment Scholarship," 2021 *Illinois Law Review Online* 195 (2021).

"The Faces of the Second Amendment Outside the Home, Take Three: Critiquing the Circuit Courts Use of History-in-Law," 67 *Cleveland State Law Review* 197 (2019).

"The Second Amendment and the Basic Right to Transport Firearms for Lawful Purposes, 13 *Charleston Law Review* 125 (2018) (invited).

"The Forgotten Emblems of the World War II Air Commandos," 6 *Air Commando Journal*, Issue 3, 2018: 42-47.

"The Difficulties in Changing an Air Force Emblem," 6 *Air Commando Journal*, Issue 3, 2018: 48.

"Dissecting the Origins of Air-Centric Special Operations Theory," 81 *Journal of Military History*, Issue 3, July 2017: 803-28.

 "The Call to Embrace Immigration Federalism in the United States," 30 *Journal of Immigration, Asylum, and Nationality Law* 353 (2016).

"The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why it Matters," 64 *Cleveland State Law Review* 373 (2016) (lead article).

"The Sudden Embrace of Executive Discretion in Immigration Law," 55 *Washburn Law Journal* 59 (2015) (invited).

"The Second Amendment in the Twenty-First Century: What Hath *Heller* Wrought?" 23 *William & Mary Bill of Rights Journal* 1143 (2015).

"The 'Originalism is Not History' Disclaimer: A Historian's Rebuttal," 63 *Cleveland State Law Review Et Cetera* 1 (2015).

2

**JA0224**

"Finding History: How Captain Cortez Enloe's Journal Sheds New Light on the History of the World War II Air Commandos and Operation THURSDAY," 3 *Air Commando Journal*, Issue 4, 2015: 11-17.

"Weighing the Constitutionality of State Immigration Verification Laws in the Wake of *Arizona v. United States*," 27 *Journal of Civil Rights & Economic Development* 441 (2014) (invited) (lead article).

"History in Law, Mythmaking, and Constitutional Legitimacy," 63 *Cleveland State Law Review* 23 (2014) (invited).

"The Statute of Northampton by the Late Eighteenth Century: Clarifying the Intellectual Legacy," 40 *Fordham Urban Law Journal City Square* 10 (2013).

"The Second Amendment and Militia Rights: Distinguishing Standard Model Legal Theory from the Historical Record," 40 *Fordham Urban Law Journal City Square* 1 (2013).

"Historical Reflections on the Beginnings of an Air Commando Theory," 2 *Air Commando Journal*, Issue 3, 2013: 9-13.

"The Second Amendment in Historiographical Crisis: Why the Supreme Court Must Reevaluate the Embarrassing 'Standard Model' Moving Forward," 39 *Fordham Urban Law Journal* 1727 (2012) (invited).

"Saving the Press Clause from Ruin: The Customary Origins of a 'Free Press' as Interface to the Present and Future," 2012 *Utah Law Review* 1691 (2012).

"Recentering Foreign Affairs Preemption in *Arizona v. United States*," 60 *Cleveland State Law Review* 133 (2012).

"The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review," 60 *Cleveland State Law Review* 1 (2012) (lead article).

"Decoding the Fourteenth Amendment's Citizenship Clause: Unlawful Immigrants, Allegiance, Personal Subjection, and the Law," 51 *Washburn Law Journal* 211 (2012) (invited and lead article).

"Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Reply to Lawrence Rosenthal and Joyce Lee Malcolm," 105 *Northwestern University Law Review* 1821 (2011) (selected for print from Colloquy).

"Restoring 'Life, Liberty, and the Pursuit of Happiness' in Our Constitutional Jurisprudence: An Exercise in Legal History," 20 *William & Mary Bill of Rights Journal* 457 (2011).

"The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective," 9 *Georgetown Journal of Law & Public Policy* 323 (2011).

"The Second Amendment Standard of Review After *McDonald*: Historical Guideposts and the Missing Arguments in *McDonald v. City of Chicago*," 2 *Akron Law Journal of Constitutional Law & Policy* 7 (2011) (invited).

"The Constitutional Significance of a 'Well-Regulated' Militia Asserted and Proven with Commentary on the Future of Second Amendment Jurisprudence," 3 *Northeastern Law Journal* 1 (2011) (invited and lead article).

"Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Reply to Lawrence Rosenthal and Joyce Lee Malcolm," 105 *Northwestern University Law Review Colloquy* 227 (2011).

"Representation Without Documentation?: Unlawfully Present Aliens, Apportionment, the Doctrine of Allegiance, and the Law," 25 *BYU Journal of Public Law* 35 (2011).

"Originalism, John Marshall, and the Necessary and Proper Clause: Resurrecting the Jurisprudence of Alexander Addison," 58 *Cleveland State Law Review* 529 (2010) (lead article).

"The Plenary Power Doctrine and the Constitutionality of Ideological Exclusions: A Historical Perspective," 15 *Texas Review of Law & Politics* 61 (2010).

"The Right of Self-Preservation and Resistance: A True Legal and Historical Understanding of the Anglo-American Right to Arms," 2010 *Cardozo Law Review De Novo* 18 (2010) (invited).

"'Arms for Their Defence'?: A Historical, Legal and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in *McDonald v. City of Chicago*," 57 *Cleveland State Law Review* 351 (2009) (lead article).

## NEWSPAPER AND ONLINE MEDIA PUBLICATIONS

"The Long Fight to Achieving Military Integration," *Air Force Historical Research Agency* (Feb. 2023).

"The History of the Air Force Song," *Air Force Historical Research Agency* (Sep. 2022).

"NRA Convention Protests Highlight US Gun Reform Divide," *Deutsche Welle*, May 30, 2022.

Q&A with Frank Wilkinson, "America's Long History of Gun Regulation," *Bloomberg News* and *Washington Post*, November 3, 2021.

"A Historian's Assessment of the Anti-Immigrant Narrative in *NYSRPA v. Bruen*," Second Thoughts: A Blog from the Center for Firearms Law at Duke University, August 4, 2021.

"Judging the Ninth Circuits Use of History in *Young v. Hawaii*," Second Thoughts: A Blog from the Center for Firearms Law at Duke University, April 16, 2021.

"The Black Panthers, NRA, Ronald Reagan, Armed Extremists, and the Second Amendment," *Second Thoughts: A Blog from the Center for Firearms Law at Duke University*, April 8, 2019.

"The 90th Anniversary of NRA's First Guiding Legislative Policies and the Implications for NYSRPA v. City of New York," *Second Thoughts: A Blog from the Center for Firearms Law at Duke University*, December 1, 2019.

"The Untold, Somewhat Embarrassing Story Behind the NRA's Laudatory Messages from Presidents Roosevelt, Truman, and Eisenhower," *Second Thoughts: A Blog from the Center for Firearms Law at Duke University*, September 23, 2019.

"The NRA is Blaming Journalists for Gun Violence," *Slate*, May 25, 2018.

"Why Does the NRA Almost Always Win?" *Buzzfeed News*, March 23, 2018.

"Conceal-Carrying the Day: We Debated Arming More People in the 1920s as a Solution to Gun Violence. The Idea Lost then, But It's Winning Now," *Slate*, March 6, 2018.

"Propaganda Machinery: How the NRA Pioneered the Right-Wing Art of Demonizing the Media," *Slate*, February 28, 2018.

"How the Gun Lobby Came to Be So Powerful," *Newsweek*, February 16, 2018.

"Justice Thomas Needs a History Lesson in the History of the 2nd Amendment," *History News Network*, December 11, 2015.

"The Hollow Impact of *Moore v. Madigan* on Gun Control?" *Huffington Post*, December 12, 2012.

"The Tale of Two Second Amendments," *Huffington Post*, September 7, 2012.

"Placing the Declaration of Independence in Historical Context: Thoughts on Educating Current and Future Generations About America's Founding Document," *ConSource Blog*, August 4, 2012.

Encyclopedia Entries "Second Amendment" and "Gun Control," *Encyclopedia Britannica*, December 2010.

## PUBLISHED BOOK REVIEWS

"Governing Immigration Through Crime: A Reader," 28 *Journal of Immigration, Asylum, and Nationality Law* 409 (2014).

"The Latino Threat: Constructing Immigrants, Citizens, and the Nation," 28 *Journal of Immigration, Asylum, and Nationality Law* 193 (2014).

## PRESENTATIONS, PANELS, AND DEBATES

"5th Annual Firearms Research Works in Progress Workshop," Texas A&M University School of Law, June 7-8, 2023.

"Debate with Stephen P. Halbrook: What Rights Does the Second Amendment Guarantee Outside the Home," Federalist Society, November 17, 2021 (available online).

"Militias Challenge Gun Laws in Virginia: 'It's About Shooting Tyrants in the Face'," *CBS News*, November 12, 2020 (available online).

"NRA Origins and 1930s Politics," C-SPAN 3 American History TV, Washington, DC, January 3, 2020 (available online).

"A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment," 2020 American Historical Association Meeting, January 3, 2020.

"Jim Bohannon Show: *Armed in America* Book Talk," *Westwood One Affiliates*, April 19, 2019 (available online).

"Law and Society Series: The Second Amendment 228 Years Later," Riley Institute and Charleston Law Review, Charleston, SC, February 2019.

"Book Talk: History of Gun Rights in America," National Constitution Center, Philadelphia, PA, February 2018 (available online).

"Guns in American Society," Wesleyan University, Middletown, CT, October 2017.

"Firearms and the Common Law Tradition," Aspen Institute, Washington, DC, September 2016.

"Fifty Years of 7th Special Operations Squadron History," Duxford Imperial War Museum, Cambridge, UK, May 2014.

"History and the Meaning of the Constitution," Cleveland-Marshall School of Law, Cleveland, Ohio, April 2014.

"How Much Do We Really Know About Our Gun Laws?" *NPR WBEZ 91.5 Afternoon Shift*, Chicago, IL, January 14, 2013 (available online).

"The Second Amendment is First on Our Minds," *NPR WBEZ 91.5 Morning Shift*, Chicago, IL, January 14, 2013 (available online).

"The Second Amendment Steps Outside," *Huffington Post Live*, New York, NY, December 12, 2012 (available online).

"The Objective Dilemma Facing State Immigration Enforcement," Indiana University School of Law—Indianapolis Junior Faculty Workshop, Indianapolis, Indiana, March 2012.

"Does the Second Amendment Extend Outside the Home?" Cleveland-Marshall School of Law, Cleveland, Ohio, March 2012.

"Foreign Affairs Preemption and the Federal-State Spheres of Government," St. John's University School of Law Immigration Symposium, New York, New York, March 2012.

"The History and Evolving Conceptions of the Right to Bear Arms," Fordham School of Law Second Amendment Symposium, New York, New York, March 2012 (available online).

"State Policy Potpourri: Some Comparative Assessments," and "Curtailing Birthright Citizenship," Washburn School of Law Breaching Borders Symposium, Topeka, Kansas, October 2011 (available online).

"Law Enforcement Authority to Verify Immigration Status: *Estrada v. Rhode Island*," Law Enforcement and Public Safety Channel, Washington, District of Columbia, April 2010.

"*McDonald v. City of Chicago*: An Anglo-American Right to Arms?" Cleveland-Marshall School of Law, Cleveland, Ohio, April 2010.

"Debate with Clark M. Neilly on *McDonald v. City of Chicago*," Akron University School of Law Federalist Society, Akron, Ohio, April 2010.

"Keynote Speaker for 'Chamber to Chambers: Second Amendment Symposium'," and "Panelist for 'Who's Right to Bear Arms?'" Northeastern University School of Law, Boston, Massachusetts, March 2010.

"Bearing Arms in the Ohio Constitution," Cleveland-Marshall School of Law, Cleveland, Ohio, April 2008.

"Washington's Decision: George Washington's Decision to Reaccept Black Enlistments," Trenton Chamber of Commerce Patriot Week, Trenton, New Jersey, December 2006.

## AWARDS

Joint Civilian Service Commendation Award, July 2019.

Allan S. Major Award for Air Force History Program Excellence, July 2016 (Air Force Level Award).

24th Special Operations Wing Supervisory Civilian of the Quarter, Civilian Category IV, July 2015.

Allan S. Major Award for Air Force History Program Excellence, July 2014 (Air Force Level Award).

352d Special Operations Group Supervisory Civilian of the Quarter, Civilian Category II, March 2013.

352d Special Operations Group Supervisory Civilian of the Quarter, Civilian Category II, March 2012.

Air Force Special Operations Command Excellence in Periodic History Award, February 2012.

Judge John R. Brown Award for Excellence in Legal Writing, August 2008 (National Award).

Certificate of Commendation, Commanding Officer, Marine Security Guard Battalion, May 2002.

Meritorious Mast, United States Marine Corps, April 2000.

Meritorious Mast, United States Marine Corps, August 1999.

Navy and Marine Corps Achievement Medal, United States Marine Corps, July 1999.

Certificate of Commendation, Commanding Officer, Marine Aviation Support Group, April 1998.

# EXHIBIT 2

Newspapers
by ancestry
https://www.newspapers.com/image/959921237

Waco Daily News (Waco, Texas) · Sun, Jul 12, 1891 · Page 8

Downloaded on Jul 12, 2023

## AN ORDINANCE.

Be it ordained by the city council of the city of Waco:

Section 1. That title "public peace and order" of the ordinance of the city of Waco be amended by adding thereto article 412, a.

Article 412 a. Any person who, in this city shall commit an aggravated assault or an aggravated assault and battery upon the person of another, shall upon conviction be fined in any sum not less than twenty-five nor more than one thousand dollars, or by imprisonment in the calaboose not less than one month nor more than two years, or by both such fine and imprisonment; but any one charged with a violation of this article shall be entitled to the same defenses that he would be entitled to under the statutes of the state as a justification or in mitigation of the penalty. An aggravated assault and aggravated assault and battery are such as defined in Title XV, Chapter 2 of the penal code of the state of Texas.

Section 2. That this ordinance take effect and be in force from and after ten days after its passage.

Passed July 9, 1891.

Approved:    C. C. McCulloch,
Attest:    Mayor.
Joney Jones, City Secretary.

Be it ordained by the city council of the city of Waco:

Section 1. That whereas article 118 of the ordinances of the city of Waco as it now stands is inoperative and void by virtue of the action of the 20th Legislature of the state of Texas, in increasing the penalty for unlawfully carrying arms. Therefore article 118 shall hereafter read as follows, to-wit:

Article 118. If any person in this city shall carry on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung shot, sword cane, spear, or knuckles made of any metal or any hard substance, bowie-knife, or any other kind of knife, manufactured for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the city calaboose not less than 20 nor more than 60 days, or both by such fine and imprisonment.

Sec. 2. Said ordinance as to dead-

ly weapons shall be further amend[ed] by adding thereto article 1190, to re[ad] as follows:

Art. 119 a: If any person shall [go] into any church or religious assembl[y,] any schoolroom, or other place whe[re] persons are assembled for amus[e-] ment or for educational or scientif[ic] purposes, or into any circus, show [or] public exhibition of any kin[d] or into a ball room, or social party [or] social gathering or to any electio[n] precinct on the day or the days of a[n] election, where any portion of th[e] people of the State are collected [to] vote at any election, or to any oth[er] place where people may be assemble[d] to muster, or to perform any publi[c] duty, or to any other public assembly[,] and shall have or carry about his per[-] son a pistol or other fire-arm, dirk[,] dagger, slung shot, sword-cane, shea[r,] brass-knuckles, bowie-knife, or an[y] other kind of a knife manufacture[d] and sold for the purpose of offence [or] defence, he shall be punished by fin[e] of not less than Fifty nor more tha[n] Five hundred dollars.

Section 2. That this ordinance shall take effect and be in force fro[m] and after Ten days after its passage[.]

Passed July 9th, 1891. Approved[:]
C. C. McCulloch,
Attest,    Mayor.
Joney Jones, City Secretary.

## Summer Days, Where Shall We Spend Them.

Half rate excursion tickets to Look[-] out Mountain Tennessee, via, Cotton Belt Route. The only line with through sleeping car service to Memphis, and the only line delivering passenger[s] for Lookout Mountain, to connecting lines at Memphis, without a long and disagreeable omnibus transfer.

Tickets will be sold July the 4th to 8th inclusive, good for return until September 30th, 1891. For further information write or call on any agent of the company.

W. H. Winfield,
General Passenger Agent,
Texarkana, Texas.

Drink "Tea Cap Tea," 50 cents per pound, at Joe S. Thompson's, The Grocer.

Choice baled millet at T. M. Sleeper & Co. only 40c. a bale.

Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers

# EXHIBIT 3



Copyright © 2023 Newspapers.com. All Rights Reserved.



# ORDINANCES,

## Of the Incorporation of the Town of Gainesville.

### Passed Upon by the Board of Trustees, May 26.

Be it ordained by the board of trustees of the inhabitants of the village of Gainesville; Missouri, as follows:.

**Section 1.** It shall be unlawful for any person within the corporate limits of the village of Gainesville of Missouri, to, directly, or indirectly sell intoxicating liquors in any quantity less than three gallons at retail or in the original package without taking out license as a dramshop keeper, and every person violating the provision of this section shall be deemed guilty of a misdemeanor and upon conviction, be punished by a fine of not less than forty nor more than two hundred dollars.

**Section 2.** It shall be unlawful for any person within the corporate limits of the village of Gainesville, Mo., to discharge any kind of fire-arms to the terror of the inhabitants of the village, or any one of them; and every person violating the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than five nor more than twenty-five dollars.

**Section 3.** It shall be unlawful for any person within the limits of the incorporation of the village of Gainesville, Mo., to play at any game whatsoever for money, property, or gain, with cards, dice, or any other device which may be adopted to, used in playing any game of chance or in which chance is a material element, or shall bet or wager on the hands of or cards or on the sides of such as do play, as aforesaid. Every such person shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than five nor more than twenty-five dollars.

**Section 4.** It shall be unlawful for any person within the corporate limits of the village of Gainesville, Mo., to make use of any loud, offensive or indecent language or to threaten, quarrel, or challenge to fight, or by fighting. Every person violating the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than five dollars nor more than forty dollars.

**Section 5.** It shall be unlawful for any person inside the corporate limits of the village of Gainesville, Mo., to run or cause to be run upon any of the public streets or alleys or upon any highway in common use inside of said corporate limits of the village of Gainesville, Mo., any horse or horses so as to interupt travelers or persons thereon; he shall be adjudged guilty of a misdemeanor, and punished by a fine of not less than five nor more than twenty-five dollars.

**Section 6.** It shall be unlawful for any person inside of the corporate limits of the village of Gainesville, Mo., to keep open or cause to be kept open any store, shop, or other place of business, or labor himself or cause any other person to labor on the first day of the week, commonly called Sunday. Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and fined not exceeding fifty dollars.

**Section 7.** It shall be unlawful for any person within the corporate limits of the village of Gainesville, Mo., to set up or maintain any bawdy house or place of prostitution or whoredom, or to induce or other place of ill fame, or for any person to frequent such place, or places, and every person violating the provisions of this section shall be adjudged guilty of a misdemeanor and punished by a fine of not less than ten and not exceeding one hundred dollars.

**Section 8.** It shall be unlawful for any person within the corporate limits of the village of Gainesville, Mo., to practice catching a base ball or to practice stiking same on any of the public streets of the village of Gainesville. Any person violating the provisions of this section shall be adjudged guilty of a misdemeanor, and punished by a fine of not less than one and not more than five dollars.

**Section 9.** It shall be unlawful for any person within the corporate limits of the village of Gainesville, Mo., to carry concealed upon or about his person, any deadly or dangerous weapon, or to go into any public gathering or place where people are assembled for any lawful purpose, with any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot or other deadly weapon, or shall in the presence of one or more persons, exhibit any such weapons in a rude and angry manner, or shall have or carry any such weapons upon or about his person while intoxicated inside the corporate limits; any person violating the provisions of this section shall be adjudged guilty of a misdemeanor, and punished by a fine not less than ten nor more than twenty-five dollars.

**Section 10.** It shall be unlawful for any person within the corporate limits, or within half a mile of same, of the village of Gainesville, Mo., to sell or dispose of, or to give away any kind of wine, beer, or whiskey, or any other intoxicating spirits in any quantity without being authorized to do so as a druggist, as provided by law. Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than fifty nor more than one hundred dollars.

**Section 11.** It shall be unlawful for any person or persons to camp on any of the streets or the public square in the village of Gainesville, Mo. Every person violating the provisions of this section shall be deemed guilty of a misdemeanor, and fined not more than twenty-five dollars

**Section 12.** It shall be unlawful for any person to give any public exhibition or show, circus or menagerie inside the corporate limits of the village of Gainesville, Mo., except exhibitions given for the benefit of religious, educational or charitable purposes, without first procuring a license from the marshal of said village. Every person violating the provisions of this section shall be deemed guilty of a misdemeanor and fined not more than twenty-five dollars.

**Section 13.** It shall be unlawful for any person within the corporate limits of the village of Gainesville, Mo., to appear upon any of the public streets while intoxicated or upon any of the alleys or commons of said village. Any person violating the provisions of this section shall be deemed guilty of a misdemeanor and upon conviction be punished by a fine not exceeding five dollars.

State of Missouri, |
County of Ozark, | ss.

I, Y. B. Mathewson, clerk of the village of the inhabitants of Gainesville, Missouri, do hereby certify that the foregoing is a true copy of the ordinances passed and approved the Board of Trustees of the village of the inhabitants of Gainesville, Mo.

## Children Cry for Pit

THE CENTAUR COMPANY, 77 MURR

**Children Cry for P**
**Children Cry for P**
**Children Cry for P**

# EXHIBIT 4

Newspapers
by ancestry
https://www.newspapers.com/image/208831791

Shelby County Herald (Shelbyville, Missouri) · Wed, Jul 29, 1891 · Page 4

Printed on Jun 25, 2023



T. P. MANUEL, Chairman Board of Trustees.
I. N. WATSON, Village Clerk.

## ORDINANCE NO. 23.

### AN ORDINANCE CONCERNING THE CARRYING OF DEADLY WEAPONS.

Be it ordained by the Board of Trustees of the inhabitants of the Village of Leonard, Mo., as follows:

SECTION 1. If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school-room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot or other deadly weapon, or shall in the presence of one or more persons, exhibit any such weapons in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall upon conviction be punished by a fine of not less than fifty nor more than two hundred dollars.

SECTION 2. This ordinance shall be in force from and after its passage and publication.

Passed and approved July 6th, 1891.

T. P. MANUEL, Chairman Board of Trustees.
I. N. WATSON, Village Clerk.

## TRUSTEE'S SALE

Copyright © 2023 Newspapers.com. All Rights Reserved.



JA0236

# EXHIBIT 5

JA0237

The Marceline Mirror (Marceline, Missouri) · Fri, Oct 28, 1892 · Page 8

https://www.newspapers.com/image/953638676

Printed on Jun 25, 2023

## ORDINANCE NO. 9.

1. Penalty for violations of this ordinance.
2. Assault and battery.
3. Failing to assist in making arrests, etc.
4. Resisting arrest, etc.
5. Permitting games of chance.
6. Betting.
7. Disturbing religious meetings, etc.
8. Carrying concealed weapons into assemblies, etc.
9. Section 8 not to apply to police, etc.
10. Conflicting ordinances repealed.
11. Ordinance to take effect, when.

### In Relation to Miscellaneous Offenses and Their Penalties.

Be it ordained by the Board of Aldermen of the City of Marceline, as follows:

SECTION 1. It shall be unlawful for any person to commit any of the acts hereinafter mentioned or enumerated within the corporate limits of the City of Marceline, and any person so offending shall be deemed guilty of a misdemeanor against the ordinances of the city, and for each offense shall be punished as hereinafter provided.

SEC. 2. Every person who shall commit an assault and battery or a common assault upon another, or indecently expose his person, shall, upon conviction, be punished by a fine of not less than one, nor more than one hundred, dollars.

SEC. 3. Every person who, without reasonable cause, shall fail to assist in making an arrest or committing any person to the city jail when required to do so by any police officer of the city in the performance of his official duty, shall be punished by a fine of not less than five, nor more than twenty, dollars, for every such offense.

SEC. 4. Every person who shall resist or attempt to hinder any officer of the city in the performance of his official duty, shall be punished by a fine of not less than ten, nor more than one hundred dollars.

SEC. 5. Every person who shall suffer or permit any game of chance, upon the result of which any money or property or valuable thing whatever is bet, to be played in any building or room or upon any premises of which such person is the owner or has possession or control, shall be punished by a fine of not less than ten, nor more than one hundred, dollars.

SEC. 6. Every person who shall bet any money or property or valuable thing whatever upon the result of any game of chance shall be punished by a fine of not less than five, nor more than twenty-five, dollars.

SEC. 7. Every person who shall willfully or contemptuously disquiet or disturb any congregation or assembly of persons met for religious worship, or for social or literary purposes, by making a noise or by rude or indecent behavior, or profane discourse within the place of assembly, or so near the same as to interrupt or disturb the order or solemnity thereof, or who shall willfully menace, threaten or assault any person there being, shall be punished by a fine of not less than one, nor more than one hundred, dollars.

SEC. 8. Every person who shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie-knife, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drink, or shall directly or indirectly sell or deliver, loan or barter, to any minor any such weapon without the consent of the parent or guardian of such minor, shall, upon conviction, be punished by a fine of not less than fifty, nor more than one hundred, dollars.

SEC. 9. The next preceding section shall not apply to any police officer, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace or make arrests, nor to persons moving or travelling peaceably through this state, and it shall be a good defense to the charge of carrying such weapons if the defendant shall show that he has been threatened with great bodily harm, or has good reason to carry the same in the necessary defense of his person, home or property.

SEC. 10. All ordinances and parts of ordinances in conflict with this ordinance are hereby repealed.

SEC. 11. This ordinance shall take effect and be in force from and after its passage.

Read three times and passed and approved this 12th day of March, 1892.

W. A. CATER, Mayor.
[SEAL.]           AARON ROOTS, President of Board.
ATTEST: J. HEMMINOS, City Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 6



Copyright © 2023 Newspapers.com. All Rights Reserved.



The Ridgeway Journal (Ridgeway, Missouri) · Thu, Apr 6, 1893 · Page 4

https://www.newspapers.com/image/858847805

Printed on Jun 25, 2023

deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election precinct on any election day in said village, or into any court room during the sitting of court, or into any public assemblage of persons met for any lawful purpose, other than military drill or meetings called under the military law of the state, having on or about his person any kind of fire arms, bowie knife, dirk, dagger, slung shot or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon on or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of his parent or guardian, he shall, upon conviction, be adjudged guilty of a misdemeanor, and fined in a sum not less than twenty-five nor more than one hundred dollars,  Provided that this section shall not apply to officers or persons whose duty it is to execute warrants or suppress breaches of the peace, nor to persons traveling peaceably through said village, not a resident of said county.

SEC. 13.  Every person who shall play at any game of any kind whatsoever for money or property, with dice, cards or any other devise which may be used in playing any game of chance, or in which chance is an element, or shall bet or wager on the hands, or cards or sides of such as do play in said village, shall be deemed guilty of a misdemeanor and punished by a fine of not less than ten nor more than one hundred dollars.

SEC. 14.  Every person who shall either labor himself or compel or permit his apprentice or

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 7

Rocheport Commercial (Rocheport, Missouri) · Fri, Sep 20, 1895 · Page 8
https://www.newspapers.com/image/953556139

Printed on Jun 25, 2023

## An Ordinance.

### MISDEMEANORS.

Be it enacted by the Board of Trustees of the Town of Rocheport as follows:

SECTION 1. DISTURBING THE PEACE. Every person who shall willfully disturb the peace of any other person or persons, by loud and unusual noise, loud and offensive or indecent conversation, or by using any profane or offensive language calculated to provoke a disturbance of the peace, or by threatening, quarreling, challenging, or fighting, shall be deemed guilty of a misdemeanor and, upon conviction, fined not less than five dollars.

SEC. 2. CONCEALED WEAPONS. If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any court room during the sitting of the court, or into any public assemblage of persons met for a lawful purpose, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slunkshot, or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry and threatening manner, or shall have or carry any such weapon upon or

Copyright © 2023 Newspapers.com. All Rights Reserved.

https://www.newspapers.com/image/953556139

about his person when intoxicated or under the influence of intoxicating drinks; or shall, directly or indirectly, sell or deliver, loan or barter, to any minor any such weapon without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor and punished by a fine not less than ten dollars nor more than twenty-five dollars.

Sec. 3. BETTING PROHIBITED. Any person who shall play at any game for money or property with cards, dice, or any other device, which may be adapted to or used in playing any game of chance, or shall, bet or wager on the hands, or cards, or sides of such as do play as aforesaid, shall be deemed guilty of a misdemeanor and, on conviction, be fined not less than five dollars.

Sec. 4. RECKLESS RIDING AND DRIVING. If any person shall unnecessarily ride or drive any horse or other animal upon or through any street or alley at a greater speed than a moderate gait, or shall so negligently ride or drive any such animal as to cause such animal, or the vehicle thereto attached, to come in contact with, or strike and injury any person or property; or shall, leave any such animal standing in any street, ally, or open lot, without being fastened or so guarded as to prevent its running away, or shall turn any such animal loose upon any street or alley, he shall be deemed guilty of a misdemeanor and, on conviction, be fined not less than five dollars for every such offense.

Sec. 5. OBSTRUCTING PASSAGE ON STREETS. Whoever shall, upon or near a street or alley, fly a kite or engage in any sport or exercise likely to scare horses, injure persons passing upon such street, or embarrass the passage of vehicle, shall be deemed guilty of a misdemeanor, and, upon conviction, be fined not less than one dollar nor more than ten dollars for every such offense.

Sec. 6. HITCH RACKS Any person who shall hitch any horse, mule, or other animal to any tree, post, block, fence, or other thing on Central street, between Third and Water streets, shall be deemed guilty of a misdemeanor, and fined not less than one dollar for every such offense. Provided, that this section shall not apply to doctors, nor to merchants, or butchers running a delivery wagon in connection with their business, and who shall be allowed to hitch such animals, so used in their business, to a post firmly set in the ground, at the edge of the sidewalk, immediately in front of their respective business houses. It shall be the duty of the Marshal to immediately remove or cause to be removed, all posts, rings, or other contrivances heretofore used for hitching purposes, except such as are herein provided for.

Sec. 7. PRISONERS REFUSING TO WORK. If any person adjudged to labor shall fail or refuse to obey any reasonable requirement of the Marshal, or to labor as directed, he shall be deemed guilty of a misdemeanor, and fined not less than ten dollars, for every such offense, to be enforced as other fines.

Sec. 8. MARSHAL POSSE. If any person, over the age of eighteen years, who, when called upon by the Marshal or assistant Marshal, to act as a posse to aid him, in arresting and taking prisoner any offender, shall refuse or neglect to do so, he shall be guilty of a misdemeanor, and fined three dollars.

Copyright © 2023 Newspapers.com. All Rights Reserved.



JA0244

# EXHIBIT 8

https://www.newspapers.com/image/694571590

Printed on Jun 25, 2023

Secretary.

## Concealed or Deadly Weapons.

The following ordinance in relation to the carrying of concealed or deadly weapons was passed by the council at the regular meeting Tuesday night:

Be it ordained by the Council of the city of Warrensburg as follows:

Sec. 1. If any person shall within this city carry concealed upon or about his person any deadly or dangerous weapon or shall go into any church or place where people have assembled for religious worship, or into any school room, or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any Court room during the sitting of court or into any other public assemblage of persons met for any lawful purpose than for Militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung shot or other deadly weapons, or shall in the presence of one or more persons, exhibit any such weapons in a rude, angry, or threatening manner or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks or shall directly or indirectly sell or deliver, loan or barter, to any minor without the consent of the parents or guardian of such minor he shall upon conviction be punished by a fine of not less than fifty or more than two hundred dollars or by imprisonment not less than five days or more than six months or by both such fine and imprisonment.

Sec. 2. This ordinance shall take effect and be in force from and after its passage and approval by the Mayor.

Passed June 3, 1890.

Approved June 5, 1890.

A. H. Gilkeson Dry Goods Co. are

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 9

JA0247



Copyright © 2023 Newspapers.com. All Rights Reserved.



J. E. Wells, Town Clerk.

## ORDINANCE NO. 4.

Be it ordained by the Board of Trustees of the inhabitants of the town of Collins, Missouri:

Sec. 1.—Any person found intoxicated within the corporate limits of said town shall be arrested and confined in the calaboose or town jail until he shall become sober, and he shall be fined for the use of the town not less than Three nor more than five dollars for each offense.

Sec. 2.—Any person who shall use any profane, obscene or indecent language, or be engaged in any loud or unusual manner, or make any other loud or unusual noise, or threaten violence or quarrel or challenge any person to fight, or boisterously obstruct or assist to resist travel, obstructing the passage of any street, alley or sidewalk, or encourage or entice any person or persons to do so, or shall in any way prevent or attempt to prevent the arrest of any person or persons, or prevent the suppression of any fight or disorder arising within the corporate limits of said town shall, on conviction, be fined not less than One nor more than Ten dollars for each offense.

Sec. 3.—Any person or persons who shall in any manner disturb the peace of any person or family or citizens of said town shall, on conviction be fined not less than one nor more than fifty dollars for each offense and if any damage to property has been done, shall forfeit to the town for the use of the person so damaged double the amount of the loss occasioned by such damage.

Sec. 4.—Any person or persons who shall resist any officer of said town in the discharge of his duties to any manner whatever, or any person, who shall when required, refuse to assist any marshal or deputy marshal of said town in making arrests or quelling riots or unlawful proceedings, on conviction, be fined not less than one nor more than fifty dollars for each offense.

Sec. 5.—Any person or persons who shall within the corporate limits of said town, engage in any fight, brawl, fraces, riot or tumultuous gathering, or who shall strike, beat, wound or assault another, shall, on conviction be fined not less than one nor more than fifty dollars for each offense.

Sec. 6.—Any person who shall carry any concealed weapon or any revolver, pistol, knife or dirk within the corporate limits of the town of Collins, shall, upon conviction be fined not less than ten nor more than fifty dollars for each offense, except however, that upon good cause shown, the board may grant a permit to any citizen of good reputation to carry weapons for self-defense.

Sec. 7.—Any person who shall draw or flourish in a threatening manner any firearms or weapon within the corporate limits of said town, shall upon conviction be fined not less than one nor more than seventy-five dollars for each offense.

Sec. 8.—Any person who shall discharge any firearms within the corporate limits of said town shall on conviction be fined not less than one nor more than fifteen dollars for each offense.

Sec. 9.—Any person who shall build a bonfire after 9 o'clock p. m. within the corporate limits of said town shall on conviction be fined not less than one nor more than ten dollars for each offense.

Sec. 10.—Any person who shall forcibly and unnecessarily ride or drive any animal or animals through the streets of said town or stall race, drive or lead any horse, mule, ass, ox, bull or cow upon, or hitch any such animal to any pavement sidewalk or awning post, or who shall leave any team of horses or mules standing in the streets of said town harnessed to a vehicle and not secured, shall upon conviction be fined in a sum not exceeding twenty dollars.

Sec. 11.—Any person who shall judiciously expose his person within the corporate limits of said town or the common districts attached, shall on conviction be fined not less than five nor more than fifty dollars for each offense, and this section shall be construed to include any person bathing in Coon Creek within the corporate limits.

Sec. 12.—Any person who shall in any manner obstruct the passage of any street, alley, side walk or crossing shall on conviction be fined not more than twenty dollars for each offense, and shall pay the cost of removing such obstruction.

Sec. 13.—Any person who shall sweep, throw or place any straw, ashes, bricks, shavings, sawdust or other rubbish or litter on any sidewalk, street or in any gutter or sewer of said town shall on conviction be fined not more than ten dollars and shall pay the costs of removing such rubbish or litter; but this section shall not apply to persons constructing any building.

Sec. 14.—Any person who shall establish, maintain or commit a nuisance upon or in any manner befoul any lots, street, yards, alleys or common within the corporate limits of the town of Collins, shall on conviction be fined not less than twenty dollars for each offense.

Sec. 15.—Any person who has no visible means of support and who for the first loitering about the saloons of said town, or frequenting dram shops and places of doubtful repute, shall be deemed a vagrant, and any person convicted of being a vagrant shall be fined not less than five nor more than twenty dollars.

Passed by the Board, May 2nd, 1887.
John B. Gannon,
Ch'm'n. Town Board.

Attest:
J. E. Wells, Town Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 10

The Craig Weekly Gazette (Craig, Missouri) · Wed, Oct 13, 1880 · Page 4
https://www.newspapers.com/image/859684459

Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers
by Ancestry

The Craig Weekly Gazette (Craig, Missouri) · Wed, Oct 13, 1880 · Page 4

https://www.newspapers.com/image/859684459

Printed on Jun 25, 2023

## ORDINANCE No. 8—Carrying Concealed Weapons.

Be it Ordained by the Board of Aldermen of the city of Craig, Missouri, as follows :

Any person who shall within the corporate limits of said city of Craig. carry or have upon his person, any concealed weapon or weapons, shall be adjudged guilty of a misdemeanor, and shall upon conviction be fined in any sum not less than one dollar, nor more than ten dollars.

C. H. Thayer, Mayor.

P. B. Cook, President.

Copyright © 2023 Newspapers.com. All Rights Reserved.


POWERED BY Newspapers.com™

JA0252

# EXHIBIT 11

JA0253



Copyright © 2023 Newspapers.com. All Rights Reserved.



Printed on Jun 25, 2023

CHAPTER VII.

License.

CHAPTER VIII.

Misdemeanors.

*Continued on Eighth page.*

Copyright © 2023 Newspapers.com. All Rights Reserved.



### Cuba Town Ordinancet.

*[Continued from first page.]*

SEC. 17.   Whoever shall in the town of Cuba either directly or indirectly expose to sale or sell intoxicating liquors or keep the doors of his house open for the purpose of selling or exposing liquor for sale on Sunday shall be deemed guilty of a misdemeanor and upen conviction thereof be fined not less than five nor more than one hundred dollars.

SEC. 18.   Every person being the owner of a slut who shall permit the same to run at large while in heat or proud shall be deemed guilty of a misdemeanor and upon conviction be fined not less than one nor more than five dollars.

SEC. 19.   This ordinance shall be in force and effect from and after its approval.

Approved May 24, 1882.

Attest:    JAS. A. GREEN, Chm'n.

M. H. HELLYER, Clerk.

CHAPTER IV.

Copyright © 2023 Newspapers.com. All Rights Reserved.



JA0256

# EXHIBIT 12



Copyright © 2023 Newspapers.com. All Rights Reserved.



https://www.newspapers.com/image/862701906

Printed on Jun 25, 2023

W. S. MESPLAY, Clerk.

## NO. 8.

AN ORDINANCE concerning the carrying of weapons.

Be it ordained by the Board of Trustees of the Town of Granby, as follows:

Sec. 1. That any person within the corporate limits of the town of Granby who shall be found carrying, either openly or concealed, any pistol, metalic knuckles, slingshot, large knife, or any other offensive weapon (except an official in the lawful discharge of his duty, or a person having such weapon for the purpose of some immediate lawful purpose) shall be fined not less than five nor more than fifteen dollars.

Passed and adopted October 30. 1873.

M. I. WILLIAMS, Chm'n.
W. S. MESPLAY, Clerk.

NO. 9.

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 13

Newspapers
by Ancestry
https://www.newspapers.com/image/379709602

The Stockton Review and Rooks County Record (Stockton, Kansas) · Fri, Jul 1, 1887 · Page 1

Downloaded on Oct 11, 2022



Copyright © 2022 Newspapers.com. All Rights Reserved.



JA0261

Newspapers
by ancestry

The Stockton Review and Rooks County Record (Stockton, Kansas) · Fri, Jul 1, 1887 · Page 1

https://www.newspapers.com/image/379709602

Downloaded on Oct 11, 2022



[SEAL] F. A. CHIPMAN,   C. W. SMITH,
City Clerk.                     Mayor.

Published July 1, 1887.

## ORDINANCE NO. 76.

### AN ORDINANCE PROHIBITING CARRY-ING DEADLY WEAPONS.

*Be it ordained by the Mayor and Councilmen of the City of Stockton, Kansas.*

SEC. 1.—If any person shall carry up-on or about his person any deadly or dangerous weapons, or shall go into any church or place where people have assembled for public worship, or into any school room or place where people have assembled for educational, liter-ary or social purposes, or to any elec-tion on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons not met for any unlawful pur-pose, or shall go upon the public streets or public places of the city having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, sling shot or other deadly weapon, or shall in any of the places above named exhibit such weapon in a rude, angry or threatening manner, or shall direct-ly or indirectly, sell or deliver, loan or barter to any minor, any such weapon without the consent of the parent or guardian of said minor, he shall upon conviction be punished by a fine of not less than ten nor more than fifty dol-lars. Provided, this ordinance shall not apply to peace officers of the city or state.

SEC 2.–This ordinance shall take effect from and after its publication in The Rooks County RECORD.

Approved, C. W. SMITH,
Attest, F. A. CHIPMAN,          Mayor.
          City Clerk.

Copyright © 2022 Newspapers.com. All Rights Reserved.



JA0262

# EXHIBIT 14

https://www.newspapers.com/image/384017570

Printed on Jun 25, 2023

# AN ORDINANCE

## Relating to the Carrying of Fire Arms and other Deadly Weapons.

*Be it ordained by the Trustees of the town of Abilene,*

SEC. 1. That any person who shall carry, within the limits of the town of Abilene, or commons, a pistol, revolver, gun, musket, dirk, bowie-knife, or other dangerous weapon upon his or their person or persons, either openly or concealed, except to bring the same and forthwith deposit it or them at their house, boarding house, store room or residence, shall be fined in a sum not less than ten dollars nor more than fifty dollars; and it shall be the duty of any town constable, or policeman of this town, to arrest and disarm any person violating this ordinance, and to deposit the arms so taken with the captain of the town police, to be by him kept until he is, by the magistrate taking cognizance of the offense of carrying arms as aforesaid, authorized to deliver the same to the person or persons from whom the same shall have been taken.

SEC. 2. Any and every person who shall be in violation of this ordinance, within the town of Abilene, or commons, and who shall refuse to deposit his or their arms with the constable or policeman as aforesaid, or shall resist any officer who may attempt to disarm him or them according to the provisions of section one of this ordinance, shall be imprisoned in the common gaol of the town not less than twenty-four hours nor more than ten days, and fined not less than $10 nor more than one hundred dollars: Provided, that the provisions of this ordinance shall not apply to the constable or any officer of the town of Abilene, while in the discharge of their duties as such constable or policeman.

SEC. 3. That any person who shall intentionally discharge any pistol, revolver or gun, within the town of Abilene, in any street, alley, highway, lot, house or other place where the life or limb of any person could be endangered, shall be punished by a fine not less than ten dollars nor more than one hundred dollars.

SEC. 4. This ordinance shall take effect and be in force from the 20th of May 1870.

T. C. HENRY, Chairman.

Attest: G. L. BRINKMAN, Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 15

JA0265

Arkansas City Weekly Traveler (Arkansas City, Kansas) · Wed, May 20, 1885 · Page 4

https://www.newspapers.com/image/53607957

Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 16

The Beloit Gazette (Beloit, Kansas) · Thu, Sep 19, 1872 · Page 4

https://www.newspapers.com/image/418858064

Printed on Jun 25, 2023

# Ordinance No. 5.

An ordinance in relation to the carrying of fire-arms or other weapons.

*Be it ordained by the Mayor and Couucilmen of the City of Beloit.*

Section 1. That any person who shall be found within the corporate limits of this city with any revolver, pistol, gun, sword, dagger, dirk or any other dangerous or deadly weapon concealed or otherwise shall be deemed guilty of a misdemeanor; Provided, that this act shall not be construed in such a manner as to prevent any person or persons from carrying a gun or rifle through the street for the known and avowed purpose of hunting in the country.

Approved Sep. 9th, 1872.

T. F. HERSEY,
Mayor.

L. J. BEST,
City Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 17

The Caldwell Advance (Caldwell, Kansas) · Thu, May 4, 1882 · Page 2
https://www.newspapers.com/image/365795786
Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.



Case 1:23-cv-01293-GLR   Document 21-4   Filed 07/28/23   Page 72 of 143

The Caldwell Advance (Caldwell, Kansas) · Thu, May 4, 1882 · Page 2

https://www.newspapers.com/image/365795786

Printed on Jun 25, 2023

Copyright © 2023 Newspapers.com. All Rights Reserved.



The Caldwell Advance (Caldwell, Kansas) · Thu, May 4, 1882 · Page 2

https://www.newspapers.com/image/365795786

Printed on Jun 25, 2023

one hundred dollars.

Sec. 10. Any person carrying any deadly or dangerous weapon, such as firearms, slung shot, sheath or dirk knife or any other weapon which when used is liable to produce death or great bodily harm, unconcealed, within the corporate limits of the city, shall upon conviction, be fined in a sum not less than ten nor more than one hundred dollars.

Sec. 11. Any person or persons carrying any deadly or dangerous weapons concealed about their person, such as firearms, slung shot, sheath or dirk knife, brass knuckles or any other weapon, which when used are liable to produce death or great bodily harm and injury, shall, upon conviction be fined in a sum not less than fifteen nor more than one hundred dollars for each and every offense.

Sec. 12. Any person who shall within the limits of the city, discharge or shoot off any gun, pistol, or other firearms, shall upon conviction thereof, be fined not less than one nor more than twenty-five dollars.

Sec. 13. Any person who shall

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 18

Copyright © 2023 Newspapers.com. All Rights Reserved.



violating this section shall be deemed guilty of a misdemeanor,

#### CONCEALED DEADLY WEAPON.

SEC. 8. Any person or persons, other than the duly appointed and commissioned officers of this city, or officers of this county or State, carrying concealed deadly weapons, such as pistols, revolvers, slung-shots, dirks or bowie-knives, within the corporate limits of the city, shall, upon conviction, be deemed guilty of a misdemeanor.

#### OPEN LEWDNESS AND DISORDERLY HOUSES.

SEC. 9. If any person shall be guilty of open lewdness or other notorious act of public indecency tending to debauch the public morals, or shall maintain or keep a lewd house or place of fornication, or shall keep a common, ill-governed and disorderly house, to the encouragement of idleness, gaming, drinking, fornication or other misbehavior, or who shall keep and maintain a common bawdy house, or house of ill-fame, shall, on conviction, be deemed guilty of a misdemeanor.

#### DRUNKENNESS.

SEC. 10. If any person shall be drunk in any highway, street, or in any public place or building, or if any person shall be drunk in his own house, or in any private building or place, disturbing his family or others, he shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in any sum not exceeding twenty-five dollars, or by imprisonment in the calaboose or county jail for a period not exceeding thirty days. Prosecutions under this section must be commenced within thirty days after the said misdemeanor is alleged to have been committed.

#### WEAPONS TO MINORS.

SEC. 11. Any person who shall sell trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung-shot, or other dangerous weapon to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall, upon conviction before the Police magistrate, or any Justice of the Peace acting in such capacity, be fined not less than five nor more than one hundred dollars.

#### POSSESSION OF A MINOR

SEC. 12. Any minor who shall have in

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 19

[Published March 11th, 1898.]

## Ordinance No. 165.

An Ordinance Prohibiting the Use and the Carrying of Fire Arms and Other Deadly Weapons.

*Be it Ordained by the Mayor and Councilmen of the City of Elk City, Montgomery County, Kansas.*

SECTION 1.  That any person within the corporate limits of said city of Elk City, who shall draw any pistol or other weapon in a hostile manner, or shall make any demonstration or threat at using such weapon on or against any person, or any person who shall carry or have on his or her person in a concealed manner, or otherwise any pistol, dirk, bowie-knife, revolver, slung-shot, billy, brass, lead or iron knuckles, or any deadly weapon of any kind within the corporate limits of said city, shall be deemed guilty of a misdemeanor and on conviction thereof shall be fined in any sum of not less than five dollars nor more than one hundred dollars.  Provided, that this ordinance shall not be so construed as to prohibit officers of the law from being armed.

SEC. 2.  Be it further ordained that all ordinances or parts of ordinances in any manner conflicting with this ordinance, be and the same are, hereby repealed.

SEC. 3.  Be it further ordained that this ordinance shall be in full force and effect on and after its publication in the Elk City ENTERPISE, the duly designated official paper of said city published and of general circulation therein.  Passed and appoved this 7th day of March, A. D. 1898.

[SEAL.]      J. A. BROWN, Mayor.
Attest: JOHN A. LOGAN, City Clerk.

STATE OF KANSAS,  }
MONTGOMERY COUNTY,  } ss
CITY OF ELK CITY.  }

I, J. A. Logan, City Clerk of Elk City, do hereby certify that the above and foregoing ordinance was read and considered by sections at a public meeting of the City Council of said city, held on the seventh day of March, A. D. 1898.  And was duly passed section by section and then as a whole by said Council.  In witness whereof I have hereunto subscribed my name and caused the seal of said city to be affixed thereto.

[Seal.]      J. A. LOGAN, City Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 20



Copyright © 2023 Newspapers.com. All Rights Reserved.



Newspapers
by ancestry
https://www.newspapers.com/image/419606234

The Harper Daily Sentinel (Harper, Kansas) · Tue, Aug 23, 1887 · Page 2

Printed on Jun 25, 2023

son therewith.

SEC. 11.   That it shall be unlawful for any person to be found drunk, or in a state of intoxication in any street, alley, public parks or other public place within the incorporate limits of the city of Harper.

SEC. 12.   That it shall be unlawful for any person to carry any deadly or dangerous weapon, such as fire arms, slung shots, sheath or dirk knife, billies, brass or metal knuckles or any other dangerous implement, which, when used, are liable to produce death or great bodily harm, within the incorporate limits of said city.

SEC. 13.   That it shall be unlawful for

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers
POWERED BY

# EXHIBIT 21

The Asheville Weekly Citizen (Asheville, North Carolina) · Sat, Jun 3, 1882 · Page 1

https://www.newspapers.com/image/61589420

Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.



Newspapers
by ancestry

https://www.newspapers.com/image/61589420

The Asheville Weekly Citizen (Asheville, North Carolina) · Sat, Jun 3, 1882 · Page 1

Printed on Jun 25, 2023

placed under the Street Commissioner and compelled to work upon the public streets for a period not to exceed five days for each offense.

SEC. 61. That if any person or persons are found carrying pistols, bowie-knives, sling-shots, billeys, or other deadly weapons (officers excepted) within the corporate limits of the town of Asheville, every person so offending shall for every such offense forfeit and pay a sum of ten dollars—one-half to the informer.

SEC. 62. Persons conducting gift enterprises, or persons establishing or controling any game of chance, within the corporate

Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers
.com

The Asheville Weekly Citizen (Asheville, North Carolina) · Sat, Jun 3, 1882 · Page 4
https://www.newspapers.com/image/61589427
Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 22

Newspapers.com
by Ancestry

https://www.newspapers.com/image/419099948

Printed on Jun 25, 2023

[Published May 22, 1889.]

## ORDINANCE NO. 72

An ordinance to prevent carrying concealed weapons and the discharge of firearms.

*Be it ordained by the Mayor and Councilmen of the City of Howard:*

Section 1. Any person who shall, within the corporate limits of the city of Howard have or carry concealed or partially concealed upon his or her person any revolver, pistol bowieknife dagger, slungshot or other deadly weapon, shall, on conviction thereof, be fined in any sum not less than one dollar nor more than fifty dollars and costs. Provided, this section shall not apply to peace-officers of the city or state. The carrying of a weapon in a holster exposed to full view shall not be deemed a concealed or partially concealed weapon under this section.

Section 2. Any person who shall, within the corporate limits of the city of Howard, discharge any firearms, except by permission of the Mayor, or when mustered for drill or review, or otherwise acting under the command, or by permission of some commissioned officer, or where done in self-defense, or for the protection of gardens and yards from destructive animals, shall, upon conviction thereof, be fined in any sum not less than One nor more than Fifty Dollars and costs.

Section 3. This ordinance shall take effect and be in force from and after its publication once in the Howard DEMOCRAT.

Passed May 16, 1889.

Approved by me this 16th day of May, 1889.

R. F. GLENN,
Mayor of the city of Howard.

Attest: W. D. BURNS, City Clerk,

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers™
POWERED BY

# EXHIBIT 23

https://www.newspapers.com/image/379760351

Printed on Jun 25, 2023

Clerk.

Be it ordained by the Mayor and Councilmen of the City of Kendall, Hamilton County, Kansas:

### SECTION I.
**DISCHARGING FIREARMS.**

If any person shall within the corporate limits of the City of Kendall, fire or discharge any gun, fowling-piece, pistol, revolver, or firearm of any kind or description, or any other thing containing powder or combustibles, or anything made of nitro-glycerine, without first having obtained permission from the Mayor in writing, every such person shall be deemed guilty of a misdemeanor.

### SECTION II.
**INDECENT DRESS AND LEWD CONDUCT.**

Any person who shall appear in any public place within the corporate limits of the city in a state of nudity, or a dress or garb not belonging to his or her sex, or an indecent or lewd dress or shall make an indecent exposure of his or her person, or be guilty of any lewd or indecent behavior, shall be deemed guilty of a misdemeanor.

### SECTION III.
**OBSCENE BOOKS, &C.—INDECENT PLAYS.**

Any person who shall exhibit, sell or offer to sell, or give away, any indecent, lewd or obscene book, picture or other thing or shall exhibit or perform any indecent play or other representation, every such person shall be deemed guilty of a misdemeanor.

### SECTION IV.
**PLYING THE VOCATION OF A PROSTITUTE.**

Any prostitute or lewd woman who shall within the corporate limits of this city, by word, sign, letter, picture, action, or the distribution of cards or other thing, ply her vocation upon the streets, at any door, or window of any house of this city, or at any other place within the limits of the same, shall be deemed guilty of a misdemeanor.

### SECTION V.
**CRUELTY TO ANIMALS.**

Any person who shall inhumanly and unnecessarily beat, injure, or maltreat any dumb animal or animals within the corporate limits of this city, shall be deemed guilty of a misdemeanor.

### SECTION VI.
**DISPLAY OF DEADLY WEAPONS.**

It shall be unlawful for any person or persons to display or make any improper use of any deadly weapon within the corporate limits of this city. Any person violating this section shall be deemed guilty of a misdemeanor, and it shall be the duty of the City Marshal and all police officers of said city to arrest any and all persons found violating this section, with or without process.

### SECTION VII.
**FIRE CRACKERS, &C.**

The explosion of fire crackers, torpedoes,

Copyright © 2023 Newspapers.com. All Rights Reserved.



JA0288



Copyright © 2023 Newspapers.com. All Rights Reserved.



JA0289

Newspapers.com
by ancestry

The Kendall Free Press (Kendall, Kansas) · Wed, Mar 23, 1887 · Page 1

https://www.newspapers.com/image/379760351

Printed on Jun 25, 2023



**OBSCENE BOOKS, &C.—INDECENT PLAYS.**

Any person who shall exhibit, sell or offer to sell, or give away, any indecent, lewd or obscene book, picture or other thing or shall exhibit or perform any indecent play or other representation, every such person shall be deemed guilty of a misdemeanor.

### SECTION IV.
**PLYING THE VOCATION OF A PROSTITUTE.**

Any prostitute or lewd woman who shall within the corporate limits of this city, by word, sign, letter, picture, action, or the distribution of cards or other thing, ply her vocation upon the streets, at any door, or window of any house of this city, or at any other place within the limits of the same, shall be deemed guilty of a misdemeanor.

### SECTION V.
**CRUELTY TO ANIMALS.**

Any person who shall inhumanly and unnecessarily beat, injure, or maltreat any dumb animal or animals within the corporate limits of this city, shall be deemed guilty of a misdemeanor.

### SECTION VI.
**DISPLAY OF DEADLY WEAPONS.**

It shall be unlawful for any person or persons to display or make any improper use of any deadly weapon within the corporate limits of this city. Any person violating this section shall be deemed guilty of a misdemeanor, and it shall be the duty of the City Marshall and all police officers of said city to arrest any and all persons found violating this section, with or without process.

### SECTION VII.
**FIRE CRACKERS, &C.**

The explosion of fire crackers, torpedoes, street, alley or other public place within the corporate limits of said city, such person or persons shall be deemed guilty of a misdemeanor and fined not less than one nor more than ten dollars, in default of payment of said fine he or they shall be confined in the calaboose not less than ten or more than twenty days.

### SECTION XXII.
**CONCERNING THE CITY CLERK, CITY TREASURER, MARSHAL, AND STREET COMMISSIONER.**

ART. 1—There are hereby created the offices of City Clerk, City Treasurer, City Marshal and Street Commissioner. The City Clerk shall keep a record faithfully of all proceedings of the Mayor and Council in books provided for that purpose.

ART. 2—The Treasurer shall safely keep all monies, notes, bonds and credits coming into his possession by virtue of his office and shall give a bond of five thousand dollars to the City of Kendall with at least two securities, conditional that he will faithfully account for all monies, notes, bonds and other credits coming into his possession by virtue of his office, said bond to be approved by the Mayor and Council. He shall pay out money only on the order of the Mayor attested by the City Clerk, which order shall also bear the seal of the city.

ART. 3—The City Marshall shall be the Chief of Police, and shall be charged with the preservation of the peace and good order of the city under the ordinances thereof and under the instructions of the Mayor and Council.

Approved March 18th, A. D., 1887.

H. R. BELL,
Mayor.

[Attest]
T. A. JOHNSON,
Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 24



Copyright © 2023 Newspapers.com. All Rights Reserved.



Newspapers.com
by ancestry
https://www.newspapers.com/image/420675083

costs are paid or replevied.

[Published Nov., 28th 1885.]

### ART. VI. SEC. I.

#### WEAPONS.

*Sec. 11.* Be it ordained by the mayor and councilmen of Meade Center in the state of Kansas, that it shall be unlawful for any person or persons who are not authorized by the laws of the United States or of the state of Kansas or of the said city of Meade Center, who shall be found within the incorporate limits of said city of Meade Center, carrying on his person a pistol, bowie knife, dirk, or other deadly weapons, shall be subject to arrest upon charge of misdemeanor and upon conviction shall be fined in any sum not exceeding $25, and stand committed until paid or replevied.

[Publishen Nov., 28th 1885.]

ART. VII. SEC. I.

Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers.com

# EXHIBIT 25

JA0294

doubt.

## ORDINANCE NO. TWELVE,

### Peace, Good Government and General Welfare.

Be it ordained by the Mayor and Councilmen of the city of Mt. Hope Kansas.

SEC. 1. That any person who shall beat, wound or assault another, or obstruct, oppose or resist any city officer in the discharge of his duty, shall upon conviction be fined in any sum not less than three dollars nor more than twenty-five dollars and costs of suit.

SEC. 2. That any person, not an officer or traveler, who shall carry any knives, (except pocket knives) firearms, brass knucks, slung shots or other deadly weapons, concealed, within the corporate limits of the city of Mt. Hope, shall be deemed guilty of an offense, and upon conviction thereof shall be fined for each and every offense, the sum of ten dollars and costs of suit.

SEC. 3. That any person under the age of twenty one years of age, who shall be found carrying any deadly weapon, concealed or otherwise, shall be deemed guilty of an offense, and upon conviction thereof, shall be fined in any sum not more than ten dollars and costs of suit. PROVIDED, this does not apply to any one leaving the city on a hunting expedition, or returning therefrom.

SEC. 4. That whoever disturbs any assembly of people met for a lawful purpose, or shall disturb the peace and quiet of the city, or any neighborhood, family or person, within the corporate limits of the city of Mt. Hope, by any improper conduct, or by loud or unusual noises, vulgar or offensive language, quarreling, fighting or challenging to fight or display any firearms or other deadly weapons, shall be deemed guilty of an offense, and upon conviction thereof be fined in any sum not less than three dollars, nor more than twenty-five dollars and costs of suit.

SEC. 5. That whoever discharges any firearms, or throws any stones or missiles by the hand or by the means of any device, or shall break, mar, deface, injure or destroy, any property, public or private, real or personal, not his own, within the corporate limits of the city of Mt. Hope, shall be deemed guilty of an offense and upon conviction thereof be fined in any sum not less than three dollars, nor more than twenty-five dollars and costs of suit.

Copyright © 2023 Newspapers.com. All Rights Reserved.



https://www.newspapers.com/image/478384879

Printed on Jun 25, 2023

SEC. 6. That any tramp or any person found wandering, tramping, loafing or begging about, within the corporate limits of the city of Mt. Hope, without any visible means of support or honestly endeavoring to seek employment shall be deemed guilty of an offense and upon conviction thereof shall be fined in any sum not more than ten dollars and costs of suit.

SEC. 7. That any person who shall be found drunk or intoxicated or who shall be guilty of any disorderly conduct on any public street or alley or in any public place, within the corporate limits of the city of Mt. Hope shall be deemed guilty of an offense, and upon conviction thereof be fined in any sum not less than three dollars nor more than twenty dollars and costs of suit.

SEC. 8. That any person who shall be found gambling, owning directing or conducting any game of chance or gambling device, or playing thereat, and any person who shall let, rent or permit his property to be used as a gaming house club room or place where any game of chance or gambling device is kept, conducted or allowed to be carried on, shall be deemed guilty of an offense and upon conviction thereof shall be fined in any sum not xceeding one hundred dollars and costs of suit. PROVIDED this shall not apply to any game for social amusement, where no bets or charges are made and no stakes are played for.

SEC. 6. That this ordinance shall be in full force and effect after its publication in the Mt. Hope Mentor one issue.

Passed by the city council May 4th, 1887.

E. J. LENHART, City Clerk.

APPROVED.

S. M. JOHNS, Mayor

[*Published in the Mt. Hope Mentor May 5th, 1887.*]

Copyright © 2023 Newspapers.com. All Rights Reserved.



JA0296

# EXHIBIT 26

Newspapers by ancestry
https://www.newspapers.com/image/369072508

Scandia Journal (Scandia, Kansas) · Fri, Jan 5, 1894 · Page 8
Printed on Jun 25, 2023

[Published January 5, 1894.]

# ORDINANCE No. 79.

An ordinance relating to crimes and punishments.

Be it ordained by the mayor and council of the City of Scandia:

SECTION 1. Every person who shall, within the corporate limits of the city of Scandia, disturb the peace of the city, or of any religious, political or other lawful meeting, or who shall disturb the peace of any neighborhood, family or person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in any sum, not less than Three ($3.00) Dollars, nor more than Fifty ($50.00) Dollars.

SECTION 2. Every person who shall, within the corporate limits of the city of Scandia, use any indecent, improper, obscene or profane language; or who shall be guilty of any indecent, lewd, obscene or boisterous conduct, shall, upon conviction, be adjudged guilty of a violation of this ordinance, and be punished by a fine of not less than One ($1.00) Dollar nor more than Ten ($10.00) Dollars.

SECTION 3. Every person who shall, within the corporate limits of the city of Scandia, be intoxicated, shall, upon conviction, be fined, for the first offense, in any sum not less than Three ($3.00) Dollars, nor more than Twenty-five ($25.00) Dollars. And for each subsequent conviction of a similar offense, within six months, in any sum not less than Five ($5.00) Dollars, nor more than Fifty ($50.00) Dollars.

SECTION 4. Every person who shall, within the corporate limits of the city of Scandia, set up, keep, or operate, any table or gambling device, with cards, dice, or any other kind of gambling device, adapted, designed and devised for the purpose of playing any games of chance, luck or skill, for money, property, chips or any other thing of value, or who shall induce, entice or permit, any person or persons, to play or bet at or upon, or about such gambling table or device, shall upon conviction be fined in any sum not less than Ten ($10.00) Dollars, nor more than Fifty ($50.00) Dollars.

SECTION 5. Every person who shall be found within the corporate limits of the city of Scandia, without visible means of support, or some legitimate business, shall be notified by the city marshal to at once depart from said city and remain outside thereof; and if such notice be not complied with, or if, after leaving, such person shall return, they shall be deemed guilty of vagrancy, and the city marshal shall forthwith arrest such person and upon conviction they shall be fined in any sum not exceeding Fifty ($50.00) Dollars.

SECTION 6. Every person who shall, within the corporate limits of the city of Scandia, carry or have upon their person any concealed pistol, revolver, bowie-knife, dirk, sling-shot, billy, knuckles or other deadly weapon, shall upon conviction be fined in any sum not less than Two ($2.00) Dollars, nor more than Fifty ($50.00) Dollars. Provided:—That any person engaged in a lawful occupation and of good moral character, may, by the mayor, be granted a permit to carry such concealed weapons.

SECTION 7. Every person who shall, within the corporate limits of the city of Scandia, commit any assault, or assault and battery, upon the person of another, or who shall beat, strike or threaten another with bodily injury, shall be deemed guilty of an unlawful disturbance of the peace of the city, and upon conviction shall be punished by a fine of not less than Five ($5.00) Dollars, nor more than Fifty ($50.00) Dollars.

SECTION 8. Every person who shall, within the corporate limits of the city of Scandia, play at, upon, or about, or wager any money, or thing of value, upon any gambling tables and devices set out and described in Section Four (4) of this ordinance, shall upon conviction be punished by a fine of not less than Two ($2.00) Dollars, nor more than Twenty-five ($25.00) Dollars.

SECTION 9. Every person who, [shall] within the corporate limits of the city of Scandia, make any lewd, obscene or indecent exposure of their person, in any public place; or who shall expose to view, in any public place, any lewd, obscene or indecent print, picture, writing or book, shall upon conviction be fined in any sum not less than Two ($2.00) Dollars, nor more than Fifty ($50.00) Dollars.

SECTION 10. Every person who shall, within the corporate limits of the city of Scandia, keep, harbor or maintain any female, knowing her to be a public prostitute, shall upon conviction be fined in any sum not exceeding Fifty ($50.00) Dollars.

SECTION 11. Every person who shall, within the corporate limits of the city of Scandia, discharge any fire-arm, rocket, giant-powder, fireworks, or any combustible or explosive material, without first obtaining a permit therefor from the mayor, shall upon conviction be fined in any sum not exceeding Twenty-five ($25.00) Dollars.

SECTION 12. Every person who shall, within the corporate limits of the city of Scandia, obstruct any street, alley, sidewalk or crossing, by placing thereon any team, wagon, buggy, cart, vehicle, boxes, barrels, wood, stone, coal, dirt, rubbish, or by making any excavation therein, or erecting any structure thereon; and every railway engineer, conductor, yard master, or other person having charge of any railway train, engine or car, who shall permit any engine, train or car, or any part thereof, to obstruct any street, alley, crossing or sidewalk longer than ten minutes at any one time, shall upon conviction be fined in any sum not exceeding Twenty-five ($25.00) Dollars. Provided:—The mayor and council may issue a permit allowing any person to obstruct a designated portion of any street, alley or sidewalk temporarily, to meet the emergencies of business.

SECTION 13. Every person who shall, within the corporate limits of the city of Scandia, wilfully and maliciously annoy any other person, or mar, break, injure, or destroy, any property of another, or tear down, injure, deface, or destroy any sign, fence, gate, building, door, window, or any other property, or open and leave open any door, window, gate or entrance to any house, barn or inclosure, shall upon conviction be fined in any sum not exceeding Fifty ($50.00) Dollars.

SECTION 14. Every person who shall, within the corporate limits of the city of Scandia, be a keeper or inmate of a house of prostitution, brothel, bawdy house, or house of assignation, or disorderly house of any kind; and every person who shall frequent, or patronize, or be found within such house, shall upon conviction be fined in any sum not less than Five [$5.00] Dollars, nor more than Fifty [$50.00] Dollars.

SECTION 15. Every person who shall, within the corporate limits of the city of Scandia, drive, or ride, any team, horse or mule along or upon any street, alley, highway or bridge, at so fast a pace as to endanger the safety of others, shall upon conviction be fined in any sum not exceeding Twenty-five [$25.00] Dollars.

SECTION 16. Every person who shall, within the corporate limits of the city of Scandia, wilfully throw any stone, brick, wood, or other substance likely to cause injury, at another person, or any house, window, door, vehicle or animal, shall upon conviction be fined in any sum not exceeding Fifty [$50.00] Dollars.

SECTION 17. Every person who shall, within the corporate limits of the city of Scandia, leave any team, horse, mule or other animal tied upon any street or alley an unreasonable length of time without proper care, or in cold, stormy and inclement weather longer than necessary, shall upon conviction be fined in any sum not exceeding Twenty-five [$25.00] Dollars.

SECTION 18. Every person who shall, within the corporate limits of the city of Scandia, permit any horse, mule, swine, cattle, chickens or other fowls, or stock of any kind, belonging to them, to run at large, or who shall lariat, herd or pasture any stock on the streets or alleys, or who shall leave any team, horse or mule upon the streets without being properly tied, shall upon conviction be fined in any sum not less than Two [$2.00] Dollars, nor more than Fifty [$50.00] Dollars. And it is hereby made the duty of the city marshal to take up and impound, or properly care for, all stock found running at large, lariated or being herded or pastured upon the streets and alleys. For each animal taken up and impounded, or otherwise cared for, the city marshal shall be entitled to receive a sum not exceeding [$1.00] Dollar, and for keeping such animal the further sum of, not to exceed, Twenty-five cents per day. Every animal taken up and impounded must be claimed by the owner within ten days; and if not so claimed, the city marshal shall advertise the same for sale, and sell to the highest bidder for cash. The proceeds shall be applied to the cost of taking up and keeping such animal, and the balance shall be paid into the city treasury for the use of the owner. Provided:—If no owner be found within three months the proceeds shall become the property of the city.

SECTION 19. Every person who shall, within the corporate limits of the city of Scandia, destroy or injure any fruit tree, shade tree, ornamental tree, hedge or shrubbery, belonging to another, or who shall allow any team, horse, mule or other animal belonging to them, so to do, shall upon conviction be fined in any sum not exceeding Fifty [$50.00] Dollars.

SECTION 20. Every person who shall, within the corporate limits of the city of Scandia, permit or allow any team, horse, mule, or other animal belonging to them, to go upon or along any sidewalk, or who shall drive or lead any animal, or animals, upon such walks, at any place not a regular crossing, shall upon conviction be fined in any sum not exceeding Twenty-five [$25.00] Dollars.

SECTION 21. All prosecutions for any violation of this ordinance shall be before the police judge, and in all cases of conviction the police judge shall forthwith commit the defendant to the city prison until the fine assessed against him and all costs of prosecution are paid. At any time after commitment the mayor may order the city marshal to put the defendant at work upon the streets until the fine is worked out at the rate of One [$1.00] Dollar per day.

SECTION 22. Ordinances number Six [6], number Twenty-four [24], number Thirty-five [35], and all ordinances and parts of ordinances in conflict herewith, are hereby repealed.

SECTION 23. This ordinance shall take effect and be in force from and after its passage, approval and publication in the SCANDIA JOURNAL.

Passed the council December 15, 1893.

Approved this 27th day of December 1893.

C. S. LYONS, Mayor.

STATE OF KANSAS, REPUBLIC COUNTY, ss:

I hereby certify the foregoing to be a true and correct copy of the original ordinance, as passed by the council and approved by the mayor, and now on file in my office. I. C. WARE,

[SEAL] City Clerk

GEORGE F. PAGE.

Attorney at Law. & Notary Public

Scandia, Kansas.

Important Notice.

All Persons Indebted to J. W. Pinney & Co., will Please Call and Settle at Once.

We need our Money.

Copyright © 2023 Newspapers.com. All Rights Reserved.
Powered by Newspapers.com

Case 1:23-cv-01293-GLR   Document 21-4   Filed 07/28/23   Page 100 of 143

Scandia Journal (Scandia, Kansas) · Fri, Jan 5, 1894 · Page 8

https://www.newspapers.com/image/369072508

Printed on Jun 25, 2023

return, they shall be deemed guilty of vagrancy, and the city marshal shall forthwith arrest such person and upon conviction they shall be fined in any sum not exceeding Fifty ($50.00) Dollars.

SECTION 6. Every person who shall, within the corporate limits of the city of Scandia, carry or have upon their person any concealed pistol, revolver, bowie-knife, dirk, sling-shot, billy, knuckles or other deadly weapon, shall upon conviction be fined in any sum not less than Two ($2.00) Dollars, nor more than Fifty ($50.00) Dollars. Provided:—That any person engaged in a lawful occupation and of good moral character, may, by the mayor, be granted a permit to carry such concealed weapons.

SECTION 7. Every person who shall, within the corporate limits of the city of Scandia, com-

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 27

The Lake Charles Echo (Lake Charles, Louisiana) · Sat, Jul 18, 1874 · Page 4

https://www.newspapers.com/image/348612058

Printed on Jun 25, 2023

Copyright © 2023 Newspapers.com. All Rights Reserved.



The Lake Charles Echo (Lake Charles, Louisiana) · Sat, Jul 18, 1874 · Page 4

https://www.newspapers.com/image/348612058

Printed on Jun 25, 2023

On motion, an ordinance to prevent the carrying weapons within the corporate limits of the town of Lake Charles, was read twice and adopted, as follows :

Section 1st. Be it ordained by the board of Aldermen of the town of Lake Charles, that whoever shall carry a weapon or weapons upon his person, within the corporate limits of said town, such as Bowie knives, pistols, revolvers, dirks, brass-knuckles, slung-shots, or any other dangerous weapon or weapons, shall be fined not less than five dollars, and in default of payment of fine with all costs, he shall be imprisoned, in the parish jail, not less than twenty-four hours, and for a second offence the fine shall be double.

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 28



Copyright © 2023 Newspapers.com. All Rights Reserved.



Lawrence Democrat (Lawrenceburg, Tennessee) · Fri, Jul 26, 1895 · Page 4

https://www.newspapers.com/image/174660388

Printed on Jun 25, 2023

more than twenty-five dollars with all cost.]

Sec. 18. Be it further ordained. That it shall be unlawful for any person to carry about their person any pistol, bouie knife, sling shot, brass knucks, dirk, sword, loaded cane, stiletto, razor or other deadly wapon in this Corporation, and it is hereby made the duty of the City Marshal or other officer who

rmit in
nement

control
or bois-
noyance
e deem-
d upon
ss than
rs with

d. That

Corpora
city or u
have the
upon th
lanes, al
such bu
terial ne
ing finis
Provide
or mate
pede the

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers
by ancestry
https://www.newspapers.com/image/174660388

sees or knows of any person carrying such deadly weapons to immediately arrest every such person that they may be dealt with according to the provisions of this act, and any person found guilty of carrying any of the aboved named weapons or any other deadly weapon shall be fined not less than ten nor more than fifty dollars with all cost. Provided that this Section shall not apply to Marshals Sheriffs or other officer while on duty.

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers
POWERED BY

# EXHIBIT 29

An Ordinance prohibiting the carrying of concealed weapon and fixing the punishment therefor.

Be it ordained by the mayor and councilmen of the city of Perry.

SECTION 1. It shall be unlawful for any person in the city of Perry to carry concealed on or about his person, saddle or saddlebags, any pistol, revolver, bowie knife, dirk, dagger, razor, slingshot, sword, cane, spear, metal knuckles or any other kind of knife or instrument manufactured or sold for the purpose of defense except in this ordinance provided.

SEC. 2. It shall be unlawful for any person in the corporate limits of the city of Perry to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles or any other offensive or defensive weapon, except as in this article provided.

SEC. 3. It shall be unlawful for any person within the corporate limits of the city of Perry, to sell or give to any minor, any of the arms or weapons designated in sections one and two of this article.

SEC. 4. Public officers while in the discharge of their official duties or while going from their homes to their place of duty or returning therefrom shall be permitted to carry arms, but at no other time and under no other circumstances, provided, however, that if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this ordinance as though he were a private person.

SEC. 5. Persons shall be permitted to carry shot guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using them in public muster or military drills or while traveling or removing from one place to another, and not otherwise.

SEC. 6. It shall be unlawful for any person to point any pistol or any other deadly weapon, whether loaded or not at any other person or persons either in anger or otherwise.

SEC. 7. Any person violating the provisions of any one of the foregoing sections, shall, upon conviction be fined in not less than Twenty Five Dollars and not more than Fifty Dollars, or imprisonment not more than 90 days or both.

SEC. 8. All ordinances or parts of ordinances in conflict with the provisions of this ordinance are hereby repealed.

SEC. 9. This ordinance shall take effect and be in force from and after its passage approved and publication.

Approved this 23 day of Jan. 1895.

                W. A. STONE,
(ATTEST)
[SEAL]              Mayor.
G. W. PURSELL, City Clerk.

**BUSINESS LOCALS.**

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 30

JA0309

https://www.newspapers.com/image/859729118

Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.



Omaha Daily World-Herald (Omaha, Nebraska) · Sun, Aug 4, 1889 · Page 12

https://www.newspapers.com/image/859729118

Printed on Jun 25, 2023

be imprisoned not exceeding thirty days.

SEC. 10.  It shall be unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slungshot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon within the corporate limits of the city of Omaha.  And any person guilty of a violation of this section shall, on conviction, be fined not exceeding one hundred dollars for each and every offense: nothing in this section, however, shall be so construed as to prevent the United States marshals and their deputies, sheriffs and their deputies, regular or special police officers of the city, from carrying or wearing such weapons as may be deemed necessary in the proper discharge of their duties.  Provided, however, if it shall be proved from the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of any lawful business, calling or employment and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

Whenever any police officer shall make an arrest of a person having concealed on or about his person any weapon or weapons, as specified in this section, it shall be such officer's duty to take from such person arrested the weapon or weapons found upon him at the time of his arrest, and to retain the same, to abide such order concerning the same as may be made by the police judge.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 31

The Black Hills Weekly Journal (Rapid City, South Dakota) · Fri, Dec 8, 1882 · Page 1

https://www.newspapers.com/image/351946935

Printed on Jun 25, 2023

### Ordinance No. 11.

Be it ordained by the president and board of trustees of the town of Rapid City:

SECTION 1. That it shall be, and it is hereby declared to be unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy, slung shot, brass or other metalic knuckles, or any other dangerous or deadly weapon within the corporate limits of the town of Rapid City, Dakota territory.

Provided, that nothing herein contained shall prevent the carrying of such weapon by a civil or military officer, or by a soldier in discharge of his duty, nor by any other person for meer purposes of transportation from one place to another.

SEC. 2. Upon complaint before the justice of the peace of the town, that an offence in violation of this ordinance has been committed, he shall inquire into the circumstances of the case, to determine whether the charge is well founded, and exercise his own discretion as to the dismissal. If the complaint shall be made good and the party arrested shall be adjudged guilty by the said justice of the peace, he shall fine the offender not less than ten nor more than fifty dollars, with the costs of prosecution.

SEC. 3. All funds assessed and collected under this ordinance shall be paid to the treasurer and be credited to the general revenue fund.

SEC. 4. This ordinance shall take effect and be in force from and after its passage and approval and publication as provided by law.

Approved December 4th, 1882.

Attest: JOHN R. BRENNAN, President.

A. C. TUCKER, Clerk.

—New novelties for the ladies at the Montana Store of Felix Poznansky.

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 32

Newspapers
by ancestry
https://www.newspapers.com/image/162705336

Arizona Daily Star (Tucson, Arizona) · Sat, May 19, 1883 · Page 3

Downloaded on Jul 12, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.



JA0315

Newspapers
by ancestry
https://www.newspapers.com/image/162705336

Arizona Daily Star (Tucson, Arizona) · Sat, May 19, 1883 · Page 3

Downloaded on Jul 12, 2023

exceeding six months or be punished by both such fine and imprisonment.

Sec. 15. If any person shall within the corporate limits of the city of Tucson carry concealed upon his person any gun, pistol, bowie-knife, dagger or other deadly weapon, he shall be deemed guilty of having committed a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding three hundred dollars or be imprisoned in the County or City jail for any period of time not exceeding six months or be punished by both such fine and imprisonment; provided that this section shall not be construed to apply to sheriffs, constables or police officers, when exercising their legitimate duties.

Sec. 16. If any saloon, gambling house, house of prostitution, dance house keeper or proprietor of any place wherein intoxicating or

Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers
.com

# EXHIBIT 33

Newspapers
by ancestry

https://www.newspapers.com/image/24064306

Printed on Jun 25, 2023

# AN ORDINANCE (No. 19)

Regulating the keeping and bearing of deadly weapons.

*Be it ordained by the City Council of the city of Galveston:*

SECTION 1. That any person carrying on or about his person, saddle or vehicle, within the corporate limits of the city of Galveston, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, or carried for purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such attack shall be immediate and pressing, or unless having or carrying the same on or about his person for the lawful defense of the state of Texas or the city of Galveston, as a militiaman in actual service, or as a peace officer or policeman, shall be fined in a sum of not less than twenty-five dollars nor more than one hundred dollars, and in default of payment thereof shall be confined in the jail for a period not less than ten days nor more than three months, and whilst so confined shall be required to work on the streets of said city, or any public work under the control of the City Council for the period of such confinement ; *provided*, that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her premises, or at his or her place of business, nor to prohibit sheriffs, their deputies, or other revenue officers, or other civil officers, from keeping or bearing arms whilst engaged in the discharge of their official duties, nor to prohibit persons traveling through the city of Galveston from keeping or carrying arms with their baggage.

SEC. 2. That any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage, and that such weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

SEC. 3. That this ordinance shall take effect and be of force on and after its due publication as prescribed by the city charter.

Approved August 19th, 1873.

C. W. HURLEY, Mayor.

Attest:

C. C. ALLEN, Clerk.

aug30D10t

AN ORDINANCE (No. 19)

Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY Newspapers™

# EXHIBIT 34

JA0319

https://www.newspapers.com/image/730567433

Printed on Jun 25, 2023

## AN ORDINANCE

### Prohibiting the carrying of Fire Arms and Concealed Weapons.

SECTION 1.   *Be it ordained by the Common Council of Nebraska City,* That it shall be, and it is hereby declared to be unlawful for any person to carry openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane billy, slung shot, brass or other metalic knuckles or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Neb.; *Provided,* that nothing herein contained shall prevent the carrying of such weapon by a civil or military officer, or by a soldier in the discharge of his duty, nor by any other person for mere purposes of transportation from one place to another.

SEC. 2.   Upon complaint before the Mayor that an offence in violation of this ordinance has been committed, he shall inquire into the circumstances of the case to determine whether the charge is well founded, and exercise his own discretion as to the dismissal thereof.   If the complaint shall be made good and the party arrested shall be adjudged guilty by the Mayor, he shall fine the offender not less than twenty dollars and not more than one hundred with the costs of prosecution.

SEC. 3.   All funds assessed shall collected under this ordinance shall be paid to the Treasurer, to be credited to the Police fund.

SEC. 4.   This ordinance shall take effect and be in force from and after its passage, approval and publication

Attest:

W. E. DILLON,
Mayor.

J. DAN. LAUER,
City Recorder.

— At a regular conclave of Mount

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 35

JA0321



Copyright © 2023 Newspapers.com. All Rights Reserved.





Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 36

[CONCLUDED NEXT WEEK.]

# LAWS OF THE
## STATE OF MISSISSIPPI

[PUBLISHED BY AUTHORITY.]

AN ACT to prevent the carrying of concealed weapons, and for other purposes.

SECTION 1. Be it enacted by the Legislature of the State of Mississippi, That any person, not being threatened with, or having good and sufficient reason to apprehend an attack, or traveling (not being a tramp,) or setting out on a journey, or peace officer, or deputies in discharge of their duties, who carries concealed in whole or in part, any bowie knife, pistol, brass knuckles, sling shot or other deadly weapon of like kind or description, shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offence by a fine of not less than five dollars nor more than one hundred dollars, and in the event the fine and cost are not paid shall be required to work at hard labor under the direction of the board of supervisors or of the court, not exceeding two months, and for the second or any subsequent offense, shall, on conviction, be fined not less than fifty nor more than two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor not exceeding six months under the direction of the board of supervisors, or of the court. That in any proceeding under this section, it shall not be necessary for the State to allege or prove any of the exceptions herein contained, but the burden of proving such exception shall be on the accused.

SEC. 2. Be it further enacted, That it shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this act described, or any pistol cartridge, and on conviction shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court, not exceeding six months.

SEC. 3. Be it further enacted, That any father, who shall knowingly suffer or permit any minor son under the age of sixteen years, to carry concealed, in whole or in part, any weapon of the kind or description in the first section of this act described, shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor under the direction of the board of supervisors, or of the court.

SEC. 4. Be it further enacted, That any student of any university, college or school, who shall carry concealed, in whole or in part, any weapon of the kind or description in the first section of this act described, or any teacher, instructor, or professor who shall, knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars, and if the fine and costs are not paid, condemned to hard labor under the direction of the board of supervisors or of the court.

SEC. 5. Be it further enacted, That each justice of the peace before whom a conviction is had, shall, in addition to the costs now allowed by law, be entitled to a tax fee of two dollars and a half.

SEC. 6. Be it further enacted, That immediately after the passage of this act, the Secretary of State shall transmit a copy to each circuit judge in the State, who shall cause the same to be read in open court on the day for the calling of the State docket of the court.

SEC. 7. Be it further enacted, That this act take effect from and after its passage.

APPROVED, February 28, 1878.

Copyright © 2023 Newspapers.com. All Rights Reserved.



JA0325

# EXHIBIT 37

JA0326



Copyright © 2023 Newspapers.com. All Rights Reserved.



Newspapers
by ancestry

https://www.newspapers.com/image/535862657

Grand Junction News (Grand Junction, Colorado) · Sat, Jul 8, 1899 · Page 7

Printed on Jun 25, 2023

in the same manner as animals running at large.

SEC. 6.   No person not being then and there an officer in the proper exercise of his duty as such shall carry or have concealed upon or about his person any pistol, gun, bowie knife, dirk, dagger, slung shot, stone, bludgeon, billy, metal knuckles or any other deadly or dangerous weapon, nor shall exhibit any such weapon in a rude, angry or threatening manner, nor shall have or carry any such weapon or weapons on or about his person when drunk or in a state of intoxication, nor shall any person, directly or indirectly, sell, barter, loan or deliver any such weapon or weapons to any drunk or intoxicated person.

SEC. 7.   No person shall throw any stones or other missile upon or at any building, whether occupied or unoccupied, nor at any

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 38


The Lyons Republican (Lyons, Kansas) · Thu, Sep 10, 1891 · Page 4
https://www.newspapers.com/image/427118938

Printed on Jun 25, 2023



# ORDINANCE NO. 179.

[First published in the Lyons REPUBLICAN, September 10th, 1891.]

An Ordinance relating to carrying concealed weapons, and repealing Ordinance No. 70.

Be it ordained by the Mayor and Councilmen of the City of Lyons, Kansas.

Sec. 1. Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, who shall be found within the limits of the City of Lyons, carrying on his person a pistol, bowie knife, dirk or other deadly weapon, shall be subject to arrest upon charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding fifty dollars, or by imprisonment in the city jail not exceeding one month, or by both such fine and imprisonment.

Sec. 2. Ordinance number seventy of the ordinances of the City of Lyons is hereby repealed.

Sec. 3. This Ordinance shall take effect after its publication in the Lyons Republican.

Passed and approved, Sept. 7th, 1891.

[seal]                       E. A. RICHARDS, Mayor.

Attest:—A. E. Magoffin, City Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 39

JA0331

Newspapers.com
by Ancestry
https://www.newspapers.com/image/541935131
Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.



Newspapers.com by Ancestry
The Brooklyn Union (Brooklyn, New York) · Thu, Aug 21, 1873 · Page 1
https://www.newspapers.com/image/541935131
Printed on Jun 25, 2023



## BOARD OF HEALTH.

### SANITARY CODE.

#### ADOPTED JULY 15, 1873.

At a meeting of the Board of Health, for the city of Brooklyn, held at 96 Court street, on the 15th day of July, A. D., 1873.

Present—James Jourdan, the President of the Board of Health, Joseph C. Hutchinson, M. D., and J. T. Conking, M. D., members of the said Board.

The said Board of Health by virtue of, and in pursuance of the authority conferred by section 9 of chapter 169 of the Laws of 1873, entitled "An act to establish a Board of Health in and for the city of Brooklyn, passed March 29, 1873," which said section declares that said Board shall possess within the city of Brooklyn, all the authority, and be charged with all the duties (unless otherwise provided for in this act) conferred or imposed upon the Metropolitan Board of Health, under an act entitled " An act to create a Metropolitan Sanitary District and Board of Health therein for the preservation of life and health, and to prevent the spread of disease," passed February twenty-sixth, eighteen hundred and sixty-six, chapter seventy-four, and also all the powers conferred by the amendments to said act, passed April nineteenth, eighteen hundred and sixty-six, and May twenty-fifth, eighteen hundred and sixty-seven, and also all the powers conferred by any act amendatory thereof, and also all the powers applicable to Brooklyn, conferred by an act for the regulation of tenements and lodging houses in the cities of New York and Brooklyn, passed May fourteenth, eighteen hundred and sixty-seven, and also all the powers conferred by an act to authorize the abatement and prevention of certain nuisances, deemed dangerous to the public health in the city of Brooklyn, passed April twenty-third, eighteen hundred and sixty-seven, and also all the authority, duty and powers, whether given by any law or by ordinance made thereunder heretofore (for the purpose of preserving or protecting life or health, or preventing disease) conferred upon or now belonging to or being exercised by the Board of Health of the city of Brooklyn, are hereby exclusively conferred upon, and shall hereafter be exclusively exercised by the aforesaid Board of Health of the city of Brooklyn, the members and officers thereof," do hereby direct, order, ordain and enact as follows :

DEFINITIONS OF TERMS.

SECTION 1. That the terms "Board," " this Board," and "said Board," shall be held to mean the "Board of Health of the City of Brooklyn ;" that the word "Department" wherever used herein, shall be held to mean the "Board of Health of the City of Brooklyn ;" that the words "person," " owner," " tenant," " lessee," " occupant," " contractor," " party," " manager," " Board," and " officer," shall respectively be held to apply to and include, both jointly and severally, each and all owners, part-owners, tenants, lessees, occupants, managers, contractors, parties in interest, persons, officers, boards and corporations who may sustain the relations, or may be in like position of any one or more thereof referred to in any ordinance or regulation ; that every order, ordinance or regulation declared applicable to the built-up portion of Brooklyn, shall, so far as the subject-matter thereof is applicable (save as to interments), and so far as this Board has authority to make the same, be held to include and apply to the built-up portions of said city ; that every word or phrase anywhere herein defined shall be held to include the same sense wherever used ; that the words " city," or " this city," or " said city," whenever used herein, shall be held to mean the city of Brooklyn ; that the word " regulations" shall be held to include " special regulation," (which latter will be from time to time issued, and will contain more detailed provisions that can be herein con-

Case 1:23-cv-01293-GLR   Document 21-4   Filed 07/28/23   Page 135 of 143

The Brooklyn Union (Brooklyn, New York) · Thu, Aug 21, 1873 · Page 1

https://www.newspapers.com/image/541935131

Printed on Jun 25, 2023

to a permit of the regulations of this Board or on or fire any gun or other firearm or rock-blast in any public street, alley, or place within the built-up portions of said city, where any human life may be imperilled.

SEC. 174. That no person shall sell, loan, or give to, or allow to be taken by any other person, any fire-arm, or other deadly or dangerous weapon, when there shall be any reason for such first named person to think or believe that any danger to life may illegally result from the giving, loaning, selling, or from the use of such arm or weapon.

SEC. 175. That no large, or church bell shall be rung or tolled at any funeral in said city without a permit therefor from this Board, nor shall such bell be rung or tolled at any other time therein to the prejudice or peril of the life or health of any human being.

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 40

Newspapers
by Ancestry
https://www.newspapers.com/image/604120328

Printed on Jun 25, 2023

## TOWN ORDINANCE NO. 21.

An Ordinance regulating and prohibiting the carrying of deadly weapons:

Be it ordained by the Board of Trustees of the town of Blackwell:

SECTION 1:—It shall be unlawful for any person within the corporate limits of the town of Blackwell to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung shot, billy, metal knucks, sand bag, or any other kind of knife or instrument manufactured or sold for the purpose of defnse except as in this ordinance provided.

SECTION 2:—It shall be unlawful for any person in the corporate limits of the town of Blackwell to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon except as in this ordinance provided.

SECTION: 3—Public officers, while in the discharge of their duties, or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances. Provided, however, that if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this ordinance as though he were a private person.

SECTION 4:—Persons shall be permitted to carry shotguns or rifles for the purpose of hunting, having them repaired, or for killing annimals, or for the purpose of using the same in public muster or military drills, or while traveling or moving from one place to another, and not otherwise.

SECTION 5:—It shall be unlawful for any person to point any pistol, revolver, shot gun or rifle, whether loaded or not, at any other person or persons either in anger or otherwise.

SECTION 6:—Any person violating the provisions of any of the forgoing sections, shall upon conviction, be adjudged guilty of a misdemeanor and be punished by a fine of not less than five dollars and costs, nor more than ten dollars and costs, and shall be committed until said fine and costs are paid.

SECTION 7:—This ordinance shall be in full force and effect ten days after its publication in the K County DEMOCRAT.

Passed August 7th 1894.

JOHN R. MAY, President.

Attest: BUEL W. HOLT, Town Clerk.

Per T. M. JONES, Deputy Town Clerk.

[First published in the K County DEMOCRAT, August 9th 1894.]

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers
POWERED BY
.com

JA0336

# EXHIBIT 41

https://www.newspapers.com/image/423668281

Printed on Jun 25, 2023

Owens lecture here before she leaves the Co.

**AN ORDINANCE.**—To prohibit intoxication breach of the peace, carrying of deadly weapons, the use of obscene language, the discharge of fire arms, and to close places of amusement on Sunday, in the city of Wallace Kansas, and to repeal certain ordinances in said city.

Be it ordained by the Mayor and Councilmen of the City of Wallace, in the State of Kansas.

Sec. 1. If any person shall be drunk in any highway, street or in any public place or building, or if any person shall be drunk in his own house or private building or place disturbing his family or others, he shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $25 or by imprisonment in the city jail for a period not exceeding 30 days.

Sec. 2. Any person who shall wilfully disturb the peace or quiet of any person, family or neighborhood, shall upon conviction thereof be fined in a sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months.

Sec. 3. Any person who shall, while intoxicated be found carrying on his person, a pistol, bowie-knife, dirk or other deadly weapon, shall upon conviction be fined in a sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months.

Sec. 4. Any person who shall carry concealed or otherwise upon his person, any pistol, bowie knife, dirk or deadly weapon, shall upon conviction be fined in any sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months. Provided however, that this shall not apply to any peace officer, of the State, County or Cities of the State, and provided further that if it shall appear to the court trying offences under this section, that the accused was engaged in any legitimate business or calling, that would necessitate the carrying of any such weapon, such person shall be acquitted.

Sec. 5. Any person who shall discharge any fire arms, rockets, powder firework torpedoes or other dangerous or combustible material, upon any streets, lots, grounds, alleys or in the vicinity of any building, shall upon conviction be fined in any sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months. Provided however, that it shall appear to the court, trying offences under this section, that the offence charged was committed by the accused in defence of his person or property or in celebrating any national holiday, public event, and that the same was done in such a manner as not to endanger the lives or property of another, such person shall be acquitted.

Sec. 6. Any person who shall speak, utter or use any indecent language in any public place in the presence and hearing of any female shall upon conviction be fined in any sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months.

Sec. 7. Any person who shall on the first day of the week, commonly called Sunday, keep open any billiard room, ball or pin ally, skating rink, house, ground or other place of amusement, shall upon conviction be fined in any sum not exceeding $100, or by imprisonment, in the city jail not exceeding 3 months.

Sec. 8. Whoever shall aid, assist, or counsel another to commit any of the offenses prohibited by this ordinance shall be deemed guilty of the same offense as the principal and punished accordingly notwithstanding, the principal may not have been charged with the offense.

Sec. 9. All fines and costs imposed by the Police Judge under this ordinance shall be by commitment of the accused to the city jail until the same is paid and the offenses herein denominated and prohibited shall extend to all such acts committed within the corporate limits of the city of Wallace.

Sec. 10. That an ordinance entitled, an ordinance relating to the carrying of deadly weapons, passed Nov. 26th, 1887, and published Dec. 3rd, 1887, and an ordinance, without title passed Nov. 17th, 1887, published Nov. 19, 1887, are hereby repealed, and this ordinance shall take effect and be in force from and after its publication in the Wallace County Register.

Passed and approved. Dec. 22nd, 1887.

Attest: GEO. W. EWEN, A. B. CHRYSLER,
Clerk Procem.     Pres. of Council.

Copyright © 2023 Newspapers.com. All Rights Reserved.


# EXHIBIT 42

JA0339

https://www.newspapers.com/image/587532621

Printed on Jun 25, 2023

## Ordinance No. 39.

*Additional Penal Ordinance—Deadly
or Dangerous Weapons—Malicious
Mischief—Shop-lifting.*

Be it ordained by the Board of Al-
men of the City of Greenfield as
follows:

SECTION I. If any person shall conceal-
ed upon or about his person, any deadly or dan-
gerous weapon, or shall go into any church or
place where people have assembled for religious
worship, or into any school room or place where
people are assembled for educational, literary
or social purposes, or to any election precinct
on any election day (whether National, State
school or Municipal), or into any Court room
during the setting of Court, or into any other
public assemblage of persons met for any lawful
purpose other than for Militia drill or meetings
called under the militia laws of the state, having
upon or about his person any kind of fire-arms,
bowie-knife, dirk, dagger, slung-shot, or other
deadly weapon, or shall in the presence of one
or more persons exhibit any such weapon in a
rude, angry and threatening manner, or shall
have or carry any such weapon upon or about
his person when intoxicated, or under the influ-
ence of intoxicating drinks, or shall directly or
indirectly sell or deliver, loan or barter to any
minor, any such weapon, without the consent of
the parent or guardian of such minor (within
the limits of the City of Greenfield) he shall upon
conviction thereof be fined not less than Fifty
Dollars, nor more than Two Hundred Dollars,
or be imprisoned in the County Jail not longer
than six months, or may be punished by both
such fine and imprisonment

SECTION II. Every person who shall wilfully
and maliciously injure or remove any saddle,
bridle, halter, hitch-rein, buggy or wagon har-
ness, the personal property of another, or who
shall wilfully and maliciously remove any tap
or nut from the axle of any buggy, wagon or
other vehicle, or otherwise injure the same, the
personal property of another, or who shall wil-
fully or maliciously remove, deface or otherwise
injure anything which is the personal property
of another, and without the owners consent shall
conceal, hide or do any act with the personal
property of another, wilfully and maliciously
which is calculated to annoy, damage or injure
another or his property, shall upon conviction
thereof be fined therefor in any sum not exceed-
ing Fifty Dollars, or may be imprisoned in the
County Jail not longer than six months, or may
be punished by both such fine and imprison-
ment.

SECTION III. Every person who shall wilfully
conceal about his person any article of personal
property belonging to another, with intent to
convert the same to his own use, or shall wilful-
ly carry away from any dwelling house, shop or
store, or from any public house any personal
property not his own, or shall be guilty of any
petit thievery ordinarily termed "Shop-lifting"
shall upon conviction thereof be fined in any
sum not exceeding One Hundred Dollars, or
shall be committed to the County Jail for any
term not exceeding six months or may be pun-
ished by both such fine and imprisonment.

SECTION IV. This ordinance shall be in full
force and effect from and after its passage.

Passed and approved January 4th 1886.
WILL R. BOWLES, Mayor.
W. B. McREYNOLDS,
President Board Aldermen
ATTEST: SEYMOUR HOYT, City Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.



JA0340

# EXHIBIT 43

# CONCEALED WEAPONS.

### Judge Brannon's Decision on This Subject.

### HIS CONCLUSIONS VERY SWEEPING.

### The Law Recognizes No Difference in Persons and All Should be Prohibited from This Practice.

BUCKHANNON, W. VA., October 12.—At the late term of the Circuit Court of Upshur county, a young man by the name of Long was tried on an indictment for carrying a pistol contrary to the act of 1882. The evidence for the prosecution was that Long was seen going along the public highway with a revolver in his hand.

The defense proved that Long was a peaceable citizen of good moral character and that he carried the weapon because that in passing along that road a short time previously, he had been pursued by a panther, and was alarmed for his safety.

**The Judge Ruled Out**

that part of the evidence relating to the danger of a panther, as an animal was not contemplated by the act of the Legislature which refers to the danger of bodily harm from some person as justifying the carrying of such weapons embraced in the law.

A verdict of guilty was rendered by the jury, and in the motion to arrest judgment and set aside the verdict, an able and elaborate argument was made by the prisoner's counsel. The ground set forth was the unconstitutionality of the law—first conflicting with the Second and Fourteenth amendments to the federal constitution, and also conflicting with our State constitution, which

**Prohibits Class**

legislation, it being contended that the feature which allows persons of good character and peaceable habits, under certain contingencies, to be exempt from the penalties of the law, is legislation in favor of a class.

The decision rendered by Judge Henry Brannon, who presided sustained the law. As the law is one which has universally met with public favor, and one that has evoked eloquent eulogies from the bench in various parts of the State, your correspondent called upon Judge Brannon with a request that a copy of his decision be furnished for publication a favor that His Honor politely granted. It is clear, concise, and will doubtless be

**Received as Conclusive.**

I herewith append it

The habit of carrying deadly weapons had become so prevalent and hurtful, that the legislature, regarding the old statute inefficient, passed an act in 1882, forbidding a person to carry about his person any revolver or other pistol, dirk, bowie-knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character.

In this case it is urged that this act is void, because in violation of the Second Amendment of the Federal Constitution, which provides that "a well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed," and also because it grants the right to carry weapons for self defense only to persons who are quiet and peaceable citizens of good character and standing, and thus

**Violates the Fundamental Principle**

that all citizens stand equal before the law: and violates that provision of the Fourteenth amendment prohibiting States from passing "any law which shall abridge the privileges or immunities of citizens, or deny to any person within their jurisdiction the equal protection of the laws."

It is a very grave act for a court to overthrow and defeat an act of the Legislature, and should be done only when its unconstitutionality is manifest. Where the repugnance to the Constitution is undoubted, the judge must yield to that high duty of respecting that higest law, the will of the people expressed in the Constitution, rather than the will of the Legislature; but never where he is doubtful, and all doubts go in favor of the act. All courts hold this doctrine. Bridges v. Shallcross, 6 W. Va.

Is it the right of the citizen to wear abroad the small and insidious arms prohibited by this act? Or does the second amendment only guarantee the right to bear large arms, such as are useful in war and in defense of liberty against arbitrary power? Clearly the latter only. In days of tyranny long ago, when monarchical power sought supreme sway and to trample down freedom, history tells us that one of its favorite methods was the

**Disarming of the People**

and wrenching from their hands and homes those arms useful and effective in defense of liberty and dangerous only to tyrants. In this free country this amendment was incorporated to avoid the dangers of the past. Another reason for its adoption was this: Standing armies had been engines of oppression in the past, and American sentiment was opposed to them, and as a substitute reliance was placed on the citizen militia, and to render it efficient it was desirable to train it to the use of arms common in war. The intimate connection in the ammendment of this provision about learning arms with the language, "a well regulated militia being necessary to the security of a free state," shows that military efficiency and popular liberty were in the mind of its draftsman rather than individual privilege, it intended. It defends individual privilege to save the right of the citizen to keep at his home and premises arms ordinarily used in war, and has no reference to small weapons which may be hidden in the pocket and first seen when drawn to do their deadly work. The lives of the people and the public peace are the highest objects of the protection of the law, and this act has

**These High Objects.**

in view. The pistol, the bowie-knife, the stiletto, the slung shot, the billy and the knuckles are the weapons of the ruffian and law breaker, are used in the riot or affray, are dangerous in moments of anger or intoxication, and from them a vast amount of murder, bodily injury and family distress arise, and from them many a bitter tear has flowed. Certainly it was never intended by the constitution to prohibit the Legislature from protecting the lives of the people and the public peace from their greatest foes; it was not intended to withhold the power to regulate within the bounds of prudence and usefulness the bearing of these weapons. It certainly can not be converted into a license to the evil disposed to make their persons walking arsenals to run rampant over the peace of the State, and disarm the Legislature of power to regulate or check it. Such a construction would make the Constitution defend lawlessness, tumult and anarchy, and sacrifice law, order and public security. I cannot yield to this dangerous construction. The construction of law must be reasonable. The act is wise and salutary, is doing good in this State, and the courts

**Should Sustain It.**

The great law writer Bishop, in his work on statutory crimes, sustains this view. Speaking of this clause in the Federal Constitution, he says:

"As to its interpretation, if we look at the question in the light of judicial reason, without the aid of specific authority, we shall be led to the conclusion that the provision protects only the right to 'keep' such 'arms' as are used for purposes of war in distinction from those which are employed in quarrels, brawls and fights between maddened individuals, since such only are properly known by the name of "arms," and such only are adapted to promote "the security of a free State." In the manner the right to "bear" arms refers merely to the military way of using them, not to their use in bravado or affray. In Georgia and Kentucky such acts have been held void, but in Arkansas, Alabama Tennessee and Pennsylvania, they have been sustained, and Bishop says the Arkansas doctrine is approved generally by American courts. Remember that this act recognizes the right to keep and carry a pistol about one's dwelling house or premises, carrying it from the

**Place of Purchase**

home, and from home to a place of repair and back again, and only prohibits their carriage on the premises of others and in public places. For purposes of self defense in immediate danger its allows a peaceable citizen of good character to carry weapons. These exceptions in the act are useful and necessary; but who will say that it is a lawful or necessary privilege to the citizen to go abroad through the land wearing [illegible] these deadly weapons?

But, it is argued here that the act discriminates between citizens, by allowing persons of good character the right of self-defense, while denying it to others. It does not deny the right of self-defense, for if a person of the worst character were assailed and in such danger as to warrant the exercise of the right of self defense and with his pistol were to slay his adversary, he could plead self defense on trial for murder, while he might be indicted for carrying a pistol beforehand. It is not a denial of the plea of self defense; it only denies to bad, dangerous persons the right to arm beforehand and carry weapons, because they are a danger to the place, whereas the

**Law-Abiding are Not.**

The power of regulation visited in the Legislature for police purposes and the maintenance of morals, law and order for the good of society are necessarily wide, even though it may seem to work discrimination between persons.

The right to earn a livelihood is a great right; yet no once can practice law, keep a hotel or sell liquor without proving a good moral character. Such has been the law for years, and no one has questioned its validity. A doctor must now prove a good character to practice. These powers of apparent discrimination must exist *ex necessitate rei*, from the necessity of the case. Liberty to the citizen is a great attribute and deserving of all protection; but it must be liberty regulated by law and consistent with the behests of organized civil society, not mere self-willed, arbitrary license. But suppose this feature limiting the right to carry weapons for self-defense to persons of character were invalid, it should not destroy the whole act. A court which should be of opinion that this particular feature is void, would disregard it by allowing the party to prove the danger impending over him, and that

**He Carried the Weapon**

in self-defense, and dispensing with proof of character. The act admits the main feature, the right to carry for self defense, but adds the condition of good character; but this latter provision is not so intimately connected with the self defense provision that it may not be separated from it, and the self defense clause stand independent of it and be executed without it. Cooley says: "A statute may contain some unconstitutional provisions, and yet the same act may contain other useful and salutary provisions not obnoxious to any just constituted exceptions. It would be inconsistent with all just principles of constitutional law to adjudge these enactments void, because they are associated in the same act but not connected with or dependent on others which are unconstitutional. Where, therefore, a part of a statute is unconstitutional, that fact does not authorize the courts to declare the remainder void, unless all the provisions are connected in subject matter, dependent on each other, operating together for the same purpose, or otherwise so connected together in meaning that it cannot be presumed the Legislature would have passed

**The One Without the Other.**

The constitutional and unconstitutional provisions may even be in the same section, and yet be perfectly distinct and separable, so that the first may stand through the last fall. The point is not whether they are contained in the same section; for the distribution into sections is purely artificial, but whether they are essentially and inseparably connected in substance. If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained."

The Fourteenth Amendment does not apply. The right to carry the weapons prohibited by this act is not a "privilege" or "immunity" within its meaning, nor does it deny the equal protection of the law. It is likely not designed to apply to the right to bear arms, for the other amendment applies to that subject, and there is no need for this as to this subject. It has other objects in view a discussion of which would make this opinion too long but if it

**Could be at All Applied**

to this subject, it would not grant the right to bear arms such as those prohibited by this act, and the remarks above would answer this point.

# EXHIBIT 5

JA0343

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SUSANNAH WARNER KIPKE, ET AL., | * | |
| *Plaintiffs*, | * | |
| v. | * | No. 1:23-cv-01293-GRL |
| | * | |
| WESLEY MOORE, ET AL., | * | |
| *Defendants*. | * | |

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

## DECLARATION OF DR. BRENNAN RIVAS

I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

1.　　I am a Historian and Independent Scholar.  My chosen professional name is Brennan Gardner Rivas. From 2021 to 2022, I was the Lloyd Lewis Fellow in American History at The Newberry Library. From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University. From 2019 to 2020, I was a Lecturer in American History at Texas Christian University. Before that, I was a graduate student in history who conducted research and administrative tasks on behalf of my professors, taught undergraduate survey courses, and worked at my university library. My educational background includes a Ph.D. in History from TCU, where my Thesis was on the development, evolution, and enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s.

2.　　I have been retained by the State of Maryland to render expert opinions in this case. I make this declaration on the basis of my training, professional expertise, and research.

1

3.      My CV, detailing my education, experience, and publications, is attached to this

declaration as Exhibit A. I have written a number of articles related to the regulation of guns,

especially as to the history of nineteenth-century weapon policies and the socio-political context

that made them possible. I have written a peer-reviewed history article, "An Unequal Right to

Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900," which was

published in the *Southwestern Historical Quarterly*. I am also working on a book manuscript

turning my dissertation, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and

Knuckles in the Lone Star State, 1836-1930," into a scholarly monograph. That manuscript has

already undergone the first round of peer review and will be published by academic press.

4.      I have provided written declarations and reports as an expert witness in the

following cases: *Miller v. Bonta*, No. 19-cv-01537 (S.D. Cal.); *Angelo v. District of Columbia*,

No. 22-cv-01878 (D.D.C); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Brumback v. Ferguson*,

No. 22-cv-03093 (E.D. Wash.); *Christian v. Nigrelli*, No. 22-cv-00695 (W.D.N.Y.); *Frey v.

Nigrelli*, No. 7:21-cv-5334-NSR (S.D.N.Y.); *Brumback v. Ferguson*, No. 1:22-cv-03093-MKD

(E.D. Wash.); *Siegel v. Platkin*, New Jersey, No. 22-cv-7463-RMB-AMD (D.N.J.); *NAGR v.

Campbell*, No. 1:22-cv-11431-FDS (D. Mass.); *Oregon Firearms Federation, Inc. v. Kotek*, No.

2:22-cv-01815-IM (D. Or.); *NSSF v. Jennings*, No. 22-cv-01499-RGA (D. Del.); *Chavez v.

Bonta*, No. 3:19-cv-01226-L-AHG (S.D. Cal.) (f/k/a *Jones v. Bonta*); *Nguyen v. Bonta*, No. 3:20-

cv-02470-WQH-BGS (S.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617-KJM-AC (E.D. Cal.);

*Nichols v. Bonta*, No. 3:11-cv-09916-SJO-SS (C.D. Cal.); *Wiese v. Bonta*, No. 2:17-cv-00903-

WBS-KJN (E.D. Cal.). I am currently working on potential expert witness reports and

declarations that may be provided in other jurisdictions. I have been deposed and testified at trial

in one matter, *Oregon Firearms Federation, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D. Or.).

5.      For this engagement, I was asked to provide expert testimony about historical gun regulations that pertained to travelers, transit companies, and transportation-related spaces.

APPLICATION OF PUBLIC CARRY LAWS TO TRAVELERS &
TRANSPORTATION

6.      Americans of the late-eighteenth and nineteenth centuries had regulations that restricted the presence of weapons in public spaces, including those related to transportation services. These public carry laws fell into two categories, one being designated by scholars as "Massachusetts Model" laws. These statutes drew heavily from legal language with deep roots in the English common law tradition, reaching at least as far back as the Statute of Northampton from 1328.[1]  The Statute of Northampton generally prohibited the carrying of arms in "Fairs, Markets, nor in the Presence of the Justices or Ministers nor in no Part elsewhere."[2]  The public spaces specifically named and protected under the Statute were the very public areas that people frequented in their daily lives—the town markets and gatherings, and the town itself under the direction of local officials, formed the very heart of community life. This tradition was absorbed into American law, where numerous colonies and states put in place similar measures that called for a weapon-free public square.[3]  Under the Massachusetts Model, no one was permitted to

---

[1] Patrick J. Charles, "The Faces of the Second Amendment Outside the Home: History versus Ahistorical Standards of Review," *Cleveland State Law Review* 60, no. 1 (2012), 7-40; Saul Cornell, Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *UC Davis Law Review* 55, no. 5 (June 2022), 2560-2566.

[2] 2 Edw. 3, c. 3 (1328) (Eng.); see also 25 Edw. 3, st. 5, c. 2, § 13 (1350) (Eng.) (if "any Man of this Realm ride armed covertly or secretly with Men of Arms against any other . . . shall be judged Treason.").

[3] A non-exhaustive list includes: 1835 Mass. Acts 750 ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace."); 1786 Va. Laws 33, ch. 21, An Act forbidding

3

carry arms into public areas without having a justifiable reason. Anyone violating this rule would

have been subject to questioning by local officials and "bound" to the peace through a peace

bond or surety.[4]

7.      Another type of public carry law that restricted the presence of weapons in public

spaces, including those related to transportation services, took the form of concealed carry laws.

States and municipalities enacted regulations like these primarily during the nineteenth century,

beginning around the turn of that century. An early example incorporated the policy alongside

language drawn from the Statute of Northampton: "That if any person or persons shall publicly

---

and punishing Affrays (… "nor go nor ride armed by night nor by day, in fair or markets, or in
other places, in terror of the Country, upon pain of being arrested and committed to prison by
any Justice on his own view, or proof of others, there to abide for so long a time as a Jury, to be
sworn for that purpose by the said Justice shall direct, and in like manner to forfeit his armour to
the commonwealth,"); Francois Xavier Martin, A Collection of Statutes of the Parliament of
England in Force in the State of North Carolina, 60-61 (Newbern 1792) ("…nor to go nor ride
armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other
ministers, nor it [sic, likely "in"] no part elsewhere, upon pain to forfeit their armour to the King,
and their bodies to prison at the King's pleasure,"); See also 1821 Me. Laws 285, ch. 76, § 1
(simplified to a requirement that officials "cause to be staid and arrested, all affrayers, rioters,
disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or
terror of the good citizens of this State,").

[4] The peace bond was one of many processes inspired by the common law heritage that formed
the basis of the "localized" law that characterized public life in early America. On "localized"
law, see Laura Edwards, *The People and Their Peace: Legal Culture and the Transformation of
Inequality in the Post-Revolutionary South* (Chapel Hill: University of North Carolina Press,
2009), 3-10. On peace bonds more generally, see Edwards, *The People and Their Peace*, 73-74,
96; Saul Cornell, "History, Text, Tradition, and the Future of Second Amendment Scholarship:
Limits on Armed Travel under Anglo-American Law, 1688-1868," *Law and Contemporary
Problems* 83, no. 3 (Summer 2020), 73-95; Saul Cornell, "Right to Carry Firearms outside of the
Home: Separating Historical Myths from Historical Realities," *Fordham Urban Law Journal* 39,
no. 5 (October 2012), 1719-1723. Edwards's passage on peace bonds is worth quoting at length:
"Peace bonds threw enforcement back on the community, summoning family, friends, and
neighbors to police the troublemakers. Bonds required one or more other people to put up the
amount, making them liable if the accused broke the peace again. That economic obligation
represented the signers' promise to keep the offender in line. Peace bonds put everyone else in
the community on notice as well, investing them with the responsibility of policing the peace
until the end of the probation period."

4

ride or go armed to the terror of the people[5], or privately carry any dirk, large knife, pistol or any

other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or

justice, on his own view, or upon the information of any other person on oath, to bind such

person or persons to their good behavior, and if he or they fail to find securities, commit him or

them to jail, and if such person or persons shall continue so to offend, he or they shall not only

forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the

---

[5] Early language for these laws, such as this one quoted from Tennessee, often made use of the phrase "to the terror of the people," which was itself an inheritance from the Statute of Northampton. Historical research by trained scholars has shown that, according to common law, the act of carrying deadly weapons in public spaces was inherently terrifying and therefore a breach of the peace. See Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *U.C. Davis Law Review* 55 (June 2022), 2555-2556 ("There was no requirement that one establish an intent to terrify or that the armed travel terrorized any specific person, the injury was to the King's Peace and sovereignty."); Mark Anthony Frassetto, "To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment," *Southern Illinois University Law Journal* 43 (2018), 65 ("Those who take a textual approach to interpreting the Statute of Northampton…argue that carrying weapons in populated public places was intrinsically terrifying and that the discussion of public terror in judicial opinions and legal treatises was an explanation for the prohibition, rather than a separate element of the crime."); Patrick J. Charles, "The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters," *Cleveland State Law Review* 64, no. 3 (June 2016), 381-382 ("But those that subscribe to the Standard Model view of the Second Amendment proclaim the Statute of Northampton can only be read as applying to the 'carrying arms in ways that caused public terror.' In making this claim, Standard Model writers have never provided sufficient evidence, at least in total historical context, to support it."); see also Patrick J. Charles, "The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It," *Cleveland State Law Review* 71, no. 3 (2022, forthcoming), draft pp.12 ("What [English jurists'] restatements inform is that by the early-to-mid-seventeenth century, England's preeminent legal minds understood that the act of carrying dangerous weapons was sufficient to amount to an affray, 'strike a feare' or 'striketh a feare.' ") [draft available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4222490]

5

peace, or riot at common law."[6]  The approach of prohibiting the carrying of concealed weapons

spread rapidly, including in slaveholding states and those removed from the Atlantic coast.[7]

      8.     As the nineteenth century wore on, concealed carry laws became more likely to

mandate a criminal penalty (often a fine) rather than engage the surety mechanism, and they also

tended to provide a number of exceptions ranging from people fearing an imminent and deadly

attack, peace officers, and travelers. These statutes varied from one state to another, though many

left the definition of terms like "travel" and "journey" quite ambiguous. In Texas, even exempted

travelers were required to place their weapons in their baggage, which did not include

saddlebags.[8]

---

[6] Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820 (Vol. I, 1821), 710. Available at the Duke Center for Firearms Law, Repository of Historical Gun Laws: https://firearmslaw.duke.edu/laws/judge-edward-scott-laws-of-the-state-of-tennessee-including-those-of-north-carolina-now-in-force-in-this-state-from-the-year-1715-to-the-year-1820-inclusive-page-710-image-714-vol-1-1821-the/

[7] A short list of examples includes: 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1 ("That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine…"); Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837 ("Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twentyfive dollars…").

[8] Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930," PhD diss. (Texas Christian University, 2019), 108-110. John Thomas Shepherd, "Who Is the Arkansas Traveler: Analyzing Arkansas's Journey Exception to the Offense of Carrying a Weapon," Arkansas Law Review 66, no. 2 (2013): 463-484.

9.      Far from a blanket exception for people to go armed at all times outside their homes, the travel exception was narrowly defined by state appellate courts. The kind of "travel" which it described was not the everyday movement through public spaces like town squares and commercial districts, or the kind of travel associated with modern public transportation. Instead, it encompassed a type of travel that separated a person, small group, or family from the protections of the law that went hand-in-hand with organized society and were a fundamental feature of community life—courts, magistrates, constables, and the security of being among one's neighbors. To be a traveler was to venture outside one's community sphere and become vulnerable to dangers such as robbers and predatory animals. Wearing one's weapons in an unfamiliar town or city could fall within the travel exception so long as such carriage was limited to merely passing through the area or conducting one's business. A case from 1879 held that: "The court decided the case on the ground that defendant, whilst stopping over at Marianna, could not be said to be on a journey, and should, to avoid a breach of the law, have deposited his pistols with his baggage, and not carried them on his person. This is correct, if the appellant was really wearing them, or either of them, as a weapon. The exception in the statute is to enable travelers to protect themselves on the highways, or in transit through populous places—not to allow them the privilege of mixing with the people in ordinary intercourse, about the streets, armed in a manner which, upon a sudden fit of passion, might endanger the lives of others. Travelers do not need weapons, whilst stopping in towns, any more than citizens do. They should lay them aside, unless the delay be slight, and the journey soon resumed."[9]  An Alabama appellate court affirmed the decision of a lower court judge who, even though he acquiesced that the defendant had a right to carry a concealed weapon while traveling on a dangerous stretch of

---

[9] *Carr v. State*, 34 Ark. 448 (1879).

road, instructed the jury that " if they further believed, from all the evidence in the case, that the

defendant was in the daily habit of coming to the city, engaging in his business in the city from

morning until evening, mingling with the inhabitants of the city in business and social

intercourse, and carried a pistol concealed about his person during this time, not being justified

or excused otherwise than for the reason of his having to travel" along the dangerous stretch of

roadway, "then he would be guilty, as charged in the indictment."[10] A Tennessee decision

rejected the idea that a "journey" meeting the standards of a travel exception "should embrace a

mere ramble in one's own neighborhood across the lines of contiguous counties."[11] The court's

final word was that "The evil intended to be corrected is the carrying of deadly weapons on the

streets, in society, in the community, or among the people with whom we are in the habit of

associating—a habit which will ultimately convert a good man into an assassin, and a brave man

into a coward."[12] These are only a small sample of the travel-related cases that formed the corpus

of traveler-exception jurisprudence associated with nineteenth century concealed weapon laws.[13]

---

[10] *Eslava v. State*, 49 Ala. 355 (1873).

[11] *Smith v. State*, 50 Tenn. 511 (1872).

[12] *Smith v. State*, 50 Tenn. 511 (1872).

[13] See also *Darby v. State*, 23 Tex. Ct. App. 407 (1880), "He was not a traveler. He resided in
Williamson county, and was merely going from his residence to the county site of said county, a
distance of about eighteen miles, intending to return the next day. These facts certainly did not
constitute him a traveler, within the common meaning of that word, and within the spirit of the
statute.". See also Shepherd, "Who Is the Arkansas Traveler," 466-482. The variation among
nineteenth-century jurisdictions in their definition of terms did not go unnoticed by
contemporaries. In his encyclopedic work on the operation of railways, Marshall Monroe
Kirkman made the point that "A court in a Western state has decided that a pistol is baggage,
being necessary to the protection of the traveler," while "Another court has decided that two
pistols could not be considered as baggage." After exploring several other examples of such
inconsistent decisions involving animals, tools, and bulky personal items, Kirkman concluded
that "Questions as to what constitutes baggage are governed by many subtleties, and in
determining a case particulars must be known, such as place of residence, character, habit and

8

10.     Judges recognized that terms like "travel" and "journey" needed to be interpreted, and that hard-and-fast rules must remain elusive. According to an Arkansas court, "The jury, or court sitting as such, can best judge of all the circumstances, and determine whether the spirit of the law has been violated. No rule with regard to this can be formulated. The intent governs, and the question of fact is, was the defendant really prosecuting his journey, only stopping for a temporary purpose; or had he stopped to stay awhile, mingling generally with the citizens, either for business or pleasure."[14] A contemporary Tennessee court emphasized legislative intent by saying "It is true, the Legislature has not undertaken to define a journey, or to say whether it shall be a long or short one, but has left the courts to interpret it in the light of good sense, and with regard to the spirit and intent of the statute itself, with the positive injunction in the fourth section of the Act that the courts shall give it a liberal construction so as to carry out its true intent and meaning"—which was to reduce the needless carrying of weapons in public.[15]

11.     An illustrative travel-related case arose in Texas in 1889. A man was convicted of violating the state's public carry law (which prohibited openly borne as well as concealed deadly weapons) by carrying a pistol on his travels to a distant town and keeping it on his person while

---

social status of owner of the goods." Marshall Monroe Kirkman, *The Science of Railways* (New York: World Railway Pub. Co., 1900), 281-283. Cases arising in Illinois during the 1850s held transportation companies liable for revolvers that were lost within checked luggage (*Davis v. Michigan S. &N. I. R. Co*., 22 Ill. 278; *Woods v. Devin*, 13 Ill. 746); but in 1870, an Illinois court stated that such liability only extended to one pistol, and that the defendant's "occupation or circumstances did not require that he be furnished with any unusual store of deadly weapons," (*Chicago, R. I. & P. R. Co. v. Collins*, 56 Ill. 212).

[14] *Carr v. State*, 34 Ark. 448 (1879).

[15] *Smith v. State*, 50 Tenn. 511 (1872), "The evil intended to be corrected is the carrying of deadly weapons on the streets, in society, in the community, or among the people with whom we are in the habit of associating—a habit which will ultimately convert a good man into an assassin, and a brave man into a coward."

he visited various establishments there. When he appealed his conviction on the ground that he was a traveler in an unfamiliar city, the appellate court disagreed. He had the right to carry the pistol on the road, in the wagon yard upon his arrival in town, and within the town "for a legitimate purpose, such as to procure a conveyance, or provisions, or to transact other business connected with the prosecution of his journey."[16] But that protection ceased when his purpose changed from business to leisure—it did not confer upon him a right to "idly stroll through its streets and visit its gambling dens and saloons and public places, armed with a pistol."[17] To do otherwise would "cause our cities and towns to be infested with armed men, while the citizens of such places would be prohibited from carrying arms to protect themselves from these privileged characters."[18] The judge's statement clearly shows that Texas courts did not understand townspeople and locals going about their everyday lives to fall within the statute's traveler exemption.

12.     Public carry laws in force during the nineteenth century applied to public spaces in American communities large and small. The exceptions which some of them carved out for travelers remained closely guarded by appellate courts and did not apply to everyday travel within a city or metro area like that which occurs aboard modern public transit services.

TRANSPORTATION PROVIDERS AS PRIVATE COMPANIES

13.     Until the twentieth century, transportation services were typically operated by private companies vested with the authority to fashion their own rules and regulations for

---

[16] *Stilly v. State*, 27 Tex. Ct. App. 445 (1889).

[17] *Stilly v. State*, 27 Tex. Ct. App. 445 (1889).

[18] *Stilly v. State*, 27 Tex. Ct. App. 445 (1889).

10

customers. Thus, even if a person deemed a "traveler" upon a "journey" according to law chose to make use of the travel exception by carrying a weapon aboard a train, such carriage would have been subject to any rules laid out by the private transportation company in question. Private companies would have had the authority to decide where and how legally transported weapons could be stowed and carried by customers aboard their vehicles and within their stations. A nineteenth century jury instruction manual contained a section for "Rules and Regulations of Carrier," which specifically stated that "a railroad company has a right to require of its passengers the observance of all reasonable rules, calculated to insure the comfort, convenience, good order and behavior of all persons on the train, and to secure the proper conduct of its business; and if a passenger wantonly disregards any such reasonable rule, the obligation to carry him farther ceases, and the company may expel him from the train at any regular station, using no more force than may be necessary for that purpose."[19] The North Pennsylvania Railroad's "rules and regulations" document for conductors (Exhibit B) specifically charged passenger conductors with the responsibility of preventing passengers from taking "into the cars guns, dogs, valises, large bundles or baskets."[20]

14.     Rail companies shipped sporting firearms for hunters but treated them like any other baggage—by separating it from the passenger and placing it in a designated baggage space.[21] Depending upon the size and traffic of the line, some rail cars also had space for

---

[19] Albert W. Brickwood, *Brickwood's Sackett on Instructions to Juries*, 3 vols., 3d. ed. (Chicago: Callaghan & Company, 1908), II: 1174-1175 (Sec 1819, "Right to Prescribe Rules").

[20] "Rules and Regulations for Running the Trains on the North Pennsylvania Railroad, adopted June 1, 1875, and approved by the president (Philadelphia, 1875), 13.

[21] In his detailed description of American rail baggage service, Marshall Monroe Kirkman wrote: "Who has not felt a tremor of apprehension as he saw his baggage melt away into the indiscriminate mass of trunks, band boxes, gripsacks, gunbags, umbrellas, burial cases, canaries

passengers to carry their own bags and stow them under their seats or by their feet, particularly if

those bags were relatively small. In the event that it was legal and permissible by company

policy for a passenger to transport a firearm or other deadly weapon, stowing it away in closed

baggage was altogether different from carrying in one's pocket or waistband (which was de facto

a violation of the law in many American jurisdictions, as previously described).

15.     As American rail infrastructure grew, the new challenges posed by rail travel—

particularly the prospect of criminal activity taking place in transit—became more apparent.

Conductors were considered the authority figures on trains and streetcars, and some states vested

them with the same powers as policemen. In the 1880s, the Georgia legislature declared that

"The conductors of a train carrying passengers are invested with all the powers duties, and

responsibilities of police officers while on duty on their trains,"[22] and decided a decade later that

"the conductors, motormen, and drivers of street railroad cars are invested with all the powers,

duties, and responsibilities of police officers while on duty on their trains or cars, and while on

duty at the termini of their lines."[23] Included within this power of conductors to police aboard

their trains was a responsibility to enforce weapon regulations in effect at the time. As a result of

this status, which was in some ways analogous to that of peace officers exempted from certain

weapon regulations, conductors were sometimes armed on the job and expected to prevent

---

and bundles that fill the station?" Kirkman, *The Science of Railways, Revised and Enlarged Edition* (New York: The World Railway Publishing Co., 1898), 389.

[22] John L. Hopkins, Clifford Anderson, and Joseph R. Lamar, *Code of the State of Georgia* (Atlanta: Foote & Davies Co., 1895), 230 (sec. 902).

[23] "Conferring Police Powers on Conductors, etc., of Street Railroads," Georgia - General Assembly, Acts and Resolutions (1890-1891), 230-231.

disorderly behavior aboard trains.[24] Still, there was not a hard-and-fast rule about it, and public

sentiment did not necessarily support the carrying of firearms by conductors aboard their trains

or cars.[25]

16.     Another approach to policing railways was to authorize rail companies to employ

their own police forces. Statutes in Ohio and Pennsylvania from the 1860s show the legislatures

of those states setting out parameters in which designated rail police could "possess and exercise

all the powers, and be subject to all the liabilities of policemen of cities… ."[26] This approach was

not at all unusual at the time, which was one in which powerful corporations engaged in

industries as disparate as manufacturing and cattle ranching turned to private detectives and

police for assistance in defending company interests against labor organizers and marketplace

competitors. That legislatures made special arrangements for authorizing railway police and

_____

[24] For example, a Los Angeles trolley conductor carried a pistol in 1908; see "Attempts to Rob Car and Is Killed," *San Francisco Chronicle* (San Francisco, CA), January 12, 1908, 33.

[25] For example, in 1902, an Atlanta trolley car conductor was arrested for drawing a loaded pistol on a passenger whom he had antagonized; news coverage of the incident stated: "The feature of the investigation was that the conductor was on a trolley car crowded with women as well as men, and was armed with a loaded revolver…It was a revelation to many that among the other paraphernalia of a street car conductor a loaded revolver was carried. They had seen bell punches, transfers, etc. but never before a pistol. It is said that McKinney [the conductor who had been arrested] is not the only street car conductor who is in the habit of going thus armed, and within the past six months pistols have been used more than once by street car men." See "Conductor Is Bound Over," *The Atlanta Constitution* (Atlanta, GA), May 17, 1902, 7.

[26] Joseph R. Swan and Milton Sayler, "Policemen for Railroads, An act to authorize the employment of a police force by railroad companies," *Supplement to the Revised Statutes of the State of Ohio, Embracing All Laws of a General Nature, Passed since the Publication of Swan and Critchfield's Revised Statutes, 1860* (Cincinnati, R. Clarke & Co., 1868), 121-122. See also "No. 228, An Act Empowering railroad companies to employ police forces," *Laws of the General Assembly of the State of Pennsylvania, passed at the session of 1865* (Harrisburg: Singerly & Myers, State Printers, 1865), 225-226.

holding them accountable only underscores the significance of protecting the peace and safety of passengers in transit.

17.     By the early twentieth century, large railway companies had sizeable departments overseeing their railway special agents. The Union Pacific Railroad (UPRR) maintained records pertaining to the firearms owned by the company, most of which were pistols assigned for use to specified employees. At periodic intervals, the supervisors of the special agents' division undertook inventories of company-owned firearms. Extant records from the early 1930s show that some of the firearms held in the company gun locker were classified as "confiscated guns," presumably confiscated from passengers carrying them illegally.[27] The UPRR special agents and rail watchmen were expected to be on the lookout for passengers carrying guns; correspondence from the Federal Bureau of Investigation (FBI) from 1950 shows the FBI requesting the assistance of all law enforcement agencies, including the UPRR special agents, in tracking down the carriers of certain guns that had been used in the commission of crimes.[28]

TRANSPORTATION COMPANY RECORDS PERTAINING TO FIREARMS

18.     Transportation companies had the authority to set reasonable safety regulations for their passengers, and they developed internal policing agencies to enforce them. The task of tracking down these internal corporate policies would require mining the extant transit company records rather than keyword-searching databases of historical statutes. There are numerous archives, libraries, and research centers across the United States that hold collections pertaining

---

[27] "Firearms Records," MS 54, Box 3, Folder 1, Union Pacific Railroad collection. California State Railroad Museum Library and Archives.

[28] "Firearms Records," MS 54, Box 3, Folder 3, Union Pacific Railroad collection. California State Railroad Museum Library and Archives.

14

to transportation history and the corporate records of transit companies.[29] My brief exploration of their finding aids indicates that most of these records are from 1900 or later, which aligns with the development of more modern business practices and the stabilization of the rail industry after the tumultuous decades of the Gilded Age. The stock manipulations, corruption, and overbuilding that characterized the rail industry from the 1860s through the end of the century led to companies selling out to competitors and going into receivership; when these events took place, records related to assets and finances would have been more likely to be retained than others. As time wore on, companies did not necessarily choose to keep their older records, and those that did sought out archival institutions to take on the responsibility of organizing and maintaining them.[30] In other words, nineteenth-century rail records are much more rare than twentieth century ones, and they are not particularly likely to contain company ridership policies. Culling these records for historical, private, company policies pertaining to gun-carrying would be exceedingly time-consuming and unlikely to produce meaningful results.

19.      The UPRR records previously cited illustrate some of the difficulties in relying upon extant corporate records to ascertain company gun policies. Even though it is one of the oldest, largest, and most influential rail companies in American history, the UPRR special services records for firearms only date back to 1931; the models of guns which the company owned demonstrates that company officials purchased much of the corporate arsenal prior to that

---

[29] https://guides.loc.gov/railroads/association-research-collections

[30] For example, the robust collections of business records held by the Newberry Library in Chicago, Illinois were donated by the companies, thus relieving them of the expense of storing and caring for them. Similarly, the archival records of the Winchester Repeating Arms Company were donated to the McCracken Research Library at the Buffalo Bill Center of the West even though the company had previously employed a historian, operated a museum, and maintained its own historical records through the mid-twentieth century. Not all companies chose to preserve or donate their historical records.

time, yet no information pertaining to it has been retained in the "Firearms Records" segment of

the collection.[31] More than that, correspondence held within the "Firearms Records" makes

reference to a company "Rules" document for employees who carried firearms on the job, yet the

rules themselves have not been preserved within the collection. We know that one of those rules

was that employees could not carry chambered rounds in their firearms, but that is only because

an employee violated that rule and accidentally shot himself—prompting a reiteration of that

particular requirement from the senior management over the special agents.[32] The other rules for

armed employees remain a matter of speculation, not because they did not exist but because all

record of them appears to have been lost. The only remaining avenue of inquiry is to page

through the entirety of the UPRR collection housed at the California State Railroad Museum in

case they have been filed in a different section of the collection. The extant records remain

heavily focused upon tracking company assets and implementing policies that might limit the

company's liability for having an armed segment of its workforce.

        20.     In conclusion, the historical record shows that public carry laws barred most

passengers from legally carrying weapons aboard transit services and vehicles. The exceptions

which nineteenth-century public carry laws made for travelers were not understood as including

the sort of everyday, intra-city travel done on public transit today. Private transportation

companies possessed the power to create their own reasonable customer/passenger rules, which

in at least some instances included prohibitions against the presence of guns in passenger cars.

---

[31] Company firearms tended to be revolvers chambered for the .38 special cartridge, which was
first manufactured in 1898 and became quite common among law enforcement agencies by about
the 1920s. "Firearms Records," MS 54, Box 3, Folder 1, Union Pacific Railroad collection.
California State Railroad Museum Library and Archives.

[32] "Firearms Records," MS 54, Box 3, Folder 3, Union Pacific Railroad collection. California
State Railroad Museum Library and Archives.

The identification of more such policies will require additional archival research, which is sure to be time-consuming and may not produce conclusive results.

I certify pursuant to 28 U.S.C. § 1746 and under penalty of perjury that to the best of my knowledge, information, and belief, the foregoing is true and correct.

Executed on __18__ July, 2023 at Fort Worth, Texas

_Brennan Gardner Rivas_
BRENNAN GARDNER RIVAS

# EXHIBIT A

# Brennan Gardner Rivas
## Curriculum Vitae · June 2023

## Employment
Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022
Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
University, Clements Center for Southwest Studies, 2020-2021
Lecturer in American History (full-time), Texas Christian University, Department of History,
2019-2020

## Education
Ph.D., History, Texas Christian University, 2019
Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
the Lone Star State, 1836-1930"
Advisor: Gregg Cantrell
M.A., History, Texas Christian University, 2013
Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"
B.A. with Honors, History, Oklahoma State University, 2010

## Publications
*Refereed Journal Articles*
"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*
"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
on the Place of Guns in American Law and Society* (New York: Oxford University Press,
forthcoming)
"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
(May 2022)
"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*
"Reflections on the American Gun Control Culture," *The Panorama: Expansive Views from the
Journal of the Early Republic*, forthcoming, 2023.
"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
Press, 2019.
Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
*Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

## Public History

"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made by History Blog* (Jun 2022)
    ~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures
"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)
"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
    ~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"
"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)
    ~ Public lecture featuring special insights for genealogical researchers
"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
    ~ Research presentation focusing on interpretation of county court records
"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
    ~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards
Firearm Issues Research Grant, 2023-2024
    ~ Awarded by the Harvard Injury Control Research Center, from grant funding from the Robert Wood Johnson Foundation, for research related to firearm issues
Lloyd Lewis Fellowship in American History, 2021-2022
    ~ Awarded by the Newberry Library to scholars using its collection to research topics in American history
Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
    ~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books
The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
    ~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students
Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
    ~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress
*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*
Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights
Status: Editing manuscript

JA0363

"The Texas Anti-Trust Movement: Antimonopoly, Populism, and Reform in the Long
    Progressive Era"
Aim: Scholarly article interpreting Texas antitrust policy an example of innovative reform in the
    Great Plains and trans-Mississippi West
Status: Research and writing in progress

## University Teaching Experience
*Instructor of Record*
Lecturer in American History, Texas Christian University                    2019-2020
    "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
    "American History since 1877: The Quest for Equality" (HIST 10613)
    "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*
Teaching Assistant, Texas Christian University                    2017-2018
    American History to 1877 (HIST 10603)
    American History since 1877 (HIST 10613)

*Teaching Interests*
American History, Legal History, Southwestern Borderlands, Civil War Era, American West,
Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks
"Second Amendment Panel—Issues in Cases Post-*Bruen*," Strategic Litigation Convening: Anti-
    Democracy Efforts and Political Violence Post-*Bruen*, Institute for Constitutional Advocacy
    and Protection, Georgetown Law, Washington, D. C., June 2023
"A Case for More Case Studies," Originalism, the Supreme Court, Gun Laws, and History, Late-
    Breaking Roundtable, American Historical Association Annual Meeting, Philadelphia,
    Pennsylvania, January 2023
"Military Disarmament Orders and the Role of Reconstruction Historiography after *Bruen*,"
    Current Perspectives on the History of Guns and Society Symposium, Wesleyan University,
    Middletown, Connecticut, October 2022
"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations,"
    Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina,
    November 2021
"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at
    the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis,
    California, October 2021
"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021
"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical
    Association Annual Meeting, Corpus Christi, Texas, February 2019
"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños
    Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018
"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern
    Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

3

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service
Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History Orientation Day, 2020
~ Advise incoming graduate students on strategies for success in the PhD program, emphasizing importance of intellectual development
Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of History Orientation Day, 2016
~ Provide honest and confidential information to prospective graduate students
Graduate Student Mentor, 2015
~ Informal departmental program designed to ease the transition for incoming graduate students

## Second Amendment Subject Matter Expert
*Duncan et al v. Bonta*, California, Case No. 17-1017-BEN-JLB, S.D. Cal.
*Miller et al v. Bonta*, California, Case No. 3:19-cv-01537-BEN-JLB, S.D. Cal.
*Angelo et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-01878-RDM, D. D.C.
*Hanson et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-02256-RC, D. D.C.
*Christian et al v. Nigrelli et al*, New York, No. 22-cv-00695 (JLS), W.D. N.Y.
*Frey et al v. Nigrelli et al*, New York, Case No. 21 Civ. 5334 (NSR), S.D. N.Y.
*Brumback et al v. Ferguson et al*, Washington, No. 1:22-cv-03093-MKD, E.D. Wash.
*Sullivan et al v. Ferguson et al*, Washington, Case No. 3:22-cv-5403, W.D. Wash.
*Siegel v. Platkin,* New Jersey, No. 22-CV-7463 (RMB) (AMD), D. N.J.
*NAGR v. Campbell*, Massachusetts, No. 1:22-cv-11431-FDS, D. Mass.
*Oregon Firearms Federation, Inc. v. Kotek*, Oregon, No. 2:22-cv-01815-IM, D. Ore.
*NSSF v. Jennings*, Delaware, No. 22-cv-01499-RGA, D. Del.
*Chavez v. Bonta*, California, No. 3:19-cv-01226-L-AHG, S.D. Cal. (f/k/a *Jones v. Bonta*)
*Nguyen v. Bonta*, California, No. 3:20-cv-02470-WQH-BGS, S.D. Cal.
*Baird v. Bonta*, California, No. 2:19-cv-00617-KJM-AC, E.D. Cal.
*Nichols v. Bonta*, California, No. 3:11-cv-09916-SJO-SS, C.D. Cal.
*Wiese v. Bonta*, California, No. 2:17-cv-00903-WBS-KJN, E.D. Cal.

## Professional Memberships
Society for Historians of the Gilded Age and Progressive Era
Texas State Historical Association
Southern Historical Association
American Historical Association

## Languages
Spanish (Proficient)

4

Latin (Proficient)

**JA0366**

# EXHIBIT B

# RULES AND REGULATIONS

### FOR

## RUNNING THE TRAINS

#### ON THE

# North Pennsylvania Railroad,

*Adopted June 1, 1875.*

## AND APPROVED BY THE PRESIDENT.

---

Other Rules, Regulations and Notices, equally binding, will be issued on the Time Tables and Supplements.

---

PHILADELPHIA,

1875.

Digitized by Google

**JA0368**

# REGULATIONS.

40   The PASSENGER CONDUCTOR will be with his train twenty minutes before starting time ; will have general charge of it from terminus to terminus ; also, of the men employed on it, and will require each and every one of them to conform strictly to these regulations.

41.  He will announce his train in both public rooms at the Berks Street Depot, and will see that no person passes the gate without a ticket, and that passengers do not take into the cars guns, dogs, valises, large bundles or baskets.  He will make frequent examinations of the cars while stopping at stations for water or otherwise, to discover defective wheels, brakes, &c., or hot boxes, and shift out cars found unsound. He must see that his train is kept clean and in proper running order, and that the cars are locked at night and the windows shut down.  He must superintend the making up of his train at points where required and must see that the brakemen do not slide the wheels, or neglect their duty.

42.  He will cause the name of each station at which the train may stop, to be announced, twice, audibly and distinctly, to the passengers, and must be particularly careful to direct passengers to the right train or car at transfer points.

43.  He must systematize his collection of tickets and fares so that by no possibility can a passenger ride twice on the same ticket, or for a longer distance than he pays for.  Tickets and passes are to be accepted and construed strictly as they read, without deviation ; if any dispute, refer to the proper officer for correction.

(13)

Digitized by Google

JA0369

# EXHIBIT 6

JA0370

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

KATHERINE NOVOTNY, ET AL.,          *

      *Plaintiffs,*          *

      v.          *          No. 1:23-cv-01295-GLR

WESLEY MOORE, ET AL.,          *

      *Defendants.*          *

   *    *    *    *    *    *    *    *    *    *    *

### DECLARATION OF THOMAS RANDALL

Thomas Randall deposes and states as follows:

1.    I am more than 18 years of age and competent to testify, upon personal knowledge, to the facts set forth herein.

2.    I am employed as the Director of Treasury for the Maryland Transit Administration (the "MTA").

3.    The MTA operates public mass transit systems through the State of Maryland, including buses, a subway, light rail system and commuter trains.

4.    The MTA provides free transportation to and from school and school-related activities to eligible students of the Baltimore City Public School system.

5.    For the 2022-23 school year, the MTA provided 30,000 plastic Smartcard passes for use by Baltimore City Public School students to ride MTA transit vehicles to and from school. These passes are valid for the whole school year.

6.      In addition, MTA provided another 330,000 paper passes good for one month for use by Baltimore City Public School students to ride MTA transit vehicles to and from school.

7.      Based on activity through April, 2023, MTA will have recorded approximately 134,000 rides by Baltimore City Public School students for the 2022-23 school year.   There are many additional unrecorded rides because students are often permitted to ride by simply flashing their pass and no electronic transaction is recorded.

I hereby declare, under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

_____

Thomas Randall

June 23, 2023

Date

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| KATHERINE NOVOTNY, ET AL., | * |
| *Plaintiffs*, | * |
| v. | * |
| | * No. 1:23-cv-01295-GLR |
| WESTLEY MOORE, ET AL., | * |
| *Defendants*. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DECLARATION OF DARYL ANTHONY

Daryl Anthony deposes and states as follows:

1.      I am more than 18 years of age and competent to testify, upon personal knowledge, to the facts set forth herein.

2.      I am employed by the Maryland Department of Natural Resources (the "DNR") as the Acting Deputy Director of the Maryland Park Service.  I have worked for DNR for more than 30 years and am personally familiar with the programs, facilities and features of Maryland State parks and forests.

3.      The mission of the DNR is to secure a sustainable future for our environment, society, and economy by preserving, protecting, restoring, and enhancing the State's natural resources at State forests and State parks.

4.      Maryland State parks include many features that are of interest to children, including playgrounds, camping areas, hiking trails, aquatic facilities, and nature centers.

5.     In addition, Maryland State parks offer programs geared toward school-age children, including arts and crafts programs, guided hikes, junior ranger programs, educational programs and nature presentations such as "Scales and Tails."

6.     The DNR encourages children and families to visit the State forests and State parks, through advertising and other marketing methods. For example, the DNR advertises its parks through its website, bulletin boards, social media and outreach partners.

7.     In 2022, DNR recorded more than 17 million visits to State parks.

I hereby declare, under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

_Daryl Anthony_

Daryl Anthony

06/28/2023

Date

JA0374

# EXHIBIT 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KATHERINE NOVOTNY, ET AL.,          *

        *Plaintiffs*,          *

        v.          *          No. 1:23-cv-01295-GLR

WESLEY MOORE, ET AL.,          *

        *Defendants*.          *

    *    *    *    *    *    *    *    *    *    *    *    *

## DECLARATION OF ANITA KASSOF

Anita Kassof deposes and states as follows:

1.    I am more than 18 years of age and competent to testify, upon personal knowledge, to the facts set forth herein.

2.    I am employed as the executive director of the Baltimore Museum of Industry.

3.    The Baltimore Museum of Industry includes exhibitions and programs that interpret the diverse and significant human stories behind labor and innovation in Baltimore, cultivating a sense of belonging and inspiring visitors to think about the intersection of work and society.

4.    Many of the exhibits and programs at the Baltimore Museum of Industry are designed to be of interest to children.  For example, the museum includes several interactive displays and a series of "touch boxes," containing materials designed specifically for preschoolers and early elementary aged children. In addition, the museum

has several classrooms designed for hands-on engagement, and museum staff regularly demonstrate working machinery and printing equipment for school groups and other visitors.

5.    The Baltimore Museum of Industry encourages children to visit the museum through advertising and other marketing methods.  For example, the museum uses social media, radio, and digital advertising to let parents know about special programming during school breaks, and has partnerships with groups that serve local families.

6.    The Baltimore Museum of Industry hosts approximately 45,000 visitors per year.  Approximately 19,400 of these visitors are children.

7.    The Baltimore Museum of Industry regularly hosts groups of school children from Maryland schools.  During these visits, as many as 230 school children may be inside the museum simultaneously.

I hereby declare, under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

June 15, 2023

Anita Kassof                                    Date

# EXHIBIT 9

JA0378

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KATHERINE NOVOTNY, ET AL.,      *

      *Plaintiffs*,      *

      v.      *    No. 1:23-cv-01295-GLR

WESLEY MOORE, ET AL.,      *

      *Defendants*.      *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## DECLARATION OF MARK J. POTTER

Mark J. Potter deposes and states as follows:

1.    I am more than 18 years of age and competent to testify, upon personal knowledge, to the facts set forth herein.

2.    I am employed as the president and chief executive officer of the Maryland Science Center museum in Baltimore, Maryland (the "Science Museum").

3.    The mission of the Science Museum is educational.  Many of the exhibits and programs at the Science Museum are of interest to children.  The museum features interactive exhibits for children, a planetarium for astronomy gurus, and giant dinosaur replicas for budding paleontologists.

4.    The Science Museum encourages children to visit the museum through advertising and other marketing methods.  For example, the Science Center advertises heavily to teachers and parents promoting student visitations.

5.     In a normal year, the Science Museum hosts approximately 300,000 visitors per year.  Approximately 67% of these visitors are children.

6.     The Science Museum regularly hosts groups of school children from Maryland schools.  During these visits, as many as 2,000 school children are inside the museum simultaneously.


I hereby declare, under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

_____        _____
Mark J. Potter                                         Date   June 8, 2023

2

**JA0380**

# EXHIBIT 10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KATHERINE NOVOTNY, ET AL.,          *

        *Plaintiffs*,          *

      v.          *

         *          No. 1:23-cv-01295-GLR

WESLEY MOORE, ET AL.,          *

        *Defendants*.          *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DECLARATION OF CARTER ARNOT POLAKOFF

Carter Arnot Polakoff deposes and states as follows:

1.    I am more than 18 years of age and competent to testify, upon personal knowledge, to the facts set forth herein.

2.    I am employed as the president and chief executive officer of the Port Discovery Children's Museum in Baltimore, Maryland (the "Port Discovery Museum").

3.    The mission of the Port Discovery Museum is educational. The museum features numerous of hands-on, indoor activities designed for children to engage in imaginative learning and play.

4.    Many of the exhibits and programs at the Port Discovery Museum are specifically designed to be of interest to children. The museum includes an indoor sports court, multiple role-playing exhibits, a giant pretend cargo ship, a water activity room, theater performances, innovative puzzles, interactive art studios and musical exhibits.

5.     The Port Discovery Museum encourages children to visit the museum through advertising and other marketing methods.  The museum also has a large digital footprint which includes digital advertising including but not limited to Google Ads, Facebook/Instagram Ads, Sponsored Content, TikTok, Bing, podcasting, OTT, and YouTube.

6.     The Port Discovery Museum hosts approximately 159,000 visitors per year. Approximately 106,000 of these visitors are children.

7.     The Port Discovery Museum regularly hosts groups of school children from Maryland schools.  During these visits, as many as 350-500 school children are inside the museum every day during the school year and summer.   One weekends, holidays, and school breaks, there is an average of 750-1250 in the building at any given time.


I hereby declare, under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

Carter Arnot Polakoff                                                          6/9/23
                                                                                            Date

2

# EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

KATHERINE NOVOTNY, ET AL.,                    *

        *Plaintiffs*,

                               *

      v.

                              *   No. 1:23-cv-01295-GLR

WESLEY MOORE, ET AL.,                         *

        *Defendants*.

                               *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**DECLARATION OF TERRI LEE FREEMAN**

Terri Lee Freeman deposes and states as follows:

1.      I am more than 18 years of age and competent to testify, upon personal knowledge, to the facts set forth herein.

2.      I am employed as the executive director of the Reginald F. Lewis Museum of Maryland African American History & Culture in Baltimore, Maryland (the "Lewis Museum").

3.      The mission of the Lewis Museum is educational.  The museum features exhibits, galleries and programs that provide visitors with historical information about the lives of African American Marylanders.

4.      Many of the exhibits and programs at the Lewis Museum are designed to be of interest to children.  All of the exhibits are appropriate and important for children to see.  They provide the historic view of Maryland's African American community that is not provided in most school settings.  Additionally, we have a number of days throughout the year that provide free admission to the public, like MLK Day, Juneteenth, Fall Fest

and the Book Festival, held every other year, as well as the Saturdays following the opening of new exhibits, we provide specific child-friendly activities.

5.      The Lewis Museum encourages children to visit the museum through outreach to schools, advertising and social media marketing.  We also partner with other nonprofit organizations.

6.      The Lewis Museum in post-COVID years, hosts nearly 20,000 visitors per year.  Approximately a third of these guests are children.

7.      The Lewis Museum regularly hosts groups of school children from Maryland schools.  During these visits, as many as 100 school children will be in the museum simultaneously.


        I hereby declare, under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

Terri Lee Freeman                                                          Date 6/13/2023

2

# EXHIBIT 12

[ 35 ]

fame offenders come not as afore is said, and the proclamation made and returned, they shall be convict and attainted of the riot, assembly, or rout aforesaid: And moreover the Justices of Peace in every county or corporation, where such riot, assembly, or rout of people shall be made, in case the same be made in their presence, or if none be present, then the justices having notice thereof, together with the sheriff, under sheriff, or serjeant, of the same county or corporation, shall do execution of this act, every one upon pain of twenty pounds, to be paid to the Commonwealth, as often as they shall be found in default of the execution of the said act ; and on such default of the justices and sheriff, under sheriff, or serjeant, a commission shall go from the General Court at the instance of the party grieved, under sheriff, or serjeant, to enquire as well of the truth of the case, and of the original matter for the party complainant, as of the default or defaults of the said justices, sheriff, under sheriff, or serjeant, in this behalf supposed, to be directed to sufficient and indifferent persons at the nomination of the judges ; and the said commissioners presently shall return into the General Court the inquests and matters before them in this behalf taken and found : But no persons convicted of a riot, rout, and unlawful assembly, shall be imprisoned for such offence by a longer space of time than one year. Persons legally convicted of a riot, rout, or unlawful assembly, otherwise than in the manner directed by this act, shall be punished by imprisonment and amercement, at the discretion of a jury, under the like limitation.

## C H A P.  XLIX.

### An ACT forbidding and punishing AFFRAYS.

BE it enacted by the General Assembly, That no man, great nor small, of what condition soever he be, except the Ministers of Justice in executing the precepts of the courts of justice, or in executing of their office, and such as be in their company assisting them, be so hardy to come before the justices of any court, or either of their Ministers of Justice, doing their office, with force and arms, on pain, to forfeit their armour to the Commonwealth, and their bodies to prison, at the pleasure of a court; nor go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the county, upon pain of being arrested and committed to prison by any justice on his own view, or proof by others, there to abide for so long a time as a jury, to be sworn for that purpose by the said Justice, shall direct, and in like manner to forfeit his armour to the Commonwealth; but no person shall be imprisoned for such offence by a longer space of time than one month.

## C H A P.  L.

### An ACT against CONSPIRATORS.

BE it declared and enacted by the General Assembly, That conspirators be they that do confederate and bind themselves by oath, covenant, or other alliance, that every of them shall aid and bear the other falsely and maliciously, to move or cause to be moved any enticement or information against another on the part of the Commonwealth, and those who are convicted thereof at the suit of the Commonwealth, shall be punished by imprisonment and amercement, at the discretion of a jury.

## C H A P.  LI.

### An ACT against conveying or taking PRETENSED TITLES.

BE it enacted by the General Assembly, That no person shall convey or take, or bargain to convey or take, any pretended title to any lands or tenements, unless the person conveying or bargaining to convey, or those under whom he claims shall have been in possession of the same, or of the reversion or remainder thereof one whole year next before ; and he who offendeth herein knowingly, shall forfeit the whole value of the lands or tenements ; the one moiety to the Commonwealth, and the other to him who will sue as well for himself as for the Commonwealth : But any person lawfully possessed of lands or tenements, or of the reversion or remainder thereof, may nevertheless take or bargain to take the pretensed title of any other person, so far and so far only as it may confirm his former estate.

## C H A P.  LII.

### An ACT to punish BRIBERY and EXTORTION.

BE it enacted by the General Assembly, That no Treasurer, Keeper of any Public Seal, Councillor of State, Counsel for the Commonwealth, Judge, or Attornies at law, practising either in the General Court, High Court of Chancery, Court of Appeals, Court of Admiralty, or Inferior Courts, Clerk of the Peace, Sheriff, Coroner, Escheator, nor any officer of the Commonwealth, shall, in time to come, take, in any form, in any manner of gift, brokage, or reward for doing his office, other than is, or shall be allowed by some act of General Assembly, passed after the Institution of the Commonwealth, that is to say, after the fifteenth day of May, in the year of our Lord, one thousand seven hundred and seventy six ; and he that doth, shall pay unto the party grieved, the treble value of that he hath received, shall be answered and imprisoned at the discretion of a jury, and shall be discharged from his office forever; and he who will sue in the said matter, shall have suit as well for the Commonwealth as for himself, and the third part of the amercement.

CHAP.

JA0388



# A

# COLLECTION

## OF THE

# STATUTES

### OF THE PARLIAMENT OF

# ENGLAND

#### IN FORCE IN THE STATE OF

# NORTH-CAROLINA.

PUBLISHED ACCORDING TO A RESOLVE OF THE GENERAL ASSEMBLY.

By FRANCOIS-XAVIER MARTIN, Esq.

COUNSELLOR AT LAW.

*NEWBERN:*

FROM THE EDITOR's PRESS.

1792.

JA0389

( 60 )

## C H A P.  VIII.

### *Nothing shall be taken for Beaupleader.*

ITEM, Whereas some of the realm have grievously complained, that they be grieved by Sheriffs, naming themselves the King's approvers, which take money by extortion for Beaupleader, the King will, that the statute of Marlebridge shall be observed and kept in this point.

## C H A P.  XIV.

### *None shall commit Maintenance.*

ITEM, Because the King desireth that common right be administered to all persons, as well poor as rich, he commandeth and defendeth, that none of his Counsellors, nor of his house, nor none other of his Ministers, nor no great man of the realm by himself, nor by other, by sending of letters, nor otherwise, nor none other in this land, great nor small, shall take upon them to maintain quarrels nor parties in the country, to the let and disturbance of the common law.

Statutes made at Northampton, tribus Septimanis Paschae, in the Second Year of the Reign of Edward the Third, and in the Year of our Lord 1328.

## C H A P.  I.

### *A Confirmation of the Great Charter and the Charter of the Forest.*

[*Unnecessary to be inserted.*]

## C H A P.  III.

### *No Man shall come before the Justices, or go or ride armed.*

ITEM, It is enacted, that no man great nor small, of what condition soever he be, except the King's servants in his presence, and his Ministers in executing of the King's precepts, or of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same in such places where such acts happen, be so hardy to come before the King's Justices, or other of the King's

( 61 )

Ministers doing their office with force and arms, nor bring no force in an affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the King's Justices, or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure. And that the King's Justices in their presence, Sheriffs and other ministers, in their bailiwicks, Lords of Franchise, and their bailiffs in the same, and Mayors and Bailiffs of cities and boroughs, within the same cities and boroughs, and borough-holders, constables and wardens of the peace within their wards shall have power to execute this act. And that the Justices assigned, at their coming down into the country, shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertain to their office.

## C H A P.  V.

### The Manner how Writs shall be delivered to the Sheriff to be executed.

ITEM where it was ordained by the statute of Westminster the second, that they which will deliver their writs to the Sheriff shall deliver them in the full county, or in the rere county, and that the Sheriff or Under-Sheriff shall thereupon make a bill : it is accorded and established, that at what time or place in the county a man doth deliver any writ to the Sheriff or to the Under-Sheriff, that they shall receive the same writs, and make a bill after the form contained in the same statute, without taking any thing therefore. And if they refuse to make a bill, others that be present shall set to their seals, and if the Sheriff or Under-Sheriff do not return the said writs, they shall be punished after the form contained in the said statute. And also the Justices of Assize shall have power to enquire thereof at every man's complaint, and to award damages, as having respect to the delay, and to the loss and peril that might happen.

## C H A P.  VI.

### Justices shall have Power to punish Breakers of the Peace.

ITEM, as to the keeping of the peace in time to come, it is ordained and enacted that the statutes made in time past, with the statute of Winchester, shall be observed and kept in every point : and where it is contained in the end of said statute of Winchester, that the Justices assigned shall have power to enquire of defaults, and to report to the King in his next parliament, and the King to remedy it, which no man hath yet seen, the same Justices shall have power to punish the offenders and disobeyers.

O

# EXHIBIT 14

JA0392

# ACTS

OF THE

# STATE OF TENNESSEE,

PASSED BY THE FIRST SESSION OF

# THE THIRTY-SIXTH GENERAL ASSEMBLY

## FOR THE YEARS 1869-70.

PUBLISHED BY AUTHORITY.

NASHVILLE, TENN.:
JONES, PURVIS & CO., PRINTERS TO THE STATE.
1870.

23

## CHAPTER XXI.

AN ACT to Amend An Act, passed on the 13th of March, 1868,
entitled "An Act to amend the revenue laws of the State."

SECTION 1. *Be it enacted by the General Assembly of
the State of Tennessee,* That An Act to amend the revenue
laws of the State, passed on the 13th day of March, 1868, Hotels and
be so amended as to impose a tax of fifty cents on each Livery Stable
room except two in a hotel or tavern, and a tax of fifty
cents on each stall in a livery stable, or stable kept by
hotel or tavern keepers, instead of one dollar, as now
imposed by law.

SEC. 2. *Be it further enacted,* That this Act take effect
from and after its passage.

W. O'N. PERKINS,
*Speaker of the House of Representatives.*
D. B. THOMAS,
*Speaker of the Senate.*

Passed November 27, 1869.

---

## CHAPTER XXII.

AN ACT to Amend the Criminal Laws of the State.

SECTION 1. *Be it enacted by the General Assembly of
the State of Tennessee,* That all voters in this State shall be To vote in
required to vote in the civil district or ward in which they or Ward.
may reside. Any person violating this Act shall be guilty
of a misdemeanor, and upon conviction thereof shall not be
fined less than twenty nor more than fifty dollars; *Provided,*
that sheriffs and other officers holding elections shall be
permitted to vote at any ward or precinct in which they
may hold an election.

SEC. 2. *Be it further enacted,* That it shall not be law-
ful for any qualified voter or other person attending any
election in this State, or for any person attending any fair, Deadly
race course, or other public assembly of the people, to carry Weapons.
about his person, concealed or otherwise, any pistol, dirk,
bowie-knife, Arkansas tooth-pick, or weapon in form, shape

JA0394

24

or size, resembling a bowie-knife, or Arkansas tooth-pick, or other deadly or dangerous weapon.

Penalty.

SEC. 3.   *Be it further enacted,* That all persons convicted under the second section of this Act shall he punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the Court.

Liquor Shops.

SEC. 4.   *Be it further enacted,* That no liquor shop in this State, shall be kept open on election days, nor shall any person, on said days, give or sell intoxicating liquors to any person for any purpose at or near an election ground.

Grand Juries.

SEC. 5.   *Be it further enacted,* That the grand juries of this State shall have inquisitorial powers concerning the commission of the offenses created by these Acts, and may send for witnesses, as in cases of gaming, illegal voting, tippling and offenses now prescribed by law.

Judges.

SEC. 6.   *Be it further enacted,* That it shall be the duty of the Circuit and Criminal Judges of this State to give the above in special charge to the several grand juries of the courts.

Proviso.

SEC. 7.   *Be it further enacted,* That there shall be no property exempt from execution for fines and costs for this offense; *Provided,* That, if from any cause, there should be a failure to hold an election in any civil district or ward, then nothing in this Act shall be so construed as to prevent any voter from voting in any other civil district or ward in his county or town, for State or county officers, at the time prescribed by law.

SEC. 8.   *Be it further enacted,* That this Act shall take effect from and after its passage.

W. O'N. PERKINS.
*Speaker of the House of Representatives.*
D. B. THOMAS,
*Speaker of the Senate.*

Passed December 1, 1869.

**JA0395**

# EXHIBIT 15

312                      MISCELLANEOUS.

shall be responsible for the payment of the expenses of
his retention in jail.

### Rewards for the Apprehension of Escaped Prisoners. Act of February 1, 1860.

SECTION 1. When any person shall make his escape
from any county of this Territory after having been
sentenced by the court to suffer any penalty, it shall be
the duty of the court to inform immediately the governor
thereof, giving a description of such fugitive.

§ 2. The governor is hereby authorized to offer a
reward, to be paid out of the funds of the Territory, to
any person who shall find and deliver such fugitive:
*Provided*, that such reward shall be at the will of the
governor.

### Reward for Accused Persons. Act of 1874, Ch. 12.

SECTION 1. In cases of murder or other felony, when
the person or persons accused of the crime shall be at
large, the governor, when in his judgment it shall be
necessary to secure the apprehension of the accused, shall
be authorized to issue his proclamation offering a reward,
not exceeding five hundred dollars, for the apprehension
and delivery of the accused to the proper office.

§ 2. The auditor of public accounts is hereby author-
ized to draw a warrant on the treasury of the Territory,
in favor of the person entitled to a reward, under the
provisions of the preceding section, for the amount thereof,
upon the presentation by such person of his account
certified and approved by the governor.

### Deadly Weapons. Act of 1869, Ch. 32.

SECTION 1. It shall be unlawful for any person to
carry deadly weapons, either concealed or otherwise, on
or about their persons within any of the settlements of
this Territory, except it be in the lawful defense of them-
selves, their families or their property, and the same
being then and there threatened with danger, or by order
of legal authority, or on their own landed property, or
in execution of an order of court.

§ 2. Deadly weapons, in the meaning of this act, shall
be construed to mean all kinds and classes of pistols,

## MISCELLANEOUS. 313·

whether the same be a revolver, derringer, repeater, or any other kind or class of pistol; any and all kinds of bowie knives, daggers, poniards, butcher knives, dirk knives and all such weapons with which cuts can be given or by which wounds can be inflicted by thrusting, including sword canes and such sharp-pointed canes with which deadly thrusts can be given, and all kinds of slung-shots, and any other kinds of deadly weapon, by whatever name it may be called, by which a dangerous wound can be inflicted.

§ 3. The penalty for the violation of the preceding sections of this act shall not be less than ten dollars nor more than fifty dollars for each offense, or not less than ten days' imprisonment nor more than fifty days' imprisonment in the county jail, or both; such fine and imprisonment in the discretion of the jury trying the case.

§ 4. Any person who shall draw a deadly weapon on another, or who shall handle a deadly weapon in a threatening manner at or towards another, in any part of this Territory, except in the lawful defense of himself, his family, or his property, or by order of legal authority, upon conviction thereof before the proper tribunal, shall, for each offense, be fined in a sum not less than twenty-five dollars nor more than seventy-five dollars, or by imprisonment in the county jail for a term of not less than twenty days or more than sixty days, or be punished by both such fine and imprisonment, in the discretion of the jury trying the cause.

§ 5. Any person who shall draw or use any deadly weapon in any ball, dance, or other public gathering of the people, or near where any election authorized by law is being held in any part of the Territory, except it be in the lawful defense of himself, his family, or his property, or in obedience to legal authority, shall, upon conviction before the proper tribunal, be punished by a fine not less than fifty dollars nor more than one hundred dollars for each offense, or by imprisonment in the county jail for a term of not less than one month nor more than three months for each offense, or by both such fine and imprisonment, in the discretion of the jury trying the cause.

§ 6. Justices of the peace, as well as the District Court, shall have jurisdiction of all offenses under the preceding sections of this act; and in all cases of prosecution under this act, in which a plea of guilty shall be entered, the court shall proceed to hear and determine the case, and

# EXHIBIT 16

Offenses against the public morality, health, police, etc.

§4528. *Deadly weapons not to be carried to public places.* [No person in this State is permitted or allowed to carry about his or her person, any dirk, bowie knife, pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State, except (a) Acts of 1870, militia muster grounds; and if any person or persons shall violate any p. 421. portion of this section, he, she or they shall be guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the Court.] (a.)

§4529. (4455.) *Other offenses against public peace.* All other offenses (a)Acts of 1865- against the public peace, not provided for in this Code, shall be prose- '66, p. 233. cuted and indicted as heretofore, and the punishment in every such case, shall be [as prescribed in section 4310 of this Code.] (a.)

---

## TENTH DIVISION.

OFFENSES AGAINST THE PUBLIC MORALITY, HEALTH, POLICE, ETC.

SECTION.
4530. Bigamy.
4531. Punishment on married person.
4532. On unmarried person.
4533. Incest.
4534. Adultery.
4535. Lewdness.
4536. Lewd houses.
4537. Disorderly houses.
4538. Gaming houses.
4539. Gaming in liquor shops.
4540. Gaming tables.
4541. Gambling.
4542. Gaming with minors.
4543. Minors not to play billiards.
4544. Gaming with clerks and bank officers.
4545. Players—witnesses.
4546. Judge's charge.
4547. Suspected houses.
4548. Sale of lottery tickets forbidden.
4549. Tickets in gift enterprises.
4550. Unwholesome provisions.
4551. Unwholesome bread, etc.
4552. Unlawful sale of kerosene.
4553. Test of kerosene.
4554. Other illegal oils.
4555. Sale of naptha.
4556. Sale of uninspected oils.
4557. Kerosene defined.
4558. Spreading small pox.

SECTION.
4559. Violating quarantine.
4560. Vagrants.
4561. Common rogues.
4562. Nuisances.
4563. Disinterring bodies.
4564. Bastardy.
4565. Retailing without license.
4566. Illegal marrying.
4567. Marrying white and colored.
4568. Illegal voting.
4569. Buying or selling votes.
4570. Sale of liquor on election days.
4571. Minors voting.
4572. Adultery with negroes.
4573. Whipping wife.
4574. Interfering with religious worship.
4575. Retailing near church.
4576. Vending near camp grounds.
4577. Police at places of worship.
4578. Running freight trains on Sunday.
4579. Violating Sabbath.
4580. Hunting on Sunday.
4581. Illegal bathing.
4582. Fines from Sabbath-breakers.
4583. Bonds in case of vagrancy.
4584. Attorney or Solicitor—duty in such case.
4585. Water and light on railroads.
4586. Equal accommodation of races.

4530. (4456.) *Polygamy and bigamy.* Polygamy, or bigamy, shall consist in knowingly having a plurality of husbands or wives at the same time.

Indictment for bigamy must set forth what—admissions of defendant as to marriage: 11 Ga., 53. Definition of bigamy: 20 Ga., 703. Principal in first and second degree: 34 Ga., 276. Bigamy under §1667: 40 Ga., 244. "Legitimate:" 20 Ga., 702; 34 Ga., 407.

4531. (4457.) *Punishment—if before marriage.* If any person or persons within this State, being married, do or shall at any time hereafter marry any person or persons, the lawful husband or wife being alive, and knowing that such lawful husband or wife is living, such person or persons so offending shall, on conviction, be punished by confinement at labor in the penitentiary, for any time not less than two years nor longer than four years, and the second marriage shall be void; but five years' absence of the husband or wife, and no information of the fate of such husband or wife, shall be sufficient cause of acquittal of the person indicted;

# EXHIBIT 17

# GENERAL LAWS

OF THE

## TWELFTH LEGISLATURE,

OF THE

# STATE OF TEXAS.

CALLED SESSION.

BY AUTHORITY.



AUSTIN:
PRINTED BY TRACY, SIEMERING & CO.
1870.

JA0402

## CHAPTER XLVI.

### AN ACT REGULATING THE RIGHT TO KEEP AND BEAR ARMS.

SECTION 1. *Be it enacted by the Legislature of the State of Texas*, That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

SEC. 2. That this act take effect and be in force in sixty days from the passage thereof.

Approved August 12, 1870.

## CHAPTER XLVII.

### AN ACT AUTHORIZING THE GOVERNOR TO ORDER AN ELECTION TO BE HELD IN HILL COUNTY FOR THE PERMANENT LOCATION OF THEIR COUNTY SEAT.

SECTION 1. *Be it enacted by the Legislature of the State of Texas*, That the Governor of the State of Texas be, and is hereby authorized to order an election to be held in the county of Hill, on the second Monday in September, A. D. 1870, (or as soon thereafter as possible), for the permanent location of the county seat of the

64                          GENERAL LAWS.

county of Hill; said election shall be held at such places and under
such rules and regulations as the Governor may prescribe.

SEC. 2.  That the returns of said election shall be made to the Sec-
retary of State, within twenty days after said election shall have
been held, and the town receiving two-thirds of the votes cast shall
be the permanent county seat of the county of Hill, but should no
place receive two-thirds of the votes cast, the present county seat
shall remain the permanent one.

SEC. 3.  That the Governor shall, within twenty days after the
returns of said election shall have been received, notify the Police
Court of the county of Hill of the result of said election.

SEC. 4.  That this act be in force from and after passage.

Approved August 12, 1870.

--------

CHAPTER XLVIII.

AN ACT MAKING APPROPRIATIONS FOR THE PAYMENT OF THE
EXPENSES OF MAINTAINING RANGING COMPANIES ON THE FRON-
TIER.

SECTION 1.  *Be it enacted by the Legislature of the State of
Texas,* That the sum of seven hundred and fifty thousand dollars,
or so much thereof as may be necessary, be and the same is hereby
appropriated, out of any moneys in the State Treasury (derived
from the sale or hypothecation of the bonds of the State issued for
frontier protection), for the purpose of paying all expenses con-
nected with the organization, arming and maintenance of the ranging
companies on the frontier, called into service under the provisions
of the act approved June 13, 1870.

SEC. 2.  That this appropriation shall be expended under the
direction of the Governor; and the Comptroller of Public Accounts
shall, under the special direction of the Governor, audit all claims
and accounts incurred for the purposes hereinbefore mentioned, and
shall draw his warrant on the Treasurer for the payment of the
same.

SEC. 3.  That this act shall take effect from and after its passage.

Approved August 12, 1870.

--------

# EXHIBIT 18

# LAWS OF MISSOURI.

## GENERAL AND LOCAL LAWS

PASSED AT THE

### ADJOURNED SESSION

OF THE

## XXVIITH GENERAL ASSEMBLY,

BEGUN AND HELD AT

### THE CITY OF JEFFERSON, WEDNESDAY, JANUARY 7, 1874.

*BY AUTHORITY.*



JEFFERSON CITY:
REGAN & CARTER, STATE PRINTERS.
1874.

SEC. 5.  The clerks so appointed shall, before entering upon their duties, enter into bond, with two or more sufficient securities, in the sum of not exceeding five thousand dollars, payable to the state of Missouri, conditioned for the faithful performance of the duties devolved upon them by this act—said bond to be taken and the amount thereof fixed by the judge of the circuit court of the county in which such clerk shall be appointed; which bond shall be filed in the office of the clerk of the circuit court of said county, and may be sued on in the name of the state of Missouri, for the use of any one injured by the breach thereof.

SEC. 6.  This act to take effect and be in force from and after its passage.

APPROVED March 19, 1874.

---

## CRIMES AND MISDEMEANORS: CARRYING CONCEALED WEAPONS.

### AN ACT to prevent the carrying of concealed weapons.

| SECTION | SECTION |
|---|---|
| 1.  Carrying concealed weapons in public assemblages prohibited. | 2.  Act to take effect immediately. |

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1.  Whoever shall, in this state, go into any church or place where people have assembled for religious worship, or into any school-room, or into any place where people may be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons met for other than militia drill or meetings, called under the militia law of this state, having concealed about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not less than ten nor more than one hundred dollars, or by imprisonment in the county jail not to exceed six months, or by both such fine and imprisonment: *Provided*, that this act shall not apply to any person whose duty it is to bear arms in the discharge of duties imposed by law.

SEC. 2.  This act shall take effect and be in force from and after its passage.

APPROVED March 26, 1874.

# EXHIBIT 19

# SESSION LAWS

OF THE

## FIFTEENTH

# LEGISLATIVE ASSEMBLY

OF THE

## TERRITORY OF ARIZONA.

————

SESSION BEGUN ON THE TWENTY-FIRST DAY
OF JANUARY, A. D. 1889.

LAWS OF ARIZONA.                17

or policeman, or person summoned to his aid, nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack upon legal process.

SEC. 3.  If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person.

SEC. 4.  The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

SEC. 5.  Any person violating any of the provisions of Articles 1 and 3, may be arrested without warrant by any peace officer and carried before the nearest Justice of the Peace for trial; and any peace officer who shall fail or refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by a fine not exceeding three hundred dollars.

SEC. 6.  Persons traveling may be permitted to carry arms within settlements or towns of the Territory for one-half hour after arriving in such settlements or town, and while going out of such towns or settlements; and Sheriffs and Constables of the various Counties of this Territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties of their respective offices.

SEC. 7.  It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted up in a conspicuous place in his bar room, or reception room if there be no bar in the house, a plain notice to travelers to divest themselves of their weapons in accordance with Section 9 of this Act, and the Sheriffs of the various Counties

# EXHIBIT 20

# THE

# STATUTES OF OKLAHOMA

## 1890.

Compiled under the supervision and direction of Robert Martin,
Secretary of the Territory,

—BY—

## WILL T. LITTLE,  L. G. PITMAN and R. J. BARKER,

—FROM—

The Laws Passed by the First Legislative Assembly of the Territory.

GUTHRIE, OKLAHOMA:
THE STATE CAPITAL PRINTING CO.,
PUBLISHERS.
1891.

JA0412

**Chap. 25.** viction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

*Public buildings and gatherings.* (2438) § **7.** It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

*Intent of persons carrying weapons.* (2439) § **8.** It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

*Pointing weapons at another.* (2440) § **9.** It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

*Violation of section seven.* (2441) § **10.** Any person violating the provisions of section seven, eight or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three nor more than twelve months.

ARTICLE 48.—FALSE PERSONATION AND CHEATS.

| SECTION. | SECTION. |
|---|---|
| 1. False impersonation, punishment for. | 7. False representation of charitable purposes. |
| 2. False impersonation and receiving money. | 8. Falsely representing banking corporations. |
| 3. Personating officers and others. | 9. Using false check. |
| 4. Unlawful wearing of grand army badge. | 10. Holding mock auction. |
| 5. Fines, how paid. | |
| 6. Obtaining property under false pretenses. | |

*Punishment for false impersonation.* (2442) § **1.** Every person who falsely personates another, and in such assumed character, either:

First. Marries or pretends to marry, or to sustain the marriage relation toward another, with or without the connivance of such other person; or,

Second. Becomes bail or surety for any party, in any proceeding whatever, before any court or officer authorized to take such bail or surety; or,

Third. Subscribes, verifies, publishes, acknowledges or proves, in the name of another person, any written instrument, with intent that the same may be delivered or used as true; or,

Fourth. Does any other act whereby, if it were done by the person falsely personated, he might in any event become liable to any suit or prosecution, or to pay any sum of money, or to incur any charge, forfeiture or penalty, or whereby any benefit might accrue to the party personating, or to any other person.

# EXHIBIT 21

# PENAL CODE

## OF

# STATE OF IDAHO,

## 1901.

Press of
**Capital** News Printing Co.,
Boise, Idaho.

person of F. a bodily injury, as while being prosecuted in the magistrate's court for displaying a deadly weapon in a rude, angry and threatening manner in the presence of others, the defendant was never in any danger of being convicted of an assault with a deadly weapon with intent to inflict bodily harm.—Territory v. Stocker, 9 Mont. 6, 22 Pac. 496.

### Section 4781.  Persons Other than Officers Carrying Certain Weapons:

It is unlawful for any person, except United States officials, officials of the State of Idaho, county officials, peace officers, guards of any jail, and officers or employees of any express company on duty, to carry, exhibit or flourish any dirk, dirk-knife, sword, sword-cane, pistol, gun or other deadly weapons, within the limits or confines of any city, town or village or in any public assembly of the State of Idaho. Every person so doing is guilty of a misdemeanor and is punishable by fine not less than fifty dollars nor more than one hundred dollars, or by imprisonment in the county jail for a period of not less than twenty days nor more than fifty days, or by both such fine and imprisonment.

1889, 15th Ses. p. 23, Sec. 1.

### Section 4782.  Fines Provided in Preceding Section: To Whom Paid:

One half of all fines collected under the preceding Section shall be paid to the officer making the arrest, which amount shall be payment in full for his services. The other one half shall be paid into the common School Fund of the county, after deducting the necessary costs of the prosecution of the case.

1889, 15th Ses. p. 23, Sec. 2.

### Section 4783.  Forcible Entry:

Every person using or procuring, encouraging or assisting another to use, any force or violence in entering upon or detaining any lands or other possessions of another, except in the cases and in the manner allowed by law, is guilty of a misdemeanor.

1887 R. S. Sec. 6962; 1874-5 p. 209, Sec. 570.        Forcible entry:  See Sec. 3974 C. Civ. Proc.

### Section 4784.  Taking Repossession of Land:

Every person who has been removed from any lands by process of law, or who has removed from any lands pursuant to the lawful adjudication or direction of any court, tribunal, or officer, and who afterwards unlawfully returns to settle, reside upon, or take possession of such lands, is guilty of a misdemeanor.

1887 R. S. Sec. 6963.

# CHAPTER CCXVIII.

## CRIMES AGAINST THE REVENUE AND PROPERTY OF THE STATE.

Section.
4785. Embezzlement and falsification of accounts by public officers.
4786. Officers neglecting to pay over public moneys.
4787. Public moneys defined.

Section.
4788. Certain officers refusing to pay over fine or forfeiture according to law.
4789. Refusing to give assessor list of property.

# EXHIBIT 22

# GENERAL LAWS.

## CHAPTER I.

An Act to repeal Sections 3698 and 3699 of the Political Code of the State of Montana, relating to the Board of Appraisers of real estate.

*Be it Enacted by the Legislative Assembly of the State of Montana:*

Section 1.   That Sections 3698 and 3699 of the Political Code of the State of Montana be, and the same are hereby repealed.

<div style="float:right">Sections 3698 and 3699 Political Code repealed.</div>

Section 2.   All Acts and parts of Acts in conflict with the provisions of this Act are hereby repealed.

<div style="float:right">Repealing clause.</div>

Section 3.   This Act shall take effect and be in force from and after its passage and approval.

<div style="float:right">When act takes effect.</div>

Approved Feby 6th 1903

## CHAPTER II.

"An Act Entitled An Act to Amend Sections six and seven of an act to Provide for the Appointment of a Board of Sheep Commissioners, and to define their powers and duties.   Approved March 5, 1897."

*Be it Enacted by the Legislative Assembly of the State of Montana:*

Section 1.   That Section six of an act entitled "An Act to Provide for the Appointment of a Board of Sheep Commissioners and to Define their Powers and Duties, approved March 5, 1897," shall be amended to read as follows:

<div style="float:right">Section 6 of Act to provide for Board of Sheep Commissioners approved March 5th, 1897, amended.</div>

Section 6.   The Board must make an annual report

<div style="float:right">Annual report.</div>

## CHAPTER XXXV.

An Act to prohibit unlawful carrying of concealed weapons, to provide penalties for violations of this act and to define the meaning of the term concealed weapons.

*Be it Enacted by the Legislative Assembly of the State of Montana:*

### Section 1.

Any person in this State who shall carry concealed or partially concealed on or about his person any revolver, pistol, dirk, dagger, slung shot, sword cane, or knuckles made of any metal or any hard substance shall be deemed guilty of a misdemeanor and shall be punished by a fine of not less than twenty five nor more than two hundred dollars, or by imprisonment in the County jail not less than ten nor more than thirty days, or by both such fine and imprisonment.

*Carrying weapons concealed or partially concealed about per-son.*

*Penalty.*

### Section 2.

The preceeding section shall not apply to a person in actual service as a militiaman, nor to a police officer or policeman, or person summoned to his aid nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying of arms on one's own premises, or place of business.

*Reservation.*

### Section 3.

If any person shall go into any church or religious assembly, any school room or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct or any place of registration, on the day or days of any election or registration, where any portion of the people of the State are collected to register or vote at any election, or to any other place where people may be assembled to perform any public duty, or at any public assembly, and shall have or carry concealed or partially concealed about his person a

*Carrying weapons in certain places.*

50                    CHAPTER XXXV—ACTS 1903

pistol or other firearm, dirk, dagger, slung shot, sword
cane, knuckles, or bowie knife, he shall· be punished
by a fine of not less than fifty nor more than five hun-
dred dollars.

**Penalty.**

### Section 4.

The preceding section shall not apply to peace offi-
cers or other persons authorized or permitted by law
to carry arms at the places therein designated.   "And
any District Judge of any judicial district of the State
of Montana, may, upon satisfactory proof being pro-
duced before him of the good moral character and
peaceable disposition of any person, grant permission
to such person to bear concealed or otherwise a "pis-
tol" or "revolver" for such a period of time as such
judge may deem necessary."

**Reservation.**

**Permit of Dis-
trict Judge.**

### Section 5.

Any person violating any of the provisions of sec-
tions one and three of this act may be arrested without
warrant by any peace officer and carried before the
nearest justice of the peace for trial: and any peace
officer who shall fail or refuse to arrest such person on
his own knowledge, or upon information from some
creditable person, shall be punished by a fine not ex-
ceeding five hundred dollars.

**Arrest.**

**Peace officer
failing to arrest.**

**Penalty.**

### Section 6.

The term concealed weapons shall be taken to mean
any weapon mentioned in the foregoing sections which
shall be wholly or partially covered by the clothing or
wearing apparel of the person so carrying the weapon.

**"Concealed
weapon" defined.**

### Section 7.

The provisions of this Act shall not apply to or be
in force in any county which the governor may desig-
nate by proclamation as a frontier county and liable
to incursions by hostile Indians.

**Act not to ap-
ply to county
designated by
proclamation by
Governor.**

**JA0421**

# EXHIBIT 23

34                           GENERAL ORDINANCES.

or spirituous liquors, or any composition of which fermented, vinous or spiritous liquors form a part. *Provided,* that this section shall not be so construed as to prevent any druggist from selling or giving away, in good faith, wine for sacramental purposes, or alcohol for art, mechanical or scientific purposes on the applicant therefor, and seller thereof, complying with the laws of this state in such case made and provided; nor to prevent the selling or giving away by druggists of alcohol, or intoxicating liquors, on a written prescription, dated and signed, first had and obtained from some regularly registered and practising physician, and then only when such physician shall state in such prescription the name of the person for whom the same is prescribed and that such intoxicating liquor is prescribed as a necessary remedy in such case.

Sec. 159.  Any person who shall sell or give away, to any person already intoxicated, any intoxicating liquor shall be deemed guilty of a misdemeanor and be fined if a druggist selling or giving away on prescription, not less than twenty-five dollars; if any other person, not less than forty dollars.

Passed May 22, 1890.


CHAPTER XVII.

CARRYING CONCEALED WEAPONS—FIRING GUNS, PISTOLS, FIRE CRACKERS, ETC.

*Be it ordained by the Board of Trustees of the Town of Columbia as follows:*

Sec. 160.  Any person who shall fire or discharge, or who shall cause the same to be done by any person under his authority or control, any gun, pistol, cannon, anvil, or any device or contrivance, charged with any explosive, shall be deemed guilty of a misdemeanor and on conviction be fined not less than ten dollars for each offense.

Sec. 161.  Any person who shall ignite or explode any explosive compound, or suffer the same to be done by any person under his control, or who shall fire, or cause to be fired or exploded, or suffer the same to be done by any person under his control, any fire cracker or crackers, Roman candles, rockets, torpedoes, squibs, or any other kind of fireworks whatever, shall be deemed guilty of a misdemeanor and on conviction be fined not less than five dollars for each offense.

Digitized by Google

JA0423

Sec. 162.   Any person who shall be guilty of carrying concealed upon or about his person any pistol, bowie knife, dirk, dagger, slung shot, or other deadly or dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than twenty-five nor more than one hundred dollars for every such offense.

Sec. 163.   Any person who shall go into any church, or place where people have assembled for religious worship; or into any school room, or place where people are assembled for educational, literary or social purposes; or into any court room, during the sitting of court, or to any election precinct on any election day; or into any other public assemblage of persons met for any lawful purpose, other than for military drill, or meetings called under the militia laws of this state, carrying concealed or in sight upon or about his person, any fire arms or other deadly or dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than one hundred nor more than one hundred and fifty dollars for ever such offense.

Sec. 164.   Any person who shall be guilty of exhibiting any fire arms, or other deadly or dangerous weapon in a rude, angry, or threatening manner; or who shall carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, shall be deemed guilty of a misdemeanor, and shall upon conviction be fined not less than fifty dollars for every such offense.

*Provided,* that the three last preceding sections shall not apply to police officers, nor to any officer whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to any posse when lawfully summoned and on duty; nor shall section 162 apply to persons moving or traveling peaceably through the state.

Passed May 22, 1890.

Digitized by Google