# EXHIBIT 105

668 FEDERAL REGISTER, *Saturday, June 27, 1936*

*Saturday, June 27, 1936*                                   No. 76

## TREASURY DEPARTMENT.

### Bureau of Internal Revenue.

[T. D. 4649]

WITHHOLDING OF INCOME TAX UNDER SECTIONS 143 AND 144 OF THE REVENUE ACT OF 1936

*Collectors of Internal Revenue and Others Concerned:*

Paragraph A. The Revenue Act of 1936 (Public, No. 740, Seventy-fourth Congress, second session, H. R. 12395), was approved by the President, June 22, 1936, 9 p. m. eastern standard time.

Paragraph B. Section 143 (Title I, Income Tax) of the Act, relating to withholding of tax at the source, provides:

SEC. 143. WITHHOLDING OF TAX AT SOURCE.—(a) *Tax-Free Covenant Bonds.*—

(1) *Requirement of withholding.*—In any case where bonds, mortgages, or deeds of trust, or other similar obligations or a corporation, issued before January 1, 1934, contain a contract or provision by which the obligor agrees to pay any portion of the tax imposed by this title upon the obligee, or to reimburse the obligee for any portion of the tax, or to pay the interest without deduction for any tax which the obligor may be required or permitted to pay thereon, or to retain therefrom under any law of the United States, the obligor shall deduct and withhold a tax equal to 2 per centum of the interest upon such bonds, mortgages, deeds of trust, or other obligations, whether such interest is payable annually or at shorter or longer periods, if payable to an individual, a partnership, or a foreign corporation not engaged in trade or business within the United States and not having any office or place of business therein: *Provided,* That if the liability assumed by the obligor does not exceed 2 per centum of the interest, then the deduction and withholding shall be at the following rates: (A) 10 per centum in the case of a nonresident alien individual (except that such rate shall be reduced, in case of a resident of a contiguous country, to such rate, not less than 5 per centum, as may be provided by treaty with such country), or of any partnership not engaged in trade or business within the United States and not having any office or place of business therein and composed in whole or in part of nonresident aliens, (B) in the case of such a foreign corporation, 15 per centum, and (C) 2 per centum in the case of other individuals and partnerships: *Provided further,* That if the owners of such obligations are not known to the withholding agent the Commissioner may authorize such deduction and withholding to be at the rate of 2 per centum, or, if the liability assumed by the obligor does not exceed 2 per centum of the interest, then at the rate of 10 per centum.

(2) *Benefit of credits against net income.*—Such deduction and withholding shall not be required in the case of a citizen or resident entitled to receive such interest, if he files with the withholding agent on or before February 1 a signed notice in writing claiming the benefit of the credits provided in section 25 (b); nor in the case of a nonresident alien individual if so provided for in regulations prescribed by the Commissioner under section 215.

(3) *Income of obligor and obligee.*—The obligor shall not be allowed a deduction for the payment of the tax imposed by this title, or any other tax paid pursuant to the tax-free covenant clause, nor shall such tax be included in the gross income of the obligee.

(b) *Nonresident aliens.*—All persons, in whatever capacity acting, including lessees or mortgagors of real or personal property, fiduciaries, employers, and all officers and employees of the United States, having the control, receipt, custody, disposal, or payment of interest (except interest on deposits with persons carrying on the banking business paid to persons not engaged in business in the United States and not having an office or place of business therein), dividends, rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income (but only to the extent that any of the above items constitutes gross income from sources within the United States), of any nonresident alien individual, or of any partnership not engaged in trade or business within the United States and not having any office or place of business therein and composed in whole or in part of nonresident aliens, shall (except in the cases provided for in subsection (a) of this section and except as otherwise provided in regulations prescribed by the Commissioner under section 215) deduct and withhold from such annual or periodical gains, profits, and income a tax equal to 10 per centum thereof, except that such rate shall be reduced, in the case of a nonresident alien individual a resident of a contiguous country, to such rate (not less than 5 per centum) as may be provided by treaty with such country: *Provided,* That no such deduction or withholding shall be required in the case of dividends paid by a foreign corporation unless (1) such corporation is engaged in trade or business within the United States or has an office or

place of business therein, and (2) more than 85 per centum of the gross income of such corporation for the three-year period ending with the close of its taxable year preceding the declaration of such dividends (or for such part of such period as the corporation has been in existence) was derived from sources within the United States as determined under the provisions of section 119: *Provided further,* That the Commissioner may authorize such tax to be deducted and withheld from the interest upon any securities the owners of which are not known to the withholding agent. Under regulations prescribed by the Commissioner, with the approval of the Secretary, there may be exempted from such deduction and withholding the compensation for personal services of nonresident alien individuals who enter and leave the United States at frequent intervals.

(c) *Return and payment.*—Every person required to deduct and withhold any tax under this section shall make return thereof on or before March 15 of each year and shall on or before June 15, in lieu of the time prescribed in section 56, pay the tax to the official of the United States Government authorized to receive it. Every such person is hereby made liable for such tax and is hereby indemnified against the claims and demands of any person for the amount of any payments made in accordance with the provisions of this section.

(d) *Income of recipient.*—Income upon which any tax is required to be withheld at the source under this section shall be included in the return of the recipient of such income, but any amount of tax so withheld shall be credited against the amount of income tax as computed in such return.

(e) *Tax paid by recipient.*—If any tax required under this section to be deducted and withheld is paid by the recipient of the income, it shall not be re-collected from the withholding agent; nor in cases in which the tax is so paid shall any penalty be imposed upon or collected from the recipient of the income or the withholding agent for failure to return or pay the same, unless such failure was fraudulent and for the purpose of evading payment.

(f) *Refunds and credits.*—Where there has been an overpayment of tax under this section any refund or credit made under the provisions of section 322 shall be made to the withholding agent unless the amount of such tax was actually withheld by the withholding agent.

(g) *Withholding before enactment of act.*—Notwithstanding the provisions of subsections (a) and (b), the deduction and withholding for any period prior to the tenth day after the date of the enactment of this Act shall be upon the items of income and at the rates prescribed in section 143 (a) and (b) of the Revenue Act of 1934, as amended, in lieu of the items and rates prescribed in such subsections.

Paragraph C. Section 144 (Title I, Income Tax) of the Act, relating to payment of corporation income tax at the source, provides:

SEC. 144. PAYMENT OF CORPORATION INCOME TAX AT SOURCE.—(a) *General Rule.*—In the case of foreign corporations subject to taxation under this title not engaged in trade or business within the United States and not having any office or place of business therein, there shall be deducted and withheld at the source in the same manner and upon the same items of income as is provided in section 143 a tax equal to 15 per centum thereof, except that in the case of dividends the rate shall be 10 per centum, and except that in the case of corporations organized under the laws of a contiguous country such rate of 10 per centum with respect to dividends shall be reduced to such rate (not less than 5 per centum) as may be provided by treaty with such country; and such tax shall be returned and paid in the same manner and subject to the same conditions as provided in that section: *Provided,* That in the case described in subsection (a) of that section (relating to tax-free covenant bonds) the deduction and withholding shall be at the rate specified in such subsection.

(b) *Withholding Before Enactment of Act.*—Notwithstanding the provisions of subsection (a), the deduction and withholding for any period prior to the tenth day after the date of the enactment of this Act shall be upon the items of income and at the rates prescribed in section 144 of the Revenue Act of 1934, as amended, in lieu of the items and rates prescribed in such subsection.

Paragraph D. Section 147 (b) (Title I, Income Tax) of the Act, relating to returns of information at the source, provides:

SEC. 147. INFORMATION AT SOURCE.— * * * *

(b) *Returns Regardless of Amount of Payment.*—Such returns may be required, regardless of amounts, (1) in the case of payments of interest upon bonds, mortgages, deeds of trust, or other similar obligations of corporations, and (2) in the case of collections of items (not payable in the United States) of interest upon the bonds of foreign countries and interest upon the bonds of and dividends from foreign corporations by persons undertaking as a matter of business or for profit the collection of foreign payments of such interest or dividends by means of coupons, checks, or bills of exchange.

Paragraph E. Section 62 (Title I, Income Tax) of the Act, relating to rules and regulations, provides:

SEC. 62. RULES AND REGULATIONS.—The Commissioner, with the approval of the Secretary, shall prescribe and publish all needful rules and regulations for the enforcement of this title.

Case 1:23-cv-01293-GLR   Document 21-105   Filed 07/28/23   Page 3 of 7

credited against the total income tax as computed in the taxpayer's return. If the tax is paid by the recipient of the income or by the withholding agent it shall not be re-collected from the other, regardless of the original liability therefor, and in such event no penalty will be asserted against either person for failure to return or pay the tax where no fraud or purpose to evade payment is involved.

ART. 11. *Withholding in the case of nonresident foreign corporations.*—A tax of 15 per cent is required to be withheld in the case of fixed or determinable annual or periodical income paid to a nonresident foreign corporation except (1) income from sources without the United States, including interest on deposits by persons carrying on the banking business paid to persons not having any office or place of business therein, (2) interest upon bonds or other obligations of a corporation containing a tax-free covenant and issued before January 1, 1934, where the liability assumed by the obligor does not exceed 2 per cent of the interest, and (3) dividends.

Withholding of a tax at the rate of 2 per cent is required in the case of interest payments made to a nonresident foreign corporation, representing income from sources within the United States, paid upon corporate bonds or other obligations containing a tax-free covenant, issued before January 1, 1934, where the liability assumed by the obligor exceeds 2 per cent of the interest.

A tax of 10 per cent is required to be withheld from income from sources within the United States paid to a nonresident foreign corporation which consists of dividends (other than dividends distributed by a corporation organized under the China Trade Act, 1922, to a resident of China) except that such rate of 10 per cent shall be reduced, in the case of corporations organized under the laws of a contiguous country, to such rate (not less than 5 per cent) as may be provided by treaty with such country. Dividends paid by a foreign corporation are not, however, subject to withholding unless such corporation is engaged in trade or business within the United States or has an office or place of business therein and more than 85 per cent of the gross income of such foreign corporation for the three-year period ending with the close of its taxable year preceding the declaration of such dividends (or for such part of such period as the corporation has been in existence) was derived from sources within the United States as determined under the provisions of section 119 of the Act.

For withholding in the case of dividends distributed by a corporation organized under the China Trade Act, 1922, see articles 4 and 12.

ART. 12. *Withholding by a China Trade Act corporation.*—Dividends distributed by a corporation organized under the China Trade Act, 1922, which are treated as income from sources within the United States under the provisions of section 119 of the Act are subject to withholding at the rate of 10 per cent when paid to persons (other than residents of China) who are (1) nonresident aliens, (2) nonresident partnerships composed in whole or in part of nonresident aliens, or (3) nonresident foreign corporations. The 10 per cent rate of withholding specified in this article with respect to dividends shall be reduced in the case of shareholders who are (a) nonresident aliens residents of a contiguous country or (b) nonresident foreign corporations organized under the laws of a contiguous country, to such rate (not less than 5 per cent), as may be provided by treaty with such country.

ART. 13. *Aids to withholding agents in determining liability for withholding of tax.*—Since no withholding of tax on bond interest or other income is required in the case of a resident foreign corporation, the person paying such income should be notified by a letter from such corporation that it is not subject to the withholding provisions of the Act. The letter from the corporation shall contain the address of its office or place of business in the United States and be signed by an officer of the corporation giving his official title. Such letter of notification, or copy thereof, should be immediately forwarded by the recipient to the Commissioner of Internal Revenue, Sorting Section, Washington, D. C.

Although the burden of withholding tax from dividends is placed upon the payor corporation, or any other person (including a nominee), having the control, receipt, custody, disposal, or payment of dividends, if such payor corporation or person has no other reason to believe that the dividends are subject to withholding, the following procedure in general may be adopted:

(1) As to those stockholders whose name and style indicate that they are nonresident aliens, foreign partnerships, or foreign corporations, the tax shall be withheld in all cases if the address of any such stockholder is without the United States.

(2) If the address of such stockholders is in care of an individual, a partnership, or a corporation within the United States, the tax shall likewise be withheld, but as to any stockholder whose address is within the United States, the tax need not be withheld.

[SEAL]                                    CHAS. T. RUSSELL,
                               *Acting Commissioner of Internal Revenue.*

Approved, June 25, 1936.
        HENRY MORGENTHAU, JR.,
              *Secretary of the Treasury.*

[F.R. Doc. 1015—Filed, June 26, 1936; 12:39 p. m.]

# DEPARTMENT OF THE INTERIOR.

## National Park Service.

### RULES AND REGULATIONS

Made, published, and approved by the Secretary of the Interior on the 18th day of June 1936, and to continue in force and effect until otherwise directed by the said Secretary.

#### GENERAL PROVISIONS

Pursuant to the authority granted to the Secretary of the Interior by the Act of August 25, 1916 (ch. 408, sec. 3, 39 Stat. 535), as amended by the Act of June 2, 1920 (ch. 218, sec. 5, 41 Stat. 731), and by the Act of March 7, 1928 (ch. 137, sec. 1, 45 Stat. 200, 235); and pursuant to the authority granted to the Secretary of War by the Act of March 2, 1933 (ch. 180, 47 Stat. 1420); and transferred to the Secretary of the Interior by Executive Order No. 6166, June 10, 1933, as interpreted by Executive Order No. 6228, July 28, 1933, under the authority of the Act of March 3, 1933 (ch. 212, sec. 403, 47 Stat. 1489, 1518); and pursuant to the authority granted to the Secretary of the Interior by various Acts of Congress relating to particular parks, monuments, and reservations: the following regulations are hereby made and published for the proper use, management, government, and protection of, and maintenance of good order in all the National Parks, National Monuments, National Military Parks, National Historical Parks, Battlefield Sites, and miscellaneous memorials which are, or hereafter may be, under the administrative jurisdiction of the National Park Service of the Department of the Interior: *Provided, however,* That these rules and regulations shall not apply to National Cemeteries or to National Capital Parks. All previous rules and regulations (except the uniform rules and regulations prescribed December 28, 1906, by the Secretaries of the Interior, Agriculture, and War, to carry out the provisions of the "Act for the Preservation of American Antiquities", approved June 8, 1906 (34 Stat. 225), and except such local subsidiary regulations as are continued in force under the provisions hereof), for such National Parks, National Monuments, National Military Parks, National Historical Parks, Battlefield Sites, and miscellaneous memorials, are hereby repealed.

*Definitions.*—The term "park", when used in these rules and regulations, unless otherwise indicated, shall be construed to include National Parks, National Military Parks, and National Historical Parks; and the term "monument", when used in these rules and regulations, unless otherwise indicated, shall be construed to include National Monuments,

Battlefield Sites, and miscellaneous memorials. The term "superintendent", when used in these rules and regulations, shall be construed to include a custodian, caretaker, or other person in charge of a National Park, National Monument, National Military Park, National Historical Park, Battlefield Site, or miscellaneous memorial.

1. *Preservation of public property, natural features and curiosities.*—The destruction, injury, defacement, removal, or disturbance in any way of any public building, sign, equipment, monument, statue, marker, or other structure, or of any tree, flower, vegetation, rock, mineral, formation, stalactite, stalagmite, phenomenon of crystallization, incrustation in any lava tube, cave, steam vent, or cone, or of any animal, bird, or other wildlife, or of any ruins or relics, or of any other public property of any kind is prohibited: *Provided,* That flowers may be gathered in small quantities when, in the judgment of the superintendent or custodian, their removal will not impair the beauty of the park or monument. Before any flowers are picked, permit must be secured from the superintendent or custodian.

Sequoia cones shall not be disturbed, or removed from any national park or monument.

No canes, umbrellas, or sticks of any kind may be taken into caves or caverns. The tossing or throwing of rocks or other material inside the caves or caverns is prohibited.

Collections for scientific or educational purposes shall be permitted only in accordance with written permits first had and obtained from the superintendent.

Bona-fide claimants or entrymen claiming or owning land reasonably adjacent to Grand Teton National Park must secure written permits before cutting any dead or down timber within the park, and are restricted to cutting such timber for firewood for their own consumption.

Visitors in Hawaii National Park may, with the permission of the park superintendent, pick and eat, or carry away, such fruits as the superintendent may designate.

2. *Camping.*—(a) No camping is permitted outside the specially designated camp sites, except when necessary in connection with trips to isolated sections of the parks and monuments.

(b) No person, party, or organization shall be permitted to camp in any public camping area in the parks or monuments more than 30 days in any calendar year.

(c) Campers shall keep their campgrounds clean. Combustible rubbish shall be burned on camp fires and all other garbage and refuse of all kinds shall be placed in garbage cans provided for the purpose. At new or unfrequented camps, garbage shall be burned or buried.

(d) Campers and others shall not wash clothing or cooking utensils in, or pollute in any other manner, the waters of the parks or monuments. Bathing in any of the streams or lakes near the regularly travelled thoroughfares in the parks and monuments is not permitted without suitable bathing clothes.

(e) Saddle, pack, or draft animals shall not be kept in or near any camping area. No such animals shall be kept on the floor of Yosemite Valley except in the operator's corral.

(f) Only in areas designated by the park superintendent may campers use any dead or fallen timber for fuel, except that Sequoia wood or bark shall not be disturbed for any purpose.

(g) The installation of permanent camping facilities by visitors is prohibited in all parks and monuments. The digging or leveling of the ground in any camp site without a ranger's permission is prohibited.

(h) Camps must be completely razed and the sites cleaned before the departure of campers. In dismantling camps, all material, such as poles, bark, planks, platforms, etc., used in construction of temporary camps must be removed, and, if combustible, must be piled on the public camp woodpiles.

(i) Campers shall not leave their camps unattended for more than 48 hours without special permission of the superintendent, obtained in advance. Camping equipment left unattended in any public camping area for 48 hours or more is subject to removal by order of the superintendent,

the expense of such removal to be paid by the person or persons leaving such equipment.

(j) No camp may be established in a park or monument and used as a base for hunting outside such park or monument.

(k) No camp shall be placed within 25 feet of any well-defined water course, water hydrant, or main road.

(l) Any article likely to frighten horses shall not be hung near a road or trail used by horses.

(m) The superintendents or custodians may, with the approval of the Director of the National Park Service, establish hours during which quiet must be maintained at any camp, and prohibit the running of motors at or near a camp during such hours.

(In Hot Springs National Park, the superintendent may establish the hours during which bathing will be permitted in the pool.)

(n) No visitors shall be permitted to camp within the canyon in Canyon de Chelly National Monument.

(o) No camping is permitted in any part of the Muir Woods National Monument, and no hikers or visitors shall enter or remain therein between one-half hour after sunset and one-half hour before sunrise.

3. *Picnicking.*—Picnicking or the eating of lunches is prohibited in restricted areas designated by the superintendent.

4. *Use of park waters.*—In Platt National Park the superintendent may, whenever it becomes necessary to do so, restrict the use of the waters of any of the springs in the park to immediate drinking purposes at such springs.

5. *Sanitation.*—(a) Garbage, papers, or refuse of any kind shall not be thrown or left on or along roads, in camping or picnic areas, or on any other park or monument lands.

(b) All comfort stations shall be used in a clean and sanitary manner.

(c) Contamination of watersheds, of water supplies, or of any water used for drinking purposes is strictly prohibited.

6. *Fires.*—Fires shall not be kindled near or on the roots of trees, dead wood, moss, dry leaves, forest mold, or other vegetable refuse, but in some open space on rocks or earth. On public campgrounds the regular fireplaces constructed for the convenience of visitors must be used. Should camp be made in a locality where no such open space exists or is provided, the dead wood, moss, dry leaves, etc., shall be scraped away to the rock or earth over an area considerably larger than that required for the fire.

Fires shall be lighted only when necessary and, when no longer needed, shall be completely extinguished, and all embers and beds smothered with earth or water, so that there remains no possibility of reignition.

Permission to burn on any cleanup operation within the parks or monuments must first be obtained in writing from the office of the superintendent or custodian, and in such cases as it is deemed advisable such burning will be under Government supervision. All costs of suppression and all damage caused by reason of loss of control of such burning operations shall be paid by the person or persons to whom such permit has been granted.

No lighted cigarette, cigar, pipe heel, match, or other burning material shall be thrown from any vehicle or saddle horse or dropped into any grass, leaves, twigs, tree mold, or other combustible or inflammable material.

Smoking or the building of fires on any lands within the parks or monuments may be prohibited or limited by the superintendent or custodian when, in his judgment, the hazard makes such action necessary.

All persons making trips away from established camps are required to obtain written fire permits from the nearest ranger before building camp fires.

The use of fireworks or firecrackers in the parks and monuments is prohibited, except with the written permission of the superintendent or custodian.

7. *Protection of wildlife.*—The parks and monuments are sanctuaries for wildlife of every sort, and all hunting, or the killing, wounding, frightening, capturing, or attempting to

674    FEDERAL REGISTER, *Saturday, June 27, 1936*

capture at any time of any wild bird or animal, except dangerous animals when it is necessary, to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the parks and monuments.

Unauthorized possession within a part or monument of the dead body or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements must be made at entrance stations to identify and transport through the parks and monuments, where necessary, the carcasses of birds or animals legally killed outside the parks and monuments. Failure to make such arrangements shall be deemed a violation of this regulation.

8. *Firearms, etc.*—Firearms, explosives, traps, seines, and nets are prohibited within the parks and monuments, except upon written permission of the superintendent or custodian. Visitors entering or traveling through the parks and monuments to places beyond shall, at entrance, report and, if required to do so, surrender all such objects in their possession to the first park or monument officer, and, in proper cases, may obtain his written permission to carry them through the park or monument sealed. Failure to obtain such written permission shall be deemed a violation of this regulation. The Government assumes no responsibility for the loss of, or damage to, any such objects so surrendered to any park or monument officer, nor are park or monument officers authorized to accept the responsibility or custody of any other property for the convenience of the visitors.

9. *Fishing.*—Persons desiring to fish in the waters of the Yosemite, Sequoia, Lassen, General Grant, Grand Canyon, Grand Teton, Acadia, Wind Cave, Great Smoky Mountains, Mammoth Cave, and Zion National Parks, and the national monuments under the jurisdiction of the National Park Service must secure a sporting fishing license, as required by the laws of the state in which such park or monument is situated. All fishing in such parks and monuments must be done in conformity with the laws of the state regarding open seasons, size of fish, and the limit of catch, except as otherwise provided in the following paragraphs, which are applicable to all parks and monuments:

Fishing with nets, seines, traps, or by the use of drugs or explosives, or for merchandise or profit, or in any other way than with hook and line, the rod or line being held in hand, is prohibited.

Fishing in particular waters may be suspended, or restricted in regard to the use of particular kinds of bait, when the superintendent or custodian, with the approval of the Director of the National Park Service, shall determine such suspension or restriction necessary and shall post such restrictions or suspensions.

The number of fish that may be taken by one person in any one day from the various lakes and streams may be regulated by the superintendent or custodian, with the approval of the Director of the National Park Service. Unless otherwise determined and posted, the number shall be limited to 10 fish. Possession of more than two days' catch by any person at any one time shall be construed as a violation of this regulation.

No fish less than six inches long may be retained, unless a different limit be determined by the superintendent with the approval of the Director of the National Park Service and posted in the particular park or monument. All fish hooked less than such limit in length shall be carefully handled with moist hands and returned at once to the water if not seriously injured. Undersized fish retained because seriously injured shall be taken in the number of fish which may be taken in one day.

The possession of live minnows, chubs, or other bait fish, or the use thereof as bait, is prohibited in all the national parks and monuments, except Acadia National Park and Fort Jefferson National Monument.

The digging of worms for bait is prohibited in all parks and monuments.

The canning or curing of fish for the purpose of transporting them out of a national park or monument is prohibited.

The possession of fishing tackle upon or along any waters closed to fishing shall be prima facie evidence that the person or persons having such fishing tackle are guilty of unlawful fishing in such closed waters.

Fishing is prohibited in the Muir Woods National Monument.

All waters of the Shenandoah National Park are closed to fishing until further notice. This, however, shall not apply to occupants of or guests at the President's Camp on the Rapidan.

10. *Private operations.*—No person shall reside permanently in a national park or monument. No person, firm, or corporation shall engage in or solicit any business, or erect buildings in the parks or monuments without permission in writing from the Director of the National Park Service, Washington, D. C. Applications for such permission may be addressed to the Director through the superintendents and custodians of the parks and monuments.

In Mount McKinley National Park, prospectors and miners may erect necessary shelter cabins or other structures necessary in mining operations on bona fide locations in the park.

11. *Public speeches.*—No person shall make or deliver any address, speech, or sermon upon any subject whatever in Platt National Park without first obtaining a permit in writing from the superintendent, which permit the superintendent is hereby authorized to issue in proper cases and which shall designate the time and locality where such address, speech, or sermon may be given.

12. *Radios.*—The use of radios in public camps, hotels, or other buildings, or in automobiles is prohibited when audible beyond the immediate vicinity of the radio set. Radios shall not be operated to the annoyance of other persons nor so as to disturb the quiet of camps or other public places. The erection of aerials or other radio installations is prohibited.

13. *Cameras.*—Before still pictures may be taken for commercial purposes and before a motion or sound picture requiring the use of artificial or special settings, or special equipment, or involving the performance of a professional cast, may be filmed in any of the parks or monuments, authority must first be obtained, in writing, from the Secretary of the Interior. Still and motion picture cameras may be freely used by amateurs in the parks and monuments for general scenic purposes.

Superintendents may issue permits to take still and motion pictures in the parks and monuments under their supervision without such previous authorization, by the Secretary of the Interior, in the following circumstances, and on condition that the permittee shall refrain from offering any gratuity of whatsoever nature to any employee of the Government in connection with the exercise of the privilege herein authorized to be granted:

1. Professional photographers and motion-picture cameramen desiring to take scenes of, or events in, the national parks as representatives of news concerns and for bona fide news publication;

2. Professional photographers and motion-picture cameramen desiring to take scenes of, or events in, the national parks, not for sale or for exhibition when paid admissions are charged, but for the purpose of stimulating general or park travel;

3. Professional photographers and motion-picture cameraman desiring to take scenes of, or events in, the national parks, for non-profit educational purposes;

4. Professional photographers desiring to take park scenes for general artistic purposes.

14. *Gambling.*—Gambling in any form, or the operation of gambling devices, whether for merchandise or otherwise, is prohibited.

15. *Advertisements.*—Private notices or advertisements shall not be posted, distributed, or displayed in the parks or monuments, excepting such as the superintendent or custodian may deem necessary for the convenience and guidance of the public.

16. *Mining claims.*—The location of mining claims on lands within the parks and monuments is prohibited, except

FEDERAL REGISTER, *Saturday, June 27, 1936*                675

in Mount McKinley National Park and in Death Valley National Monument. This regulation is subject to the further exception contained in the Act of Congress approved February 14, 1931 (46 Stat. 1161), reserving to the Navajo Tribe of Indians the mineral rights in the Canyon de Chelly National Monument.

Mining in Mount McKinley National Park may be regulated by the Secretary of the Interior as to surface use of locations under the Act of January 26, 1931 (46 Stat. 1043).

Mining in Death Valley National Monument is subject to the following special regulations, which are prescribed to govern the surface use of claims therein:

(a) The claim shall be occupied and used exclusively for mineral exploration and development and for no other purpose; except that, upon written permission of the Director of the National Park Service, the surface of the claim may be used for other specified purposes, the use to be on such conditions and for such period as may be prescribed when permission is granted.

(b) The owner of the claim and all persons holding under him shall conform to all rules now prescribed or which may be made applicable by the Director of the National Park Service, governing occupancy of lands within the national monument.

(c) The use and occupancy of the surface of mining claims as prescribed above shall apply to all such claims located after the date of the Act of June 13, 1933, within the limits of the national monument as fixed by the proclamation of February 11, 1933, and to all mining claims on lands hereafter included in the National monument, located after such inclusion, so long as such claims are within the boundaries of said monument.

(d) Prospectors or miners shall not open or construct roads or vehicle trails without first obtaining a permit from the Director of the National Park Service. Applications for permits may be made through the custodian of the monument, upon submitting a map or sketch showing the location of the mining property to be served and the location of the proposed road or vehicle trail. The permit may be conditioned upon the permittee's maintaining the road or trail in a passable condition as long as it is used by the permittee or his successors.

17. *Archeologic ruins and objects.*—Visitors shall not be permitted to visit the ruins in Mesa Verde National Park nor to enter the canyon in Canyon de Chelly National Monument unless accompanied by National Park Service employees. The superintendent may waive this requirement in Mesa Verde National Park by issuing a special written permit to persons engaged in scientific studies.

Visitors shall not remove any artifacts or other objects of archeological or historical significance from the place where they may be found, nor purchase any such objects from Indians or others. Any such objects purchased or removed in violation of this regulation shall be delivered to the superintendent or his representative on demand.

18. *Lost articles.*—Persons finding lost articles, other than relics, should deposit them at the office of the superintendent or custodian, or at the nearest ranger station, leaving their own names and addresses, so that if the articles are not claimed by the owners within 60 days, they may be turned over to those who found them.

19. *Private lands.*—Owners of private lands within the limits of any park or monument are entitled to the full use and enjoyment thereof; the boundaries of such lands, however, shall be determined, and marked and defined, so they may be readily distinguished from the park or monument lands. While no limitations or conditions are imposed upon the use of private lands so long as such use does not interfere with or injure the Government lands, private owners shall provide against trespass by their livestock upon lands of the parks or monuments, and all trespasses committed will be punished to the full extent of the law. Stock may be taken over the lands of parks and monuments with the written permission and under the supervision of the superintendent or custodian, but such permission and super-

vision are not required when access to such private lands is had wholly over roads or lands not owned or controlled by the United States.

20. *Grazing.*—The running at large, herding, or grazing of livestock of any kind on the Government lands in the parks and monuments, as well as the driving of livestock over the same, is prohibited, except where authority therefor has been granted by the superintendent or custodian, with the approval of the Director of the National Park Service. The owners of livestock found improperly on the park or monument lands will be prosecuted.

The above regulation is subject to the exception contained in the provisions of the Act of Congress approved February 26, 1929 (45 Stat. 1314), relating to grazing in Grand Teton National Park; and to the exception contained in the Act of Congress approved February 14, 1931 (46 Stat. 1161), reserving to the Navajo Tribe of Indians the right to the surface use of the lands in the Canyon de Chelly National Monument for agricultural, grazing, or other purposes.

No authority may be granted for grazing in the Yellowstone National Park.

21. *Authorized operators.*—All persons, firms, or corporations holding franchises in the parks and monuments shall keep the grounds used by them properly policed and shall maintain the premises in a sanitary condition to the satisfaction of the superintendent or custodian. No operator shall retain in his employment a person whose presence in the park or monument may be deemed by the superintendent or custodian subversive to the good order and management of the park or monument.

All operators shall require each of their public contact employees to wear a metal badge with a number thereon, or other mark of identification. The name and number corresponding therewith, or the identification mark, shall be registered in the office of the superintendent or custodian. These badges must be worn in plain sight.

22. *Fraudulently obtaining accommodations.*—The obtaining of food, lodging, or other accommodations in the national parks and monuments with intent to defraud is forbidden, and such fraudulent intent will be presumed from refusal or neglect to pay therefor on demand, or payment therefor with negotiable paper on which payment is refused, or absconding without paying or offering to pay therefor, or false or fictitious showing or pretense of baggage or other property, or surreptitious removal or attempted removal of baggage.

23. *Dogs and cats.*—(a) Dogs and cats are prohibited on the Government lands in the parks and monuments, except that upon written permission of the superintendent or custodian, secured upon entrance, they may be transported over through roads by persons passing through the parks and monuments provided they are kept under leash, crated, or otherwise under restrictive control of the owner at all times while in the park or monument: *Provided, however,* That employees and others may be authorized by the superintendent or custodian to keep dogs for official purposes in the administrative area of a park or monument, and subject to such further conditions as may be determined by the superintendent or custodian.

(b) Stray dogs or cats running at large in the parks and monuments may be killed to prevent molestation of the wild-life therein.

(c) In Mount McKinley National Park, dogs may be used for hauling, with the permission of the superintendent, and subject to the following rights and restrictions: In the winter, prospectors and miners may use such dogs as may be necessary for a reasonable time for heavy hauling of supplies, fuel, timber, and other objects; thereafter each person is limited to seven dogs. In the summer, no dogs are allowed except in special cases. In no case nor at any time shall litters of pups be raised in the park except by special permission of the superintendent. Persons entering the park with dogs must register at McKinley Park entrance, Katishna entrance, or the nearest ranger station, giving such information as may be required by the superintendent.

such overtaking vehicle, shall move to the right to allow a safe passage.

When automobiles going in opposite directions meet on a grade, the ascending machine has the right-of-way, and, the descending machine shall be backed or otherwise handled as may be necessary to enable the ascending machine to pass in safety.

48. *Following vehicles.*—Except in slow-moving traffic, a vehicle shall not follow another vehicle closer than 50 feet, nor closer than 15 feet at any time.

49. *Clutches and gears.*—No motor vehicle shall be operated on any highway with clutch disengaged or gear out of mesh except for the purpose of changing or shifting gears or stopping or while being towed, or when such vehicle is equipped with commercial free-wheeling devices.

50. *Lights.*—All motor vehicles except motorcycles shall be equipped with two headlights and one or more red tail-lights, the headlights to be of sufficient brilliancy to insure safety in driving at night, and all lights shall be kept lighted after sunset when the vehicle is on a road, and at all times when passing through unlighted tunnels. Headlights shall be dimmed when meeting other vehicles, riding or driving animals, or pedestrians.

51. *Sounding horn.*—The horn shall be sounded on approaching sharp curves or other places where the view ahead is obstructed, or before passing other vehicles or pedestrians, or, if necessary, before passing riding or driving animals.

52. *Muffler cut-outs.*—Muffler cut-outs shall be kept closed at all times within the limits of the parks and monuments.

53. *Accidents—stop-overs.*—If vehicles stop because of accident or for any other reason, they shall be immediately parked in such a way as not to interfere with travel on the road.

54. *Parking.*—The superintendent may limit the time allowed for parking in any parking area upon the posting of signs indicating such limit.

55 *Traffic signs.*—Drivers of all vehicles shall comply with the directions of all official traffic signs posted in the the parks or monuments.

56. *Intoxication.*—No person who is under the influence of intoxicating liquor or narcotic drugs shall operate or drive a motor-driven vehicle of any kind on the roads of the parks or monuments.

### LOCAL SUBSIDIARY REGULATIONS

Subsidiary regulations necessary to cover local situations and promulgated under general provisions contained in these regulations will be published in the FEDERAL REGISTER and may be seen at the headquarters of the parks or monuments in which they are operative.

All subsidiary regulations promulgated under general provisions contained in the Rules and Regulations approved by the Secretary of the Interior June 6, 1935, are hereby continued in force and effect until amended or repealed.

### PENALTIES

(a) Any person who violates any of the foregoing rules or regulations in regard to any park or monument not specified in paragraph (b) hereof shall be deemed guilty of a misdemeanor and shall be punished by a fine of not more than $500 or imprisonment for not exceeding six months, or both.

(b) Any person who knowingly and willfully violates any of the foregoing rules or regulations in regard to any of those national military parks, battlefield sites, national monuments, or miscellaneous memorials transferred to the jurisdiction of the Secretary of the Interior from that of the Secretary of War by Executive Order No. 6166, June 10, 1933, and enumerated in Executive Order No. 6228, July 28, 1933, shall be deemed guilty of a misdemeanor and punished by a fine of not more than $100 or imprisonment for not more than three months, or by both such fine and imprisonment.

Approved: June 18, 1936.

HAROLD L. ICKES,
*Secretary of the Interior.*

[F. R. Doc. 1006—Filed June 26, 1936; 10:40 a. m.]

## DEPARTMENT OF AGRICULTURE.

### Agricultural Adjustment Administration.

ORDER TERMINATING OPERATION OF LICENSE FOR MILK—ATLANTA, GEORGIA, SALES AREA

Whereas, W. R. Gregg, Acting Secretary of Agriculture of the United States of America, acting under the provisions of the Agricultural Adjustment Act, as amended, for the purpose and within the limitations therein contained, and pursuant to the applicable general regulations issued thereunder, did, on the 15th day of November 1934, issue under his hand and the official seal of the Department of Agriculture a License for Milk—Atlanta, Georgia, Sales Area, effective the 1st day of December 1934, which license was subsequently amended on August 12, 1935, and suspended on the 25th day of January 1936, said suspension being effective on and after 12:01 a. m., January 27, 1936; and

Whereas, the Secretary of Agriculture has determined to terminate the said license, as amended;

Now, therefore, the undersigned, acting under the authority vested in the Secretary of Agriculture under the terms and conditions of the said act, as amended, and pursuant to the applicable general regulations issued thereunder, hereby terminate the said license, as amended.

In witness whereof, H. A. Wallace, Secretary of Agriculture of the United States of America, has executed this Order of Termination in duplicate, and has hereunto set his hand and caused the official seal of the Department of Agriculture to be affixed in the city of Washington, District of Columbia, this 25th day of June 1936, and hereby declares that this termination shall be effective on and after 12:01 a. m. July 1, 1936.

[SEAL]

H. A. WALLACE,
*Secretary of Agriculture.*

[F. R. Doc. 1012—Filed, June 26, 1936; 11:58 a. m.]

## FEDERAL TRADE COMMISSION.

Commissioners: Charles H. March, Chairman; Garland S. Ferguson, Jr., Ewin L. Davis, W. A. Ayres, Robert E. Freer.

[File No. 21–267]

IN THE MATTER OF APPLICATION FOR TRADE PRACTICE RULES FOR THE SCHOOL SUPPLIES AND EQUIPMENT DISTRIBUTING INDUSTRY

NOTICE OF OPPORTUNITY TO BE HEARD

This matter now being before the Federal Trade Commission under its Trade Conference procedure, in pursuance of the Act of Congress approved September 26, 1914. (38 Stat. 717; 15 USCA, Section 41) ;

Opportunity is hereby extended by the Federal Trade Commission to any and all persons affected by or having an interest in the proposed trade practice rules for the School Supplies and Equipment Distributing Industry to present to the Commission their views upon the same, including suggestions or objections, if any. For this purpose they may, upon application to the Commission, obtain copies of the proposed rules. Communications of such views should be made to the Commission not later than Wednesday, July 15, 1936. Opportunity for oral hearing will be afforded July 15, 1936, at 10 a. m., Room 101, Federal Trade Commission Building, 815 Connecticut Avenue, Washington, D. C., to such persons as may desire to appear, and who have made prior written or telegraphic request to be heard orally. All briefs or other communications received concerning the proposed rules will become part of the public record subject to inspection by interested parties. After giving due consideration to such suggestions or objections as may be received concerning the rules proposed by the industry, the Commission will proceed to their final consideration.

By the Commission.

[SEAL]

OTIS B. JOHNSON, *Secretary.*

Entered June 24, 1936.

[F. R. Doc. 1007—Filed June 26, 1936; 11:15 a. m.]

# EXHIBIT 106

Chapter 651

**(House Bill 824)**

AN ACT concerning

**Public Safety – Regulated Firearms – Possession and Permits to Carry, Wear, and Transport a Handgun**

FOR the purpose of altering *the penalty for a violation of the prohibition on wearing, carrying, or transporting a handgun; requiring the State Commission on Criminal Sentencing Policy to annually report certain information to the Governor and General Assembly; requiring the Department of State Police to transmit a certain summary of certain laws relating to firearms to certain persons and in a certain manner; altering* the disqualifiers for possession of a regulated firearm; altering the maximum fees~~,~~ and qualifications for issuance~~, and the renewal period~~ for a permit to carry, wear, or transport a handgun; *requiring the Secretary of State Police, in consultation with the Office of the Attorney General and the Maryland Department of Health to develop a certain curriculum;* altering a provision of law to require, rather than authorize, the Secretary ~~of State Police~~ to revoke a certain permit on a finding that the holder does not meet certain qualifications; requiring the Secretary to regularly review certain information in a certain manner to determine whether certain permit holders continue to meet certain requirements, take reasonable steps to ensure the surrender of certain firearms under certain circumstances, and provide certain notice to a certain applicant under certain circumstances; altering a certain reporting requirement; ~~requiring the Deputy Secretary for Public Health Services to develop a youth suicide prevention and firearm safe storage guide;~~ and generally relating to regulated firearms.

~~BY repealing and reenacting, with amendments,~~
~~Article – Criminal Law~~
~~Section 4–104(a), (b), and (c)~~
~~Annotated Code of Maryland~~
~~(2021 Replacement Volume and 2022 Supplement)~~

BY repealing and reenacting, without amendments,
Article – Criminal Law
Section ~~4–104(a)(1), (3), and (4), (c), and (d)~~ ~~4–104(d)~~ *4–203(a) and (c)(1)*
Annotated Code of Maryland
(2021 Replacement Volume and 2022 Supplement)

*BY repealing and reenacting, with amendments,*
*Article – Criminal Law*
*Section 4–203(c)(2)*
*Annotated Code of Maryland*
*(2021 Replacement Volume and 2022 Supplement)*

Ch. 651                           2023 LAWS OF MARYLAND

*BY adding to*
        *Article – Criminal Procedure*
        *Section 6–215*
        *Annotated Code of Maryland*
        *(2018 Replacement Volume and 2022 Supplement)*

BY repealing and reenacting, with amendments,
        Article – Public Safety
        Section 5–133, 5–304, 5–306, and ~~5–300~~ 5–310 through 5–312
        Annotated Code of Maryland
        (2022 Replacement Volume)

*BY adding to*
        *Article – Public Safety*
        *Section 5–147*
        *Annotated Code of Maryland*
        *(2022 Replacement Volume)*

BY repealing and reenacting, without amendments,
        Article – Public Safety
        Section 5–301(a), (b), (c), and (e) ~~and,~~ 5–303, and 5–309
        Annotated Code of Maryland
        (2022 Replacement Volume)

~~BY adding to~~
        ~~Article – Health – General~~
        ~~Section 13–39A–01 to be under the new subtitle "Subtitle 39A. Youth Suicide~~
        ~~Prevention and Firearm Safe Storage"~~
        ~~Annotated Code of Maryland~~
        ~~(2019 Replacement Volume and 2022 Supplement)~~

        SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND,
That the Laws of Maryland read as follows:

## Article – Criminal Law

~~4–104.~~

        ~~(a)~~        ~~(1)~~        ~~In this section the following words have the meanings indicated.~~

                ~~(2)~~        ~~"Ammunition" means a cartridge, shell, or other device containing~~
~~explosive or incendiary material designed and intended for use in a firearm.~~

                ~~(3)~~        ~~"Child" means an individual under the age of 16 years.~~

– 2 –

WES MOORE, Governor                          Ch. 651

~~(4)     (i)     "Firearm" means a handgun, rifle, shotgun, short–barreled rifle, or short–barreled shotgun, as those terms are defined in § 4–201 of this title, or any other firearm.~~

~~(ii)    "Firearm" does not include an antique firearm as defined in § 4–201 of this title.~~

~~(b)     This section does not apply if:~~

~~(1)     the **[child's] MINOR'S** access to a firearm is supervised by an individual at least 18 years old;~~

~~(2)     the **[child's] MINOR'S** access to a firearm was obtained as a result of an unlawful entry;~~

~~(3)     the firearm is in the possession or control of a law enforcement officer while the officer is engaged in official duties; or~~

~~(4)     the **[child] MINOR** has a certificate of firearm and hunter safety issued under § 10–301.1 of the Natural Resources Article.~~

~~(c)     A person may not store or leave a loaded firearm in a location where the person knew or should have known that an unsupervised child **MINOR** would gain access to the firearm.~~

~~(d)     A person who violates this section is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $1,000.~~

*4–203.*

*(a)     (1)     Except as provided in subsection (b) of this section, a person may not:*

*(i)     wear, carry, or transport a handgun, whether concealed or open, on or about the person;*

*(ii)    wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State;*

*(iii)   violate item (i) or (ii) of this paragraph while on public school property in the State;*

*(iv)    violate item (i) or (ii) of this paragraph with the deliberate purpose of injuring or killing another person; or*

    *(v)  violate item (i) or (ii) of this paragraph with a handgun loaded with ammunition.*

    *(2)  There is a rebuttable presumption that a person who transports a handgun under paragraph (1)(ii) of this subsection transports the handgun knowingly.*

   *(c)  (1)  A person who violates this section is guilty of a misdemeanor and on conviction is subject to the penalties provided in this subsection.*

    *(2)  If the person has not previously been convicted under this section, § 4–204 of this subtitle, or § 4–101 or § 4–102 of this title:*

    *(i)  except as provided in item (ii) of this paragraph, the person is subject to imprisonment for not less than 30 days and not exceeding **[3] 5** years or a fine of not less than $250 and not exceeding $2,500 or both; or*

    *(ii)  if the person violates subsection (a)(1)(iii) of this section, the person shall be sentenced to imprisonment for not less than 90 days.*

### *Article – Criminal Procedure*

***6–215.***

   ***(A)  ON OR BEFORE OCTOBER 1, 2024, AND EACH OCTOBER 1 THEREAFTER, THE COMMISSION SHALL REPORT TO THE GOVERNOR AND, IN ACCORDANCE WITH § 2–1257 OF THE STATE GOVERNMENT ARTICLE, THE GENERAL ASSEMBLY ON THE NUMBER OF CHARGES, CONVICTIONS, AND SENTENCES FOR VIOLATIONS OF § 4–203 OF THE CRIMINAL LAW ARTICLE AND § 5–133(D) OF THE PUBLIC SAFETY ARTICLE.***

   ***(B)  THE INFORMATION INCLUDED IN THE REPORT SHALL BE DISAGGREGATED BY JURISDICTION, RACE, AND GENDER.***

### Article – Public Safety

5–133.

   (a)  This section supersedes any restriction that a local jurisdiction in the State imposes on the possession by a private party of a regulated firearm, and the State preempts the right of any local jurisdiction to regulate the possession of a regulated firearm.

   (b)  Subject to § 5–133.3 of this subtitle, a person may not possess a regulated firearm if the person:

    (1)  has been convicted of a disqualifying crime;

WES MOORE, Governor                                        Ch. 651

(2)      has been convicted of a violation classified as a common law crime and received a term of imprisonment of more than 2 years;

(3)      *SUBJECT TO SUBSECTION (B–1) OF THIS SECTION,* IS ON SUPERVISED PROBATION *AFTER BEING CONVICTED*:

(I)      ~~AFTER BEING CONVICTED~~ OF A CRIME PUNISHABLE BY IMPRISONMENT FOR 1 YEAR OR MORE;

(II)      FOR A VIOLATION OF § 21–902(B) OR (C) OF THE TRANSPORTATION ARTICLE; OR

(III)      FOR VIOLATING A PROTECTIVE ORDER UNDER § 4–509 OF THE FAMILY LAW ARTICLE;

~~(4)      (I)      HAS BEEN CONVICTED OF A SECOND OR SUBSEQUENT VIOLATION OF § 4–104 OF THE CRIMINAL LAW ARTICLE; OR~~

~~(II)      HAS BEEN CONVICTED OF A VIOLATION OF § 4–104 OF THE CRIMINAL LAW ARTICLE IF THE VIOLATION RESULTED IN THE USE OF A LOADED FIREARM BY A CHILD CAUSING DEATH OR SERIOUS BODILY INJURY TO THE CHILD OR ANOTHER PERSON;~~

[(3)] ~~(5)~~ *(4)* is a fugitive from justice;

[(4)] ~~(6)~~ *(5)* is a habitual drunkard;

[(5)] ~~(7)~~ *(6)* is addicted to a controlled dangerous substance or is a habitual user;

[(6)] ~~(8)~~ *(7)* suffers from a mental disorder as defined in § 10–101(i)(2) of the Health – General Article and has a history of violent behavior against the person or another;

[(7)] ~~(9)~~ *(8)* has been found incompetent to stand trial under § 3–106 of the Criminal Procedure Article;

[(8)] ~~(10)~~ *(9)*      has been found not criminally responsible under § 3–110 of the Criminal Procedure Article;

[(9)] ~~(11)~~ *(10)*      has been voluntarily admitted for more than 30 consecutive days to a facility as defined in § 10–101 of the Health – General Article;

[(10)] ~~(12)~~ *(11)*      has been involuntarily committed to a facility as defined in § 10–101 of the Health – General Article;

[(11)] ~~(13)~~ *(12)*   is under the protection of a guardian appointed by a court under § 13–201(c) or § 13–705 of the Estates and Trusts Article, except for cases in which the appointment of a guardian is solely a result of a physical disability;

[(12)] ~~(14)~~ *(13)*   except as provided in subsection (e) of this section, is a respondent against whom:

(i)   a current non ex parte civil protective order has been entered under § 4–506 of the Family Law Article; or

(ii)   an order for protection, as defined in § 4–508.1 of the Family Law Article, has been issued by a court of another state or a Native American tribe and is in effect; or

[(13)] ~~(15)~~ *(14)*   if under the age of 30 years at the time of possession, has been adjudicated delinquent by a juvenile court for an act that would be a disqualifying crime if committed by an adult.

*(B–1) SUBSECTION (B)(3) OF THIS SECTION MAY NOT BE CONSTRUED TO PROHIBIT POSSESSION OF A REGULATED FIREARM BY A PERSON WHO WAS NOT CONVICTED OF BUT RECEIVED ONLY PROBATION BEFORE JUDGMENT FOR AN OFFENSE LISTED IN SUBSECTION (B)(3) OF THIS SECTION.*

(c)   (1)   A person may not possess a regulated firearm if the person was previously convicted of:

(i)   a crime of violence;

(ii)   a violation of § 5–602, § 5–603, § 5–604, § 5–605, § 5–612, § 5–613, § 5–614, § 5–621, or § 5–622 of the Criminal Law Article; or

(iii)   an offense under the laws of another state or the United States that would constitute one of the crimes listed in item (i) or (ii) of this paragraph if committed in this State.

(2)   (i)   Subject to paragraph (3) of this subsection, a person who violates this subsection is guilty of a felony and on conviction is subject to imprisonment for not less than 5 years and not exceeding 15 years.

(ii)   The court may not suspend any part of the mandatory minimum sentence of 5 years.

WES MOORE, Governor                    Ch. 651

(iii)    Except as otherwise provided in § 4–305 of the Correctional Services Article, the person is not eligible for parole during the mandatory minimum sentence.

(3)    At the time of the commission of the offense, if a period of more than 5 years has elapsed since the person completed serving the sentence for the most recent conviction under paragraph (1)(i) or (ii) of this subsection, including all imprisonment, mandatory supervision, probation, and parole:

(i)    the imposition of the mandatory minimum sentence is within the discretion of the court; and

(ii)    the mandatory minimum sentence may not be imposed unless the State's Attorney notifies the person in writing at least 30 days before trial of the State's intention to seek the mandatory minimum sentence.

(4)    Each violation of this subsection is a separate crime.

(5)    A person convicted under this subsection is not prohibited from participating in a drug treatment program under § 8–507 of the Health – General Article because of the length of the sentence.

(d)    (1)    Except as provided in paragraph (2) of this subsection, a person who is under the age of 21 years may not possess a regulated firearm.

(2)    Unless a person is otherwise prohibited from possessing a regulated firearm, this subsection does not apply to:

(i)    the temporary transfer or possession of a regulated firearm if the person is:

1.    under the supervision of another who is at least 21 years old and who is not prohibited by State or federal law from possessing a firearm; and

2.    acting with the permission of the parent or legal guardian of the transferee or person in possession;

(ii)    the transfer by inheritance of title, and not of possession, of a regulated firearm;

(iii)    a member of the armed forces of the United States or the National Guard while performing official duties;

(iv)    the temporary transfer or possession of a regulated firearm if the person is:

      1.  participating in marksmanship training of a recognized organization; and

      2.  under the supervision of a qualified instructor;

    (v) a person who is required to possess a regulated firearm for employment and who holds a permit under Subtitle 3 of this title; or

    (vi) the possession of a firearm for self–defense or the defense of others against a trespasser into the residence of the person in possession or into a residence in which the person in possession is an invited guest.

  (e) This section does not apply to a respondent transporting a regulated firearm if the respondent is carrying a civil protective order requiring the surrender of the regulated firearm and:

    (1) the regulated firearm is unloaded;

    (2) the respondent has notified the law enforcement unit, barracks, or station that the regulated firearm is being transported in accordance with the civil protective order; and

    (3) the respondent transports the regulated firearm directly to the law enforcement unit, barracks, or station.

  (f) This section does not apply to the carrying or transporting of a regulated firearm by a person who is carrying a court order requiring the surrender of the regulated firearm, if:

    (1) the firearm is unloaded;

    (2) the person has notified a law enforcement unit, barracks, or station that the firearm is being transported in accordance with the order; and

    (3) the person transports the firearm directly to a State or local law enforcement agency or a federally licensed firearms dealer.

  ~~(G) SUBJECT TO SUBSECTION (B)(4) OF THIS SECTION, A PERSON WHO HAS BEEN CONVICTED OF A VIOLATION OF § 4–104 OF THE CRIMINAL LAW ARTICLE MAY NOT POSSESS A REGULATED FIREARM FOR 5 YEARS FOLLOWING THE DATE OF THE CONVICTION.~~

*__5–147.__*

WES MOORE, Governor                                  Ch. 651

_(A)      IN THIS SECTION, "DEPARTMENT" MEANS THE DEPARTMENT OF STATE POLICE._

_(B)      (1)      THE DEPARTMENT SHALL TRANSMIT TO EACH E–MAIL ADDRESS ON FILE WITH THE DEPARTMENT THAT IS ASSOCIATED WITH THE PURCHASER OR TRANSFEREE OF A REGULATED FIREARM OR A PERSON WHO HAS REGISTERED A REGULATED FIREARM WITH THE DEPARTMENT A SUMMARY OF EACH NEW LAW OR CHANGE TO EACH EXISTING LAW PERTAINING TO FIREARMS THAT WAS PASSED BY THE GENERAL ASSEMBLY DURING EACH LEGISLATIVE SESSION AS PROVIDED IN PARAGRAPH (2) OF THIS SUBSECTION._

_(2)      THE SUMMARY DESCRIBED IN PARAGRAPH (1) OF THIS SUBSECTION SHALL BE TRANSMITTED:_

_(I)      WITHIN 45 DAYS AFTER THE GENERAL ASSEMBLY ADJOURNS SINE DIE IN A LEGISLATIVE SESSION;_

_(II)      FOR EACH ACT ESTABLISHING A NEW LAW OR CHANGE TO AN EXISTING LAW PERTAINING TO FIREARMS, 30 DAYS BEFORE THE EFFECTIVE DATE OF THE ACT; AND_

_(III)      IF AN ACT IS DESIGNATED AS AN EMERGENCY ACT, AS SOON AS PRACTICABLE._

5–301.

(a)      In this subtitle the following words have the meanings indicated.

(b)      "Handgun" has the meaning stated in § 4–201 of the Criminal Law Article.

(c)      "Permit" means a permit issued by the Secretary to carry, wear, or transport a handgun.

(e)      "Secretary" means the Secretary of State Police or the Secretary's designee.

5–303.

A person shall have a permit issued under this subtitle before the person carries, wears, or transports a handgun.

5–304.

(a)      An application for a permit shall be made under oath.

Ch. 651                          2023 LAWS OF MARYLAND

(b)      (1)      Subject to subsections (c) and (d) of this section, the Secretary may charge a nonrefundable fee payable when an application is filed for a permit.

(2)      The fee may not exceed:

(i)      [$75] ~~$150~~ *$125* for an initial application;

(ii)      [$50] ~~$100~~ *$75* for a renewal or subsequent application; and

(iii)      [$10] **$20** for a duplicate or modified permit.

(3)      The fees under this subsection are in addition to the fees authorized under § 5–305 of this subtitle.

(c)      The Secretary may reduce the fee under subsection (b) of this section accordingly for a permit that is granted for one day only and at one place only.

(d)      The Secretary may not charge a fee under subsection (b) of this section to:

(1)      a State, county, or municipal public safety employee who is required to carry, wear, or transport a handgun as a condition of governmental employment; or

(2)      a retired law enforcement officer of the State or a county or municipal corporation of the State.

(e)      The applicant shall pay a fee under this section by an electronic check, a credit card, or a method of online payment approved by the Secretary.

5–306.

(a)      Subject to [subsection] **SUBSECTIONS** (c) **AND (D)** of this section, the Secretary shall issue a permit within a reasonable time to a person who the Secretary finds:

(1)      **(I)**      is [an adult] **AT LEAST 21 YEARS OLD**; **OR**

**(II)      IS** ~~AN ADULT~~ **A PERSON WHO IS A MEMBER OF THE ARMED FORCES OF THE UNITED STATES** ~~OR,~~ **THE NATIONAL GUARD, OR THE UNIFORMED SERVICES;**

(2)      (i)      has not been convicted of a felony or of a misdemeanor for which a sentence of imprisonment for more than 1 year has been imposed; or

(ii)      if convicted of a crime described in item (i) of this item, has been pardoned or has been granted relief under 18 U.S.C. § 925(c);

WES MOORE, Governor                                    Ch. 651

(3)      has not been convicted of a crime involving the possession, use, or distribution of a controlled dangerous substance;

(4)      **IS NOT ON SUPERVISED PROBATION FOR:**

(I)      **CONVICTION OF A CRIME PUNISHABLE BY IMPRISONMENT FOR 1 YEAR OR MORE;**

(II)      **A VIOLATION OF § 21–902(B) OR (C) OF THE TRANSPORTATION ARTICLE; OR**

(III)      **VIOLATING A PROTECTIVE ORDER UNDER § 4–509 OF THE FAMILY LAW ARTICLE;**

[(4)] **(5)**      is not presently an alcoholic, addict, or habitual user of a controlled dangerous substance unless the habitual use of the controlled dangerous substance is under legitimate medical direction;

(6)      **DOES NOT SUFFER FROM A MENTAL DISORDER AS DEFINED IN § 10–101(I)(2) OF THE HEALTH – GENERAL ARTICLE AND HAVE A HISTORY OF VIOLENT BEHAVIOR AGAINST THE PERSON OR ANOTHER;**

(7)      **HAS NOT BEEN INVOLUNTARILY ADMITTED FOR MORE THAN 30 CONSECUTIVE DAYS TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;**

(8)      **IS NOT A RESPONDENT AGAINST WHOM:**

(I)      **A CURRENT NON EX PARTE CIVIL PROTECTIVE ORDER HAS BEEN ENTERED UNDER § 4–506 OF THE FAMILY LAW ARTICLE;**

(II)      **A CURRENT EXTREME RISK PROTECTIVE ORDER HAS BEEN ENTERED UNDER § 5–601 OF THIS TITLE; OR**

(III)      **ANY OTHER TYPE OF CURRENT COURT ORDER HAS BEEN ENTERED PROHIBITING THE PERSON FROM PURCHASING OR POSSESSING FIREARMS;**

[(5)] **(9)**      except as provided in subsection (b) of this section, has successfully completed prior to application and each renewal, a firearms training course approved by the Secretary that ~~includes:~~

(i)      ~~1.      for an initial application, a minimum of 16 hours of instruction by a qualified handgun instructor; or~~

– 11 –

Ch. 651                        2023 LAWS OF MARYLAND

~~2.     for a renewal application, 8 hours of instruction by a~~
~~qualified handgun instructor;~~

~~(ii)     classroom instruction on:~~

~~1.     State~~ **AND FEDERAL** ~~firearm~~ **[**law**]** **LAWS;**

~~2.     home firearm safety;~~ **[**and**]**

~~3.     handgun mechanisms and operation; and~~

**~~4.     STATE SELF–DEFENSE LAW, INCLUDING:~~**

**~~A.     THE JUSTIFIABLE USE OF FORCE OR DEADLY FORCE;~~**
**~~AND~~**

**~~B.     THE     PROPORTIONAL     USE     OF     FORCE     IN~~**
**~~SELF–DEFENSE AND CONFLICT DE–ESCALATION AND RESOLUTION; AND~~**

~~(iii)     a firearms qualification component that~~ **[**~~demonstrates the~~
~~applicant's proficiency and use of the firearm~~**]** **~~INCLUDES LIVE–FIRE SHOOTING~~**
**~~EXERCISES ON A FIRING RANGE AND REQUIRES THE APPLICANT TO DEMONSTRATE:~~**

**~~1.     SAFE HANDLING OF A HANDGUN; AND~~**

**~~2.     SHOOTING  PROFICIENCY  WITH  A  HANDGUN~~** *MEETS*
*THE MINIMUM CRITERIA SPECIFIED IN SUBSECTION (A–1) OF THIS SECTION*; and

**[**(6)**] (10)**     based on an investigation:

(i)     has not exhibited a propensity for violence or instability that may
reasonably render the person's possession of a handgun a danger to the person or to
another; and

(ii)     **[**has good and substantial reason to wear, carry, or transport a
handgun, such as a finding that the permit is necessary as a reasonable precaution against
apprehended danger**]** **IS NOT OTHERWISE PROHIBITED BY STATE OR FEDERAL LAW
FROM PURCHASING OR POSSESSING A HANDGUN.**

*(A–1) THE FIREARMS TRAINING COURSE REQUIRED UNDER SUBSECTION (A)
OF THIS SECTION SHALL INCLUDE:*

*(1)     (I)     FOR AN INITIAL APPLICATION, A MINIMUM OF 16 HOURS OF
IN–PERSON INSTRUCTION BY A QUALIFIED HANDGUN INSTRUCTOR; OR*

*(II)   FOR A RENEWAL APPLICATION, 8 HOURS OF IN–PERSON INSTRUCTION BY A QUALIFIED HANDGUN INSTRUCTOR;*

*(2)   CLASSROOM INSTRUCTION ON:*

*(I)   STATE AND FEDERAL FIREARM LAWS, INCLUDING LAWS RELATING TO:*

*1.   SELF–DEFENSE;*

*2.   DEFENSE OF OTHERS;*

*3.   DEFENSE OF PROPERTY;*

*4.   THE SAFE STORAGE OF FIREARMS;*

*5.   THE CIRCUMSTANCES UNDER WHICH AN INDIVIDUAL BECOMES PROHIBITED FROM POSSESSING A FIREARM UNDER STATE AND FEDERAL LAW, INCLUDING BECOMING A RESPONDENT AGAINST WHOM:*

*A.   A CURRENT NON EX PARTE CIVIL PROTECTIVE ORDER HAS BEEN ENTERED UNDER § 4–506 OF THE FAMILY LAW ARTICLE;*

*B.   AN ORDER FOR PROTECTION, AS DEFINED IN § 4–508.1 OF THE FAMILY LAW ARTICLE, HAS BEEN ISSUED BY A COURT OF ANOTHER STATE OR A NATIVE AMERICAN TRIBE AND IS IN EFFECT; OR*

*C.   A CURRENT EXTREME RISK PROTECTIVE ORDER HAS BEEN ENTERED UNDER SUBTITLE 6 OF THIS TITLE;*

*6.   THE REQUIREMENTS AND OPTIONS FOR SURRENDERING, TRANSFERRING, OR OTHERWISE DISPOSING OF A FIREARM AFTER BECOMING PROHIBITED FROM POSSESSING A FIREARM UNDER STATE OR FEDERAL LAW;*

*7.   THE REQUIREMENTS FOR REPORTING A LOSS OR THEFT OF A FIREARM TO A LAW ENFORCEMENT AGENCY AS REQUIRED BY § 5–146 OF THIS TITLE;*

*8.   THE FIREARMS AND FIREARM ACCESSORIES WHICH ARE BANNED UNDER STATE AND FEDERAL LAW;*

*9.        THE TYPES OF FIREARMS THAT REQUIRE A SPECIAL PERMIT OR REGISTRATION TO ACQUIRE OR POSSESS UNDER STATE OR FEDERAL LAW;*

*10.       THE LAW PROHIBITING STRAW PURCHASES;*

*11.       THE LAW CONCERNING ARMED TRESPASS UNDER § 6–411 OF THE CRIMINAL LAW ARTICLE; AND*

*12.       THE LOCATIONS WHERE A PERSON IS PROHIBITED FROM POSSESSING A FIREARM REGARDLESS OF WHETHER THE PERSON POSSESSES A PERMIT ISSUED UNDER THIS SUBTITLE;*

*(II)      HOME FIREARM SAFETY;*

*(III)     HANDGUN MECHANISMS AND OPERATIONS;*

*(IV)     CONFLICT DE–ESCALATION AND RESOLUTION;*

*(V)      ANGER MANAGEMENT; AND*

*(VI)     SUICIDE PREVENTION; AND*

*(3)       A FIREARM QUALIFICATION COMPONENT THAT INCLUDES LIVE–FIRE SHOOTING EXERCISE ON A FIRING RANGE AND REQUIRES THE APPLICANT TO DEMONSTRATE:*

*(I)      SAFE HANDLING OF A HANDGUN; AND*

*(II)     SHOOTING PROFICIENCY WITH A HANDGUN.*

*(A–2) THE SECRETARY, IN CONSULTATION WITH THE OFFICE OF THE ATTORNEY GENERAL AND THE DEPARTMENT OF HEALTH, SHALL DEVELOP, PUBLISH, UPDATE, AND DISTRIBUTE TO ALL STATE–CERTIFIED FIREARMS INSTRUCTORS A CURRICULUM OF INSTRUCTION FOR THE TOPICS REQUIRED FOR CLASSROOM INSTRUCTION IN SUBSECTION (A–1) OF THIS SECTION.*

(b)      An applicant for a permit is not required to complete a certified firearms training course under subsection (a) of this section if the applicant:

(1)      is a law enforcement officer or a person who is retired in good standing from service with a law enforcement agency of the United States, the State, or any local law enforcement agency in the State;

WES MOORE, Governor                                        Ch. 651

(2)      is a member, retired member, or honorably discharged member of the armed forces of the United States or the National Guard;

(3)      is a qualified handgun instructor; or

(4)      has completed a firearms training course approved by the Secretary.

(c)      An applicant under the age of 30 years is qualified only if the Secretary finds that the applicant has not been:

(1)      committed to a detention, training, or correctional institution for juveniles for longer than 1 year after an adjudication of delinquency by a juvenile court; or

(2)      adjudicated delinquent by a juvenile court for:

(i)      an act that would be a crime of violence if committed by an adult;

(ii)      an act that would be a felony in this State if committed by an adult; or

(iii)      an act that would be a misdemeanor in this State that carries a statutory penalty of more than 2 years if committed by an adult.

**(D)      (1)      THE SECRETARY MAY NOT ISSUE A PERMIT TO A PERSON IF THE PERSON:**

**(I)      HAS BEEN CONVICTED _ON OR AFTER OCTOBER 1, 2023,_ OF A SECOND OR SUBSEQUENT VIOLATION OF § 4–104 OF THE CRIMINAL LAW ARTICLE; OR**

**(II)      HAS BEEN CONVICTED _ON OR AFTER OCTOBER 1, 2023,_ OF A VIOLATION OF § 4–104 OF THE CRIMINAL LAW ARTICLE IF THE VIOLATION RESULTED IN THE USE OF A LOADED FIREARM BY A ~~CHILD~~ _MINOR_ CAUSING DEATH OR SERIOUS BODILY INJURY TO THE ~~CHILD~~ _MINOR_ OR ANOTHER PERSON.**

**(2)      SUBJECT TO PARAGRAPH (1) OF THIS SUBSECTION, THE SECRETARY MAY NOT ISSUE A PERMIT TO A PERSON WHO HAS BEEN CONVICTED _ON OR AFTER OCTOBER 1, 2023,_ OF A VIOLATION OF § 4–104 OF THE CRIMINAL LAW ARTICLE FOR 5 YEARS FOLLOWING THE DATE OF THE CONVICTION.**

**[(d)] (E)**      The Secretary may issue a handgun qualification license, without an additional application or fee, to a person who:

(1)      meets the requirements for issuance of a permit under this section; and

– 15 –

(2)      does not have a handgun qualification license issued under § 5–117.1 of this title.

5–309.

(a)      Except as provided in subsection (d) of this section, a permit expires on the last day of the holder's birth month following 2 years after the date the permit is issued.

(b)      Subject to subsection (c) of this section, a permit may be renewed for successive periods of [3] 2 years each if, at the time of an application for renewal, the applicant possesses the qualifications for the issuance of a permit and pays the renewal fee stated in this subtitle.

(c)      A person who applies for a renewal of a permit is not required to be fingerprinted unless the Secretary requires a set of the person's fingerprints to resolve a question of the person's identity.

(d)      The Secretary may establish an alternative expiration date for a permit to coincide with the expiration of a license, certification, or commission for:

(1)      a private detective under Title 13 of the Business Occupations and Professions Article;

(2)      a security guard under Title 19 of the Business Occupations and Professions Article; or

(3)      a special police officer under § 3–306 of this article.

5–310.

(a)      **(1)**      The Secretary [may revoke a permit on a finding that the holder] **SHALL**:

[(1)]   **(I)**      **REVOKE A PERMIT ON A FINDING THAT THE HOLDER** does not meet the qualifications described in § 5–306 of this subtitle; [or] **AND**

[(2)]   **(II)**      **REGULARLY REVIEW INFORMATION REGARDING ACTIVE PERMIT HOLDERS USING THE CRIMINAL JUSTICE INFORMATION SYSTEM CENTRAL REPOSITORY OF THE DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES TO DETERMINE WHETHER ALL PERMIT HOLDERS CONTINUE TO MEET THE QUALIFICATIONS DESCRIBED IN § 5–306 OF THIS SUBTITLE.**

**(B)**      **THE SECRETARY MAY REVOKE A PERMIT ON A FINDING THAT THE HOLDER** violated § 5–308 of this subtitle.

**(C)** **IF THE SECRETARY REVOKES A PERMIT UNDER THIS SECTION FROM A PERSON THE SECRETARY DETERMINES IS PROHIBITED FROM POSSESSING A REGULATED FIREARM UNDER § 5–133 OF THIS TITLE, THE SECRETARY SHALL TAKE REASONABLE STEPS TO ENSURE THE SURRENDER OF ANY REGULATED FIREARMS IN THE PERSON'S POSSESSION.**

[(b)] **(D)** A holder of a permit that is revoked by the Secretary shall return the permit to the Secretary within 10 days after receipt of written notice of the revocation.

5–311.

**(A)** **IF THE SECRETARY DENIES A PERMIT OR RENEWAL OF A PERMIT OR REVOKES OR LIMITS A PERMIT, THE SECRETARY SHALL PROVIDE WRITTEN NOTICE OF THAT INITIAL ACTION TO THE APPLICANT, INCLUDING A DETAILED EXPLANATION OF THE REASON OR REASONS FOR THE INITIAL ACTION.**

[(a)] **(B)** A person who is denied a permit or renewal of a permit or whose permit is revoked or limited may request the Secretary to conduct an informal review by filing a written request within 10 days after receipt of **THE** written notice of the Secretary's initial action **UNDER SUBSECTION (A) OF THIS SECTION**.

[(b)] **(C)** An informal review:

        (1) may include a personal interview of the person who requested the informal review; and

        (2) is not subject to Title 10, Subtitle 2 of the State Government Article.

[(c)] **(D)** **(1)** In an informal review, the Secretary shall sustain, reverse, or modify the initial action taken and notify the person who requested the informal review of the decision in writing within 30 days after receipt of the request for informal review.

        **(2)** **THE WRITTEN NOTICE OF THE RESULTS OF THE SECRETARY'S INFORMAL REVIEW UNDER PARAGRAPH (1) OF THIS SUBSECTION SHALL INCLUDE A DETAILED EXPLANATION OF THE REASON OR REASONS FOR THE SECRETARY'S DECISION TO SUSTAIN, REVERSE, OR MODIFY THE INITIAL ACTION.**

[(d)] **(E)** A person need not file a request for an informal review under this section before requesting review under § 5–312 of this subtitle.

5–312.

        (a) (1) A person who is denied a permit or renewal of a permit or whose permit is revoked or limited may request to appeal the decision of the Secretary to the Office of Administrative Hearings by filing a written request with the Secretary and the Office of

Administrative Hearings within 10 days after receipt of written notice of the Secretary's [final] action.

(2)     A person whose application for a permit or renewal of a permit is not acted on by the Secretary within 90 days after submitting the application to the Secretary may request a hearing before the Office of Administrative Hearings by filing a written request with the Secretary and the Office of Administrative Hearings.

(b)     (1)     Within 60 days after the receipt of a request under subsection (a) of this section from the applicant or the holder of the permit, the Office of Administrative Hearings shall schedule and conduct a de novo hearing on the matter, at which witness testimony and other evidence may be provided.

(2)     Within 90 days after the conclusion of the last hearing on the matter, the Office of Administrative Hearings shall issue a **WRITTEN** finding of facts and a decision.

(3)     A party that is aggrieved by the decision of the Office of Administrative Hearings may appeal the decision to the circuit court.

(c)     (1)     Subject to subsection (b) of this section, any hearing and any subsequent proceedings of judicial review shall be conducted in accordance with Title 10, Subtitle 2 of the State Government Article.

(2)     Notwithstanding paragraph (1) of this subsection, a court may not order the issuance or renewal of a permit or alter a limitation on a permit pending a final determination of the proceeding.

(d)     *(1)*     On or before January 1[, 2019, 2020, 2021, and 2022,] **EACH YEAR** ~~BEGINNING IN 2024, THE SECRETARY AND~~ the Office of Administrative Hearings shall report to the Governor and, in accordance with § 2–1257 of the State Government Article, the General Assembly ***THE FOLLOWING INFORMATION DISAGGREGATED BY AN APPLICANT'S COUNTY OF RESIDENCE, RACE, ETHNICITY, AGE, AND GENDER***:

~~(1)~~     *(I)*     the number of appeals of decisions by the Secretary that have been filed with the Office of Administrative Hearings within the previous year;

~~(2)~~     *(II)*     the number of decisions by the Secretary that have been sustained, modified, or reversed by the Office of Administrative Hearings within the previous year;

~~(3)~~     *(III)*     the number of appeals that are pending; [and]

~~(4)~~     *(IV)*     the number of appeals that have been withdrawn within the previous year~~;~~*.*

WES MOORE, Governor                                    Ch. 651

*(2)        ON OR BEFORE JANUARY 1 EACH YEAR, THE SECRETARY SHALL REPORT TO THE GOVERNOR AND, IN ACCORDANCE WITH § 2–1257 OF THE STATE GOVERNMENT ARTICLE, THE GENERAL ASSEMBLY THE FOLLOWING INFORMATION DISAGGREGATED BY AN APPLICANT'S COUNTY OF RESIDENCE, RACE, ETHNICITY, AGE, AND GENDER:*

~~(5)~~ *(I)*        THE TOTAL NUMBER OF PERMIT APPLICATIONS THAT WERE SUBMITTED TO THE SECRETARY WITHIN THE PREVIOUS YEAR~~, BROKEN DOWN BY COUNTY IN WHICH THE APPLICANTS RESIDE, AS WELL AS THE RACE, AGE, AND GENDER OF THE APPLICANTS~~;

~~(6)~~ *(II)*        THE TOTAL NUMBER OF PERMIT APPLICATIONS THAT WERE GRANTED BY THE SECRETARY WITHIN THE PREVIOUS YEAR~~, BROKEN DOWN BY COUNTY IN WHICH THE APPLICANTS RESIDE, AS WELL AS THE RACE, AGE, AND GENDER OF THE APPLICANTS~~;

~~(7)~~ *(III)*        THE TOTAL NUMBER OF PERMIT APPLICATIONS THAT WERE DENIED BY THE SECRETARY WITHIN THE PREVIOUS YEAR~~, BROKEN DOWN BY COUNTY IN WHICH THE APPLICANTS RESIDE, AS WELL AS THE RACE, AGE, AND GENDER OF THE APPLICANTS~~;

~~(8)~~ *(IV)*        THE TOTAL NUMBER OF PERMIT APPLICATIONS THAT WERE REVOKED WITHIN THE PREVIOUS YEAR~~, BROKEN DOWN BY COUNTY IN WHICH THE APPLICANTS RESIDE, AS WELL AS THE RACE, AGE, AND GENDER OF THE APPLICANTS~~; AND

~~(9)~~ *(V)*        THE TOTAL NUMBER OF PERMIT APPLICATIONS FILED WITH THE SECRETARY THAT ARE PENDING AT THE TIME OF THE ISSUANCE OF THE REPORT~~, BROKEN DOWN BY COUNTY IN WHICH THE APPLICANTS RESIDE, AS WELL AS THE RACE, AGE, AND GENDER OF THE APPLICANTS~~.

~~SECTION 2. AND BE IT FURTHER ENACTED, That the Laws of Maryland read as follows:~~

~~Article – Health – General~~

~~SUBTITLE 39A. YOUTH SUICIDE PREVENTION AND FIREARM SAFE STORAGE.~~

~~13–39A–01.~~

~~(A)        IN THIS SECTION, "GUIDE" MEANS THE YOUTH SUICIDE PREVENTION AND FIREARM SAFE STORAGE GUIDE DEVELOPED UNDER SUBSECTION (B) OF THIS SECTION.~~

– 19 –

~~(B)   ON OR BEFORE JANUARY 1, 2024, THE DEPUTY SECRETARY FOR PUBLIC HEALTH SERVICES SHALL DEVELOP A YOUTH SUICIDE PREVENTION AND FIREARM SAFE STORAGE GUIDE.~~

~~(C)   THE GUIDE DEVELOPED UNDER SUBSECTION (B) OF THIS SECTION SHALL:~~

~~(1)   PROVIDE A DESCRIPTION OF THE FIREARM AND AMMUNITION REQUIREMENTS ESTABLISHED UNDER § 4–104(B)(4) AND (5) OF THE CRIMINAL LAW ARTICLE;~~

~~(2)   IDENTIFY THE RISKS ASSOCIATED WITH UNSAFE FIREARM STORAGE FOR MINORS, INCLUDING:~~

~~(I)   SUICIDE;~~

~~(II)   DEATH OR SERIOUS BODILY INJURY FROM ACCIDENTAL DISCHARGE; AND~~

~~(III)   SHOOTING INCIDENTS INVOLVING MINORS; AND~~

~~(3)   INCORPORATE BEST PRACTICES FOR FIREARM AND AMMUNITION SAFE STORAGE.~~

~~(D)   THE DEPARTMENT SHALL:~~

~~(1)   POST THE GUIDE ON ITS WEBSITE;~~

~~(2)   MAKE AN ELECTRONIC VERSION OF THE GUIDE AVAILABLE TO FAMILIES, HEALTH AND SOCIAL SERVICES PROVIDERS, AND ANY OTHER ENTITIES THAT HAVE AN INTEREST IN YOUTH SUICIDE PREVENTION OR FIREARMS STORAGE, INCLUDING:~~

~~(I)   BEHAVIORAL HEALTH PROGRAMS;~~

~~(II)   THE DEPARTMENT OF JUVENILE SERVICES;~~

~~(III)   FIREARMS DEALERS LICENSED BY THE FEDERAL GOVERNMENT;~~

~~(IV)   LOCAL HEALTH DEPARTMENTS;~~

~~(V)   LOCAL SCHOOL SYSTEMS;~~

WES MOORE, Governor                                    Ch. 651

~~(VI)   THE MARYLAND ASSOCIATION OF NONPUBLIC SPECIAL EDUCATION FACILITIES;~~

~~(VII)   THE MARYLAND ASSOCIATION OF YOUTH SERVICE BUREAUS;~~

~~(VIII)   STATE AND LOCAL LAW ENFORCEMENT AGENCIES; AND~~

~~(IX)   THE STATE DEPARTMENT OF EDUCATION.~~

~~SECTION 3. AND BE IT FURTHER ENACTED, That:~~

~~(a)   The Deputy Secretary for Public Health Services shall establish a stakeholder advisory committee to make recommendations regarding the development of the youth suicide prevention and firearm safe storage guide under § 13–39A–01 of the Health – General Article, as enacted by Section 2 of this Act.~~

~~(b)   The stakeholder advisory committee established under subsection (a) of this section shall include:~~

~~(1)   behavioral health practitioners;~~

~~(2)   experts on best practices for firearm and ammunition storage;~~

~~(3)   families impacted by the risk of suicide by minors;~~

~~(4)   health care professionals; and~~

~~(5)   youth advocates.~~

~~SECTION 4. AND BE IT FURTHER ENACTED, That, on or before December 31, 2024, December 31, 2025, and December 31, 2026, the Deputy Secretary for Public Health Services shall report to the General Assembly, in accordance with § 2–1257 of the State Government Article, on how State and local agencies have distributed the youth suicide prevention and firearm safe storage guide developed under § 13–39A–01 of the Health – General Article, as enacted by Section 2 of this Act.~~

*SECTION 2. AND BE IT FURTHER ENACTED, That the provisions of this Act shall be construed to apply only to an initial application or renewal application for a permit to wear, carry, or transport a handgun that is submitted to the Secretary of State Police on or after the effective date of this Act. The provisions of this Act may not be construed to affect the requirements to maintain a permit to wear, carry, or transport a handgun that was issued by the Secretary of State Police before the effective date of this Act until the permit is subject to renewal.*

Ch. 651                           2023 LAWS OF MARYLAND

SECTION 2. 5. *3.* AND BE IT FURTHER ENACTED, That, if any provision of this Act or the application thereof to any person or circumstance is held invalid for any reason in a court of competent jurisdiction, the invalidity does not affect other provisions or any other application of this Act that can be given effect without the invalid provision or application, and for this purpose the provisions of this Act are declared severable.

SECTION 3. 6. *4.* AND BE IT FURTHER ENACTED, That this Act shall take effect October 1, 2023.

**Approved by the Governor, May 16, 2023.**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SUSANNAH WARNER KIPKE, et al.,　　*

　　　　Plaintiffs,　　　　　　　*

v.　　　　　　　　　　　　*　　　Civil Action No. GLR-23-1293
　　　　　　　　　　　　　　　Member Case: GLR-23-1295
WES MOORE, et al.,　　　　　*

　　　　Defendants.　　　　　*

***

**MEMORANDUM OPINION**

THIS MATTER is before the Court on: (1) Consol Plaintiffs Katherine Novotny, Sue Burke, Esther Rossberg, Maryland Shall Issue, Inc., Second Amendment Foundation, and Firearms Policy Coalition's (collectively, "Novotny Plaintiffs") Motion for Preliminary Injunction (Novotny et al. v. Moore et al., ("Novotny"), No. GLR-23-1295, ECF No. 24); (2) Plaintiffs Susannah Warner Kipke and Maryland State Rifle and Pistol Association, Inc.'s ("MSRPA") (collectively, "Kipke Plaintiffs") Motion for Preliminary Injunction (Kipke et al. v. Moore et al., ("Kipke"), No. GLR-23-1293, ECF No. 12); (3) Kipke Plaintiffs' Motion for Summary Judgment (Kipke, ECF No. 13); Novotny Plaintiffs' Motion for Summary Judgment (Kipke, ECF No. 18); (4) Defendants Ivan J. Bates, Roland L. Butler, Jr., Alison M. Healey, Joshua Kurtz, Wesley Moore, Scott D. Shellenberger, and Paul J. Wiedefeld's (collectively, "State Defendants")[1] Motion to Dismiss (Novotny, ECF

---

[1] Novotny Plaintiffs and Kipke Plaintiffs do not name exact same individual Defendants—Novotny Plaintiffs name the aforementioned individuals and Kipke Plaintiffs name just Moore and Butler. Regardless, the Defendant is effectively the State itself in both suits, and thus the Court will refer to Defendants collectively as "State Defendants."

No. 36); and (5) State Defendants' Cross Motions for Summary Judgment (Kipke, ECF Nos. 21, 23). The Motions are fully briefed, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2023). For the reasons outlined below, the Court will grant the Motions for Preliminary Injunction in part and deny them in part. The Court will further deny the Motion to Dismiss and the Motions for Summary Judgment without prejudice.

## I.   BACKGROUND

### A.   Senate Bill 1 and Other Maryland Firearm Restrictions

This action concerns Plaintiffs' challenges to the constitutionality of the recently-enacted Gun Safety Act of 2023, also known as Senate Bill 1 ("SB 1"), as well as several other Maryland firearm regulations. Defendant Wes Moore, Governor of the State of Maryland, signed SB 1 into law on May 16, 2023, and it goes into effect on October 1, 2023. 2023 Md. Laws ch. 680 (to be codified at Md. Code Ann. (2023), Crim. Law ["CR"] §§ 4-111(c)–(e), 6-411). The State legislature enacted SB 1 after the Supreme Court's June 23, 2022 decision in New York State Rifle and Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111 (2022). As discussed more fully below, the Supreme Court in Bruen held that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." Id. at 2122. It also struck down New York's gun permitting scheme as unconstitutional because it required an applicant to show "proper cause" for carrying a handgun publicly. Id. at 2156. New York's "proper cause" standard was similar

See Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989) (holding that a suit against a state official in his official capacity is a suit against the official's office, not the individual).

to Maryland's prior "good and substantial reason" permitting standard, so <u>Bruen</u> called into question that aspect of the State's permitting scheme. (<u>See</u> <u>Novotny</u>, Defs.' Mem. L. Supp. Mot. Dismiss Opp'n Pls.' Mot. Prelim. Inj. ["Opp'n Novotny Mot."] at 8, ECF No. 36-1).[2] Indeed, the Appellate Court of Maryland later concluded that Maryland's "good and substantial reason" standard was unconstitutional. <u>In re Rounds</u>, 279 A.3d 1048, 1052 (Md.Ct.Spec.App. 2022).

In the 2023 legislative session, Maryland's General Assembly enacted laws to change the State firearm permitting process, <u>see</u> 2023 Md. Laws ch. 651 (to be codified at Md. Code. Ann. (2023), Pub. Safety § 5-133(b)(3)), and SB 1, which places restrictions on areas in which guns may be carried, even with a permit. First, SB 1 identifies three categories of statutorily-defined locations where individuals are prohibited from carrying: (1) an "area for children and vulnerable individuals," (2) a "government or public infrastructure area," and (3) a "special purpose area." 2023 Md. Laws ch. 680 (to be codified at CR §§ 4-111(c)-(e)). Certain exceptions apply, such as for active or retired law enforcement, private property owners with authorized security, and individuals who transport a firearm inside a motor vehicle, as long as they either have a public carry permit or lock the firearm in a container. 2023 Md. Laws ch. 680 (to be codified at CR § 6-411(b)).

An "area for children and vulnerable individuals" relates generally to daycare facilities, private schools, and medical facilities. It is statutorily defined as: (1) "a preschool or prekindergarten facility or the grounds of the facility," (2) "a private primary or

---

[2] Citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

secondary school or the grounds of the school," and (3) "a health care facility," which is

defined to include hospitals, ambulatory surgical centers, and facilities that are "organized

primarily to help in the rehabilitation of disabled individuals." 2023 Md. Laws ch. 680 (to

be codified at CR § 4-111(a)(2)).

A "government or public infrastructure area" generally relates to government

buildings, buildings on college and university campuses, polling places, and power plants.

It is statutorily defined as:

> (i) a building or any part of a building owned or leased by a
> unit of State or local government; (ii) a building of a public or
> private institution of higher education, as defined in § 10-101
> of the Education Article; (iii) a location that is currently being
> used as a polling place in accordance with [the Election Law
> Article]; (iv) an electric plant or electric storage facility . . .; (v)
> a gas plant . . .; or (vi) a nuclear power plant facility.

2023 Md. Laws ch. 680 (to be codified at CR § 4-111(a)(4)).

A "special purpose area" relates generally to certain places where the public gathers

for entertainment, educational, or other collective social pursuits. It is statutorily defined

as "(i) a location licensed to sell or dispense alcohol or cannabis for on-site consumption;

(ii) a stadium; (iii) a museum; (iv) an amusement park; (v) a racetrack; or (vi) a video

lottery facility [casino] . . . " 2023 Md. Laws ch. 680 (to be codified at CR § 4-111(a)(8)).

Finally, SB 1 prohibits individuals from entering buildings on private property while

carrying a firearm without first obtaining permission to do so (the "private building consent

rule"). 2023 Md. Laws ch. 680 (to be codified at CR § 6-411). The manner in which

permission may be expressed or obtained depends on whether the building at issue is a

dwelling. SB 1 provides that an individual carrying a firearm "may not enter or trespass in

the dwelling of another unless the owner or the owner's agent has given express permission, either to the person or to the public generally, to wear, carry, or transport a firearm inside the dwelling." 2023 Md. Laws ch. 680 (to be codified at CR § 6-411(c)).

With regard to all other private property, an individual carrying a firearm may not enter or trespass on such property unless the owner or the owner's agent (1) "has posted a clear and conspicuous sign indicating that it is permissible to" carry a firearm on the property, or (2) "has given the person express permission" to carry a firearm on the property. 2023 Md. Laws ch. 680 (to be codified at CR § 6-411(d)).

Separate from SB 1, Maryland also has firearm restrictions in the following locations:

- In State parks, State forests, and Chesapeake Forest Lands. COMAR 08.07.06.04 (State parks), 08.07.01.04 (State forests), and 08.01.07.14 (Chesapeake Forest Lands).

- On public transit owned or controlled by the Maryland Mass Transit Administration or operated by a private company under contract to the Administration. Md. Code Ann., Transp. § 7-705(b)(6).

- At welcome centers, rest areas, scenic overlooks, roadside picnic areas, and other public use areas within interstate and State highway rights-of-way. COMAR 11.04.07.01, 11.04.07.12.

- On the grounds of public school property. CR § 4-102(b).

- On property of state public buildings, improvements, grounds, and multiservice centers under the jurisdiction of the Department of General Services. COMAR 04.05.01.01, 04.05.01.03.

- In the Camden Yards Sports Complex. COMAR 14.25.01.01(B)(14), 14.25.02.06.

- In a casino. COMAR 36.03.10.48.

- At a demonstration in a public place (or in a vehicle that is within 1,000 feet of a demonstration in a public place) after being informed by a law enforcement officer that a demonstration is occurring and being ordered to leave the area until the individual disposes of the firearm. CR § 4-208(b)(2).

**B.**    <u>**The Parties & Procedural History**</u>

On May 16, 2023, two lawsuits were filed challenging SB 1 and the other related firearm regulations set forth above. Kipke Plaintiffs filed the first lawsuit. (<u>Kipke</u>, ECF No. 1). Kipke is a Maryland resident, and she owns and operates Mrs. Kipke's Secure Gun Storage. (<u>Kipke</u>, Compl. ¶ 9, ECF No. 1). Kipke also has a carry permit, and she wishes to carry a handgun outside her home for self-defense. (<u>Id.</u> ¶ 10). The MSRPA is an association dedicated to defending the Second Amendment rights of law-abiding Maryland residents. (<u>Id.</u> ¶ 14). It alleges that SB 1 and other State regulations compromise its "central mission" and the rights of its members. (<u>Id.</u> ¶¶ 15–16). Kipke Plaintiffs allege Kipke and at least one member of the MSRPA "could and would, but for reasonable fear of prosecution . . . exercise their right to carry a handgun for self-defense" in the locations prohibited by SB 1 and Maryland law. (<u>Id.</u> ¶¶ 12, 17). Additionally, Kipke Plaintiffs would like to allow individuals to possess firearms on their property without posting signage or giving express permission. (<u>Id.</u> ¶¶ 13, 18).

Novotny Plaintiffs brought the second lawsuit. (<u>Novotny</u>, ECF No. 1). Novotny, Burke, and Rossberg are Maryland residents with carry permits who wish to carry handguns in locations prohibited by SB 1 and Maryland law. (<u>Novotny</u>, Compl. ¶¶ 22–26, ECF No. 1). Maryland Shall Issue and Firearms Policy Coalition are nonprofit

organizations, and the Second Amendment Foundation is a nonprofit educational foundation. (Id. ¶¶ 27–31). They are dedicated to the advancement of gun ownership rights. (Id. ¶¶ 27–31). Like the Kipke Plaintiffs, the Novotny Plaintiffs claim that SB 1 and Maryland law infringe on their Second Amendment rights and prevent them from carrying firearms in certain locations. (See id. ¶¶ 22–31).

Kipke Plaintiffs make the following claims under 42 U.S.C. § 1983 to challenge the constitutionality of SB 1 and other Maryland firearm regulations: (1) Second and Fourteenth Amendments violations due to restrictions on carrying firearms in State parks, State forests, State highway rest areas, mass transit facilities, public school property, the grounds of preschools or prekindergarten facilities, museums, the Camden Yards Sports Complex, stadiums, healthcare facilities, government buildings, locations selling alcohol, amusement parks, racetracks, casinos, the private building consent rule, and demonstrations in public places (Count I); a First and Fourteenth Amendment violation due to the private building consent rule (Count II); a Second and Fourteenth Amendment Due Process Clause violation due to Maryland's permit process and an applicants' need to satisfy "subjective criteria" (Count III); and a Fourteenth Amendment Equal Protection Clause violation for the State's alleged discriminatory treatment of Kipke Plaintiffs in comparison to retired law enforcement officers (Count IV). (Kipke, Compl. ¶¶ 47–68).

Novotny Plaintiffs' make a similar, but more narrow challenge of Maryland firearm restrictions—their Complaint contains several of the same claims as Count I of the Kipke Complaint. They allege that Maryland cannot restrict firearms in the following locations: healthcare facilities, locations selling alcohol, museums, and private property without the

owner's consent (Count I); mass transit facilities (Count II); and State parks, State forests, and State Chesapeake forest lands (Count III). (Novotny, Compl. ¶¶ 45–57).

Because of the complete overlap between Novotny Plaintiffs' claims and Count I of the Kipke Complaint, the Court consolidated the two cases on July 13, 2023. (Kipke, ECF No. 15). Prior to consolidation, Novotny Plaintiffs filed a Motion for Preliminary Injunction. (Novotny, ECF No. 24). They seek to enjoin enforcement of the firearm restrictions listed in their Complaint. (Novotny, Mot. Prelim. Inj. at 1, ECF No. 24). State Defendants filed a Motion to Dismiss and Opposition to Preliminary Injunction on June 28, 2023. (Novotny, ECF No. 36). Novotny Plaintiffs filed a Reply to State Defendants' Opposition and an Opposition to State Defendants' Motion to Dismiss on July 12, 2023. (Novotny, ECF No. 38). State Defendants filed a Reply in Support of their Motion to Dismiss on August 2, 2023. (Kipke, ECF No. 22).

In the meantime, on July 20, 2023, Novotny Plaintiffs filed a Motion for Summary Judgment. (Kipke, ECF No. 18). State Defendants filed a Cross Motion for Summary Judgment and Opposition to Novotny Plaintiffs' Motion for Summary Judgment on August 3, 2023. (Kipke, ECF No. 23). On August 11, 2023, Novotny Plaintiffs filed a Reply in Support of their Motion for Summary Judgment and an Opposition to State Defendants' Motion for Summary Judgment. (ECF No. 26).

In the Kipke case, State Defendants filed an Answer on June 30, 2023. (Kipke, ECF No. 11). Kipke Plaintiffs filed a Motion for Preliminary Injunction (Kipke, ECF No. 12) and a Motion for Summary Judgment (Kipke, ECF No. 13) on July 3, 2023. On July 28, 2023, State Defendants filed a Cross Motion for Summary Judgment and Opposition to

Kipke Plaintiffs' Motion for Preliminary Injunction. (Kipke, ECF No. 21). On August 11,

2023, Kipke Plaintiffs filed a Reply in Support of their Motion for Summary Judgment,

Response in Opposition to State Defendants' Cross Motion for Summary Judgment, and

Reply in Support of their Motion for Preliminary Injunction. (ECF No. 29). State

Defendants filed a Reply in support of their Cross Motion for Summary Judgment on

September 8, 2023.[3] (ECF No. 30).

## II.    DISCUSSION

### A.    Standard of Review

"A preliminary injunction is an 'extraordinary and drastic remedy.'" See Munaf v.

Geren, 553 U.S. 674, 689–90 (2008) (quoting 11A Charles Alan Wright, Arthur R. Miller,

& Mary Kay Kane, Federal Practice & Procedure § 2948, at 129 (2d ed. 1995)). A party

seeking a preliminary injunction or temporary restraining order must establish the

following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering

irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in

the party's favor; and (4) that the injunction is in the public interest. Winter v. Nat. Res.

Def. Council, Inc., 555 U.S. 7, 20 (2008); see also The Real Truth About Obama, Inc. v.

Fed. Election Comm'n, 575 F.3d 342, 346–47 (4th Cir. 2009). A moving party must satisfy

each requirement as articulated. Pashby v. Delia, 709 F.3d 307, 320 (4th Cir. 2013).

---

[3] Both State Defendants and Novotny Plaintiffs request that the Court hold a hearing and consolidate the Motions for Preliminary Injunction with a trial on the merits under Rule 65. (See Pls.' Reply Mem. Supp. Mot. Prelim. Inj. ["Novotny Pls.' Reply"] at 10, ECF No. 38). As stated above, the Court finds that no hearing is necessary, and it will not consider the dispositive motions at this time.

Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22.

**B.**   **Analysis**

   **1. Controlling considerations under Bruen**

In Bruen, the Supreme Court held that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 142 S.Ct. at 2122. Consistent with its prior decision in District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." Id. at 2126. If the plaintiff's conduct is presumptively protected, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." Id. at 2130. The Court held that the examination of a firearm law's constitutionality would end with this historical analysis, thereby rejecting the two-step test that courts previously applied. Id. at 2127. Under that two-step test, courts would first perform the historical inquiry, followed by a means-end analysis under strict or intermediate scrutiny to assess whether the government's interest justified the restriction. Id. at 2127–29.

The historical analysis required by Bruen considers whether there is "'historical precedent' from before, during, and even after the founding" that "evinces a comparable tradition of regulation." Id. at 2131–32 (quoting Heller, 554 U.S. at 631). The Supreme Court recognized that certain cases would present "straightforward" applications of historical analysis, and that other "modern regulations that were unimaginable at the

founding" would require a more "nuanced approach." <u>See</u> <u>id.</u> "When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy." <u>Id.</u> at 2132. The Supreme Court provided two primary metrics to determine whether a modern regulation is "relevantly similar" to a historical regulation: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." <u>Id.</u> at 2132–33. "[C]entral" to this inquiry is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." <u>Id.</u> (quoting <u>McDonald v. City of Chicago</u>, 561 U.S. 742, 767 (2010). "[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." <u>Id.</u> at 2133. Although "courts should not 'uphold every modern law that remotely resembles a historical analogue,' . . . analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." <u>Id.</u> (quoting <u>Drummond v. Robinson</u>, 9 F.4th 217, 226 (3d Cir. 2021)). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." <u>Id.</u>

The Supreme Court then explained that courts may analogize regulations of firearms in certain locations to "'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.'" <u>Id.</u> (quoting <u>Heller</u>, 554 U.S. at 626). The Court declined to "comprehensively define 'sensitive places,'" but it also listed legislative assemblies, polling places, and courthouses as belonging to that category. <u>Id.</u>

The Supreme Court further stated that it is "settled" that carrying could be prohibited consistent with the Second Amendment in those locations. Id.

Novotny Plaintiffs argue that the Supreme Court only named legislative assemblies, polling places, and courthouses as examples of sensitive places. (Novotny, Mem. Supp. Pls.' Mot Prelim. Inj. ["Novotny Pls.' Mot."] at 21–22, ECF No. 24-1). They further argue that these sensitive places are defined by "the presence of comprehensive, state-provided security that rendered the need for armed self-defense unnecessary." (Novotny Pls.' Reply at 8). Thus, according to Novotny Plaintiffs, "[t]o draw a valid analogy to 'those historical regulations,' . . . the State must show that any new purportedly sensitive place where it seeks to restrict firearm-carry shares that characteristic." (Id. (quoting Bruen, 142 S.Ct. at 2133)).

Novotny Plaintiffs' strained reading of the sensitive-places doctrine is unsupported by Bruen or any other authority. They claim that the Supreme Court did not include schools or government buildings among the enumerated sensitive places, but the Court expressly adopted Heller's prior identification of those locations as sensitive places. See Bruen, 142 S.Ct. at 2133.[4] Although the Supreme Court in Bruen refused to find that the entirety of Manhattan was a sensitive place simply because it was crowded and protected by police,

---

[4] There is no indication that Bruen disturbed any of the Court's conclusions in Heller. See Bruen, 142 S.Ct. at 2122 ("We too agree, and now hold, consistent with Heller and McDonald, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."); id. at 2157 ("Nor have we disturbed anything that we said in Heller or McDonald v. Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), about restrictions that may be imposed on the possession or carrying of guns.") (Alito, J., concurring).

id. at 2134, the Court did not comprehensively define sensitive places, id. at 2133. The

Supreme Court merely listed schools, government buildings, legislative assemblies, polling

places, and courthouses as "settled" examples, and invited courts to "use analogies to those

historical regulations of 'sensitive places' to determine that modern regulations prohibiting

the carry of firearms in new and analogous sensitive places are constitutionally

permissible." Id. (emphasis in original). Accordingly, because Bruen conclusively named

schools among the other examples of sensitive places, Novotny Plaintiffs' argument that

sensitive places are limited to buildings with comprehensive, state-provided security is

baseless.

After explaining that Courts could analogize to historical sensitive places, the

Supreme Court provided guidance regarding the relevant time period for historical sources:

> Constitutional rights are enshrined with the scope they were
> understood to have when the people adopted them." Heller,
> 554 U.S. at 634–635, 128 S.Ct. 2783 (emphasis added). The
> Second Amendment was adopted in 1791; the Fourteenth in
> 1868. Historical evidence that long predates either date may
> not illuminate the scope of the right if linguistic or legal
> conventions changed in the intervening years.

Id. at 2136. The Supreme Court left open the question of whether "courts should primarily

rely on the prevailing understanding of an individual right when the Fourteenth

Amendment was ratified in 1868 when defining its scope." Id. at 2138 ("We need not

address this issue today because, as we explain below, the public understanding of the right

to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with

respect to public carry."). In Maryland Shall Issue, Inc. v. Montgomery County, this Court

concluded that "historical sources from the time period of the ratification of the Fourteenth

Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment." No. TDC-21-1736, 2023 WL 4373260, at *8 (D.Md. July 6, 2023), appeal docketed, No. 23-1719 (4th Cir. July 10, 2023) (citing Bruen, 142 S.Ct. at 2138).

Plaintiffs argue that this Court erred in considering historical regulations around the ratification of the Fourteenth Amendment. (Novotny Pls.' Reply at 17; Kipke, Reply Supp. Pls.' Mot. Prelim. Inj. ["Kipke Pls.' Reply"] at 37, ECF No. 29). Novotny Plaintiffs argue that the Fourth Circuit has held that 1791, the year the Second Amendment was ratified, is "the critical year for determining the amendment's historical meaning." (Novotny Pls.' Reply at 17 (quoting Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives, 5 F.4th 407, 419 (4th Cir.), as amended (July 15, 2021), vacated as moot, 14 F.4th 322 (4th Cir. 2021), cert. denied sub nom., Marshall v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 142 S.Ct. 1447 (2022)). Novotny Plaintiffs recognize that Hirschfeld was vacated and can thus serve only as persuasive authority, not binding precedent. (Id. at 17 n.1). Further, the Supreme Court expressly declined to find that historical evidence from the ratification of the Second Amendment could not be considered. Bruen, 142 S.Ct. at 2138. Accordingly, the Court agrees with the logic in Maryland Shall Issue and will thus consider historical evidence from ratification of the Fourteenth Amendment in 1868.

**2.   Likelihood of Success on the Merits**

The first requirement of a motion for preliminary injunction is that the moving party demonstrate a likelihood of success on the merits. Winter, 555 U.S. at 20. To show a likelihood of success on the merits in the context of the constitutionality of firearm

regulations, plaintiffs must show that their conduct is covered by the plain text of the Second Amendment. See Bruen, 142 S.Ct. at 2126. If plaintiffs succeed, the government must then demonstrate that the regulations are consistent with "the Nation's historical tradition of firearm regulation." Id. at 2130.

As a preliminary matter, the Court notes that there is no dispute that Plaintiffs' conduct is covered by the plain text of the Second Amendment. The Second Amendment protects the individual's right to carry a gun for self-defense outside the home, id. at 2122, and Plaintiffs wish to exercise that right in locations where Maryland law prohibits firearms. Accordingly, the Court turns to whether State Defendants can establish that the challenged provisions are consistent with historical regulation.

The Court will analyze each restriction separately. It will start with the restrictions challenged by all Plaintiffs, which are the carry restrictions in: museums; health care facilities; State parks, State forests, and Chesapeake Forest Lands; mass transit facilities; locations selling alcohol; and private property. (Novotny Pls.' Mot at 8; Kipke, Pls.' Mem. Supp. Mot. Prelim Inj. ["Kipke Pls.' Mot."] at 10–12, ECF No. 12-1). It will then move to the remaining restrictions challenged by the Kipke Plaintiffs, which are: school grounds; government buildings; stadiums, amusement parks, casinos, and racetracks; public demonstrations; and State highway rest areas.[5] (Kipke Pls.' Mot. at 10–12).

---

[5] After State Defendants explained that Maryland law only prohibits displaying a firearm at a highway rest area, not carrying a concealed handgun, Kipke Plaintiffs withdrew their challenge to COMAR 11.04.07.12. (Opp'n Kipke Pls.' Mot. Prelim. Inj. ["Opp'n Kipke Mot."] at 60–61, ECF No. 21-1; Kipke Pls.' Reply. at 34). Accordingly, the Court will not determine whether to preliminarily enjoin enforcement of Maryland's firearm restrictions in State highway rest areas.

> **a.** <u>**Firearm Carry Restrictions Challenged By All Plaintiffs**</u>
>
> **i.** **Museums**

Plaintiffs first challenge SB 1's prohibition on carrying firearms at museums. They argue that firearm violence and museums existed at the time of the founding, but that guns were not banned in museums. (<u>See</u> Novotny Pls.' Mot. at 26–27, 34–35; Kipke Pls.' Mot. at 28–29). Thus, according to Plaintiffs, SB 1 cannot be consistent with historical regulations. (<u>Id.</u>). State Defendants respond that museums are analogous to schools, and therefore they are sensitive places "outside of the purview of the Second Amendment." (Opp'n Novotny Mot. at 37). State Defendants also argue that the restrictions in museums are supported by historical regulations related to "place[s] where persons are assembled for educational, literary, or scientific purposes." (<u>Id.</u> at 37–38).

Plaintiffs' challenge on this point is unlikely to succeed. First, as set forth above, <u>Bruen</u> affirmed that schools are sensitive places, and museums are like schools because they serve an educational purpose and are often geared towards children. (<u>See e.g.</u>, Decl. Anita Kassof ¶¶ 4–7, ECF No. 36-8 (noting that the Baltimore Museum of Industry's ["BMI"] exhibits are designed for children and stating that the museum hosts over 200 children at a time); (Mark J. Potter Decl. ¶ 6, ECF No. 36-9 (explaining that the Maryland Science Center hosts as many as 2,000 children at once). Further, because Maryland's restrictions on firearms in museums can be justified by the protection of children as a vulnerable population, regulations banning firearms in museums are similar to those in schools.

Second, SB 1's prohibition on carrying in museums is supported by a representative number of historical statutes that demonstrate a historical tradition of firearm regulation in places of gathering for education, literary, or scientific purposes. (See Gen. L. Tx., ch. 46 § 1 (1870), ECF No. 36-17); Gen. L. Mo., Crim. § 1 (1874), ECF No. 36-18); Sess. L. Az. § 3 (1889), ECF No. 36-19); Ok. Stat. Crim., ch. 25 §§ 7–10 (1890), ECF No. 36-20; Mt. Gen. L, ch. 35 § 3 (1903), ECF No. 36-22). These historical provisions imposed a similar burden to SB 1 on the right to bear arms, and they are comparably justified by the need to prevent disruption of educational, literary, or scientific purposes.[6] See Md. Shall Issue, Inc., 2023 WL 4373260, at *12 (denying motion for preliminary injunction as to carrying restrictions in libraries because libraries are "places for gathering for literary or educational purposes"). Accordingly, the Court finds that, at this stage in the litigation, Plaintiffs have failed to demonstrate a clear likelihood of success on the merits as to their challenge to SB 1's museum restriction.

---

[6] The Court acknowledges that Bruen identified several jurisdictions, including Arizona, New Mexico, Idaho, and Oklahoma, as comprising of less than 1% of the United States' population in 1890, 142 S.Ct. at 2154, and that the Supreme Court cautioned against using outlier jurisdictions or statutes as representative historical analogues, id. at 2133. Nevertheless, Bruen did not designate Texas as an outlier jurisdiction—it merely found that two firearm bans not at issue here were unusually broad compared to other State regulations at the time. Id. at 2153.

In the instant case, although State Defendants do cite some statutes from outlier jurisdictions, they also cite Texas and Missouri statutes prohibiting firearms where persons are assembled for education, literary, or scientific purposes. (See Opp'n Novotny Mot. at 37–38 (citing Gen. L. Tx., ch. 46 § 1; Gen. L. MO, Crim. § 1)). Further, the instant case can be distinguished from Bruen because the State Defendants here have successfully analogized museums to schools as sensitive places. See Bruen, 142 S.Ct. at 2134 (rejecting the State of New York's argument that the island of Manhattan is a sensitive place).

ii.     **Health Care Facilities**

Similarly, Plaintiffs have not demonstrated a clear likelihood of success regarding SB 1's prohibition on carrying firearms at health care facilities because health care facilities are sensitive places, and their regulation is similar to historical analogues that prohibited firearms in places where people assembled for scientific purposes. Plaintiffs argue that State Defendants cannot point to similar historical regulations, and there is "no doubt the medical profession existed in 18th and 19th century America, and so too did firearm violence." (See Novotny Pls.' Mot. at 28 (internal citation removed)); Kipke Pls.' Mot at 30–31). Plaintiffs' argument is unconvincing because health care facilities, like schools, serve a vulnerable population, and their regulation is justified by the protection of that population.

Further, as discussed above, there are representative historical statutes aimed at protecting places for educational, literary, or scientific purposes, and health care facilities clearly advance a scientific purpose. While these statutes do not expressly prohibit firearms in health care facilities, Bruen does not require historical statutes to be a "twin" or "dead ringer" for the modern regulation. 142 S.Ct. at 2133. Additionally, as this Court explained in Maryland Shall Issue, "hospitals did not exist in their modern form at the time of the ratification of the Second or Fourteenth Amendments," 2023 WL 4373260, at *14, and thus a more nuanced analysis involving other historical analogues is appropriate. Consequently, the Court concludes that Plaintiffs are unlikely to succeed as to their challenge of SB 1's prohibition on carrying guns in health care facilities.

       **iii.**       **State Parks, State Forests, and Chesapeake Forest Lands**

Plaintiffs next argue that SB 1's ban of firearms in State parks, forests, and Chesapeake Forest Lands violates their Second Amendment rights. They contend that the ban covers "thousands of acres of land" without justification, and that there are no comparable historical regulations, despite the existence of public parks at the founding. (Novotny Pls.' Mot. at 31–32; Kipke Pls.' Mot. at 23–25). State Defendants make three arguments in response: (1) parks are State property, and thus the state, as the proprietor, may restrict firearms, (2) parks are sensitive places, and (3) SB 1's restriction on firearms in parks is consistent with historical firearm regulation. (Opp'n Novotny Mot. at 44–48). The Court will address each of these arguments.

As to the State-as-proprietor argument, State Defendants correctly point out private property owners are unrestricted by the Second Amendment, and they may choose to prohibit firearms. <u>See</u> <u>Cedar Point Nursery v. Hassid</u>, 141 S.Ct. 2063, 2072 (2021) (explaining that the right to exclude is "'one of the most essential sticks in the bundle of rights that are commonly characterized as property'"). Further, it is also clear that when the State acts as a market participant and proprietor by operating a business, it typically has the same rights as a private proprietor to manage its internal affairs. <u>See</u> <u>Reeves, Inc. v. Stake</u>, 447 U.S. 429, 445–46 (1980) (holding that a State-operated cement plant was not subject to the Commerce Clause). However, States acting in their proprietary capacities do not necessarily enjoy "absolute freedom" from constitutional constraints. <u>See</u> <u>United States v. Kokinda</u>, 497 U.S. 720, 725–26 (1990) ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints,

as does a private business[.]"). Indeed, <u>Bruen</u> did not opine on a State's right as a property owner to exclude firearms, so <u>Bruen</u>'s historical test for determining whether gun restrictions are constitutional did not take this issue into account. Consequently, the Court concludes that even if the State regulates firearms in its proprietary capacity, State Defendants must still show that the laws are consistent with historical regulation, or they must successfully analogize the restricted location to an established sensitive place. <u>See</u> <u>Bruen</u>, 142 S.Ct. at 2132 (describing required historical analysis).

Here, State Defendants have neither shown that Maryland acts as a proprietor in regulating firearms in its parks, nor that parks are sensitive places. State Defendants have, however, provided a sufficient historical record to show that SB 1's park restrictions are consistent with historical regulations.

First, although the State owns the property in its parks, parks are not businesses, and State Defendants have not established Maryland acts as a market participant by owning parks open to the public. <u>See</u> <u>Reeves</u>, 447 U.S. at 445–46 (discussing South Dakota's participation in the free market as the operator of a cement plant). State Defendants have also failed to show that parks are sensitive places. As Plaintiffs point out, Maryland's parks cover thousands of miles, and while children surely visit these parks for education or recreation, State Defendants do not allege that the parks are primarily geared towards children or any other vulnerable population. Additionally, the Court notes that <u>Bruen</u> named just a few examples of sensitive places, and the Court is not convinced that parks are sufficiently analogous to schools, government buildings, legislative assemblies, polling places, or courthouses.

Nevertheless, State Defendants have shown that SB 1's restriction on firearms in parks is consistent with historical firearm regulation. Very few public parks existed at the time the Second Amendment was ratified, and those that did exist were typically located in cities. (See Saul Cornell Decl. ¶¶ 54–56, ECF No. 36-3). Plaintiffs thus argue that because these parks existed and were not regulated, there is no historical tradition of regulation in parks. Their argument misses the mark for several reasons. First, Plaintiffs point to just a handful of parks in existence at the time of the founding such as Boston Common and New York's City Hall Park. (Novotny Pls.' Mot. at 31–32; Kipke Pls.' Mot. at 23–24). The Court cannot infer that parks were historically not regulated from so few places. Further, not only were there few parks at that time, but these parks did not resemble the modern, expansive State and federal park system that the United States has today. Boston Common, for example, "was used primarily as a pasture, a place of execution, and site for the militia to muster and drill." (Cornell Decl. ¶ 54). Notably, it was not completely unregulated, and militia were prohibited from "coming to muster with a loaded firearm." (Id.).

The historical record further shows that as States and cities created more parks, they also imposed firearm regulations. Around the time the Fourteenth Amendment was ratified, several jurisdictions prohibited firearms in public parks, including: New York City (Mins. Proceedings Brd. Comm'rs (1858) at 3–5, ECF No. 36-37); Philadelphia (Gen. L. Pa., § 21, (1868), ECF No. 36-39); Chicago (L. Chicago, ch. 31 § 6 (1873), ECF No.36-41); St. Louis (St. Louis Ordinance, Art. 11 § 3 (1881), ECF No. 36-46); and Boston (Park Ordinances, Brd. Comm'rs § 3 (1886), ECF No. 36-49). See Md. Shall Issue, 2023 WL 4373260 at *11

(discussing historical regulations in public parks); (Cornell Decl. at ¶ 56) (same). Novotny Plaintiffs argue that these are urban parks, so there is no precedent for a ban of all state parks. (Novotny Pls.' Reply at 39–40). However, rural, more isolated state parks were not established in significant numbers until after the ratification of the Fourteenth Amendment, and thus the Court will not infer a lack of regulation from the absence of laws governing rural state parks at that time. (See Cornell Decl. ¶ 57,). Lastly, the Court finds that SB 1's public park ban imposes the same burden on the right to armed self-defense as these historical statutes, and the laws are comparably justified by the need for public safety.[7] Accordingly, the Court finds that Plaintiffs are unlikely to succeed in their challenge of SB 1's prohibition on firearms in parks.

### iv.    Mass Transit Facilities

Plaintiffs challenge Maryland's ban of firearms in mass transit facilities and in vehicles owned by the State. They argue that firearm violence existed at the founding, as did transportation, and that transportation was not regulated. (Novotny Pls.'s Mot. at 29–30; Kipke Pls.' Mot. at 25–27). State Defendants respond that the State acts in its proprietary capacity in providing transportation, and therefore the State is free to restrict firearms. (Opp'n Novotny Mot. at 35–36). State Defendants further argue that mass transit facilities are sensitive places. (Id. at 36–37). The Court agrees with State Defendants.

---

[7] The need to advance public safety may be less apparent in rural, isolated areas. The Court also acknowledges that when it denied the motion for preliminary injunction in Maryland Shall Issue as to the ban on firearms in Montgomery County parks, the Court specifically noted that Montgomery County was densely populated. 2023 WL 4373260, at *11. Nevertheless, even isolated parks can draw large crowds, and the public safety justification remains the same.

While there is no doubt that transportation existed at the time of the founding, almost all transportation was provided by private companies. (Decl. Dr. Brennan Rivas ¶ 13, ECF No. 36-5). Plaintiffs point to only one public ferry in South Carolina that was established as early as 1725. (Novotny Pls.'s Mot. at 29; Kipke Pls.' Mot. at 25). As explained above in the Court's analysis of the small number of public parks in existence in the eighteenth century, the Court cannot infer a lack of regulation from the absence of public transportation regulations at that time. Rather, because State-operated transit barely existed at the founding, the Court must take a more nuanced approach to the historical analysis. See Bruen, 142 S.Ct. at 2132 (requiring a "nuanced approach" where modern concerns were not contemplated at the founding).

This approach indicates that mass transit facilities are sensitive places because they are analogous to both schools and government buildings. Like schools, mass transit facilities are crowded spaces that serve vulnerable populations like children and disabled people. Additionally, some mass transit facilities, such as bus, train, or subway stations, could also be categorized as government buildings, which are established sensitive places. The Court also notes that in providing transportation services, Maryland is a market participant, and thus it may have the ability to exclude firearms on its property, just as a private entity engaged in transportation services could. See Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R. I., Inc., 507 U.S. 218, 231–32 (1993) (explaining that a State may "manage its own property when pursuing a purely proprietary interest . . . where analogous private conduct would be permitted"). As explained above, the Supreme Court has not provided guidance on the State's powers as a

proprietor or property owner in the context of the Second Amendment, and thus the Court relies on the identification of mass transit facilities as sensitive places in its determination that Plaintiffs are unlikely to succeed in their challenge of Maryland's mass transit ban.

**v.   Locations Selling Alcohol**

Plaintiffs also claim that SB 1's ban on firearms in locations licensed to sell alcohol violates the Second Amendment. Plaintiffs argue that such locations, like bars and restaurants, as well as firearm violence, existed at the time of the founding, and that there is no corresponding historical tradition of firearm regulation. (Novotny Pls.' Mot. at 25–26; Kipke Pls.' Mot. at 22–23). State Defendants respond that locations selling alcohol are sensitive places because they are crowded and serve vulnerable people. (Opp'n Novotny Mot. at 38–39). Further, State Defendants claim that the firearm ban in these locations is consistent with historical regulations. (Id.). They cite an 1890 Oklahoma law banning firearms where liquor is sold, (Ok. Stat. Crim., ch. 25 § 7, ECF No. 36-20), and several laws prohibiting intoxicated people from carrying, (see Patrick J. Charles Decl. ¶ 26, ECF No. 36-4).

At bottom, the Court agrees with Plaintiffs and finds that they have shown a clear likelihood of success in their challenge of SB 1's firearm ban in locations selling alcohol. First, bars and restaurants are not analogous to any established sensitive place. While it is true that such businesses can attract crowds and there are risks associated with alcohol consumption, the Court is unconvinced that intoxicated people qualify as a vulnerable population, like children or hospitalized individuals. Additionally, while some crowded spaces are considered sensitive places, Bruen rejected the argument that Manhattan was

24
**JA0986**

sensitive "simply because it is crowded and protected generally by the New York City Police Department." 142 S.Ct. at 2134. Applying the same logic here, the Court finds that locations selling alcohol cannot be designated as sensitive places merely because they are crowded.

Additionally, the Court concludes that SB 1's restriction on locations selling alcohol is not consistent with historical regulations. The Supreme Court has already identified Oklahoma as a non-representative jurisdiction, Bruen, 142 S.Ct. at 2154, and thus the Court will not interpret the Oklahoma statute as evincing the nation's tradition of firearm regulation. As for the other statutes cited by State Defendants, they are not similar to SB 1's restriction on locations selling alcohol because they do not impose a "comparable burden on the right of armed self-defense." See id. at 2133. Those historical statutes prevented only intoxicated individuals from carrying firearms, while SB 1 bans all people present at locations selling alcohol from carrying. Novotny Plaintiffs have represented that they "have no objection to prohibiting intoxicated people from carrying firearms." (Novotny Pls.' Reply at 35–36). Indeed, existing Maryland law already bans carrying a firearm while under the influence of alcohol or drugs. COMAR 29.03.02.02. But SB 1 does not mirror that more narrow prohibition, and because it broadly prevents anyone at a location selling alcohol from carrying, Plaintiffs are likely to succeed on the merits in their Second Amendment challenge related to those locations.

### vi.     Private Building Consent Rule

### A.     <u>Standing</u>

As a threshold matter related to Plaintiffs' challenge of SB 1's private building consent rule, State Defendants argue that Plaintiffs lack standing. (Opp'n Novotny Mot. at 49). SB 1 prohibits carrying a firearm into private property unless the owner has posted clear and conspicuous signage or given express permission allowing individuals to carry a firearm into that building. 2023 Md. Laws ch. 680 (to be codified at CR § 6-411(c)). Plaintiffs allege that the private building consent rule injures them because were it not for the rule, they would carry firearms into private property where no signage or consent is provided, such as grocery stores, drug stores, and gas stations. (See <u>Novotny</u>, Compl. ¶ 22; <u>Kipke</u>, Compl. ¶ 40).

Article III of the United States Constitution limits the jurisdiction of federal courts to "cases" and "controversies," so plaintiffs in federal civil actions must demonstrate standing to assert their claims. <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" requirements of standing consist of three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) the injury must be fairly traceable to the actions of the defendant; and (3) it must be "likely" that the injury will be "redressed by a favorable decision." <u>Id.</u> at 560–61 (citations omitted). An injury in fact must be "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 339 (2016) (quoting <u>Lujan</u>, 504 U.S. at 560). A plaintiff can satisfy the injury-in-fact requirement by alleging "'an intention to engage in a course of conduct arguably affected

with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" <u>Susan B. Anthony List v. Driehaus</u>, 573 U.S. 149, 159 (2014) (quoting <u>Babbitt v. Farm Workers</u>, 442 U.S. 289, 298 (1979)).

State Defendants argue that Plaintiffs cannot establish any of the three elements. First, they contend that Plaintiffs have not suffered an injury in fact because their claim is "based on the premise that there exists some private building (that plaintiffs wish to enter armed) for which the owner both (1) consents to individuals entering their building armed, and (2) for whatever reason will decline to express that consent through a sign (or other express permission)." (Opp'n Novotny Mot. at 49–50). Plaintiffs respond that they have suffered an injury in fact because:

> [They] currently do carry firearms into private buildings open to the public where no sign either expresses or denies consent to that act, but will be forced to cease doing so when [SB 1] takes effect . . . Moreover, the need to ensure consent before engaging in constitutionally protected conduct is itself a burden on that conduct and thus an injury in fact.

(Novotny Pls.' Reply. at 41–42; <u>see also</u> Kipke Pls.' Reply at 47–48).

The Court agrees with Plaintiffs and finds that they have suffered an injury in fact. The Second Amendment "presumptively guarantees" citizens the right to carry arms "in public for self defense." <u>Bruen</u>, 142 S.Ct. 2111, 2135 (2022). Plaintiffs have alleged that they carry firearms in privately-owned buildings that are open to the public and that do not contain signage granting consent to carry. Thus, they have expressed an intention to engage in a course of conduct affected with their Second Amendment rights, and SB 1 creates a credible threat of prosecution. <u>See</u> <u>Susan B. Anthony List</u>, 573 U.S. at 159.

Second, State Defendants argue that Plaintiffs have failed to establish traceability because any alleged injury to Plaintiffs' Second Amendment rights would be caused by the discretion of third-party property owners, not the State. (Opp'n Novotny Mot. at 50). Plaintiffs acknowledge that private property owners are not bound by the Second Amendment, so they have a right to prohibit firearms. (See Novotny Pls.' Reply at 44; Kipke Pls.' Reply at 49); Cedar Point Nursery, 141 S.Ct. at 2072. But the right to exclude does not equate to a break in the chain of constitutional causation that would create a lack of traceability to the State. To the contrary, Plaintiffs have alleged that they currently carry firearms in buildings open to the public, and that they will not be able to do so because of SB 1. The ability of private property owners to remedy Plaintiffs' injury is irrelevant, and the case law cited by State Defendants is inapposite. For example, State Defendants rely on Simon v. E. Ky. Welfare Rts. Org., 426 U.S. 26, 44 (1976), where the Supreme Court held that indigent patients lacked standing to challenge an IRS ruling that extended charitable tax exemptions to nonprofit hospitals that did not provide hospitalization services to patients who could not pay. Id. The Supreme Court found that the alleged harm—reduced access to hospital services—was not traceable to the IRS's ruling because it was "purely speculative" whether the denials of medical service could be traced to the IRS's "encouragement" to limit services, or if the denials instead resulted from independent hospital policy decisions. Id. at 42–43. This differs greatly from the instant case, where

Plaintiffs are prevented from carrying in certain privately owned buildings because of SB 1.[8]

Lastly, the Court finds that Plaintiffs have established redressability for similar reasons. State Defendants argue that private property owners can exclude firearms, so the injury—not being able to carry a firearm into private buildings—would not be redressed by enjoining SB 1. (Opp'n Novotny Mot. at 52). State Defendants mischaracterize Plaintiffs' injury—it is not merely the inability to carry in privately-owned buildings. Rather, their injury is the threat of prosecution for carrying firearms in places that, under prevailing law, they have previously had the presumptive right to do so absent express prohibition by the property owner. Accordingly, enjoining SB 1 would redress Plaintiffs' injury.

### B.    Historical Analysis

The Court now moves to whether SB 1's private building consent rule is consistent with historical firearm regulation.[9] State Defendants cite a 1715 Maryland colonial law that imposed criminal penalties against anyone "of evil fame, or a vagrant, or dissolute liver,

---

[8] The Court also notes that while a private property owners' right to exclude is unquestioned, SB 1 does not merely codify this longstanding right. The right to exclude presumes that individuals may carry a gun unless the property owner prohibits it—SB 1's private building consent rule does the opposite, because it presumptively bans firearms unless the property owner expressly consents.

[9] State Defendants also argue that the Second Amendment does not cover Plaintiffs' conduct in carrying firearms in privately-owned buildings. (Opp'n Novotny Mot. at 48–49). For the reasons set forth infra in the Court's discussion of standing, the Court disagrees. Again, private property owners can freely exclude firearms, but absent their prohibition, Plaintiffs have a presumptive right to carry in buildings open to the public. Accordingly, Plaintiffs' conduct related to carrying in privately owned buildings is covered by the Second Amendment.

that shall shoot, kill or hunt, or be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave, having been once before warned." (Md. Acts., ch. 26 § 7 (1715), ECF No. 36-24). This statute appears to be aimed at limiting hunting and the carrying rights of criminals, not the general population, and thus it cannot serve as evidence of a historical tradition of prohibiting people from carrying on private property.

Next, State Defendants cite other eighteenth century laws from Pennsylvania, New Jersey, New York, and Massachusetts, but these statutes are similarly aimed at prohibiting hunting on another's land. (See Pa. Stat., ch. 246 § 3 (1721), ECF No. 36-25; Nj. Acts, ch. 305 § 4 (1722), ECF No. 36-26; Ny. L., ch. 1233 § 1 (1763), ECF No. 36-27; Acts. Colony Nj., § 1 (1771), ECF No. 36-28; Acts. L. Ma., ch. 28 (1789), ECF No. 36-29). Under the Bruen framework, these laws are not representative of SB 1's private building consent rule because they are not similarly justified. See Antonyuk v. Hochul, 639 F.Supp.3d 232, 340–42 (N.D.N.Y. 2022) (identifying the laws from Pennsylvania, New Jersey, and New York as "'anti-poaching laws,' aimed at preventing hunters . . . from taking game off of other people's lands").

State Defendants then cite the laws from the ratification of the Second Amendment, including statutes from Louisiana and Texas. (Acts. La., § 1 (1865), ECF No. 36-30; L. Tx., 11 Crim. Code ch. 6508(a) (1867), ECF No. 36-31). Louisiana and Texas created these laws as part of their discriminatory "Black Codes," which sought to deprive African Americans of their rights. See McDonald, 561 U.S. at 847 (Thomas, J., concurring in part and concurring in the judgment) (describing this history). The Supreme Court has

cautioned against relying on such laws, and this Court will not infer a historical tradition of regulation consistent with the private building consent rule from these statutes. See Bruen, 142 S.Ct. at 2149 (concluding that two discriminatory statutes were "surely too slender a reed on which to hang a historical tradition of restricting the right to public carry"). Further, laws primarily aimed at only one group of people do not have the same impact on the right to bear arms as the private building consent rule, which broadly bans carrying without consent in private buildings for all citizens. Nor are these laws comparably justified because their intent was to discriminate, rather than to advance public safety.

Lastly, State Defendants reference an 1893 Oregon law, which may have been aimed at hunting and is thus dissimilar to SB 1's private building consent rule. (Gen. L. Or., ch. 79 §§ 1–3, (1893), ECF No. 36-32 (prohibiting armed persons from entering another's property without permission and with a dog)). Even if this statute was not aimed at preventing poaching, the Court concludes that this single law does not evince a historical tradition of prohibiting firearms on private property absent the owner's consent. See Bruen, 142 S.Ct. at 2133 (warning against "endorsing outliers that our ancestors would never have accepted."). Accordingly, the Court finds that Plaintiffs are clearly likely to succeed in their challenge of SB 1's private building consent rule.[10]

---

[10] Kipke Plaintiffs also argue that the private building consent rule violates the First Amendment and must be enjoined for that reason. (Kipke Pls.' Mot. at 35). Because the Court has already found that Plaintiffs are likely to succeed in their claim for a violation of the Second Amendment, and will further grant the Plaintiffs' Motions as to that claim as explained below, the Court need not address the First Amendment argument.

**b.      <u>Firearm Carry Provisions Challenged by Kipke Plaintiffs</u>**

Having determined whether Novotny and Kipke Plaintiffs' mutual claims are likely to succeed, the Court now turns to the additional claims brought by the Kipke Plaintiffs. Kipke Plaintiffs challenge firearm restrictions in the following locations: school grounds; government buildings; stadiums, racetracks, amusement parks, and casinos; and within 1,000 feet of a public demonstration. (Kipke Pls.' Mot. at 10–12).

**i.      School Grounds**

First, Kipke Plaintiffs do not challenge Maryland's ban on carrying firearms inside School buildings, but they argue that the restrictions prohibiting carrying on school grounds are unconstitutional. (<u>Id.</u> at 31–32). Specifically, they claim that historical regulations on firearms in schools did not mention the grounds, and therefore firearms cannot be restricted there. (<u>Id.</u>).

The Court is not convinced. It is settled law that schools are sensitive places. <u>Heller</u>, 554 U.S. at 626 ("nothing in [this] opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings[.]"); <u>McDonald</u>, 561 U.S. at 786 (repeating "assurances" that schools and government buildings are sensitive places); <u>Bruen</u>, 142 S.Ct. at 2133 (identifying schools and government buildings as sensitive places). Kipke Plaintiffs fail to acknowledge that school grounds are plainly analogous to school buildings, and therefore the grounds may also be designated as sensitive places. <u>See</u> <u>Bruen</u>, 142 S.Ct. at 2134 (explaining that schools are sensitive places, and "courts can use analogies to those historical regulations of sensitive places to determine that modern regulations prohibiting the carry of firearms in

new and analogous sensitive places are constitutionally permissible.") (cleaned up). Like schools themselves, school grounds serve children through places like drop-off and pick-up areas, playgrounds, and recreational areas. Thus, the bans in schools and school grounds are comparably justified by vulnerable populations and public safety, and the burden on the right to self-defense is the same. Accordingly, the Kipke Plaintiffs are not likely to succeed in their challenge of Maryland's ban on carrying on school grounds.

### ii.     Government Buildings

Similarly, Kipke Plaintiffs are unlikely to succeed on the merits regarding their challenge of Maryland's ban on carrying firearms in government buildings. Government buildings are indisputably sensitive places. Heller, 554 U.S. at 626; McDonald, 561 U.S. at 786; Bruen, 142 S.Ct. at 2133. While it is true that Bruen identifies legislative assemblies, polling places, and courthouses as additional examples of sensitive places, 142 S.Ct. at 2133, nothing in that opinion, nor in Heller or McDonald, indicates that only these types of government buildings are sensitive places. On the contrary, Heller and McDonald refer only to "government buildings" generally, and Bruen expressly adopts "Heller's discussion of 'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.'" Id. at 2133 (quoting Heller, 554 U.S. at 626). Consequently, the Court concludes that Kipke Plaintiffs have not demonstrated a clear likelihood of success on the merits as to their challenge of Maryland's ban on carrying in government buildings.

iii.     **Stadiums, Racetracks, Amusement Parks, and Casinos**

Next, Kipke Plaintiffs challenge firearm regulations in stadiums (including Camden Yards), racetracks, amusement parks, and casinos. This Court has previously upheld regulations in similar places, such as recreational facilities and multipurpose exhibition facilities, because there is a historical tradition of restricting carrying in these locations. Md. Shall Issue, 2023 WL 4373260, at *12 (citing same statutes as State Defendants in the instant case); (see Opp'n Kipke Pls.' Mot. at 48). Kipke Plaintiffs contend that Maryland Shall Issue was wrongly decided because the statutes cited by the State are not analogous to modern regulations on entertainment venues, and the Court mistakenly relied on historical sources from the ratification of the Fourteenth Amendment. (Kipke Pls.' Reply at 37).

The Court disagrees. Kipke Plaintiffs have not explained how the Court allegedly erred in its reasoning by analogy in Maryland Shall Issue, so they have not met their burden as movants to establish a clear likelihood of success on the merits. Additionally, as set forth above, Bruen did not confine historical analysis to the time period of the ratification of the Second Amendment. Bruen, 142 S.Ct. at 2136 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them. The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years.") (cleaned up). In fact, the Supreme Court declined to opine on "whether courts should primarily rely" on historical evidence from the ratification of the Second or Fourteenth Amendments. Id. at 2138. Accordingly, this

34

Court will follow <u>Maryland Shall Issue</u> in considering historical sources from the nineteenth century. Consistent with that decision, the Court concludes that the regulations restricting firearms in stadiums, racetracks, amusement parks, and casinos are analogous to historical statutes banning them in gathering places for entertainment, and thus Kipke Plaintiffs have failed to show a likelihood of success as to that claim.

### iv.    Public Demonstrations

Lastly, Maryland law bans carrying a firearm within 1,000 feet of public demonstration after "(i) the person has been advised by a law enforcement officer that a demonstration is occurring at the public place; and (ii) the person has been ordered by the law enforcement officer to leave the area of the demonstration until the person disposes of the firearm." CR § 4-208(b)(2). As a threshold matter, State Defendants argue that Kipke Plaintiffs do not have standing to challenge this provision. State Defendants contend that there is no injury in fact because Kipke Plaintiffs' alleged injury is speculative and based on "a highly attenuated chain of possibilities." (Opp'n Kipke Mot. at 69–70).

The Court disagrees. Kipke alleges that if not for her fear of persecution, she would carry a handgun at a public demonstration and remain there after a law enforcement officer ordered her to leave. (Supp. Kipke Decl. ¶ 2, ECF No. 29-1). Thus, she has adequately alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." <u>Susan B. Anthony List</u>, 573 U.S. at 159 (quoting <u>Babbitt</u> 442 U.S. at 298). Further, she has also alleged a credible threat of persecution. Although State Defendants suggest that no individual has ever been prosecuted under the statute, (Opp'n Kipke Mot. at 71 n.47), they have also failed to

disavow prosecution, and Kipke's desired conduct is barred by the statute's plain language. Kenny v. Wilson, 885 F.3d 280, 288 (4th Cir. 2018) ("Threat of prosecution is especially credible when defendants have not 'disavowed enforcement' if plaintiffs engage in similar conduct in the future") (quoting Susan B. Anthony List, 573 U.S. at 163). The Court therefore concludes that Kipke Plaintiffs have standing.[11]

As to the merits of the public demonstration claim, Kipke Plaintiffs have also demonstrated a clear likelihood of success. Just before the ratification of the Second Amendment, "six out of the thirteen original colonies required their citizens to go armed when attending . . . public assemblies." Koons v. Platkin, No. CV 22-7463 (RMB/AMD), 2023 WL 3478604, at *73 (D.N.J. May 16, 2023) (citing Heller, 554 U.S. at 601) (observing that "[m]any colonial statutes required individual arms bearing for public-safety reasons"). State Defendants cite to several nineteenth-century statutes that prohibited firearms at public assemblies. (See Opp'n Kipke Pls.' Mot. at 71). Bruen nevertheless makes it clear that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." 142 S.Ct. at 2154.

The Court notes that it is obligated to question the constitutionality of Maryland's restriction on carrying at public demonstrations because of Bruen's narrow historical

---

[11] When there are multiple plaintiffs, the Court need only determine that there is at least one plaintiff with standing for a particular claim in order to consider the claim. Town of Chester v. Laroe Ests., Inc., 581 U.S. 433, 439 (2017). Therefore, because Kipke has standing, the Court may consider Kipke Plaintiffs' claim.

framework. If the Court were permitted to apply intermediate or even strict scrutiny to public demonstration restriction, the law would almost certainly pass constitutional muster, because it does not categorically ban all firearms at public demonstrations. Rather, it prohibits guns only in a narrow set of circumstances designed to promote public safety while preserving the right to bear arms. Even so, the Supreme Court has rejected this means-ends analysis, and this Court must conclude Kipke Plaintiffs are likely to succeed in their challenge of the public demonstration restriction.

### 3.   Irreparable Harm

The Court now turns to the second element of a preliminary injunction claim: the likelihood of suffering irreparable harm in the absence of preliminary relief. Winter, 555 U.S. at 20. The deprivation of a constitutional right "unquestionably constitutes irreparable injury." Miranda v. Garland, 34 F.4th 338, 365 (4th Cir. 2022) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)). Thus, in the context of an alleged constitutional violation, the likelihood of irreparable harm necessarily depends on the likelihood of success on the merits of the claim. See id. ("Without his alleged constitutional injury, [plaintiff] has failed to show that he will suffer irreparable harm."). Accordingly, because Plaintiffs have shown a likelihood of success on the merits as to their challenges of the firearm restrictions in private property, locations selling alcohol, and within 1,000 feet of public demonstrations, they have also established irreparable harm as to those claims only.

### 4.   Balance of the Equities and the Public Interest

Lastly, the Court will consider the balance of the equities and the public interest together because these factors merge when the State is the opposing party. See Nken v.

Holder, 556 U.S. 418, 435 (2009). State Defendants argue that the challenged firearm restrictions advance public safety and that the State is entitled to enforce its duly enacted laws. (Opp'n Kipke Mot. at 88−90). Plaintiffs respond that preserving Second Amendment rights is in the public interest and that Bruen rejected the State's public interest arguments. (Kipke Pls.' Reply at 45; see also Novotny Pls.' Mot. at 49).

Plaintiffs are correct that the public has a strong interest in upholding constitutional rights and the State is not harmed by an injunction preventing it from enforcing unconstitutional laws. See Legend Night Club v. Miller, 637 F.3d 291, 302–03 (4th Cir. 2011). Therefore, because Plaintiffs have shown a likelihood of success in their challenge to the private building consent rule and the regulations on public demonstrations and locations selling alcohol, the balance of the equities and the public interest tip in Plaintiffs' favor as to those claims, and the Court will enjoin enforcement of those provisions.

Regarding Plaintiffs' remaining claims, the Court finds that the balance of the equities and the public interest weighs against a preliminary injunction. As the Court explained in Maryland Shall Issue, Bruen prevents courts from considering the public interest, including safety concerns, only "[when] assessing whether a firearm restriction is unconstitutional under the Second Amendment." Md. Shall Issue, 2023 WL 4373260, at *16 (citing Bruen, 142 S.Ct. at 2129–30). Bruen did not consider whether a preliminary injunction should be granted, and thus it did not apply the test established in Winter, 555 U.S. at 20, which requires this Court to consider the public interest in determining whether to temporarily enjoin enforcement of a law. Id.

Accordingly, the Court will consider State Defendants' public interest arguments, and it finds them persuasive. The devastating effects of firearm violence on Marylanders and United States citizens are self-evident. Enjoining enforcement of the Maryland firearm restrictions that either protect sensitive places or are consistent with historical regulations would undermine the public's interest in preventing gun violence. Plaintiffs' Motions will therefore be denied as to their remaining claims.

**5.      Dispositive Motions**

Having decided to grant partial injunctive relief, the Court will deny State Defendants' Motion to Dismiss and the Motions for Summary Judgment without prejudice. (Novotny, ECF No. 36; Kipke, ECF Nos. 13, 18, 21, 23). The parties may, if they wish, refile dispositive motions after having the opportunity to supplement them and participate in discovery prior to a trial on the merits.

### III.      CONCLUSION

For the foregoing reasons, the Court will grant Plaintiffs' Motions for Preliminary Injunction (Novotny, ECF No. 24; Kipke, ECF No. 12) in part and deny them in part. The Motions will be granted as to the claims regarding the private building consent rule and the regulations on locations selling alcohol and public demonstrations, and the Motions will be denied in all other respects. The Motion to Dismiss (Novotny, ECF No. 36) and the Motions for Summary Judgment (Kipke, ECF Nos. 13, 18, 21, 23) will be denied without prejudice. A separate Order follows.

Entered this 29th day of September, 2023.

_____/s/_____
George L. Russell, III
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SUSANNAH WARNER KIPKE, et al., | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. GLR-23-1293 |
| | | Member Case: GLR-23-1295 |
| WES MOORE, et al., | * | |
| Defendants. | * | |

\*\*\*

## ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this 29th day of September, 2023 by the United States District Court for the District of Maryland, hereby:

ORDERED that Plaintiffs' Motions for Preliminary Injunction (Kipke et al. v. Moore et al., ("Kipke"), No. GLR-23-1293, ECF No. 12); Novotny et al. v. Moore et al., ("Novotny"), No. GLR-23-1295, ECF No. 24) are GRANTED IN PART and DENIED IN PART;

IT IS FURTHER ORDERED that the Motions for Prelminary Injunction are GRANTED as to the claims to enjoin enforcement of Maryland's laws restricting the carrying of firearms in: (1) locations selling alcohol, to be codified as Md. Code Ann., (2023), Crim. Law § 4-111(a)(2)(8)(i) ; (2) private buildings or property without the owner's consent, to be codified at Md. Code Ann., (2023), Crim. Law § 6-411); and within 1,000 feet of a public demonstration, Md. Code Ann., (2016), Crim. Law § 4-208.

IT IS FURTHER ORDERED that State Defendants are ENJOINED from enforcing these laws;

**JA1003**

IT IS FURTHER ORDERED that the Motions for Preliminary Injunction are DENIED in all other respects;

IT IS FURTHER ORDERED that State Defendants' Motion to Dismiss (Novotny, ECF No. 36) is DENIED without prejudice;

IT IS FURTHER ORDERED that the Motions for Summary Judgment (Kipke, ECF Nos. 13, 18, 21, 23).  are DENIED without prejudice;

IT IS FURTHER ORDERED that the parties shall FILE a joint status report within 14 days of this Order to inform the Court:

1. Whether any party plans to seek an interlocutory appeal and/or to file answers to the Complaints;

2. Whether the parties wish to participate in  discovery, and if so, the parties shall submit a proposed scheduling order and new motions' deadline;

3. Whether the parties object to having the case transferred to a U.S. Magistrate Judge for all further proceedings;

4. Whether the parties would like would like to participate in a settlement conference;

5. Of any other matter they wish to bring to the Court's attention.


_____ /s/ _____
George L. Russell, III
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SUSANNAH WARNER KIPKE, *et al.*,   *

     *Plaintiffs*,   *

   v.   *   No. 1:23-cv-01293-GLR

WES MOORE, *et al.*,   *

     *Defendants*.   *

 * * * * * * * * * * * *

## ORDER

UPON CONSIDERATION of the Defendants' Motion for Relief from Order (the "Motion"), any response thereto, any argument thereon, and all matters of record, it is this 2nd day of October, 2023, by the United State District Court for the District of Maryland hereby

ORDERED that the Motion is GRANTED, and it is further

ORDERED that the orders entered in the *Kipke* Lawsuit (ECF 32) and the *Novotny* Lawsuit (ECF 41) shall be modified to state, in relevant part: "IT IS FURTHER ORDERED that the Motions for Preliminary Injunction are GRANTED as to the claims to enjoin enforcement of Maryland's laws restricting the carrying of firearms in . . . (2) private buildings or property without the owner's consent, to be codified at Md. Code Ann., (2023), Crim. Law § 6-411(d) . . . ."

       _____/s
       George L. Russell, III
       United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SUSANNAH WARNER KIPKE, et al., | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. GLR-23-1293 |
| | | Member Case: GLR-23-1295 |
| WES MOORE, et al., | * | |
| Defendants. | * | |

\*\*\*

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on: (1) Plaintiffs Susannah Warner Kipke and Maryland State Rifle and Pistol Association, Inc.'s ("MSRPA") (collectively, "Kipke Plaintiffs") Motion for Summary Judgment (ECF No. 13); (2) Consol Plaintiffs Katherine Novotny, Sue Burke, Esther Rossberg, Maryland Shall Issue, Inc., Second Amendment Foundation, and Firearms Policy Coalition's (collectively, "Novotny Plaintiffs") Motion for Summary Judgment (ECF No. 18); (3) Roland L. Butler, Jr. and Wes Moore's Cross Motion for Summary Judgment (ECF No. 21); and (4) Ivan J. Bates, Butler, Alison M. Healey, Joshua Kurtz, Moore, Scott D. Shellenberger, Paul J. Wiedefeld's (collectively, "State Defendants") Cross Motion for Summary Judgment (ECF No. 23). The Motions are fully briefed, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2023). For the reasons outlined below, the Court will grant the Motions in part and deny them in part.

## I.    BACKGROUND

**A.    The Gun Safety Act of 2023 and Other Maryland Firearm Restrictions**

The Court provided a complete description of the facts and law at issue in this case in its September 29, 2023 Memorandum Opinion, (ECF No. 31), which it incorporates here by reference. The Court will not repeat that description in its entirety and will instead provide a brief summary.

This action concerns Plaintiffs' challenges to the constitutionality of the Gun Safety Act of 2023 (the "Act"), formerly known as Senate Bill 1, as well as several other Maryland firearm regulations. See Md. Code Ann. (2023), Crim. Law ["CR"] §§ 4-111, 6-411. The Act took effect in part on October 1, 2023, and it identifies three categories of statutorily-defined locations where individuals are prohibited from carrying: (1) an "area for children and vulnerable individuals," (2) a "government or public infrastructure area," and (3) a "special purpose area." Id. §§ 4-111(c)–(e). These three categories include bans on carrying firearms in the following locations: schools and school grounds; healthcare facilities; government buildings; stadiums; museums; amusement parks; racetracks; casinos; and locations selling alcohol for onsite consumption (bars and restaurants). Id. § 4-111(a). Certain exceptions apply, such as for active or retired law enforcement officers, private property owners with authorized security, and individuals who transport a firearm inside a motor vehicle, as long as they either have a public carry permit or lock the firearm in a container. Id. § 6-411(b).

The Act also prohibits individuals from entering buildings on private property while carrying a firearm without first obtaining permission to do so (the "private building consent

rule"). Id. § 6-411. The manner in which permission may be expressed or obtained depends on whether the building at issue is a dwelling. The Act provides that an individual carrying a firearm cannot enter a dwelling without the owner's permission. Id. § 6-411(c). With regard to all other private property, an individual carrying a firearm may not enter or trespass on such property unless the owner or the owner's agent (1) "has posted a clear and conspicuous sign indicating that it is permissible to" carry a firearm on the property, or (2) "has given the person express permission" to carry a firearm on the property. Id. § 6-411(d).

Separate from the Act, Maryland also has firearm restrictions in the following locations:

- In State parks, State forests, and Chesapeake Forest Lands. COMAR 08.07.06.04 (State parks), 08.07.01.04 (State forests), and 08.01.07.14 (Chesapeake Forest Lands).

- On public transit owned or controlled by the Maryland Mass Transit Administration or operated by a private company under contract to the Administration. Md. Code Ann., Transp. § 7-705(b)(6).

- At welcome centers, rest areas, scenic overlooks, roadside picnic areas, and other public use areas within interstate and State highway rights-of-way. COMAR 11.04.07.01, 11.04.07.12.

- On the grounds of public school property. CR § 4-102(b).

- On property of state public buildings, improvements, grounds, and multiservice centers under the jurisdiction of the Department of General Services. COMAR 04.05.01.01, 04.05.01.03.

- In the Camden Yards Sports Complex. COMAR 14.25.01.01(B)(14), 14.25.02.06.

- In a casino. COMAR 36.03.10.48.

- At a demonstration in a public place (or in a vehicle that is within 1,000 feet of a demonstration in a public place) after being informed by a law enforcement officer that a demonstration is occurring and being ordered to leave the area until the individual disposes of the firearm. CR § 4-208(b)(2).

**B.**    **Procedural History**

On May 16, 2023, two lawsuits were filed challenging the Act and the other related firearm regulations set forth above. Kipke Plaintiffs filed the first lawsuit, (<u>Kipke et al. v. Moore et al.</u>, ("<u>Kipke</u>"), No. GLR-23-1293, ECF No. 1), and Novotny Plaintiffs brought the second, (<u>Novotny et al. v. Moore et al.</u>, ("<u>Novotny</u>"), No. GLR-23-1295, ECF No. 1).[1]

Kipke Plaintiffs make the following claims under 42 U.S.C. § 1983 to challenge the constitutionality of the Act and other Maryland firearm regulations: (1) Second and Fourteenth Amendments violations due to restrictions on carrying firearms as applied to: State parks; State highway rest areas; mass transit facilities; public school property; the grounds of preschools or prekindergarten facilities; museums; the Camden Yards Sports Complex; stadiums; healthcare facilities; government buildings; locations selling alcohol; amusement parks, racetracks, and casinos;  private buildings; and demonstrations in public places (Count I); (2) a First and Fourteenth Amendment violation due to the private building consent rule (Count II); (3) a Second and Fourteenth Amendment Due Process Clause violation due to Maryland's permit process and an applicant's need to satisfy "subjective criteria" (Count III); and (4) a Fourteenth Amendment Equal Protection Clause

---

[1] Record citations refer to the <u>Kipke</u> docket unless otherwise indicated.

violation for the State's alleged discriminatory treatment of Kipke Plaintiffs in comparison to retired law enforcement officers (Count IV). (Compl. ¶¶ 47–68, ECF No. 1).

Novotny Plaintiffs make a similar, but more narrow challenge of Maryland firearm restrictions—their Complaint contains several of the same claims as Count I of the Kipke Complaint. They allege that Maryland cannot restrict firearms in the following locations: healthcare facilities; locations selling alcohol; museums; and private property without the owner's consent (Count I); mass transit facilities (Count II); and State parks, State forests, and State Chesapeake forest lands (Count III). (Novotny, Compl. ¶¶ 45–57, ECF No. 1).

Because of the complete overlap between Novotny Plaintiffs' claims and Count I of the Kipke Complaint, the Court consolidated the two cases on July 13, 2023. (ECF No. 15). Prior to consolidation, Novotny Plaintiffs filed a Motion for Preliminary Injunction, (Novotny, ECF No. 24), seeking to enjoin enforcement of the firearm restrictions listed in their Complaint. (Novotny, Mot. Prelim. Inj. at 1, ECF No. 24).[2] They also filed a Motion for Summary Judgment seeking a permanent injunction on July 20, 2023. (ECF No. 18). State Defendants filed a Cross Motion for Summary Judgment and Opposition to Novotny Plaintiffs' Motion for Summary Judgment on August 3, 2023. (ECF No. 23). On August 11, 2023, Novotny Plaintiffs filed a Reply in Support of their Motion for Summary Judgment and an Opposition to State Defendants' Motion for Summary Judgment. (ECF No. 26).

---

[2] Citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

In the <u>Kipke</u> case, State Defendants filed an Answer on June 30, 2023. (ECF No. 11). Kipke Plaintiffs filed a Motion for Preliminary Injunction, (ECF No. 12), and a Motion for Summary Judgment, (ECF No. 13), on July 3, 2023. On July 28, 2023, State Defendants filed a Cross Motion for Summary Judgment and Opposition to Kipke Plaintiffs' Motion for Preliminary Injunction. (ECF No. 21). On August 11, 2023, Kipke Plaintiffs filed a Reply in Support of their Motion for Summary Judgment, Response in Opposition to State Defendants' Cross Motion for Summary Judgment, and Reply in Support of their Motion for Preliminary Injunction. (ECF No. 29). State Defendants filed a Reply in Support of their Cross Motion for Summary Judgment on September 8, 2023. (ECF No. 30).

On September 29, 2023, the Court issued its Memorandum Opinion and Order granting the Motions for Preliminary Injunction in part and denying them in part. (Sept. 29, 2023 Order at 1, ECF No. 32). Specifically, the Court granted the Motions for Preliminary Injunction as to Maryland's laws restricting the carrying of firearms in: (1) locations selling alcohol for onsite consumption; (2) private property without the owner's consent; and (3) within 1,000 feet of a public demonstration. (<u>Id.</u>; Oct. 2, 2023 Order at 1, ECF No. 35 (citing CR § 4-111(a)(2)(8)(i), § 4-208, § 6-411(d))). The Motions for Preliminary Injunction were otherwise denied, and the Court also denied the Motion to Dismiss, (<u>Novotny</u>, ECF No. 36), and the Motions for Summary Judgment, (ECF Nos. 13, 18, 21, 23) without prejudice. (Sept. 29, 2023 Order at 2).

On October 12, 2023, State Defendants filed an Answer to the Novotny Plaintiffs' Complaint. (ECF No. 36). The parties then informed the Court that they did not plan to conduct discovery, and they requested that the Court renew the Motions for Summary

Judgment for consideration without further briefing. (Status Report at 1–2, ECF No. 37).

The Court renewed those Motions on November 17, 2023. (ECF No. 38). Since then, the

parties have filed several Notices of Supplemental Authority and related Responses, which

the Court considers in its analysis below. (ECF Nos. 39–48, 51–56).

## II.    DISCUSSION

### A.    Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light

most favorable to the nonmovant, drawing all justifiable inferences in that party's

favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott v. Harris, 550 U.S. 372,

380 (2007)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v.

S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the

movant demonstrates, through "particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations,

stipulations . . . admissions, interrogatory answers, or other materials," that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the

materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2),

and supporting affidavits and declarations "must be made on personal knowledge" and "set

out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden

shifts to the nonmovant to identify evidence showing there is genuine dispute of material

fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986) (quoting Anderson, 477 U.S. at 247).

**B.    Analysis**

    **1.    Claims challenging State firearm regulations in specific locations**

Kipke Plaintiffs move for Summary Judgment on Counts I and II of their Complaint. (Kipke Pls.' Mem. Supp. Mot. Summ. J. ["Kipke Pls.' Mot."] at 17–37, ECF No. 13-1). They ask the Court to permanently enjoin enforcement of the Act and other State

regulations that ban the carrying of firearms in: bars and restaurants; public parks; public transportation and mass transit facilities; stadiums, racetracks, amusement parks, and casinos; museums; near public demonstrations; healthcare facilities; school grounds, government buildings; and private property without the owner's consent. (Id. at 22–34). They make this argument under the Second Amendment, and they also argue that the private building consent rule must be enjoined for violating the First Amendment. (Id. at 34).

Similarly, Novotny Plaintiffs move for summary judgment on all three Counts in their Complaint. They ask for a declaratory judgment and permanent injunction on the carry bans in: healthcare facilities; museums; bars and restaurants; mass transit facilities; State parks; and in private buildings without the owners' consent. (Novotny Pls.' Mot. Summ. J. and Briefing Schedule ["Novotny Pls.' Mot."] at 1–2, ECF No. 18). In their Cross Motions, State Defendants respond that they are entitled to summary judgment on those same claims. (Defs.' Consolidated Mem. L. Supp. Mot. Summ. J. ["Defs.' Consolidated Cross Mot."] at 6, ECF No. 21-1; Defs.' Mot. Summ. J. at 3, ECF No. 23).

The Court previously considered these same issues on the Motions for Preliminary Injunction. (See generally Sept. 9, 2023 Mem. Op. ["Mem. Op."], ECF No. 31). Although those Motions required a different standard of review than the summary judgment standard set forth above, there has been no discovery in this case, and the facts are unchanged and undisputed. (See Status Report at 1 (explaining that no party wished to conduct discovery); Novotny Pls.' Mot. at 1 ("The constitutionality of these provisions is a pure question of law . . . no discovery is necessary")). Further, the Court conducted a thorough review of

the entire record in making its September 29, 2023 decision. Accordingly, for the same reasons stated in the Memorandum Opinion where the Court determined whether Plaintiffs were likely to succeed on the merits of their claims, the Court now finds that there is no genuine dispute of material fact as to whether the regulations identified above violate the Second Amendment. The Court will grant in part and deny in part the Motions for Summary Judgment in accordance with its prior Memorandum Opinion and Order, and the Court will permanently enjoin Maryland's laws restricting the carrying of firearms in locations selling alcohol for onsite consumption, private buildings without the owner's consent, and within 1,000 feet of a public demonstration. The Court will enter judgment for Plaintiffs as to those claims. Plaintiffs' Motions for Summary Judgment will otherwise be denied, and judgment will be entered for State Defendants.

The parties have filed several Notices of Supplementary Authority since the Court issued its Memorandum Opinion and Order, but none of them change the Court's decision or require the Court to revisit its analysis. For example, Plaintiffs cite <u>Brown v. Bureau of Alcohol, Tobacco, Firearms & Explosives</u>, No. 1:22-CV-80, 2023 WL 8361745, at *10 (N.D.W.Va. Dec. 1, 2023); <u>Springer v. Grisham</u>, No. 1:23-CV-00781 KWR/LF, 2023 WL 8436312, at *7–8 (D.N.M. Dec. 5, 2023) (appeal docketed); and <u>Lara v. Comm'r Pa. State Police</u>, 91 F.4th 122, 133 (3d Cir. 2024) for the proposition that courts must look to only to founding-era laws to determine whether a modern regulation is consistent with the country's history of firearm regulation under <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 597 U.S. 1 (2022). (Novotny Pls.' Dec. 5, 2023 Notice Suppl. Authority at 1–2, ECF No. 41; Novotny Pls.' Dec. 8, 2023 Notice Suppl. Authority at 1–2, ECF No. 44;

Novotny Pls.' Jan. 24, 2024 Notice Suppl. Authority at 1–2, ECF No. 51; Kipke Pls.' Apr. 10, 2024 Notice Suppl. Authority at 1, ECF No. 52). These decisions do not bind this Court, and the Court is unconvinced by their conclusions for the reasons set forth in the Memorandum Opinion. (See Mem. Op. at 14 (citing Bruen, 597 U.S. at 37–38 and explaining that the Supreme Court expressly declined to determine whether courts should "primarily rely" on founding-era laws, or laws around the time of the ratification of the Fourteenth Amendment)).

Plaintiffs also cite Maryland Shall Issue, Inc. v. Moore, 86 F.4th 1038, 1047–49 (4th Cir. 2023), reh'g en banc granted, No. 21-2017 (L), 2024 WL 124290 (4th Cir. Jan. 11, 2024), and United States v. Rahimi, 144 S.Ct. 1889, 1896 (2024). (Novotny Pls.' Nov. 21, 2023 Notice Suppl. Authority at 1, ECF No. 39; Kipke Pls.' Nov. 28, 2023 Notice Suppl. Authority at 1, ECF No. 40; Kipke Pls.' June 24, 2024 Notice Suppl. Authority at 1, ECF No. 53). As to Maryland Shall Issue, it is not a final decision because the Fourth Circuit granted the petition for rehearing en banc. Maryland Shall Issue, Inc. v. Moore, No. 21-2017 (L), 2024 WL 124290, at *1 (4th Cir. Jan. 11, 2024). Further, Maryland Shall Issue did not address the issue of whether the Courts may look beyond the founding era for historical evidence, and therefore that case is unhelpful to Plaintiffs.

Plaintiffs' arguments fare no better with Rahimi, which is inapposite to the instant case. In Rahimi, the Supreme Court upheld the constitutionality of 18 U.S.C. § 922(g)(8), which prohibits individuals subject to a domestic violence restraining order from possessing a firearm. 144 S.Ct. at 1896–97. The Supreme Court held that such an individual may be temporarily disarmed consistent with the Second Amendment because historic

surety and going-armed laws traditionally limited the right to bear arms for individuals that pose a clear threat of physical violence to others. Id. at 1901 (citing Bruen, 597 U.S. at 30). Plaintiffs argue that Rahimi supports their claim because the Supreme Court stated that "[u]nlike the regulation struck down in Bruen, [which required carry permit applicants to demonstrate proper cause and a special need for self-protection,] Section 922(g)(8) does not broadly restrict arms use by the public generally." Id. Plaintiffs, therefore, appear to contend that the regulations at issue here are similar to the impermissibly broad regulatory scheme in Bruen, and thus that that these regulations must be enjoined. (See Kipke Pls.' June 24, 2024 Notice Suppl. Authority at 1). The Court finds that the instant case is factually distinct from both Rahimi and Bruen because the challenged laws here relate to carrying in specific locations, not to permitting and who may carry a firearm. Further, many of the regulations at issue here may be upheld under Bruen either as analogous sensitive places or because they are consistent with historical regulations, as set forth in the Memorandum Opinion. (See Mem. Op. at 16–39).

Accordingly, the Court will grant Plaintiffs' Motions for Summary Judgment in part as to (1) locations selling alcohol for onsite consumption, CR § 4-111(a)(2)(8)(i); (2) private property without the owner's consent, id. § 6-411(d); and (3) within 1,000 feet of a public demonstration, id. § 4-208. These laws will be permanently enjoined. Because the Court will permanently enjoin the private building consent rule on Second Amendment Grounds, it need not determine whether that law also violates the First Amendment, as Kipke Plaintiffs claim in Count II of their Complaint. Plaintiffs' Motions for Summary Judgment will otherwise be denied.

12

**2.      Fourteenth Amendment Claims**

In Counts III and IV of the <u>Kipke</u> Complaint, Kipke Plaintiffs allege a Second and Fourteenth Amendment Due Process Clause violation due to Maryland's permit process and an applicant's need to satisfy "subjective criteria," and a Fourteenth Amendment Equal Protection Clause violation for the State's alleged discriminatory treatment of Kipke Plaintiffs in comparison to retired law enforcement officers. (Compl. ¶¶ 57–68). In State Defendants' Cross Motion for Summary Judgment, they argue that the Court should grant judgment in their favor on those claims. (Defs.' Consolidated Cross Mot. at 94–105). In their Opposition to Defendants' Motion, Kipke Plaintiffs did not address Counts III or IV, nor did they respond in any way to State Defendants' arguments. (<u>See generally</u> Opp'n Cross Mot. Summ. J., ECF No. 29). Consequently, Kipke Plaintiffs have abandoned their Fourteenth Amendment claims, and because the Court finds State Defendants' arguments to be meritorious, summary judgment will be entered for State Defendants on Counts III and IV of the <u>Kipke</u> Complaint. <u>See</u> <u>Ferdinand-Davenport v. Children's Guild</u>, 742 F.Supp.2d 772, 777 (D.Md. 2010) (plaintiff abandoned her claim when she failed to respond to the defendant's argument in dispositive motion).

### III.      CONCLUSION

For the foregoing reasons, the Court will grant the Motions for Summary Judgment in part and deny them in part. (ECF Nos. 13, 18, 21, 23). Plaintiffs' Motions, (ECF Nos. 13, 18), will be granted as to the claims regarding the private building consent rule and carrying near public demonstrations or in locations selling alcohol for onsite-consumption, and the Motions will be denied in all other respects. State Defendants' Cross Motions for

Summary Judgment, (ECF Nos. 21, 23), will be granted as to the Kipke Plaintiffs'
Fourteenth Amendment claims (Counts III and IV of the <u>Kipke</u> Complaint), as well as the
claims regarding: State Parks; mass transit facilities; schools and school grounds;
museums; stadiums; healthcare facilities; government buildings; amusement parks;
racetracks; and casinos. The Cross Motions for Summary Judgment will otherwise be
denied. A separate Order follows.

Entered this 2nd day of August, 2024.

_____/s/_____
George L. Russell, III
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SUSANNAH WARNER KIPKE, et al.,       *

     Plaintiffs,       *

v.       *       Civil Action No. GLR-23-1293
                 Member Case: GLR-23-1295

WES MOORE, et al.,       *

     Defendants.       *

***

## ORDER

    For the reasons stated in the foregoing Memorandum Opinion, it is this 2nd day of

August, 2024 by the United States District Court for the District of Maryland, hereby:

    ORDERED that Plaintiffs' Motions for Summary Judgment (ECF Nos. 13, 18) are

GRANTED IN PART and DENIED IN PART;

    IT IS FURTHER ORDERED that Plaintiffs' Motions for Summary Judgment are

GRANTED as to the claims regarding Maryland's laws restricting the carrying of firearms

in: (1) locations selling alcohol for onsite-consumption, Md. Code Ann., (2023), Crim.

Law § 4-111(a)(2)(8)(i); (2) private buildings or property without the owner's consent,

Crim. Law § 6-411(d); and (3) within 1,000 feet of a public demonstration, Md. Code Ann.,

(2016), Crim. Law § 4-208;

    IT IS FURTHER ORDERED that the Court DECLARES that these three provisions

violate the Second Amendment;

    IT IS FURTHER ORDERED that State Defendants are ENJOINED from enforcing

these laws, and any regulations, policies, and practices implementing the enjoined

provisions, as to persons who have a valid wear-and-carry permit issued by the Maryland State Police;

IT IS FURTHER ORDERED that judgment is ENTERED in favor of Plaintiffs on these three claims;

IT IS FURTHER ORDERED that Plaintiffs' Motions for Summary Judgment are DENIED in all other respects;

IT IS FURTHER ORDERED that State Defendants' Cross Motions for Summary Judgment (ECF Nos. 21, 23) are GRANTED IN PART and DENIED IN PART;

IT IS FURTHER ORDERED that State Defendants' Motions for Summary Judgment are GRANTED as to the claims regarding firearm carry restrictions in: (1) museums; (2) healthcare facilities; (3) State parks, State forests, and Chesapeake Forest Lands; (4) mass transit facilities; (5) schools and school grounds; (6) government buildings; and (7) stadiums, racetracks, amusement parks, and casinos. State Defendants' Motions for Summary Judgment are also GRANTED as to the Fourteenth Amendment Due Process and Equal Protection Claims (Counts III and IV of the Kipke Complaint);

IT IS FURTHER ORDERED that judgment is ENTERED in favor of State Defendants on those claims;

IT IS FURTHER ORDERED that State Defendants' Motions for Summary Judgment are otherwise DENIED;

IT IS FURTHER ORDERED that the Clerk shall CLOSE these consolidated cases.


_____/s/_____
George L. Russell, III
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| SUSANNAH WARNER KIPKE, *et al.*, | * |
| *Plaintiffs*, | * |
| v. | * |
| | *   No. 1:23-cv-01293-GLR |
| WES MOORE, *et al.*, | * |
| *Defendants*. | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**ORDER**

UPON CONSIDERATION of the Defendants' Consent Motion for Relief from Order (the "Motion"), any response thereto, any argument thereon, and all matters of record, it is this 8th day of August, 2024, by the United States District Court for the District of Maryland hereby

ORDERED that the Motion is GRANTED, and it is further

ORDERED that the orders entered in the *Kipke* Lawsuit (ECF 58) and the *Novotny* Lawsuit (ECF 45) shall be modified to state, in relevant part: "IT IS FURTHER ORDERED that Plaintiffs' Motions for Summary are GRANTED as to the claims reagrding Maryland's laws restricting the carrying of firearms in: (1) locations selling alcohol for on-site consumption, Md. Code Ann., (2023), Crim. Law § 4-111(a)(8)(i); . . . ."

_____
/s
George L. Russell, III
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SUSANNAH WARNER KIPKE, et al. | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-01293-GLR |
| | ) | |
| WES MOORE, in his official capacity | ) | |
| as Governor of Maryland, et al. | ) | |
| | ) | |
| *Defendants.* | ) | |

**NOTICE OF APPEAL**

Notice is given that Plaintiffs Susannah Warner Kipke and Maryland State Rifle and Pistol Association, Inc. appeal to the United States Court of Appeals for the Fourth Circuit from the District Court's Aug. 2, 2024 Order granting in part and denying in part Plaintiffs' motion for summary judgment, granting in part and denying in part Defendants' cross-motion for summary judgment, entering judgment for Plaintiffs in part, and entering judgment for Defendants in part; and the Court's Aug. 8, 2024 Order granting Defendants' Motion for Relief from Order.

Dated: August 15, 2024

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney (Bar No. 08761)
James W. Porter, III (Bar No. 19416)
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-347-1684
jsweeney@bradley.com

Counsel for Plaintiffs

1

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 15th day of August, 2024, the foregoing was served, via electronic delivery to Defendants' counsel via CM/ECF system which will forward copies to Counsel of Record.

Respectfully submitted,

/s/ *John Parker Sweeney*
John Parker Sweeney (Bar No. 08761)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| KATHERINE NOVOTNY, et al., | |
| *Plaintiffs,* | |
| v. | Case No. 1:23-cv-01295-GLR |
| WES MOORE, in his official capacity as Governor of Maryland, et al., | |
| *Defendants.* | |

### NOTICE OF APPEAL

Notice is given that Plaintiffs Katherine Novotny, Sue Burke, Esther Rossberg, Maryland Shall Issue, Inc., Second Amendment Foundation, and Firearms Policy Coalition appeal to the United States Court of Appeals for the Fourth Circuit from the District Court's August 2, 2024 Order (Doc. 45) granting in part and denying in part Plaintiffs' motion for summary judgment, granting in part and denying in part Defendants' cross-motion for summary judgment, entering judgment for Plaintiffs in part, and entering judgment for Defendants in part; and the Court's August 8, 2024 Order (Doc. 47) granting Defendants' Motion for Relief from Order.

1

Dated: August 23, 2024

/s/ Mark W. Pennak
Mark W. Pennak (Bar ID# 21033)
LAW OFFICES OF MARK W. PENNAK
7416 Ridgewood Ave.
Chevy Chase, MD 20815
Tel: (301) 873-3671
Fax: (301) 718-9315
mpennak@marylandshallissue.org

*Attorney for Plaintiffs Katherine Novotny, Sue Burke, Esther Rossberg, Maryland Shall Issue, Inc., Second Amendment Foundation, and Firearms Policy Coalition*

Matthew Larosiere*
THE LAW OFFICE OF MATTHEW LAROSIERE
6964 Houlton Circle
Lake Worth, FL 33467
Tel: (561) 452-7575
larosieremm@gmail.com
*Admitted *pro hac vice*

*Attorney for Plaintiff Maryland Shall Issue, Inc.*

Respectfully submitted,

/s/ David H. Thompson
David H. Thompson*
Peter A. Patterson*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
*Admitted *pro hac vice*

*Attorneys for Plaintiffs Katherine Novotny, Sue Burke, Esther Rossberg, Maryland Shall Issue, Inc., Second Amendment Foundation, and Firearms Policy Coalition*

2

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 23rd day of August, 2024, the foregoing was served, via electronic delivery to Defendants' counsel via CM/ECF system which will forward copies to Counsel of Record.

/s/ David H. Thompson
David H. Thompson
*Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

SUSANNAH WARNER KIPKE, *et al.*,      *

               *Plaintiffs*,      *

                              No. 1:23-cv-01293-GLR

             v.      *

WES MOORE, *et al.*,      *

               *Defendants*.      *

   *     *     *     *     *     *     *     *     *     *     *     *

## NOTICE OF APPEAL

Defendants, through their undersigned counsel, hereby appeal to the United States Court of Appeals for the Fourth Circuit from this Court's August 2, 2024 order in *Kipke v. Moore*, Civil Action No. GLR-23-1293 (ECF 58 (later modified as ECF 60)) granting plaintiffs' motion for summary judgment as to the claims regarding Maryland's laws restricting the carrying of firearms in: (1) locations selling alcohol for onsite-consumption, Md. Code Ann., (2023), Crim. Law § 4-111(a)(8)(i); (2) private buildings or property without the owner's consent, Crim. Law § 6-411(d); and (3) within 1,000 feet of a public demonstration, Md. Code Ann., (2016), Crim. Law § 4-208.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland


/s/ Ryan R. Dietrich
_____
ROBERT A. SCOTT
Federal Bar No. 24613
RYAN R. DIETRICH
Federal Bar No. 27945
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rdietrich@oag.state.md.us
(410) 576-7648
(410) 576-6955 (facsimile)

August 29, 2024                    Attorneys for Defendants


## CERTIFICATE OF SERVICE

    I certify that, on this 29th day of August, 2024 the foregoing was served by CM/ECF

on all registered CM/ECF users.


/s/ Ryan R. Dietrich
_____
Ryan R. Dietrich

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KATHERINE NOVOTNY, *et al.*,　　　*

　　　　　　　　*Plaintiffs*,　　　*

　　　　　　　　　　　　　　　　　　No. 1:23-cv-01295-GLR

　　　　v.　　　　　　　　*

WESLEY MOORE, *et al.*,　　　*

　　　　　　　　*Defendants*.　　　*

　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*

## NOTICE OF APPEAL

Defendants, through their undersigned counsel, hereby appeal to the United States Court of Appeals for the Fourth Circuit from this Court's August 2, 2024 order in *Novotny v. Moore*, Civil Action No. GLR-23-1295 (ECF 45 (later modified as ECF 47)) granting plaintiffs' motions for summary judgment as to the claims regarding Maryland's laws restricting the carrying of firearms in: (1) locations selling alcohol for onsite-consumption, Md. Code Ann., (2023), Crim. Law § 4-111(a)(8)(i); (2) private buildings or property without the owner's consent, Crim. Law § 6-411(d); and (3) within 1,000 feet of a public demonstration, Md. Code Ann., (2016), Crim. Law § 4-208.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland


/s/ Ryan R. Dietrich

_____

ROBERT A. SCOTT
Federal Bar No. 24613
RYAN R. DIETRICH
Federal Bar No. 27945
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rdietrich@oag.state.md.us
(410) 576-7648
(410) 576-6955 (facsimile)

August 29, 2024                    Attorneys for Defendants


## CERTIFICATE OF SERVICE

I certify that, on this 29th day of August, 2024 the foregoing was served by CM/ECF

on all registered CM/ECF users.


/s/ Ryan R. Dietrich

_____

Ryan R. Dietrich