Nos. 24-1799(L), 24-1827, 24-1834, 24-1836
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**
_____

**SUSANNAH WARNER KIPKE, et al.,**

*Plaintiffs-Appellants/Cross-Appellees*,

**v.**

**WES MOORE, et al.,**

*Defendants-Appellees/Cross-Appellants.*
_____

**KATHERINE NOVOTNY, et al.,**

*Plaintiffs-Appellants/Cross-Appellees*,

**v.**

**WES MOORE, et al.,**

*Defendants-Appellees/Cross-Appellants.*
_____

On Appeal from the United States District Court for the District of Maryland
(George L. Russell, III, District Judge)
_____

**BRIEF OF APPELLEES/CROSS-APPELLANTS**
_____

[Counsel listed on following page.]

ANTHONY G. BROWN
Attorney General of Maryland

RYAN R. DIETRICH
JESSICA M. FINBERG
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rdietrich@oag.state.md.us
(410) 576-7648
(410) 576-6955 (facsimile)

December 23, 2024

Attorneys for Appellees/Cross-Appellants

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 24-1799       Caption: Kipke v. Moore

Pursuant to FRAP 26.1 and Local Rule 26.1,

Ivan Bates
(name of party/amicus)


who is    Appellee/Cross-Appellant   , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:


5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:


6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.


7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.


Signature: /s/Ryan R. Dietrich                          Date:        9/4/2024

Counsel for: Appellees/Cross-Appellants

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1799__     Caption: __Kipke v. Moore__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Roland Butler__
(name of party/amicus)

_____

who is __Appellee/Cross-Appellant__, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.     Does party/amicus have any parent corporations?    ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:


5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:


6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.


7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.


Signature: /s/Ryan R. Dietrich                          Date:        9/4/2024

Counsel for: Appellees/Cross-Appellants

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _24-1799_    Caption: _Kipke v. Moore_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Alison Healey_
(name of party/amicus)

_____

who is ___Appellee/Cross-Appellant___, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/Ryan R. Dietrich _____    Date: _____9/4/2024_____

Counsel for: Appellees/Cross-Appellants _____

- 2 -

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 24-1799     Caption: Kipke v. Moore

Pursuant to FRAP 26.1 and Local Rule 26.1,

Joshua Kurtz
(name of party/amicus)

_____

who is ___Appellee/Cross-Appellant___, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐ YES ☑ NO


2.     Does party/amicus have any parent corporations?     ☐ YES ☑ NO
       If yes, identify all parent corporations, including all generations of parent corporations:


3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐ YES ☑ NO
       If yes, identify all such owners:


12/01/2019 SCC

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/Ryan R. Dietrich _____      Date: _____9/4/2024_____

Counsel for: Appellees/Cross-Appellants _____

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __24-1799__      Caption: __Kipke v. Moore__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Wes Moore__
(name of party/amicus)

_____

 who is __Appellee/Cross-Appellant__, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      ☐YES ☑NO


2.      Does party/amicus have any parent corporations?      ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:


3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?      ☐YES ☑NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/Ryan R. Dietrich _____    Date: _____9/4/2024_____

Counsel for: Appellees/Cross-Appellants _____

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>24-1799</u>      Caption: <u>Kipke v. Moore</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Scott Shellenberger</u>
(name of party/amicus)

_____

 who is <u>Appellee/Cross-Appellant</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐ YES ☑ NO

2.     Does party/amicus have any parent corporations?     ☐ YES ☑ NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐ YES ☑ NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?          ☐YES ☑NO
If yes, identify entity and nature of interest:


5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:


6.    Does this case arise out of a bankruptcy proceeding?          ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.


7.    Is this a criminal case in which there was an organizational victim?          ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.


Signature: /s/Ryan R. Dietrich                          Date:          9/4/2024

Counsel for: Appellees/Cross-Appellants

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1799__    Caption: __Kipke v. Moore__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Paul Weidefeld__
(name of party/amicus)

_____

 who is ___Appellee/Cross-Appellant___, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/Ryan R. Dietrich                    Date: _____9/4/2024_____

Counsel for: Appellees/Cross-Appellants

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

ISSUES PRESENTED ..........................................................................................2

JURISDICTIONAL STATEMENT ......................................................................3

STATEMENT OF THE CASE ..............................................................................3

    Statutory Background ......................................................................................3

        Maryland's Longstanding Restrictions on Public Carry......................3

        The Supreme Court's Decision in Bruen .............................................4

        The General Assembly Enacts New Firearms Legislation ..................5

            Restrictions on Statutorily-Defined Locations ...........................5

            The Private Building Consent Rule .............................................7

    Procedural Background ....................................................................................8

SUMMARY OF ARGUMENT..............................................................................9

ARGUMENT .......................................................................................................11

I.     THE STANDARD OF REVIEW IS DE NOVO.......................................................11

II.    THERE IS A ROBUST HISTORICAL TRADITION OF PROHIBITING FIREARMS IN SENSITIVE LOCATIONS BASED ON THOSE LOCATIONS' CHARACTERISTICS. ........................................................................................11

     A.    Bruen Permits Significant Flexibility in Determining That a Particular Location is a "Sensitive Place."........................................13

     B.    Limiting Firearms in Certain Locations Has a Rich American Tradition That Derived from Its English Forebears............................17

C.    The History and Tradition of Restricting Firearms at Sensitive Places Encompass Multiple Principles That Apply to Modern Firearms Regulation. ...................................................22

III.    WHEN MARYLAND ACTS WITHIN ITS PROPRIETARY CAPACITY OR AS A MARKET PARTICIPANT, RESTRICTIONS ON CARRYING FIREARMS ON GOVERNMENT-OWNED PROPERTY DO NOT IMPLICATE THE SECOND AMENDMENT. ...................................................27

IV.    THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S DECISION UPHOLDING MARYLAND'S LAWS PROHIBITING FIREARM CARRIAGE IN VARIOUS SENSITIVE LOCATIONS. ...................................................31

A.    Health Care Facilities ...........................................................31

B.    Museums ...............................................................................33

C.    Stadiums, Amusement Parks, Racetracks, and Casinos.....................33

D.    Any Transit Vehicle or Transit Facility Owned or Controlled by the Maryland Transit Administration..............................34

E.    State Parks and Forests.........................................................37

F.    Government Buildings and Property Under the Jurisdiction of the Department of General Services ...................................40

G.    School Grounds .....................................................................44

V.    THIS COURT SHOULD REVERSE THE DISTRICT COURT'S DECISIONS INVALIDATING RESTRICTIONS ON CARRYING FIREARMS NEAR PUBLIC DEMONSTRATIONS AND AT PLACES SELLING ALCOHOL FOR ON-SITE CONSUMPTION. ...................................................45

A.    Public Demonstrations .........................................................45

B.    Locations Selling Alcohol for On-Site Consumption .........................48

VI.    THIS COURT SHOULD REVERSE THE DISTRICT COURT'S DECISION INVALIDATING MARYLAND'S PRIVATE PROPERTY CONSENT RULE................50

A.    Plaintiffs Lack Standing Because They Have Not Sustained an Injury That is Traceable to State Action. ..............................50

B.      The Text of the Second Amendment Does Not Encompass a Right to Carry Arms into Another's Building Absent Consent. .........52

C.      The Private Building Consent Rule is Consistent with the Nation's History and Tradition of Firearm Regulations. ....................55

CONCLUSION ........................................................................................59

REQUEST FOR ORAL ARGUMENT ....................................................60

CERTIFICATE OF COMPLIANCE ........................................................60

## TABLE OF AUTHORITIES

Page

### Cases

*Adderley v. Florida*, 385 U.S. 39 (1966) ...................................................28

*Andrews v. State*, 50 Tenn. 165 (1871) ....................................................21

*Antonyuk v. James*, 120 F.4th 941
 (2d Cir. 2024)............................................. 14, 15, 16, 22, 24, 32, 34, 40, 48, 49

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979) .....................46

*Bellon v. PPG Emp. Life & Other Benefits Plan*, 41 F.4th 244
 (4th Cir. 2022)............................................................................11

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) ...................................... 15, 37, 41

*Bonidy v. United States Postal Serv.*, 790 F.3d 1121
 (10th Cir. 2015)........................................................................ 28, 30

*Building & Const. Trades Council v. Associated Builders & Contractors*,
 507 U.S. 218 (1993).....................................................................29

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ....................................45

*Clapper v. Amnesty Int'l*, 568 U.S. 398 (2013) .......................................46

*DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365
 (Va. 2011) ........................................................................... 22, 45

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................... 13, 23, 31, 41, 52

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...........................15

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167
 (2000)...............................................................................51

*GeorgiaCarry.Org v. U.S. Army Corps of Eng'rs*, 212 F. Supp. 3d 1348
 (N.D. Ga. 2016) .....................................................................38

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244
(11th Cir. 2012) ........................................................................ 28, 52

*Goldstein v. Hochul*, 680 F. Supp. 3d 370 (S.D.N.Y. 2023) ................................. 25

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) ..................................... 15

*Greer v. Spock*, 424 U.S. 828 (1976) ..................................... 28

*Hall v. Garcia*, No. C 10-03799 RS, 2011 WL 995933
(N.D. Cal. Mar. 17, 2011) ..................................... 44

*Hill v. State*, 53 Ga. 472 (1874) ..................................... 21

*In re Rounds*, 255 Md. App. 205 (2022) ..................................... 5

*Kovacic v. Cuyahoga Cnty. Dep't of Children and Family Servs.*,
724 F.3d 687 (6th Cir. 2013) ..................................... 23

*LaFave v. County of Fairfax*, No. 1:23-cv-1605 (WBP), 2024 WL 3928883
(E.D. Va. Aug. 23, 2024) ..................................... 39, 48

*Lara v. Commissioner Pa. State Police*, 91 F.4th 122 (3d Cir. 2024) ..................................... 16

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..................................... 50, 51

*Marsh v. Alabama*, 326 U.S. 501 (1946) ..................................... 28

*Maryland Shall Issue v. Montgomery County*, 680 F. Supp. 3d 567
(D. Md. 2023) ..................................... 25, 31, 32, 34, 39

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..................................... 1, 57

*Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018) ..................................... 28

*Mintz v. Chiumento*, 724 F. Supp. 3d 40 (N.D.N.Y. 2024) ..................................... 14, 18

*National Rifle Ass'n v. Bondi*, 61 F.4th 1317 (11th Cir. 2023) ..................................... 15

*Owens v. State*, 3 Tex. App. 404 (1878) ..................................... 21

*Reeves, Inc. v. Stake*, 447 U.S. 429 (1980) ..................................... 29, 30

*Schoenthal v. Raoul*, No. 3:22-cv-50326, 2024 WL 4007792
(N.D. Ill. Aug. 30, 2024) ..................................... 26

v

*Silbert v. Ramsey*, 301 Md. 96 (1984) ....................................................28

*Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) ...........................51

*State v. Shelby*, 90 Mo. 302 (1886) .........................................................21

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ...............................................50

*Sveen v. Melin*, 584 U.S. 811 (2018) ........................................................54

*Tinker v. Des Moines Independent Cmty Sch. Dist.*, 393 U.S. 503 (1969) ............23

*Turaani v. Wray*, 988 F.3d 313 (6th Cir. 2021) .............................................51

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330 (2007),................................................................30

*United States v. Allam*, 677 F. Supp. 3d 545 (E.D. Tex. 2023) ....................... 25, 45

*United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019)......................... 22, 26, 29, 43

*United States v. Dorosan*, 350 Fed. App'x 874 (5th Cir. 2009) ...................... 30, 43

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) .........................................15

*United States v. Power*, No. 20-po-33-GLS, 2023 WL 131050 (D. Md. Jan. 9. 2023) ...................................................... 32, 42, 45

*United States v. Rahimi*, 602 U.S. 680 (2024)..................................... 13, 14, 16, 56

*United States v. Walter*, No. 3:20-CR-0039, 2023 WL 3020321 (D.V.I. Apr. 20, 2023 .................................................................45

*Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024)........................................ 14, 15, 25, 26, 29, 34, 40, 48, 49, 56, 57

*Zaitzeff v. City of Seattle*, 484 P.3d 470 (Wash. App. 2021)...................................22

**Constitutional Provisions**

U.S. Const. amend II.... 1, 8, 9, 10, 11, 12, 13, 15, 21, 22, 24, 25, 26, 27, 29, 31, 34, 35, 38, 50, 52, 53, 55, 56

U.S. Const. amend XIV .......................................................................... 14, 15, 38

## Statutes

1853 N.M. Laws 67-69 ...............................................................49

1889 Ariz. Sess. Laws 17 .........................................................49

2023 Md. Laws ch. 651 ..............................................................5

28 U.S.C. § 1291 .........................................................................3

28 U.S.C. § 1331 .........................................................................3

Md. Code Ann, Crim. Law § 4-102 (LexisNexis 2021) ........................3, 6

Md. Code Ann., Crim. Law § 4-111(a)(2) (LexisNexis Supp. 2023) .....................6

Md. Code Ann., Crim. Law § 4-111(a)(4) (LexisNexis Supp. 2023) .....................6

Md. Code Ann., Crim. Law § 4-111(a)(8) (LexisNexis Supp. 2023) .....................6

Md. Code Ann., Crim. Law § 4-111(a)(9) (LexisNexis Supp. 2023) .....................7

Md. Code Ann., Crim. Law § 4-111(b) (LexisNexis Supp. 2023) .....................6

Md. Code Ann., Crim. Law § 4-111(b)(11) (LexisNexis Supp. 2023) .....................7

Md. Code Ann., Crim. Law § 4-111(d)(2) (LexisNexis Supp. 2023) .....................6

Md. Code Ann., Crim. Law § 4-208 (LexisNexis 2021) ...............................................3

Md. Code Ann., Crim. Law § 4-208(b)(2) (LexisNexis 2021)........................ 45, 46

Md. Code Ann., Crim. Law § 6-411(a)(6) (LexisNexis Supp. 2023) ................7, 58

Md. Code Ann., Crim. Law § 6-411(b)(5) (LexisNexis Supp. 2023) ....................58

Md. Code Ann., Crim. Law § 6-411(c) (LexisNexis Supp. 2023) ...........................7

Md. Code Ann., Crim. Law § 6-411(d) (LexisNexis Supp. 2023) ...........................7

Md. Code Ann., Est. & Trusts § 3-101 (LexisNexis 2022) ....................................54

Md. Code Ann., Pub. Safety § 5-306 (LexisNexis Supp. 2023) ...........................5

Md. Code Ann., Pub. Safety § 5-307(c) (LexisNexis Supp. 2023) ...........................5

vii

Md. Code Ann., Transp. § 7-705(b)(6) (LexisNexis 2020)......................................3

Md. Code Ann., Transp. § 7-711(a) (LexisNexis 2020).........................................35

**Regulations**

COMAR 04.05.01.01 ............................................................................4

COMAR 04.05.01.03 ............................................................................4

COMAR 08.01.07.14 ............................................................................4

COMAR 08.07.01.04 ............................................................................4

COMAR 08.07.06.04 ............................................................................4

COMAR 09.10.03.03A(10) ......................................................................4

COMAR 14.25.01.01 ............................................................................4

COMAR 14.25.02.06 ............................................................................4

COMAR 34.04.08.02 ............................................................................4

COMAR 34.04.08.04 ............................................................................4

COMAR 36.03.01.02B(6).........................................................................4

COMAR 36.03.10.48 ............................................................................4

**Miscellaneous**

1 Documentary History of Reconstruction 280 (W. Fleming ed.1950) .................57

1 William Blackstone, *Commentaries* *120 ...........................................53

Joshua Hochman, Note, *The Second Amendment on Board: Pub. and Priv. Hist. Traditions of Firearm Regul.*, 133 Yale L. J. 1676 (2024).......................35

Darrell Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 466 (2019) .....................................................24

Erin Cox, *Md. Tightened Gun Laws After Watershed High-Court Ruling. The NRA Sued.*, Wash. Post, May 16, 2023.......................................54

Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J. L., Med. & Ethics 183, 189-90 tbl. A4 (2020) ..................................................................................53

## INTRODUCTION

In 2010, the Supreme Court assured the States that "reasonable firearms regulations" consistent with historical tradition, including "solutions to social problems that suit local needs and values," could "continue under the Second Amendment" *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010).  Through restricting where individuals may carry firearms publicly, Maryland has done just what the Court envisioned.  Not only are the prohibitions challenged here reasonable restrictions that apply at only a limited set of locations, but they are all supported by a historical tradition that stretches from the Founding through Reconstruction and beyond.  Because the people of Maryland have the authority to enact the laws that they believe best protect the public, plaintiffs' counter-historical assault on these laws should be rejected.

The district court was correct to uphold most of Maryland's location-based restrictions, including those prohibiting the carrying of firearms at health care facilities, museums, stadiums, and amusement parks; in government buildings; on school grounds; and on public transit.  But the district court nonetheless erred in concluding that Maryland's public-carry restrictions at locations that sell alcohol for on-site consumption and within 1,000 feet of a public demonstration were not supported by the historical record and were thus unconstitutional.  Similarly, the district court was wrong to conclude that Maryland's prohibition on carrying

firearms on private property without the property owner's permission is unconstitutional. This Court should instead conclude that all of Maryland's locational restrictions are constitutional.

## ISSUES PRESENTED

1.     Did the district court properly uphold Maryland's firearm restrictions applicable to (1) health care facilities; (2) museums, stadiums, amusement parks, and racetracks; (3) state-owned mass transportation vehicles and facilities; (4) state parks; (5) government buildings and grounds; and (6) school grounds, where those restrictions are consistent with historical tradition and with the Supreme Court's "sensitive places" pronouncements?

2.     Did the district court err in striking down as unconstitutional Maryland's laws restricting firearm carriage (1) within 1,000 feet of a public demonstration; and (2) at places that sell alcohol for on-site consumption, where both laws are consistent with historical tradition?

3.     Did the district court err in striking down as unconstitutional Maryland's prohibition on firearm carriage on private property without permission, where that default rule is consistent with a property owner's right to exclude?

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 to hear plaintiffs' claims, except as to those claims for which no plaintiff had standing.[1] The State adopts plaintiffs' jurisdictional statement with respect to appellate jurisdiction.

## STATEMENT OF THE CASE

**Statutory Background**

**Maryland's Longstanding Restrictions on Public Carry**

In this appeal, plaintiffs collectively challenge nearly all of Maryland's restrictions on where firearms may be carried. Some of these restrictions are longstanding, including the following restrictions set forth in the Maryland Code:

- Public school property. Md. Code Ann, Crim. Law § 4-102 (LexisNexis 2021).

- Public demonstration: An individual may not possess a firearm at a demonstration in a public place or have a firearm in their vehicle within 1,000 feet of the demonstration. This provision, however, applies only after (1) the individual has been advised by a law enforcement officer that a demonstration is occurring; and (2) the individual has been ordered by the law enforcement officer to leave the area until the individual disposes of the firearm. Crim. Law § 4-208.

- Public transit: An individual may not possess a "concealed weapon[]" in any transit vehicle or transit facility owned or controlled by the Maryland Transit Administration ("MTA"). Md. Code Ann., Transp. § 7-705(b)(6) (LexisNexis 2020). The MTA "operates public mass

---

[1] As discussed below, no plaintiff had standing to challenge (1) the restriction on carrying a firearm within 1,000 feet of a public demonstration, and (2) the private building consent rule.

3

transit systems through[out] the State of Maryland, including buses, a subway, light rail system and commuter trains."  (JA371.)

Other longstanding restrictions are set forth in the Code of Maryland Regulations (COMAR):

- Certain state buildings and grounds.  An individual may not carry firearms on "state public buildings, improvements, grounds, and multiservice centers under the jurisdiction of the Department of General Services."  COMAR 04.05.01.01, 04.05.01.03.

- State parks, state forests, and Chesapeake Forest Lands.  COMAR 08.01.07.14, 08.07.01.04, 08.07.06.04.

- A horse-racing facility.  COMAR 09.10.03.03A(10).

- The Camden Yards Sports Complex (which includes Oriole Park at Camden Yards, M&T Bank Stadium, and the various surrounding buildings).  COMAR 14.25.01.01, 14.25.02.06.

- A "State museum," which is defined to include "any property operated as a museum by the Department [of Planning] or a unit within the Department."  COMAR 34.04.08.02, 34.04.08.04.

- Casinos.  COMAR 36.03.01.02B(6), 36.03.10.48.

### The Supreme Court's Decision in *Bruen*

As discussed more fully below, in June 2022 the Supreme Court decided *New York State Rifle and Pistol Association v. Bruen*, 597 U.S. 1 (2022).  In *Bruen*, the Court struck down as unconstitutional New York's public-carry permit scheme to the extent that it required an applicant to show "proper cause" for carrying a handgun publicly.  New York's "proper cause" standard was similar to Maryland's "good and

4

substantial reason" standard in that it required an applicant to "demonstrate a special need for self-protection distinguishable from that of the general community." Applying *Bruen*, the Appellate Court of Maryland therefore concluded that Maryland's "good and substantial reason" standard was unconstitutional as well. *In re Rounds*, 255 Md. App. 205, 212 (2022).

## The General Assembly Enacts New Firearms Legislation

In the wake of *Bruen* and *Rounds*, the General Assembly enacted two laws relating to Maryland's public-carry permit scheme. The first law, House Bill 824, changed the permitting process by, among other things, eliminating the "good and substantial reason" standard. 2023 Md. Laws ch. 651 (amending Md. Code Ann., Pub. Safety § 5-306 (LexisNexis Supp. 2023)). The second law, Senate Bill 1, enacted several provisions restricting where individuals may possess firearms, even if they otherwise possess public-carry permits.[2]

## Restrictions on Statutorily-Defined Locations

Senate Bill 1 prohibited individuals from carrying firearms in three categories of locations. The first category, an "area for children and vulnerable individuals," encompasses daycare facilities, private schools, and medical facilities. It is statutorily defined to include (1) "a preschool or prekindergarten facility or the

---

[2] Senate Bill 1 also provided that a person who carries a handgun pursuant to a public-carry permit generally must keep it concealed. Pub. Safety § 5-307(c).

grounds of the facility"; (2) "a private primary or secondary school or the grounds of the school";[3] and (3) "a health care facility," which is defined to include hospitals, ambulatory surgical centers, and facilities that are "organized primarily to help in the rehabilitation of disabled individuals." Crim. Law § 4-111(a)(2).

The second category, a "government or public infrastructure area," covers "building[s] or any part of a building owned or leased by a unit of State or local government," buildings on college and university campuses, polling places, and power plants. *Id*. § 4-111(a)(4). With regard to government buildings, the law requires "a clear and conspicuous sign at the main entrance" stating that carrying firearms is prohibited. *Id*. § 4-111(d)(2).

The third category, a "special purpose area," encompasses certain places where the public gathers for entertainment, educational enrichment, or other collective social pursuits. It is defined as "(i) a location licensed to sell or dispense alcohol or cannabis for on-site consumption; (ii) a stadium; (iii) a museum; (iv) an amusement park; (v) a racetrack; or (vi) a [casino]." *Id*. § 4-111(a)(8).

These prohibitions contain exemptions. One exemption is for active and retired law enforcement personnel. *Id*. § 4-111(b). Moreover, Senate Bill 1 exempts the owner or lessee of a (non-governmental) location and any person expressly

_____

[3] As discussed above, firearms (and other weapons) already were prohibited on *public* school property. Crim. Law § 4-102(b).

authorized to provide security at the location. *Id*. § 4-111(a)(9). Finally, Senate Bill 1 provides an exemption for a firearm carried or transported in a motor vehicle, so long as the firearm either is carried by an individual with a valid public-carry permit or is locked in a container. *Id*. § 4-111(b)(11).

## The Private Building Consent Rule

Senate Bill 1 prohibited individuals (with exceptions for active members of law enforcement and the military) from entering buildings on private property while carrying firearms without first obtaining permission to do so (the "private building consent rule"). These provisions apply only to buildings and expressly exclude "the land adjacent to a building." Crim. Law § 6-411(a)(6).

With regard to all private buildings that are not dwellings,[4] an individual carrying a firearm may not enter or trespass at such a building unless the owner or the owner's agent (1) "has posted a clear and conspicuous sign indicating that it is permissible to" carry a firearm in the building; or (2) "has given the person express permission" to carry a firearm in the building. *Id*. § 6-411(d).

---

[4] Plaintiffs do not challenge a similar provision requiring that individuals have permission before entering another's dwelling while armed. Crim. Law § 6-411(c); Appellants' Br. 12-13.

7

## Procedural Background

On May 16, 2023, the same day that Senate Bill 1 was signed into law, two sets of plaintiffs filed lawsuits challenging the law's constitutionality, primarily on Second Amendment grounds. (JA26-79.) Collectively,[5] they challenged restrictions applying to (1) state parks and forests; (2) mass transit facilities and vehicles; (3) school property (but not the school buildings); (4) health care facilities, (5) property under the jurisdiction of the Department of General Services; (6) entertainment facilities such as stadiums, racetracks, amusement parks, and casinos; (7) property operated as a museum by the Department of Planning; (8) buildings owned or leased by a unit of state or local government (but not legislative assemblies, polling places, or courthouses); (9) locations selling alcohol for on-site consumption; and (10) public demonstrations (and areas within 1,000 feet thereof).[6] (JA44-46, JA71-78.) The plaintiffs also challenged the private building consent rule, but not for dwellings.[7] (JA45, JA56.)

---

[5] One set of plaintiffs, led by Susannah Kipke, challenged all of the locational restrictions set forth above. The other set of plaintiffs, led by Katherine Novotny, challenged only a subset of those restrictions.

[6] Plaintiffs also challenged Maryland's prohibition on the "display or discharge" of a firearm at a highway rest area, COMAR 11.04.07.12, but are no longer pursuing this claim. Appellants' Br. 45 n.10.

[7] The set of plaintiffs led by Mrs. Kipke also challenged Maryland's permitting scheme on due process and equal protection grounds, but they have abandoned these challenges on appeal. (JA47-48); Appellants' Br. 12 n.1.

Both sets of plaintiffs moved for preliminary injunction and for summary judgment. The State also moved for summary judgment as to all claims.

After consolidating the cases, the district court denied injunctive relief as to the bulk of plaintiffs' claims, including with regard to restrictions at museums, health care facilities, mass transit facilities and vehicles, state parks, entertainment facilities, school grounds, and government buildings. (JA978-999.) The district court, however, granted injunctive relief as to the private building consent rule, as well as the restrictions at public demonstrations and locations that sell alcohol for on-site consumption. (JA978-999.)

The court also denied all summary judgment motions without prejudice. (JA1001.) The parties then renewed those motions, which the court granted in part and denied in part in a manner corresponding to its disposition of the preliminary injunction motions. (JA1006-1019.) All parties timely appealed.

## SUMMARY OF ARGUMENT

In *Bruen*, the Supreme Court reaffirmed that the right set forth in the Second Amendment did not extend to the carrying of firearms at "sensitive places." 597 U.S. at 30. Although the Court did not define that phrase, it gave several examples, including "schools" and "government buildings," and made clear that this list was not exhaustive. *Id*. Instead, *Bruen* contemplated that "new and analogous" sensitive

places would be proper sites for firearm regulation based on the historical record. *Id*.

That record reveals an expansive tradition of restricting firearms at crowded locations, at places that serve vulnerable populations, and at places where people assemble to exercise their constitutional right of assembly. This tradition stretches as far back as the English Statute of Northampton and endures through both the Colonial and Reconstruction eras. Applying that tradition, Maryland's locational restrictions—at health care facilities, museums, entertainment facilities, mass transit vehicles and facilities, state parks and forests, government buildings, school property, public demonstrations, and places that sell alcohol for on-site consumption—are constitutional.

Moreover, Maryland's private building consent rule, which requires that individuals have permission to enter the private property of another while armed, is constitutional. To begin, plaintiffs lack standing to challenge this law because the harm they seek to rectify—the ability to enter property armed—is attributable not to any state actor, but to the property owner's exercise of legitimate discretion. Moreover, because unauthorized entry onto another's property while armed is contrary to the property law principles that formed the backdrop against which the Second Amendment was adopted, the law does not even implicate constitutionally protected conduct. Finally, even if the law does implicate such conduct, it is

supported by a tradition that includes substantively identical laws from both the Colonial and Reconstruction eras.

## ARGUMENT

### I.   THE STANDARD OF REVIEW IS DE NOVO.

This Court "review[s] a summary judgment award de novo, 'based on [its] independent review of the entire record.'" *Bellon v. PPG Emp. Life & Other Benefits Plan*, 41 F.4th 244, 251 (4th Cir. 2022) (citations omitted).

### II.   THERE IS A ROBUST HISTORICAL TRADITION OF PROHIBITING FIREARMS IN SENSITIVE LOCATIONS BASED ON THOSE LOCATIONS' CHARACTERISTICS.

In 2022, the Supreme Court in *Bruen* struck down the "proper cause" aspect of New York's public-carry permit scheme.  In doing so, the Court established that if "the Second Amendment's plain text covers an individual's conduct," then the government seeking to regulate that conduct "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  597 U.S. at 17.

Recognizing the need for such regulation, *Bruen* endorsed several types of restrictions.  Addressing the issue central to this litigation, the Court "assume[d] it settled" that certain locations are "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id*. at 30.  The opinion endorsed such "longstanding" bans in schools, legislative assemblies, polling places, and

11

courthouses, while recognizing that this list was non-exhaustive and "that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id*.

*Bruen* acknowledged that applying the restated Second Amendment standard would require further analysis by lower courts. Although *Bruen* instructed that the historical inquiry "will often involve reasoning by analogy," it declined to "provide an exhaustive survey of the features that render regulations relevantly similar," except to identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 29. As the Court recognized, in some cases historical analogies will be "relatively simple to draw," while "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id*. at 27.

*Bruen* also cautioned that its standard was not intended to be a "regulatory straightjacket" and made clear that governments were not required to identify "historical twin[s]" or "dead ringer[s]" to support modern regulations. *Id*. at 30. The Court recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," and further underscored that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id*. at 27-28. Accordingly, when "[p]roperly interpreted, the Second

Amendment allows a 'variety' of gun regulations." *Id*. at 80 (Kavanaugh, J., concurring) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008)).

Earlier this year, the Supreme Court again reaffirmed that "the right secured by the Second Amendment is not unlimited." *United States v. Rahimi*, 602 U.S. 680, 690 (2024). In doing so, the Court expressed concern that lower courts had been applying *Bruen* too strictly. *Id.* at 691. Thus, it clarified that "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id*. at 692 (emphasis added).

That tradition, as shown below, encompasses multiple principles that support the constitutionality of Maryland's locational restrictions.

### A.   *Bruen* Permits Significant Flexibility in Determining That a Particular Location is a "Sensitive Place."

Although *Bruen* identified only a few examples of "sensitive places," that decision, and the emerging jurisprudence applying it, establish several principles that should further guide this Court's analysis here.

First, because the Supreme Court has already determined that the Second Amendment embodies a general tradition of limiting firearms at some places, relatively few analogues are necessary to establish the constitutionality of sensitive-place restrictions. The Court illustrated this principle when it concluded that the constitutionality of firearm bans in schools, government buildings, polling places, courthouses and legislative assemblies was "settled," despite acknowledging that the

13

available historical record contained "relatively few" examples of such restrictions. *Bruen*, 597 U.S. at 30; *see Wolford v. Lopez*, 116 F.4th 959, 980 (9th Cir. 2024) (noting that, because "[o]ur Nation has a clear historical tradition of banning firearms at sensitive places, . . . [w]hen examining whether a particular place falls within that tradition, a small number of laws, even localized laws, can suffice, if those laws were viewed as non-controversial" (citations omitted)); *see also Antonyuk v. James*, 120 F.4th 941, 972 (2d Cir. 2024).

Second, *Bruen* made clear that its list of sensitive places was not comprehensive and that the historical record would reveal "*new* and analogous" sensitive places that are "constitutionally permissible." 597 U.S. at 30 (emphasis in original). This acknowledgment was consistent with the Court's general direction for lower courts to apply a "more nuanced approach" with regard to "new circumstances" or "cases implicating unprecedented societal concerns or dramatic technological changes." *Id*. at 27-28. More particularly, in applying this approach, courts must "tak[e] into account that it is illogical to expect a government to regulate a place before it existed in its modern form." *Wolford*, 116 F.4th at 980; *see also Mintz v. Chiumento*, 724 F. Supp. 3d 40, 63 (N.D.N.Y. 2024) (applying a "flexible" approach to firearm restrictions at summer camps because "[s]uch camps did not exist at the time of the Nation's founding, or even at the time of the ratification of the Fourteenth Amendment"). Instead, as the Court announced in *Rahimi*, the proper

14

focus is on whether a modern law "is consistent with the *principles* that underpin our regulatory tradition." 602 U.S. at 692 (emphasis added).

Third, the relevant historical record includes evidence from both the Founding era and the Reconstruction era. Because the people's adoption of the Fourteenth Amendment was the mechanism through which the Second Amendment became applicable to the States, declining to consider the prevailing attitudes of that era would disregard *Bruen*'s directive to focus on the scope that rights "were understood to have *when the people adopted them*." *Bruen*, 597 U.S. at 34 (citation omitted; emphasis in original). This Court adopted this approach in *Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc), when it surveyed the "arc of weapons regulations" from the Founding through the modern era to conclude that Maryland's prohibition on assault weapons was consistent with the national tradition of firearm regulation. *Id.* at 461-72. It is thus unsurprising that the courts of appeals agree that evidence from the Reconstruction era is critical to understanding the scope of the Second Amendment right. *See, e.g.*, *Antonyuk*, 120 F.4th at 972; *Wolford*, 116 F.4th at 980; *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011).[8] *But see Lara v. Commissioner Pa. State Police*, 91 F.4th 122, 134 (3d

---

[8] *See also National Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023), *vacated pending rehr'g en banc*, 2023 WL 4542153 (11th Cir. July 14, 2023).

Cir. 2024), *cert. granted and judgment vacated in light of Rahimi*, 2024 WL 4486348 (Oct. 15, 2024).

Fourth, *Bruen* teaches that an important factor in whether a historical regulation supports an analogous modern restriction is whether it faced contemporaneous challenges to its constitutionality. 597 U.S. at 36. There, although statutes and case law from the Reconstruction era arguably showed a tradition of limiting public-carry permits to only those individuals who showed a need to carry, the Court discounted this evidence because, in its view, it was inconsistent with an earlier-established historical tradition of public carry. *Id*. at 68. At the same time, *Bruen* noted that restrictions at certain sensitive places were constitutional because the Court was "aware of no disputes regarding the lawfulness of such prohibitions." *Id*. at 30. *Bruen* thus ratifies the principle that, where a historical tradition does not conflict with an earlier-established tradition and stands without contemporaneous challenge, that will be prima facie evidence that a similar modern restriction is constitutional.

Finally, courts have recognized that "the absence of a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much." *Antonyuk*, 120 F.4th at 969. This is because "[l]egislatures past and present have not generally legislated to their constitutional limits," and thus "it is not necessarily the case that [a legislature's failure to enact a particular law] must

be because the legislators then or there deemed such a regulation inconsistent with the right to bear arms." *Id*. Instead, for example, lawmakers may not have been "moved to forbid behavior that is governed by custom, universal practice, or private warning." *Id*. at 970. Accordingly, "novelty does not mean unconstitutionality . . . even if the problems faced by past generations could be described, at a high level of generality, as similar to the problems we face today." *Id*. (citation omitted).

### B. Limiting Firearms in Certain Locations Has a Rich American Tradition That Derived from Its English Forebears.

"For nearly five centuries in England, from the late thirteenth century through the late eighteenth century, what constituted a 'sensitive place' in which arms bearing could be regulated and restricted was rather broad. It encompassed densely populated areas, as well as areas where people regularly congregated for lawful purposes or conducted commerce." (JA203 (declaration of historian Patrick Charles).) Most notably, the 1328 Statute of Northampton prohibited Englishmen from bringing "force in affray of the peace, nor [going] nor rid[ing] armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers." (JA203.) Although these restrictions were "relatively silent" as to specific locations, "[t]his is because English restrictions on going armed in 'sensitive places' were worded quite broadly, and therefore there was no need for the law to carve out individual locations." (JA204.)

17

Historical evidence "unequivocally" demonstrates "that armed carriage restrictions and the English common law against 'going armed' in urban and densely populated locations indeed made their way into the American Colonies and subsequent United States." (JA205-206.)  In fact, around the time of the Founding, two jurisdictions expressly enacted or retained their own versions of the Statute of Northampton: Virginia in 1786 (JA387-388) and North Carolina in 1792 (JA390-391).  *See Bruen*, 597 U.S. at 35 (noting that "[a] long, unbroken line of common-law precedent stretching from Bracton to Blackstone" will demonstrate a relevant historical tradition).

"It was not until the mid-to-late nineteenth century that state and local governments within the United States began enacting express, location specific armed carriage restrictions."  *Mintz*, 724 F. Supp. 3d at 59.  (*See also* JA168 (describing laws from Louisiana (1831) and New Mexico (1852) restricting weapons at "ball rooms").)  These "Reconstruction era laws did not represent a new constitutional principle different than the common law restrictions that existed for centuries, but an application of the same legal principles to new circumstances brought about by changes in firearms technology, consumer behavior, and the demographic changes associated with greater urbanization." (JA169.)  One exemplar is an 1870 law from Texas that prohibited going armed "into any church or religious assembly, any school room or other place where persons are assembled

18

for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election," or into "any other place where people may be assembled to muster or perform any other public duty, or any other public assembly."  (JA402-404.)

Around this same time, several other States enacted specific locational restrictions on firearms:

- Tennessee (1869): "any election in this State, . . . any fair, race course, or other public assembly of the people."  (JA393-395.)

- Georgia (1870): "any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State."  (JA400.)

- Missouri (1874): "any church or place [of worship], any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose [other than militia mustering]."  (JA406-407.)

- Arizona (1889): "any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct . . . , or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly."  (JA409-410.)

- Oklahoma (1890): "any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus,

show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly." (JA412-413.)

- Idaho (1901): "any public assemblage." (JA415-417.)

- Montana (1903): "any church or religious assembly, any school room or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election . . ., or to any other place where people may be assembled to perform any public duty, or at any public assembly." (JA419-421.)

(*See also* JA206-208 (chronicling state laws).)

In addition to these state laws, many local ordinances restricted the carrying of firearms in specific locations. "The reason that so many localities enacted these ordinances was the prevalence of the legal concept of 'firearms localism'—this concept being a preference among state and local lawmakers to regulate firearms and deadly weapons more strictly at the local rather than state level." (JA209-211.) Similar to the state statutes set forth above, these ordinances, such as ones enacted in Columbia, Missouri and Stockton, Kansas, restricted the carrying of firearms in places such as those "where people have assembled for educational, literary or social purposes" and, more generally, at "any other public assemblage of persons met for any lawful purpose." (JA209-213, JA 261, JA423-424.) Moreover, consistent with the concept of firearms localism, many local jurisdictions enacted ordinances that restricted the carrying of firearms in "corporate" or "incorporate" areas.

20

(JA213-214.) These ordinances, which restricted the carrying of firearms in entire municipalities, rendered more specific restrictions unnecessary. (*See* JA213-215 (setting forth ordinances from local jurisdictions in North Carolina (1882), Louisiana (1874), Pennsylvania (1873), Utah (1893), Nebraska (1889), and modern-day South Dakota (1882).)

There is no evidence that any of these sensitive-place restrictions were ever found to be unconstitutional. Indeed, the opposite is true. (*See* JA216 (citing decisions such as *Hill v. State*, 53 Ga. 472 (1874); *State v. Shelby*, 90 Mo. 302 (1886); and *Owens v. State*, 3 Tex. App. 404 (1878)).) Not only do these cases show that these restrictions passed legal muster, but they reveal the prevailing attitudes of the very same people who decided to subordinate their States' police powers to the limitations of the Second Amendment:

> We confess that it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together.

*English v. State*, 35 Tex. 473, 478-79 (1871); *see also Andrews v. State*, 50 Tenn. 165, 182 (1871); *Hill*, 53 Ga. at 476 ("[T]he bearing of arms of any sort [at concerts] is an eye-sore to good citizens, offensive to peaceable people, an indication of a want of a proper respect for the majesty of the laws, and a marked breach of good manners.").

## C.  The History and Tradition of Restricting Firearms at Sensitive Places Encompass Multiple Principles That Apply to Modern Firearms Regulation.

The history detailed above yields a series of principles that support the contemporary regulation of firearms at sensitive places.

First, the sensitive places doctrine furthers the important interest in protecting places where vulnerable or impaired people might ordinarily be present. *See Antonyuk*, 120 F.4th at 1010 (highlighting "this Nation's tradition of firearm regulation in locations where vulnerable populations are present"); *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (noting that some "places are 'sensitive' for purposes of the Second Amendment because of 'the people found there'"); *Bruen*, 597 U.S. at 30 (treating "schools" as an undisputed category).   Recognizing this principle, several courts have concluded that places are sensitive based on the presence of children. *See, e.g., Antonyuk*, 120 F.4th at 1026 ("We rely on *Bruen* for the proposition that the tradition of regulating firearms in spaces frequented by children is also well-established and representative."); *Zaitzeff v. City of Seattle*, 484 P.3d 470, 479 (Wash. App. 2021); *DiGiacinto v. Rector & Visitors of George Mason Univ*., 704 S.E.2d 365, 370 (Va. 2011).  Indeed, groups that have historically been treated as vulnerable—including children, the physically or mentally ill, the elderly, and intoxicated individuals—not only may themselves require additional protection

from firearm use, but also may be limited in their own ability to use a firearm responsibly.

Plaintiffs, however, insist that, despite the express references in *Heller* and *Bruen*, schools are not in fact sensitive places, and courts cannot therefore use them to draw analogies to other places where firearms may be prohibited. Appellants' Br. 2, 28, 33-34. To that end, plaintiffs assert that restrictions at schools relate only to students, and that the authority to impose them derives from the *in loco parentis* doctrine. Appellants' Br. 33-34. But the Court's reference to "schools" was unqualified, even though it could have easily clarified that such a distinct limiting principle applied. And it identified "schools" as "sensitive *places*," highlighting that the permissible restriction encompassed the location itself, not a limited subset of individuals inside. *Bruen*, 537 U.S. at 30. Further, treating the Court's reference to schools as applying only to students would be, at a minimum, in considerable tension with the precept that children do not "shed their constitutional rights . . . at the schoolhouse gate." *Tinker v. Des Moines Independent Cmty Sch. Dist.*, 393 U.S. 503, 506 (1969). In any event, plaintiffs cite no decision adopting their novel reading of *Bruen*. Instead, courts have consistently concluded that firearms restrictions at schools (and not just for students) are constitutional. *See, e.g.*, *Kovacic v. Cuyahoga Cnty. Dep't of Children and Family Servs.*, 724 F.3d 687, 707-08 (6th Cir. 2013)

23

(noting that "[t]he Second Amendment protects a right to carry guns, . . . but not in school zones").

Second, there is a specific tradition of prohibiting firearms in crowded locations. *See Antonyuk*, 120 F.4th at 1019-20 (discussing the "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places"). Whether it is the Statute of Northampton's restrictions at fairs and markets, its Founding-era analogues, or the various States' restrictions at places of "public assembly," *id.*, the rationale for these restrictions does not require much elaboration. With crowds comes an inherent risk of disorder, to which firearms add yet another layer. These restrictions thus reflect the fact that the use (or threatened use) of firearms in such crowded locations, even in legitimate self-defense, not only is impractical, but poses deadly risks to everyone present.[9]

Third, where a particular location is a sensitive place, governments generally may prohibit firearms within a "buffer zone" surrounding that location. This

---

[9] Similarly, the historical tradition embodied in the limitations on firearms at any "public assembly" or "public gathering" demonstrates the principle that the personal exercise of Second Amendment rights should yield when necessary to protect the exercise of other fundamental rights, such as the exercise of religious or political rights. *See* Darrell Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 466 (2019) (asserting that certain places "are sensitive because they are the locus of the production of other kinds of public goods protected by other kinds of constitutional rights, and that the protection of the character of these types of institutions justifies limits on private firearms").

principle emerges from Founding- and Reconstruction-era laws prohibiting the carrying of firearms within a defined distance from otherwise well-established sensitive locations such as polling places and parks. *See Maryland Shall Issue v. Montgomery County*, 680 F. Supp. 3d 567, 589 (D. Md. 2023), *appeal docketed*, No. 23-1719 (4th Cir.) (chronicling these laws and concluding that there is "a historical tradition of firearm regulation consisting of restrictions on carrying a firearm within a certain reasonable buffer zone around 'sensitive places' and other locations at which firearms could be restricted"); *United States v. Allam*, 677 F. Supp. 3d 545, 578 (E.D. Tex. 2023) (similar).

Finally, the historical record refutes two purported principles that plaintiffs advance. First, plaintiffs rely on laws from the early Colonial era that required citizens to carry arms in certain circumstances, such as at church services or while traveling. Appellant's Br. 32-33, 44. That these statutes imposed a *duty*, however, says nothing about the scope of the Second Amendment *right*. More importantly, as courts have recognized, these early laws "have limited importance in the *Bruen* analysis" because they were designed to better facilitate the defense from slave insurrections (or attacks by Native Americans). *Wolford*, 116 F.4th at 997. As one court put it bluntly, "these statutes are rooted in racism[,] not the Second Amendment." *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 396 (S.D.N.Y. 2023), *appeal docketed*, No. 23-995 (2d Cir.).

25

Next, plaintiffs assert that the only sensitive places where firearms may be prohibited are "places where the government t[akes] on the burden of security." Appellants' Br. 29. But this overly strict interpretation is contrary to both history and the Supreme Court's precedents, and nearly every court to address this claim has rejected it outright. *See, e.g.*, *Wolford*, 116 F.4th at 981; *Class*, 930 F.3d at 465 (concluding that "the 'level of threat' posed" does not determine which "places are 'sensitive' for purposes of the Second Amendment"); *Schoenthal v. Raoul*, No. 3:22-cv-50326, 2024 WL 4007792, at *21 (N.D. Ill. Aug. 30, 2024), *appeals docketed*, Nos. 24-2643, 24-2644 (7th Cir.) (noting that this theory "makes little sense"). No places in the Founding era provided such comprehensive security. (JA167.) Plaintiffs nonetheless cite (without having done so in the district court) Founding-era statutes purportedly establishing that States required sheriffs or other officials to be present at courthouses, legislative assemblies, and polling places. Appellants' Br. 29-31. But they have not shown that the mere presence of officials amounts to comprehensive security, nor have they shown any connection between these laws and other laws disarming everyone else. Further, plaintiffs' argument runs counter to *Bruen*'s express identification of schools as paradigmatic sensitive places, 597 U.S. at 30, given that there is no evidence that schools historically were subjected to such security.

26

Moreover, plaintiffs' reliance on an assurance of state-provided security as the determinative factor contravenes *Bruen*'s broader command to remain faithful to history and tradition. For instance, would a "sensitive place" endorsed by *Bruen*— such as a polling place—lose that status just because the government has opted not to implement such heightened security? Or, conversely, may a location that might have historically allowed firearms now be elevated to "sensitive place" status simply because the government provides sufficient security? These questions highlight that plaintiffs' approach would subordinate their Second Amendment rights to the government's security budget—an illogical result that this Court should avoid.

III.   **WHEN MARYLAND ACTS WITHIN ITS PROPRIETARY CAPACITY OR AS A MARKET PARTICIPANT, RESTRICTIONS ON CARRYING FIREARMS ON GOVERNMENT-OWNED PROPERTY DO NOT IMPLICATE THE SECOND AMENDMENT.**

As plaintiffs conceded below, the Second Amendment does not confer a right to carry firearms onto others' property against their wishes. *See Kipke v. Moore*, No. 23-cv-1293-GLR, ECF 13-1 at 27. This is because the Second Amendment, which codified a pre-existing right, must be interpreted in light of the background principles that existed at the time of its adoption. And the ability of property owners to exercise exclusive dominion and control over their land, including the ability to expel trespassers, is a fundamental aspect of Anglo-American (and Maryland) law that, as a matter of historical tradition, formed the backdrop for the Second Amendment. (JA165-167); *see also GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d

27

1244, 1262 (11th Cir. 2012) ("An individual's right to bear arms . . . , whatever its full scope, certainly must be limited by the equally fundamental right of a private property owner to exercise exclusive dominion and control over its land."); *Silbert v. Ramsey*, 301 Md. 96, 101 (1984).

These principles apply fully to locations owned or operated by a governmental entity. Courts have consistently recognized that "the government, 'no less than a private owner of property,' retains the 'power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 12 (2018) (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966)); *see also Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) ("As a government-owned business acting as a proprietor rather than as a sovereign, the USPS has broad discretion to govern its business operations according to the rules it deems appropriate."); *cf. Greer v. Spock*, 424 U.S. 828, 836 (1976) (rejecting the "principle that whenever members of the public are permitted freely to visit a place owned or operated by the Government, then that place becomes a 'public forum'").[10] That precept is consistent with the broader principle that, when

---

[10] In contrast to proprietary endeavors with clear private-sector analogues, the government may face more constraints when it has dedicated its property to a traditionally public function, as with sidewalks and streets. *Cf. Marsh v. Alabama*, 326 U.S. 501, 506 (1946) (holding that a privately run "company town" could not prohibit solicitation on its sidewalks because, by opening its sidewalks and roads to the public, it was performing "essentially a public function"). The government may therefore be required to affirmatively justify a restriction on the public carrying of

the government provides a good or service for consumption in the private marketplace, it will not be subject to the same constitutional restrictions as when it acts in a regulatory capacity. *See Reeves, Inc. v. Stake*, 447 U.S. 429, 437, 439 (1980) (observing that "state proprietary activities may be, and often are, burdened with the same restrictions imposed on private market participants" and that "[e]venhandedness suggests that, when acting as proprietors, States should similarly share existing freedoms from federal constraints"); *Building & Const. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 227 (1993) (stressing "the distinction between government as regulator and government as proprietor").

In other words, when a government entity acts as an ordinary market participant, it acts on the same plane as a private actor. Thus, for instance, a state-owned concrete plant will not be subject to the restraints of the Commerce Clause and may, like any other private operator in that market, choose to sell only to in-state customers. *Id*. at 440. Courts applying these principles have thus concluded that governments may prohibit the possession of firearms on government property without running afoul of the Second Amendment. *See Wolford*, 116 F.4th at 970-71 ("[I]f a State operates a bank, the State, too, may exercise its proprietary right to exclude, just as a private property owner may."); *Class*, 930 F.3d at 464 ("[A]s the

---

firearms on government-owned roads and sidewalks. No such restriction is at issue here.

owner of the Maryland Avenue lot, the government—like private property owners—has the power to regulate conduct on its property," including with respect to weapons); *Bonidy*, 790 F.3d at 1126-27; *United States v. Dorosan*, 350 Fed. App'x 874, 875 (5th Cir. 2009).

A contrary conclusion would defy the "[e]venhandedness" that is the foundation of the market participant doctrine. *Reeves*, 447 U.S. at 439. For instance, if the State may not regulate firearms on the grounds of its publicly-owned stadiums, then weapons could be prohibited at a Washington Commanders game at the privately owned Northwest Stadium, but not at a Baltimore Ravens game at government-owned M&T Bank Stadium. Likewise, a private museum, such as the Maryland Center for History and Culture, could prohibit patrons from carrying weapons inside its premises, but a public museum could not. Furthermore, given that, "[u]nlike private ent[ities], government is vested with the responsibility of protecting the health, safety, and welfare of its citizens," *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342-43 (2007), the government's ability to fulfill that duty would be undermined if it were unable to regulate firearm carriage on its own property.

## IV.   THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S DECISION UPHOLDING MARYLAND'S LAWS PROHIBITING FIREARM CARRIAGE IN VARIOUS SENSITIVE LOCATIONS.

As explained above, and as the Supreme Court has emphasized, there is a historical tradition of prohibiting firearms in sensitive places. *Bruen*, 597 U.S. at 30-31; *Heller*, 554 U.S. at 626. The district court's decision to uphold the State's firearms prohibitions as to certain such places is consistent with that tradition.

### A.   Health Care Facilities

Modern hospitals and other health care facilities are unlike anything that existed at the time of the Founding. *See Maryland Shall Issue*, 680 F. Supp. 3d at 590-91. Instead, "[i]t was not until the late nineteenth century, 'as society became increasingly industrialized and mobile and as medical practices grew in their sophistication and complexity,' that there was a shift from the norm of medical care practice at home to 'the professionalization of health care services that eventually included the development of a full and competitive commercial market for medical services that increasingly took place in hospitals.'" *Id*. (citation omitted). As a result, when considering whether the public understanding of the Second Amendment would have contemplated these modern restrictions, this Court must apply the more "nuanced approach" approved in *Bruen*. *Id*.

This approach reveals both that health care facilities are "sensitive places" in their own right and that restrictions on carrying firearms in these facilities are

31

consistent with the historical tradition discussed above.  First, health care facilities are places that serve vulnerable individuals, including the sick and disabled.  *See Antonyuk*, 120 F.4th at 1009-13.  Restrictions on firearms at health care facilities preserve an environment that is most conducive to their purposes of healing and rehabilitation.  Similarly, many hospitals in Maryland have a teaching component, and therefore share many of the same features as schools.  *See United States v. Power*, No. 20-po-33-GLS, 2023 WL 131050, *5 (D. Md. Jan. 9. 2023) (noting that the National Institutes of Health are " similar to a college campus" because of the research and lectures that take place there).

Second, restrictions on firearms at health care facilities, especially hospitals, are similar to the many historical laws restricting firearms in places where people are assembled for "scientific purposes."  (*See, e.g.*, JA401-413, JA418-421.) Recognizing that firearms are inconsistent with environments designed for "scientific purposes" thus dovetails with restrictions on places, such as health care facilities, where science is being applied in furtherance of such a vital purpose as human health. *See Maryland Shall Issue*, 680 F. Supp. 3d at 591-92.

Plaintiffs have no answer to these principles, other than to point to a few examples of hospitals that existed at the time of the Founding and the lack of governmental restrictions at those specific locations.  Appellants' Br. 41-42.  But given these locations' novelty and their relatively small number, the lack of specific

governmental regulation is not significant. Rather, because the historical tradition supports the conclusion that health care facilities are sensitive places due to their purposes and service of vulnerable populations, the district court properly concluded that the State may restrict firearms at these locations.

## B.    Museums

Museums, like health care facilities, are sensitive places at which restrictions on carrying firearms are constitutional. Museums are analogous to schools in that they serve an educational purpose and, despite serving all ages, are often predominantly geared toward children. (*See, e.g.* JA375-386.) And museums in Maryland can, and do, host hundreds (and sometimes thousands) of children at one time. (*See* J.A. 375-386 (affidavits from Maryland museums).) Because the presence of children justifies the *Bruen*-endorsed restrictions on carrying firearms in schools (and places serving other vulnerable populations), it similarly justifies Maryland's restrictions on firearms in museums. Further, restrictions on carrying firearms in museums are supported by the more specific historical limitation related to any "place where persons are assembled for educational, literary, or scientific purposes." (*See, e.g.*, JA401-413, JA418-421.)

## C.    Stadiums, Amusement Parks, Racetracks, and Casinos

Although stadiums, amusement parks, racetracks, and casinos are relatively new (at least in their modern forms), they are places where people gather for

recreational and social activities, often in enclosed, crowded environments. *See Wolford*, 116 F.4th at 987 (noting that casinos, stadiums, amusement parks, and museums "did not exist in modern form at the Founding," and thus analogizing them to the balls, fandangos, and other social gatherings in early American history). Prohibiting firearms in these locations thus follows the well-established tradition of restricting the carrying of firearms in places where individuals gather in discrete, crowded, enclosed spaces for "recreation or social activities." *Maryland Shall Issue*, 680 F. Supp. 3d at 587; *see also Antonyuk*, 120 F.4th at 1036-39; (JA392-398, JA401-404, JA408-413).

As discussed above, States that prohibited firearms at places where large numbers of people gathered recognized that individuals' ability to safely defend themselves with firearms would be diminished in such circumstances, and that the potential for other harms (whether through mass panic or errant bullets) made the carrying of firearms in such circumstances dangerous and imprudent.  (*See* JA392-421.)  Because Maryland's restrictions at these locations are consistent with the historical traditions discussed above, they do not offend the Second Amendment. *See Antonyuk*, 120 F.4th at 1036-39; *Wolford*, 116 F.4th at 987-89.

### D.   Any Transit Vehicle or Transit Facility Owned or Controlled by the Maryland Transit Administration

Public transportation facilities and vehicles are likewise sensitive places where firearms may be regulated.  This is so for three independent reasons.

First, because the State operates these transportation services and facilities in its proprietary capacity, it possesses the authority—just like any private entity similarly engaged in activities using its own property—to determine the regulations that will apply.[11]

Second, restrictions on public transportation vehicles and facilities are consistent with the historical tradition of limiting firearms in sensitive places. Although there appear to be no *governmental* regulations from the Founding or Reconstruction eras relating specifically to public transportation, that is for good reason, because "[u]ntil the twentieth century, transportation services were typically operated by private companies vested with the authority to fashion their own rules and regulations for customers." (JA353-354.) Looking to how these private transportation services regulated firearm carriage can thus demonstrate a relevant and applicable historical tradition. *See* Joshua Hochman, Note, *The Second Amendment on Board: Pub. and Priv. Hist. Traditions of Firearm Regul.*, 133 Yale L. J. 1676, 1690-96 (2024). And railroad companies operating in the Reconstruction era did in fact restrict firearms on their trains. For example, the North Pennsylvania Railroad's "'rules and regulations' document for conductors . . . specifically charged

---

[11] Pursuant to this authority, Maryland state law allows executive branch employees to ride transit vehicles for free. Transp. § 7-711(a). Restrictions on carrying firearms on public transit thus further the government's strong interest in, and preferred method of, keeping its workforce safe.

passenger conductors with the responsibility of preventing passengers from taking 'into the cars guns, dogs, valises, large bundles or baskets.'" (JA352-355, JA369.) During this period, various States vested railroads and their employees with the authority to police their trains, and "[i]ncluded within this power . . . was a responsibility to enforce weapon regulations in effect at the time." (JA353-357.)

Third, public transit facilities and vehicles share characteristics with locations historically treated as "sensitive places": they are crowded places, and thus similar to those where States have historically regulated firearms. As in the crowded ballrooms of the Reconstruction era, the carrying of firearms on a crowded bus or subway train has the potential to insert chaos into an already chaotic environment. Not only would the discharge of a firearm in a crowded transit vehicle—even in legitimate self-defense—have the potential to strike any number of innocent bystanders, but it would likely cause panic in a closed environment where any mass attempt to escape could cause injury or worse. Further, use of a firearm would likely result in massive disruptions as the circumstances were investigated, thus interfering with the State's interest in providing reliable transportation for the public. And the MTA's vehicles and transit facilities serve vulnerable populations, most notably children. Like many municipal public transit systems, MTA "provides free transportation to and from school and school-related activities to eligible students of the Baltimore City Public School system." (JA371.)

When individuals forego private modes of transportation and opt to use the State's public transit system for their own benefit, they do so under those rules that the people of Maryland, through the General Assembly, have determined best serves their safety interests. And because Maryland's decision to restrict the carrying of firearms on public transit is consistent with historical practice, plaintiffs' challenge to those restrictions must fail.

### E.     State Parks and Forests

Plaintiffs' challenge to regulations prohibiting the carrying of firearms in state parks and state forest lands fails for three reasons.

First, just as a private park may restrict firearms as it sees fit, the State, as proprietor of lands dedicated to a recreational purpose, may restrict those who choose to enter these locations from carrying firearms.

Second, state parks and forests are also "sensitive places" where firearms may be prohibited. State parks and forests often host large gatherings of people and specifically cater to children. (JA373-374.) They are therefore analogous to schools and other locations where States have historically regulated firearms.[12]  For these reasons, among others, courts have held that parks and similar recreational areas are

---

[12] It is no response that state parks and forests cannot be sensitive places because they contain areas that may not ordinarily be crowded or have children present. Plaintiffs' claim is a facial challenge, so they must show that the prohibition on firearms in state parks cannot be applied in any circumstances. *See Bianchi*, 111 F.4th at 452.

sensitive areas where firearms may be prohibited.  *See, e.g.*, *GeorgiaCarry.Org v. U.S. Army Corps of Eng'rs*, 212 F. Supp. 3d 1348, 1366 (N.D. Ga. 2016); *Warden v. Nickels*, 697 F. Supp. 2d 1221, 1229 (W.D. Wash. 2010).

Third, even beyond these reasons, firearms restrictions at parks are supported by a robust historical tradition.  "There were no modern-style parks in the era of the Second Amendment."  (JA176.)  Instead, "[t]he creation of parks as we now know them began in the middle of the nineteenth century."  (JA177.)  "[I]nspired by a new attitude toward nature and public spaces," the modern parks movement re-envisioned certain public spaces "as places of relaxation, repose, and recreation." (JA177.)  The parks movement is perhaps "best exemplified by New York's Central Park," which opened in 1858.  (JA177.)  From its inception, the ordinances applicable to Central Park provided that "[a]ll persons are forbidden . . . to carry fire-arms."  (JA485.)  And as the modern parks movement spread across the country, so too did firearms restrictions.  Around the time the Fourteenth Amendment was ratified, laws were passed prohibiting firearms in public parks in the five most populous cities in the Nation: New York City (1858) (JA483-486); Philadelphia (1868) (JA492-497); Chicago (1873) (JA502-506); St. Louis (1881) (JA530-532); and Boston (1886) (JA544-545).  (JA177-178.)  These bans were not limited to the Nation's largest municipalities.  Dozens of laws prohibited firearms in public parks

in at least 14 States by 1900[13] and in at least 24 States by 1921.[14] *See LaFave v. County of Fairfax*, No. 1:23-cv-1605 (WBP), 2024 WL 3928883, at *9 (E.D. Va. Aug. 23, 2024), *appeal docketed*, No. 24-1886 (4th Cir.).  And, soon after creating Yellowstone National Park, the federal government banned firearms there in 1897. (JA178, JA858.)  Then, in 1936, the federal government limited firearms in all national parks.  (JA933-939.)

These laws demonstrate a robust historical tradition of regulations that are not only distinctly similar, but substantively identical, to those at issue here.  *See Maryland Shall Issue*, 680 F. Supp. 3d at 581.  Not only that, but these laws, numerous as they were, stood without challenge until only very recently.  *See Bruen*, 597 U.S. at 30.

Nonetheless, plaintiffs seek to escape this robust history by pointing to locations that have existed since before the Founding (such as Boston Common) and

---

[13] These included New York (1858) (JA482-486); Pennsylvania (1868) (JA491-497); Illinois (1873) (JA501-506); California (1875) (JA507-512); Missouri (1881) (JA529-532); Massachusetts (1887) (JA543-545); Utah (1888) (JA546-550); Minnesota (1889) (JA551-555); New Jersey (1908) (JA556-559); Michigan (1891) (JA560-565); Washington (JA579-84); Delaware (1893) (JA585-588);   Indiana (1896) (JA615-617); and Colorado (1898) (JA629-632).

[14] These included Connecticut (1902) (JA643-648); Texas (1904) (JA668-672); Nebraska (1904) (JA673-678); Tennessee (1909) (JA745-752); Kentucky (1909) (JA758-766); Virginia (1910) (JA767-772); Alabama (1917) (JA809-813); Wisconsin (1917) (JA820-826); Vermont (1921) (JA840-843); and North Carolina (1921) (JA844-847).

then arguing that, because no restrictions on firearms at these locations have been located, there can be no relevant historical tradition on firearm regulation in "parks" generally.  Appellants' Br. 46.  But it would be constitutional folly to attempt to derive a historical tradition from the *absence* of a particular type of regulation in such a small number of places, especially since the concept of a dedicated space for public recreation would have been novel at the time.  Moreover, plaintiffs mischaracterize how these few public spaces were used.  At the time of the Founding, Boston Common "was used primarily as a pasture, a place of execution, and site for the militia to muster and drill."  (JA176); *see Antonyuk*, 120 F.4th at 1024-25 (rejecting Boston Common as an analogue to today's parks); *Wolford*, 116 F.4th at 982 (same).  Finally, and perhaps most importantly, plaintiffs ignore the purpose of the parks movement described above, and the fact that when parks proliferated throughout the Nation, firearms regulations were a complementary aspect of that movement.

## F.    Government Buildings and Property Under the Jurisdiction of the Department of General Services

Plaintiffs' challenge to restrictions on firearms in government buildings and property under the jurisdiction of the Department of General Services fails for multiple reasons.

First, to the extent that any government property is being operated in the government's proprietary capacity, any restrictions on the carrying of firearms at any such property are constitutional. *See* discussion at pages 27-30 above.

Second, any restrictions in government buildings are constitutional because the Supreme Court has already expressly recognized such locations as "sensitive places." First in *Heller*, and then again in *Bruen*, the Court stated that "nothing in [its] opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools *and government buildings*." 554 U.S. at 626 (emphasis added); *see also Bruen*, 597 U.S. at 30; *id*. at 72 (Alito, J., concurring); *id*. at 81 (Kavanaugh, J., concurring).

Any analysis regarding firearms restrictions at government buildings should end there. Indeed, because plaintiffs have brought a facial challenge, they must "establish 'that no set of circumstances exists under which [the law] would be valid,' or that the statute lacks any 'plainly legitimate sweep.'" *Bianchi*, 111 F.4th at 452. That the Supreme Court has already approved of restrictions in several types of government buildings—courthouses, polling places, and legislative assemblies— necessarily means that plaintiffs' claim fails.

Moreover, plaintiffs ignore that the Court in *Bruen* did not qualify the phrase "government buildings." Indeed, "[i]f the *Bruen* Court intended [its reference to 'government buildings'] to restrict the applicability of the 'sensitive places' doctrine

41

to, e.g., a small subset of government buildings, the Supreme Court could have explicitly made that limitation." *Power*, 2023 WL 131050, at *5.

And even if *Bruen*'s reference to "government buildings" somehow does not include *all* types of government buildings, this Court should nonetheless decline to adopt plaintiffs' narrow view of that phrase. Instead, *Bruen*'s reference to "government buildings" plainly encompasses, at the very least, those buildings where government services or other administrative functions are being performed. Restricting firearms at these types of locations not only furthers Maryland's (and any government's) inherent interest in protecting the everyday functioning of governmental operations but is also, for perhaps those very reasons, consistent with historical tradition. As early as 1328, individuals were prohibited from going armed "before the King's justices, or other of the King's ministers doing their office." *Bruen*, 597 U.S. at 40 (citing 2 Edw. 3 c. 3 (1328)). And, as discussed above, these restrictions made their way across the Atlantic when jurisdictions such as Virginia and North Carolina enacted or retained their own versions. (JA387-391.) Because restrictions on firearms in buildings where government employees perform government functions have a historical tradition dating to the Founding and beyond, *see Power*, 2023 WL 131050, at *11, those restrictions are constitutional.

Finally, to the extent that plaintiffs challenge firearms restrictions on "grounds" of government property (i.e., not buildings themselves), these restrictions

42

would be valid as long as the grounds are associated with a government building that is appropriately deemed a "sensitive location."[15]  Indeed, where buildings house government officials and employees performing official governmental functions, there is no compelling reason why the adjacent grounds should be treated any differently from the buildings themselves.  It is perhaps for that reason that courts have had no trouble concluding that restrictions relating to a governmental sensitive place may constitutionally extend to any grounds that are reasonably adjacent to that building.  *See, e.g.*, *Class*, 930 F.3d at 464; *Dorosan*, 350 Fed. App'x at 875.

As a final note, synthesizing the relevant principles reveals a coherent and administrable framework for analyzing whether a firearms restriction on government property is constitutional.  First, to the extent that government property houses government officials or administrative services, it is a "sensitive place" as referenced in *Bruen*.  Second, where the government operates its property in a proprietary capacity (i.e., not as the owner of public streets and sidewalks), the government may act in that capacity—just like any private property owner—to restrict the carrying of firearms.

---

[15] The ability to constitutionally restrict firearms within the grounds of government property is further supported by the historical tradition of "buffer zones."  *See* discussion at pages 24-25.

G.    **School Grounds**

The district court correctly rejected plaintiffs' challenge to restrictions on publicly carrying firearms on the grounds of schools.  Plaintiffs, of course, do not challenge restrictions as they pertain to the school buildings themselves.  This is not surprising, for *Bruen* expressly recognizes schools as sensitive places where the carrying of firearms may be restricted.  597 U.S. at 30.  But as explained above, where firearms restrictions are constitutional within a building that is properly deemed a sensitive place, they also are constitutional as applied to the adjacent grounds.  *See* discussion at pages 24-25.

These principles are even more salient as they relate to schools.  Unlike government buildings, where most of the government functions are performed indoors, many school activities, such as recess or even certain lessons, take place outside on grounds that are specifically designed for children's activities.  The purposes underlying firearms restrictions—to protect children and to preserve the sanctity of the learning environment—are thus served as much by restrictions on school grounds as by restrictions within the school buildings themselves.  *See Hall v. Garcia*, No. C 10-03799 RS, 2011 WL 995933, *4 (N.D. Cal. Mar. 17, 2011) (noting that, "[f]or the same reason that schools are sensitive places—the presence of large numbers of children either at school or traveling to and from it—possession of firearms within some distance around such locations similarly presents the risk of

44

danger and disruption"). For perhaps these reasons, plaintiffs have failed to articulate any reason why school grounds should be treated any differently from school buildings themselves. And as with grounds adjacent to sensitive locations generally, courts have had little difficulty concluding that the entire grounds of schools—as well as buffer zones around them—are places where firearms restrictions are constitutional. *See, e.g.*, *Allam*, 677 F. Supp. 3d at 578; *United States v. Walter*, No. 3:20-CR-0039, 2023 WL 3020321, *8 (D.V.I. Apr. 20, 2023); *Power*, 2023 WL 131050, at * 12; *DiGiacinto*, 704 S.E.2d at 370.

### V.    THIS COURT SHOULD REVERSE THE DISTRICT COURT'S DECISIONS INVALIDATING RESTRICTIONS ON CARRYING FIREARMS NEAR PUBLIC DEMONSTRATIONS AND AT PLACES SELLING ALCOHOL FOR ON-SITE CONSUMPTION.

#### A.    Public Demonstrations

The district court should be reversed as to its decision striking down Maryland's prohibition on "hav[ing] a firearm in the person's possession or on or about the person at a demonstration in a public place or in a vehicle that is within 1,000 feet of a demonstration in a public place." Crim. Law § 4-208(b)(2). This is so for two reasons.

First, the district court erred when it found that any plaintiff had standing. Justiciable injury for purposes of Article III must be "real and immediate" and not speculative and abstract. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). "'[A]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty*

*Int'l*, 568 U.S. 398, 409 (2013) (citation omitted); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (finding no standing where claims are "imaginary," "speculative," "hypothetical," or "abstract" (citations omitted)).

Here, no plaintiff faces an "actual or imminent" threat of prosecution for violating this statute. Instead, any enforcement is hypothetical and would "rel[y] on a highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410. For example, Mrs. Kipke has alleged an intent to carry a handgun at "a demonstration in a public place (and/or in a vehicle that is within 1,000 feet of a demonstration in a public place)." (JA30, JA83.) But contrary to the district court's reasoning (JA997), simply carrying a handgun at a public demonstration is not an offense under the statute. Rather, two independent events must still occur. First, to fall within the statute's prohibition, the person must first be "advised by a law enforcement officer that a demonstration is occurring at the public place." Crim. Law § 4-208(b)(2). A law enforcement officer, however, has no legal obligation to make this advisement (whether generally or to Mrs. Kipke in particular), even if a public demonstration is in fact occurring. Second, the statute requires that the person be ordered "to leave the area of the demonstration until the person disposes of the firearm." *Id*. This provision thus requires an order from an officer directed to a particular person regarding a particular firearm. Yet, because she intends to carry her handgun only in a concealed manner, Mrs. Kipke has not explained how a law enforcement officer

would become aware that she was carrying a firearm in the first place. As a result, neither Mrs. Kipke nor any other plaintiff faces an actual (let alone imminent) harm that is cognizable under the law.[16]

Second, even if plaintiffs have standing, a prohibition on possessing firearms at public demonstrations is supported by the historical record. As discussed above, numerous jurisdictions—Texas, Tennessee, Georgia, Missouri, Arizona, Oklahoma, Idaho, and Montana, as well as numerous municipalities—historically prohibited carrying firearms at places of public assembly or gathering. (*See* JA392-421.) Maryland's ban on firearms at or near public demonstrations is constitutional in light of these laws. And because restrictions at public demonstrations are constitutional, so are restrictions within a reasonable "buffer zone." *See* discussion at pages 24-25.

Furthermore, this prohibition is supported by an even longer historical tradition of laws prohibiting the use of firearms in "affray of the peace" or to cause fear. (*See* JA204, JA387-391.) Given that the prohibition takes effect only after it becomes known to law enforcement that a person is carrying a firearm (and thus has violated the command to keep firearms concealed), the clear purpose of the law is to enable law enforcement officers to maintain order so as to prevent fear or panic that would interfere with people's ability to exercise their constitutional right of

---

[16] Underscoring the remoteness of any prosecution, plaintiffs have not shown that anyone has ever been prosecuted for a violation of this statute.

assembly.  *See LaFave*, 2024 WL 3928883, at *14 (finding a restriction on firearms adjacent to permitted events in certain public areas or buildings constitutional because it "is relevantly similar to the 'public assembly,' 'public gathering,' and 'to the terror of the people' laws").

### B.    Locations Selling Alcohol for On-Site Consumption

The district court likewise erred in concluding that Maryland's prohibition on firearm carriage at places that sell alcohol for on-site consumption is unconstitutional.  As every court of appeals to address this issue has found, these laws are supported by a rich tradition "reflecting the[] understanding that firearms and intoxication are a deadly mix."  *Wolford*, 116 F.4th at 985; *see Antonyuk*, 120 F.4th at 1027-32.

First, at the time of the Founding, several states prohibited the possession and sale of liquor at or near any militia muster.  (JA216-217 (compiling statutes)); *see Wolford*, 116 F.4th at 985 (citing, e.g., a "1756 Maryland law prohibit[ing] the sale of liquor within five miles of a training exercise for the militia").  Later, some cities—Chicago in 1851 and St. Paul, Minnesota in 1858—prohibited places selling liquor from keeping gunpowder.  *Wolford*, 116 F.4th at 985.  And at the same time that States were prohibiting the carrying of firearms in public gatherings, *see* discussion at pages 18-20, they were also prohibiting the carriage of firearms by intoxicated individuals.  (JA218-219 (citing laws from Kansas (1867), Mississippi

48

(1878), Missouri (1879), Oklahoma (1890), and Wisconsin (1883), as well as laws from local jurisdictions).)

Finally, and perhaps most importantly, various jurisdictions in this period enacted laws that were "directly on point" with Maryland's prohibition. *Wolford*, 116 F.4th at 986. These include (1) an 1853 New Mexico law that prohibited firearms at any "room adjoining [a ball or fandango] where liquors are sold," *id*. at 986 (citing 1853 N.M. Laws 67-69); (2) an 1870 San Antonio law that banned firearms at any "bar-room" or "drinking saloon," *id*.; (3) an 1879 New Orleans law that banned firearms at any "public hall" or "tavern," *id*.; (4) an 1889 Arizona law that required the keepers of "drinking saloon[s]" to post "plain notice to travelers to divest themselves of their weapons," *Antonyuk*, 120 F.4th at 1030 (citing 1889 Ariz. Sess. Laws 17); and (5) an 1890 Oklahoma law that prohibited the carrying of firearms in "any place where intoxicating liquors are sold" (JA413).

Together, these laws, and the principles supporting them, comprise a historical tradition of allowing jurisdictions to regulate the carrying of firearms in places where alcohol is sold and consumed. This historical tradition also reflects the commonsense recognition that places that sell alcohol for on-site consumption share many characteristics of sensitive places generally, as they often are crowded with vulnerable (i.e., intoxicated) populations. And even if the person carrying the firearm is not consuming alcohol, the underlying concerns about crowds, conflict,

and the diminished capacity and safety of defensive use of a firearm remain. Because these principles are reflected in a long history stretching from the Founding through Reconstruction and beyond, Maryland's prohibition is constitutional.

## VI. THIS COURT SHOULD REVERSE THE DISTRICT COURT'S DECISION INVALIDATING MARYLAND'S PRIVATE PROPERTY CONSENT RULE.

The district court's conclusion that the private building consent rule is unconstitutional should be reversed for three independent reasons: (1) plaintiffs lacked standing to challenge the law; (2) the private building consent rule does not implicate conduct within the scope of the Second Amendment and (3) the law is consistent with the historical tradition of firearm regulation.

### A. Plaintiffs Lack Standing Because They Have Not Sustained an Injury That is Traceable to State Action.

To establish Article III standing, a plaintiff must allege (1) an "injury in fact" (2) that is "fairly traceable" to the defendant's conduct and (3) "that is likely to be redressed by the requested relief." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs' claim fails at all three levels.

First, plaintiffs' alleged injury is hypothetical. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Their claim is based on the premise that there exists some private building for which the owner both (1) consents to individuals entering their building while armed; and (2) for whatever reason, will decline to express that consent through a sign (or other express permission). Because plaintiffs have

identified no such building, they have failed to meet their burden to show a constitutionally cognizable injury.

For similar reasons, plaintiffs' allegations do not establish traceability. A plaintiff fails to establish traceability when the injuries that are alleged are attributable to the "broad and legitimate" discretion of independent third parties not before the court, unless the defendant's conduct had a "determinative or coercive effect" on the third party's actions. *See Lujan*, 504 U.S. at 560; *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). In this case, plaintiffs' alleged harm is attributable not to any state actor, but rather to the legitimate discretion of the property owners. Because "'legitimate discretion' breaks the chain of constitutional causation" necessary for traceability, *Turaani v. Wray*, 988 F.3d 313, 317 (6th Cir. 2021), it eliminates plaintiffs' standing along with it.

Finally, plaintiffs fail to establish redressability. To do so, plaintiffs must demonstrate that a favorable judicial decision will "likely, as opposed to merely speculative[ly]," eliminate their alleged injury. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 180-81 (2000). But they cannot show that their ability to carry firearms into particular buildings rises or falls on whether the private building consent rule is enforced. In other words, plaintiffs have not shown that any establishment (1) *would* consent to their carrying firearms absent the private building consent rule; but (2) *would not* do so if the private building consent rule is enforced.

**B.**    **The Text of the Second Amendment Does Not Encompass a Right to Carry Arms into Another's Building Absent Consent.**

Plaintiffs' claim also fails on the merits because they cannot show that the plain text of the Second Amendment covers their conduct. *Bruen*, 597 U.S. at 24. In *Heller*, the Court examined history to determine that the scope of the Second Amendment's text included a right to carry in one's own home. 554 U.S. at 581-95, 626-27. And in *Bruen*, the Court extended that right to include a "general right" to carry publicly. 597 U.S. at 31. But neither decision addressed whether "the right" embodied in the Second Amendment overrides a property owner's right to exclude. Here, plaintiffs fail to make the predicate showing that the Second Amendment's text confers a right to carry firearms into another's building absent their consent.

In fact, history suggests the opposite. The "right" codified in the Second Amendment was a preexisting right in English common law. *Heller*, 554 U.S. at 592. Therefore, as applied to private property, the Second Amendment right is best understood in light of the common law history of private property rights. *GeorgiaCarry.Org*, 687 F.3d at 1261. At English common law, the right to exclude was fundamental to such rights. *Id.* at 1262. This system reflected views that the rights of "personal security," "personal liberty," and "private property" were "inviolate" and equally necessary for the preservation of civil liberties. *Id.* at 1265 (citing 1 William Blackstone, *Commentaries* *120). Thus, the English common law

right to self-defense that the Framers memorialized in the Second Amendment was not meant to "expand, extend or enlarge the individual right to bear arms at the expense of other fundamental rights." *Id.* at 1264. It was against this historical background that the Framers wrote, and the people adopted, the Second Amendment. *Id.*

The State thus does not offend the Second Amendment by adopting a framework governing private property that best effectuates private owners' preferences. And the evidence demonstrates that the private building consent rule does, in fact, effectuate the preferences of the majority of Marylanders. *See* Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J. L., Med. & Ethics 183, 189-90 tbl. A4 (2020) (finding that a statistically significant majority of Americans and Marylanders reject a default right to carry weapons onto other people's property).

That Marylanders would support this policy choice is not surprising. For over 50 years, Marylanders operated under a legal and social landscape in which only those individuals who had an atypical need for self-defense were permitted to carry handguns publicly. As critics of that system were quick to point out, Maryland's good-and-substantial-reason requirement resulted in relatively few individuals carrying a handgun publicly. And one consequence of that was that Marylanders could go about their daily lives with the understanding that very few ordinary

53

citizens would be armed.  But now that the good-and-substantial-reason requirement has been eliminated, significantly more people are permitted to carry handguns publicly in Maryland.[17]  And because Maryland has opted for a concealed-carry-only regime, as *Bruen* entitles it to do, Marylanders are left in the dark as to who may be carrying a firearm.  By requiring individuals to receive permission before entering a private building with a firearm, the private building consent rule thus furthers the important purpose of allowing Marylanders to be better informed about who may be carrying a firearm into their buildings.

Moreover, the State's ability to set the rules for entry on private property is consistent with the fact that state legislatures regularly set default rules to effectuate the preferences of their constituents in cases of silence.  *See, e.g.,* Md. Code Ann., Est. & Trusts § 3-101 (LexisNexis 2022) (intestacy statute governing property distribution given decedent's silence on subject).  The reversibility of the private building consent rule mitigates constitutional concerns.  For example, in *Sveen v. Melin*, 584 U.S. 811 (2018), the Supreme Court held that a Minnesota statute automatically revoking a former spouse's insurance beneficiary designation following divorce did not violate the Contracts Clause because it effectuated the

---

[17]  *See* Erin Cox, *Md. Tightened Gun Laws After Watershed High-Court Ruling. The NRA Sued.*, Wash. Post, May 16, 2023 (noting that approved public-carry permits "skyrocketed" from 39,797 as of July 1, 2022 to 125,233 as of May 2023).

presumed intent of policy holders and was easily reversible.  *Id*. at 814, 824-25.  The

private building consent rule similarly effectuates the presumed intent of property

owners and is easily reversible by those who personally hold another preference.

### C.   The Private Building Consent Rule is Consistent with the Nation's History and Tradition of Firearm Regulations.

Finally, even if the Second Amendment *does* cover bringing firearms into

another's building without permission, the private building consent rule is

nonetheless consistent with the Nation's historical tradition of firearms regulation.

There would have been a fundamental understanding at the time of the Founding

that *all* entry onto another's land without consent constituted a trespass, even though

the entrant "does no damage at all."  (JA165-166.)  Because "[i]t would have been

unthinkable to members of the Founding generation that any person could enter

another's land armed, without permission or appropriate legal authority,"

Maryland's private building consent rule "simply restores the legal rule in place at

the Founding."  (JA165-166.)

Colonial-era statutes reinforce this history and tradition of making firearm

carriage onto another's property a trespass absent consent.  For example, a 1721

Pennsylvania Colony statute made it unlawful for anyone "to carry any gun or hunt

on the improved or inclosed lands of any plantation other than his own, unless he

has license or permission from the owner of such lands or plantation." (JA430-435.) Other states passed similar laws.[18]

The district court discounted these laws because their purpose appeared to be related to prohibitions on hunting. (JA992); *see Wolford*, 116 F.4th at 994-95 (noting that "the primary aim of some of those laws was to prevent poaching"). But even if that limitation is significant in light of the general background principles discussed above (as well as the Supreme Court's admonition to examine the "*principles* underlying the Second Amendment, *see Rahimi*, 602 U.S. at 692 (emphasis added)), it ignores the fact that several other statutes, enacted both in the Colonial and Reconstruction eras, were not so limited.

For example, in 1771, New Jersey enacted a provision that prohibited individuals from carrying "any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in Writing from the Owner or Owners or legal Possessor." (JA447.) This provision made no mention of hunting. Then, during the Reconstruction era, Louisiana passed an 1865 law declaring that "it shall not be lawful for any person or persons to carry fire-arms on the premises or plantations of any citizen, without the

---

[18] These included: Maryland (1715) (JA425-429); New Jersey (1722) (JA436-440, JA446-453); New York (1763) (JA441-445); and Massachusetts (1789) (JA454-457).

56

consent of the owner or proprietor, other than in lawful discharge of a civil or military order." (JA461.)  The next year, Texas passed a nearly identical statute.[19] (JA468-469.)  And in 1893, Oregon made it "unlawful for any person, other than an officer on lawful business, being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof." (JA475.)  Again, none of these statutes was limited to entering for the purpose of hunting.

These laws are not only "relevantly similar" to, but "dead ringers" for, Maryland's private building consent rule.  *See Wolford*, 116 F.4th at 995 (concluding that Hawaii's private building consent rule was constitutional because these laws show "an established tradition of arranging the default rules that apply specifically to the carrying of firearms onto private property").  This is true not only of "how" the laws operate, but "why" they were enacted.  Both the private building consent

---

[19] The district court discounted the Louisiana and Texas statutes because, in the court's view, those States "created these laws as part of their discriminatory 'Black Codes,' which sought to deprive African Americans of their rights." (JA992 (citing *McDonald*, 561 U.S. at 847 (Thomas., J., concurring)).)  But although the passage in *McDonald* cited by the district court refers to a Louisiana law, that law is not the Louisiana law at issue here.  Instead, the law referenced in *McDonald* was a general prohibition on the carrying of firearms by African-Americans "not in the military service." 1 Documentary History of Reconstruction 280 (W. Fleming ed.1950).  Unlike that and similar laws, which expressly referenced African-Americans, the two laws at issue here have no similar limitations, so there is no basis to assert that these laws were "aimed at only one group of people" and therefore can be disregarded. (JA993.)

rule and these historic laws use the law of trespass as an incentive for firearm owners to seek consent from property owners before they enter armed. Property owners are then better equipped to be able to exercise their property rights by choosing to allow or prohibit a guest to carry a firearm on their premises according to their preference. Without this incentive, property owners may never know whether a guest is armed and cannot meaningfully exercise their right to exclude for the security and protection of themselves and their property. Maryland's law even facilitates this exchange of information between firearm owners and proprietors by excluding the "land adjacent to a building" and portions of buildings subject to a public easement from the private building consent rule. Crim. Law § 6-411(a)(6), (b)(5). Firearm owners are thus not precluded from being able to walk up to the doorway of a proprietor's building to seek consent. But beyond that point, both the private building consent rule and its historical analogues empower property owners to make their own decisions. In other words, both the private building consent rule and its historical analogues make it a trespass to carry a firearm onto another's property absent consent so as to facilitate a proprietor's exercise of the right to exclude and secure their property. As a result, the private building consent rule is consistent with the Nation's tradition of firearms regulation and is therefore constitutional.

## CONCLUSION

The judgment of the district court should be affirmed in part and reversed in part, and the case should be remanded for entry of summary judgment in favor of the defendants on all claims.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Ryan R. Dietrich

_____

RYAN R. DIETRICH
JESSICA M. FINBERG
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rdietrich@oag.state.md.us
(410) 576-7648
(410) 576-6955 (facsimile)

Attorneys for Appellees/Cross-Appellants

## REQUEST FOR ORAL ARGUMENT

Appellees/Cross-Appellants respectfully request that the Court hear oral argument in this appeal, as it involves multiple constitutional challenges to statutes and regulations of a sovereign State.

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,571 words, excluding the parts of the brief exempted by Rule 32(f).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Fourteen point, Times New Roman.

/s/ Ryan R. Dietrich

_____

Ryan R. Dietrich

## CERTIFICATE OF SERVICE

I certify that, on this 23rd day of December, 2024, the Brief of Appellees/ Cross-Appellants was filed electronically and served on counsel of record who are registered CM/ECF users.

/s/ Ryan R. Dietrich

_____

Ryan R. Dietrich

**TEXT OF PERTINENT PROVISIONS**
**(Rule 28(f))**

**Annotated Code of Maryland**
**Crim. Law § 4-102. Deadly weapons on school property.**

(a) This section does not apply to:

(1) a law enforcement officer in the regular course of the officer's duty;

(2) an off-duty law enforcement officer or a person who has retired as a law enforcement officer in good standing from a law enforcement agency of the United States, the State, or a local unit in the State who is a parent, guardian, or visitor of a student attending a school located on the public school property, provided that:

(i) the officer or retired officer is displaying the officer's or retired officer's badge or credential;

(ii) the weapon carried or possessed by the officer or retired officer is concealed; and

(iii) the officer or retired officer is authorized to carry a concealed handgun in the State;

(3) a person hired by a county board of education specifically for the purpose of guarding public school property;

(4) a person engaged in organized shooting activity for educational purposes; or

(5) a person who, with a written invitation from the school principal, displays or engages in a historical demonstration using a weapon or a replica of a weapon for educational purposes.

(b) A person may not carry or possess a firearm, knife, or deadly weapon of any kind on public school property.

(c)

(1) Except as provided in paragraph (2) of this subsection, a person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $1,000 or both.

(2) A person who is convicted of carrying or possessing a handgun in violation of this section shall be sentenced under Subtitle 2 of this title.

**Annotated Code of Maryland**

**Crim. Law § 4-208. Possession of firearm at public demonstration.**

(a)

(1) In this section the following words have the meanings indicated.

(2)

(i) "Demonstration" means one or more persons demonstrating, picketing, speechmaking, marching, holding a vigil, or engaging in any other similar conduct that involves the communication or expression of views or grievances and that has the effect, intent, or propensity to attract a crowd or onlookers.

(ii) "Demonstration" does not include the casual use of property by visitors or tourists that does not have the intent or propensity to attract a crowd or onlookers.

(3)

(i) "Firearm" means a handgun, rifle, shotgun, short-barreled rifle, short-barreled shotgun, or any other firearm, whether loaded or unloaded.

(ii) "Firearm" does not include an antique firearm.

(4) "Handgun" has the meaning stated in § 5-101 of the Public Safety Article.

(5) "Law enforcement officer" means:

(i) a member of a police force or other unit of the United States, the State, a county, municipal corporation, or other political subdivision who is responsible for the prevention and detection of crime and the enforcement of the laws of the United States, the State, a county, municipal corporation, or other political subdivision;

(ii) a park police officer of the Maryland-National Capital Park and Planning Commission;

(iii) a member of the University System of Maryland Police Force; and

(iv) any military or militia personnel directed by constituted authority to keep law and order.

(6)

(i) "Public place" means a place to which the general public has access and a right to resort for business, entertainment, or other lawful purpose.

(ii) "Public place" is not limited to a place devoted solely to the uses of the public.

(iii) "Public place" includes:

1. the front or immediate area or parking lot of a store, restaurant, tavern, shopping center, or other place of business;

2. a public building, including its grounds and curtilage;

3. a public parking lot;

4. a public street, sidewalk, or right-of-way;

62

        5. a public park; and

        6. other public grounds.

(b)

    (1) This subsection does not apply to a law enforcement officer.

    (2) A person may not have a firearm in the person's possession or on or about the person at a demonstration in a public place or in a vehicle that is within 1,000 feet of a demonstration in a public place after:

        (i) the person has been advised by a law enforcement officer that a demonstration is occurring at the public place; and

        (ii) the person has been ordered by the law enforcement officer to leave the area of the demonstration until the person disposes of the firearm.

(c) A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 1 year or a fine not exceeding $1,000 or both.


**Annotated Code of Maryland**
**Crim. Law § 4-111. Possession of a firearm.**

(a)

    (1) In this section the following words have the meanings indicated.

    (2) "Area for children and vulnerable individuals" means:

        (i) a preschool or prekindergarten facility or the grounds of the facility;

        (ii) a private primary or secondary school or the grounds of the school; or

        (iii) a health care facility, as defined in § 15-10B-01(g)(1), (2), (3), and (4) of the Insurance Article.

    (3) "Firearm" has the meaning stated in § 4-104 of this subtitle.

    (4) "Government or public infrastructure area" means:

        (i) a building or any part of a building owned or leased by a unit of State or local government;

        (ii) a building of a public or private institution of higher education, as defined in § 10-101 of the Education Article;

        (iii) a location that is currently being used as a polling place in accordance with Title 10 of the Election Law Article or for canvassing ballots in accordance with Title 11 of the Election Law Article;

        (iv) an electric plant or electric storage facility, as defined in § 1-101 of the Public Utilities Article;

        (v) a gas plant, as defined in § 1-101 of the Public Utilities Article; or

        (vi) a nuclear power plant facility.

    (5) "Law enforcement official" has the meaning stated in § 4-201 of this article.

(6) "Police officer" has the meaning stated in § 3-201 of the Public Safety Article.

(7) "ROTC" means Reserve Officer Training Corps.

(8) "Special purpose area" means:

    (i) a location licensed to sell or dispense alcohol or cannabis for on-site consumption;

    (ii) a stadium;

    (iii) a museum;

    (iv) an amusement park;

    (v) a racetrack; or

    (vi) a video lottery facility, as defined in § 9-1A-01 of the State Government Article.

(b) This section does not apply to:

    (1) a law enforcement official or a police officer;

    (2) an on-duty employee of a law enforcement agency authorized by the agency to possess firearms on duty or whose duty assignment involves the possession of firearms;

    (3) a member of the armed forces of the United States, the National Guard, or the uniformed services on duty or traveling to or from duty;

    (4) a member of an ROTC program while participating in an activity for an ROTC program;

    (5) a correctional officer or warden of a correctional facility in the State;

    (6) a railroad police officer appointed under Title 3, Subtitle 4 of the Public Safety Article;

    (7) an employee of an armored car company, if the person is acting within the scope of employment and has a valid permit to wear, carry, or transport a handgun issued under Title 5, Subtitle 3 of the Public Safety Article;

    (8) subject to subsection (i) of this section, a person who has retired as a law enforcement official in good standing from a law enforcement agency of the United States, the State or another state, or a local unit in the State or another state, who possesses a firearm, if:

        (i)

            1. the person is carrying the person's badge or credential in compliance with the requirements of the badge or credential;

            2. the firearm carried or possessed by the person is concealed from view under or within an article of the person's clothing; and

            3. the person is authorized to carry a handgun under the laws of the State or the United States; or

(ii)

    1. the person possesses a valid permit to wear, carry, or transport a handgun issued under Title 5, Subtitle 3 of the Public Safety Article; and

    2. the firearm carried or possessed by the person is concealed from view under or within an article of the person's clothing;

(9) for a location that is not owned by, leased by, or otherwise under the control of the State or a political subdivision of the State:

    (i) the owner or lessee of the location; or

    (ii) a person who is authorized by the owner or lessee of the location to wear, carry, or transport a firearm at the location for the purpose of:

        1. employment as a security guard licensed under Title 19 of the Business Occupations Article; or

        2. protecting any individual or property at the location with an express agreement between the parties, remuneration, or compensation;

(10) a location being used with the permission of the person or governmental unit that owns, leases, or controls the location for:

    (i) an organized shooting activity for educational purposes;

    (ii) a historical demonstration using a firearm; or

    (iii) hunting or target shooting; or

(11) a firearm that is carried or transported in a motor vehicle if the firearm is:

    (i) locked in a container; or

    (ii) a handgun worn, carried, or transported in compliance with any limitations imposed under § 5-307 of the Public Safety Article, by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article.

(c) A person may not wear, carry, or transport a firearm in an area for children or vulnerable individuals.

(d)

    (1) A person may not wear, carry, or transport a firearm in a government or public infrastructure area.

    (2) A government or public infrastructure area specified under subsection (a)(4)(i) of this section must display a clear and conspicuous sign at the main entrance of the building or the part of a building that is owned or leased by the unit of State or local government indicating that it is not permissible to wear, carry, or transport a firearm in the building or that part of the building.

(e) A person may not wear, carry, or transport a firearm in a special purpose area.

(f) A person who willfully violates subsection (c), (d)(1), or (e) of this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 1 year or a fine not exceeding $1,000 or both.

(g)

    (1) A conviction under this section may not merge with a conviction for any other crime based on the act establishing the violation of this section.

    (2) A sentence imposed under this section may be imposed separate from and consecutive to or concurrent with a sentence for any crime based on the act establishing the violation of this section.

(h) For purposes of this section, a requirement to keep a handgun concealed is not violated by:

    (1) the momentary and inadvertent exposure of a handgun; or

    (2) the momentary and inadvertent exposure of the imprint or outline of a handgun.

        (i) Nothing in this section limits the power of an administrative head of a Maryland court to punish for contempt or to adopt rules or orders regulating, allowing, restricting, or prohibiting the possession of weapons in any building housing the court or any of its proceedings, or on any grounds appurtenant to the building.


**Annotated Code of Maryland**
**Crim. Law § 6-411. Violation of the rules of carrying or transporting a firearm.**

(a)

    (1) In this section the following words have the meanings indicated.

    (2)

        (i) "Dwelling" means a building or part of a building that provides living or sleeping facilities for one or more individuals.

        (ii) "Dwelling" does not include:

            1. common elements of a condominium, as defined in § 11-101 of the Real Property Article;

            2. property of a cooperative housing corporation other than a unit as defined in § 5-6B-01 of the Corporations and Associations Article; or

            3. common areas of a multifamily dwelling as defined in § 12-203 of the Public Safety Article.

    (3) "Firearm" has the meaning stated in § 4-104 of this article.

    (4) "Law enforcement official" has the meaning stated in § 4-201 of this article.

    (5) "Police officer" has the meaning stated in § 3-201 of the Public Safety Article.

    (6)

        (i) "Property" means a building.

        (ii) "Property" does not include the land adjacent to a building.

(b) This section does not apply to:

(1) a law enforcement official or police officer;

(2) an on-duty employee of a law enforcement agency authorized by the agency to possess firearms on duty or whose duty assignment involves the possession of firearms;

(3) a member of the armed forces of the United States, the National Guard, or the uniformed services on duty or traveling to or from duty;

(4) a correctional officer or warden of a correctional facility in the State;

(5) the wearing, carrying, or transporting of a firearm on a portion of real property subject to an easement, a right-of-way, a servitude, or any other property interest that allows public access on or through the real property; or

(6) the wearing, carrying, or transporting of a firearm on a portion of real property subject to an easement, a right-of-way, a servitude, or any other property interest allowing access on or through the real property by:

(i) the holder of the easement, right-of-way, servitude, or other property interest; or

(ii) a guest or assignee of the holder of the easement, right-of-way, servitude, or other property interest.

(c) A person wearing, carrying, or transporting a firearm may not enter or trespass in the dwelling of another unless the owner or the owner's agent has given express permission, either to the person or to the public generally, to wear, carry, or transport a firearm inside the dwelling.

(d) A person wearing, carrying, or transporting a firearm may not:

(1) enter or trespass on property unless the owner or the owner's agent has posted a clear and conspicuous sign indicating that it is permissible to wear, carry, or transport a firearm on the property; or

(2) enter or trespass on property unless the owner or the owner's agent has given the person express permission to wear, carry, or transport a firearm on the property.

(e) A person who willfully violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 1 year or a fine not exceeding $1,000 or both.

(f)

(1) A conviction under this section may not merge with a conviction for any other crime based on the act establishing the violation of this section.

(2) A sentence imposed under this section may be imposed separate from and consecutive to or concurrent with a sentence for any crime based on the act establishing the violation of this section.

**Annotated Code of Maryland**
**Transportation § 7-705. Prohibited acts.**
(a) It is unlawful for any person entering a transit facility or transit vehicle owned or controlled by the Administration for the purpose of obtaining transit service or a train owned or controlled by the Administration or operated by a railroad company under contract to the Administration to provide passenger railroad service to:

(1) Fail to pay the applicable fare charged by the Administration in the required manner; or

(2) Fail to:

(i) Pay the applicable fare;

(ii) Exhibit proof of payment; or

(iii) Provide truthful identification.

(b) It is unlawful for any person to engage in any of the following acts in any transit vehicle or transit facility, designed for the boarding of a transit vehicle, which is owned or controlled by the Administration or a train owned or controlled by the Administration or operated by a railroad company under contract to the Administration to provide passenger railroad service:

(1) Expectorate;

(2) Smoke or carry a lighted or smoldering pipe, cigar, or cigarette;

(3) Consume food or drink, or carry any open food or beverage container;

(4) Discard litter, except into receptacles designated for that purpose;

(5) Play or operate any radio, cassette, cartridge, tape player, or similar electronic device or musical instruments, unless such device is connected to an earphone that limits the sound to the hearing of the individual user;

(6) Carry or possess any explosives, acids, concealed weapons or other dangerous articles;

(7) Carry or possess any live animals, except seeing-eye animals and hearing-ear animals properly harnessed and accompanied by a blind person or a deaf person, and small animals properly packaged;

(8) Board any transit vehicle through the rear exit door, unless so directed by an employee or agent of the Maryland Transit Administration;

(9) Urinate or defecate, except in restrooms;

(10) Fail to move to the rear of any transit vehicle when requested to do so by the operator or a police officer;

(11) Fail to vacate a seat designated for the elderly or handicapped when requested to do so by the transit vehicle operator, train conductor, or a police officer; or

(12) Except by contract with the Administration, solicit the purchase of any goods or services.

(c) As used in this section, "elderly and handicapped person" means any person who, by reason of illness, injury, age, congenital malfunction, or other permanent or temporary incapacity or disability, is unable to use transit facilities and transit services or railroad facilities and railroad services as effectively as a person who is not so affected.

(d) The provisions of subsection (b)(3), (5), (8), and (12) of this section do not apply to charter bus service rendered by the Administration. The provisions of subsection (b)(2) and (12) of this section do not apply to excursion train service rendered by the Administration or by a railroad company under contract to the Administration. The provisions of subsection (b)(3) of this section do not apply to any railroad service rendered by the Administration or by a railroad company under contract to the Administration.

(e) Except as provided in subsection (f) of this section, any person who violates any provision of this section is guilty of a misdemeanor and is subject to a fine of not more than $500 for each offense.

(f)

   (1) It is unlawful for any person to obstruct, hinder, or interfere with:

      (i) The operation or operator of a transit vehicle or railroad passenger car; or

      (ii) A person engaged in official duties as a station agent, conductor, or station attendant who is employed by:

         1. The Administration;

         2. An entity that provides transit service under contract with the Administration;

         3. A local government agency or public transit authority;

         4. A private entity that provides public transit service; or

         5. An entity that provides transit service under a transportation compact under Title 10 of this article.

   (2) Any person who violates this section is guilty of a misdemeanor and is subject to a fine of not more than $1,000, imprisonment not exceeding 1 year, or both, for each offense.

(g) This section does not prohibit enforcement of any other State or local law or regulation that is consistent with the provisions of this section.

69

**COMAR 04.05.01.01 Definition and Application**.
A. "Property" means State public buildings, improvements, grounds, and multiservice centers under the jurisdiction of the Department of General Services.
B. In addition to the regulations in this chapter, the following areas are also subject to COMAR 04.05.02 and the procedural rules of the Senate and House of Delegates:
    (1) General Assembly buildings, improvements, and grounds;
    (2) Senate and House of Delegates:
        (a) Chambers,
        (b) Lounges,
        (c) Lobbies,
        (d) Appurtenant areas,
        (e) Committee rooms; and
    (3) Joint Hearing Room.


**COMAR 04.05.01.03 Prohibited Conduct.**
A. An individual shall be subject to arrest if the individual:
    (1) Damages or defaces the property;
    (2) Creates loud, unusual noise, including profanity;
    (3) Disturbs employees performing their duties;
    (4) Prevents or disturbs the general public from obtaining services provided on the property; or
    (5) Obstructs:
        (a) Entrances,
        (b) Walks,
        (c) Corridors,
        (d) Elevators,
        (e) Offices,
        (f) Stairways, or
        (g) Parking lots.
B. Except for official purposes and by authorized personnel, an individual on the property may not carry open or concealed firearms, explosives, incendiary devices, or dangerous or deadly weapons.
C. Photographs, video, video tape, movie film, or audio recordings for commercial purposes may only be made on the property with the approval of the occupying agency head.
D. The operation of gambling devices, conducting a pool or lottery, the selling or purchasing of "numbers" or lottery tickets and gambling or betting in any form on

the property is prohibited, except for operations by the Maryland State Lottery Agency.

E. Dogs and other animals may not be brought upon the property for other than official purposes, except seeing-eye dogs and animals used to guide or assist handicapped persons.

F. Executive Order 01.01.1987.13 prohibits smoking and the carrying of lit tobacco products or substitutes in public access areas of the property. Smoking is allowed only in areas so designated with posted signs.

G. Physical damage of the property is prohibited and includes:

    (1) Defacing or marking of the property;

    (2) Throwing articles of any kind at or from the property;

    (3) Climbing upon any part of the property;

    (4) Tampering with landscape and planting; or

    (5) Willful damage, destruction, or removal of property.


**COMAR 08.01.07.14 Weapons.**

**A. Definition.**

    (1) In this regulation, the following term has the meaning indicated.

    (2) Term Defined. "Weapon" means:

        (a) A device capable of propelling a projectile at high velocity by mechanical means, by explosion, or by expanding gas, including but not limited to a firearm, crossbow, or long bow;

        (b) A dirk knife, bowie knife, switchblade (except a penknife without a switchblade), sand club, metal knuckles, razor, or nunchaku; or

        (c) A device capable of:

            (i) Inflicting death or bodily harm to an individual;

            (ii) Maiming or killing wildlife; or

            (iii) Destroying property.

B. Except as provided in Regulation .04 of this chapter and §§C and D of this regulation, possession or use of weapons or firearms by an individual other than a law enforcement officer is prohibited in Chesapeake Forest Lands.

C. Target shooting is permitted only at designated shooting ranges. The regulations governing the use of these ranges shall be posted and strictly enforced.

D. Except when legally hunting or legally target shooting, an individual may not discharge a firearm on land or waters owned or controlled by the Service.

E. Firearms shall be unloaded, and arrows kept in a quiver or case, when in a Chesapeake Forest camping area in accordance with Regulation .07 of this chapter.

**COMAR 08.07.01.04 Weapons.**

A. Definition. In this regulation, "weapon" means:

(1) A device capable of propelling a projectile at high velocity by mechanical means, by explosion, or by expanding gas, including but not limited to a firearm, crossbow, or longbow;

(2) A dirk knife, bowie knife, switchblade (except penknives without switchblades), sand club, metal knuckles, razor, or nunchaku; or

(3) A device capable of:

(a) Inflicting death or bodily harm to an individual,

(b) Maiming or destroying wildlife, or

(c) Destroying property.

B. Except as provided in § C and D of this regulation, possession or use of weapons or firearms by an individual other than a law enforcement officer is prohibited in all State forests.

C. Target shooting is permitted only at designated shooting ranges. The regulations governing the use of these ranges shall be posted and strictly observed.

D. Except when legally hunting or legally target shooting, an individual may not discharge a firearm on land or waters owned or controlled by the Service.

E. Firearms shall be unloaded, and arrows kept in a quiver or case, when in a State forest campsite.


**COMAR 08.07.06.04 Weapons.**

A. Definition. In this regulation, "weapon" means:

(1) A device capable of propelling a projectile at high velocity by mechanical means, by explosion, or by expanding gas, including, but not limited to a firearm, crossbow, or longbow;

(2) A dirk knife, bowie knife, switchblade, sand club, metal knuckles, razor, or nunchaku; and

(3) A device capable of:

(a) Inflicting death or bodily harm to an individual;

(b) Maiming or destroying wildlife; or

(c) Destroying property.

B. Except as provided in Regulation .03 of this chapter and in C and D of this regulation, an individual other than a law enforcement officer may not possess a weapon in a State park. The Service may approve an exception for an archery range, firearms range, or an exhibition.

C. During hunting season, a licensed hunter may carry firearms and bows and arrows across State parks in order to get to hunting areas or to other State or private property which is open to hunting. The firearms shall be carried unloaded

72

and cased, or carried unloaded with breech open or broken. Arrows shall be carried in a quiver or case.

D. Target shooting is permitted at designated shooting ranges. The regulations governing the use of these ranges shall be posted and strictly observed.


**COMAR 09.10.03.03 General.**

A. Except as provided in §A(14) of this regulation, the following acts are prohibited if committed on the grounds of a facility under the jurisdiction of the Commission, if they affect a race conducted live in this State, or if they affect the betting on a race in this State:

(1) Offering, promising, giving, accepting, or soliciting a bribe in any form, directly or indirectly, to or by a person having any connection with the outcome of a race;

(2) Entering, or knowingly aiding and abetting in the entering of, a horse ineligible or unqualified to race;

(3) Participating in any improper, corrupt, or fraudulent act or practice in relation to racing;

(4) Causing, attempting to cause, or any participation in an attempt to cause the pre-arrangement of a race result;

(5) Soliciting bets on a horse from the public by a licensee either by correspondence or other methods;

(6) Using or possessing a battery, buzzer, electrical device, or other appliance, other than an ordinary whip, which could be used to alter the speed or racing condition of a horse in a race or workout;

(7) Using profane, abusive, or insulting language to employees of the Commission, employees of a facility under the jurisdiction of the Racing Commission, or the public;

(8) Being in an intoxicated state;

(9) Fighting or other conduct of a disorderly nature;

(10) Using or possessing a deadly weapon;

(11) Committing or participating in the commission of a criminal act;

(12) Violating a regulation or condition of the Commission or aiding or abetting a person in the violation of a regulation or condition of the Commission;

(13) Failing to comply with an order or ruling of a steward, judge, or other racing official pertaining to a racing matter;

(14) Cruelty to a horse wherever committed;

(15) Tampering, or attempting to tamper, with a horse for any purpose;

(16) Transferring, or attempting to transfer, the ownership of a horse for a purpose other than its legitimate sale or lease;

73

(17) Registering a horse under the name of a person other than the legitimate owner or lessee of the horse;

(18) Making false or misleading statements to a racing official or submitting false or misleading statements on a license application;

(19) Except as otherwise provided in this regulation, using or possessing, actually or constructively, any of the following items:

    (a) A drug, or

    (b) A hypodermic needle, hypodermic syringe, or other device which could be used for injection;

(20) Using or possessing the ingredients or the paraphernalia associated with the forced feeding to a horse of a combination of baking soda and sugar, or a form of sugar, or administrating a substance by tubing within 24 hours of a racing program in which a horse is scheduled to race;

(21) The possession or administration of Erythropoietin or any analogous substance that increases the oxygen-carrying capacity of the blood; and

(22) Failing to report the knowledge of a violation of this regulation to the stewards, judges, or the Commission.

B. The use or possession of the items listed in §A(19)(a) and (b) of this regulation is permissible if the:

    (1) Item is possessed or used for a legitimate purpose by a licensed veterinarian;

    (2) Item is possessed or used pursuant to a valid prescription or order from a medical practitioner while acting in the course of the practitioner's professional practice; or

    (3) Stewards or judges, in their discretion, grant permission authorizing the possession or use of the item.

C. The use of a shockwave therapy device is prohibited unless:

    (1) The device is registered with the Commission Veterinarian;

    (2) The device is used by a licensed veterinarian;

    (3) The device is used on a horse at least 10 days before the horse participates in a race or workout; and

    (4) Each use of the device is reported to the stewards on a daily medication report as provided in COMAR 09.10.01.47K and COMAR 09.10.02.39F(3) and (4).


**COMAR 14.25.02.06 Weapons.**

The possession, carrying, or transporting, either openly with the intent to injure a person in an unlawful manner, or concealed, or the use or discharge of, a weapon at an Authority facility is prohibited, including those weapons described in Criminal Law Article, §§4-101 and 4-201, Annotated Code of Maryland, except for official

purposes and by authorized personnel. An individual carrying a weapon shall notify the Director of Security for the Authority before entering an Authority facility.

## COMAR 34.04.08.04 Weapons.

A. A person, other than a duly authorized law enforcement officer, may not possess a weapon at a State museum except as provided in §B of this regulation.
B. The museum director may approve an exception for an exhibition that in the museum director's judgment promotes the purposes of the museum.

## COMAR 36.03.10.48 Possession of a Weapon in a Facility.

A. Except as otherwise provided in this regulation, an individual may not possess in a facility:

(1) A firearm as defined in Public Safety Article, §5-101, Annotated Code of Maryland;

(2) An electronic control device as defined in Criminal Law Article, §4-109, Annotated Code of Maryland;

(3) A dangerous weapon as defined in Criminal Law Article, §4-101, Annotated Code of Maryland; or

(4) Any other device or object designed to be used to inflict pain or cause injury.

B. The prohibition in §A of this regulation:

(1) Applies to all employees and contractors of the facility operator including security department employees; and

(2) Does not apply to:

(a) An on-duty officer or agent of a local, State or federal law enforcement agency having proper jurisdiction over the facility when the officer or agent is acting in an official capacity;

(b) An individual who is employed by an armored car company or other entity that is under contract with the facility to transport cash or a cash equivalent; or

(c) An individual authorized by the Commission to possess a weapon or device identified in §A of this regulation.

C. An individual requesting Commission authorization to possess a weapon identified in §A of this regulation in a facility shall submit to the Commission in writing a request documenting:

(1) A compelling need to possess a weapon in the facility;

75

(2) That the individual is lawfully in possession of the weapon under applicable federal and State law; and

(3) That the individual has received training in the possession and use of the weapon.