Nos. 24-1799(L), 24-1827, 24-1834, 24-1836

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

SUSANNAH WARNER KIPKE, ET AL.,
*Plaintiffs-Appellants / Cross-Appellees*,

v.

WESLEY MOORE, ET AL.,
*Defendants-Appellees / Cross-Appellants*.

KATHERINE NOVOTNY, ET AL.,
*Plaintiffs-Appellants / Cross-Appellees*,

v.

WESLEY MOORE, ET AL.,
*Defendants-Appellees / Cross-Appellants*.

On Appeal from the United States District Court
for the District of Maryland
Nos. 1:23-cv-01293-GLR, 1:23-cv-01295-GLR

**AMICUS BRIEF OF EVERYTOWN FOR GUN SAFETY
IN SUPPORT OF
DEFENDANTS-APPELLEES/CROSS-APPELLANTS**

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue,
    P.O. Box 4184
New York, NY 10163

Sana S. Mesiya
Everytown Law
P.O. Box 14780
Washington, DC 20044
smesiya@everytown.org
(202) 517-6620

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock and hence no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ............................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 1

I. Reconstruction-Era and Later Historical Evidence
Is a Crucial Part of the *Bruen-Rahimi* Analysis .............................. 3

   A. Reconstruction-Era and Later Evidence Is Critically Important
to the Historical Inquiry, Regardless of Which Era Is the
Primary Focus ............................................................. 4

   B. If this Court Chooses To Resolve the Time Period Question, the
Proper Focus Is the Reconstruction Era, Not the
Founding Era ............................................................. 10

II. Sensitive Places Are Not Defined By Government-Provided
Security ...................................................................... 20

   A. Schools and government buildings ......................................... 21

   B. Legislative buildings, polling places, and courthouses. ........... 23

CONCLUSION ................................................................ 28

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024) ................................................ 6, 10, 12, 14

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) (en banc), *petition for cert. filed sub nom.*
*Snope v. Brown*, No. 24-203 (U.S. Aug. 21, 2024) ........................ *passim*

*Bonidy v. U.S. Postal Service*,
790 F.3d 1121 (10th Cir. 2015) ......................................................... 22

*Burson v. Freeman*,
504 U.S. 191 (1992) .......................................................................... 23

*Crawford v. Washington*,
541 U.S. 36 (2004) ............................................................................ 19

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .............................................................. 4, 7, 11, 21

*Dobbs v. Jackson Women's Health Organization*,
597 U.S. 215 (2022) ............................................................................ 9

*Espinoza v. Montana Dep't of Revenue*,
591 U.S. 464 (2020) .......................................................................... 15

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ............................................................. 12

*Gamble v. United States*,
587 U.S. 678 (2019) .......................................................................... 15

*Goldstein v. Hochul*,
680 F. Supp. 3d 370 (S.D.N.Y. 2023), *appeal docketed*, No. 23-995 (2d
Cir. July 6, 2023) ................................................................................ 9

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018) ............................................................. 12

*LaFave v. County of Fairfax*,
No. 1:23-cv-01605, 2024 WL 3928883 (E.D. Va. Aug. 23, 2024), *appeal*
*docketed*, No. 24-1886 (4th Cir. Sept. 16, 2024) .................. 7, 12, 20, 22

iii

*Lara v. Commissioner Pennsylvania State Police*,
  91 F.4th 122 (3d Cir. 2024), *vacated sub nom. Paris v. Lara*, No. 24-93,
  2024 WL 4486348 (U.S. Oct. 15, 2024) ......................................... 13, 14

*Mahanoy Area Sch. Dist. v. B. L.*,
  594 U.S. 180 (2021) ................................................................. 16

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ................................................................. 11

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995) ................................................................. 16

*Md. Shall Issue, Inc. v. Montgomery County*,
  680 F. Supp. 3d 567 (D. Md. 2023), *appeal docketed*, No. 23-1719 (4th
  Cir. July 10, 2023) ................................................................. 7, 13

*Nat'l Rifle Ass'n v. Bondi*,
  61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, 72
  F.4th 1346 (11th Cir. 2023)................................................. 9, 12, 14, 15

*Nev. Comm'n on Ethics v. Carrigan*,
  564 U.S. 117 (2011)................................................................. 10, 19

*New York State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022).......................................................... *passim*

*Ramos v. Louisiana*,
  590 U.S. 83 (2020)................................................................. 15, 19

*Rupp v. Bonta*,
  723 F. Supp. 3d 837 (C.D. Cal. 2024), *appeal docketed*, No. 24-2583
  (9th Cir. Apr. 24, 2024)......................................................... 13, 14

*Timbs v. Indiana*,
  586 U.S. 146 (2019)................................................................. 19-20

*United States v. Class*,
  930 F.3d 460 (D.C. Cir. 2019)................................................. 20, 21

*United States v. Greeno*,
  679 F.3d 510 (6th Cir. 2012) ...................................................... 12

*United States v. Rahimi*,
  602 U.S. 680 (2024)....................................................... *passim*

*We the Patriots, Inc. v. Lujan Grisham*,
   697 F. Supp. 3d 1222 (D.N.M. 2023), *appeal dismissed*, 119 F.4th 1253
   (10th Cir. 2024) ................................................................... 13

*Wolford v. Lopez*,
   116 F.4th 959 (9th Cir. 2024) ...................................... *passim*

*Worth v. Jacobson*,
   108 F.4th 677 (8th Cir. 2024) ...................................... 13, 14

## Other Authorities

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction*
   (1998) ................................................................................ 18

Archives of Maryland (Biographical Series): Cornelius Mills (c.1755–
   1823), *available at* https://tinyurl.com/yc3nfzzv ................................. 25

Brief for Independent Institute as Amicus Curiae, *New York State Rifle
   & Pistol Ass'n v. Bruen* (No. 20-843) (July 20, 2021) ........................... 5

Burch, Benjamin, *History, Art, & Archives – United States House of
   Representatives*, https://tinyurl.com/46wbn2cr ..................................... 26

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*,
   13 Charleston L. Rev. 205 (2018)............................................................ 5

Del. Const. of 1776, art. 28, *reprinted in Constitutions of the Several
   Independent States of America* (1786) ................................................. 24

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L.
   Rev. 1 (2022) ................................................................................ 16

*Guarding the White House*, White House Hist. Ass'n,
   https://www.whitehousehistory.org/press-room/press-
   timelines/guarding-the-white-house.................................................... 27

J. William Harris, *Portrait of a Small Slaveholder: The Journal of
   Benton Miller*, 74 Georgia Historical Quarterly 1 (1990) .................... 26

*John Quincy Adams Digital Diary, Dated 22 March 1838*, Primary
   Source Cooperative at the Massachusetts Historical Society,
   https://tinyurl.com/25am8xmk.......................................................... 26

*John Quincy Adams Digital Diary, Dated 7 December 1831*, Primary Source Cooperative at the Massachusetts Historical Society, https://tinyurl.com/yjvusktm ................................................................. 26

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) ............................................................... 15

Katie Zezima, *People Used to Be Able to Walk into the White House. Legally*, Wash. Post (Sept. 23, 2014), https://perma.cc/M2UM-VHND ........................................................ 27

Kurt L. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439) ...................................................... 18, 19

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ................................................ 17

Luke Barr, *Trump Says He Wants Police at Polling Sites. Experts Say that's Unlawful*, ABC News (Aug. 21, 2020), tinyurl.com/fcv5x9xe.... 23

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008).... 16

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) ........................... 16

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) ....................................................................... 16

Transcript of Oral Argument, *New York State Pistol & Rifle Ass'n v. Bruen* (No. 20-843) (U.S. Nov. 3, 2021) ............................................... 15

United States Capitol Police, *Mission & History*, https://www.uscp.gov/the-department/our-mission ............................. 26

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with over ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The firearms restrictions Plaintiffs challenge in Maryland's Gun Safety Act of 2023 and other provisions of Maryland law are constitutional under the approach to Second Amendment cases

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

established in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), for the reasons defendants-appellees/cross-appellants set forth in their brief. Everytown submits this amicus brief to expand on two points that support the constitutionality of those restrictions.

*First*, in conducting the Second Amendment historical inquiry, *Bruen*, *Rahimi*, and the recent en banc decision in *Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc), *petition for cert. filed sub nom. Snope v. Brown*, No. 24-203 (U.S. Aug. 21, 2024), make clear that this Court should give significant weight to Reconstruction-era and later evidence. This is so regardless of which time period is the central focus of that inquiry—the founding era, when the Second Amendment was ratified, or the Reconstruction era, when it was made applicable to the states through the Fourteenth Amendment. And while the Court need not resolve the question of which of those periods should be the central focus to decide this appeal and uphold Maryland's laws, if it chooses to do so, it should conclude that the historical analysis properly centers on the Reconstruction era and 1868.

*Second*, the Court should reject Plaintiffs' historically inaccurate theory that sensitive places are defined by comprehensive, government-provided security. As the district court correctly found, this "baseless" argument is "unsupported by *Bruen* or any other authority." JA974-975; *see* JA1015 (adopting prior decision's reasoning). "Put simply, lack of comprehensive government security is not a determinative factor." *Wolford v. Lopez*, 116 F.4th 959, 981 (9th Cir. 2024).

## ARGUMENT

## I.  Reconstruction-Era and Later Historical Evidence Is a Crucial Part of the *Bruen-Rahimi* Analysis

Plaintiffs assert that "[o]nly Founding Era understandings can establish historical tradition." Dkt. 35 ("Pls. Br.") 15. That is not correct. Even though the Supreme Court and this Court have not yet resolved the question of which period is the primary focus of the Second Amendment inquiry,[2] both have made clear that evidence from Reconstruction and beyond is a critically important part of the historical analysis. And while this Court need not resolve this difficult

---

[2] *See Rahimi*, 602 U.S. at 692 n.1 (leaving open question of whether inquiry's central focus is Reconstruction era or founding era); *Bruen*, 597 U.S. at 37-38 (same).

time-period question to resolve this case, if it chooses to do so, the correct originalist answer is to focus on the Reconstruction era and 1868, not the founding and 1791.

**A.    Reconstruction-Era and Later Evidence Is Critically Important to the Historical Inquiry, Regardless of Which Era Is the Primary Focus**

As the district court correctly recognized, *see, e.g.*, JA975-976, JA979, JA983-984, JA996-997, history from Reconstruction and later is crucial to the Second Amendment analysis. The Supreme Court has repeatedly examined history from the mid-19th century and beyond when assessing the validity of firearms regulations. *Heller* relied on "'19th-century cases that interpreted the Second Amendment,'" "'discussion of the Second Amendment in Congress and in public discourse' after the Civil War," and "'how post-Civil War commentators understood the right.'" *Bruen*, 597 U.S. at 21 (describing and quoting *District of Columbia v. Heller*, 554 U.S. 570, 610, 614 (2008)). Likewise, *Bruen* relied on mid-19th-century cases and statutes, *see id.* at 51-57, and surveyed "public discourse surrounding Reconstruction," *id.* at 60. *Bruen* also invoked 19th-century evidence in discussing sensitive places in particular. It said that "18th- *and 19th-century*" laws restricting the

possession of guns in legislative assemblies, polling places, and courthouses satisfied its historical analysis, 597 U.S. at 30 (emphasis added), and cited to sources in which all the 19th-century laws restricting guns in the locations the Court listed were from the *late* 19th century.[3]

*Rahimi* has now put the relevance of 19th century evidence even further beyond doubt. It rested its decision *upholding* a challenged law in large part on laws passed between 1836 and 1868. *See* 602 U.S. at 696 (relying on Massachusetts surety statute from 1836); *id.* (invoking similar statutes of nine other jurisdictions by citation to *Bruen*, 597 U.S. at 56 & n.23); *Bruen*, 597 U.S. at 56 & n.23 (citing 1838 Wisconsin, 1840 Maine, 1846 Michigan, 1847 Virginia, 1851 Minnesota, 1854 Oregon, 1857 District of Columbia, 1860 Pennsylvania, and 1868 West Virginia surety laws).

---

[3] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

This Court and other circuits have likewise recognized that 19th-century and later laws are critical to the historical inquiry. In *Bianchi*, this Court emphasized that it "is vital to appreciate that while history may fix the date on which certain events occur, the understanding of history is not frozen in time." 111 F.4th at 462. It then considered evidence from the 19th century through the late 20th century to "trac[e] the broader and consistent story of our nation's [firearm] regulation" in upholding Maryland's assault-weapons law. *Id.* at 465-71. In *Antonyuk*, the Second Circuit explained that "evidence from the Reconstruction Era regarding the scope of the right to bear arms … is at least as relevant as evidence from the Founding Era." *Antonyuk v. James*, 120 F.4th 941, 988 n.36 (2d Cir. 2024). And in *Wolford*, the Ninth Circuit agreed that, at least in sensitive-places challenges like this one, it would "look to the understanding of the right to bear arms *both* at the time of the ratification of the Second Amendment in 1791 *and* at the time of the ratification of the Fourteenth Amendment in 1868." 116 F.4th at 980.[4]

---

[4] Like the court below, other district courts within this circuit have similarly adopted this "long view of … history," *Bianchi*, 111 F.4th at 471, and considered historical sources from the 19th- and 20th-

This focus on Reconstruction-era and later evidence follows the Supreme Court's instruction that "examination of a variety of legal and other sources to determine the *public understanding* of a legal text in the period *after* its enactment or ratification" is "a critical tool of constitutional interpretation." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 605) (second emphasis added). As Justice Kavanaugh explained in *Rahimi*, "the Framers[] expect[ed] and inten[ded] that post-ratification history would be a proper and important tool" of constitutional interpretation. 602 U.S. at 725 (Kavanaugh, J., concurring); *see also id.* at 728-29 (collecting over thirty Supreme Court cases relying on post-ratification history, including evidence long after the founding). Justice Barrett likewise emphasized in *Rahimi* that "postenactment history can be an important tool," including to

---

centuries. *See, e.g.*, *LaFave v. County of Fairfax*, No. 1:23-cv-01605, 2024 WL 3928883, at *7-11 (E.D. Va. Aug. 23, 2024) (rejecting the argument that the historical analysis must "be restricted to the Founding Era" and considering firearm regulations from even before 1791 and continuing into the 20th century), *appeal docketed*, No. 24-1886 (4th Cir. Sept. 16, 2024); *Md. Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567, 582-83, 585-88 (D. Md. 2023) (explaining that the court would "consider historical sources from the time period of the ratification of the Fourteenth Amendment," and also considering 20th-century history), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023).

"liquidate ambiguous constitutional provisions." *Id.* at 738 (Barrett, J., concurring) (cleaned up). And that is consistent with *Bruen*'s guidance that "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." 597 U.S. at 35-36 (cleaned up). Even Plaintiffs concede that post-ratification history can sometimes "clarify Founding Era understandings." Pls. Br. 15.

Looking to 19th-century and later evidence can also help contextualize earlier legislative inaction. If a regulation passed in the decades around Reconstruction—within the lifetimes of some who were alive at the founding—did not raise a constitutional challenge at the time of its passage, and there is no separate historical evidence showing that the regulation would have raised constitutional concern in earlier decades, then it can be inferred that the regulation comports with the founding-era public understanding of the right.

In other words, absent affirmative evidence to the contrary, a court should presume that a Reconstruction-era or later tradition also reflects the founding-era understanding. And here, Plaintiffs have provided no founding-era evidence that contradicts later tradition, so

8

there is no reason to think that there was some drastic shift in the
understanding of the Second Amendment from 1791 to 1868.[5] Despite
what Plaintiffs contend, the "absence of … restriction[s] from the
Founding Era," Pls. Br. 39; *see id.* at 51, does not suffice. Indeed, it is a
"serious problem[]"to "assume[] that founding-era legislatures
maximally exercised their power to regulate, thereby adopting a 'use it
or lose it' view of legislative authority." *Rahimi*, 602 U.S. at 739-40
(Barrett, J., concurring); *see also, e.g., Dobbs v. Jackson Women's Health
Org.*, 597 U.S. 215, 217 (2022) (explaining that "the fact that many
States in the late 18th and early 19th century did not criminalize"
certain conduct "does not mean that anyone thought the States lacked
the authority to do so").

---

[5] Plaintiffs' attempted reliance on colonial-era laws requiring some
men to carry guns to church, *see* Pls. Br. 32-33, is misplaced. Those laws
"were not rooted in the Second Amendment's tradition," but rather were
passed so that "militiamen or free white men" could "defend against
potential attacks by Native Americans and Blacks during slave
uprisings." *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 396 (S.D.N.Y.
2023), *appeal docketed*, No. 23-995 (2d Cir. July 6, 2023). And in any
case, reliance on such laws "mistakes a legal obligation for a right."
*Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1331 (11th Cir. 2023), *vacated
on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023).

Nor is 1868 a cutoff. It is "implausible" that "public understanding would promptly dissipate whenever [one] era gave way to another." *Antonyuk*, 120 F.4th at 973. As this Court confirmed in *Bianchi*, arms regulations enacted "in a later century than the ratification of the Second and Fourteenth Amendments" still "remain relevant" in conducting the *Bruen-Rahimi* historical analysis. 111 F.4th at 469; *see id.* at 468-70 (considering consistent historical evidence from the 20th century). After all, "[p]rinciples of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011).

In sum, late 19th- and early 20th-century history did not come "far too late," Pls. Br. 3, as Plaintiffs argue. Instead, it plays a critical role in the *Bruen-Rahimi* historical analysis—and that is true no matter whether the focus of that analysis is 1791 or 1868.

## B. If this Court Chooses To Resolve the Time-Period Question, the Proper Focus Is the Reconstruction Era, Not the Founding Era

For the reasons just set out, this Court should consider 19th-century and later evidence and uphold Maryland's restrictions

regardless of whether the Reconstruction era or the founding era is the most relevant time period. But if it chooses to address that time-period question, it should conclude that the inquiry centers on the Reconstruction era and 1868.

To begin, because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35), focusing on 1868 in a case concerning a state law is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? Since the people chose to extend the Bill of Rights to the states in 1868, it is their understanding of the scope of each right at that time that should control the originalist analysis today.

Indeed, holding otherwise would not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right around 1868. *See McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010); *see also id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). "It would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction

standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk*, 120 F.4th at 973.

That is presumably why the Seventh Circuit, in a pre-*Bruen* opinion by Judge Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011); *accord United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018).[6]

In fact, since *Bruen*, courts have seen a notable "trend … of recognizing the Reconstruction Era as more probative of the Second Amendment's scope than the Founding Era," in cases involving state or local laws. *LaFave*, 2024 WL 3928883, at *8; *see Bondi*, 61 F.4th at 1322 ("[H]istorical sources from the Reconstruction Era are more probative of

---

[6] These courts reached this conclusion at the first, historical step of the pre-*Bruen* Second Amendment framework used by lower federal courts. Those analyses generally remain good law. *Bruen* rejected the second step (means-end scrutiny), but explained that the first "is broadly consistent with *Heller*." 597 U.S. at 19.

the Second Amendment's scope than those from the Founding Era.");[7]
*Rupp v. Bonta*, 723 F. Supp. 3d 837, 851, 876-78 (C.D. Cal. 2024)
(reaching same conclusion), *appeal docketed*, No. 24-2583 (9th Cir. Apr.
24, 2024); *Md. Shall Issue, Inc.*, 680 F. Supp. 3d at 582-83 (agreeing
with *Bondi*); *We the Patriots, Inc. v. Lujan Grisham*, 697 F. Supp. 3d
1222, 1234 (D.N.M. 2023) (agreeing with *Bondi* and *Maryland Shall
Issue*), *appeal dismissed*, 119 F.4th 1253 (10th Cir. 2024). And, as noted,
still more courts have concluded that Reconstruction-era evidence is at
least as important as founding-era evidence. *See supra* p. 6 and note 4;
*see also Bianchi*, 111 F.4th at 464-72 (considering evidence from both
eras, as well as later evidence).

Plaintiffs urge this Court to focus on founding-era history, relying
on *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d
Cir. 2024), *vacated sub nom. Paris v. Lara*, No. 24-93, 2024 WL 4486348
(U.S. Oct. 15, 2024), and *Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir.
2024). *See* Pls. Br. 26. The district court expressly rejected that
approach, *see* JA1015-1016, and this Court should do the same. Instead

---

[7] Despite being vacated for rehearing en banc, *Bondi*'s robust
reasoning and authorities remain persuasive.

of engaging with originalist principles, the court in *Lara* based its conclusion on a "general assumption" in several Supreme Court cases cited by *Bruen*. *Lara*, 91 F.4th at 133 (citing *Bruen*, 597 U.S. at 37). Similarly, in *Worth*, the Eighth Circuit pointed to this same assumption to conclude that Reconstruction-era laws "carry less weight than Founding-era evidence." *Worth*, 108 F.4th at 692-93, 697. But the Supreme Court made clear that this general assumption did not resolve the time-period issue—otherwise, it would have just said so in *Bruen*, rather than leaving the issue open. *See Bondi*, 61 F.4th at 1323. Moreover, the cases *Bruen* cited did not address the significance of the Fourteenth Amendment's ratification for this issue and cannot have resolved the question that *Bruen* and *Rahimi* expressly left open. *See Bruen*, 597 U.S. at 37-38; *Rahimi*, 602 U.S. at 692 n.1. Because *Lara* and *Worth* relied on an assumption and cannot be squared with originalist principles, they are not persuasive. *See* JA1015-1016 (finding *Lara* "unconvinc[ing]" and noting that it "do[es] not bind" the court); *Antonyuk*, 120 F.4th at 974 (rejecting the reasoning in *Lara*); *Rupp*, 723 F. Supp. 3d at 877-78 (declining to follow *Lara* because, "[r]ather than

14

elevate an assumption to a holding, the Court thinks it best to address the issue from first principles").[8]

The conclusion that the 1868 understanding should govern in a case against a state is far from radical. It is the answer former Solicitor General Paul Clement, as counsel for New York's NRA affiliate, gave when asked by Justice Thomas during oral argument in *Bruen*.[9] It is also the position of prominent originalist scholars "across the political spectrum." *Bondi*, 61 F.4th at 1322 n.9 (citing, among others, Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo).[10] Both

---

[8] Plaintiffs likewise suggest that *Gamble v. United States*, 587 U.S. 678 (2019), *Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020), and *Ramos v. Louisiana*, 590 U.S. 83 (2020), have resolved this time-period issue in favor of 1791. *See* Pls. Br. 23-24. But again, none of those cases addressed the significance of the Fourteenth Amendment's ratification and thus cannot have resolved an issue that *Bruen* and *Rahimi* expressly left open. *See Bruen*, 597 U.S. at 37-38; *Rahimi*, 602 U.S. at 692 n.1.

[9] *See* Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843) ("[If] the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.").

[10] *See* Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52-53 (2010); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485

15

Justice Thomas and Justice Scalia have expressed similar views. *See Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 212 (2021) (Thomas, J., dissenting) ("While the majority entirely ignores the relevant history, I would begin the assessment of the scope of free-speech rights incorporated against the States by looking to what ordinary citizens at the time of the Fourteenth Amendment's ratification would have understood the right to encompass." (cleaned up)); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) (calling for "further evidence of common practice in 1868, since I doubt that the Fourteenth Amendment time-warped the post-Civil War States back to the Revolution"). Simply put, a faithful originalist analysis compels applying the 1868 understanding of the right to keep and bear arms in a case challenging a state law.

---

(2008); *see also* Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists"); Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008).

 To be clear, we do not suggest that each of these scholars also believes that 1868 is the correct focus for analyzing the meaning of the right in cases against the federal government. But, as explained below, the weight of authority and analysis favors 1868. *See infra* pp. 17-20.

16

This conclusion raises the question (not directly presented here) as to the correct temporal focus in cases challenging *federal* laws. To be sure, the choice between 1791 and 1868 is a less straightforward one for federal laws. "Originalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* seemed to reject the possibility of different standards for the state and federal governments, requiring incorporated rights to "have the same scope" against each. 597 U.S. at 37. Accordingly, it appears that originalists must justify applying either the 1868 understanding or the 1791 understanding (if they conflict) to all levels of government.

Existing doctrine does not resolve this choice. In *Rahimi*, the Supreme Court specifically declined to resolve it—in a case concerning a federal law. *See* 602 U.S. at 692 n.1. And in *Bruen*, the Court noted only that prior decisions had "*assumed*" that the scope for both state and federal governments "is pegged to the public understanding … in 1791."

17

597 U.S. at 37 (emphasis added). If the majority believed those decisions controlled the issue, it would have said so.

Instead, the Court expressly left the question open, pointing to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 37-38. The Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).[11] The Court's choice to highlight *only*

---

[11] On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning as to not only the states, but also the federal government. *See* Amar, *The Bill of Rights*, *supra*, at xiv, 223, 243 (referring to this as a doctrinal "feedback effect"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866."). More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, … invest[ing] those

these two scholars suggests a belief that their views are correct, and thus that Reconstruction should be the central focus.

Plaintiffs contend that prioritizing the Reconstruction-era understanding of the right would "work a radical shift in constitutional jurisprudence." Pls. Br. 23. But, to the contrary, "[r]eliance on post-ratification history 'has shaped scores of Court cases spanning all domains of constitutional law, every era of the nation's history, and Justices of every stripe.'" *Rahimi*, 602 U.S. at 728 (Kavanaugh, J., concurring) (citation omitted); *see id.* at 728-29 (citing cases). Indeed, even in cases Plaintiffs rely on, the Court has routinely looked at a wide span of history, including from the Reconstruction era, in assessing constitutional claims.[12]  Thus, finding that the Reconstruction era is the

---

original 1791 texts with new 1868 meanings." Lash, manuscript, at 2; *see Bruen*, 597 U.S. at 38. On this view, too, 1868 meanings bind both the states and the federal government.

[12] *See, e.g.*, *Nev. Comm'n on Ethics*, 564 U.S. at 122-25 (in interpreting First Amendment, finding consistent tradition from founding era through 20th century); *Ramos*, 590 U.S. at 90-92 (looking to sources from 14th through late-19th centuries to determine meaning of Sixth Amendment right to jury trial); *Crawford v. Washington*, 541 U.S. 36, 42-50 (2004) (looking to sources from 16th through 19th centuries to determine meaning of Confrontation Clause); *Timbs v. Indiana*, 586 U.S. 146, 150-53 (2019) (looking to sources from Magna Carta to colonial era to Reconstruction to present day in interpreting

central focus, if the Court chooses to resolve that question, would work

no "radical shift."

## II.  Sensitive Places Are Not Defined By Government-Provided Security

The Court should reject Plaintiffs' argument that the Second

Amendment forbids prohibiting guns in the absence of comprehensive,

government-provided security. *See* Pls. Br. 28-33. Several courts,

including the district court below, have rejected that argument, before

and after *Bruen*. *See* JA974-975; *Wolford*, 116 F.4th at 981; *United

States v. Class*, 930 F.3d 460, 464-65 (D.C. Cir. 2019); *LaFave*, 2024 WL

3928883, at *13. This Court should do the same, for two central reasons.

*First*, it is impossible to reconcile Plaintiffs' argument with *Heller* and

*Bruen*'s recognition that guns may be prohibited in schools and

government buildings. *Second*, the argument is also irreconcilable with

---

Eighth Amendment Excessive Fines Clause and finding that it applies
against the states).

*Bruen*'s confirmation that prohibitions in legislative buildings, polling places, and courthouses are constitutional.

A.    **Schools and government buildings.** *Heller* recognized that guns may be prohibited in schools and government buildings, and *Bruen* reiterated *Heller*'s statement. See *Heller*, 554 U.S. at 626; *Bruen*, 597 U.S. at 30; *see also id.* at 81 (Kavanaugh, J., concurring). This Court, sitting en banc, recently endorsed the same principle, reaffirming that "'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings' are permissible." *Bianchi*, 111 F.4th at 450 (quoting *Heller*, 554 U.S. at 626).

The constitutionality of these prohibitions alone is sufficient to defeat the comprehensive-security argument. Schools—which typically include not only buildings but yards, play areas, and athletic fields— routinely lack comprehensive, government-provided security. *See, e.g.*, *Wolford*, 116 F.4th at 981 (rejecting argument because "[m]any schools and polling places have few security measures—now or in the past—yet the Supreme Court listed those places as conclusively sensitive"); *Class*, 930 F.3d at 465 (observing that "many schools and government buildings—the paradigmatic 'sensitive places' identified in [*Heller*]—are

21

open to the public, without any form of special security or screening"
(cleaned up)). Accordingly, as the district court correctly explained,
"because *Bruen* conclusively named schools … [as] sensitive places, …
[the] argument that sensitive places are limited to buildings with
comprehensive, state-provided security is baseless." JA975.

The same is true of government buildings. Any number of
government buildings lack comprehensive security, such as public
libraries, community recreation centers, and post offices. *See, e.g.*,
*Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1123 (10th Cir. 2015)
(stating, in rejecting Second Amendment challenge to prohibition on
firearms in post offices, that specific post office at issue "d[id] not
regularly employ any security officers"); *see also LaFave*, 2024 WL
3928883, at *13 (noting that "many recognized sensitive spaces lack
enhanced security").

In essence, Plaintiffs' comprehensive-security argument first
ignores *Heller* and *Bruen*'s endorsement of firearms prohibitions in
schools and government buildings, then invents a principle purportedly
(but incorrectly, *see infra* Part II.B) based on the other location
restrictions *Bruen* approves, and then tries to deploy that principle as a

reason to ignore the Supreme Court's endorsement of prohibitions in schools and government buildings. That is hopelessly circular.

**B.  Legislative buildings, polling places, and courthouses.**

Even leaving aside that Plaintiffs' argument is impossible to reconcile with the constitutionality of firearms restrictions in schools and government buildings, their argument also fails on its own terms. Plaintiffs have failed to establish that the three additional locations *Bruen* named—legislative assemblies, polling places, and courthouses— all feature comprehensive security.

Polling places, for example, routinely lack government security. *See Wolford*, 116 F.4th at 981. Indeed, law enforcement officers are often "barred from the vicinity of the polls to avoid any appearance of coercion in the electoral process." *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality opinion) (describing Tennessee law barring law enforcement from the vicinity of polls); *see also*, *e.g.*, Luke Barr, *Trump Says He Wants Police at Polling Sites. Experts Say that's Unlawful*, ABC News (Aug. 21, 2020), tinyurl.com/fcv5x9xe (quoting Minnesota Secretary of State explaining that "you can't preemptively station or assign [police officers] to a polling place. You just can't do it. It's

unlawful."). The same was true historically. *See* Del. Const. of 1776, art. 28, *reprinted in The Constitutions of the Several Independent States of America* 143-44 (1786) (mandating that "*no person[s]* shall come armed" to any election and that no "battalion or company, in the pay of the continent, or of this or any other State" shall come within one mile of any election-place for twenty-four hours before or after an election (emphasis added)).[13]

Plaintiffs' efforts to support their argument with historical evidence fall well short. Their legislative-assembly laws, for example, *see* Pls. Br. 29-30, do not come close to proving that these buildings routinely had comprehensive security.[14] They cite statutes permitting payments to "door-keepers"—in almost all cases, just one or two individuals for a legislative house. *See, e.g.*, Pls.' Ex. 7, p. 240 (New Jersey statute providing for payment to single door-keeper); Pls.' Ex. 5,

---

[13] *Available at* https://avalon.law.yale.edu/18th_century/de02.asp.

[14] The U.S. Department of Justice recently detailed similar flaws in security arguments raised with respect to polling places and courthouses, in defending a challenge by two of the same organizational plaintiffs (and their same counsel) against the federal restriction on carrying guns in post offices. *See* Defendants' Combined Motion for Summary Judgment & Opposition to Plaintiffs' Motion for Summary Judgment, *Firearms Policy Coal. v. Garland*, No. 4:24-cv-00565 (N.D. Tex., Nov. 27, 2024), Dkt. 27, at 12-20.

pp. 426-27 (South Carolina statute, one door-keeper for each legislative chamber); Pls.' Ex. 6, pp. 372-73 (Georgia statute, one individual in dual role of "messenger and door-keeper" for each chamber). None of these statutes, however, mandated how often these door-keepers attended the legislative buildings, explained their duties when they did so, or ensured that these positions were constantly (or ever) filled. It is not even clear that a door-keeper routinely provided security. A source from the Maryland State Archives, for example, indicates that the regular tasks of one of Maryland's legislative door-keepers included "supplying wood for the use of the General Assembly and maintaining the furniture." Archives of Maryland (Biographical Series): Cornelius Mills (c.1755–1823), *available at* https://tinyurl.com/yc3nfzzv (describing the tasks of Mr. Cornelius Mills as door-keeper in October 1778) (footnotes omitted); *see id.* ("During this time, Mills also worked on the James Brice House in Annapolis as a carpenter/joiner, ran a boardinghouse, and advertised his experience as an auctioneer."). And even if their duties did include security, a tiny contingent of door-keepers for an entire legislative house would not amount to meaningful, let alone "comprehensive," security. *Cf.* J. William Harris, *Portrait of a Small*

*Slaveholder: The Journal of Benton Miller*, 74 Georgia Historical Quarterly 1, 14 (1990) (explaining that Benton Miller, who served as door-keeper in Georgia House from 1873 to 1883, had lost "more than four inches of his left leg" in the Civil War and walked with crutch and cane).[15]

Indeed, even such indisputably sensitive places as the U.S. Capitol and the White House lacked serious security for decades. *See* United States Capitol Police, *Mission & History*, https://www.uscp.gov/the-department/our-mission (explaining that

---

[15] In his diary, John Quincy Adams made observations about a number of 19th-century door-keepers of the U.S. House of Representatives that further undermine any suggestion that these men would have provided meaningful security. For example, in 1831, the final year of Benjamin Burch's 10-year service as House door-keeper, Adams noted that the 70-year-old Burch "has been for several years and yet is an invalid, confined to his house"—suggesting that Burch had spent several years employed as door-keeper without even being present in the House. *See John Quincy Adams Digital Diary, Dated 7 December 1831*, Primary Source Cooperative at the Massachusetts Historical Society, https://tinyurl.com/yjvusktm; Burch, Benjamin, *History, Art, & Archives – United States House of Representatives*, https://tinyurl.com/46wbn2cr. Burch's successor was Overton Carr, who served as door-keeper from 1831 to 1837. Carr died from ill health while still employed in this position—and Adams described him as having been "many months in decline." *John Quincy Adams Digital Diary, Dated 22 March 1838*, Primary Source Cooperative at the Massachusetts Historical Society, https://tinyurl.com/25am8xmk.

when Congress moved to Washington, DC in 1800, a "lone watchman, John Golding, was hired to protect the Capitol Building," and that the watch remained one person until 1828, when it was expanded to four); Katie Zezima, *People Used to Be Able to Walk into the White House. Legally.*, Wash. Post (Sept. 23, 2014), https://perma.cc/M2UM-VHND ("Despite being open to the public, there was very little security at the White House until a drunk man threw rocks at President John Tyler…. Abraham Lincoln … stationed guards at the White House. After the Civil War, however, security measures dropped off."); *Guarding the White House*, White House Hist. Ass'n, https://www.whitehousehistory.org/press-room/press-timelines/guarding-the-white-house (timeline describing no guards at White House before 1830, other than militia presence on White House grounds during War of 1812, and no permanent security force until a four-man guard was established in 1842). Accordingly, it cannot be the case that a place is "sensitive" only if it is "protected by government-provided security." Pls. Br. 28.

## CONCLUSION

This Court should reverse the judgment of the district court as to the claims regarding the private property consent rule, carrying in locations selling alcohol for onsite consumption, and carrying within 1,000 feet of public demonstrations, and should affirm the judgment in all other respects.

Dated: December 23, 2024          Respectfully submitted,

<u>/s/ Sana S. Mesiya</u>
Sana S. Mesiya
Everytown Law
P.O. Box 14780
Washington, DC 20044
smesiya@everytown.org
(202) 517-6620

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163

*Counsel for amicus curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because this brief contains 5,679 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

<u>/s/ Sana S. Mesiya</u>
Sana S. Mesiya
*Counsel for amicus curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2024, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Sana S. Mesiya
Sana S. Mesiya
*Counsel for amicus curiae*
*Everytown for Gun Safety*