Nos. 24-1799(L), 24-1827, 24-1834, and 24-1836

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

SUSANNAH WARNER KIPKE, et al.,
PLAINTIFFS-APPELLANTS / CROSS-APPELLEES,

v.

WESLEY MOORE, in his official capacity, et al.,
DEFENDANTS-APPELLEES / CROSS-APPELLANTS.

KATHERINE NOVOTNY, et al.,
PLAINTIFFS-APPELLANTS / CROSS-APPELLEES,

v.

WESLEY MOORE, in his official capacity, et al.,
DEFENDANTS-APPELLEES / CROSS-APPELLANTS.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Nos. 1:23-cv-01293, and 1:23-cv-01295

**BRIEF FOR THE DISTRICT OF COLUMBIA, ILLINOIS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAII, MAINE, MASSACHUSETTS, MINNESOTA, NEVADA, NEW JERSEY, NEW YORK, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, AND WASHINGTON AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE IN PART AND REVERSAL IN PART**

BRIAN L. SCHWALB
District of Columbia Attorney General

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

ANNE A. DENG
Assistant Attorney General

Office of the Attorney General for the
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

KWAME RAOUL
Illinois Attorney General

JANE ELINOR NOTZ
Solicitor General

SARAH A. HUNGER
Deputy Solicitor General

Office of the Attorney General for the
State of Illinois
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5502
sarah.hunger@ilag.gov

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ..................................................................1

SUMMARY OF ARGUMENT ....................................................................2

ARGUMENT ...............................................................................................5

I.    The Second Amendment Allows States To Implement Reasonable Firearm Regulations To Promote Gun Safety And Protect Against Gun Violence...............................................5

II.    Consistent With Regulations Adopted By Other States, Maryland's Designation Of "Sensitive Places" Protects Uniquely Vulnerable Locations And Populations ................................9

III.    Maryland's Private-Property Provision Reflects A Reasoned Policy Decision About How Best To Protect Public Safety And The Rights Of Property Owners..........................................18

    A.    The private-property provision does not implicate Second Amendment rights because it merely sets a default rule ..........18

    B.    Property owners have good reason to prefer a default rule that bars firearms without explicit permission.........................21

    C.    Other states have adopted similar presumptions for the carry of firearms on private property.......................................22

CONCLUSION.......................................................................................26

# TABLE OF AUTHORITIES

*Cases*

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024) ................................................................ 10, 11, 13

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) ........................................................................ 9

*Blum v. Yaretsky*,
457 U.S. 991 (1982) ...................................................................................... 19

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ............................................................ 1, 2, 5, 6, 7, 9, 13

*GeorgiaCarry.Org, Inc. v. Georgia*,
687 F.3d 1244 (11th Cir. 2012) .................................................................... 18

*Maryland Shall Issue, Inc. v. Montgomery Cnty., Maryland*,
680 F. Supp. 3d 567 (D. Md. 2023) ............................................................. 13

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ........................................................................... 5, 6, 7, 8

*Medtronic Inc. v. Lohr*,
518 U.S. 470 (1996) ........................................................................................ 5

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022) ................................................. 1, 5, 6, 7, 8, 9, 10, 13

*United States v. Class*,
930 F.3d 460 (D.C. Cir. 2019) ................................................................. 9, 14

*United States v. Morrison*,
529 U.S. 598 (2000) ........................................................................................ 5

*United States v. Rahimi*,
144 S. Ct. 1889 (2024) ........................................................................... 5, 7, 8

*Voisine v. United States*,
579 U.S. 686 (2016) ........................................................................................ 9

*Wolford v. Lopez*,
116 F.4th 959 (9th Cir. 2024) ................................................... 18, 22

*Statutes and Regulations*

Ala. Code § 13A-11-59 ................................................................ 16

Ala. Code § 13A-11-61.2 ............................................................. 16

Alaska Stat. § 11.61.220 ........................................................ 16, 22

Ark. Code Ann. § 5-73-306 ..................................................... 16, 24

Cal. Penal Code § 26230 ....................................................... 15, 16

Colo. Rev. Stat. § 18-9-118 ........................................................ 16

Conn. Gen. Stat. § 53-202d ......................................................... 22

D.C. Code § 7-2509.07 ......................................................... 16, 23

D.C. Code § 22-4502.01 .............................................................. 16

Fla. Stat. § 790.06 ................................................................... 16

Haw. Rev. Stat. Ann. § 134-9.1 .................................................... 16

Haw. Rev. Stat. Ann. § 134-9.5 .................................................... 22

Kan. Stat. Ann. § 75-7c24 .......................................................... 25

Kan. Stat. Ann. § 75-7c10 .......................................................... 25

Ky. Rev. Stat. § 244.125 ............................................................ 16

430 Ill. Comp. Stat. § 66/65 ........................................... 15, 16, 23, 25

La. Rev. Stat. § 40:1379.3 ...................................................... 16, 22

Md. Code Ann., Crim. Law § 4-111 ................................................. 2

Md. Code Ann., Crim. Law § 6-411 ............................................. 4, 19

Me. Stat. tit. 17-A, § 402 ......................................................... 24

Minn. Stat. § 97A.091 ............................................................. 16

Miss. Code Ann. § 45-9-101 ................................................... 16

Mo. Rev. Stat. § 571.107 ..................................................... 1, 17

Mont. Code § 87-5-401 ........................................................... 16

N.C. Gen. Stat. § 14-277.2 ..................................................... 16

N.D. Cent. Code § 62.1-02-04 ............................................... 16

N.J. Stat. Ann. § 2C:58-4.6 ................................................... 16

N.Y. Penal Law § 265.01-e ............................................... 15, 16

Neb. Rev. Stat. § 28-1202.01 ........................................... 16, 23

Okla. Stat. Ann. tit. 21, § 1272.1 ......................................... 16

S.C. Code Ann. § 16-23-465 ................................................. 16

S.C. Code Ann. § 23-31-220 ................................................. 23

Tex. Penal Code § 46.03 .................................................. 15, 16

Tex. Penal Code § 30.05 .................................................. 23, 25

Tex. Penal Code § 30.06 .................................................. 23, 25

Tex. Penal Code § 30.07 .................................................. 23, 25

Va. Code. Ann. § 18.2-283.2 ................................................. 16

Va. Code Ann. § 18.2-308.01 ................................................ 24

Vt. Stat. Ann. tit. 10, § 5201 ................................................ 24

Wash. Rev. Code Ann. § 9.41.300 ......................................... 16

Wyo. Stat. § 6-8-104(t)(vii) ...................................................... 16

## Other

Brad J. Bushman, *Guns Automatically Prime Aggressive Thoughts, Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*, 9 Soc. Psych. & Personality Sci. 727 (2018)..................................... 12

*Brooklyn Subway Shooting: Police Search for Gunman in Attack on Brooklyn Subway*, N.Y. Times (Apr. 15, 2022) ................................................ 11

Bruen *and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C. L. Rev. E. Supp. I.-60 (2022) ................................................ 10

Carlie Porterfield, *10 Injured in Stampede at New York's Barclays Center Amid Shooting Scare, Police Say*, Forbes (May 29, 2022) ............................... 11

David Hemenway et al., *Gun Use in the United States: Results from Two National Surveys*, 6 Injury Prevention 263 (2000) ............................................ 11

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018) .................................................... 10

FBI, *Uniform Crime Reporting Statistics: Their Proper Use* (May 2017) ............ 17

*Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183 (Winter 2020) .......................................... 20

Heather A. Turner et al., *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*, 32 J. Traumatic Stress 881 (2019)...... 13

Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183 (Winter 2020) .......................................................... 19, 20, 24

Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 Nw. U. L. Rev. 139 (2021) ................................................................ 12, 14

Larry Buchanan et al., *Who Stops a 'Bad Guy With a Gun'?*, N.Y. Times (Jun. 22, 2022) ......................................................................... 15

*Law Enforcement Officers Killed and Assaulted*, FBI (tbl. 33, "Law Enforcement Officers Feloniously Killed, 2010-2019") .................................... 15

Randy E. Barnett, *The Sound of Silence: Default Rules and Contractual Consent*, 78 Va. L. Rev. 821 (1992) ................................................... 19

R. K. Campbell, *Dialing Long Distance*, Police Mag. (Oct. 31, 2003) .................. 15

*The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018) ............................................ 9

*The Sound of Silence: Default Rules and Contractual Consent*, 78 Va. L. Rev. 821 (1992) ......................................................... 20

Tyler Fedor et al., *9 People Wounded in South Carolina Mall Shooting, Police Say*, N.Y. Times (Apr. 16, 2022) .................................................. 11

Victoria Arancio et al., *8 shot, 2 trampled in mass shooting at nightclub in Kansas*, ABC11 (Jul. 3, 2023) ..................................................... 11

*When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 Nw. U. L. Rev. 139 (2021) ............................... 12

**INTEREST OF AMICI CURIAE**

Amici the District of Columbia, Illinois, California, Colorado, Connecticut, Delaware, Hawaii, Maine, Massachusetts, Minnesota, Nevada, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington (collectively, "Amici States") submit this brief in support of defendants-appellees pursuant to Federal Rule of Appellate Procedure 29(a)(2).

Amici States have a responsibility to protect the health, safety, and welfare of their communities, which includes protecting their residents from the harmful effects of gun violence and promoting the safe and responsible use of firearms. Amici States have historically fulfilled this responsibility by exercising their police powers to implement reasonable measures to regulate firearms, including by imposing location-based restrictions on carrying guns and setting presumptions for the carry of firearms on private property. Such regulation does not conflict with the Second Amendment. As the Supreme Court has consistently recognized, the Second Amendment does not encompass the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," leaving states with the flexibility they need to protect their communities. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008)).

1

Indeed, the Second Amendment "leaves [jurisdictions with] a variety of tools for combating [the] problem" of gun violence. *Heller*, 554 U.S. at 636. This flexibility is an essential element of our federalist system, and it ensures that firearm regulations appropriately and effectively address the specific concerns in each locality. Although Amici States have taken different approaches to regulating firearms, they share an interest in addressing gun violence in ways that are tailored to the needs of their residents. Amici States seek to maintain their authority to address firearm-related issues through legislation that is consistent with historical tradition and responsive to the unique circumstances in their communities.

## SUMMARY OF ARGUMENT

In 2023, following the Supreme Court's opinion in *Bruen*, Maryland enacted comprehensive legislation reforming its public-carry regime. As part of that legislative enactment, which is referred to as the Gun Safety Act of 2023 ("Act"), Maryland identified a list of "sensitive places" in which firearms are restricted and set a default rule that restricts carrying on private property without the owner's consent. *See* Md. Code Ann., Crim. Law § 4-111 (sensitive places), § 6-411 (private-property default rule).

Shortly after the Act was passed, plaintiffs challenged the constitutionality of the private-property provision and certain sensitive-place restrictions under the Act and other Maryland firearm laws, seeking injunctive relief. The district court

granted plaintiffs' motions in part and denied them in part and entered orders enjoining defendants, first preliminarily and then permanently, from enforcing some of the Act's restrictions on public carrying. Specifically, the district court enjoined enforcement of restrictions on carrying within 1,000 feet of a public demonstration, in locations selling alcohol for on-site consumption, and on private property without first obtaining permission to do so. *See* Joint Appendix ("J.A.") 963 (preliminary injunction memorandum opinion); J.A. 1006 (permanent injunction memorandum opinion). The district court denied plaintiffs' motions with respect to their challenges to other provisions of the Act—restrictions on carrying in museums, healthcare facilities, state parks, mass transit facilities, school grounds, government buildings and grounds, stadiums, racetracks, amusement parks, and casinos. *See* J.A. 969-70, 1001, 1018-19. Plaintiffs appealed, and Maryland cross-appealed.

Amici States agree with Maryland that the challenged provisions do not violate the Second Amendment because they fit squarely within a long tradition of constitutionally acceptable regulations that states and localities have adopted to protect their residents. To start, the sensitive places challenged by plaintiffs are consistent with the types of locations that other states have designated as sensitive— designations that limit firearm possession in especially dangerous spaces, around vulnerable populations, and where individuals are exercising other constitutionally

protected rights. As in other states, Maryland's sensitive-place designations protect the public from the heightened risk of gun violence in such locations.

Amici States further agree that the Act's prohibition against the carrying of firearms on private property "unless the owner or the owner's agent has posted a clear and conspicuous sign" or given "express permission" otherwise, Md. Code Ann., Crim. Law § 6-411(d)(1)-(2), does not burden anyone's Second Amendment rights.[1] By contrast, it *protects* property owners' rights by allowing them to make an informed decision about whether and how firearms are brought on their property, and it does so by setting an easily altered presumption. This approach also accords with laws adopted by other states. Although state measures vary in form, they collectively demonstrate that setting presumptions for the carrying of firearms onto private property is well within states' traditional regulatory role.

---

[1] The Act prohibits carrying firearms absent permission from the owner or owner's agent both in "dwelling[s]," Md. Code Ann., Crim. Law § 6-411(c), and on "property," *id.* § 6-411(d). Appellants appear to be challenging only the latter, § 6-411(d). *See* Appellants' Br. 12-13 ("[The Kipke plaintiffs] . . . challenged the no-carry default for private properties (but not for dwellings). . . . The Novotny Plaintiffs challenged . . . the no-carry default as to private property open to the public.").

# ARGUMENT

**I.    The Second Amendment Allows States To Implement Reasonable Firearm Regulations To Promote Gun Safety And Protect Against Gun Violence.**

Since the Founding, states have enacted restrictions on who may bear arms, where arms may be brought, and the manner in which arms may be carried.  *See United States v. Rahimi*, 144 S. Ct. 1889, 1899-901 (2024); *Bruen*, 142 S. Ct. at 2145; *McDonald v. City of Chicago*, 561 U.S. 742, 784-85 (2010); *Heller*, 554 U.S. at 626-27.  The Act is one in a long line of state regulations designed to make gun possession and use safer for the public, and it is a lawful exercise of Maryland's regulatory powers.

States have "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons."  *Medtronic Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (internal quotation marks omitted).  Enacting measures to promote public safety—particularly those that are tailored to local circumstances—falls squarely within the reasonable exercise of states' police powers.  Indeed, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."  *United States v. Morrison*, 529 U.S. 598, 618 (2000).

The Supreme Court has repeatedly affirmed states' authority in this area, even as it has defined the scope and import of the rights conferred by the Second Amendment. In each of its major Second Amendment opinions—*Heller*, *McDonald*, *Bruen*, and *Rahimi*—the Court expressly acknowledged the important role states play in setting their own local policies to minimize the risk of gun violence, a role consistent with our Nation's historical tradition.

In *Heller*, the Court made clear that the Second Amendment right to keep and bear arms is "not unlimited." 554 U.S. at 626. Although states may not ban the possession of handguns by responsible, law-abiding individuals or impose similarly severe burdens on the Second Amendment right, they still possess "a variety of tools" to combat the problem of gun violence in a way that is responsive to the needs of their communities. *Id.* at 636. States may, for example, implement measures prohibiting certain groups of people from possessing firearms, and they may "forbid[] the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 626-27.

The Court reiterated this point in *McDonald*, emphasizing that the Second Amendment "by no means eliminates" a state's "ability to devise solutions to social problems that suit local needs and values." 561 U.S. at 785; *see id.* at 802 (Scalia, J., concurring) ("No fundamental right—not even the First Amendment—is absolute."). Recognizing that "conditions and problems differ from locality to

locality," *id.* at 783, the Court made clear that "state and local experimentation with reasonable firearms regulations" could and should continue "under the Second Amendment," *id*. at 785 (brackets and internal quotation marks omitted).

*Bruen* confirmed these principles. There, the Court explicitly stated that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of provisions "designed to ensure only that those bearing arms . . . are, in fact, 'law-abiding, responsible citizens.'" 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). And, building on *Heller*, the Court "assume[d] it settled" that prohibiting firearms in sensitive locations—including "schools and government buildings," "legislative assemblies, polling places, and courthouses," and "new and analogous sensitive places"—is constitutional. *Id*. at 2133 (emphasis omitted).

Most recently, in *Rahimi*, the Court again explained that "the right secured by the Second Amendment is not unlimited" and should not be understood to protect the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 144 S. Ct. at 1897 (quoting *Heller*, 554 U.S. at 626-27). Indeed, the Court elaborated, "[a]t the founding, the bearing of arms was subject to regulations ranging from rules about firearm storage to restrictions on gun use by drunken New Year's Eve revelers" to "ban[s] [on] the carrying of dangerous and unusual weapons . . . [and] concealed firearms." *Id.* (internal quotation marks omitted).

These decisions make clear that states retain the power to enact laws to protect their residents and that those laws need not be uniform: states are free to select "solutions to social problems that suit local needs and values," ensuring that firearm regulations appropriately and effectively address the specific circumstances in each state. *McDonald*, 561 U.S. at 785. As the Court emphasized in *Bruen*, the Second Amendment is not a "regulatory straightjacket." 142 S. Ct. at 2133. Rather, states are permitted to enact a wide range of firearm regulations. *See id.* at 2162 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (quoting *Heller*, 554 U.S. at 636)).

Nor are states limited to precisely the same laws that were enacted in the past. *See Rahimi*, 144 S. Ct. at 1897 (stating that the Court's "precedents were not meant to suggest a law trapped in amber"). Thus, in *Bruen*, the Court instructed courts to "use analogies" to long-recognized sensitive places—such as schools and government buildings—to "determine [whether] modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Bruen*, 142 S. Ct. at 2133-34 (emphasis omitted); *see Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring) (describing "the 'sensitive places' principle that limits the right to public carry" as a principle from which states and courts could analogize). And in *Rahimi*, the Court reiterated that *Bruen* does not mandate a "historical twin," 144 S. Ct. at 1903, but instead requires courts to "ascertain whether

the new law is 'relevantly similar' to laws that our tradition is understood to permit," *id.* at 1898.

In short, "[t]he [Second] Amendment has not disabled the ability of representative democracy to respond to an urgent public safety crisis." *Bianchi v. Brown*, 111 F.4th 438, 472 (4th Cir. 2024) (en banc). States retain not only the freedom, but also the fundamental responsibility, to implement reasonable measures designed to respond to the needs of their communities and to protect their residents from the harms associated with gun violence.

## II. Consistent With Regulations Adopted By Other States, Maryland's Designation Of "Sensitive Places" Protects Uniquely Vulnerable Locations And Populations.

As the Supreme Court has consistently recognized, the right to "bear" firearms in public has long been understood to permit restrictions on bearing arms in "sensitive places." *Heller*, 554 U.S. at 626; *see Bruen*, 142 S. Ct. at 2133 (reaffirming that in sensitive places, "arms carrying [can] be prohibited consistent with the Second Amendment"). Because people "can preserve an undiminished right of self-defense by not entering [such] places" or by "taking an alternate route," *United States v. Class*, 930 F.3d 460, 465-66 (D.C. Cir. 2019) (internal quotation marks omitted), laws restricting firearms in places identified as sensitive "neither prohibit nor broadly frustrate any individual from generally exercising his right to bear arms," *Voisine v. United States*, 579 U.S. 686, 714 (2016) (Thomas, J.,

dissenting).    "[S]ensitive places" thus are "in effect exempt . . . from the Second Amendment."  *Bruen*, 142 S. Ct. at 2133-34; *see* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 215 (2018) ("[T]he sensitive places doctrine is an exception to the general right to bear arms.").

Maryland's designation of various locations as sensitive places—including healthcare facilities, state parks, mass transit facilities, school grounds, and government buildings—is a reasonable and appropriate response to the heightened risk associated with the presence of firearms in such locations.  Indeed, other states routinely restrict firearms possession, as Maryland has done, in particularly crowded or volatile places, around vulnerable populations, or where individuals are exercising other constitutionally protected rights.

*First*, states frequently restrict the use of firearms in certain dangerous places where volatile conditions create special risks to health and safety.  For example, states have designated areas as sensitive places to preserve order and diminish the risk of panic in crowded locations.  *See* Carina Bentata Gryting & Mark Frassetto, *NYRSPA* v. *Bruen and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C. L. Rev. E. Supp. I.-60, I.-68 (2022) ("The number of potential targets . . . and the increased risk of conflict all seem to be relevant in the historical determination that an area constitutes a sensitive

place."); *see also Antonyuk v. James*, 120 F.4th 941, 1027 (2d Cir. 2024) (finding that "a high population density in discrete, confined spaces, such as quintessential public squares, has historically justified firearm restrictions"). In crowded places, such as museums, stadiums, racetracks, amusement parks, casinos, and mass transit facilities, firearm use is likely to end in tragedy—not only for the innocent bystanders who may be shot, but also for others who may be crushed or trampled by a panicked crowd. *See, e.g.*, Victoria Arancio *et al.*, *8 shot, 2 trampled in mass shooting at nightclub in Kansas*, ABC11 (Jul. 3, 2023), https://tinyurl.com/3mcaexxf; Carlie Porterfield, *10 Injured in Stampede at New York's Barclays Center Amid Shooting Scare, Police Say*, Forbes (May 29, 2022), https://tinyurl.com/2xeuc7fj; *Brooklyn Subway Shooting: Police Search for Gunman in Attack on Brooklyn Subway*, N.Y. Times (Apr. 15, 2022) (10 shot and another 13 injured from smoke inhalation, falls, or panic attacks), http://tinyurl.com/4tdteru9; Tyler Fedor *et al.*, *9 People Wounded in South Carolina Mall Shooting, Police Say*, N.Y. Times (Apr. 16, 2022) (nine shot and five others injured in the stampede), https://tinyurl.com/5n8y2w62.

Likewise, when individuals consume alcohol—which impairs both judgment and dexterity—the risk of either accidental or intentional use of firearms increases. *See* David Hemenway *et al.*, *Gun Use in the United States: Results from Two National Surveys*, 6 Injury Prevention 263, 266 (2000),

11

https://tinyurl.com/55yf7d3m ("Regular citizens with guns, who are sometimes tired, angry, drunk or afraid, and who are not trained in dispute resolution or when it is proper to use a firearm, have many opportunities for inappropriate gun use."). Physical jostling and emotional frustration are also not uncommon in spaces like bars and restaurants. The presence of firearms can make these situations more dangerous. *Antonyuk*, 120 F.4th at 1031 (noting that "liquor-licensed establishments are both typically crowded milieus and are frequented by intoxicated individuals who cannot necessarily be trusted with firearms and who may also, due to their intoxication, be unable to defend themselves effectively"). Indeed, given the "weapons effect," wherein the presence of a weapon primes individuals to think and act more aggressively, allowing firearms in these spaces increases the likelihood of violence. *See* Brad J. Bushman, *Guns Automatically Prime Aggressive Thoughts, Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*, 9 Soc. Psych. & Personality Sci. 727, 730-31 (2018), https://tinyurl.com/34cnpvmd.

Allowing firearms to be carried in certain locations can also jeopardize the effective operation of those locations. The discharge of a firearm in a healthcare facility or government building may cause a costly and inconvenient shut-down, disrupting essential services. And even the perceived risk of gun violence can cause social and economic repercussions, as individuals may be discouraged from visiting crowded or confined locations where they know others may be armed. *See* Joseph

Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L. Rev. 139, 141 (2021) ("Gun laws protect people's freedom and confidence to participate in every domain of our shared life, from attending school to shopping, going to concerts, gathering for prayer, voting, assembling in peaceable debate, counting electoral votes, and participating in the inauguration of a President.").

*Second*, designating state parks, school grounds, healthcare facilities, amusement parks, and similar locations as sensitive places helps protect particularly vulnerable populations, like children and their caretakers. These individuals cannot easily defend themselves or escape a violent attack, should one occur. And even if they are not physically harmed by firearms, exposure to such violence can cause psychological harm. *See* Heather A. Turner *et al.*, *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*, 32 J. Traumatic Stress 881, 888 (2019), https://tinyurl.com/2vwsed8n (finding that indirect exposure to gun violence, including witnessing violence or hearing gunshots, can be traumatic to children). Indeed, courts have recognized that the regular presence of children and other vulnerable people in a particular location is a strong indication that it is properly deemed sensitive for Second Amendment purposes. *See, e.g.*, *Antonyuk*, 120 F.4th at 1012 (finding historical "tradition of prohibiting firearms in locations where vulnerable populations congregate"); *Maryland Shall Issue, Inc. v.*

*Montgomery Cnty., Maryland*, 680 F. Supp. 3d 567, 584 (D. Md. 2023) ("[P]rohibitions on firearms in both schools and childcare facilities are meant to protect . . . vulnerable populations, consisting of students and children.").

*Third*, states frequently designate sensitive places to protect the exercise of other constitutional rights. The Supreme Court has recognized that areas in which constitutionally protected activities occur, such as courthouses, polling places, and legislative assemblies, are quintessential examples of sensitive places. *See Bruen*, 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626-27. Firearms may be prohibited in these locations because of the risk that violence could threaten key government functions. The D.C. Circuit, for example, held that a parking lot near the Capitol could be designated a sensitive place because it enabled staffers to safely travel to and from their work at the national legislature. *See Class*, 930 F.3d at 464. The same reasoning applies to areas—like state parks or around public demonstrations—in which individuals engage in other constitutionally protected activities, such as speech and political engagement. Not only are these locations often targets of violence, but the mere presence of firearms and the implicit threat they communicate could chill individuals' peaceful exercise of their rights. *See* Blocher & Siegel, *supra* at 141.

*Fourth*, creating a buffer zone around sensitive places—such as Maryland's restriction on carrying a firearm within 1,000 feet of a public demonstration—is a

sensible policy choice designed to ensure the safety and security of these locations. As a basic principle, increasing the distance between an individual with a firearm and a potential victim makes good sense because, for most individuals, long-distance shooting is both more difficult and less effective. *See, e.g.*, R. K. Campbell, *Dialing Long Distance*, Police Mag. (Oct. 31, 2003), https://tinyurl.com/2p9vmpkj ("[M]ost officers believe that shooting a pistol beyond 25 yards is futile."). Indeed, in 2019, over 90% of police officers killed by firearms were shot from a range less than 50 yards. *Law Enforcement Officers Killed and Assaulted*, FBI, https://tinyurl.com/mr22mszd (tbl. 33, "Law Enforcement Officers Feloniously Killed, 2010-2019") (last visited Dec. 30, 2024). But beyond simply increasing the difficulty of aiming a firearm, buffer zones serve an additional, critical purpose: they empower law enforcement to intercept armed individuals *before* they reach a sensitive place. By the time an active shooter is at a sensitive location, it is often too late for law enforcement to prevent the attack. Larry Buchanan *et al.*, *Who Stops a 'Bad Guy With a Gun'?*, N.Y. Times (Jun. 22, 2022), https://tinyurl.com/4n7r8ys7 (reporting several cases in which an attacker shot dozens of individuals in the 30 seconds to a couple of minutes that it took for law enforcement to respond). Robust buffer zones thus provide law enforcement the time and space they need to stop armed individuals before they reach their intended victims.

In light of the reasons why sensitive-place designations protect public safety, states have long exercised their authority to restrict firearms in sensitive locations similar to the Maryland laws challenged here. For instance, many states have enacted restrictions on carrying firearms in public parks or wildlife preserves, *see, e.g.*, Cal. Penal Code § 26230(a)(12), (13); Minn. Stat. § 97A.091, subd.1(1); Mont. Code § 87-5-401(1); or entertainment venues, *see, e.g.*, Ala. Code §§ 13A-11-61.2(a)(5)-(6); N.Y. Penal Law § 265.01-e(2)(p); Tex. Penal Code § 46.03(a)(4), (13). Other states restrict carrying in healthcare facilities, *see, e.g.*, 430 Ill. Comp. Stat. 66/65(a)(7); Mo. Rev. Stat. § 571.107(17); Tex. Penal Code § 46.03(a)(11), and on mass transit systems, *see, e.g.*, Colo. Rev. Stat. § 18-9-118; N.Y. Penal Law § 265.01-e(2)(n). At least 11 jurisdictions restrict the carry of firearms at or near public demonstrations or rallies.[2] At least 18 jurisdictions have passed laws restricting the carry of firearms in establishments primarily serving

---

[2] *See* Ala. Code §§ 13A-11-59(b)-(c); Ark. Code Ann. § 5-73-306(17); D.C. Code § 7-2509.07(14); Haw. Rev. Stat. Ann. § 134-9.1(a)(15); 430 Ill. Comp. Stat. 66/65(a)(10); La. Rev. Stat. § 40:1379.3(N)(9); N.C. Gen. Stat. § 14-277.2(a); Neb. Rev. Stat. § 28-1202.01(3); N.J. Stat. Ann. § 2C:58-4.6(a)(6); N.Y. Penal Law § 265.01-e(2)(s); Wash. Rev. Code Ann. § 9.41.300(2)(a)-(b).

alcohol.[3]   And many jurisdictions have instituted buffer zones around sensitive places.[4]

The fact that the list of locations designated as sensitive may vary from state to state reflects both the need to tailor such designations to the specific characteristics of each community and a shared concern with minimizing the risk of gun violence. *See* FBI, *Uniform Crime Reporting Statistics: Their Proper Use* 1 (May 2017), https://tinyurl.com/yzh8v8up (noting that a wide variety of factors "affect the volume and type of crime occurring from place to place," including population density, the size of the youth population, poverty level, job availability, modes of transportation, climate, and cultural characteristics).   While firearms restrictions

---

[3]     *See* Alaska Stat. § 11.61.220(a)(2); Cal. Penal Code § 26230(a)(9) (eff. Jan. 1, 2025); D.C. Code § 7-2509.07(a)(7); Fla. Stat. § 790.06(12)(a)(12); Haw. Rev. Stat. Ann. § 134-9.1(a)(4); Ky. Rev. Stat. § 244.125(1); Mich. Comp. Laws Serv. § 28.425o(1)(d); Miss. Code Ann. § 45-9-101(13); Mo. Rev. Stat. § 571.107(7); N.J. Stat. § 2C:58-4.6(a)(15); N.Y. Penal Law § 265.01-e(2)(o); Neb. Rev. Stat. § 28-1202.01(3); N.D. Cent. Code § 62.1-02-04(1); Okla. Stat. Ann. tit. 21, § 1272.1; S.C. Code Ann. § 16-23-465; Tex. Penal Code § 46.03(a)(7); Wash. Rev. Code Ann. § 9.41.300(1)(d); Wyo. Stat. § 6-8-104(t)(vii).

[4]     *See, e.g.*, Ala. Code § 13A-11-59(c) (restricting firearms "within 1,000 feet of a demonstration at a public place"); D.C. Code § 7-2509.07(14) (1,000-foot buffer around demonstrations); N.J. Stat. Ann. § 2C:58-4.6(a)(6) (100-foot buffer around demonstrations); Wash. Rev. Code Ann. § 9.41.300(2)(b) (250-foot buffer around demonstrations); D.C. Code § 22-4502.01(a) (1,000-foot buffer around schools); Tex. Penal Code § 46.03(a)(6) (1,000-foot buffer around places of execution); Va. Code. Ann. § 18.2-283.2 (restricting carry in the entire "Capitol Square" area, including "sidewalks . . . extending from 50 feet" from government-building entrances).

vary based on local conditions and needs, they collectively demonstrate that Maryland's law is precisely the kind of regulation that states have traditionally adopted to address the particular concerns associated with carrying firearms in sensitive places.

## III.    Maryland's Private-Property Provision Reflects A Reasoned Policy Decision About How Best To Protect Public Safety And The Rights Of Property Owners.

The Act's private-property provision, which prohibits carrying arms on private property without the property owner's express verbal or written permission, is also constitutionally valid.  In adopting a default rule that firearms are not allowed on private property without express permission, Maryland has chosen an approach that is tailored to the needs and characteristics of its community.  This rule is in line with the national consensus on such default rules, and it reflects the interests of property owners in protecting public safety and preventing gun violence on their property.  It also fits comfortably within the longstanding practice of states across the country, which have set similar presumptions for carrying on private property.

### A.    The private-property provision does not implicate Second Amendment rights because it merely sets a default rule.

There is no Second Amendment right to carry firearms on another person's private property without their consent.  *See GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012) (noting that "the Second Amendment does not include protection for a right to carry a firearm [on private property] against the

18

owner's wishes"), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. Rather, when the Amendment was adopted, it incorporated longstanding principles of "property law, tort law, and criminal law" that recognized a private property owner's right to determine who may enter and whether they may be armed. *Id.* "Nothing in the text of the Second Amendment or otherwise suggests that a private property owner—even owners who open their private property to the public—must allow persons who bear arms to enter." *Wolford v. Lopez*, 116 F.4th 959, 994 (9th Cir. 2024). Maryland's private-property provision, which affirms property owners' decisions about whether to allow public carrying on their property, thus does not interfere with any Second Amendment rights.

Instead, Maryland's law merely regulates how property owners communicate their consent and clarifies the inference that can be drawn from a property owner's silence, setting a constitutionally permissible default rule. *See GeorgiaCarry.Org*, 687 F.3d at 1264 ("Quite simply, there is no constitutional infirmity when a private property owner exercises his, her, or its . . . right to control who may enter, and whether that invited guest can be armed, and the State vindicates that right."). For instance, property owners in Maryland may consent to the carry of firearms on their property simply by "post[ing] a clear and conspicuous sign indicating that it is permissible to wear, carry, or transport a firearm on the property," Md. Code Ann., Crim. Law § 6-411(d)(1), or by giving "express permission," *id.* § 6-411(d)(2). This

approach protects property owners' authority to make their own decisions about whether to allow firearms on their grounds and ensures they have the information they need to make an informed choice. It neither predetermines whether firearms will be barred on private property nor impairs the right to carry a firearm for self-defense. Accordingly, the private-property provision falls outside the ambit of the Second Amendment. *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ("[C]onstitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains.").

The district court's conclusion to the contrary is based on the flawed view that "[p]laintiffs have a presumptive right to carry in buildings open to the public," and that the private-property provision infringes on that right. J.A. 991 n.9, 1015. But this reasoning misunderstands the operation of default rules. Default rules "govern parties in the absence of some explicit contrary agreement or altering action." Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183, 183 (Winter 2020), https://tinyurl.com/4ke6hv8j. Because individuals can change or opt out of defaults like the challenged provision, it is "unrealistic" to view them "as being 'imposed upon' the parties." Randy E. Barnett, *The Sound of Silence: Default Rules and Contractual Consent*, 78 Va. L. Rev. 821, 865 (1992). Rather, "one's silence in the

face of default rules that one can change constitutes consent to the application of"
rules like Maryland's. *Id.* at 906.

### B. Property owners have good reason to prefer a default rule that bars firearms without explicit permission.

Maryland's default rule also reflects the national consensus on default rules
governing the carry of firearms on private property. In a national survey, a majority
of respondents expressed support for a "no carry" default rule for residences, places
of employment, and retail establishments. *See* Ayres & Jonnalagadda, *supra* at 186.
Given these preferences, the private-property provision is an efficient policy choice,
minimizing transaction costs by eliminating the need for most property owners to
contract around the default (while leaving others free to allow firearms if they wish).
*Id*. at 183.

Indeed, many property owners have good reason to prefer the default rule set
by Maryland. Numerous privately owned locations have characteristics that make
the presence of firearms more dangerous, similar to traditional "sensitive places,"
and property owners may share the concerns that motivate states to restrict firearms
in such locations. *See supra* Section I. For instance, many places covered by the
private-property provision, such as shopping malls and grocery stores, are crowded
and confined spaces in which the presence of firearms poses a particular risk to
public health and safety. In addition, a variety of places, including stores and
fast-food restaurants, are frequented by vulnerable populations like children, whom

property owners may want to protect.  And some private spaces may also be the site of constitutionally protected activity, which a property owner might fear will be disrupted by the presence of firearms.  For example, political meetings and conventions often take place in private offices or business conference centers.  Given these concerns, a property owner could reasonably determine that allowing firearms would be too dangerous or otherwise undesirable.

Thus, even though privately owned spaces may not be designated as sensitive places per se, private property owners may share the same concerns that motivate states to restrict firearms in those locations.  Property owners may also have important reasons of their own to want to restrict firearms on their property.  Setting a default rule that bars firearms on private property without the property owners' express permission respects the preferences of the majority of owners without precluding others from making a different decision, and in doing so fosters clarity for members of the public.  It is a sensible and efficient measure that does not interfere with the rights of property owners to decide whether to exclude, or to allow, firearms on their property.

### C.     Other states have adopted similar presumptions for the carry of firearms on private property.

Like Maryland, other states have made the policy choice to set a default rule for the carrying of firearms on private property.  While the default rules in different locations vary based on local needs and conditions, Maryland's choice fits squarely

within the longstanding tradition of states regulating how and when private property owners exercise their right to exclude firearms.

Several states have enacted laws that, like Maryland's, provide that individuals may not carry a firearm onto another person's property without that person's express permission.  For example, Hawaii restricts the carry of firearms on private property "unless the person has been given express [written or verbal] authorization" by the owner or operator, Haw. Rev. Stat. Ann. § 134-9.5(a)-(b)—a law recently upheld by the Ninth Circuit, *see Wolford*, 116 F.4th at 995 (holding that "Hawaii's [private-property default] law falls well within the historical tradition"). Connecticut provides that assault weapons may only be carried "on property owned by another person with the owner's express permission."  Conn. Gen. Stat. § 53-202d(f)(1).  And Alaska and Louisiana, among others, provide that a person may not carry a concealed weapon into the residence of another person without the express consent of someone who lives there.  Alaska Stat. § 11.61.220(a)(1)(B); La. Rev. Stat. Ann. § 40:1379.3(O)(2) ("No individual to whom a concealed handgun permit is issued . . . may carry a concealed handgun into the private residence of another without first receiving the consent of that person."); *see* D.C. Code § 7-2509.07(b)(1) (providing that the carrying of a concealed pistol "[o]n private residential property shall be presumed to be prohibited unless otherwise authorized

by the property owner . . . and communicated personally to the licensee in advance of entry onto the residential property").

Other states have flipped the presumption. Nebraska, for instance, allows a permitholder to carry a concealed handgun "anywhere in Nebraska," excepting private property on which "the person, persons, entity, or entities in control of the place or premises or employer in control of the place or premises has prohibited the carrying of concealed handguns into or onto the place or premises." Neb. Rev. Stat. § 28-1202.01; *see also* 430 Ill. Comp. Stat. 66/65(a-10) (explaining that the owner of private real property may prohibit the carrying of concealed firearms on the property); Tex. Penal Code §§ 30.05(c), 30.06, 30.07 (criminalizing the open or concealed carry of a handgun on the property of another if the licensee does not have the owner's consent and has received notice that carry is forbidden); Va. Code Ann. § 18.2-308.01(c) (noting that a concealed handgun permit does not authorize possession of a handgun "in places where such possession . . . is prohibited by the owner of private property"). And Arkansas sets a default that firearms are allowed in others' homes without express consent, but it requires that anyone who carries a concealed handgun into such a dwelling also notify the occupant. Ark. Code Ann. § 5-73-306(18)(A)(iv).

Similarly, states have created default rules for firearm-related activities on private property. For example, 25 states require that hunters obtain permission

before entering private property.  Ayres & Jonnalagadda, *supra* at 184.  And again, other states have chosen the inverse default.  Vermont, for example, requires that a property owner who wishes to ban hunting post signs around their property line.  Vt. Stat. Ann. tit. 10, § 5201; *see also* Me. Stat. tit. 17-A, § 402 (requiring that a property owner who wants to exclude individuals indicate that access is prohibited, either in general or for a specific activity like hunting).

In addition to setting default rules for carrying firearms on private property, several states have adopted detailed requirements regulating how a private property owner should communicate whether she allows firearms on her property.  Texas, for example, requires that a notice prohibiting the carry of firearms use certain language, be posted conspicuously in both English and Spanish, and use print in contrasting colors with block letters at least one inch in height.  Tex. Penal Code §§ 30.05(c), 30.06, 30.07.  Kansas similarly regulates "the location, content, size and other characteristics of signs" barring firearms on private property, Kan. Stat. Ann. §§ 75-7c24, 75-7c10, as does Illinois, *see* 430 Ill. Comp. Stat. 66/65(d) (requiring that signs prohibiting firearms be conspicuously posted at building's entrance, meet design requirements established by state police, and be four by six inches in size).

In short, Maryland's private-property provision reflects the legislature's reasoned policy determination about how best to set the default rule for carrying firearms on private property and how property owners should communicate their

decision about whether to exclude such weapons. Although this provision is not identical to provisions adopted by other states, it is similarly informed by and tailored to local conditions and the needs of residents. The law therefore fits comfortably within both the longstanding practice of other states and the bounds of the Second Amendment.

## CONCLUSION

The Court should affirm in part and reverse in part the decision below.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for
the District of Columbia

KWAME RAOUL
Attorney General for
the State of Illinois

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE
Solicitor General

JANE ELINOR NOTZ
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

SARAH A. HUNGER
Deputy Solicitor General

ANNE A. DENG
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
for the State of Illinois
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5202
sarah.hunger@ilag.gov

Office of the Attorney General
for the District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

December 2024

ROB BONTA
*Attorney General*
State of California

PHILIP J. WEISER
*Attorney General*
State of Colorado

WILLIAM TONG
*Attorney General*
State of Connecticut

KATHLEEN JENNINGS
*Attorney General*
State of Delaware

ANNE E. LOPEZ
*Attorney General*
State of Hawaii

AARON M. FREY
*Attorney General*
State of Maine

ANDREA CAMPBELL
*Attorney General*
Commonwealth of Massachusetts

KEITH ELLISON
*Attorney General*
State of Minnesota

AARON D. FORD
*Attorney General*
State of Nevada

MATTHEW J. PLATKIN
*Attorney General*
State of New Jersey

LETITIA JAMES
*Attorney General*
State of New York

ELLEN F. ROSENBLUM
*Attorney General*
State of Oregon

MICHELLE A. HENRY
*Attorney General*
Commonwealth of Pennsylvania

PETER F. NERONHA
*Attorney General*
State of Rhode Island

CHARITY R. CLARK
*Attorney General*
State of Vermont

ROBERT W. FERGUSON
*Attorney General*
State of Washington

## CERTIFICATE OF COMPLIANCE

I certify that:

1. This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because the brief contains 5,911 words, excluding exempted parts.

2. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on December 30, 2024, an electronic copy of the foregoing was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE