**Nos. 24-1799(L), 24-1827, 24-1834, 24-1836**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT
_____

SUSANNAH WARNER KIPKE, *et al.*,

*Plaintiffs-Appellants / Cross-Appellees*,

v.

WES MOORE, *et al.*,

*Defendants-Appellees / Cross-Appellants*,

_____

KATHERINE NOVOTNY, *et. al.*,

*Plaintiffs-Appellants / Cross-Appellees*,

v.

WESLEY MOORE, *et al.*,

*Defendants-Appellees / Cross-Appellants*.

_____

On Appeal from the United States District Court
for the District of Maryland
No. 1:23-cv-01293-GLR
No. 1:23-cv-01295-GLR

_____

**PLAINTIFFS-APPELLANTS' RESPONSE AND REPLY BRIEF**
_____

(Counsel listed on following page)

John Parker Sweeney
James W. Porter, III
William Chadwick Lamar, Jr.
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street NW, Suite 1350
Washington, DC 20036
Phone: (202) 719-8216
jsweeney@bradley.com

*Attorneys for Plaintiffs-Appellants /
Cross-Appellees Susannah Warner Kipke
and Maryland State Rifle and Pistol
Association, Inc.*

David H. Thompson
Peter A. Patterson
Megan Marie Wold
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Phone: (202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
mwold@cooperkirk.com
wbergstrom@cooperkirk.com

*Attorneys for Plaintiffs-Appellants /
Cross-Appellees Katherine Novotny,
Sue Burke, Esther Rossberg,
Maryland Shall Issue, Inc., Second
Amendment Foundation, and
Firearms Policy Coalition*

Mark W. Pennak
LAW OFFICES OF MARK W. PENNAK
7416 Ridgewood Ave.
Chevy Chase, MD 20815
Tel: (301) 873-3671
mpennak@marylandshallissue.org

*Attorney for Plaintiffs-Appellants /
Cross-Appellees Katherine Novotny,
Sue Burke, Esther Rossberg,
Maryland Shall Issue, Inc., Second
Amendment Foundation, and
Firearms Policy Coalition*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1799__     Caption: __Susannah Warner Kipke, et al. v. Wes Moore, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Susannah Warner Kipke__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ John Parker Sweeney         Date: August 27, 2024

Counsel for: Appellants

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1799__          Caption: Susannah Warner Kipke, et al. v. Wes Moore, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Maryland State Rifle and Pistol Association, Inc.
(name of party/amicus)


who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                              ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                                  ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ John Parker Sweeney                    Date:   August 27, 2024

Counsel for: Appellants

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. ___24-1827___      Caption: ___Novotny v. Moore_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

___Firearms Policy Coalition_____
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO

2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation?                    ☐YES ☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
        party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
        caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
        corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
        If yes, the United States, absent good cause shown, must list (1) each organizational
        victim of the criminal activity and (2) if an organizational victim is a corporation, the
        parent corporation and any publicly held corporation that owns 10% or more of the stock
        of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David H. Thompson _____        Date: ___ September 4, 2024 ___

Counsel for: Plaintiffs-Appellants _____

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1827__     Caption: __Novotny v. Moore__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Maryland Shall Issue, Inc.__
(name of party/amicus)

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO

2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David H. Thompson                    Date:    September 4, 2024

Counsel for: Plaintiffs-Appellants

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1827__    Caption: __Novotny v. Moore__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Second Amendment Foundation__
(name of party/amicus)

_____

who is _____appellant_____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation?                ☐YES☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES☑NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                ☐YES☑NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
        party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
        caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
        corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?                ☐YES☑NO
        If yes, the United States, absent good cause shown, must list (1) each organizational
        victim of the criminal activity and (2) if an organizational victim is a corporation, the
        parent corporation and any publicly held corporation that owns 10% or more of the stock
        of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David H. Thompson                          Date:    September 4, 2024

Counsel for: Plaintiffs-Appellants

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1827     Caption: Novotny v. Moore

Pursuant to FRAP 26.1 and Local Rule 26.1,

Sue Burke
(name of party/amicus)


 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.   Does party/amicus have any parent corporations?                              ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:




3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
     other publicly held entity?                                                  ☐YES ☑NO
     If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                  ☐YES ☑NO
If yes, identify entity and nature of interest:


5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:


6.      Does this case arise out of a bankruptcy proceeding?                  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.


7.      Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.


Signature:  /s/ David H. Thompson                    Date:    November 4, 2024

Counsel for:  Plaintiffs-Appellants


- 2 -

[ Print to PDF for Filing ]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1827   Caption: Novotny v. Moore

Pursuant to FRAP 26.1 and Local Rule 26.1,

Katherine Novotny
(name of party/amicus)


who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.   Does party/amicus have any parent corporations?   ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:




3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
     If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?          ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?          ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?          ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David H. Thompson                Date:    November 4, 2024

Counsel for: Plaintiffs-Appellants

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1827          Caption: Novotny v. Moore

Pursuant to FRAP 26.1 and Local Rule 26.1,

Esther Rossberg
(name of party/amicus)


 who is _____ appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO


2.   Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
     If yes, identify all parent corporations, including all generations of parent corporations:




3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                              ☐ YES ☑ NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐YES☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                     ☐YES☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?     ☐YES☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David H. Thompson                          Date:    November 4, 2024

Counsel for: Plaintiffs-Appellants

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

SUMMARY OF THE ARGUMENT ...................................................2

ARGUMENT .......................................................................................3

I.   Maryland concedes that the Second Amendment's text presumptively prohibits all but one of the Carry Bans............................................3

II.   Maryland failed to prove that any of the Carry Bans is consistent with historical tradition ..............................................................................7

    A.   The State's Bruen-defying methodological distortions should be rejected ....................................................................................8

    B.   Sensitive places must be protected by comprehensive government-provided security ...................................................................13

    C.   The State's fabricated "traditions" and "principles" find no support in history or precedent ...................................................21

    D.   The State failed to demonstrate a justifying historical tradition for the Carry Bans that the district court upheld...........................31

        1.   Museums....................................................................31

        2.   Healthcare Facilities .................................................32

        3.   Mass Transit ............................................................33

        4.   State Parks and Forests ...........................................34

        5.   Entertainment Facilities...........................................37

        6.   School Grounds ........................................................37

        7.   All Government Buildings ........................................38

    E.   The State failed to demonstrate a justifying historical tradition for the Carry Bans that the district court enjoined........................41

        1.   Public Demonstrations .............................................41

        2.   Locations Selling Alcohol (Bars and Restaurants) ...................45

        3.   No-Carry Default......................................................48

CONCLUSION ....................................................................................56

i

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Antonyuk v. James,*
   120 F.4th 941 (2d Cir. 2024) .................................. 4, 7, 13, 23, 36, 50, 53, 54, 56

*Babbitt v. United Farm Workers Nat'l Union,*
   442 U.S. 289 (1979)................................................................................50, 51

*Bianchi v. Brown,*
   111 F.4th 438 (4th Cir. 2024) (en banc) ...........................................................11

*Bonidy v. United States Postal Service,*
   790 F.3d 1121 (10th Cir. 2015) ........................................................................30

*Building & Construction Trades Council of Metropolitan District. v.*
   *Assocated Builders & Contractors,*
   507 U.S. 218 (1993)..........................................................................................29

*Brown v. Entertainment Merchants Association,*
   564 U.S. 785 (2011)....................................................................................5, 50

*Carpenter v. United States,*
   585 U.S. 296 (2018)............................................................................................9

*Carralero v. Bonta,*
   No. 23-4354, --- F.4th ----, 2025 WL 98154 (9th Cir. Jan. 15,
   2025) ...................................................................................................................52

*Christian v. Nigrelli,*
   642 F. Supp. 3d 393 (W.D.N.Y. 2022)..............................................................51

*Citizens United v. FEC,*
   558 U.S. 310 (2010).........................................................................................40

*Clapper v. Amnesty International USA,*
   568 U.S. 398 (2013)..........................................................................................42

*Club Madonna, Inc. v. City of Miami Beach,*
   42 F.4th 1231 (11th 2022) ................................................................................40

*Common Cause/Georgia v. Billups*,
    554 F.3d 1340 (11th Cir. 2009) ..........................................................49

*Department of Commerce v. New York*,
    588 U.S. 752 (2019).............................................................................51

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)......................................................................*passim*

*Doe v. City of Albuquerque*,
    667 F.3d 1111 (10th Cir. 2012) ..........................................................40

*Doe v. Mckesson*,
    71 F.4th 278 (5th Cir. 2023) ...............................................................44

*Engquist v. Oregon Department of Agriculture*,
    553 U.S. 591 (2008).............................................................................29

*Espinoza v. Montana Department of Revenue*,
    591 U.S. 464 (2020).....................................................................11, 26

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ..............................................................40

*FEC v. Cruz*,
    596 U.S. 289 (2022).............................................................................50

*Freedom From Religion Foundation, Inc. v. Obama*,
    641 F.3d 803 (7th Cir. 2011) ..............................................................49

*Frein v. Pennsylvania State Police*,
    47 F.4th 247 (3d Cir. 2022) ..................................................................6

*Harper v. Public Service Commission of West Virginia*,
    396 F.3d 348 (4th Cir. 2005) ..............................................................30

*Hill v. State*,
    53 Ga. 472 (1874) ...............................................................................18

*Kenny v. Wilson*,
    885 F.3d 280 (4th Cir. 2018) ..............................................................43

iii

*Koons v. Platkin*,
   673 F. Supp. 3d 515 (D.N.J. 2023) ...................................................52

*Lara v. Comm'r Penn. State Police*,
   --- F.4th ----, 2025 WL 86539 (3d Cir. Jan. 13, 2025) ......................12

*Libertarian Party of Virginia v. Judd*,
   718 F.3d 308 (4th Cir. 2013) .......................................................44, 50

*Liberty University, Inc. v. Lew*,
   733 F.3d 72 (4th Cir. 2013) ...............................................................49

*Mahoney Area Sch. Dist. v. B.L.*,
   594 U.S. 180 (2021)...........................................................................23

*Maryland Shall Issue, Inc. v. Montgomery Cnty.*,
   680 F. Supp. 3d. 567 (D. Md. 2023)..................................................28

*Maryland Shall Issue, Inc. v. Hogan*,
   971 F.3d 199 (4th Cir. 2020) .............................................44, 50, 51

*Maryland Shall Issue, Inc. v. Moore*,
   116 F.4th 211 (4th Cir. 2024) (en banc) ............................................6

*McDonald v. City of Chicago*,
   561 U.S. 731 (2010)...........................................................................27

*Minnesota Voters Alliance v. Mansky*,
   585 U.S. 1 (2018).........................................................................29, 30

*New Jersey v. One 1990 Honda Accord*,
   154 N.J. 373 (1998) ...........................................................................53

*New Jersey v. T.L.O.*,
   469 U.S. 325 (1985)...........................................................................23

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
   597 U.S. 1 (2022).......................................................................*passim*

*New York v. United States*,
   505 U.S. 144 (1992)...........................................................................30

iv

*North Carolina Right to Life, Inc. v. Bartlett*,
    168 F.3d 705 (4th Cir. 1999) ....................................................................43, 44

*Packingham v. North Carolina*,
    582 U.S. 98 (2017)................................................................................................9

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992)............................................................................................5

*Ramos v. Louisiana*,
    590 U.S. 83 (2020)............................................................................................56

*Range v. Attorney General*,
    124 F.4th 218 (3d Cir. 2024) (en banc) ..........................................................22

*Reeves Inc. v. Stake*,
    447 U.S. 429 (1980)....................................................................................29, 30

*Simon v. Eastern Kentucky Welfare Rights Organization*,
    426 U.S. 26 (1976)............................................................................................50

*Steele v. City of Boston*,
    128 Mass. 583 (1880) ......................................................................................35

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)....................................................................42, 43, 48, 49

*Tsao v. Captiva MVP Rest. Partners, LLC*,
    986 F.3d 1332 (11th Cir. 2021) ......................................................................49

*Turaani v. Wray*,
    988 F.3d 313 (6th Cir. 2021) ..........................................................................50

*United States v. Allam*,
    677 F. Supp. 3d 545 (E.D. Tex. 2023)......................................................28, 38

*United States v. Class*,
    930 F.3d 460 (D.C. Cir. 2019)........................................................................30

*United States v. Comstock*,
    560 U.S. 126 (2010)........................................................................................30

*United States v. Kokinda*,
497 U.S. 720 (1990)....................................................................29

*United States v. Rahimi*,
602 U.S. 689 (2024).............................................................*passim*

*United States v. Texas*,
599 U.S. 670 (2023)....................................................................43

*United States v. Williams*,
113 F.4th 637 (6th Cir. 2024) ...............................................7, 22

*Wolford v. Lopez*,
116 F.4th 959 (9th Cir. 2024) .................... 4, 7, 22, 24, 30, 49, 50, 54

*Worth v. Jacobson*,
108 F.4th 677 (8th Cir. 2024) ....................................................12

**Statutes, Codes, Regulations, and Constitutional Provisions**

Md. Code, Crim. Law

§ 3-202 ............................................................................27

§ 4-102 ............................................................................37

§ 4-111(a)(2) ...............................................................32, 37

§ 4-111(a)(4) ...................................................................38

§ 4-111(a)(8) .........................................................31, 37, 45

§ 4-208 ............................................................................41

§ 4-611 ............................................................................48

Md. Code, Pub. Safety § 5-307 .........................................27

Md. Code, Transp. § 7-705(b)(6) .......................................33

COMAR

04.05.01.01 ....................................................................39

04.05.01.03 ....................................................................39

08.01.07.14 ....................................................................34

08.07.01.04 ....................................................................34

08.07.06.04 ..................................................................................34

14.25.01.01 ..................................................................................37

14.25.02.06 ..................................................................................37

36.03.10.48 ..................................................................................37

1786 VA. ACTS ........................................................................18, 25

1852 N.M. LAWS ............................................................................26

1870 TENN. ACTS............................................................................26

1870 TEX. GEN. LAWS .....................................................................26

1874 MO. LAWS ..............................................................................26

1889 ARIZ. TERR. SESS. LAWS ........................................................26

1890 OKLA. TERR. LAWS .................................................................26

1903 MONT. GEN. LAWS ..................................................................26

A DIGEST OF THE LAWS OF GEORGIA (Robert & George Watkins eds. 1800) ..........................................................................................15

ACTS OF THE PROVINCE OF NEW JERSEY (Samuel Allinson ed., 1776) ...................53

An Act establishing the Court of Appeals, Ch. CCLXXVII 1 William Littell, THE STATUTE LAW OF KENTUCKY (1809) ..............................16

An Act for reducing into one Act, the several Acts concerning the Court of Appeals and the special Court of Appeals, CH. XI, LAWS OF VIRGINIA, OCT. SESS. 1792 (1792).........................................16, 17

ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA (Augustine Davis ed. 1796) ............................................................16

COLLECTION OF STATUTES OF THE PARLIAMENT IN ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA (F. Martin Ed. 1792).................25

Jerome Bayon, *General Digest of the Ordinances and Resolutions of the Corporation of New Orleans* (1831)............................................26

2 Edw. 3, 258, ch. 3 (1328),.............................................................17

GEORGIA CODE (1873) .....................................................................26

IDAHO PENAL CODE (1901) ..............................................................26

vii

JAMES IREDELL, LAWS OF THE STATE OF NORTH-CAROLINA (Edenton: Hodge and Wills, 1791) ...................................................................26

2 LAWS OF DELAWARE (Samuel and John Adams eds. 1797) .................................16

LAWS OF NEW JERSEY (Joseph Bloomfield ed., Trenton, James J. Wilson 1811) ......................................................................................16

MD. CONST. .......................................................................................15

PA. CONST. (1776) ................................................................................53

Preface of the Commissioners of 1838, REVISED CODE OF NORTH CAROLINA (1855) ...........................................................................25, 26

THE PUBLIC LAWS OF SOUTH CAROLINA (Philadelphia, R. Aitken & Son 1790) .........................................................................................16

VT. CONST. (1777).................................................................................53

**Other Authorities**

A Test Case for the President, NEW YORK TRIBUNE, March 7, 1866, in IX PUBLIC OPINION: A Comprehensive Summary of The Press Throughout the World on All Important Current Topics, Jan.–June 1866) ...........................................................................................55

Ian Ayres, Guests with Guns: Public Support for "No Carry" Defaults on Private Land, 48 J.L. MED. & ETHICS 183 (2020) ....6, 49, 50, 51, 52

Anne Beamish, Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia, 40 LANDSCAPE J. 1 (2021) .......................................................................35

1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND (1765) ...........................................................................................17, 18

Cheryl A. Brooks, Race, Politics, and Denial: Why Oregon Forgot to Ratify the Fourteenth Amendment, 83 OR. L. REV. 731 (2004). .................55, 56

CBS Baltimore Staff, NRA sues Maryland: What could it mean for the state's new gun laws?, CBS News Baltimore (May 17, 2023) .........................43

3 CONG. REC. (1875). ............................................................................55

RONALD FLEMING, ON COMMON GROUND (1982) ..................................................35

Tabatha Abu El-Haj, *Defining Peaceably: Policing the Line Between Constitutionally Protected Protest and Unlawful Speech*, 80 MO. L. REV. 961 (2015) ......................................................................44, 45

WILLIAM HAKEWEL, *MODUS TENENDI PARLIAMENTUM* OR THE OLD MANNER OF HOLDING PARLIAMENT IN ENGLAND (1761) ...................................15

Stephen P. Halbrook, *Faux Histoire of the Right to Bear Arms: Young v. Hawaii (9th Cir. 2021)*, SSRN........................................................................25

Stephen P. Halbrook, *The Right to Bear Arms in Texas: The Intent of the Framers of the Bills of Rights*, 41 BAYLOR L. REV. 629 (1989) ..................55

THOMAS JEFFERSON, A MANUAL OF PARLIAMENTARY PRACTICE. FOR THE USE OF THE SENATE OF THE UNITED STATES (1801).....................................15

Aaron Katersky & Bill Hutchinson, *Woman set on fire on New York City subway identified by police*, ABC News (Dec. 31, 2024) .........................33

Baylen J. Linnekin, *"Tavern Talk" and the Origins of the Assembly Clause: Tracing the First Amendment's Assembly Clause Back to its Roots in Colonial Taverns*, 39 HASTINGS CONST. L.Q. 593 (2012) ...................................................................................................................46

N.Y. CITY DEP'T OF PARKS, *Bowling Green*,.............................................35

Hugh F. Rankin, *The General Court of Colonial Virginia*, COLONIAL WILLIAMSBURG DIGIT. LIBR. (Aug. 1958) ...........................................................17

Brian Sawers, *Keeping Up with the Joneses: Making Sure Your History Is Just As Wrong As Everyone Else's*, 111 MICH. L. REV. FIRST IMPRESSIONS 21 (2013) .............................................................................53

Brian Sawers, *Property Law as Labor Control in the Postbellum South,* 33 LAW & HIST. REV. 351 (2015).............................................................55

CHRSTINE SISMONDO, AMERICA WALKS INTO A BAR (2011) ...................46

R. SHEARDOWN, THE DUTY OF CONSTABLES (1790)................................16

Barry Simms, *Maryland Transit Administration Police investigating stabbing at Lexington Market*, WBALTV (Aug. 16, 2024) ................................33

Jacob R. Straus, *Sergeant at Arms and Doorkeeper of the Senate: Legislative and Administrative Duties* at 1, Cong. Rsch. Serv. (Aug. 20, 2008) ................................................................................... 15

Texas Black Codes, DIG. HIST. (2021) .................................................................. 55

5 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES (1803) ........................... 19

1 NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) .............................................................................. 54

2 NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1832) .............................................................................. 56

# INTRODUCTION

Maryland cannot "eviscerate the general right to publicly carry arms for self-defense" by declaring most places that citizens conduct their daily activities to be "sensitive places." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 30–31 (2022). Like any firearm restriction, locational restrictions are unconstitutional unless the State affirmatively proves that they are "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17.

Maryland's sweeping locational restrictions would nullify *Bruen* and the Second Amendment's unqualified command by criminalizing armed self-defense at all manner of ordinary locations, which presumptively include every single private business in the State. But Maryland's brief points to only one conclusion: neither constitutional text nor this Nation's historical tradition supports any of Maryland's Carry Bans. Implicitly acknowledging the problem, Maryland advances methodological arguments that defy Supreme Court precedent and proffers traditions that belie history. The State has not met its burden to justify any of the Carry Bans. This Court should hold that each is unconstitutional.[1]

---

[1] Plaintiffs incorporate the Jurisdictional Statement, Statement of the Case, and Standard of Review from their opening brief. (ECF No. 35-1 ("Pls.' Br.")). Plaintiffs agree with the State's Statement of the Issues. (ECF No. 39 ("State's Br.")).

## SUMMARY OF THE ARGUMENT

The State's brief confirms that the Carry Bans are unconstitutional.

**The Plain Text.** The Second Amendment's text covers carrying handguns—period. The plain text makes no locational distinctions, whether with respect to "home/public" or otherwise. *See Bruen*, 597 U.S. at 32. The text thus presumptively protects citizens' right to carry arms wherever they go. Maryland does not dispute that the text is satisfied and presumptively prohibits the Carry Bans, except with respect to the private-property No-Carry Default. But carrying a firearm on private property open to the public is carrying a firearm, and the plain text is satisfied. And if more were required, these locations are "frequented by the general public" and squarely within the right recognized by *Bruen*. *See id.* at 33.

**Historical Tradition.** The State labors to relitigate *Bruen*'s and *Rahimi*'s methodological holdings. It marches forth *Bruen*-and-history-defying arguments that it need only show a "few" examples of "Reconstruction Era" analogues and that hyper-flexible nuanced reasoning is warranted. None of its methodological arguments are correct, but they show that the Carry Bans cannot be sustained under a faithful application of the text-and-history standard.

Maryland strains to manufacture historically baseless traditions of banning firearms wherever "vulnerable" people like "children" might be found, or in any

2

crowded place, or within a vague buffer zone surrounding any sensitive location. It requests an exemption from the Second Amendment whenever it acts as a proprietor, and it asks that the Second Amendment be relegated to second-class status wherever other rights are exercised. These arguments are supported nowhere in history or precedent. The State falls back on mid-to-late 19th-century analogues that are too late, too few, and, in many cases, simply irrelevant to the Carry Bans. It is not surprising that it struggles to secure historical support, because its arguments flatly contradict our Nation's Founding Era traditions: citizens were protected at the "few" and "exceptional" "sensitive places" by government-provided security, while at all other places they were expected (or even required) to carry arms to defend themselves and others. Maryland's Carry Bans violate the Second Amendment.

## ARGUMENT

### I.    Maryland concedes that the Second Amendment's text presumptively prohibits all but one of the Carry Bans.

Plaintiffs are among "the people"; the bans regulate "Arms"; and the text protects carrying a handgun for self-defense anywhere "outside the home," including the locations where Maryland has forbidden (or presumptively forbidden) doing so. (Pls.' Br. at 17–18). The Carry Bans restrict conduct that the "plain text covers," which triggers Maryland's burden to demonstrate that its restrictions are "consistent with this Nation's historical tradition." *Bruen*, 597 U.S. at 17.

3

The State implicitly concedes that the plain text generally prohibits all of its locational restrictions. It skips right over the text except for the No-Carry Default, which it defends by arguing that the text does not "confer[] a right to carry firearms into another's building absent consent." (State's Br. at 52). That argument fails.

First, as a matter of plain text, "bear arms" means "carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Nothing in the plain text draws a distinction regarding **where** weapons may be carried—whether "home/public" or otherwise. *Bruen*, 597 U.S. at 32.

Second, even if some line could be drawn respecting private property, it would not exclude Plaintiffs' proposed conduct. Businesses open to the public obviously qualify as locations "frequented by the general public." *Bruen*, 597 U.S. at 33. There certainly is nothing in the plain text of the Constitution that would allow a distinction based on the ownership of places frequented by the public. Plaintiffs do not dispute that **private**-property owners have a right to affirmatively exclude armed visitors. But the No-Carry Default is a **government**-imposed restriction that turns history on its head and presumptively prohibits handguns on every parcel of private property in Maryland. That infringement triggers the State's historical burden. *Antonyuk v. James*, 120 F.4th 941, 1044 (2d Cir. 2024); *Wolford v. Lopez*, 116 F.4th 959, 993 (9th Cir. 2024).

4

Third, Maryland's argument that the No-Carry Default falls outside the scope of the Second Amendment because it "effectuate[s] the preferences of the majority of Marylanders" is both wrong and irrelevant. (State's Br. at 53). The Supreme Court has explained that such presumptive bans "do not enforce [a property owner's] authority over [its property]; they impose *governmental* authority, subject only to a [property owner's] veto." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011). Private property owners **already have the right** to exclude firearms from their property, which the State cannot arrogate to itself subject only to the property owner's veto. Maryland's setting default rules in other contexts—like intestacy and insurance (State's Br. at 54)—provides no support because those contexts do not contradict the "unqualified command" of a constitutional right. *Bruen*, 597 U.S. at 17. The far more analogous context of the First Amendment supports Plaintiffs' position and not the State's. In *R.A.V. v. City of St. Paul*, 505 U.S. 377, 380–81 (1992), the Supreme Court held that an ordinance that banned the placement of discriminatory symbols on private property was unconstitutional. It was no defense that private landowners could exclude the symbols themselves—the government **still** violated the First Amendment by imposing a criminal penalty based on the nature of the trespass. *Id.*

5

Fourth, Maryland cannot deny that its No-Carry Default obstructs the ability to carry arms for self-defense "outside the home," *Bruen*, 597 U.S. at 33, by "radically expand[ing] the private spaces where" firearms are forbidden. Ian Ayres, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. MED. & ETHICS 183, 184 (2020). As a matter of plain text, any government-imposed obstruction or hindrance to armed self-defense is an "infringe[ment]" that can only be justified by historical tradition. *Frein v. Penn. State Police*, 47 F.4th 247, 254 (3d Cir. 2022) (holding that the Second Amendment "forbids lesser violations that hinder a person's ability to hold on to his guns" (cleaned up)).[2] The No-Carry Default is self-evidently a government-imposed obstruction—that is the point. Plaintiffs cannot bring firearms with them to places that they could have but for the No-Carry Default, not because they fear to commit a trespass, but because they fear criminal

---

[2] The Court recently declined to address "historical sources" informing the "interpretation of the term 'infringe.'" *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 226 n.14 (4th Cir. 2024) (en banc). But the Court found it unnecessary to "define the outer contours of the term 'infringe,'" *id.*, and adopted "a more nuanced consideration of the concept of 'infringement'" for shall-issue licensing, which the Court held was broadly sanctioned by footnote 9 of *Bruen*, *id.* at 221–22. That approach has no application to locational restrictions on "the general right to publicly carry arms for self-defense," *Bruen*, 597 U.S. at 31, which may be restricted only in "exceptional circumstances," *id.* at 38; *see also Rahimi*, 602 U.S. at 691 ("We also clarified [in *Bruen*] that when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'"). The Court must apply original public meaning here, because the prohibition directly impacts the right.

prosecution. The State's attempts to obfuscate how the No-Carry Default suppresses protected conduct should be rejected, just as they have been unanimously rejected by other courts. *Antonyuk*, 120 F.4th at 1044; *Wolford*, 116 F.4th at 993.

One amicus brief unabashedly contends that the so-called "presumptively lawful" restrictions listed in *Heller*—including "sensitive places" restrictions—fall "outside the Second Amendment" altogether. (ECF No. 41-1 at 5–6). But *Heller*'s untested dicta cannot justify an end-run around text and history. *United States v. Williams*, 113 F.4th 637, 648 (6th Cir. 2024) (declining to "apply[] *Heller*'s dicta uncritically"). *Heller* made clear that "historical justifications" would be considered in later cases. 554 U.S. at 635. *Bruen* demonstrated that "sensitive places" restrictions must be grounded in "the historical record." 597 U.S. at 30. And *Rahimi* forbade reliance on dicta about issues "simply not presented." *United States v. Rahimi*, 602 U.S. 689, 702 (2024). The Second Amendment's plain text presumptively prohibits all of the challenged Carry Bans.

## II.    Maryland failed to prove that any of the Carry Bans is consistent with historical tradition.

The State tries to justify its Carry Bans by reworking the Second Amendment's methodology, conjuring ahistorical "traditions," and then retreating to analogues that are too late, too few, and too incomparable to justify anything. The

7

State hardly engages, and only superficially, with the arguments in Plaintiffs'
opening brief and fails to show that the Carry Bans have any historical support.

### A. The State's *Bruen*-defying methodological distortions should be rejected.

The State does not dispute the basic methodology: Maryland must
"affirmatively prove," based on "historical evidence," that an "enduring,"
"representative," and "comparable tradition of regulation" justifies its bans. *Bruen*,
597 U.S. at 19, 24, 27, 30, 69. But it does make several efforts to distort how that
methodology operates. Each should be rejected.

**1.** The State argues that "relatively few analogues are necessary" to justify
any locational restriction. (State's Br. at 13). But that woefully misreads *Bruen*,
which held that "the historical record yields relatively few . . . '*sensitive places*,'"
597 U.S. at 30 (emphasis added), not that any restrictions need only be supported by
a few historical analogues. It is not plausible that *Bruen* painstakingly explained the
State's burden to prove "a "well-established," "representative," and "enduring"
American tradition, *id.* at 30, 67, and "doubt[ed] that *three*" historical sources could
be enough, *id.* at 46, only to disregard those methodological principles when it came
to locational restrictions at legislative assemblies, polling places, and courthouses.
And this all underscores that the constitutionality of locational restrictions "was

8

simply not presented" in *Bruen*. *Rahimi*, 602 U.S. at 702. Maryland cannot misuse *Bruen*'s "assum[ption]" to lessen its burden. 597 U.S. at 30.

**2.** The State says that the Court should apply hyper-flexible "nuanced" analogical reasoning for any location that did not exist in its "modern form" until recently. (State's Br. at 14). But *Bruen* and *Heller* applied "straightforward" analysis and searched for distinctly similar restrictions involving relevant precursor locations, despite material differences between the Founding and today regarding population and firearm technology. *Bruen*, 597 U.S. at 26–27. Maryland ignores that such precursors gave the Founders opportunities to enact laws to address the age-old problem of armed violence, but none exist. It also ignores that the Supreme Court consistently relies on traditions surrounding historical precursors to protect against modern encroachments. The Second Amendment protects modern arms "that were not in existence at the time of the founding," just like "the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search." *Id.* (quoting *Heller*, 554 U.S. at 582); *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (social media); *Carpenter v. United States*, 585 U.S. 296, 305 (2018) (modern "surveillance tools"). Similarly, the Second Amendment protects carrying firearms in public today—whether or not the places people frequent closely resemble their Founding Era precursors.

Maryland fundamentally errs by even attempting to compare locations from the Founding Era and today. The "analogical reasoning" demanded by *Bruen* and made clear by *Rahimi* requires that **restrictions** be relevantly similar, not the places or items on which the restrictions act. It may well be that a modern semiautomatic handgun is utterly unlike a Founding Era musket in key ways. But as *Heller* shows, those differences are **irrelevant**, because both are "Arms" and the **principle** that permits the government to ban certain "dangerous and unusual weapons" cannot be applied to either, since they are (and were) "in common use at the time for lawful purposes like self-defense." *Heller*, 554 U.S. at 624, 627 (quotations omitted). Here, it is totally irrelevant how much a modern sports bar resembles a Founding Era tavern (more on that below) because what is critical is that the **principle** that permits the government to ban firearms in a public location—that it has assumed the burden to secure it—is inapplicable to both.

Maryland also invites error by arguing that *Bruen* invites unusually flexible analogies merely because it authorized courts to "use analogies" for bans in "*new* and analogous sensitive places." 597 U.S. at 30. *Bruen* was using "sensitive places" in this passage as an example of the **ordinary** application of the method it had just announced, not carving out an exception to it.

10

**3.**    The State begs for permission to rely on Reconstruction Era sources that contradict Founding Era evidence. (State's Br. at 15). Its single paragraph of conclusory argument does not even acknowledge—much less rebut—Plaintiffs' demonstrations in their opening brief (at 21–27) that: (1) only Founding Era understandings can inform the scope of the Second Amendment; (2) post-enactment sources are permissible evidence only to the extent they confirm original meaning around 1791; and (3) sources from the second half of the 19th century (or later) can never establish historical tradition, especially when they contradict earlier history. This Court is bound to follow the Supreme Court's practice of rooting constitutional meaning in Founding Era understandings and rejecting mid-to-late 19th-century evidence as too late. *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020); *Bruen*, 597 U.S. at 82–83 (Barrett, J., concurring); *see also Rahimi*, 602 U.S. at 692 (emphasizing "the balance struck *by the founding generation*" (emphasis added)).

The State is wrong that *Bianchi* authorized rooting historical tradition in Reconstruction Era evidence. *Bianchi* treated 19th-century laws as confirmatory of Founding Era practices. *Bianchi v. Brown*, 111 F.4th 438, 468 (4th Cir. 2024) (en banc), *cert. pet. docketed*, No. 24-203 (U.S. Aug. 23, 2024). That cannot justify making Reconstruction Era history predominant or independently sufficient. And *Rahimi* emphasized the importance of Founding Era sources while largely ignoring

Reconstruction Era history. 602 U.S. at 698 (holding that Section 922(g)(8) was relevantly similar to the "founding era regimes" of surety and going armed laws); *see also Lara v. Comm'r Penn. State Police*, --- F.4th ----, 2025 WL 86539, at *10 (3d Cir. Jan. 13, 2025) (noting that "[n]othing in *Rahimi* undermines" that 1791 is the critical date); *Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir. 2024) ("*Bruen* strongly suggests that we should prioritize Founding-era history.").

**4.**     Maryland misapprehends the relevance of whether earlier generations lodged constitutional challenges to proffered historical laws. (State's Br. at 16). Post-ratification caselaw is relevant only to the extent legislation from the same era would be appropriate and is just one method of determining original meaning. *Bruen*, 597 U.S. at 68–69. *Bruen* did not "ratify" any "principle" elevating the importance of prior challenges by stating that it was "aware of no disputes" about the propriety of locational restrictions at legislative assemblies, polling places, and courthouses. 597 U.S. at 30. Locational restrictions were "simply not presented." *Rahimi*, 602 U.S. at 702. And the lack of dispute about those restrictions does not undermine Plaintiffs' case because Maryland's Carry Bans are divorced from the historical tradition supporting the examples cited by *Bruen*: comprehensive security.

**5.**     The State concludes its series of methodological distortions by arguing that the "absence" of similar historical laws—historical silence—does not suggest

12

that its bans are unconstitutional. (State's Br. at 16 (relying on *Antonyuk*, 120 F.4th at 969)). But the historical record is not silent: the Founders protected citizens at "sensitive places" through comprehensive government-provided security, while at all other places citizens were expected (or required) to carry arms. Maryland's argument also ignores *Bruen*'s holding that "the lack of a distinctly similar historical regulation" is "relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 597 U.S. at 26. The State is wrong to suggest that, in the absence of firearm restrictions, the historical record is "silent." As *Bruen*'s text-then-history method demonstrates, the critical historical fact is that the Founders enshrined the Second Amendment in our Constitution. If the plain text covers Plaintiffs' conduct and the historical record yields no tradition limiting its "unqualified command," then the record is not "silent"—it speaks resoundingly in favor of the free exercise of the right. *See Bruen*, 597 U.S. at 17. Once the text is implicated, it is the government's burden to prove a historical exception. And that burden cannot be met with silence.

**B.    Sensitive places must be protected by comprehensive government-provided security.**

Our Nation's Founding Era traditions "demand[] our unqualified deference." *Bruen*, 597 U.S. at 26. And Maryland failed to rebut the two traditions that matter. First, citizens were historically protected at "sensitive locations" by comprehensive

13

government-provided security. Second, everywhere else, citizens were expected (or even required) to carry arms. These traditions prove that Maryland has not (and cannot) demonstrate that its Carry Bans are consistent with our Nation's history.

**1.** At the Founding, firearms could be banned in sensitive locations because they were enclosed and protected by comprehensive government-provided security that made armed self-defense unnecessary. (Pls.' Br. at 28–32). The tradition is clear: governments may prohibit firearms in a location only if they first take on the burden of securing it.

Maryland offers no historical evidence to dispute this. All it musters is a speculative suggestion that "the mere presence of officials" does not necessarily "amount[] to comprehensive security." (State's Br. at 26). But Maryland bears the burden "to establish the relevant tradition of regulation," and its "speculat[ion]" does not suffice. *Bruen*, 597 U.S. at 58 n.25. In any case, Maryland is wrong: legislative assemblies, polling places, and courthouses were historically provided officials tasked with security, as is largely the case today.

***Legislative Assemblies.*** The English Parliamentary practice was to assign sergeants-at-arms and doorkeepers (or porters), who were tasked with securing the

14

chambers against unauthorized visitors and threats.[3] This tradition was adopted by Americans. THOMAS JEFFERSON, A MANUAL OF PARLIAMENTARY PRACTICE. FOR THE USE OF THE SENATE OF THE UNITED STATES, § XVIII (1801) ("[T]he door of the house ought not to be shut, but to be kept by porters, or serjeants at arms, assigned for that purpose."); *see* Jacob R. Straus, *Sergeant at Arms and Doorkeeper of the Senate: Legislative and Administrative Duties* at 1, CONG. RSCH. SERV. (Aug. 20, 2008) (at the Founding, the Doorkeeper or Sergeant-at-Arms held the duty "to ensure that a quorum of Senators was present and that other interested parties were kept out of the chamber"). And "common sense suggests" that the officials at state-level legislatures who carried those same titles (including sergeants-at-arms, doorkeepers, sheriffs, constables, or sergeants) similarly maintained order and controlled entry points. *See Rahimi*, 602 U.S. at 698. Maryland has no evidence to the contrary.

---

[3] *See, e.g.*, WILLIAM HAKEWEL, *MODUS TENENDI PARLIAMENTUM* OR THE OLD MANNER OF HOLDING PARLIAMENT IN ENGLAND 22 (1671) ("The principal Porter of the Parliament shall stand beneath the great Gate of the Monastery . . . where the Parliament is held, and must keep the door, so that none come into the Parliament but he which ought to come to the Parliament . . . ."); *id.* at 23 ("The King was wont to assign Sergeants at Arms, to stand a great while together without the door of the Parliament, to make the door, so that none should make thrusting or tumults about the door, by which the Parliament might be hindred, upon pain of taking of their bodies, because of right the door of the Parliament ought not to be shut, but to be kept by Porters, or Kings Sergeants at Arms.").

***Polling Places.*** Early American laws often required sheriffs to attend elections explicitly to preserve "good order," A DIGEST OF THE LAWS OF GEORGIA 611 (Robert & George Watkins eds. 1800), or "the peace," MD. CONST. art. 1, § 14 (1776). Others ordered sheriffs to attend elections without mentioning security, but common sense makes their purpose plain: to maintain order and preserve peace. ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 325 (Augustine Davis ed. 1796); 2 LAWS OF DELAWARE 984 (Samuel and John Adams eds. 1797); THE PUBLIC LAWS OF SOUTH CAROLINA 386–88 (Philadelphia, R. Aitken & Son 1790); *see also* LAWS OF NEW JERSEY 36 (Joseph Bloomfield ed., Trenton, James J. Wilson 1811) (designating "election officers" with power to arrest and jail peacebreakers).

***Courthouses.*** Plaintiffs cited numerous examples of state laws requiring sheriffs to attend court or compensating law enforcement for attending judicial proceedings. (Pls.' Br. at 31–32). And history confirms that they attended to secure the courts. English tradition, inherited by the Founders, required law enforcement "to preserve quietness, order, and decency, in the Courts of Justice, where you are required to attend for that very purpose." R. SHEARDOWN, THE DUTY OF CONSTABLES 16 (1790). Some American laws were similarly direct: some ordered the sheriff to control entrance and maintain order and others ordered an official serving under the sheriff (the "tipstaff") to perform those duties. *See* An Act for reducing into one Act,

16

the several Acts concerning the Court of Appeals and the special Court of Appeals, CH. XI, LAWS OF VIRGINIA, OCT. SESS. 1792 at 34 (1792) ("The Court of Appeals shall appoint a clerk, tipstaff and cryer."); An Act establishing the Court of Appeals, Ch. CCLXXVII 1 William Littell, THE STATUTE LAW OF KENTUCKY 561 (1809) (ordering the "sheriff and his deputies . . . to perform the duties of sheriff, tipstaff, and crier"); *see also* Hugh F. Rankin, *The General Court of Colonial Virginia*, COLONIAL WILLIAMSBURG DIGIT. LIBR. at 14 (Aug. 1958), https://bit.ly/3OWKO5M (explaining that "[t]he tipstaff" was tasked with "acting as usher, messenger, and doorkeeper for the General Court"). Law enforcement officials usually performed protective functions as well as executing whatever other duties were prescribed for them.

History "confirm[s] what common sense suggests": the Founders protected legislative assemblies, polling places, and courthouses by providing personnel whose duty it was to secure the premises. *See Rahimi*, 602 U.S. at 698. Even Maryland's own authorities support this tradition. The Statute of Northampton contained language that prohibited carry "in the presence of the Justices or other Ministers," 2 Edw. 3 ch. 3 (1328), but it expressly exempted "Ministers" from that prohibition, *id.*, and the King's ministers included arms-bearing and security-providing "sheriffs" and "bailiffs" ("sheriff's officers"), 1 WILLIAM BLACKSTONE,

17

COMMENTARIES ON THE LAWS OF ENGLAND 331–32, 334 (1765). Similar exemptions appeared in Virginia's analogue. 1786 VA. ACTS 35, ch. 49. And *Hill v. State*, 53 Ga. 472, 478 (1874), in approving an indictment for carrying into a courthouse, emphasized the government's duty to protect people within courthouses. The Founders (and even Reconstructionists) prohibited firearms in sensitive places by providing heightened security, not by leaving law-abiding citizens defenseless.

Lacking historical evidence, Maryland argues that "comprehensive security" would not prove workable or sensible in practice. But its rhetorical questions only demonstrate the reasonableness of this comprehensive-security tradition. First, Maryland asks whether a historically sensitive location would "lose that status just because the government has opted not to implement such heightened security." (State's Br. at 27). Second, it asks whether a state could ban firearms in a location that historically allowed them if it "provides sufficient security." (*Id.*). The answer to both questions is yes. But contrary to the State's implication, there is nothing at all surprising or counterintuitive about that result. In fact, it is the necessary result of *Bruen* and *Rahimi*'s teaching that a modern regulation is constitutional only so long as it is consistent with historical tradition. The Second Amendment's central principle is the individual right to self-defense, *see Heller*, 554 U.S. at 630 (referring to "the core lawful purpose of self-defense"), and the logic of sensitive places

restrictions is that they are supportable only insofar as the government takes it upon itself to provide security. If Maryland wants to make a place sensitive, it may do so, but only if it implements security measures (guards, metal detectors, etc.) that obviate the need for armed self-defense. And this comports with common sense. If Maryland suddenly defunded courthouse security at state courthouses, but insisted on acting as though its courthouses were secure because it remains illegal to bring firearms there, treating the courthouses as secure would be delusional. Conversely, the fact that Maryland has never provided comprehensive security at the myriad locations at which it bans firearms and only recently, after its unconstitutional "may-issue" carry-licensing regime was abrogated following *Bruen*, even referred to them as "sensitive," demonstrates that the State's approach is unsupported by history.

**2.**     The other relevant tradition is that, at all other places, citizens were expected (or even required) to bear arms to maintain public safety. At the Founding, a person simply did not "go[] out of his house on any occasion, without his rifle or musket in his hand." 5 St. George Tucker, Blackstone's Commentaries, app, n.B at 19 (1803). And Plaintiffs' opening brief details early American laws that required citizens to carry arms at public assemblies and places of worship, (Pls.' Br. at 32–33 & n.4), required travelers to bear arms, (*id.* at 44 & nn.8–9), and regulated firearms through misuse restrictions—not disarmament, (*id.* at 33 & n.5).

19

Maryland's two responses ring hollow. First, it says that laws imposing a "duty" to carry are not relevant to the "right" to carry. (State's Br. at 25). That is wrong. These laws reflect the Founders' belief that law-abiding citizens could and should carry weapons to protect themselves and others (including the vulnerable), and that is why *Heller* emphasized them. 554 U.S. at 601 ("Many colonial statutes required individual arms bearing for public-safety reasons . . . ."). They demonstrate that the Founders' response to the exact same threat Maryland perceives today—firearm violence in public—was precisely the opposite of what Maryland adopted. Second, Maryland accuses Plaintiffs of citing laws "rooted in racism," because some "facilitate[d] the defense from slave insurrections (or attacks by Native Americans)." (State's Br. at 25).[4] These laws (as opposed to the treatment of enslaved people and Native Americans) are not racist; they reflected the need to facilitate self-defense in response to the real dangers of life at the time. *Bruen*, 597 U.S. at 78 (Alito, J., concurring) ("If these people were attacked, they were on their own."). They demonstrate that the Founders responded to threats by arming citizens, not by banning firearms. And, again, *Heller* relied on them. 554 U.S. at 601. Maryland's bans contradict these Founding Era traditions and violate the Second Amendment.

---

[4] It is an ironic argument for Maryland to make, given its own reliance on racist laws. *Infra* at 55.

### C.    The State's fabricated "traditions" and "principles" find no support in history or precedent.

Maryland's alternative principles have no historical basis. According to the State, it can ban firearms: (1) wherever "vulnerable" people like "children" might be found; (2) in any crowded place; (3) where other constitutional rights are exercised; (4) within any "buffer zone"; and (5) in any building that the government owns or operates. (State's Br. at 22–27). These traditions find no support in history and blatantly contradict our Founding Era traditions.

**1.**    Maryland contends that it can ban firearms wherever "vulnerable or impaired people might ordinarily be present." (State's Br. at 22). It cites no historical evidence for this breathtakingly broad, novel principle. And, given that vulnerable populations like the elderly, ill, and impaired were around at the Founding, the "lack" of any Founding Era ban wherever the vulnerable might be and the Founders' protection of the vulnerable through "different means" (government security or ensuring an armed citizenry) are overwhelming evidence that Maryland's argument is spurious. *Bruen*, 597 U.S. at 26. Maryland merely invokes *Heller*'s untested dicta about "schools" and regurgitates a few other courts' incorrect conclusions.

*Heller*'s dicta does not support a vulnerable-people tradition. (Pls.' Br. at 34–37). *Heller* acknowledged that its dicta was not tested for "historical justifications." 554 U.S. at 635. *Bruen* did not authorize analogizing to schools or analyzing

21

locational restrictions untethered to history. 597 U.S. at 30. *Rahimi* forbids substantive reliance on issues "simply not presented." 602 U.S. at 702. Justification can "only" come from "historical tradition." *Bruen*, 597 U.S. at 17; *see also Williams*, 113 F.4th at 648; *Range v. Att'y Gen.*, 124 F.4th 218, 226 (3d Cir. 2024) (en banc) (warning "not to overread" dicta from *Heller*). Even *Wolford* recognized that conclusions about schools must be tied to "laws specifically regulating firearms in or near schools." 116 F.4th at 1000. And the only historically accurate principle that can be drawn from those regulations is that they applied only to students over whom schools exercised *in loco parentis* authority. This principle cannot justify Maryland's Carry Bans.

Maryland does not refute that the only early American evidence of school regulation was university rules that disarmed students but not faculty, staff, or visitors, nor that such rules were exercises of *in loco parentis* authority. These characteristics are crucial to "[w]hy and how" such laws burdened Second Amendment rights differently than Maryland's bans. *Rahimi*, 602 U.S. at 692. Because neither Maryland nor any location at issue exercises *in loco parentis* authority over the adults it regulates, Maryland's laws are not comparably justified (why). And, by restricting everyone's ability to carry, Maryland's bans go far

22

"beyond" these historical laws (how). *Bruen* itself approvingly referenced carry by teachers at Freedmen's schools. 597 U.S. at 61.

Maryland's two counterarguments fail. First, it says that *Heller*'s dicta (quoted by *Bruen*) about schools "was unqualified." (State's Br. at 23). But, again, neither *Heller* nor *Bruen* purported to ground *Heller*'s dicta in history. Second, Maryland recites *Tinker*'s statement that children do not completely "shed their constitutional rights" at school. (State's Br. at 23). But people under 18 **do** have limited constitutional rights at school **because of** the historical tradition of *in loco parentis* authority. *See, e.g.*, *Mahoney Area Sch. Dist. v. B.L.*, 594 U.S. 180, 189–90 (2021) (First Amendment); *New Jersey v. T.L.O.*, 469 U.S. 325, 344 (1985) (Fourth Amendment). That is not true for adults not subject to such authority. There is no historical basis to extrapolate from government authority in schools the principle that states may ban adults from carrying firearms anywhere that children might be, much less expand that to apply to **any** vulnerable person **anywhere**.

Maryland retreats to citing a few mistaken courts' conclusions. Its only post-*Bruen* decision endorsing its argument is *Antonyuk*, 120 F.4th at 1010–11, which relied on (1) mid-19th-century militia eligibility laws that are far narrower than Maryland's generally applicable bans; and (2) late-19th-century laws from outliers (1870 Texas, 1883 Missouri) and territories (1889 Arizona and 1890 Oklahoma) that

23

are too late, too unrepresentative, and otherwise too irrelevant to justify any of Maryland's bans. (Pls.' Br. at 19). Even *Wolford* rejected a "tradition of regulating firearms at all places that contain a vulnerable population." 116 F.4th at 1000.

Finally, Maryland's argument is directly contrary to *Bruen*. *Bruen* forbade lower courts from defining "sensitive places" by any metric that would "effectively declare the island of Manhattan" sensitive or that otherwise would "eviscerate the general right to publicly carry arms for self-defense." 597 U.S. at 31. Banning firearms wherever the vulnerable might be found would do exactly that.

**2.**    Maryland wishes to ban firearms wherever "people regularly congregate[]" or in any "crowded" location. (State's Br. at 17, 24). But *Bruen* made clear that "there is no historical basis" to declare a place sensitive "simply because it is crowded." 597 U.S. at 31. This, too, would surely run afoul of *Bruen*'s "island of Manhattan" warning. *Id.* And Maryland has no historical support.

Maryland begins with the 1328 Statute of Northampton and American laws (purportedly) modeled after it. (State's Br. at 17–21, 24). The Supreme Court, however, has twice rejected any argument that these laws justify broadly applicable carry bans. *Bruen* held that Northampton-style laws and the affray tradition only prohibited carrying arms "in a way that spreads 'fear' or 'terror' among the people" and could not justify laws that "impaired the right of the general population to

24

peaceable public carry." 597 U.S. at 50–51. *Rahimi* then reiterated that affray laws could not justify modern bans that "broadly restrict arms use by the public generally." 602 U.S. at 698. Maryland emphasizes Northampton "fairs and markets" language, but *Bruen* held that this language did not establish total bans in those locations. 597 U.S. at 40, 43–45, 49–50. The only valid American analogue to the Statute of Northampton that Maryland cites expressly codified the requisite "terror" element recognized within the Statute of Northampton. 1786 Va. Acts 35, ch. 49.

The State does cite one other putative Statute of Northampton analogue that notably lacks the "terror" language included by Virginia. Collection of Statutes of the Parliament in England in Force in the State of North-Carolina, 60–61, ch. 3 (F. Martin Ed. 1792). The problem with this statute is that it did not exist. Maryland's source is "a 1792 book by a lawyer who thought he was compiling the English statutes in force in North Carolina." Stephen P. Halbrook, *Faux Histoire of the Right to Bear Arms: Young v. Hawaii (9th Cir. 2021)* at 21, SSRN, https://bit.ly/3QyFZA5. The "statute" is in fact merely a copy of the fourteenth century statute, as its references to the "King's Ministers" suggest. Later compilers declared the source "utterly unworthy of the talents and industry of the distinguished compiler" and guilty of "inserting many [statutes] . . . which never were, and never could have been in force, either in the Province, or in the State." *Preface of the*

*Commissioners of 1838*, REVISED CODE OF NORTH CAROLINA xiii (1855). Contemporaneously, James Iredell (who later became a Supreme Court Justice) was tasked by the North Carolina General Assembly with compiling all the laws that remained in force in the state following independence, and he did not include the alleged analogue. JAMES IREDELL, LAWS OF THE STATE OF NORTH-CAROLINA 70 (Edenton: Hodge and Wills, 1791). Northampton-style laws do not support a crowded-places tradition.

Maryland retreats to outliers from mid-to-late 19th and early 20th centuries. (State's Br. 18–20, 24).[5] But these laws are far too late to "establish an early American tradition," *Espinoza*, 591 U.S. at 482, especially given their contradiction of Founding Era traditions allowing (and even requiring) carry in crowded locales. Nor are these outliers representative. Texas had a limited view of the right to public carry. *Bruen*, 597 U.S. at 64–65. New Mexico, Arizona, and Oklahoma were unrepresentative territories. *Id.* at 67–68. The 20th-century Idaho and Montana laws are too late. *Id.* at 66 n.28. The State also cites a localized 1817 New Orleans

---

[5] 1852 N.M. LAWS 67, § 3; 1870 TENN. ACTS 23, ch. 22, § 2; GA. CODE, pt. IV, tit. I, div. X, § 4528 (1873) (codifying 1870 act); 1870 TEX. GEN. LAWS 63, ch. 46, § 1; 1874 MO. LAWS 43, § 1; 1889 ARIZ. TERR. SESS. LAWS 17, § 3; 1890 OKLA. TERR. LAWS 496, art. 47, § 7; IDAHO PENAL CODE 84, ch. 218, § 4781 (1901) (codifying 1889 act); 1903 MONT. GEN. LAWS 49, ch. 35, § 3; *see also* Jerome Bayon, *General Digest of the Ordinances and Resolutions of the Corporation of New Orleans* 371 (1831) (art. 1) (discussing 1817 ordinance).

ordinance entitled to no weight. *Id.* at 67. That leaves just Missouri, Georgia, and Tennessee, belated regulations outside the parameters of "the founding generation," *Rahimi*, 601 U.S. at 692, and too few to justify anything. *Bruen*, 597 U.S. at 46.

**3.**    Maryland contends in a footnote that "Second Amendment rights should yield when necessary to protect the exercise of other fundamental rights." (State's Br. at 24 n.9). But relegating the Second Amendment to "a second-class right" is off the table. *Bruen*, 597 U.S. at 70 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)). This argument would impermissibly render "sensitive" every street corner or other location where Marylanders exercise First Amendment rights. *But see Bruen*, 597 U.S. at 31. Suggesting that suppressing armed defense is "necessary" to protect other rights gets it backwards: a central purpose of the Second Amendment is to ensure that citizens can "resist tyranny" to protect their other rights. *Heller*, 554 U.S. at 598. And amici wrongly conjure nonexistent risks like gun violence and intimidation by carry-permit holders. (ECF No. 41-1 at 34). Carry-permit holders are overwhelmingly unlikely to commit violent crimes. Maryland only allows **concealed** carry, MD. CODE, PUB. SAFETY § 5-307, and brandishing a firearm is separately illegal as first-degree assault, MD. CODE, CRIM. LAW § 3-202. History does not support banning firearms at a location merely because other rights are exercised there.

27

**4.**     Maryland claims a tradition of prohibiting firearms within any "buffer zone" surrounding a place where firearms are banned. (State's Br. at 24). Rather than cite historical evidence, Maryland invokes two district court decisions discussing laws banning arms near "locations such as polling places and parks." (*Id.* at 25 (citing *United States v. Allam*, 677 F. Supp. 3d 545 (E.D. Tex. 2023), *appeal docketed*, No. 24-40065 (5th Cir.); *Maryland Shall Issue, Inc. v. Montgomery Cnty.*, 680 F. Supp. 3d 567 (D. Md. 2023), *appeal docketed*, No. 23-1719 (4th Cir.))). Only *Allam* references an 18th-century law: Article 28 of the 1776 Delaware Constitution, which applied only to militias, covered only polling places, and applied only during elections. 677 F. Supp. 3d at 576. Neither case supports a "broadly restrict[ive]" buffer zone tradition. *See Rahimi*, 602 U.S. at 698. And neither supports the two Carry Bans that Maryland advances this "tradition" to defend: the grounds of government buildings and the grounds of schools. (State's Br. at 43, 45).

**5.**     The State argues that it is exempt from the Second Amendment whenever it "acts within its proprietary capacity or as a market participant." (State's Br. at 27). But Maryland's government-as-proprietor and market-participant theories have no support in text, history, or precedent, and cannot justify Maryland's bans.

Maryland begins by feigning historical support in **private-property** owners' right to exclude. But it identifies no historical tradition of "broadly prohibit[ing]"

28

firearms at places the **government** owns or operates that was justified only by that ownership or operation. *Bruen*, 597 U.S. at 38. There is no tradition of allowing the government to trample Second Amendment rights (or any other Bill of Rights guarantee) simply because the government acts as proprietor. *United States v. Kokinda*, 497 U.S. 720, 725 (1990).

This is just another effort to evade *Bruen*. *Bruen* repeatedly explained that a government-imposed firearm restriction survives "[o]nly if" it complies with "historical tradition," *id.* at 34, and *Rahimi* doubled down, 602 U.S. at 689. *Bruen* also discussed historical tradition for bans in a specific "few" government buildings, 597 U.S. at 30, which would have been meaningless if Maryland had *carte blanche* to prohibit firearms in any government building. Maryland concedes that it owns the streets and sidewalks yet cannot ban firearms there, (State's Br. at 28 n.10), and it offers no rational distinction between those and other government spaces.

Nor does any other precedent support Maryland's unprecedented claim. Nobody doubts that a state enjoys limited "power to preserve the property under its control," *Minn. Voters Alliance v. Mansky*, 585 U.S. 1, 12 (2018), to engage in "private conduct" on its property, *Bldg. & Const. Trades Council of Metro. Dist. v. Assoc. Builders & Contractors*, 507 U.S. 218, 229 (1993), or to "operate freely in the free market," *Reeves Inc. v. Stake*, 447 U.S. 429, 437 (1980). But it enjoys no

29

such power when it acts "as lawmaker" or "sovereign." *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 598 (2008). Maryland acted as a sovereign "lawmaker," not as a proprietor, when it enacted the Carry Bans, *id.*, and it will act as a "sovereign" when it imposes "criminal" penalties, *Harper v. Pub. Serv. Comm'n of W. Va.*, 396 F.3d 348, 351 (4th Cir. 2005).

And the State's cases are otherwise inapposite. The Supreme Court cases largely apply "distinct" standards applicable to constitutional questions that remain the victims of interest balancing. *See Minn. Voters Alliance*, 585 U.S. at 12. The Second Amendment cases held only that a government-owned parking lot "on the grounds of the United States Capitol" was a sensitive place, *United States v. Class*, 930 F.3d 460, 462, 464 (D.C. Cir. 2019), *abrogated by Bruen*, 597 U.S. 1, or resulted from interest balancing, *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1126–29 (10th Cir. 2015), or just erred, *Wolford*, 116 F.4th at 970–71. Maryland also cites discussion of Congress's commerce power, *Reeves*, 447 U.S. at 437–38, ignoring that even permissible exercises yield to Bill of Rights guarantees, *New York v. United States*, 505 U.S. 144, 156 (1992) (First Amendment); *United States v. Comstock*, 560 U.S. 126, 133 (2010) (Due Process Clause). The State finally complains about the unfairness of subjecting it to the Second Amendment, when

private entities are not. Maryland can protect its properties in many ways—such as by providing security—but infringing on the Second Amendment is not one of them.

\* \* \*

Maryland's claimed traditions defy history, precedent, and common sense. With an accurate framing of our Nation's historical traditions, this Court should conclude that Maryland has not justified any of its Carry Bans.

### D. The State failed to demonstrate a justifying historical tradition for the Carry Bans that the district court upheld.

Rather than engage with Plaintiffs' opening brief (at 38–57), Maryland just repeats the same flawed arguments that the district court accepted: proffered traditions with no historical support and incomparable analogues from the late-19th and early-20th century that contradict our Founding Era traditions.

#### 1. Museums

Maryland defends its museum ban, MD. CODE, CRIM. LAW § 4-111(a)(8)(iii), in a single paragraph by comparing museums to schools and citing five outlier statutes that, between 1870 and 1903, purported to ban firearms at places serving "educational, literary, or scientific purposes." (State's Br. at 33). Plaintiffs' opening brief and the discussion above already rebut both arguments. (Pls.' Br. at 38–40).

31

Museum bans cannot be justified by comparison to schools. Museums (as Maryland concedes) are not modern innovations and unlike schools at the Founding, they lack *in loco parentis* authority over anyone.

Maryland cites five belated outlier statutes to support its claim that it can ban firearms anywhere learning occurs, but they cannot overcome the undisputed "lack" of any Founding Era ban at museums or similar locations. *Bruen*, 597 U.S. at 26. They contradict our Founding Era practices of expecting citizens to carry firearms, (*supra* at 19–20). And even beyond these deficiencies, this motley band—consisting of outliers (Texas, Missouri), territories (Arizona and Oklahoma), and a 20th-century law (Montana)—cannot establish a tradition of banning firearms anywhere, let alone in museums. *Bruen*, 597 U.S. at 64–65, 66 n.28, 67–68 & n.30.

## 2. Healthcare Facilities

Maryland's ban at healthcare facilities, MD. CODE, CRIM. LAW § 4-111(a)(2)(iii), fares no better. The State concedes the lack of any Founding Era support, so it asks the Court to flexibly apply "nuanced" reasoning and disregard the lack of any Founding Era support as "not significant." (State's Br. at 31–33). But hospitals are not "*new.*" *Bruen*, 597 U.S. at 30. Although healthcare facilities have grown in sophistication since the Founding, so have metropolitan areas and firearms that people carry, yet neither *Bruen* nor *Heller* applied nuanced analysis because of

32

those issues. *Id.* at 26–27. This simply underscores that Maryland cannot overcome the lack of Founding Era evidence of firearm regulation in healthcare facilities. (Pls.' Br. at 41–42).

Maryland's again suggests that firearms can be banned because "vulnerable" people are in hospitals, but as discussed above, no such tradition exists. (*Supra* at 21–24). The State also repeats the same five outlier statutes from 1870 to 1903 that say nothing about healthcare, are too late, and are otherwise unrepresentative. Lacking any historical support, the ban is unconstitutional.

### 3. Mass Transit

Maryland bans firearms in any mass transit facility or vehicle, MD. CODE, TRANSP. § 7-705(b)(6), though it is unfortunately increasingly obvious that mass transit is a location where individuals need self-defense.[6] Plaintiffs thoroughly demonstrated this ban's lack of historical support, (Pls.' Br. at 42–45), and Maryland's response brief provides no counter, (State's Br. at 35–37).

After admitting it has no support "from the Founding or Reconstruction eras," the State tries to justify the ban through "rules and regulations" adopted by "private

---

[6] Barry Simms, *Maryland Transit Administration Police investigating stabbing at Lexington Market*, WBALTV (Aug. 16, 2024); *see also* Aaron Katersky & Bill Hutchinson, *Woman set on fire on New York City subway identified by police*, ABC NEWS (Dec. 31, 2024).

transportation services." (State's Br. at 35). This it cannot do. For one, Maryland's premise (that the lack of regulation is due to the lack of mass and public transit at earlier periods) is false. Plaintiffs showed that mass and public transit existed near the Founding and that the Founders encouraged citizen arms-bearing and often required travelers to carry arms. (Pls.' Br. at 43–44). For another, private transit rules have no bearing on whether a state can prohibit firearms, just as the ability of private property owners to ban firearms on their property has nothing to do with the government's ability to do the same. Maryland claims that crowding and vulnerable populations justify the ban on public transportation, but those ahistorical arguments are just as inadequate this time around. And Maryland also invokes government proprietorship, but that historically baseless argument was rebutted above.

### 4.    State Parks and Forests

The State also fails to show any historical tradition that could justify its bans in State Parks (COMAR 08.07.06.04), State forests (COMAR 08.07.01.04), and Chesapeake Forest Lands (COMAR 08.01.07.14).

Maryland argues that it can ban firearms in hundreds of thousands of acres of parks and forests because "children" and other "gatherings of people" might be found (but "not ordinarily") somewhere in there. (State's Br. at 37 & n.12). Plaintiffs have already shown that neither vulnerable people nor congregations of other people

34

can justify its bans. (*See supra* at 21–24). The district court correctly rejected this argument: "Maryland's parks cover thousands of miles, and while children surely visit these parks for education or recreation, State Defendants do not allege that the parks are primarily geared towards children or any other vulnerable population." (JA0982). Maryland does not seriously dispute the district court's reasoning, and its invocation of these arguments demonstrates their overbreadth. If firearms can be banned throughout a vast park or forest merely because a child might visit some portion, then firearms can be banned **anywhere**.

Maryland concedes, again, that its bans have no Founding Era support, which it tries to downplay by arguing that parks did not serve "public recreation" purposes at the Founding. (State's Br. at 40). History proves otherwise. Bowling Green, founded in 1733, served as a place for "Recreation & delight." N.Y. CITY DEP'T OF PARKS, *Bowling Green*, https://www.nycgovparks.org/parks/bowling-green/history (last visited Jan. 20, 2025). Boston Common, established in 1634, has served as a place of "recreation of the people" since "time immemorial," *Steele v. City of Boston*, 128 Mass. 583, 583 (1880), and "as a site for informal socializing and recreation" as early as the 1660s, Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1, 3 (2021). When the English revivalist, George Whitfield, visited Boston in 1740, his

preaching was so popular that the meetinghouses could no longer accommodate him and his followers—over 20,000 on one day—met to hear him in Boston Common. *See* RONALD FLEMING, ON COMMON GROUND 21 (1982), https://archive.org/details/oncommongroundca0000unse/page/21/mode/1up. And the Founders were as familiar with violence at parks as they were with parks themselves. (Pls.' Br. at 46–47). That the number of parks has grown does not give rise to any "unprecedented" concern that justifies ignoring Founding Era history; if that were so, then *Bruen* would have been decided differently. 597 U.S. at 27.

The State retreats to a patchwork of localized and park-specific restrictions from 1858 to 1936, (State's Br. at 38–39), which Plaintiffs have shown cannot justify Maryland's statewide bans. (Pls.' Br. at 45–49). Maryland's historical evidence is too late and impermissibly contradicts Founding Era tradition allowing firearms in parks. Its localized analogues also are not remotely comparable to Maryland's statewide bans that almost entirely target non-urban, rural areas. Maryland has not shown any tradition that could justify its bans in State parks, State forests, and Chesapeake Forest Lands. Maryland's regulations deprive Marylanders of their Second Amendment self-defense rights on hundreds of thousands of acres of public land throughout Maryland, even though the State permits hunting with firearms in many areas of these parks and forests. Localized urban bans certainly cannot justify

36

banning firearms in rural locations, state forests, and the like. *Antonyuk*, 120 F.4th at 1019 (recognizing the disconnect between "*urban* parks" and "*rural* parks"); *see also infra* at 39–40.[7]

### 5. Entertainment Facilities: Stadiums, Amusement Parks, Racetracks, and Casinos

Maryland tries to support its bans at entertainment facilities[8] with the same disproven congregations-and-crowds tradition and irrelevantly belated analogues. It does not rebut Plaintiffs' showing that gatherings for entertainment purposes predate the Founding without any evidence of restriction. (Pls.' Br. at 50–51). And it offers the same patchwork of outliers, territories, and municipalities that justifies nothing.

### 6. School Grounds

The State hangs the defense of its school grounds bans, MD. CODE, CRIM. LAW § 4-102(b) (public school property); *id.* 4-111(a)(2)(ii) (private school grounds), on the claim that the Supreme Court has "recognize[d] schools as sensitive places" and school-grounds bans are supported as buffer zones. (State's Br. at 44–45). Neither of these arguments justifies Maryland's bans.

---

[7] Maryland invokes government proprietorship, which should again be rejected.

[8] MD. CODE, CRIM. LAW §§ 4-111(a)(8)(ii), 4-111(a)(8)(iv), 4-111(a)(8)(v), 4-111(a)(8)(vi); COMAR 14.25.01.01(B)(14), 14.25.02.06, 36.03.10.48.

First, Maryland has not shown that schools are categorically sensitive places where Maryland can "broadly restrict arms use by the public generally." *Rahimi*, 602 U.S. at 698. No dicta from *Heller* or *Bruen* absolves Maryland of its responsibility to prove a justifying historical tradition. (Pls.' Br. at 34–36, 51–53; *supra* at 7–13). And Maryland does not dispute that any historical school bans disarmed only students and derived from *in loco parentis* authority. Maryland's bans go well "beyond what was done" in historical laws. *Rahimi*, 602 U.S. 698.

Second, even if schools were categorically sensitive, the State still has not shown a tradition of banning firearms within any buffer zone around schools. (*Supra* at 28). The only 18th-century buffer zone law was a temporary militia-gathering prohibition near polling places—and not schools as such. *Allam*, 677 F. Supp. 3d at 576. Early 19th-century university rules only banned firearms for students. *Id.* at 569–70. And statutes from the mid-to-late 19th-century are too late and otherwise incomparable. *Id.* at 572–74. Maryland failed to justify its school grounds bans.

### 7.    All Government Buildings

The State also failed to justify its **statewide** ban on carrying within **all** government buildings, MD. CODE, CRIM. LAW § 4-111(a)(4)(i), as well as on the "grounds" of all buildings "under the jurisdiction of the Department of General

38

Services," such as the Maryland State House. COMAR 04.05.01.01; COMAR 04.05.01.03.

Several of Maryland's arguments have already been rebutted. Government proprietorship is no justification. Maryland's argument that *Heller* "did not qualify the phrase 'government buildings'" when it labeled them as "sensitive" in dicta, (State's Br. at 41), ignores that *Heller* reserved consideration of "the historical justifications" for later cases. 554 U.S. at 635. And *Bruen* confirms that *Heller* did not categorically authorize government building bans, otherwise it would not have enumerated the "relatively few" government buildings where prohibitions might comply with "the historical record." 597 U.S. at 30.

Next, Maryland pleads the *Salerno*-based principle that Plaintiffs' facial challenge fails because bans at legislative assemblies, polling places, and courthouses are constitutional. (State's Br. at 41). But Maryland has not shown that a **statewide** ban on carrying firearms into **all** government buildings is supported by historical tradition. This failure of proof is just like *Bruen* and *Heller*. The carry regime challenged in *Bruen* might have been constitutional had it applied only to some people (*e.g.*, violent felons) or in some locations (e.g., courthouses). Yet *Bruen* facially invalidated New York's law. And *Heller*'s handgun ban likely could have been constitutional had it applied only to some people, yet it too was facially

39

stricken. The mere fact that a few specific government buildings might be sensitive does not foreclose Plaintiffs' facial challenge to bans at government buildings writ large. And, properly construed, the "no-set-of-circumstances test" asks "whether the statute fails the relevant constitutional test"—here, history-and-tradition—and "'descri[bes] the outcome'" of a successful facial challenge. *Club Madonna, Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022) (quoting *Doe v. City of Albuquerque*, 667 F.3d 1111, 1123 (10th Cir. 2012)); *Ezell v. City of Chicago*, 651 F.3d 684, 697–698 (7th Cir. 2011) (similar). It is not defense of the Carry Bans that Maryland's broad restrictions swept in actual sensitive places. And because the distinction between a facial and as-applied challenge simply "goes to the breadth of the remedy employed by the Court," *Citizens United v. FEC*, 558 U.S. 310, 331 (2010), the Court at a minimum should strike the government buildings ban with respect to unsecured government buildings.

Maryland next argues that buildings should be held "sensitive" wherever "government services or other administrative functions are being performed." (State's Br. at 42). But its only evidence is Northampton-style laws, which support nothing other than banning carrying arms with intent to terrify, (*supra* at 24–26), and prove Plaintiffs' comprehensive-security tradition, (*supra* at 13–20).

Maryland defends its ban on the "grounds" of government properties with a rote recitation of a buffer zone tradition. (State's Br. at 42–43). There is no historical tradition to support Maryland's generally applicable firearm ban on the grounds of government properties. Maryland's State House predates the Founding, yet Maryland has not shown that the Founders prohibited firearms on its grounds. Maryland's ban is more burdensome and incomparable to Delaware's narrow and temporary ban on militia gatherings near polling places. And Maryland cannot discharge its burden by asking Plaintiffs to provide a "compelling reason" why individual self-defense is necessary. (State's Br. at 43). That is not how constitutional rights operate.

### E.      The State failed to demonstrate a justifying historical tradition for the Carry Bans that the district court enjoined.

Maryland cross-appealed the district court's orders enjoining its bans at public demonstrations and locations selling alcohol, as well as its No-Carry Default. The State's standing and merits arguments are wrong, all three laws are unconstitutional, and the district court's judgment should be affirmed in this relevant part.

#### 1.      Public Demonstrations

The district court properly enjoined Maryland's ban on carrying a firearm at public demonstrations. MD. CODE, CRIM. LAW § 4-208(b)(2). Plaintiffs have standing, and the State has failed to demonstrate a justifying historical tradition.

41

a. ***Standing***. The State challenges Plaintiffs' standing only by arguing that Plaintiffs have not shown an imminent prospective injury. (State's Br. at 45–47). That is wrong: Plaintiff Susannah Kipke's concrete intentions confer standing. Plaintiff Kipke submitted two declarations. In the first, she explained that she would (but for the ban) carry her handgun at a yearly public demonstration for Maryland Families for Safe Birth. (JA0080, JA0083). In the second, she elaborated that when she carries at "the yearly demonstration," she "would not leave the area even after being advised by a law enforcement officer that a demonstration [was] occurring and being ordered by the law enforcement officer to leave the areas of the demonstration until [she] dispose[s] of [her] firearm." (JA0100). These averments confer standing to bring a pre-enforcement challenge.

A plaintiff may bring a pre-enforcement challenge to a criminal law if she shows "[1] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and [2] there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). It is enough to show a "substantial risk" of future harm, such as being arrested. *See id.* at 158 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (disavowing need to show that the harm is "literally certain")). Maryland does not dispute that Kipke has a constitutionally protected interest in carrying her

handgun. It does not dispute that her intended conduct is proscribed by Maryland law. And it does not dispute a "credible threat of prosecution" exists in any challenge to a "non-moribund statute that facially restricts expressive [*i.e.*, protected] activity by the class to which [Kipke] belongs," especially given that Maryland has never "disavowed enforcement." *Kenny v. Wilson*, 885 F.3d 280, 288–89 (4th Cir. 2018); *see also N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999) (requiring "compelling evidence to the contrary").

The State's only argument is that Kipke's arrest is speculative because a police officer would have to notice her firearm and then exercise his discretion to advise Kipke that a demonstration is ongoing, order her to leave, and ultimately arrest her when she does not. This argument is a non-starter: "law-enforcement discretion" is "deep-rooted" in our justice system, even when the statute orders officers to arrest violators. *United States v. Texas*, 599 U.S. 670, 682 (2023). If Maryland were correct, no plaintiff would ever have standing. And, even so, Plaintiffs have shown a "substantial risk" that Kipke will face enforcement. *SBA List*, 573 U.S. at 159. First, there is at least a substantial risk that a trained law enforcement officer would notice Kipke's weapon carried in a holster, even when concealed. Second, there is a substantial risk that an officer would then order Kipke to leave, given Maryland's

43

notorious political hostility towards firearms.[9] And Maryland has not shown "compelling evidence to the contrary." *N.C. Right to Life, Inc.*, 168 F.3d at 710.[10]

**b. *The merits*.** Maryland's public-demonstration ban is antithetical to our historical traditions. The Founders expected (or even required) citizens to carry arms at public gatherings and other crowded places to maintain public safety. (Pls.' Br. at 32–33). Maryland cannot deny that "[p]olitical uprisings, from peaceful picketing to lawless riots, have marked our history from the beginning—indeed, from *before* the beginning." *Doe v. Mckesson*, 71 F.4th 278, 313 (5th Cir. 2023) (Willett, J., concurring in part and dissenting in part). Both peaceful and "disruptive" demonstrations were always "part of the venerable American tradition of public protest." Tabatha Abu El-Haj, *Defining Peaceably: Policing the Line Between Constitutionally Protected Protest and Unlawful Speech*, 80 MO. L. REV. 961, 968–

---

[9] The Governor's press secretary, in response to this lawsuit, demonstrated the State's hostility by saying that "more guns on the street" is "*the problem*." CBS Baltimore Staff, *NRA sues Maryland: What could it mean for the state's new gun laws?,* CBS NEWS BALTIMORE (May 17, 2023) (emphasis added).

[10] Traceability or redressability are satisfied. The state-official defendants are "at least in part responsible for" Kipke's injuries. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013); *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 212 (4th Cir. 2020) (holding that defendant's conduct "does not have to be 'the sole or even immediate cause"). And "a favorable outcome would repeal the 'burdens' on" Kipke's protected conduct. *Maryland Shall Issue, Inc.*, 971 F.3d at 213–14.

44

972 (2015). And yet, Maryland cannot provide a single example of a Founding Era law banning firearms at demonstrations, assemblies, or protests.

Maryland proceeds to invoke the same handful of outlier, territorial, and otherwise irrelevant laws from the late-19th and early-20th centuries that prohibited firearms at public gatherings. (State's Br. at 47). But these laws are too late, too unrepresentative, and impermissibly contradictory of our Founding Era traditions. (*Supra* at 26–27). Maryland also cites Northampton-style "affray" traditions. (State's Br. at 47). But that tradition cannot sustain Maryland's public demonstrations ban, which goes far beyond prohibiting "bearing arms to terrorize the people." *Bruen*, 597 U.S. at 47; *Rahimi*, 602 U.S. at 697. Kipke, for example, insists on her right to carry only for self-defense while peaceably demonstrating, yet her conduct is criminalized by the public demonstrations ban all the same. Maryland's ahistorical ban must be stricken as unconstitutional.

### 2.      Locations Selling Alcohol (Bars and Restaurants)

Maryland's ban on carrying a firearm into any location licensed to sell or dispense alcohol for on-site consumption (bars and restaurants) was also properly enjoined. MD. CODE, CRIM. LAW § 4-111(a)(8)(i). The Founders were intimately familiar with taverns, with violence relating to them, and with regulation of taverns and alcohol. "Consuming alcohol was one of the most widespread practices in the

American colonies," and "[t]averns served as the most common drinking and gathering place for colonists." Baylen J. Linnekin, *"Tavern Talk" and the Origins of the Assembly Clause: Tracing the First Amendment's Assembly Clause Back to its Roots in Colonial Taverns*, 39 HASTINGS CONST. L.Q. 593, 595 (2012). Playing an indispensable role in our Nation's birth, taverns are where: the Boston Tea Party and the Revolution were planned; George Washington gave his post-war farewell address; decisions were made during the Constitutional Convention; and federalists and anti-federalists jockeyed for political support. CHRSTINE SISMONDO, AMERICA WALKS INTO A BAR 66–67, 71–72, 76, 82–83 (2011). The Founders were familiar with firearm violence in taverns. *Id.* at 16 ("[T]averns were plagued with pernicious loitering and the . . . shooting off of guns." (internal quotation marks omitted)). As early as Colonial America, "tavern legislation was involved and constantly changing." *Id.* at 15. And yet, there was no Founding Era tradition of banning the mere possession of firearms in taverns or other places selling alcohol.

Maryland identifies no such tradition, either. The only laws it offers within 50 years of the Founding concerned the sale of alcohol to (or possession of alcohol by) militiamen. (State's Br. at 48 (citing JA0216–0217)). But these laws are incomparable to Maryland's ban because they applied only to select people (militiamen) and often only while on duty.

46

Nor does Maryland's mid-to-late 19th-century evidence help. The State's five laws from 1867 to 1883 restricting carry by intoxicated people are too late and too few to be probative of historical tradition. (State's Br. at 48–49 (citing JA0218–0219)). They also are not as burdensome as Maryland's ban, which prohibits even the teetotaler from carrying a firearm into a restaurant that sells alcohol to others. Maryland retreats to a late-19th-century patchwork of territories (New Mexico 1852, Arizona 1889, Oklahoma 1890) and municipalities (San Antonio 1870, New Orleans 1879) that banned firearms in places like balls, fandangos, saloons, taverns, or places where liquor is sold. (State's Br. at 49). But these laws are too late, too few, and impermissibly contradictory of Founding Era history.[11] The State finally regurgitates its ahistorical plea to ban firearms in crowds and around the vulnerable; and the State says that the intoxicated are among the vulnerable. But crowds still are not a relevant consideration. Nor is the presence of the vulnerable, even if the intoxicated were counted among them (which assuredly should not be so). Maryland's ban should be invalidated as unconstitutional.

---

[11] Maryland mentions two 1850s ordinances barring alcohol sellers from keeping gunpowder. (State's Br. at 48). These belated, "localized restrictions" are irrelevant and dissimilar to Maryland's ban in why and how. *Bruen*, 597 U.S. at 57.

### 3.     No-Carry Default

Maryland presumptively bans firearms on all private property—including places like grocery stores, pharmacies, places of worship, and virtually anywhere else law-abiding citizens frequent—unless the owner has "posted a clear and conspicuous sign" or otherwise given "express permission to" carry a firearm." MD. CODE, CRIM. LAW § 4-611(d)(1)–(2). The district court properly enjoined this ban.

**a. *Standing*.** Seeking to insulate its No-Carry Default from historical-tradition review, the State challenges standing by arguing that Plaintiffs' injuries are speculative. The State is wrong.

***Injury-in-fact.*** Plaintiffs have demonstrated concrete, prospective injuries. *First*, they have shown concrete intentions to carry firearms into private buildings open to the public where no sign expresses or denies consent, but will be forced to cease doing so if the No-Carry Default were to take effect.[12] Plaintiffs' proposed conduct is supported by constitutional interests, proscribed by statute, and faced with credible threats of prosecution—demonstrating a pre-enforcement injury-in-fact. *SBA List*, 573 U.S. at 159. *Second*, even where ultimately permitted to carry with

---

[12] JA0080–0083 (Kipke); JA0085–0087 (Dinkins); JA0088–0089 (Fryar); JA0092–0094 (Hurley); JA0096–0097 (Smith); JA0102 (Novotny); JA0104–0105 (Burke); JA0107–0108 (Rossberg); JA0110–0111 (Carlin-Weber); JA0113–0114 (Gottlieb); JA0116–0117 (Combs).

permission, Plaintiffs will suffer cognizable injuries through "lost time" associated with obtaining consent. *See Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1338 (11th Cir. 2021); *Freedom From Religion Found., Inc. v. Obama*, 641 F.3d 803 (7th Cir. 2011) (similar); *see also Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 90 (4th Cir. 2013). *Third*, the State's "imposition of [a] burden" or precondition on a constitutional right is justiciable. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009) (precondition to voting); *Wolford*, 116 F.4th at 993 (finding standing to challenge Hawaii's No-Carry Default because the law "plac[ed] a new burden on their right to carry").

The State responds that Plaintiffs' injuries are speculative unless they identify buildings where owners consent to entry but refuse to post a sign or grant express permission. (State's Br. at 50–51). That is wrong. There is a "substantial risk" that at least one of the places that Plaintiffs visit will fit that profile. *SBA List*, 573 U.S. at 159. That is the State's whole point in enacting the law. If it really does not change anything, one wonders why Maryland bothers defending the law at all. The State's own evidence demonstrates that "many defaults are never altered," and it is obvious that the number of locations that will no longer allow firearms will "radically expand[]" under the State's altered default rule. Ayres, *supra*, at 190. In any event, Plaintiffs **have** identified such locations. *See, e.g.*, JA0082 (Kipke), JA0103 (Burke).

49

*Traceability.* Plaintiffs' injuries are traceable to Maryland's No-Carry Default. Maryland enacted a criminal prohibition reversing the historical norm and imposing compliance burdens, with an evidence-backed expectation that locations no longer allowing firearms will "radically expand[]." Ayres, *supra*, at 190. The State is "at least in part responsible." *Libertarian Party of Va.*, 718 F.3d at 316; *Maryland Shall Issue, Inc.*, 971 F.3d at 212.

Maryland says that Plaintiffs' injuries are attributable to property owners' refusals to consent, rather than its new law. (State's Br. at 50). No court of appeals has bought this argument. *Antonyuk*, 120 F.4th at 1043; *Wolford*, 116 F.4th at 992–93. Nor does Maryland's caselaw help: *Simon* and *Turaani* stand only for the inapposite point that plaintiffs sometimes lack standing to challenge regulation of a third party that only incidentally affects them. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976); *Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021). Plaintiffs' injuries are "directly inflicted" by Maryland's law, *FEC v. Cruz*, 596 U.S. 289, 297 (2022); *Brown*, 564 U.S. at 795 n.3 (explaining that law requiring "parents' prior consent" would "impose *governmental* authority"), even if third parties theoretically could remedy their injury by consenting, *Cruz*, 596 U.S. at 298 (finding standing despite "legally available 'alternative' that would have avoided any liability"). It is nonsensical to presume all owners would consent. *Babbitt v. United*

*Farm Workers Nat'l Union*, 442 U.S. 289, 301 (1979) (finding standing where injury was "inevitable"). And even if Plaintiffs' injuries were contingent on third parties' conduct, property owners' hoped-for failures to consent are "likely react[ions]" to Maryland's flipping the historical default, *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019), as Maryland's evidence demonstrates, Ayres, *supra*, at 190.

**Redressability.** Plaintiffs' injuries are redressable by declaratory and injunctive relief allowing them to continue entering private properties with their firearms absent affirmative exclusion. *Maryland Shall Issue, Inc.*, 971 F.3d at 213–14. Maryland's own evidence demonstrates that an injunction would remedy their injuries. Ayres, *supra*, at 188.

**b. *The merits.*** Maryland's No-Carry Default has no support in the historical record. It was intentionally enacted as a novel method to thwart the right to carry in public, *Ayres*, *supra* at 184, and it turns our historical tradition upside down.

Our tradition is that citizens may carry arms with them when lawfully present on the private property of another, unless the owner affirmatively excludes them or their arms. *Christian v. Nigrelli*, 642 F. Supp. 3d 393, 407–08 (W.D.N.Y. 2022) (explaining the Nation's tradition that "carrying on private property is . . . generally permitted absent the owner's prohibition"), *aff'd*, 89 F.4th 271 (2d Cir. 2023). And for properties open to the public, citizens historically held an "implied license" to

51

enter with arms "unless such consent is conditioned or subsequently revoked by the property owner." *Koons v. Platkin*, 673 F. Supp. 3d 515, 610 (D.N.J. 2023). The authority and duty to exclude lies with private-property owners, not the State. Maryland has not shown any relevant tradition allowing the government to arrogate to itself private-property owners' right to exclude.

Maryland asserts that the Founders would not have tolerated armed entry "without permission or appropriate legal authority." (State's Br. at 55). But it ignores the tradition of implied licensure and offers no historical evidence of a State coopting the private-property owner's right to exclude and requiring affirmative consent to enter any property held open to the public. *See* Ayres, *supra*, at 984 ("no state ha[d] adopted generalized 'no carry' defaults for retail establishments" as of 2020).

The State points to a handful of Colonial laws it characterizes wrongly as "making firearm carriage onto another's property a trespass absent consent." (State's Br. at 55–56 & n.15). These laws had an incomparable "justification": every single one was a hunting regulation designed to discourage poaching, as evidenced by their titles and text. *Carralero v. Bonta*, No. 23-4354, --- F.4th ----, 2025 WL 98154, at *7–9 (9th Cir. Jan. 15, 2025) (Van Dyke, J., dissental).[13] Maryland cannot justify

---

[13] Maryland concedes this except for a single section of the 1771 New Jersey law. ACTS OF THE PROVINCE OF NEW JERSEY 343–47 (Samuel Allinson ed., 1776)

"prohibiting the lawful carriage of firearms for self-defense on private property open to the public" with a "tradition of prohibiting illegal hunting on private lands." *Antonyuk*, 120 F.4th at 1046.

These Colonial laws also had incomparable burdens. For one, they only prohibited hunting on private lands not held open to the public. For example, they prohibited carry "upon any person's land" (1715 Maryland); "on the improved or inclosed lands" (1721 Pennsylvania and 1722 New Jersey); "inclosed Land" (1763 New York); "any Lands not his own and for which the Owner pays Taxes" (1771 New Jersey)[14]; and on "said Islands" without "the special license of the proprietors of said Islands" (1789 Massachusetts). Such laws regulated "carriage only on private lands *not open to the public*." *Antonyuk*, 120 F.4th at 1046. And Founding Era laws

---

(codifying 1771 New Jersey law) (JA0446). Maryland emphasizes that Section 1 "made no mention of hunting." (State's Br. at 56). But its preamble demonstrates its anti-poaching purpose: "Preservation of Deer and other Game" and "to prevent trespassing with Guns, Traps and Dogs." Nearly every other provision expressly regulated hunting or trapping. Even New Jersey's Supreme Court characterized it as "punish[ing] violations of fish and gaming statute." *New Jersey v. One 1990 Honda Accord*, 154 N.J. 373, 389–90 (1998).

[14] Given that unimproved land was untaxed in New Jersey in 1771, the 1771 New Jersey law had the same narrow scope as the Maryland, New York, Pennsylvania, and earlier New Jersey laws cited here—it affected only "improved" lands. Brian Sawers, *Keeping Up with the Joneses: Making Sure Your History Is Just As Wrong As Everyone Else's*, 111 MICH. L. REV. FIRST IMPRESSIONS 21, 25–26 (2013); *see also* ACTS OF THE PROVINCE OF NEW JERSEY, *supra*, at 343–45.

often guaranteed the right to hunt on unenclosed lands, regardless of ownership. *See, e.g.*, PA. CONST. § 43 (1776) (protecting right to hunt on lands "not inclosed"); VT. CONST. ch. 2 § XXXIX (1777) (same). For another, except for New York's law, Maryland's analogues prohibited only long guns, as evidenced by their uses of "guns." 1 NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 96 (1828) (explaining that "one species of fire-arms, the pistol, is never called a gun"); JA0443–0044 (1721 Pennsylvania statute regulating "guns" disparately from "firearms"). Maryland's "burden is entirely out of step" with its narrow analogues. *Antonyuk*, 120 F.4th at 1047.

Maryland wrongly speculates that one Colonial regulation might have extended beyond poaching, (State's Br. at 55), which Plaintiffs rebutted above, *supra* at 52–53 n.13). *Wolford* similarly quibbled that some covered more than lands not open to the public, in wrongly upholding Hawaii's No-Carry Default. 116 F.4th at 995. But Maryland has no such evidence. Nor has it shown these laws were "ever enforced" against non-poachers—much less against someone with an implied license to enter, or relating to unenclosed lands, or someone carrying only a handgun. *Bruen*, 597 U.S. at 58; *id.* at 58 n.25 (holding "barren record of enforcement" is an "additional reason to discount [laws'] relevance"). "To the extent there are multiple

54

plausible interpretations," the Court must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 44 n.11.

The State makes its last stand with an 1865 Louisiana statute, an 1866 Texas statute, and an 1893 Oregon statute. (State's Br. at 57). These statutes should be disregarded. For one, they are far too late. For another, the Louisiana and Texas laws were "part of their discriminatory 'Black Codes,' which sought to deprive African Americans of their rights." JA0992.[15] The laws were part of a package of regulations aimed at restricting the ability of freedmen to support themselves without going back to work for their former slaveholders. Brian Sawers, *Property Law as Labor Control in the Postbellum South*, 33 LAW & HIST. REV. 351, 366 (2015). And Oregon in the 19th and 20th centuries had its own "troubling history of racial discrimination." Cheryl A. Brooks, *Race, Politics, and Denial: Why Oregon Forgot to Ratify the*

---

[15] Maryland rightfully concedes that Texas' law was a Black Code provision. Texas Black Codes, DIG. HIST. (2021), https://bit.ly/3KV7suz; Stephen P. Halbrook, *The Right to Bear Arms in Texas: The Intent of the Framers of the Bills of Rights*, 41 BAYLOR L. REV. 629, 653 (1989) ("the closest Texas came to adopting a black code provision to disarm freedmen"). It resists that conclusion for Louisiana's law. But it is wrong. *A Test Case for the President*, NEW YORK TRIBUNE, March 7, 1866, *in* IX PUBLIC OPINION: A Comprehensive Summary of The Press Throughout the World on All Important Current Topics, Jan.–June 1866, https://bit.ly/4evpaQE (quoting the Louisiana law as evidence that Louisiana was "nothing but a machine for restoring to political power the rebels" and "reenacting slavery in fact"); 3 CONG. REC. 1648 (1875) (Report of Representative Hoar) (describing law as "depriving the great mass of the colored laborers of the State of the right to keep and bear arms").

*Fourteenth Amendment*, 83 Or. L. Rev. 731, 732 (2004); *Ramos v. Louisiana*, 590 U.S. 83, 88 (2020). These laws belong in the dustbin of history. (Pls.' Br. at 19–20).

Nor are these laws relevantly similar. The Louisiana law applied only to "premises or plantations," suggesting application only to farmland. 2 Noah Webster, American Dictionary of the English Language (1832) (defining "plantation," "[i]n the United States and the West Indies," as "a cultivated estate; a farm"). The Texas and Oregon laws were even narrower. Texas's covered only "inclosed premises or plantation[s]" (JA0468) and Oregon's forbid "go[ing] or trespass[ing] upon any enclosed premises or lands" (JA0475), meaning land "*not open to the public*." *Antonyuk*, 120 F.4th at 1046. The State offers no evidence to suggest otherwise. And if "*three* colonial regulations" cannot suffice, then three racist late-19th-century statutes cannot either. *Bruen*, 597 U.S. at 66.

## CONCLUSION

Plaintiffs respectfully request that this Court reverse the district court's judgment as to Maryland's bans at or within museums; healthcare facilities; mass transit facilities and vehicles; state parks; entertainment facilities; school grounds; and all government buildings and their grounds, excluding only those at which the State provides comprehensive security today (such as courthouses). Plaintiffs also request that the Court affirm the district court's judgment as to Maryland's bans at

public demonstrations and locations selling alcohol, and the No-Carry Default. The

Court should remand with instruction to enter judgment for Plaintiffs accordingly.

Dated: January 22, 2025                  Respectfully Submitted,

/s/*John Parker Sweeney*                 /s/*David H. Thompson*
John Parker Sweeney                      David H. Thompson
James W. Porter, III                     Peter A. Patterson
William Chadwick Lamar, Jr.              Megan Marie Wold
BRADLEY ARANT BOULT CUMMINGS LLP         William V. Bergstrom
1615 L Street NW, Suite 1350             COOPER & KIRK, PLLC
Washington, DC 20036                     1523 New Hampshire Ave., N.W.
Phone: (202) 719-8216                    Washington, D.C. 20036
jsweeney@bradley.com                     Phone: (202) 220-9600
                                         dthompson@cooperkirk.com
*Attorneys for Appellants / Cross-*       ppatterson@cooperkirk.com
*Appellees Susannah Warner Kipke and*     mwold@cooperkirk.com
*Maryland State Rifle and Pistol*         wbergstrom@cooperkirk.com
*Association, Inc.*

                                         *Attorneys for Appellants / Cross-*
                                         *Appellees Katherine Novotny, Sue*
                                         *Burke, Esther Rossberg, Maryland*
                                         *Shall Issue, Inc., Second Amendment*
                                         *Foundation, and Firearms Policy*
                                         *Coalition*

                                         /s/*Mark W. Pennak*
                                         Mark W. Pennak
                                         LAW OFFICES OF MARK W. PENNAK
                                         7416 Ridgewood Ave.
                                         Chevy Chase, MD 20815
                                         Tel: (301) 873-3671
                                         mpennak@marylandshallissue.org

                                         *Attorney for Appellants / Cross-*
                                         *Appellees Katherine Novotny, Sue*
                                         *Burke, Esther Rossberg, Maryland*
                                         *Shall Issue, Inc., Second Amendment*
                                         *Foundation, and Firearms Policy*
                                         *Coalition*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32 because it contains 12,973 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface and type-style requirements of Rule 32(a) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: January 22, 2025

/s/ *John Parker Sweeney*
John Parker Sweeney

Counsel for *Kipke* Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2025, a copy of the foregoing was served via electronic delivery to all parties' counsel via the Court's appellate CM/ECF system, which will forward copies to Counsel of Record.

*/s/ John Parker Sweeney*
John Parker Sweeney

Counsel for *Kipke* Plaintiffs

60