Nos. 24-1799(L), 24-1827, 24-1834, 24-1836
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**
_____

**SUSANNAH WARNER KIPKE, *et al.*,**

*Plaintiffs-Appellants/Cross-Appellees*,

**v.**

**WES MOORE, *et al.*,**

*Defendants-Appellees/Cross-Appellants.*
_____

**KATHERINE NOVOTNY, *et al.*,**

*Plaintiffs-Appellants/Cross-Appellees*,

**v.**

**WES MOORE, *et al.*,**

*Defendants-Appellees/Cross-Appellants.*
_____

On Appeal from the United States District Court for the District of Maryland
(George L. Russell, III, District Judge)
_____

**REPLY BRIEF OF APPELLEES/CROSS-APPELLANTS**
_____

[Counsel listed on following page.]

ANTHONY G. BROWN
Attorney General of Maryland

RYAN R. DIETRICH
JESSICA M. FINBERG
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rdietrich@oag.state.md.us
(410) 576-7648
(410) 576-6955 (facsimile)

Attorneys for Appellees/Cross-
Appellants

February 26, 2025

# TABLE OF CONTENTS

Page

REPLY ARGUMENT ..................................................................................1

I.  PLAINTIFF'S NARROW UNDERSTANDING OF THE SENSITIVE PLACES
    DOCTRINE IS CONTRARY TO THE HISTORICAL RECORD, REFUTED BY
    CASE LAW, AND UNWORKABLE IN APPLICATION. ...........................................2

    A.  This Court Should Reject Plaintiffs' Unworkable and
        Ahistorical Comprehensive-Security Theory ........................................2

    B.  This Court Should Reject Plaintiffs' Reliance on
        Anachronistic and Racist Laws That Mandated the Carrying
        of Firearms. ...........................................................................7

    C.  Plaintiffs' Other Challenges to the "Sensitive Places"
        Doctrine Do Not Undermine Its Application Here. ...........................10

II.  PLAINTIFFS LACK STANDING TO CHALLENGE MARYLAND'S
     RESTRICTION ON CARRYING A FIREARM NEAR A PUBLIC
     DEMONSTRATION, BUT THAT RESTRICTION IS CONSTITUTIONAL IN
     ANY EVENT. ........................................................................................13

III.  MARYLAND'S FIREARM RESTRICTION AT LOCATIONS LICENSED TO
      SELL ALCOHOL FOR ON-SITE CONSUMPTION IS CONSTITUTIONAL. ................15

IV.  MARYLAND'S PRIVATE BUILDING CONSENT RULE IS
     CONSTITUTIONAL. ................................................................................15

CONCLUSION ........................................................................................18

CERTIFICATE OF COMPLIANCE ...................................................................19

# TABLE OF AUTHORITIES

Page

## Cases

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) ...................................................4, 6

*District of Columbia v. Heller*, 554 U.S. 570  (2008) ...................................... 1, 3, 5

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ... 1, 3, 5, 7, 10, 15

*Owens v. State*, 3 Tex. App. 404 (1878) ..................................................................10

*Reynolds v. Swain*, 13 La. 193 (1839) ....................................................................17

*United States v. Rahimi*, 602 U.S. 691 (2024)........................................................15

*Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024)......................................... 8, 11, 17

## Constitutional Provisions

Md. Decl. Rights art. 5 .............................................................................................12

## Statutes

Md. Code Ann., Crim. Law § 4-208 (LexisNexis Supp. 2024)...............................13

Md. Code Ann., Crim. Law § 4-208(b) (LexisNexis Supp. 2024).........................13

Md. Code Ann., Crim. Law § 4-208(b)(2) (LexisNexis Supp. 2024) ................... 13

Md. Code Ann., Crim. Law § 4-111(b)(9) (LexisNexis Supp. 2024) ......................8

## Miscellaneous

1 James Kent, *Commentaries on American Law* (3d ed. 1836) ..............................12

5 St. George Tucker, *Blackstone's Commentaries*, app. n.B (1803).........................9

Act No. 702, *reprinted in 7 Statutes at Large of South Carolina*
   (D.J. McCord ed. 1840) ......................................................................................8

An Act to Define and Declare the Rights of Persons Lately Known as Slaves, and Free Persons of Color (Tex. Nov. 10, 1866) ..................................17

I *Laws of the State of North-Carolina, Including the Titles of Such Statutes and Parts of Statutes of Great Britian as Are in Force in Said State* (1821) ...........................................................................12

*Preface of the Commissioners of 1838, Revised Code of North Carolina* (1855) ...................................................................... 11, 12

*The Revised Statute Laws of the State of Louisiana*, Sec. 821 (1870)....................18

Nos. 24-1799(L), 24-1827, 24-1834, 24-1836

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

**SUSANNAH WARNER KIPKE**, *et al.*,

*Plaintiffs-Appellants/Cross-Appellees*,

v.

**WES MOORE**, *et al.*,

*Defendants-Appellees/Cross-Appellants*.

_____

**KATHERINE NOVOTNY**, *et al.*,

*Plaintiffs-Appellants/Cross-Appellees*,

**v.**

**WES MOORE**, *et al.*,

*Defendants-Appellees/Cross-Appellants*.

_____

On Appeal from the United States District Court for the District of Maryland
(George L. Russell, III, District Judge)

_____

### REPLY ARGUMENT

In *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), and later in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 30 (2022), the Supreme Court affirmed that there are certain locations—"sensitive places"—where firearms may

be prohibited. Plaintiffs' brief, however, invites this Court to ignore that pronouncement in favor of alternative theories that find no support in the historical record. This Court should reject those arguments and, as to the restrictions on firearm carriage at places selling alcohol for on-site consumption, the restrictions on firearm carriage near public demonstrations, and the private building consent rule, should reverse the decision below.

## I.   PLAINTIFF'S NARROW UNDERSTANDING OF THE SENSITIVE PLACES DOCTRINE IS CONTRARY TO THE HISTORICAL RECORD, REFUTED BY CASE LAW, AND UNWORKABLE IN APPLICATION.

In asking this Court to set aside the State's restrictions on carrying firearms at demonstrations and at locations serving alcohol, as well as the private building consent rule, plaintiffs distort the sensitive places doctrine and the historical tradition of firearms regulation. Plaintiffs' novel theories—which have been rejected by the circuit courts that have considered them—should be rejected by this Court as well.

### A.   This Court Should Reject Plaintiffs' Unworkable and Ahistorical Comprehensive-Security Theory.

Public demonstrations and locations serving alcohol for on-site consumption are sensitive places where firearms may be prohibited. Appellees' Br. 45-50. Still, plaintiffs continue to urge that a location is a "sensitive place" only if there is "comprehensive government-provided security." Response & Reply Br. 3, 12, 13, 14-19. This theory not only contravenes the Supreme Court's (and this Court's) precedents, but raises so many questions that it would be unworkable in any event.

First, if the presence of state-provided security is the sole criterion by which all locational restrictions must be judged, plaintiffs do not explain why *Bruen* did not simply articulate such a standard. Given that *Bruen* discussed "sensitive places" in a passage meant to clarify the application of the history-and-tradition standard announced in *Heller*, the Court could have easily included this limiting principle in furtherance of that purpose. That it did not speaks volumes.

Even more telling is what the Court *did* say. In *Bruen*, the Court rejected New York's assertion that the "sensitive places" doctrine could encapsulate all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." 597 U.S. at 30-31. If the Court had believed that "comprehensive government-provided security" was the defining characteristic of a sensitive place, Response & Reply Br. 13, it could have rejected New York's argument out of hand on that basis. It did not. Instead, the Court used cautious language, stating only that including within the category of "sensitive places" "all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly," and would "eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 597 U.S. at 30-31.

Furthermore, the Court effectively foreclosed plaintiffs' narrow view when it identified characteristics of locations it might recognize as "sensitive places." In rejecting New York's more expansive position described above, the *Bruen* Court

stated: "It is true that people sometimes congregate in 'sensitive places,' and it is likewise true that law enforcement professionals are usually presumptively available in those locations." 597 U.S. at 31. The Court's observation that law enforcement officials are "usually presumptively available" in sensitive places thus refutes plaintiffs' theory that government-provided security must always be present.

That theory, moreover, confuses a "sensitive" place with a "secure" place. This Court has already rejected the notion that a "sensitive place" is one that is absolutely secure. Instead, the Court has acknowledged that citizens "have no less of a right to protect themselves" while in a "sensitive place," but has explained that "our society has deemed that giving people the capacity to use large amounts of force at a moment's notice in a sensitive place is not worth the danger that they will unlawfully deploy such force against innocent civilians or public figures there." *Bianchi v. Brown*, 111 F.4th 438, 450 (4th Cir. 2024) (en banc). That statement is fundamentally at odds with plaintiffs' view that a place is "sensitive" only if it is comprehensively secure.

Ironically, plaintiffs' theory could even expand the concept of "sensitive places" beyond what the Supreme Court had in mind. Plaintiffs claim that "[i]f Maryland wants to make a place sensitive, it may do so, but only if it implements security measures (guards, metal detectors, etc.) that obviate the need for armed self-defense." Response & Reply Br. 19. Thus, plaintiffs effectively argue that *any*

public place in Maryland may potentially be a sensitive place at which firearm carriage may be prohibited, regardless of historical tradition. For example, under plaintiffs' theory, Maryland may decide to impose comprehensive security on a grocery store, and—simply by virtue of that decision—individuals may be prohibited from carrying firearms in that grocery store.

Conversely, plaintiffs' "comprehensive government-provided security" theory fails to account for places that the Supreme Court expressly recognized are sensitive. Under plaintiffs' theory, because Maryland does not currently provide comprehensive security at any of its more than 1,500 polling places, its prohibition on firearm carriage there would violate the Second Amendment—despite *Heller* and *Bruen*'s express approval of such a prohibition. Again, if the animating principle is comprehensive security, one wonders why *Bruen* or *Heller* did not simply say so, rather than deem polling places "sensitive places" without qualification.

Plaintiffs' theory is unworkable even on its own terms. That theory presupposes that there is a level of security *less* than "comprehensive" (where an individual may not be prohibited from carrying a firearm) and, correspondingly, a level of security that meets that standard. But plaintiffs make no effort to explain how one might draw the line between comprehensive and noncomprehensive security or to answer the multitude of questions that their own theory raises. What does it mean to "secure the premises"? Response & Reply Br. 17. Is a single security

guard "tasked with security" enough? Response & Reply Br. 14. Or is there some formula based on a facility's area or layout? Must government-provided security personnel be armed with firearms? Must they have some particular level of training? Must they be dedicated to "protective functions," or may they also "execut[e] whatever other duties [are] prescribed for them"? Response & Reply Br. 17. Does the requisite level of security evolve based on threats, whether internal or external? Is "comprehensive security" transitory, such that the ability to carry a firearm springs into existence if the security guard momentarily steps away? Plaintiffs do not attempt to answer any of these questions.

Finally, plaintiffs' theory of sensitive places creates a fatal flaw in their argument. Plaintiffs seek to invalidate the challenged restrictions on their face. But as this Court recently explained, facial challenges require plaintiffs "to establish that no set of circumstances exists under which [the statute at issue] would be valid, or that the statute lacks any plainly legitimate sweep." *Bianchi*, 111 F.4th at 452 (citations and quotation marks omitted). And under plaintiffs' theory, whether a particular location is a "sensitive place" depends on the level of security being provided *at that time*. This type of fact-dependent inquiry precludes the broad facial relief that plaintiffs are seeking here.[1]

---

[1] In arguing that "the State's approach is unsupported by history," Response & Reply Br. 19, plaintiffs highlight the relative recency of some of the State's locational restrictions. This contention, however, ignores that, until 2023, Maryland

**B.    This Court Should Reject Plaintiffs' Reliance on Anachronistic and Racist Laws That Mandated the Carrying of Firearms.**

Plaintiffs' opposition to the private building consent rule and to the firearm restrictions at demonstrations and locations that serve alcohol rests, in part, on certain colonial laws that mandated that citizens carry firearms at particular times or in particular locations, such as at church or while travelling away from settled areas. Response & Reply Br. 19-20, 44. These laws do not undermine the historical tradition supporting the challenged provisions' constitutionality.

First, most of these laws date from the early colonial era, and all of them served distinct purposes that are no longer relevant today. *Bruen* instructs that, in assessing the nature of a particular tradition derived from historical regulations, one must look to both "how" and "why" a regulation "burden[s] a law-abiding citizen's right to armed self-defense." 597 U.S. at 29. These laws did not "burden a law-abiding citizen's right to armed defense" at all; rather, they related only to the community's *collective* self-defense. Specifically, the purpose of these laws was to protect citizens from external threats such as slave insurrections and Native

significantly restricted the number of people who were able to obtain public carry permits, and thus there was little practical need for broad locational restrictions. *Bruen*, of course, required Maryland to relax its scheme for issuing public carry permits. It is no surprise—and certainly no sign of constitutional infirmity—that when it generally became easier to carry firearms in Maryland, the State enacted restrictions on public carry at sensitive places supported by this Nation's historical tradition, including at locations serving alcohol for on-site consumption.

American attacks, not interpersonal violence among American citizens. *Wolford v. Lopez*, 116 F.4th 959, 997 (9th Cir. 2024). However existential these threats may have been at the time, they do not exist anymore, and therefore any reliance on these laws as a source of enduring principles is misplaced. And although plaintiffs deny that these laws were racist, *see* Response & Reply Br. 20, one need only look to a 1743 South Carolina statute that required colonists to bring their guns to church but that also laid bare its purpose: so that "the inhabitants of this Province may be the better secured and provided against the insurrections and other wicked attempts of negroes and other slaves." Act No. 702, *reprinted in* 7 *Statutes at Large of South Carolina* 417-19 (D.J. McCord ed. 1840), https://tinyurl.com/4jceefep.

Second, to the extent that these laws demonstrate a tradition of armed protection of premises where people gather, the restrictions that plaintiffs challenge honor that tradition. With regard to non-governmental locations referenced in Senate Bill 1, including locations serving alcohol for on-site consumption and private buildings, the prohibitions on the carrying of firearms do not apply to "a person who is authorized by the owner or lessee of the location to wear, carry, or transport a firearm at the location for the purpose of . . . employment as a [licensed] security guard [or] protecting any individual or property at the location with an express agreement between the parties." Md. Code Ann., Criminal Law § 4-111(b)(9) (LexisNexis Supp. 2024). Thus, instead of the government

conscripting its citizens into the collective defense of the community, property owners are now free to determine whether, and to what extent, to provide armed security at the places they control.

Finally, neither these laws nor other authorities establish early America as a place where an individual's armed self-defense was elevated over all other considerations. Plaintiffs cite St. George Tucker's edition of William Blackstone's *Commentaries on the Laws of England* for the notion that "[a]t the Founding, a person simply did not 'go[] out of his house on any occasion, without his rifle or musket in his hand.'" Response & Reply Br. 19. Even if it were true that early Americans routinely left their houses with their muskets or rifles, that practice provides no insight into whether they ordinarily carried those weapons into any particular location. And plaintiffs do not mention that Professor Tucker himself was referring only to a practice "[i]n many parts of the United States."[2]  5 St. George Tucker, *Blackstone's Commentaries*, app. n.B at 19 (1803).

Plaintiffs have thus failed to show that the "tradition" of requiring everyone to be armed extended beyond the circumstances—to which no analogue exists

---

[2] Plaintiffs' reliance on the cited passage is inapposite for an additional reason: Professor Tucker was not making a freestanding point about the carrying of firearms but, rather, was explaining why defining the crime of treason broadly to include the public carrying of firearms would be unworkable outside England. *See* 5 St. George Tucker, *Blackstone's Commentaries*, app. n.B at 19 (1803).

today—in which colonists were collectively engaged in defending themselves from threats external to their political community, whether slave insurrections or attacks by Native Americans. Indeed, outside of this context, plaintiffs have not presented *any* documentary evidence, from *any* historical era, of requirements that people be armed at social events or other public gatherings. That lack of evidence is particularly stark in light of the robust contrary tradition that the State has set forth. S*ee* Appellees' Br. 21; *see also*, *e.g.*, *Owens v. State*, 3 Tex. App. 404, 407 (1878) ("Nor does it matter how much or with what good reason I may be in dread of an immediate and pressing attack . . ., the imminence of such danger affords no excuse in my wearing deadly weapons to church, or in a ball-room, or other places mentioned where [an] attack may be made and the lives of innocent people there assembled placed in jeopardy or sacrificed.").

### C.    Plaintiffs' Other Challenges to the "Sensitive Places" Doctrine Do Not Undermine Its Application Here.

Plaintiffs argue that Maryland cannot rely on certain historical traditions, such as restricting firearms in crowded locations or protecting vulnerable populations, Response & Reply Br. 21-24, because of *Bruen*'s admonition that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." 597 U.S. at 31. But the State is not arguing that the ability to limit firearms in crowded locations or to protect vulnerable populations is a freestanding principle

unmoored from the historical tradition. Instead, these principles are the evident underpinnings of that tradition and therefore may be used to analogize modern locational restrictions to the historical record. *Cf. Wolford*, 116 F.4th at 981 (declining to hold that "all possible locations that serve children or another vulnerable population are necessarily sensitive places," but stating that "[t]he historical record, *in addition to those facts*, must inform the analysis" (emphasis added)).[3]

Further, plaintiffs take issue with the State's reference to North Carolina's analogue to the Statute of Northampton, which was included in a Founding-era compilation of all English statutes in force in North Carolina at that time. (JA390-391); *see* Response & Reply Br. 25-26. Claiming that this statute "did not exist," plaintiffs argue that (1) it is "merely a copy" of the original Statute of Northampton, "as its references to the 'King's Ministers' suggest"; and (2) later compilers criticized the cited compilation as unreliable because it was overinclusive. Response & Reply Br. 25 (citing *Preface of the Commissioners of 1838*, *Revised Code of North Carolina* xiii (1855)). Both attacks are easily dismissed. First, it is immaterial that

---

[3] Plaintiffs also assail the "protecting vulnerable populations" principle by arguing that, as to schools, the operative principle actually is the *in loco parentis* doctrine. Response & Reply Br. 22. Plaintiffs do not explain, however, why the Court treated schools as sensitive *places*, coupling them with "government buildings."

the statutes contained within were the English statutes themselves, for in the early years of the Republic, Americans continued to apply many English statutes. *See* 1 James Kent, *Commentaries on American Law* 473 (3d ed. 1836) ("It is also the established doctrine [that] the English statutes, passed before the emigration of our ancestors, and applicable to our situation, and in amendment of the law, constitute a part of the common law of this country."); *see also* Md. Decl. Rights art. 5 (declaring that "the Inhabitants of Maryland are entitled to . . . the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six"). Second, the subsequent criticism on which the plaintiffs rely did not speak to the inclusion of the Statute of Northampton. And with good reason: The same publication explained that, in 1817, the General Assembly had appointed a new committee to compile the statutes of Great Britain in force in the state. *See Preface of the Commissioners of 1838* xiii-xiv, https://tinyurl.com/4e25jckw  That new committee's compilation[4] also included the Statute of Northampton and went uncriticized. *Id.*

---

[4] *See* I *Laws of the State of North-Carolina, Including the Titles of Such Statutes and Parts of Statutes of Great Britian as Are in Force in Said State*, 87 (1821) (listing "2 Edward 3, 1328, Chap. 3"), https://tinyurl.com/2p92npx7.

II. **Plaintiffs Lack Standing to Challenge Maryland's Restriction on Carrying a Firearm Near a Public Demonstration, But That Restriction Is Constitutional in Any Event.**

Plaintiffs assert that Mrs. Kipke has standing to challenge Maryland's prohibition in Criminal Law § 4-208(b)(2) because she intends to carry a handgun to a public demonstration and this "intended conduct is proscribed by Maryland law." Response & Reply Br. 43. Whatever Mrs. Kipke's intent, that statement of the law is incorrect. Maryland law does not prohibit the mere carrying of a firearm at or within 1,000 feet of a public demonstration. Instead, a person becomes subject to the prohibitions of Criminal Law § 4-208 only when (1) a law enforcement officer becomes aware of the person's possession of the firearm; (2) the officer chooses to inform the person that "a demonstration is occurring at the public place"; (3) the officer orders the person "to leave the area of the demonstration until the person disposes of the firearm"; and (4) the person refuses to do so. Crim. Law § 4-208(b).

As to the first element, plaintiffs claim that "there is at least a substantial risk that a trained law enforcement officer would notice [her] weapon carried in a holster, even when concealed." Response & Reply Br. 43. They fail to explain, however, why this would be so.

The second and third elements, which can be satisfied only upon the exercise of a law enforcement officer's discretion, also undercut plaintiffs' standing argument. Although plaintiffs claim that this argument is a "non-starter" because

13

discretion is "'deep-rooted' in our justice system," Response & Reply Br. 43, this statute implicates more than just the run-of-the-mill enforcement discretion that nearly all criminal statutes allow. Normally, a criminal law prohibits specified conduct and subjects a person to arrest if they engage in that prohibited conduct; law enforcement, in turn, may exercise discretion not to arrest or prosecute a violator. But here, a person who merely carries a firearm at a public demonstration does not thereby become subject to arrest. Instead, the officer must first exercise discretion to (1) inform the person that there is a public demonstration; and (2) inform the person that they must leave the area to dispose of the firearm. Only then does the continued possession of a firearm become unlawful. Allowing a plaintiff to have standing simply by asserting a desire to carry a handgun at a demonstration ignores that, unless the officer first exercises discretion to issue the appropriate warnings, the plaintiff's conduct is not unlawful.

As to the merits, plaintiffs are wrong to rely again on colonial laws that required citizens to carry firearms at public assemblies. Response & Reply Br. 19. As explained above, these laws reflect a distinct purpose aimed at a distinct external threat, i.e., protection from slaves and Native Americans. They thus do not undermine the constitutionality of restrictions whose purpose is to preserve the peace at public gatherings. *See* Appellees' Br. 17-21 (discussing tradition of such restrictions). Maryland's law fulfills this purpose in a manner even more nuanced

than the historical tradition: Maryland respects a person's ability to carry a firearm as a default but nonetheless empowers law enforcement to curtail that ability if circumstances warrant.

## III. MARYLAND'S FIREARM RESTRICTION AT LOCATIONS LICENSED TO SELL ALCOHOL FOR ON-SITE CONSUMPTION IS CONSTITUTIONAL.

In its opening brief, the State set forth a multifaceted historical tradition of both recognizing and regulating the deadly mix of alcohol and firearms, supporting a conclusion that locations selling alcohol for on-site consumption—which are often crowded with vulnerable (intoxicated) people—are "sensitive places" where firearms may be prohibited. Appellees' Br. 48-50. In response, plaintiffs offer nothing more than a refusal to concede that any showing by the State could ever establish *any* tradition of regulation. This is the same type of rigidity that the Supreme Court rejected in *Rahimi* when it repudiated the notion that historical regulations are "trapped in amber," and instead instructed courts to look to the "*principles* that underpin our regulatory tradition." 602 U.S. at 691-92 (emphasis added). Because regulating firearms at locations that sell alcohol for on-site consumption is consistent with this tradition, the State's law is constitutional.

## IV. MARYLAND'S PRIVATE BUILDING CONSENT RULE IS CONSTITUTIONAL.

The State's opening brief explained that plaintiffs lacked standing to challenge the private building consent rule and that, even if any plaintiff had

standing, their claim failed at *Bruen*'s first step because the Second Amendment does not encompass a freestanding right to carry a firearm onto another's property without their consent. Appellees' Br. 50-55. This Court should reject their claim at the outset for the reasons previously stated.

Plaintiffs' arguments on the merits fail as well. First, plaintiffs cannot escape the 1771 New Jersey law cited by the State by claiming that the law had an "anti-poaching purpose." Response & Reply Br. 52 n.13. Plaintiffs point to the preamble, which referred to the law's intent to "prevent trespassing with guns, traps and dogs." The law did indeed prohibit trespassing with guns, traps, and dogs. It did so, however, in a provision separate from the one on which the State relies: Section 2 of the law prohibited "hunt[ing] or watch[ing] for Deer with a Gun, or set[ting] in any Dog or Dogs to drive Deer, or any other Game" without permission. (JA447.) Section 1, however—the section at issue here—separately made it unlawful, absent consent, for a person to "carry any Gun on any Lands not his own," without any reference to hunting. (JA447.) In other words, even if parts of the New Jersey law were directed to preventing poaching, the restriction relevant to this case was not so limited.

Nor can plaintiffs avoid the import of laws from Louisiana (1865), Texas (1866), and Oregon (1893) by observing that, by their text, they apply only to "premises" or "plantations." Response & Reply Br. 56. Using a dictionary

definition, plaintiffs argue that the term "plantation" "suggest[s] application only to farmland." Response & Reply Br. 56. But they make no attempt to show that the term "premises" was so limited. And as the Ninth Circuit in *Wolford* explained, Louisiana courts regularly used the term "premises" contemporaneously to describe businesses, including "a brick building operated by apothecaries." 116 F.4th at 995 (citing, *e.g.*, *Reynolds v. Swain*, 13 La. 193, 194 (1839)). Plaintiffs' attempt to narrow the statutes' meaning thus fails.

Finally, plaintiffs cannot brush aside these three laws as vestiges of our nation's racist past. Plaintiffs ask the Court to disregard these three laws because the Texas and Louisiana statutes were part of those States' "Black Codes," and because Oregon "had its own 'troubling history of racial discrimination.'" Response & Reply Br. 55-56. But plaintiffs paint with too broad a brush. The Black Codes of Louisiana and Texas demonstrate that those States knew how to draft laws targeting the rights of African Americans. *See, e.g.*, An Act to Define and Declare the Rights of Persons Lately Known as Slaves, and Free Persons of Color (Tex. Nov. 10, 1866), https://tinyurl.com/yznrtyv5 (reaffirming that African Americans were prohibited from marrying Whites, serving on juries, holding office, and voting). The laws cited here contain no such limitation, so there is no basis to conclude that they did not apply to the population generally. Moreover, the restrictions on carrying firearms remained in effect even after Reconstruction was implemented. (JA466-468) (1874

digest of Texas laws); *The Revised Statute Laws of the State of Louisiana*, Sec. 821 (1870), https://tinyurl.com/nmzszy5r.  And plaintiffs' assertion that Oregon's law can be discounted simply because the State has a "troubling history of racial discrimination" suggests that *no* law will ever be good enough for them:  If the bar is set such that a historical American law must come from a jurisdiction with no legacy of racial discrimination, the government, regrettably, will always come up empty.

## CONCLUSION

The judgment of the district court should be affirmed in part and reversed in part, and the case should be remanded for entry of summary judgment in favor of the defendants on all claims.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Ryan R. Dietrich

_____
RYAN R. DIETRICH
JESSICA M. FINBERG
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rdietrich@oag.state.md.us
(410) 576-7648

Attorneys for Appellees/Cross-Appellants

18

**CERTIFICATE OF COMPLIANCE**

1.    This brief complies with the type volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 4,090 words, excluding the parts of the brief exempted by Rule 32(f).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Fourteen point, Times New Roman.

/s/ Ryan R. Dietrich

_____

Ryan R. Dietrich

**CERTIFICATE OF SERVICE**

I certify that, on this 26th day of February, 2025, the Reply Brief of Appellees/ Cross-Appellants was filed electronically and served on counsel of record who are registered CM/ECF users.

/s/ Ryan R. Dietrich

_____

Ryan R. Dietrich