**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-1799

SUSANNAH WARNER KIPKE; MARYLAND STATE RIFLE AND PISTOL
ASSOCIATION, INC.,

Plaintiffs – Appellants,

v.

WES MOORE, in his official capacity as Governor of Maryland; ROLAND L. BUTLER,
JR., in his official capacity as Maryland State Police Superintendent and Secretary;
JOSHUA KURTZ, in his official capacity as Secretary of Natural Resources,

Defendants – Appellees.

------------------------------

EVERYTOWN FOR GUN SAFETY; BRADY CENTER TO PREVENT GUN
VIOLENCE; GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE;
DISTRICT OF COLUMBIA; ILLINOIS; CALIFORNIA; COLORADO;
CONNECTICUT; DELAWARE; HAWAII; MAINE; MASSACHUSETTS;
MINNESOTA; NEVADA; NEW JERSEY; NEW YORK; OREGON;
PENNSYLVANIA; RHODE ISLAND; VERMONT; WASHINGTON,

Amici Supporting Appellees.

No. 24-1827

KATHERINE NOVOTNY; SUE BURKE; ESTHER ROSSBERG; MARYLAND
SHALL ISSUE, INC.; SECOND AMENDMENT FOUNDATION; FIREARMS
POLICY COALITION,

Plaintiffs – Appellants,

v.

WESLEY MOORE, in his official capacity as Governor of Maryland; ALISON M. HEALEY, in her official capacity as States Attorney for Harford County, Maryland; SCOTT D. SHELLENBERGER, in his official capacity as States Attorney for Baltimore County, Maryland; IVAN J. BATES, in his official capacity as States Attorney for Baltimore City, Maryland; COL. ROLAND L. BUTLER, JR., in his official capacity as Superintendent of the Maryland State Police; PAUL J. WIEDEFELD, in his official capacity as Secretary of Transportation; JOSHUA KURTZ, in his official capacity as Secretary of Natural Resources,

Defendants – Appellees.

-------------------------------

EVERYTOWN FOR GUN SAFETY; BRADY CENTER TO PREVENT GUN VIOLENCE; GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE; DISTRICT OF COLUMBIA; ILLINOIS; CALIFORNIA; COLORADO; CONNECTICUT; DELAWARE; HAWAII; MAINE; MASSACHUSETTS; MINNESOTA; NEVADA; NEW JERSEY; NEW YORK; OREGON; PENNSYLVANIA; RHODE ISLAND; VERMONT; WASHINGTON,

Amici Supporting Appellees.

---

**No. 24-1834**

---

SUSANNAH WARNER KIPKE; MARYLAND STATE RIFLE AND PISTOL ASSOCIATION, INC.,

Plaintiffs – Appellees,

v.

WES MOORE, in his official capacity as Governor of Maryland; ROLAND L. BUTLER, JR., in his official capacity as Maryland State Police Superintendent and Secretary; JOSHUA KURTZ, in his official capacity as Secretary of Natural Resources,

Defendants – Appellants.

-------------------------------

2

EVERYTOWN FOR GUN SAFETY; BRADY CENTER TO PREVENT GUN VIOLENCE; GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE; DISTRICT OF COLUMBIA; ILLINOIS; CALIFORNIA; COLORADO; CONNECTICUT; DELAWARE; HAWAII; MAINE; MASSACHUSETTS; MINNESOTA; NEVADA; NEW JERSEY; NEW YORK; OREGON; PENNSYLVANIA; RHODE ISLAND; VERMONT; WASHINGTON,

Amici Supporting Appellants.

---

**No. 24-1836**

---

KATHERINE NOVOTNY; SUE BURKE; ESTHER ROSSBERG; MARYLAND SHALL ISSUE, INC.; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION,

Plaintiffs – Appellees,

v.

WESLEY MOORE, in his official capacity as Governor of Maryland; ALISON M. HEALEY, in her official capacity as States Attorney for Harford County, Maryland; SCOTT D. SHELLENBERGER, in his official capacity as States Attorney for Baltimore County, Maryland; IVAN J. BATES, in his official capacity as States Attorney for Baltimore City, Maryland; COL. ROLAND L. BUTLER, JR., in his official capacity as Superintendent of the Maryland State Police; PAUL J. WIEDEFELD, in his official capacity as Secretary of Transportation; JOSHUA KURTZ, in his official capacity as Secretary of Natural Resources,

Defendants – Appellants.

------------------------------

EVERYTOWN FOR GUN SAFETY; BRADY CENTER TO PREVENT GUN VIOLENCE; GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE; DISTRICT OF COLUMBIA; ILLINOIS; CALIFORNIA; COLORADO; CONNECTICUT; DELAWARE; HAWAII; MAINE; MASSACHUSETTS; MINNESOTA; NEVADA; NEW JERSEY; NEW YORK; OREGON; PENNSYLVANIA; RHODE ISLAND; VERMONT; WASHINGTON,

Amici Supporting Appellants.

———————

Appeals from the United States District Court for the District of Maryland, at Baltimore. George L. Russell, III, Chief District Judge.  (1:23-cv-01293-GLR; 1:23-cv-01295-GLR; 1:23-cv-01293-GLR; 1:23-cv-01295-GLR)

———————

Argued:  May 7, 2025                                          Decided:  January 20, 2026

———————

Before DIAZ, Chief Judge, GREGORY, and AGEE, Circuit Judges.

———————

Affirmed in part and reversed in part by published opinion.  Judge Gregory wrote the opinion, in which Chief Judge Diaz joined.  Judge Agee wrote a separate opinion concurring in part and dissenting in part.

———————

**ARGUED:** Peter A. Patterson, COOPER & KIRK, PLLC, Washington, D.C.; John Parker Sweeney, BRADLEY ARANT BOULT CUMMINGS LLP, Washington, D.C., for Appellants/Cross-Appellees.  Ryan Robert Dietrich, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees/Cross-Appellants. **ON BRIEF:** James W. Porter, III, William Chadwick Lamar, Jr., BRADLEY ARANT BOULT CUMMINGS LLP, Washington, D.C., for Appellants/Cross-Appellees Susannah Warner Kipke and Maryland State Rifle and Pistol Association, Inc.  David H. Thompson, Megan Marie Wold, William V. Bergstrom, COOPER & KIRK, PLLC, Washington, D.C., for Appellants/Cross-Appellees Katherine Novotny, Sue Burke, Esther Rossberg, Maryland Shall Issue, Inc., Second Amendment Foundation, and Firearms Policy Coalition. Mark W. Pennak, LAW OFFICES OF MARK W. PENNAK, Chevy Chase, Maryland, for Appellants/Cross-Appellees Katherine Novotny; Sue Burke; Esther Rossberg; Maryland Shall Issue, Inc.; Second Amendment Foundation; and Firearms Policy Coalition. Anthony G. Brown, Attorney General, Jessica M. Finberg, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees/Cross-Appellants.  Janet Carter, William J. Taylor, Jr., New York, New York, Sana S. Mesiya, EVERYTOWN LAW, Washington, D.C., for Amicus Everytown for Gun Safety.  Kelly M. Percival, Esther Sanchez-Gomez, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, San Francisco, California, for Amicus Giffords Law Center to Prevent Gun Violence.  Melanie R. Hallums, New York, New York, Thomas M. Bondy, Holly J. Boux, ORRICK, HERRINGTON & SUTCLIFFE LLP, Washington, D.C.; Douglas N. Letter, Shira Lauren Feldman, Tess M. Fardon, BRADY CENTER TO PREVENT GUN VIOLENCE, Washington, D.C., for Amicus Brady Center to Prevent Gun Violence.  Brian L. Schwalb, Attorney General, Caroline S. Van Zile, Solicitor General, Ashwin P. Phatak, Principal Deputy Solicitor General, Anne A. Deng, Assistant

4

Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA, Washington, D.C., for Amicus District of Columbia. Kwame Raoul, Attorney General, Jane Elinor Notz, Solicitor General, Sarah A. Hunger, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois, for Amicus State of Illinois. Rob Bonta, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA, Sacramento, California, for Amicus State of California. William Tong, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut, for Amicus State of Connecticut. Anne E. Lopez, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF HAWAII, Honolulu, Hawaii, for Amicus State of Hawaii. Andrea Campbell, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, Boston, Massachusetts, for Amicus Commonwealth of Massachusetts. Aaron D. Ford, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEVADA, Carson City, Nevada, for Amicus State of Nevada. Letitia James, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York, for Amicus State of New York. Michelle A. Henry, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF PENNSYLVANIA, Harrisburg, Pennsylvania, for Amicus Commonwealth of Pennsylvania. Charity R. Clark, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont, for Amicus State of Vermont. Philip J. Weiser, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF COLORADO, Denver, Colorado, for Amicus State of Colorado. Kathleen Jennings, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF DELAWARE, Wilmington, Delaware, for Amicus State of Delaware. Aaron M. Frey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine, for Amicus State of Maine. Keith Ellison, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota, for Amicus State of Minnesota. Matthew J. Platkin, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, Trenton, New Jersey, for Amicus State of New Jersey. Ellen F. Rosenblum, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon, for Amicus State of Oregon. Peter F. Neronha, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island, for Amicus State of Rhode Island. Robert W. Ferguson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amicus State of Washington.

---

5

GREGORY, Circuit Judge:

Plaintiffs challenged numerous Maryland regulations prohibiting guns in various places as violative of the Second Amendment. Maryland defends each prohibition by invoking the sensitive place exception to the Second Amendment, first identified in *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008). The Court splits on the constitutionality of many of the regulations so, for ease of reference, we summarize our holdings here, noting which parts of each of our respective opinions are controlling.

As to the proper sensitive place framework, Judge Gregory writes for the court. Chief Judge Diaz agrees and Judge Agee writes separately.

We unanimously hold that Maryland's prohibition on guns in government buildings is constitutional and affirm the district court. *See* Md. Code, Crim. Law § 4-111(a)(4)(i); Code of Md. Regs. § 04.05.01.[1] Judge Gregory, joined by Chief Judge Diaz and Judge Agee, writes for the Court on this question.

We hold that Maryland's prohibition on guns in public transportation is constitutional and affirm the district court. *See* Md. Code, Transp. § 7-705(b)(6). Judge Gregory, joined by Chief Judge Diaz, writes for the Court on this question, and Judge Agee dissents.

We unanimously hold that Maryland's prohibition on guns on school grounds is constitutional and affirm the district court. *See* Md. Code, Crim. Law §§ 4-102(b), 4-111(a)(2)(i)–(ii). Judge Gregory, joined by Chief Judge Diaz and Judge Agee, writes for the Court on this question.

---

[1] Any citations to Maryland's regulations reference the version current at the time of the parties' briefing.

We hold that Maryland's prohibition on guns within 1,000 feet of a public demonstration is constitutional and reverse the district court. *See* Md. Code, Crim. Law § 4-208. Judge Gregory, joined by Chief Judge Diaz, writes for the Court on this question, and Judge Agee dissents.

We hold that Maryland's prohibition on guns in state parks, *see* Code of Md. Regs. § 08.07.06.04(B), is constitutional and that Maryland's prohibitions on guns in state forests, *see* Code of Md. Regs. § 08.07.01.04(B), and Chesapeake Forest Lands, *see* Code of Md. Regs. § 08.01.07.14(B), are likewise constitutional. Judge Gregory, joined by Chief Judge Diaz, writes for the Court on this question. Judge Agee would hold that Maryland's restriction on guns in state parks and forests is unconstitutional.

We hold that Maryland's prohibition on guns in museums is constitutional and affirm the district court. *See* Md. Code, Crim. Law § 4-111(a)(8)(iii). Judge Gregory, joined by Chief Judge Diaz, writes for the Court, and Judge Agee dissents.

We unanimously hold that Maryland's prohibition on guns in healthcare facilities is constitutional and affirm the district court. *See* Md. Code, Crim. Law § 4-111(a)(2)(iii). Judge Gregory, joined by both Chief Judge Diaz and Judge Agee, writes for the Court.

We hold that Maryland's prohibitions on guns at stadiums, racetracks, amusement parks, and casinos are constitutional and affirm the district court. *See* Md. Code, Crim Law § 4-111(a)(8)(ii), (iv), (v), (vi); Code of Md. Regs. §§ 14.25.02.06, 36.03.10.48. Judge Gregory, joined by Chief Judge Diaz, writes for the Court, and Judge Agee dissents.

7

We hold that Maryland's prohibition on guns in locations that sell alcohol is constitutional and reverse the district court.  *See* Md. Code, Crim. Law § 4-111(a)(8). Judge Gregory, joined by Chief Judge Diaz, writes for the Court, and Judge Agee dissents.

We hold that Maryland's prohibition on carrying guns on private property held open to the public is unconstitutional and affirm the district court.  *See* Md. Code, Crim. Law § 6-411(d).  Judge Gregory, joined by Chief Judge Diaz, writes for the Court, and Judge Agee joins.  With respect to property not held open to the public, however, we hold that Plaintiffs lack standing.  Judge Gregory, joined by Chief Judge Diaz, writes for the Court, and Judge Agee joins.

In sum, all sections of Judge Gregory's opinion are controlling.

## I.

In this consolidated cross-appeal, two sets of plaintiffs challenge various Maryland regulations prohibiting guns in certain locations.  As relevant here, both sets of plaintiffs challenge firearm restrictions related to:  1) government buildings; (2) mass transit facilities and vehicles; (3) school grounds; (4) public demonstrations (and areas within 1,000 feet thereof); (5) state parks and forests; (6) healthcare facilities; (7) places of amusement, including museums, stadiums, racetracks, video lottery facilities, amusement parks, and casinos; (8) locations that sell alcohol; and (9) private property.

Both sets of plaintiffs moved for preliminary injunction and summary judgment. The State also moved for summary judgment as to all claims.  After consolidating the cases, the district court denied injunctive relief to the majority of Plaintiffs' claims, including

those with regards to restrictions at museums, health care facilities, mass transit facilities and vehicles, state parks and forests, places of amusement, school grounds, and government buildings. The district court granted injunctive relief as to the private building restriction, as well as the restrictions at public demonstrations and locations that sell alcohol for on-site consumption.

The district court denied all summary judgment motions without prejudice. The parties then renewed those motions, which the district court granted in part and denied in part. All parties timely appealed.

## II.

"We review de novo the district court's decision on the parties' cross-motions for summary judgment" and summary judgment may be granted "only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 220 (4th Cir. 2024) (en banc) (quoting Fed. R. Civ. P. 56(a)) (internal quotation marks omitted).

## III.

Plaintiffs argue that Maryland's regulations violate the Second Amendment. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II.

With the exception of the Kipke Plaintiffs' challenge to Maryland's government buildings prohibition, *see infra* at § III.B.1, Plaintiffs' challenge to the prohibition of guns

at schools, *see infra* at § III.B.3, and the Kipke Plaintiffs' challenge to the private property restriction, *see infra* at § III.B.9, all other claims are facial challenges. "[A] facial challenge 'is the most difficult challenge to mount successfully, because it requires [the challenger] to establish that no set of circumstances exists under which the Act would be valid.'" *United States v. Nutter*, 137 F.4th 224, 229 (4th Cir. 2025) (quoting *United States v. Rahimi*, 602 U.S. 680, 693 (2024)) (internal quotation marks omitted). To prevail on a facial Second Amendment challenge, "the Government need only demonstrate that [the challenged regulation] is constitutional in *some* of its applications." *Id.* (quoting *Rahimi*, 602 U.S. at 693).

In defense of each restriction, Maryland argues that they apply to "sensitive places." *See, e.g.*, *Heller*, 554 U.S. at 626–27. To date, we have not addressed the proper sensitive place analysis following the Supreme Court's clarification of the scope of the Second Amendment right to bear arms in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). This case, therefore, requires us to clarify the sensitive place doctrine and its role within the broader *Bruen* analysis. This opinion proceeds by first addressing the sensitive place framework and then conducts a location-by-location analysis.

A. Framework

When interpreting the Second Amendment, "we are guided by the principle that the Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 576. Precedent interpreting the Second Amendment was relatively limited as litigation regarding its meaning and application was infrequent until 2008 when the Supreme Court

10

issued its decision in *Heller*.  Over a decade later, the Court issued its decision in *Bruen*, articulating a two-part test meant to guide lower courts in assessing Second Amendment challenges.

At *Bruen* step one, our job is to construe the Second Amendment's plain text according to its original public meaning.  *See Bruen*, 597 U.S. at 34 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*") (quotation omitted).  We do so by answering three questions:  (1) whether the petitioner is "part of the people whom the Second Amendment protects"; (2) whether the weapons at issue are "in common use for a lawful purpose"; and (3) whether the Second Amendment protects the "proposed course of conduct."  *United States v. Price*, 111 F.4th 392, 400 (4th Cir. 2024) (en banc) (cleaned up).  Once those three questions have been answered affirmatively, the step one inquiry is at an end, and the court must proceed to step two.  *Bruen*, 597 U.S. at 24.

At *Bruen* step two, our job is different, we must determine whether "a firearm regulation is *consistent* with this Nation's historical tradition."  *Bruen*, 597 U.S. at 17 (emphasis added).  Why and how the regulation burdens the right are central to this inquiry.  *Rahimi*, 602 U.S. at 692.  "For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations."  *Id.*  However, "[e]ven when a law regulates arms-bearing for a permissible reason, . . . it may not be compatible with the right if it does so to an extent beyond what was done at the founding."  *Id.*  "And when a challenged regulation does not precisely

11

match its historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* (internal quotation marks omitted). The law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin." *Id.* In other words, "unprecedented societal concerns or dramatic technological changes" can prompt new kinds of regulations that are constitutional. *Bruen*, 597 U.S. at 27.

The Court has made clear that the Second Amendment does not impose "a law trapped in amber" and allows for regulations beyond "ones that could be found in 1791." *Rahimi*, 602 U.S. at 691. Accordingly, we look beyond the Founding Era to determine whether our national tradition of firearm regulation supports a government's restriction today. *See Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 114 (10th Cir. 2024) (noting that "the burden at step one differs from step two's history and tradition test in that it does not necessitate bringing forth evidence of *historical practice*").

This two-pronged approach to the use of history is how this Court resolved *Bianchi v. Brown*, 111 F.4th 438, 472 (4th Cir. 2024) (en banc). There, we explained that at *Bruen* step one, the scope of the Second Amendment is based on its "particular meaning in the ratifying public's consciousness, with baked-in prerogatives and qualifications alike." *Bianchi*, 111 F.4th at 447. Accordingly, we looked at only Founding Era common law to understand the scope of "the individual right to keep and bear arms." *Id.* at 448–50. Our conclusion that modern military-style weapons fall beyond the Second Amendment's protections as a textual matter was based on our reading that Founding Era common law did not prevent the government from banning dangerous and unusual weapons. We also engaged in a step two analysis that looked at historical sources from throughout American

history, including well beyond the Reconstruction Era. *See id.* at 446 (referencing the aims of the drafters of the Fourteenth Amendment). That analysis allowed us to take a "long view" of history to situate restrictions on modern military-style weapons within our national tradition of firearm regulation. *Id.* at 471. Hence, the historical sources we look to at *Bruen* step one are limited to the Founding Era, and the sources we look to at *Bruen* step two can come throughout American history.

When analyzing the sensitive places doctrine and determining where it fits within the *Bruen* framework and the three step one questions discussed in *Price*, we hold that this doctrine goes to the "proposed course of conduct," namely, the carrying of guns in public, which the Second Amendment protects. *See Bruen*, 597 U.S. at 70–71; *see also United States v. Gould*, 146 F.4th 421, 427 (4th Cir. July 29, 2025) (holding that a law "bar[ring] an individual who is otherwise law-abiding from possessing a weapon in common use for a common purpose" regulates conduct "covered by the Second Amendment's plain text" at step one).

Sensitive-place laws "directly impact the right to bear" arms and are therefore, as the Fifth Circuit concluded, "subject to *Bruen*'s historical analysis" at step two. *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024). Moreover, "*Bruen* used . . . sensitive-place regulations to exemplify the analogical approach it envisioned" in the historical tradition analysis, "impl[ying] that sensitive-place regulations are justified by historical tradition at step two, not by plain text at step one." *Price*, 111 F.4th 392, 417 n.2 (4th Cir. 2024) (en banc) (Quattlebaum, J., concurring). As such, this very approach will guide our analysis.

13

B. Location-by-Location Analysis

Against this backdrop, and having determined the proper framework for sensitive place analyses, we now address the district court's ruling with respect to the following ordinances: (1) government buildings; (2) mass transit facilities and vehicles; (3) school grounds; (4) public demonstrations (and areas within 1,000 feet thereof); (5) state parks and forests; (6) healthcare facilities; (7) places of amusement, including museums, stadiums, racetracks, video lottery facilities, amusement parks, and casinos; (8) locations that sell alcohol; and (9) private property.

1. Government Buildings

Maryland bans the carrying of firearms in "a building or any part of a building owned or leased by a unit of State or local government," Md. Code, Crim. Law § 4-111(a)(4)(i), and "[e]xcept for official purposes and by authorized personnel, an individual on [State public buildings, improvements, grounds, and multiservice centers under the jurisdiction of the Department of General Services] may not carry open or concealed firearms," Code of Md. Regs. §§ 04.05.01.01, 04.05.01.03.

We uphold Maryland's government building provision. The Supreme Court has expressly recognized, first in *Heller*, and then again in *Bruen*, that government buildings are sensitive places. *See Heller*, 554 U.S. at 626 (noting that "nothing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as . . . government buildings"); *Bruen*, 597 U.S. at 31 (stating, in the context of schools and government buildings, that "[w]e therefore can assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with

14

the Second Amendment"). This guidance from the Supreme Court is more than sufficient to uphold Maryland's prohibition of firearms in government buildings.

## 2. Mass Transit

Maryland law states: "[i]t is unlawful for any person" to "[c]arry or possess any . . . concealed weapons" "in any transit vehicle or transit facility, designed for the boarding of a transit vehicle, which is owned or controlled by the [Mass Transit] Administration ["MTA"] or a train owned or controlled by the Administration or operated by a railroad company under contract to the Administration to provide passenger railroad service." Md. Code, Transp. § 7-705(b)(6).

We uphold Maryland's public transportation provision under the proprietary property doctrine. The Supreme Court has "long held the view that there is a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage its internal operation." *Engquist v. Or. Dep't of Ag.*, 553 U.S. 591, 598 (2008) (cleaned up); *see also United States v. Kokinda*, 497 U.S. 720, 725 (1990) ("The Government's ownership of property does not automatically open that property to the public" and it is "long-settled" "that governmental actions are subject to a lower level of . . . scrutiny when . . . [the government is functioning] as proprietor."). This is because "the government—like other property owners—has power to preserve the property under its control for the use to which it is lawfully dedicated." *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679–80 (1992) (cleaned up). So, in contrast to when it regulates the use of "open spaces, [] meeting hall[s], park[s], street corner[s], or

15

other public thoroughfare[s]," *id*. at 725 (cleaned up), "a State generally may 'manage its own property when it pursues its purely proprietary interests . . . where analogous private conduct would be permitted,'" *Wolford v. Lopez*, 116 F.4th 959, 971 (9th Cir. 2024) (quoting *Bldg. & Constr. Trades Council v. Assoc. Builders & Contractors of Mass./R.I., Inc*., 507 U.S. 218, 231–32 (1993)). This includes when the government is engaging in commerce, rather than in regulation. *Kokinda*, 497 U.S. at 725 (discussing *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974) (plurality)). The Ninth and D.C. Circuits have extended the propriety function doctrine to the Second Amendment context and today we join them. *Wolford*, 116 F.4th at 970–71, 1000; *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019), *abrogated on other grounds by Bruen*, 597 U.S. 1. We hold that, when the government is acting in its proprietary capacity or as a market participant, rather than as a steward of public land, it may prohibit guns without offending the Second Amendment.

To determine when the government is operating a space in its propriety capacity, we turn to the First Amendment. In doing so, we are in good company. The Supreme Court has recognized the similarities between First and Second Amendment doctrine, emphasizing that the *Bruen* history and tradition test "accords with how we protect . . . the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Bruen*, 697 U.S. at 24. The D.C. Circuit also analogized to the First Amendment framework to determine whether the government acted in its proprietary capacity in banning guns near the Capitol Building. *Class*, 930 F.3d at 464.

In the First Amendment context, the Supreme Court has held that the proprietary property doctrine applies to other mass transit systems. *See, e.g.*, *Int'l Soc. for Krishna*

*Consciousness, Inc.*, 505 U.S. at 682 (the government may prohibit solicitation in airport terminals); *Lehman*, 418 U.S. at 301 (city operated street cars are not public forums). In the *Lehman* plurality opinion, the Court explained that, by operating a streetcar, "the city is engaged in commerce" and that its purpose was to "provide rapid, convenient, pleasant, and inexpensive service to [its] commuters." *Id.* (plurality). In other words, by operating a streetcar system, the government acts in its proprietary function. So, the Court concluded that, so long as its policies survived rational basis review, the city could prohibit certain types of advertisements in its streetcars. *Id.* at 303–04 (plurality); *see also White Coat Waste Proj. v. Greater Richmond Transit Co*., 35 F.4th 179, 197 (4th Cir. 2022) ("[A]s the Supreme Court and our sister circuits have concluded, transit advertising space is a nonpublic forum."). This reasoning is not limited to transit advertising. For example, the Second Circuit held that the entire New York City subway system was not a public forum for First Amendment purposes. *Young v. N.Y.C. Transit Auth*., 903 F.2d 146, 161 (2d Cir. 1990). We think it proper to import this reasoning from the First to the Second Amendment here. Just like the city in *Lehman* acted in its proprietary capacity when it ran its streetcars, Maryland acts in its proprietary capacity when it runs the MTA.

The dissent contends that Maryland's law reaches well beyond State-owned buildings devoted to transit. Certainly, the propriety property doctrine does not extend to property not owned or controlled by the State. We think, however, that the provision is cabined to exclude such property, as the provision applies only to items "owned or controlled by the [MTA] or . . . operated by a railroad company under contract to the [MTA]." Md. Code Ann., Transp. § 7-705(b)(6). To be sure, the term "control" could be

interpreted more broadly than is appropriate under the Second Amendment. But courts generally interpret statutes to avoid constitutional difficulties. *Off. of Senator Mark Dayton v. Hanson*, 550 U.S. 511, 514 (2007). If the statute is improperly applied to facilities not owned or properly controlled by the State, that would be an issue of statutory interpretation for another time.

Additionally, Maryland's prohibition on carrying guns in mass transit comports with our history and tradition. The dissent argues that our holding conflicts with Founding Era laws permitting the carry of firearms on transportation. But as Professor Saul Cornell, one of Maryland's historical experts, explained, at the time of the Founding "[t]here was no modern-style mass transportation" and "forms of transport were privately owned." J.A. 153, Declaration of Saul Cornell ("Cornell Decl."), ¶ 13. Indeed, "[u]ntil the twentieth century, transportation services were typically operated by private companies vested with the authority to fashion their own rules and regulations for customers." J.A. 353–54, Declaration of Brennan Gardner Rivas ("Rivas Decl."), ¶ 13.

As such, to understand the scope of the Second Amendment and our historical tradition of firearm regulations on public transportation, we turn to the policies of privately-owned historic railroad companies. This was the approach adopted by Ninth Circuit in *Wolford*, where the court explained that these companies "were providing essentially a public service and were more properly characterized as mixed public-private entities." 116 F.4th at 1001. Thus, railroad regulations are a useful source in determining the scope of our historical tradition of regulations. *Id.*; *see generally* Joshua Hochman, *The Second*

*Amendment on Board*, 133 Yale L. J. 1676 (2024) (urging courts to look at private companies' regulations to determine our historical tradition).

Early railroad companies routinely prohibited travelers from carrying loaded or improperly stored guns. By one scholar's count, "at least six U.S. railroads between 1835 and 1900—including at least three of the nation's dominant players—. . . regulate[d] firearm carriage in passenger cars." *Id*. at 1690; *see also Wolford*, 116 F.4th at 1001.[2] "Generally, these rules barred passengers from carrying loaded or uncased firearms, or firearms not inspected by the company." Hochman, *supra*, at 1690. For example, by 1835, the South Carolina Canal and Rail Road Company stated, "No Gun or Fowling Piece shall be permitted to enter the car unless examined by the Conductor." *Id*. at 1692. Likewise, both the North Pennsylvania Railroad Company (by 1875) and the Albany Railway (by 1900) prohibited passengers from taking guns into the rail cars. *Id.* at 1693, 1695. Looking to these regulations, the Ninth Circuit found "a historical tradition of prohibiting the carry of loaded firearms or the carry of firearms not properly stored." *Wolford*, 116 F.4th at 1001.

Despite identifying this tradition, the Ninth Circuit struck down a California ban on carrying firearms in "[a] bus, train, or other form of transportation paid for in whole or in part with public funds." *Wolford*, 116 F.4th at 1000 (discussing Cal. Penal Code § 26230(a)(8)). The Ninth Circuit found California's ban that prohibited all firearms too

---

[2] We note that "companies did not necessarily choose to keep their older records" of past regulations. J.A. 358 (Rivas Decl.). So, our archival record is admittedly slim. But we think it reasonable to assume that other companies adopted similar regulations.

broad because "most of the [historic railroad] companies" allowed passengers to check unloaded firearms as part of their luggage. *Id.* at 1001.

But passengers using the MTA system cannot "check" luggage in most cases. As the MTA Director of Treasury explained, MTA operates "buses, a subway, light rail system and commuter trains" throughout the state. J.A. 371, Declaration of Thomas Randall, ¶ 3. Unlike traditional long-distance rail service, passengers do not part with their luggage on a bus or subway. Nor do commuter trains have separate luggage cars—all cars are passenger cars. So for the most part, guns carried on the MTA system are readily accessible; the only way to prevent passengers from accessing guns is to prohibit them altogether. As Plaintiffs have brought only a facial challenge to this regulation and it is permissible in at least some types of transportation that MTA operates, Maryland's prohibition falls within our historical tradition. *See e.g.*, *Nutter*, 137 F.4th at 229 (recognizing that, to succeed on a facial challenge, plaintiffs must demonstrate that "no set of circumstances exists under which the Act would be valid") (cleaned up).

In a last attempt to convince us otherwise, Plaintiffs cite to nineteenth-century state laws excepting travelers from concealed carry laws. But, as Dr. Rivas, another one of Maryland's historical experts, explains, the travel exceptions did not describe "the everyday movement through public spaces like town squares and commercial districts, or the kind of travel associated with modern public transportation." J.A. 350 (Rivas Decl.). "Instead," the traveler exceptions "encompassed a type of travel that separated a person, small group, or family from the protections of the law that went hand-in-hand with organized society." *Id.* For example, the Supreme Court of Arkansas explained that "[t]he

20

exception in the [concealed carry] statute [for individuals on a journey] is to enable travelers to protect themselves on the highways, or in transit through populous places—not to allow them the privilege of mixing with the people in ordinary intercourse, about the streets, armed in a manner which, upon a sudden fit of passion, might endanger the lives of others." *Carr v. State*, 34 Ark. 448, 449 (1879). The Supreme Court of Tennessee likewise explained that its concealed carry exception for "person[s] who are on a journey" did not "embrace a mere ramble in one's own neighborhood across the lines of contiguous counties." *Smith v. State*, 50 Tenn. 511, 513 (1872). Because MTA provides commuter and short-distance travel, the historical tradition of allowing travelers to carry guns does not apply.

Looking to the *why* (preventing public transportation passengers from accessing guns) and *how* (prohibiting passengers from carrying readily accessible guns in passenger compartments) of the regulations, we hold that—even independent of the proprietary property doctrine—Maryland's prohibition of guns on mass transit comports with our historical tradition.

### 3. School Grounds

Maryland prohibits the "carry[ing] or possess[ing of] a firearm . . . on public school property[,]" Md. Code, Crim. Law § 4-102(b), and, separately, bans the carrying of guns at "a preschool or prekindergarten facility or the grounds of the facility" and at "a private primary or secondary school or the grounds of the school." Md. Code, Crim. Law § 4-111(a)(2)(i)–(ii). While not challenging "Maryland's prohibition of firearms inside school buildings," Plaintiffs bring an as-applied challenge, arguing that the district court

erred in upholding Maryland's law "banning firearms on the grounds of schools[.]" Opening Br. at 51–52 (emphasis removed).

We hold that Maryland's prohibition of guns on school grounds is constitutional. The Supreme Court has noted (albeit in dicta) that schools are sensitive places, and "courts can use analogies" to the historical regulation of schools "to determine that modern regulations prohibiting the carry of firearms in . . . analogous sensitive places are constitutionally permissible." *See Bruen*, 597 U.S. at 31.[3]  Here, we hold that school grounds are analogous to school buildings.  Like schools themselves, school grounds serve children through many school activities and places, such as recess and drop-off and pick-up locations.  In addition, the purposes underlying firearms restrictions, namely, to protect children and to preserve a peaceful learning environment, are comparable between schools and school grounds and the burden on the right to self-defense is the same.  Accordingly, school grounds are considered sensitive for the same reasons schools are considered sensitive, and Maryland's prohibition is constitutionally permissible.

### 4.  Public Demonstrations

Under Maryland law, a "person may not have a firearm in the person's possession or on or about the person at a demonstration in a public place or in a vehicle that is within 1,000 feet of a demonstration in a public place after:  (i) the person has been advised by a law enforcement officer that a demonstration is occurring at the public place; and (ii) the person

---

[3] We adopted the Supreme Court's dicta as to schools in *LaFave v. The County of Fairfax*, 149 F.4th 476 (4th Cir. 2025).  There, we rejected a facial challenge to the County's ban on possessing and carrying firearms in county parks because four of the parks had preschools on park property.

has been ordered by the law enforcement officer to leave the area of the demonstration until the person disposes of the firearm." Md. Code, Crim. Law § 4-208(b)(2).[4] We hold that, while Plaintiffs have standing to bring their challenge, their claim fails on the merits.

To establish Article III standing, plaintiffs must show (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). With respect to the injury-in-fact element, in particular, the injury must be "concrete and particularized[,]" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal citation omitted), though "it is not necessary that petitioner first expose [her]self to actual arrest or prosecution to be entitled to challenge a statute that [s]he claims deters the exercise of [her] constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). "[O]nce it is established that at least one party has standing to bring the claim, no further inquiry is required as to another party's standing to bring that claim." *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 209 (4th Cir. 2020), *as amended* (Aug. 31, 2020).

While Maryland contends that Plaintiffs failed to satisfy the injury-in-fact requirement, we disagree. Plaintiff Kipke, for example, demonstrated an intent to engage

---

[4] The provision defines a demonstration as "one or more persons demonstrating, picketing, speechmaking, marching, holding a vigil, or engaging in any other similar conduct that involves the communication or expression of views or grievances and that has the effect, intent, or propensity to attract a crowd or onlookers" and clarified that a demonstration "does not include the casual use of property by visitors or tourists that does not have the intent or propensity to attract a crowd or onlookers." Md. Code, Crim. Law § 4-208(a)(2).

in conduct proscribed by the statute.  In her affidavit, Kipke asserted that, "each year for the past several years[,]" she has attended an annual public demonstration in Annapolis, Maryland and "intend[s] to continue doing so."  J.A. 83, Declaration of Susannah Kipke ("Kipke Decl"), ¶ 7.  She further stated that "but for [her] fear of prosecution [she] would not leave the area [of the public demonstration] even after being advised by a law enforcement officer that a demonstration is occurring and being ordered by the law enforcement officer to leave the areas of the demonstration until [she] dispose[d] of [her] firearm."  J.A. 100, Supplemental Declaration of Susannah Kipke, ¶ 2.  Thus, Kipke's course of conduct is "arguably affected with a constitutional interest."  *Susan B. Anthony List*, 573 U.S. at 159 (citing *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)); *see Bruen*, 597 U.S. at 8 ("[T]he Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home.").  As such, Kipke has sufficiently demonstrated an injury-in-fact and has standing to challenge the public demonstration ban.

Turning to the merits, we hold that Maryland's prohibition on carrying guns near public demonstrations is consistent with our national historical tradition of promoting peaceful assemblies, particularly given the interaction between the rights the First and Second Amendments preserve.

To start, the First Amendment protects "the right of the people *peaceably* to assemble."  U.S. Const. amend. I (emphasis added).  By including the "peaceably" caveat, the Founders made clear that not all assemblies are lawful, and that the government may constitutionally disperse assemblies that threaten the public peace.  As the Supreme Court

explained, "violence has no sanctuary in the First Amendment, and the use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of 'advocacy.'" *N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982) (citation omitted). So, we must read the right to bear arms in conjunction with the First Amendment's protection of the right to peaceably assemble. Though the right to bear arms surely is "not a second-class right," *Bruen*, 597 U.S. at 70 (citation omitted), neither are the rights to free speech and free assembly.

Second, our history, both before and after the ratification of the Second Amendment, demonstrates a long-standing tradition of government regulating permissible assembles, including regulating arms at public assemblies. Beginning with the reign of King Edward IV in the fifteenth century, and subject to only minor alterations, "[t]he *riotous assembling* of *twelve* persons, or more, and not dispersing upon proclamation," was a criminal offense under English law up until the Revolution. 2 *Blackstone's Commentaries: With Notes of Reference* 142–43 (St. George Tucker ed. 1803) [hereinafter "Tucker's Blackstone"]. As Blackstone concluded, "our ancient law . . . seems pretty well to have guarded against any violent breach of the public peace; especially as any riotous assembly on a public or general account . . . ." *Id.* at 147. The American colonies built on this tradition, enacting unlawful assembly statutes that ordered dispersal of assemblies, particularly where individuals were armed with weapons.[5]

---

[5] *See, e.g.*, Act of 1786, ch. 8, 1786 Mass. Acts 502–503. Pennsylvania likewise adopted an unlawful assembly statute in 1771. *See* Act of 1771, ch. 618, *in* 8 Statutes at Large of Pennsylvania from 1682-1801, at 5. Virginia followed suit in 1786, as did New
(Continued)

So, evidence from the time of the Founding demonstrates that the Founders had a tradition of limiting and carefully scrutinizing any threats of violence at public assemblies and saw the presence of weapons as a greater threat to the public peace than unarmed assemblies.  Justices of the Peace were entrusted with broad authority to arrest groups of citizens who threatened the peace.  One action that was considered to threaten that peace was to show armor—in other words, showing an intention, or "at least an apparent tendency," to engage in violence.  Hening, *New Virginia Justice* at 383.  As states enacted statutes codifying this tradition, they lowered the number of individuals necessary to constitute a riot if those individuals were armed, demonstrating an anxiety around armed assemblies.  And the oft-included requirements that Justices of the Peace must first order a dispersal is akin to the Maryland provision requiring a police officer to first instruct an individual with a gun to leave before that individual can be found in violation of the statute.  Md. Code, Crim. Law § 4-208(b)(2)(ii).

Continuing into the 19th century, numerous jurisdictions, including Tennessee, Texas, Arizona, Oklahoma, and Missouri, historically prohibited carrying firearms at places of public assembly or gathering.  J.A. 392–421.  Maryland's bans on firearms are consistent with these historical traditions.

As such, we hold that Maryland's prohibition on carrying guns is constitutionally permissible.

---

Jersey in 1797.  *See* Act of 1792, ch. 103, VA. CODE ANN. §§ 8–9 (1792); Act of 1797, 1797 Laws of New-Jersey 234.

5. State Parks and Forests

Maryland prohibits the carrying of firearms in state parks (Code of Md. Regs. 08.07.06.04(B)), state forests (Code of Md. Regs. 08.07.01.04(B)), and Chesapeake Forest Lands (Code of Md. Regs. 08.01.07.14(B)).[6]  Because "as soon as modern parks arose, municipalities and states enacted laws prohibiting the carrying of firearms into parks," *Wolford*, 116 F.4th at 982, we join the reasoning of the Second and Ninth Circuits and hold that Maryland's prohibition on carrying guns in urban public parks is constitutional. *Antonyuk*, 120 F.4th at 1025–26.  We likewise hold that Maryland's prohibitions on guns in state forests and Chesapeake Forest Lands are constitutional.

As an initial matter, "[t]here were no modern-style parks in the era of the Second Amendment."  J.A. 176, Cornell Dec., ¶ 54; *see Wolford*, 116 F.4th at 982 (explaining that "green spaces began to take the shape of a modern park, in the middle of the 19th century"); *Antonyuk*, 120 F.4th at 1024–1025 (same).  So, though green spaces existed during the Founding era, today's modern public parks—more akin to "municipal institutions"—are distinct.  *Antonyuk*, 120 F.4th at 1022.  *See Wolford*, 116 F.4th at 982 (explaining that the Boston Common was "used primarily for grazing animals and for holding military exercises and was not akin to modern parks."); *Antonyuk*, 120 F.4th at 1024 (recognizing that "[t]he modern idea of the park emerged in the nineteenth century, before which open spaces that were not privately owned . . . consisted of grazing areas open to all") (internal citation and quotation marks omitted).  As parks did not appear in their modern form until

---

[6] Maryland does, however, allow hunting and target shooting on certain state lands. *See, e.g.*, Code of Md. Regs. § 08.01.07.14(D).

the middle of the nineteenth century, "one way that Defendants can show a historical tradition is by establishing that, when [parks] . . . first arose in modern form, states and municipalities began to regulate the possession of firearms [in parks], the regulations were considered constitutional at the time, and the regulations were comparable to a tradition of regulating a similar place or places in the earlier years of the Nation." *Wolford*, 116 F.4th at 981.

Defendants made that showing here: "As soon as green spaces began to take the shape of a modern park, . . . municipalities and other governments imposed bans on carrying firearms into the parks." *Id.* at 982. *See Antonyuk*, 120 F.4th at 1022 ("The proliferation of these urban public park regulations between 1861 and 1897 coincides with the rise of public parks as municipal institutions over the latter half of the 19th century."). For example, New York banned the carrying of firearms in Central Park, "perhaps the Nation's first modern public park," in 1858, the year the park opened. *Wolford*, 116 F.4th at 982. The Ninth Circuit identified "similar prohibitions as parks emerged across the Nation" and noted that "[m]any municipalities, including major cities, prohibited the carry of firearms at all parks . . . ." *Id.* at 982–83. *See id.* (summarizing prohibitions in several states). In addition, as Professor Cornell explained, the nation's five largest cities (New York, Chicago, Philadelphia, St. Louis, and Boston) all adopted prohibitions on carrying firearms in public parks between 1861 and 1886. J.A. 177, Cornell Decl., ¶ 56. Put simply,

28

then, the *how* (banning all guns in urban parks) and the *why* (preserving the tranquility of parks) of these regulations mirror Maryland's prohibitions.[7]

The same logic applies to Maryland's limitations on guns in forests. Here, we rely on the Supreme Court's teaching that a challenged regulation can survive a Second Amendment challenge even where it does not precisely match its historical precursors.

Maryland's state forests and lands have evolved from being viewed principally as resources for commercial exploitation to places that promote a balanced emphasis on economic, social, and environmental goals. *See A Brief History of the Forest Service*, Md. Dep't of Nat. Resources Forest Serv., https://dnr.maryland.gov/forests/pages/aghistory.aspx; https://perma.cc/U7R3-KUDP (last visited November 18, 2025). To that end, many of Maryland's forests offer diverse and substantial recreational and educational opportunities. *See Maryland's State Forests*, Md. Dep't of Nat. Resources Forest Serv., https://dnr.maryland.gov/forests/Pages/mdforests.aspx; https://perma.cc/5J5A-3U5Y (last visited November 18, 2025). In that way, they are sufficiently analogous to state parks so as to require us to reject the Plaintiffs' facial challenge to the ban on firearms.

And while there is a robust historical tradition of protecting hunting rights in rural lands, Maryland's statute falls within that tradition because it permits regulated hunting within state forests and Chesapeake Forest Lands. *See* Code of Md. Regs.

---

[7] Separately, the Second and Ninth Circuits have not found evidence that courts questioned the constitutionality of these laws. *Wolford*, 116 F.4th at 983 ("Plaintiffs have not pointed to—and we have not found—any evidence that those laws were questioned as unconstitutional."); *Antonyuk*, 120 F.4th at 1022 ("[T]he ordinances were not merely adopted by legislative bodies in the respective cities in which they applied—they were apparently accepted without any constitutional objection by anyone."). Nor have we.

§ 08.07.06.04(B), 08.07.06.03, 08.01.07.04.  As such, this regulation does not run afoul of, or impede upon, one's Second Amendment rights.

Accordingly, we hold that Maryland's prohibitions on carrying guns in urban public parks, state forests and Chesapeake Forest Lands are constitutional.

### 6. Health Care Facilities

Maryland prohibits the carrying of firearms in "a health care facility."  Md. Code, Crim. Law § 4–111(a)(2)(iii).[8]  We unanimously hold that this prohibition is constitutional.

"[M]odern hospitals and medical facilities do not resemble the hospitals at the Founding."  *Wolford*, 116 F.4th at 999.  Nevertheless, Maryland's health care facilities prohibition falls within our historical tradition of proscribing guns in places that serve vulnerable populations.  Hospitals serve medical patients, a vulnerable population, and there is a "tradition of prohibiting firearms in locations where vulnerable populations congregate . . . ."  *Antonyuk*, 120 F.4th at 1012.  In addition, a subset of medical patients—including "the intellectually disabled, mentally ill," and "those with substance use disorders"—have "historically been considered a vulnerable population justifying firearm regulation."  *Id.*  There is also a historical tradition of banning guns in places used for scientific purposes.  *Id.* at 1020.  Health care facilities fall well within that historical tradition.

---

[8] The Code defines a "health care facility" as "(1) a hospital . . . ; (2) a related institution . . . ; (3) an ambulatory surgical facility or center which is any entity or part thereof that operates primarily for the purpose of providing surgical services to patients not requiring hospitalization and seeks reimbursement from third party payors as an ambulatory surgical facility or center; [and] (4) a facility that is organized primarily to help in the rehabilitation of disabled individuals."  Md. Code, Ins. § 15-10B-01(g)(1)–(4).

In light of our historical tradition of prohibiting the carrying of guns in places that serve vulnerable populations and engage in scientific pursuits, the *why* and the *how* of Maryland's regulation match that of historic regulations. We therefore uphold Maryland's prohibition of firearms in healthcare facilities.

### 7. Places of Amusement

Maryland prohibits the carrying of firearms in various places of amusement: "a stadium," "an amusement park," "a racetrack," and a "video lottery facility." Md. Code Crim Law § 4-111(a)(8)(ii), (iv), (v), (vi). It also bans the carrying of firearms at Camden Yards, a baseball stadium, Code of Md. Regs. § 14.25.02.06, in casinos, Code of Md. Regs. § 36.03.10.48, and in museums, Md. Code, Crim. Law § 4-111(a)(8)(iii). We hold that these statutes and regulations are constitutional.

First, various places of amusement, including stadiums, racetracks, casinos, and amusement parks did not exist in modern form in 1791. *See Wolford*, 116 F.4th at 987 (noting that "casinos, stadiums, [and] amusement parks . . . did not exist in modern form at the Founding"). Though gambling existed during the Founding, many states banned gambling, and the casinos that did exist were often privately operated. *See* Hochman, *supra*, at 1721. Also, sporting venues did not have modern stadium-esque facilities, and amusement parks did not exist in the United States until 1846. *See Horse Racing*, Britannica, https://www.britannica.com/sports/horse-racing; https://perma.cc/35X2-BBG4 (last visited, July 21, 2025); *Roster of the World's Oldest 50 Amusement Parks*, Nat'l Amusement Park Historical Ass'n, https://www.napha.org/Resources/Facts-Figures/Worlds-Oldest-Operating-Parks; https://perma.cc/8X79-Q4Q2 (last visited, July

21, 2025).  Finally, although museums and historical societies existed around the time of the Founding, they "were private institutions," while today's museums are crowded municipal spaces that are frequented by children.  J.A. 153, Cornell Decl., ¶ 13.  Even though "all places where people gather are *necessarily* sensitive places," locations that serve an educational purpose, or serve children, are historically protected.  *Wolford*, 116 F.4th at 981 (emphasis added); *see Antonyuk*, 120 F.4th at 1026–27 (stating that there is a "tradition of regulating firearms in places of educational and scientific opportunity").  As such, we look to the historical record for more analogous regulations of those places.  And the record "supports the conclusion that prohibitions on firearms at places of amusement fall within the national historical tradition of prohibiting firearms at sensitive places."  *Wolford*, 116 F.4th at 987.

"Both before and shortly following the ratification of the Fourteenth Amendment," states, cities, and territories alike prohibited firearms at a "wide range of places for social gathering and amusement that are analogous to modern casinos, stadiums, amusement parks, zoos," and museums.  *Id.*  The Ninth Circuit discussed several examples in *Wolford*, including New Orleans' prohibition of firearms at any public ballroom in 1817 and Missouri's ban of firearms at any gathering for educational, literary, or social purposes in 1875.  *Id.*

This extensive set of historical regulations banning firearms at places of amusement and social gathering "justifies the conclusion" that modern-day places of amusements such as stadiums, amusement parks, racetracks, video lottery facilities, casinos, and museums "fall within the national historical tradition of prohibiting firearms at sensitive places."

*Wolford*, 116 F.4th at 988.  In other words, the *how* of these regulations (a complete ban) mirrors Maryland's, and the *why* is likewise the same.  Consistent with that tradition, Maryland's prohibitions are constitutionally permissible.

### 8. Locations that Sell Alcohol

Maryland prohibits firearms at "location[s] licensed to sell or dispense alcohol . . . for on-site consumption[.]"  Md. Code, Crim. Law § 4-111(a)(8)(i).  We uphold Maryland's prohibition of firearms at these locations.  Restricting firearms at locations that sell alcohol is consistent with the historical tradition of banning firearms in sensitive places.  Specifically, there is a historical tradition of regulations recognizing the inherent dangers of mixing alcohol and firearms; prohibiting guns at social gatherings; and, starting in the mid-nineteenth century, prohibiting firearms in places that sell liquor.

First, in the Founding Era, several states enacted legislation aimed at the mixing of firearms and liquor.  Some states prohibited the sale of liquor to members of the militia. J.A. 216–217, Declaration of Patrick J. Charles (compiling statutes); *see also Wolford*, 116 F.4th at 985 (citing, e.g., a "1746 New Jersey law prohibit[ing] the sale of liquor to members of the militia while on duty").  The Supreme Court used similar regulations as an example in *Rahimi*, recognizing "[a]t the founding, the bearing of arms was subject to regulations ranging from rules about firearm storage to restrictions on gun use by drunken New Year's Eve revelers."  602 U.S. at 691 (citing Act of Mar. 1, 1783, 1783 Mass. Acts and Laws ch.13, pp. 218–219; 5 Colonial Laws of New York ch. 1501, pp. 244–246 (1894)).  Virginia had a broader version of this rule that prohibited intoxicated individuals from using firearms in nearly all circumstances.  *See* Act of Mar. 10, 1655-6, 1 Stat. at

Large of Va. 401–02 (1808) (prohibiting persons from "shooting any gunns at drinkeing (marriages and ffunerals onely excepted))" (errors in original).

Later, "[s]ome cities, for example, Chicago in 1851 and St. Paul, Minnesota in 1858[,] prohibited retailers of liquor from keeping gunpowder." *Wolford*, 116 F.4th at 985. And, between 1867 and 1889, three states "prohibited intoxicated persons from carrying firearms." *Antonyuk*, 120 F.4th at 1030.[9]  These regulations show that "from before the Founding and continuing throughout the Nation's history, governments have regulated in order to mitigate the dangers of mixing alcohol and firearms." *Wolford*, 116 F.4th at 986.

Second, there is a "well-established tradition of prohibiting firearms at crowded places." *Id.*; *see Antonyuk*, 120 F.4th at 1019 (recognizing a national tradition of "regulating firearms in public forums and quintessentially crowded places").  For example, in 1817, New Orleans prohibited firearms in ballrooms. *Wolford*, 116 F.4th at 986.  Texas did the same in 1870. *Id.*  And, in 1875, Missouri prohibited firearms at public assemblies. *Id*.  To be sure, ballrooms and public assemblies are not identical to locations that sell liquor.  But at their core, these places share the same characteristics. *See id*; *Antonyuk*, 120 F.4th at 1019.

Third, various jurisdictions in this period enacted laws that are "directly on point" with Maryland's prohibition. *Wolford*, 116 F.4th at 986.  For example, in 1853, New Mexico banned firearms at any "room adjoining [a ball or fandago] where [l]iquors [were]

---

[9] The three states discussed by the Second Circuit were Kansas, Wisconsin, and Missouri. *Antonyuk*, 120 F.4th at 1030. *See, e.g.*, *id.* (citing Wis. Stat. Ann. § 4379(b) (West 1889) ("It shall be unlawful for any person in a state of intoxication to be armed with any pistol or revolver.")).

sold," and in 1890, Oklahoma banned firearms in "any place where intoxicating liquors [were] sold." *Wolford*, 116 F.4th at 986.

Taking these three types of regulations together, we, like the Ninth Circuit, "conclude that those laws establish that bars and restaurants that sell alcohol are among the Nation's 'sensitive places' where firearms may be prohibited." *Id.* As such, Maryland's prohibition of firearms at alcohol locations is constitutionally permissible.

### 9. Private property without permission

Under Maryland law, "[a] person wearing, carrying, or transporting a firearm may not: (1) enter or trespass on property unless the owner or the owner's agent has posted a clear and conspicuous sign indicating that it is permissible to wear, carry, or transport a firearm on the property; or (2) enter or trespass on property unless the owner or the owner's agent has given the person express permission to wear, carry, or transport a firearm on the property." Md. Code, Crim. Law § 6-411(d).

We hold that Plaintiffs have standing to challenge Maryland's rule on private property held open to the public and their claim succeeds on the merits. However, Plaintiffs lack standing to challenge the rule for property *not* held open to the public.

We begin with Plaintiffs' challenge to Maryland's rule on private property held open to the public. As mentioned previously, to establish Article III standing, plaintiffs must show (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. *See Lujan*, 504 U.S. at 560–61. Plaintiffs have made the required showing.

35

First, Plaintiffs have adequately alleged injury-in-fact. Namely, Plaintiffs allege that they intend to continue carrying firearms on private property open to the public, J.A. 80, 82–83, 85, 86–87, 88–89, 92, 94, 96–97, 102, 104, 107, and the law requires that they seek permission before doing so, placing a new burden on their right to carry. If Plaintiffs carry firearms on private property without first seeking consent, they will violate Maryland's law and face the threat of criminal prosecution. As for causation, there is a causal connection between the injury—Plaintiffs' burden on their right to carry—and the conduct complained of—Maryland prohibiting firearms on private property without permission. Finally, "the relevant injury for standing purposes is the credible threat of arrest and prosecution that Plaintiffs face" if they carry firearms onto private property "without first receiving permission" and "*that* injury is clearly redressable by an injunction against enforcement of the private-property restriction." *Antonyuk*, 120 F.4th at 1043. As such, Plaintiffs have established Article III standing.

Plaintiffs also succeed on the merits of their claim, as Maryland's restriction on bringing firearms onto private property held open to the public without express consent is unconstitutional. Maryland's prohibition is directed at gun owners, not property owners. It is a criminal statute that nowhere references the right of the property owner to exclude a gun owner. *See* Md. Code, Crim. Law § 6-411(c)–(d). With or without the private-property consent rule, Maryland property owners have the right to exclude unwanted people (including those with guns) from their property. And we see nothing in the rule that alters Maryland property law. Therefore, Maryland's reliance on the trespass tradition is inapposite, and we diverge from the Ninth Circuit's conclusion that similar statutes merely

36

operate to "arrang[e] the default rules that apply specifically to the carrying of firearms onto private property." *Wolford*, 116 F.4th at 995.

Maryland's other support for the prohibition is also wanting. Many of the historical statutes Maryland cites appear to regulate hunting on others' property without permission, as the Second Circuit concluded. *See Antonyuk*, 120 F.4th at 1046. The statutes do not support a broader tradition of excluding all weapons for all purposes from the private property of others without express permission. And the other statutes Maryland cites (a 1771 New Jersey statute, an 1865 Louisiana statute, an 1866 Texas statute, and an 1893 Oregon statute) appear to be outliers. Appellees' Br. at 56–57.

Maryland's rule would effectively declare most public places "gun-free zones." But that likely stretches the sensitive places doctrine too far. *See Bruen*, 597 U.S. at 31 (holding that "the island of Manhattan [is not] a 'sensitive place'"). In short, there is no relevant historical tradition supporting Maryland's private-property consent rule, at least on this record and as to property held open to the public.

With respect to property not held open to the public, however, Plaintiffs lack standing to challenge Maryland's regulation.

The Kipke Plaintiffs did not bring a facial challenge to the regulation; they instead only challenge Maryland's rule as to property held open to the public (i.e., not dwellings). The Novotny Plaintiffs did bring a facial challenge to Maryland's regulation, but they lack standing to challenge the restriction as to property not held open to the public.

A close reading of the Novotny Plaintiffs' standing declarations shows that they attest only to their intent to bring guns to "stores and other privately owned buildings that are

otherwise open to the public" and the sensitive places that give rise to Plaintiffs' other challenges. *E.g.*, J.A. 104, Declaration of Sue Burke, ¶ 6. No Plaintiff states that they wish to bring a firearm into a dwelling. Without such a statement, Plaintiffs have not alleged a "concrete intention to (arguably) violate" that portion of the restriction, as required to bring a pre-enforcement challenge. *Hogan*, 971 F.3d at 218. Plaintiffs therefore lack standing for their claim related to property not held open to the public.

IV.

To sum up, we:

- Affirm the district court's grant of summary judgment to Maryland regarding firearm carry restrictions in

    (1)   government buildings, Md. Code, Crim. Law § 4-111(a)(4)(i), Code of Md. Regs. §§ 04.05.01.03, 04.05.01.01;

    (2)   mass transit facilities, Md. Code, Transp. § 7-705(b)(6);

    (3)   schools and school grounds, Md. Code, Crim. Law §§ 4-102(b), 4-111(a)(2)(i)–(ii);

    (4)   state parks, Code of Md. Regs. § 08.07.06.04(B), State Forests Code of Md. Regs. 08.07.01.04(B), and Chesapeake Forest Lands, Code of Md. Regs. 08.01.07.14(B);

    (5)   museums, Md. Code, Crim. Law § 4-111(a)(8)(iii);

    (6)   healthcare facilities, Md. Code, Crim. Law § 4-111(a)(2)(iii); and

38

(7)     stadiums, racetracks, amusement parks, and casinos, Md. Code Crim

        Law §§ 4-111(a)(8)(ii), (iv), (v), (vi); Code of Md. Regs.

        §§ 14.25.02.06, 36.03.10.48;

- Reverse the district court's grant of summary judgment to Plaintiffs and reverse the district court's order enjoining Maryland from enforcing the prohibition on guns within 1,000 feet of a public demonstration, Md. Code, Crim. Law § 4-208;

- Reverse the district court's grant of summary judgment to Plaintiffs and the district court's order enjoining Maryland from enforcing the regulation regarding firearms carrying restrictions in locations selling alcohol for on-site consumption, Md. Code, Crim. Law § 4-111(a)(8)(i); and

- Affirm the district court's grant of summary judgment to Plaintiffs and enjoin Maryland from enforcing the regulations regarding firearms carrying restrictions in private buildings or property without the owner's consent. Md. Code, Crim. Law § 6-411(d).

*AFFIRMED IN PART AND REVERSED IN PART*

AGEE, Circuit Judge, concurring in part and dissenting in part:

I join the majority opinion's conclusion that the firearms restrictions pertaining to government buildings (Maj. Op. III.B.1) and school grounds (Maj. Op. III.B.3) are constitutional. I also join in full the majority's articulation of why Plaintiffs have standing to challenge the statute that flips the presumption that firearms are permitted on private property held open to the public and that this provision is unconstitutional (Maj. Op. III.B.9). I also join in full the view that Plaintiffs lack standing to challenge the presumption-flipping statute insofar as it regulates private property not held open to the public (Maj. Op. III.B.9). In addition, with respect to healthcare facilities, I concur in the majority's judgment that the prohibition is permitted, but write separately to explain my reasoning on this point (Maj. Op. III.B.6).

As to all the other challenged Maryland provisions, however, I would hold that they violate the Second Amendment. In my view, the majority opinion simply fails to follow how the Supreme Court has directed courts to consider the historical tradition of firearm regulation when examining whether a particular law violates the Second Amendment right to carry arms in public. Accordingly, I write separately to articulate the proper approach adhering to the Supreme Court's direction and applying it to the challenged provisions of Maryland law.

I therefore respectfully concur in part and dissent in part.

I.

The Second Amendment sets a high barrier for when the government can prohibit its citizenry from possessing and bearing firearms: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, *shall not be infringed*." U.S. Const. amend. II (emphasis added). Its protections are "among the 'fundamental rights necessary to our system of ordered liberty.'" *United States v. Rahimi*, 602 U.S. 680, 690 (2024) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010)).[1] In light of this clear mandate, courts should approach all firearms regulations skeptically.

In *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), the Supreme Court articulated a two-part framework for analyzing Second Amendment challenges to firearms restrictions. At step one, courts "look[] to the text of the Second Amendment to see if it encompasses the desired conduct at issue." *Bianchi v. Brown*, 111

---

[1] So fundamental is the Second Amendment to the other rights enshrined in the Bill of Rights that Founding-era constitutional legal scholar at the College of William & Mary, St. George Tucker, said it "may be considered as the true palladium of liberty":

> The right of self-defence is the first law of nature: in most governments it has been the study of rulers to confine this right within the narrowest limits possible. Wherever standing armies are kept-up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction.

Stephen P. Halbrook, *St. George Tucker's Second Amendment: Deconstructing "the True Palladium of Liberty*", 3 Tenn. J. L. & Pol'y 120, 125 (quoting St. George Tucker, *View of the Constitution of the United States*, *in 1 Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia* app. D at 300 (William Young Birch & Abraham Small 1803)).

F.4th 438, 445–46 (4th Cir. 2024) (en banc). If the conduct in question does fall within the scope of the right, then "the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. If it does not, "that conduct falls outside the ambit of the Second Amendment, and the government may regulate it." *Bianchi*, 111 F.4th at 446.

When a court finds that the text of the Second Amendment *does* cover the regulated conduct, then "the analysis moves to the second step," where the government bears the burden to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* (quoting *Bruen*, 597 U.S. at 24). "Only if such consistency is shown can a court conclude that the regulation is constitutionally permissible." *Id.*

I agree with the majority that the challenged Maryland provisions rise or fall at step two of the *Bruen* framework. *See* Maj. Op. at 13. That is to say, the *Bruen* step-one inquiry shows that each provision regulates a "'proposed course of conduct,' namely, the carrying of guns in public, which the Second Amendment protects." Maj. Op. at 13 (quoting *Bruen*, 597 U.S. at 32). Therefore, Maryland's restrictions are presumptively unconstitutional unless the State can carry its burden of showing that regulating firearms at each challenged location "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

Throughout its Second Amendment cases, the Supreme Court has identified as one category of firearms laws that withstands scrutiny at step two prohibitions on the possession and carriage of firearms in so-called "sensitive places." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008) (stating, in dicta, that nothing about its decision "should

be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places"); *McDonald*, 561 U.S. at 786 (reiterating *Heller*'s "assurances" that "longstanding regulatory measures" such as laws forbidding the carrying of firearms in "sensitive places" do not violate the Second Amendment). But the Supreme Court has offered scant guidance on what constitutes a "sensitive place" beyond identifying a handful of examples: "places such as schools and government buildings," *Heller*, 554 U.S. at 626, as well as "legislative assemblies, polling places, and courthouses," *Bruen*, 597 U.S. at 30. These delineated sensitive places are not exhaustive, *Heller*, 554 U.S. at 627 n.26, leaving some legislatures eager to label scores of locations "sensitive" and prohibit the carrying of firearms in them. But labels alone do not suffice to demonstrate that a particular restriction aligns with what the Supreme Court had in mind. Courts must instead consider on a case-by-case basis whether such "sensitive place" restrictions align with the Nation's history and tradition of firearms regulation, and it is up to the State to prove that is so.

In *Bruen*, the Supreme Court made it clear that whether a place qualifies as a "sensitive place[]" depends on the standard step-two analysis that case describes, fixing this question firmly to its more dynamic discussion of the nation's "longstanding" history of certain constitutionally permitted firearms restrictions. 597 U.S. at 30. Thus, for example, the New York restriction "disarm[ing] law-abiding citizens" in "all places where people typically congregate" throughout Manhattan relied on a "far too broad[]" concept of a sensitive place and would "in effect exempt cities from the Second Amendment and [] eviscerate the general right to publicly carry arms for self-defense[.]" *Id.* at 31 (cleaned up). Instead, the Supreme Court instructed that the first point of inquiry is whether firearms

were historically restricted in such places and, if so, whether disputes arose "regarding the lawfulness of such prohibitions." *Id.* at 30. If not, then courts can "assume it settled that these locations [are] 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* In addition, the Supreme Court recognized that courts can "use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carrying of firearms in *new* and *analogous* places are constitutionally permissible." *Id.* (second emphasis added).

Thus, the Court's guidance on "sensitive places" leads to its general discussion of the step-two inquiry as to whether a particular restriction has authentic and well-grounded roots in the Nation's historical tradition of regulating firearms. At this stage, courts are to consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. A "fairly straightforward" inquiry can take place "when a challenged regulation addresses a general societal problem that has persisted since the 18th century." *Id.* at 26. In that event, the absence or existence of relevant Founding-Era analogues will drive the Court's analysis as "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at 26–27. So too if "some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative

evidence of unconstitutionality." *Id.* at 27.[2] Conversely, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Rahimi*, 602 U.S. at 692. But "[e]ven when a law regulates arms-bearing for a permissible reason, . . . it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id.* As these examples demonstrate, when undertaking the *Bruen* step-two inquiry, it's important to remember that "[t]he question is not whether the new regulation is broadly analogous to an older regulation at a high level of generality, but whether it 'comport[s] with the principles underlying the Second Amendment.'" *Koons v. Att'y Gen. N.J.*, 156 F.4th 210, 278 (3d Cir. 2025) (Porter, J., concurring in part and dissenting in part) (quoting *Rahimi*, 602 U.S. at 692), *reh'g en banc granted and opinions vacated by Koons v. Att'y Gen. N.J.*, Nos. 23-1900 & 23-2043, 2025 WL 3552513 (Dec. 11, 2025).[3]

---

[2] Plaintiffs urge the Court to adopt a more exacting standard for what constitutes a sensitive place, arguing that the Supreme Court's list of examples share the common trait of either being a place where the Government acts *in loco parentis* over students (schools) or provides its own substantial security over the location (government buildings, legislative assemblies, polling places). While this argument rests on questionable factual support, it more fundamentally lacks foundation in the Supreme Court's cases. Nothing in *Heller*, *McDonald*, or *Bruen* tethers the "sensitive places" construct to these features. Instead, *Bruen* reasons that firearms restrictions in sensitive places are constitutional because they are "longstanding" and undisputed, 597 U.S. at 30, concepts that align with the step-two inquiry. For this reason, I do not accept Plaintiffs' concept of when a place-based restriction survives a Second Amendment challenge. *See Schoenthal v. Raoul*, 150 F.4th 889, 908–10 (7th Cir. 2025).

[3] On December 11, 2025, the Third Circuit granted rehearing en banc in *Koons*, an act that vacated the opinions and judgment that had, inter alia, upheld many New Jersey
(Continued)

Relatedly, when looking to the Nation's historical regulation of firearms, "not all history is created equal." *Bruen*, 597 U.S. at 34. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* (quoting *Heller*, 554 U.S. at 634–35). Firearms laws that come too early or too late do not aid in understanding what the right meant to those who enacted the Second Amendment.

Significantly, the Second Amendment codified a preexisting right, one "inherited from our English ancestors." *Heller*, 554 U.S. at 599 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). But "the English common law 'is not to be taken in all respects to be that of America.'" *Bruen*, 597 U.S. at 39 (quoting *Van Ness v. Pacard*, 27 U.S. 137, 144 (1829) (Story, J., for the Court)). And that's particularly true for the right to bear arms, which the American colonies intentionally and robustly protected in marked contrast to some restrictions they disliked in the English tradition. "Post-independence, Americans were contemptuous of what they considered to be the constricted nature of the English right to arms." David B. Kopel & Joseph G.S. Greenlee*, The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 230 (2018). As but one example, St. George Tucker annotated Blackstone's legal texts to highlight "when and how American law differed from British law," and quite pointedly "denounced statutory infringements of the English right to arms, particularly the English game laws,

---

firearms restrictions enacted under the auspices of their regulating firearms in "sensitive places." Because I am persuaded by the reasoning of one aspect of the panel majority (rejecting the proprietary actor construct) and several components of the separate opinion of Judge Porter concurring in part and dissenting in part regardless of their continued force of law within the Third Circuit, I continue to cite those opinions in this opinion.

which he thought had disarmed almost the entire population." *Id.* at 231 & n.105; *see* Halbrook, *supra*, at 126–28. Thus, the Supreme Court has cautioned that historical evidence long predating the Second Amendment's enactment often does not reflect the contemporary view of the scope of the right as it existed at the time the amendment was adopted. *Bruen*, 597 U.S. at 34–35.

Firearms laws post-dating 1791 constitute an even more problematic recourse because the Supreme Court has made clear that, "to the extent later history contradicts what the text says, the text controls," and "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 36 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

The force of this directive is that, rather than relying indiscriminately on enactments throughout the Nation's history, courts must look first to the text followed by any "public meaning" at the Founding, as exemplified by regulations adopted around the time of the Second Amendment's enactment in 1791. To the extent earlier or later laws confirm the original understanding, the Supreme Court has noted that this *consistency* only adds additional support to the already-fixed public understanding of the amendment's scope at the Founding, which is the lodestar of the inquiry. *Id.* at 35–36; *see also id.* at 37 (stating that in *Heller*, "19th-century evidence was treated as mere confirmation of what the Court thought had already been established" (cleaned up)). But where later-enacted regulations diverge from the enactment-era record, the Supreme Court has instructed that such provisions do not support the constitutionality of the challenged law. *E.g.*, *id.* at 58 n.28

47

("As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.").[4] Focusing on the Founding Era understanding is, of course, not unique to the Second Amendment context; the Supreme Court has looked to the same era—and discounted the relevance of later enactments much more numerous than any proffered in this case—when interpreting other rights enshrined in the Bill of Rights. *E.g.*, *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020) (rejecting Montana's argument "that a tradition *against* state support for religious schools arose in the second half of the 19th century, [with] more than 30 States—including Montana—adopt[ing] no-aid provisions," because "[s]uch a development, of course, cannot by itself establish an early American tradition").

As was true in *Bruen*, while Plaintiffs assert a "Second Amendment" challenge to the Maryland laws, "[s]trictly speaking, [a state] is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Bruen*, 597 U.S. at 37. Although the Supreme Court has recognized that an "open scholarly debate" is ongoing as to whether state firearms regulations should account for both 1791 and 1868 "public meaning" (as evidenced by regulations of the day) to determine the scope of the Second Amendment as incorporated to the States via the Fourteenth Amendment, the Court has

---

[4] As reflected by my joining the dissent in *Bianchi*, I disagree with the *Bianchi* majority's distinction—which the majority in this case now doubles down on—that a broader array of historical evidence could be used at step two than at step one. *Compare* Majority Op. at 12–13, *with Bianchi*, 111 F.4th at 500–16 (Richardson, J., dissenting). Regardless of what historical evidence the en banc Court determined it could rely on in *Bianchi*, I must adhere to the narrower approach directed by the Supreme Court.

48

only noted its existence within academia, not set further precedent. *See id.* at 37–38.[5] When undertaking the *Bruen* step-two analysis itself, the Supreme Court has relied only on the understanding of the right to carry as it was understood in 1791, and it has never relied exclusively or even to any substantial degree on laws from 1868 or later to identify a historical tradition of firearms regulation as the historical analogue of a modern-day regulation. *E.g.*, *Heller*, 554 U.S. at 614 (observing that post-Civil War authority "do[es] not provide as much insight into [the Second Amendment's] original meaning as earlier sources"); *Bruen*, 597 U.S. at 35 (cautioning "against giving postenactment [i.e., post-1791] history more weight than it can rightly bear"); *Samia v. United States*, 599 U.S. 635, 655 (2023) (Barrett, J., concurring) ("[E]vidence . . . from the late 19th and early 20th centuries [is] far too late to inform the meaning of [the scope of a constitutional right enumerated] at the time of the founding.").

Nor would doing so comport with the Court's statements in which it recognized that it has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37; *see Lara v. Comm'r Penn. State Police*, 125 F.4th 428, 439–40 (3d Cir. 2025) (quoting this language as being a "strong hint" that a state firearms regulation technically governed by the Fourteenth Amendment

---

[5] Not only has the Supreme Court twice expressly declined to address this debate in its decisions in *Bruen* and *Rahimi*, but over the past year, it has repeatedly declined to grant certiorari in petitions directly seeking guidance on this point. *See, e.g.*, *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025); *Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024), *cert. granted on other grounds*, --- S. Ct. ---, 2025 WL 2808808 (Oct. 3, 2025) (limiting grant of certiorari to a different question presented).

is to be analyzed based on the "public meaning of the right when the Second Amendment was ratified"). That is particularly true in the specific context of when the right to carry is at issue, because the Supreme Court has repeatedly observed that "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Bruen*, 597 U.S. at 38.[6]

Somewhat removed from the concern of pure time is the concern of whether a particular state law can truly serve as a model of the contemporary understanding of the Second Amendment's scope, given that states were not subject to the Second Amendment until it became incorporated via the Fourteenth Amendment. Until then, and unless a state's constitution protected a right to bear arms—some did not—its citizens were subject to a host of laws that may have restricted the right to carry in a way fundamentally at odds with the Second Amendment. *See Koons*, 156 F.4th at 286 (Porter, J., concurring in part and dissenting in part); *accord id.* at 286–87. And "[e]ven after ratification of the Fourteenth Amendment, 'the laws of the ratifying states frequently fell far short of the standards of the

---

[6] Reasons beyond simply following what the Supreme Court has said to date also support the conclusion that an 1868 understanding of the scope of the right to carry is substantively the same as the 1791 understanding. Judge Porter fleshes these out in his separate opinion in *Koons*, and I won't belabor those same points here. 156 F.4th at 289–95 (Porter, J., concurring in part and dissenting in part). Briefly, put, Judge Porter cites, among other things, contemporary statements from those who enacted the Fourteenth Amendment to demonstrate that they believed their actions to be guaranteeing the rights originally espoused in the Bill of Rights—including the Second Amendment—*not* expanding on those rights. *Id.* at 290–93. In other words, advocates of the Fourteenth Amendment did not claim to "*redefine* fundamental rights" but rather "protect the preexisting rights and freedoms enumerated in the Constitution." *Id.* at 292–93 (cleaned up).

first eight amendments, and ratification produced no effort to bring those laws into conformity with the Bill of Rights.'" *Id.* at 287 (quoting L. Rosenthal, *The New Originalism Meets the Fourteenth Amendment: Original Public Meaning and the Problem of Incorporation*, 18 J. Contemp. Legal Issues 361, 390 (2009)). Accurately understanding the Second Amendment's scope requires more than merely identifying a state law's existence.

For these reasons, as is true with the Second Amendment in general, "post-ratification history [of the Fourteenth Amendment] can *confirm* a court's understanding of Founding-Era public meaning," but the Supreme Court has drawn "a firm line where later evidence 'contradicts earlier evidence[.]'" *Lara*, 125 F.4th at 441 (quoting *Bruen*, 597 U.S. at 66) (emphasis added). And "[i]n that circumstance, [where] 'later history contradicts what the text says, the text controls.'" *Id.* (quoting *Bruen*, 597 U.S. at 36). For all these reasons, it is unnecessary—and, absent a heretofore undiscovered, unique, and extraordinary post-Founding factor, always inappropriate—to look beyond the public meaning of the Second Amendment's scope that existed in 1791 when considering the constitutionality of a state firearm regulation.

At bottom, the Supreme Court has made clear that the historical analogues from which courts discern the principles on which the how and why of firearms regulations are compared originate in the Founding Era, not later. The district court's decision and the majority opinion grossly misread *Bruen* to treat Reconstruction-era and later firearms regulations as relevant historical analogues to assess whether the modern challenged laws are constitutional. *See Koons*, 156 F.4th at 280 (Porter, J., concurring in part and dissenting

in part) (describing this approach as "methodological error" because "while mid- or late-19th century evidence might reinforce an early-American tradition, it cannot create one in the first place").

More troubling still, for many of the challenged Maryland provisions, a smattering of mid-to-late 19th century and later laws serve as the *only* historical analogues on which the majority opinion pins its analysis. That diversion only further attenuates its conclusions from *Bruen*'s mandate to understand the Second Amendment's scope based on its widespread meaning at the Founding. *See, e.g.*, *Bruen*, 597 U.S. at 46 (seeking the "*early American practice* of regulating public carry by the general public" (emphasis added)); *see also id.* at 65–66 (rejecting as "outliers" a duly enacted law from the 1870s because it "contradict[ed] the overwhelming weight of other evidence regarding the right to keep and bear arms for defense in public") (cleaned up)).

That said, the State need not come forward with a precise "historical twin" from the Founding Era for its modern-day restrictions to be constitutional. *See Lara*, 125 F.4th at 441 ("*Rahimi* teaches that public meaning is not just those regulations that could be found in 1791, but rather the principles underlying the Second Amendment, with historical regulations providing evidence of those principles." (cleaned up)). But it must be "well-established and representative." *Bruen*, 597 U.S. at 30.

The *Bruen* Court recognized that some cases "implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 27. While the Second Amendment's "meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those

the Founders specifically anticipated." *Id*. at 28. "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 29–30. However, "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id.* at 30 (cleaned up).

How the Supreme Court has undertaken this historical inquiry demonstrates that the absence of Founding-Era regulations appropriately analogous to a challenged law means that the challenged law is unconstitutional, regardless of the later historical record. In *Heller*, the District of Columbia had enacted a "flat ban on the possession of handguns in the home" to redress the scourge of "firearm violence in densely populated communities." *Bruen*, 597 U.S. at 27. As the Supreme Court observed, this same problem existed in the Founding Era such that "the Founders themselves could have adopted [a comparable prohibition] to confront that problem," so the fact they did not do so was dispositive. *Id.* Therefore, when looking at the historical record, the Court considered "'founding-era historical precedent,' including 'various restrictive laws in the colonial period,' and [found] that none was analogous to the District's ban." *Id.* (quoting *Heller*, 554 U.S. at 631). That was enough for the Court to deem the provision unconstitutional. "19th-century evidence was 'treated as mere confirmation of what the Court thought had already been established.'" *Id.* at 37 (quoting *Gamble v. United States*, 587 U.S. 678, 702 (2019)).

So too in *Bruen*. There, the Supreme Court deemed the historical inquiry "relatively simple to draw," observing that the challenged law sought to address "the same alleged societal problem addressed in *Heller*: 'handgun violence,' primarily in 'urban area[s].'" *Id*

at 27 (quoting *Heller*, 554 U.S. at 631). The Court looked to the "'historical precedent' from before, during, and even after the founding" and concluded that it reflected no "tradition of regulation" comparable to the challenged New York licensing regime, *id.* (quoting *Heller*, 554 U.S. at 631), which required citizens to demonstrate "proper cause" to secure a license to carry a firearm outside the home, *id.* at 12. So once again, the absence of a proper historical analogue from the Founding Era determined the outcome of the case and the Court never referenced later evidence when undertaking the step-two analysis.

Most recently in *Rahimi*, although the Supreme Court upheld the federal criminal provision at issue, "it did not include a single source dating from the Civil War onwards" as a basis for its decision. *Koons*, 156 F.4th at 284 (Porter, J., concurring in part and dissenting in part). Instead, it "looked exclusively to pre-Revolution, Founding-era, and early antebellum sources" as the only historical analogues on which to hinge its analysis. *Id.* at 284–85.

These cases reinforce that the Supreme Court has practiced what it has preached and grounded its Second Amendment analysis in the public meaning of the right to carry that existed in the Founding Era. Neither *Heller* nor *Bruen* used post-Founding-Era regulations to rehabilitate a challenged law that falls within the Second Amendment's plain text and for which no comparable Founding-Era regulations existed. And *Rahimi* did not deem Reconstruction-era or later regulations relevant at all to its identification of a historical analogue. Instead, when faced with an absence of analogous restrictions on the right to public carry from the Founding Era, the Supreme Court ended its analysis and deemed modern regulations on that right unconstitutional. That approach makes constitutional

sense under *Bruen*'s burden-shifting framework. "Unlike cases where challenged laws enjoy the presumption of constitutionality, a modern gun prohibition at *Bruen* step two is presumptively unconstitutional unless the government can show that it fits within a relevant tradition of historical firearms regulation." *Koons*, 156 F.4th at 286 (Porter, J., concurring in part and dissenting in part). So, "the absence of analogous regulations from the Founding and antebellum periods is highly relevant, because they are the best available source of" identifying that "tradition of historical firearms regulation." *Id.* at 285, 286.

Moreover, these first principles dictate that to prevail at step two of *Bruen*, Maryland must come forward with proof that each of its regulations prohibiting firearms in a place it has designated as "sensitive" find relevant historical analogues either (a) in the non-exhaustive list of delineated places that the Supreme Court has specifically recognized, or (b) in the commonly understood public meaning of the Second Amendment at the time of its enactment. Earlier and later regulations—in particular, Reconstruction-era and later laws—may only *confirm* a particular understanding of the pre-existing right to public carry at the Founding, but they cannot serve as an analogue when they contradict it.

This approach differs markedly from that taken by the majority opinion (and the district court), which treats later-19th- and 20th-century evidence on par with evidence from the Founding Era when considering the *Bruen* step-two analysis. *E.g.*, Maj. Op. 12–13. That perspective is erroneous and contravenes Supreme Court authority in three significant ways.

First, it improperly includes laws from the wrong timeframe when ascertaining historical analogues to compare with today's regulations. Second, by taking the "long view

of history," the majority opinion misdirects attention away from the recognition of what the Second Amendment encompassed around 1791 and thereby ignores the significance of that era's context. Maj. Op. 13. Founding-Era silence as well as enactment of contemporary provisions *permitting* or even *requiring* possession of firearms in analogous public spaces must drive the analysis. Third, the majority opinion improperly expands the scope of the inquiry by looking to laws from outliers such as individual municipalities and territories that *Bruen* said are not "instructive" to the step-two inquiry. *Bruen*, 597 U.S. at 67; *see id.* at 66–68 (discussing why territorial and municipal restrictions do not "overcome the overwhelming evidence of an otherwise enduring American tradition of permitting public carry," noting that "miniscule territorial populations . . . would have lived under them" as compared to the population of the nation as a whole). Relatedly, in the context of mass transit, the majority strays even further, looking not to any duly enacted law at all in its quest to conjure support for Maryland's law, but rather to *private companies'* rules about firearm carriage adopted in the mid-to-late 19th century. Such rules are too removed in both kind (private, not governmental) and time (too late) to be appropriate *Bruen* analogues.

Unsurprisingly, a focused understanding of what the Supreme Court has directed courts to consider when undertaking this analysis leads to a different result than the amorphous and atextual approach the majority opinion uses, as explained in the location-by-location analysis that follows.

II.

At the outset, when approaching the specific challenged places at issue here, it's important to recognize that we are not free to second-guess the locations the Supreme Court has identified as falling within its concept of "sensitive places." For that reason, as the majority opinion sets out, we readily dispose of Plaintiffs' challenges to Maryland's prohibitions of firearms on "school grounds" and "government buildings." *See* Maj. Op. III.B.1 and 3. Simply put, there's no daylight between the delineated place "schools" and the remaining property on which they sit, which often perform identical functions and serve the same populations as the school buildings themselves. Similarly, "government buildings"—while potentially capacious—have similarly been identified by the Supreme Court as places where governments have historically been able to control access to firearms. If the Supreme Court later wishes to narrow those locations, that is within their province to do so. But it is not within ours as a lower court.

In my view, "government buildings" is particularly notable because it brings within its scope many places that may also fall within other categories of the places challenged here.[7] Because governments can therefore generally control firearm possession in such

---

[7] Although some circuit courts of appeals have noted in dicta that the Supreme Court may not have literally meant that every government building is a sensitive place, that is what the Court has said—and repeated. *Compare Schoenthal*, 150 F.4th at 917 ("The Supreme Court has recognized that 'government buildings' have maintained a longstanding tradition of firearm restriction, although we do not read *Bruen* to necessarily situate all government buildings within the category of widely-accepted sensitive places." (quoting *Bruen*, 597 U.S. at 30)), *and Koons*, 156 F.4th at 250, *with McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as . . . laws forbidding carrying of firearms in sensitive places such as (Continued)

57

*buildings*, Maryland remains free under this principle to prohibit possession of firearms in those places. And that is true of any state-controlled building that might also fall within one of the other challenged provisions of state law here. For example, as discussed later, nothing in my conclusion that the State cannot prohibit firearms in *all* museums because museums are not per se "sensitive places" would prevent the State from prohibiting entrants from possessing firearms in a government building operated as a museum.[8]

Even more broadly, nothing in the analysis that precedes or follows prevents *private* property owners from exercising their long-standing entrenched right to prohibit individuals on their property from possessing firearms. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) ("The right to exclude is 'one of the most treasured' rights of property ownership. . . . [It] is 'universally held to be a fundamental element of the property right,' and is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" (citations omitted)). Thus, regardless of the *government's* limited regulatory authority under the Second Amendment, *private* owners remain free to prohibit entrants from possessing firearms in their healthcare facilities, parks, museums, places of amusement, establishments where alcohol is sold, and the like.

---

schools and government buildings[.] . . . We repeat those assurances here." (cleaned up)). So until the Supreme Court clarifies a different meaning, I would take its reference to "government buildings" to mean exactly what it says, no more and no less.

    [8] My view stems directly from the Supreme Court's previous recognition that its sensitive place doctrine extends to "government buildings" and not from the proffered basis that the State can ban firearms in spaces in which it acts as a proprietor. I address why it is inapt to rely on that doctrine later, in the section addressing Maryland's mass transit restriction.

The sole question before the Court is whether a *government* can categorically interfere with the Second Amendment right to carry firearms in public in the challenged locations. My conclusion that many of these provisions do not withstand a proper Second Amendment "sensitive places" inquiry means only that Maryland cannot act in the sweeping way it has attempted.

### A.  Healthcare Facilities

With exceptions that are not at issue in this facial challenge, the Maryland law states that "[a] person may not wear, carry, or transport a firearm in" certain healthcare facilities. Md. Code Ann., Crim. Law §§ 4-111(a)(2)(iii), (c). A cross-referenced provision defines covered healthcare facilities as: hospitals and their related institutions (each of which has their own further statutory definition); ambulatory surgical facilities or centers "that operate[] primarily for the purpose of providing surgical services to patients not requiring hospitalization and seek[] reimbursement from third party payors as an ambulatory surgical facility or center"; and facilities primarily focused on the rehabilitation of disabled individuals. Md. Code Ann., Ins. Law §§ 15-10B-01(g)(1)–(4).

The covered healthcare facilities exist for purposes of the assembly of individuals seeking medical treatment, including those in intensive care units, undergoing surgeries, and needing rehabilitation due to physical impediments. I can conceive of few places more holistically devoted to the gathering and protection of a defenseless and vulnerable population group and those who are attending to them than healthcare facilities. Put simply, however sensitive places are defined beyond the current delineations from the Supreme Court, healthcare facilities would fall within that scope. *Bruen*, 597 U.S. at 30. That's

sufficient, in my view, to support the constitutionality of the Maryland prohibition. *See Rahimi*, 602 U.S. at 693 (reiterating that facial challenges are the "'most difficult challenge[s] to mount successfully,' because [they] require[] a defendant to 'establish that no set of circumstances exists under which the Act would be valid,'" and that, "to prevail, the Government need only demonstrate that [the statute] is constitutional in *some* of its applications" (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987))). I therefore concur in the judgment of the majority affirming the district court's grant of summary judgment as to the claim based on §§ 4-111(a)(2)(iii), (c).

## B.  Mass Transit

Maryland also prohibits individuals from carrying or possessing "concealed weapons" "in any transit vehicle or transit facility, designed for the boarding of a transit vehicle, which is owned or controlled by the [Mass Transit] Administration [("MTA")] or a train owned or controlled by the [MTA] or operated by a railroad company under contract to the [MTA] to provide passenger railroad service." Md. Code Ann., Transp. § 7-705(b)(6). A division of the Maryland Department of Transportation, the MTA operates a variety of local transit services (e.g., bus, light rail, and metro subway systems) as well as statewide transit services (such as the Maryland Area Regional Commuter ("MARC") train service connecting Washington, D.C., and a paratransit system for individuals with disabilities). "About Us," http://mta.maryland.gov/about [https://perma.cc/3677-8XXG] (last visited Jan. 13, 2026). Maryland statutes further define the terms used in this Second Amendment restriction as follows:

60

- "Transit vehicle" means "a mobile device used in rendering transit service," Md. Code Ann., Transp. § 7-101(s);

- "Transit service" means "the transportation of persons and their packages and baggage and of newspapers, express, and mail in regular route, special, or charter service by means of transit facilities" (but not to include vanpool or railroad services), *Id*. § 7-101(q); and

- "Transit facility" means "any one or more or combination of tracks, rights-of-way, bridges, tunnels, subways, rolling stock, stations, terminals, ports, parking areas, equipment, fixtures, buildings, structures, other real or personal property, and services incidental to or useful or designed for use in connection with the rendering of transit service by any means, including rail, bus, motor vehicle, or other mode of transportation, but does not include any railroad facility." *Id*. § 7-101(o).

These provisions reflect that Maryland's law reaches well beyond State-owned buildings devoted to transit. As noted earlier, I conclude that the Supreme Court's designation of "government buildings" as sensitive places would be sufficient grounds to conclude that Maryland can prohibit arms in "government buildings" devoted to transit purposes. But a "building" does not encompass the massive infrastructure or "vehicles" that this prohibition includes. Nor are they sufficiently analogous in purpose or type to "government buildings" or any other *Heller*- or *Bruen*-delineated "sensitive place" to end the inquiry there. Instead, for each of those "places," it's necessary to consider the broader historical tradition to determine whether similar or analogous restrictions existed at the Founding.

While the Founding-Era record is limited, it does not support Maryland's ban on firearms while in transit. From the late 1600s through the Founding Era, ferries transported individuals between "major port cities." Joshua Hochman, Note, *The Second Amendment on Board: Public & Private Historical Traditions of Firearm Regulation*, 133 Yale L.J.

1676, 1685 & n.40 (2024); *see* Free Public Library of Jersey City, *From Canoe to Tunnel: A Sketch of the History of Transportation between Jersey City and New York, 1661–1909* 6 (3d ed. 1909) (discussing ferry service running several times a week from 1661 forward, with routes expanding over the next two centuries, and including a 1783 ferry service that "would take passengers from Communipaw to connect with the stage running to Newark and Philadelphia"); Jay Young, *Infrastructure: Mass Transit in 19th- and 20th-Century Urban America* 1–2 (2015) (discussing regular ferry service connecting urban centers in the early 1800s).

Stagecoaches and Stage wagons for hire also arose throughout the colonies in the early 18th century and continued until overtaken by the railroad over a century later. *E.g.*, Ron Vineyard, Stage Waggons and Coaches, Colonial Williamsburg Found. Library Rsch. Rept. Series – 00380 (Aug. 2002), *available at* https://research.colonialwilliamsburg.org/DigitalLibrary/view/index.cfm?doc=ResearchReports%5CRR0380.xml [https://perma.cc/JMY9-VQGX] (last visited Jan. 13, 2026); *see* George A. Thrupp, *The History of Coaches* 97–125 (1887) (discussing the prevalence of "public carriages" in the colonial era).

Yet Maryland has not come forward with any evidence that firearms were regulated—let alone prohibited by the Government—on any of these conveyances. Nor is there evidence of any national tradition from the Founding Era of preventing individuals from carrying firearms while traveling from place to place, whatever their means of traveling. Quite the opposite: many colonies *required* travelers to arm themselves when traveling. *See, e.g.*, Kopel & Greenlee*, supra*, at 234 & nn.109–11 (compiling laws from

62

17th-century Virginia, Massachusetts Bay, Plymouth, Rhode Island, and Maryland); Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. Firearms & Pub. Pol. 1, 15–16 (2004). So while the Founding-era evidence is scant, it all skews firmly against Maryland being able to show a national tradition of prohibiting commuters or travelers from carrying firearms while assembled for that purpose. That immediately casts doubt on its constitutionality under *Bruen*.

Even accepting that forms of public mass transit were less numerous and transported fewer people than in the modern era still does not permit an end-run around what can be gleaned from the Founding Era's allowance of firearms in analogous contexts. We are, in fact, required under *Bruen* to consider the hows and whys of past regulations to determine the constitutionality of modern restrictions. When it comes to types of public mass transportation—and, indeed, many of the other challenged regulations—much of the majority opinion's focus ignores that people gathered together for all sorts of purposes throughout the Founding Era, yet there's no evidence of contemporaneous efforts to regulate the mere possession of firearms as a consequence of them doing so. Indeed, as *Bruen* recognized, "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." 597 U.S. at 30.

Relatedly, *Bruen* repudiated the notion that a place could be designated as "sensitive" based solely on concerns about people congregating there in close proximity to one another. *Id.* at 31. Just as there was "no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department," so too there is no historical

basis for Maryland to declare all manner of places within its jurisdiction as "sensitive" simply because they are areas where a cross-section of the population gathers in crowded spaces and are generally protected by transit police. *Id.*[9] In short, the mere congregation of individuals in a defined space is insufficient to support a place being deemed "sensitive" so as to justify a location-specific ban of this sort.

Nor are the "going armed" or "affray" laws adopted in many colonies and new states appropriate analogues to Maryland's mass transit prohibition. Such regulations "barr[ed] people from *misusing* weapons to harm or menace others" through brandishing or discharge. *Rahimi*, 602 U.S. at 693. They did not prohibit mere public carriage in crowded spaces. *Id.* at 693–94; *see* Eugene Volokh, *The First and Second Amendments*, 109 Columbia L. Rev. Sidebar 97, 101 (2009) (quoting Founding-era commentaries describing such "going armed" laws as "covering 'a man arming himself with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people'" (cleaned up)). Accordingly, these laws are not helpful historical analogues for resolving this case, which challenges the ability to carry for the classic Second Amendment protected activity of self-defense in delineated mass transit spaces purely because of their designation as

---

[9] While some may attempt to distinguish the island of Manhattan from a transit vehicle, we dismiss their similarities at our peril. Transit vehicles featured in Justice Kagan and Justice Alito's questioning of counsel during oral argument in *Bruen*, demonstrating the connection between the State's justification for the ban at issue there and its logical extension to other spheres. *See* Tr. of Oral Argument at 28, *Bruen*, 597 U.S. 1 (2022) (No. 20-843); *see also* Hochman, *supra*, at 1678 (discussing these exchanges).

"sensitive."[10] Moreover, other laws—not challenged here—address when an individual who "disrupts the public order" or "poses a clear threat of physical violence to another" may be disarmed consistent with the Second Amendment. *Rahimi*, 602 U.S. at 695–98. But those concerns are not in play in this case. And regardless, they're not a relevant analogue for deciding whether the State may disarm individuals simply because some quantity of other people are in the same location.

Maryland's position—incorporated into the majority opinion—also ignores the core purpose behind the Second Amendment—the right of public carry for self-defense. People regularly exercise their Second Amendment right to protect themselves when they are out in society, and they do so with documented success. *E.g.*, Don B. Kates & Alice Marie Beard, *Murder, Self-Defense, and the Right to Arms*, 45 Conn. L. Rev. 1685, 1693–94 (2013) ("Overwhelmingly when victims draw guns, criminals flee. Criminals flee armed citizens because they want helpless victims, not gunfights with armed ones. . . . A statistician for the U.S. Justice Department's National Crime Victimization Study estimates that when defending against rape, robbery, or assault, guns help 65% of the time and make things worse about 9% of the time. . . . Criminological studies conclude that "[r]esistance

---

[10] Related exemplars from England like the Statute of Northampton of 1328 are distinguishable on the same grounds. *See Rahimi*, 602 U.S. at 693–98 (discussing same). Indeed, "the most famous application of Northampton at common law *rejected* the idea that merely bearing arms in [populated] places constituted unlawful behavior. *Sir John Knight's Case*, 90 Eng. Rep. 330 (K.B. 1686)." *Koons*, 156 F.4th at 288 (Porter, J., concurring in part and dissenting in part). In short, "Northampton-inspired going-armed laws were about dangerous and threatening conduct, not general prohibitions on public carry in sensitive places." *Id.*

with a gun appears to be [the] most effective [response to criminal attack] in preventing serious injury [and] preventing property loss."); James M. Manley, *Defining the Second Amendment Right to Carry: Objective Limits on a Fundamental Right*, 14 Thomas M. Cooley J. Practical & Clinical Law 81, 99 (2012) ("Statistical evidence of past crimes would provide little justification for carry restrictions, because those statistics would simply show that the need for self-defense is greater in crime-ridden areas.").

The ability to exercise this right is no less necessary just because the space in question transports large numbers of people. According to the Congressional Research Service, "[c]rime on public transportation systems has been generally worse since the beginning of the COVID-19 pandemic. According to [Department of Transportation] data, in the five years from 2020 through 2024, homicides in transit systems were more than double on average than in the five years before the pandemic, 2015 through 2019. Assaults increased on average by about 80%." William J. Mallett, Cong. Rsch. Serv., R48644, *Surface Transportation Reauthorization: Public Transportation* 16 & n.78 (2025), *available                                                                                             at* https://www.congress.gov/crs_external_products/R/PDF/R48644/R48644.2.pdf [https://perma.cc/L7TT-Y8C5]. Without the ability to arm themselves, travelers in the modern era, no less than those at the Founding, find themselves particularly defenseless and vulnerable.

A further weakness in the justification for the mass transit vehicle and infrastructure firearm prohibition: Maryland—and the majority opinion—rely on the policies of *private* companies restricting firearms carriage in transit conveyances, arguing that because public

transportation did not generally exist until the 1900s, such private companies were "providing essentially a public service" in the 19th century. Maj. Op. 16 (quoting *Wolford v. Lopez*, 116 F.4th 959, 1001 (9th Cir. 2024), *cert. granted on other grounds*, --- S. Ct. ---, 2025 WL 2808808 (Mem.) (Oct. 3, 2025)). But private companies are free to impose whatever restrictions they wish regarding firearms carriage without transgressing the Second Amendment. Accordingly, any historical record as to their policies is irrelevant to the question before us, which is whether there's support for the conclusion that *governments*—consistent with the Second Amendment—prohibited persons from carrying firearms in this sphere.[11] *Cf. Ortega v. Grisham*, 148 F.4th 1134, 1150 n.8 (10th Cir. 2025) (distinguishing private-market limitations on firearms possession because only "*[g]overnment-erected* barriers to possession . . . are covered by the Second Amendment's text" (emphasis added)).

It's also necessary to address the majority opinion's flawed alternative ground for affirming this provision: reliance on the proprietary property doctrine. Paramount to

---

[11] Even if one were to accept the premise that what private companies did is somehow relevant to the *Bruen* inquiry, I find persuasive the Ninth Circuit's discussion in *Wolford* that any such private rules tended to focus on how and where firearms were carried and did not impose the sort of sweeping prohibition across local and statewide transit for both commuting and traveling that the Maryland provision imposes. *See* 116 F.4th at 1001 ("[M]ost of the companies appeared to prohibit only carriage without pre-boarding inspection, carriage in the passenger cars (the firearms had to be checked as luggage), carriage of *loaded* firearms, or carriage of 'dangerous' weapons, such as rifles with bayonets attached. Moreover, several States enacted a 'traveler's exception,' whereby persons traveling longer distances could carry their firearms on board." (citing Hochman, *supra*, at 1696–97)). Thus, even when consulted, these private rules created in the 19th century as railroads were built do not provide an adequate historical analogue because *how* they regulated firearms fundamentally differs from Maryland's sweeping prohibition.

rejecting that approach is that the Supreme Court has *never* suggested that the necessary historical analysis becomes inapplicable when the government acts in its proprietary rather than sovereign capacity. The Court certainly could have done so as a basis for explaining why some of the so-called "sensitive places" exist as exceptions to the general right to carry identified in *Heller*. But it did not. And when it fashioned *Bruen*'s historical framework, it discussed the sensitive-places exception solely within that construct.

The Supreme Court's unqualified adoption of a historical approach in *Bruen* is sufficient reason to negate any legitimacy of the majority's alternative explanation for finding the mass transit prohibitions constitutional. But the majority's other justifications are also inapt. Reasoning from First Amendment principles isn't particularly persuasive. Plenty of principles apply in one context—say, the First Amendment—but are not then carried over to interpret an entirely different constitutional right—say, the Second Amendment. Nor is the Ninth Circuit's decision to adopt a proprietary property doctrine relevant. *See Wolford*, 116 F.4th at 970–71. As noted, our sister circuits have adopted contrary views on this issue, so it's ultimately a matter of determining which is most consistent with *Bruen*. As the *Koons* panel majority had recognized, "the prospect of enabling the government, in its proprietary capacity, to prohibit the possession or carry of firearms on property it owns would work great damage to individuals' Second Amendment rights[.] . . . [P]ermitting the government to end-run the Second Amendment when it acts as a proprietor brings with it the prospect of 'eviscerat[ing] the general right to publicly

carry arms for self-defense' that *Bruen* articulated." *Koons*, 156 F.4th at 250 (quoting *Bruen*, 597 U.S. at 31).[12]

In sum, because Maryland has not met its burden of showing a long-standing historical tradition of governments regulating modes of mass transit for similar purposes and in a similar method in the Founding Era of the Republic, I would hold that the Maryland mass transit prohibitions—to the extent they cover something other than a government building—violate the Second Amendment.

## C. Public Demonstrations

Under Maryland law, individuals cannot possess a firearm "at a demonstration in a public place or in a vehicle that is within 1,000 feet of a demonstration in a public place" after they have been "advised by a law enforcement officer that a demonstration is occurring" at the scene and have "been ordered by the law enforcement officer to leave the

---

[12] This is not to say that Government ownership is irrelevant to the Second Amendment inquiry, but rather that it is relevant only *within Bruen*'s historical analysis. On this point, the Seventh Circuit aligned with the now-vacated panel majority in *Koons*. In their views, endorsing the government's proprietary actor framework would "effectively withdraw[] firearm restrictions on government property from the *Bruen* framework" when the approach called for by *Bruen* would be to consider it "at *Bruen*'s second step as a guidepost for locating the public transit restriction within our nation's tradition." *Schoenthal v. Raoul*, 150 F.4th at 918; *accord Koons*, 156 F.4th at 250 n.104 ("*Bruen* accommodates questions of state versus private property ownership within its principles-based test by asking whether excluding weapons from a particular locale comports with 'the Nation's historical tradition of firearm regulation,' meaning we must consider whether a regulation in each location is analogous to laws protecting sovereign functions and officials." (citation omitted)). What I—and they—decline to do, but which the majority opinion permits, "is [to] treat simple governmental ownership of property as a shield against Second Amendment scrutiny." *Koons*, 156 F.4th at 250 n.104; *see Schoenthal*, 150 F.4th at 918 & n.26.

area of the demonstration until the person disposes of the firearm." Md. Code Ann., Crim. Law § 4-208(b)(2). State law further defines both "demonstration" and "public place." *Id.* § 4-208(a)(2), (6).

While I agree with the majority that Plaintiffs have standing to challenge this provision and therefore join that part of the majority opinion (Maj. Op. 23–24.), I disagree on the merits and would instead affirm the district court's grant of injunctive relief to Plaintiffs.

Maryland has not come forward with evidence that—at the Founding—States enacted measures prohibiting firearms at public demonstrations. On the contrary, the historical record reflects quite the opposite. As the district court observed, "[j]ust before the ratification of the Second Amendment, 'six out of the thirteen original colonies *required* their citizens to go armed when attending . . . public assemblies.'" *Kipke v. Moore*, 695 F. Supp. 3d 638, 662 (D. Md. 2023) (emphasis added) (quoting *Koons v. Platkin*, 673 F. Supp.3d 515, 629 (D.N.J. 2023), *aff'd in part, rev'd in part*, *Koons*, 156 F.4th at 210). Specifically, in the 150 years before the Second Amendment's enactment, American colonies up and down the Atlantic enacted laws requiring men to bring firearms with them to church and other public gatherings. *E.g.*, Kopel & Greenlee, *supra*, at 233 & n.108 (documenting 17th-century laws from Virginia, Rhode Island, Georgia, Connecticut, Massachusetts Bay, Maryland, and South Carolina); Cramer, *supra*, at 12–15. For example, a 1643 Connecticut law cited the possibility of attacks as the basis for each household to "'bring a musket, pystoll or some peece, with powder and shott to e[a]ch meeting.'" Cramer, *supra*, at 12 & n.50 (cleaned up). And a 1642 Maryland law forbade able-bodied

men from "go[ing] to church or Chappell . . . without [a] fixed gunn and 1 Charge at least of powder and Shott." *Id.* at 13 & n.55 (citation omitted). Given that the Second Amendment codified a preexisting right, such colonial laws illuminate that our Founders would *never* have commonly understood that right to permit the government to *prohibit* carrying firearms at public demonstrations.

These specific colonial-era laws also reinforce the broader historical record from the Founding Era. Americans owned firearms and they carried those arms with them when they left home. *See, e.g.*, Alexis De Tocqueville, Journey to America 266 (J.P. Mayer ed., George Lawrence trans., Faber & Faber Ltd. 1959) (describing from his famous travels in the new country, a typical cabin in Kentucky or Tennessee as containing "a fairly clean bed, some chairs, a good gun, often some books and almost always a newspaper"); Robert H. Churchill, *Once More Unto the Breach, Dear Friends*, 25 L. & Hist. Rev. 205, 212 (observing, with citations, that "[t]he available evidence of gun ownership in colonial probate inventories" supports the author's conclusion that colonists at the brink of the Revolution "were accustomed to keeping arms"). To return to St. George Tucker's appraisal, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than a European fine gentleman without his sword by his side." Kopel & Greenlee, *supra*, at 234 n.110 (citation omitted). Put bluntly, "'Americans certainly did not think that bringing guns to town was a problem'—it 'was normal.'" 156 F.4th at 304–05 (Porter, J., concurring in part and dissenting in part) (quoting Kopel & Greenlee, *supra*, at 233–34 & n.110).

The majority opinion dismisses such Founding-Era evidence based on the misguided notion that laws governing riotous assembly permit the regulation of armed aseemblies. Maj. Op. 25–26. But that's a red herring—*Bruen* instructs courts to look to the Founding Era to determine whether a modern-day restriction is grounded in the Nation's tradition of restricting firearm carriage. As already discussed, the affray laws did not address the sort of widespread prohibitions on presence and possession of firearms contemplated by Maryland's modern prohibition. When it comes to public demonstrations and firearms, the Founding-Era record reveals: (1) no nationwide consensus of prohibiting the mere presence firearms at public gatherings, and (2) numerous examples of firearms being *required* at public gatherings. It's the combined effect of these two components of the historical record that compels the conclusion the Second Amendment does *not* permit governments to prohibit mere possession of firearms at any public demonstration.

Additional considerations bolster this conclusion. As observed elsewhere, Founding-Era required-carry laws "establish[] an expectation that the person next to you in the crowd is armed, thus undermining the majority's assumption that an armed person in the assembly threatens the public good." *Koons*, 156 F.4th at 304 (Porter, J., concurring in part and dissenting in part). Put another way, the existence of these Founding-Era examples illuminates the falsity of the position that locations where the public gathers en masse carry a national tradition of being inherently "sensitive" such that they fall within a class of permissible firearms restrictions.

The majority's prefatory observation about the interplay of the First and Second Amendment further obfuscates the analysis. No one disputes that the First Amendment

protects "the right of the people *peaceably* assemble," or that—consistent with the Second Amendment—a state can prohibit firearms from being used in a manner that disrupts the peace. But Maryland's law prohibits the mere presence of firearms during public demonstration under circumstances unrelated to maintaining the peace. By presuming that the mere presence of firearms somehow threatens peaceful public assembly, Maryland's law subjugates the Second Amendment right to public carriage for lawful purposes to the First Amendment right to assemble. It also ignores that restricting open carry may itself have First Amendment implications. *See, e.g.*, Timothy Zick, *Arming Public Protests*, 104 Iowa L. Rev. 223, 241–53 (2018). That's precisely what the Supreme Court has cautioned against by reminding courts and legislatures that the Second Amendment is "not a second-class right." *Bruen*, 597 U.S. at 70 (citation omitted).

Given the absence of Founding-Era regulations to support Maryland's broad prohibition of firearms at and near public demonstrations, the majority opinion instead cites a host of inapplicable laws as supposed analogues. None meet *Bruen*'s exacting standards. As previously discussed, "affray" and other prohibitions on riotous or unlawful assembly targeted the manner in which arms were carried, not their mere presence or possession. The critical question for these jurisdictions was not whether an assembly was armed, but whether it constituted an "affray," i.e., a disturbance of the peace. *E.g.*, *Koons*, 156 F.4th at 304 (Porter, J., concurring in part and dissenting in part). And while a handful of states and territories dating from 1869 to 1890 enacted broader assembly-oriented provisions, as explained above, the Supreme Court deems such examples much too sparse—and from a period much too late—to substantiate proof of a nationwide understanding at the time of

the Founding. *See Bruen*, 597 U.S. at 66–67 ("[L]ate-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence" and "the bare existence of [a handful of] localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry.").

For these reasons, I agree with the district court that Maryland failed to meet its burden at *Bruen* step two as to Maryland's public demonstration firearms restriction, Md. Code, Crim. Law § 4-208(b)(2), and would hold the provision unconstitutional.

### D.    State Parks and Forests

With certain exceptions not relevant here, Maryland prohibits individuals from possessing firearms in its parks, Md. Code Regs. 08.07.06.04(B); possessing or using firearms in its forests, Md. Code Regs. 08.07.01.04(B); and possessing or using firearms in the Chesapeake Forest Lands, Md. Code Regs. 08.01.07.14(B).[13] The prohibitions contain exceptions authorizing certain target shooting, hunting, or possession while crossing state land to hunt on private property. *See* Md. Code Regs. 08.07.06.04(C)–(D), 08.07.01.04(C)–(E), 08.01.07.14(C)–(E).

### 1.  State Parks

In considering the park restriction, the majority opinion adopts an approach taken by several sister circuits, bypassing any effort to locate a historical analogue in the

---

[13] The Chesapeake Forest Lands is a defined number of acres spanning six counties along the Eastern Shore of Maryland. Md. Code Regs. 08.01.07.02.

Founding Era before attempting to justify the restriction. Maj. Op. 27–30. Instead, it declares "modern-style parks" in urban settings an innovation of the mid-19th-century that permits courts to look strictly to mid-to-late-19th-century firearms prohibitions as a basis for finding a sufficient historical record of firearms regulations in such spaces to justify Maryland's broad prohibition. *Id.*

As addressed elsewhere in this opinion, I believe that the majority opinion's approach to this historical inquiry flouts *Heller* and *Bruen*, which direct our focus to the Founding-Era understanding. Although *Bruen* acknowledged that modern-day problems may require a more "nuanced" approach when seeking a historical analogue, 597 U.S. at 27, the majority misapplies that directive in the context of Maryland's restriction on firearms in parks. When a problem existed at the Founding, a lack of regulation at that time strongly suggests the modern prohibition is unconstitutional. *E.g.*, *id.* at 26 ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.").

The majority opinion first errs by misrepresenting the historical record to suggest that any problems associated with open-aired recreational spaces is a context known only to post-Reconstruction America. Not so. Examples of Founding-Era urban and rural public spaces abound; and all without any firearm prohibitions. While "small cities and towns of the new American Republic did not have public parks[,]" that was because "[t]hey did not need them; their inhabitants had only to walk a short distance to reach nature." Witold

Rybczynski, *Parks and Landscape*, *in* 1 Encyclopedia of the New American Nation: The Emergence of the United States, 1754–1829 154 (Paul Finkelman ed., 2006); Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth Century Boston, New York, & Philadelphia*, 40 Landscape J. 1, 3 (2021) ("Before the nineteenth century, the demand for large open green space was low because most towns were relatively compact, density was low, homes had their own gardens and orchards, and residents had easy access to the countryside."); *The Gardens of Colonial Williamsburg*, Colonial Williamsburg, at 7, https://www.colonialwilliamsburg.org/discover/resource-hub/timelines/gardens-of-cw/ [https://perma.cc/9MF7-EK5N] (last visited Jan. 13, 2026) ("Never far from wild landscapes, the colonists apparently did not feel the need to recreate them in their gardens."). "Nevertheless, there were park-like urban spaces [in the Founding Era]. Almost every New England village had a turfed green at its center, used for markets and other public gatherings. When villages grew into towns, these greens were often enlarged, as in the case of the Boston Common." Rybczynski, *supra*, at 154; Beamish, *supra*, at 2 ("Before parks, seventeenth- and eighteenth-century Boston, New York, and Philadelphia had public urban landscapes with many characteristics of parks[.]")[14] Also

---

[14] Boston Common serves as a particularly apt analogue. *See* A. Beamish, 40 Landscape J. at 3–7 (discussing the Boston Common). Owned by the city, this "tract of land [has been] . . . used as a place of public resort for the recreation of the people" since "time immemorial." *Steele v. City of Boston*, 128 Mass. 583, 583 (Mass. 1880); *see* Beamish, *supra*, at 3 ("[T]he treeless 45-acre [Boston] Common was set aside as public open space in 1634[.]"). It was "traversed by divers footpaths, leading in different directions," *Steele*, 128 Mass. at 583, and individuals at the Founding engaged in a wide range of activities there, from walking and congregating to grazing cattle and drilling for the militia, Carl Bridenbaugh, Cities in the Wilderness: The First Century of Urban Life in (Continued)

prevalent in the Founding Era were public grass-laden squares around which were built "important civic buildings such as churches and courthouses." Rybczynski, *supra*, at 154; National Gallery of Art, *Square*, *History of Early American Landscape Design*, https://heald.nga.gov/mediawiki/index.php/Square [https://perma.cc/BHC3-PPML] (last visited Jan. 13, 2026) (describing the development of the common "square" in American cities, with historical examples listed, and heralding the "opportunity [they] afforded for recreation, light, fresh air, and a mixing of the citizenry[, which] propelled these landscapes into instruments of social reform"). As but a few notable examples, New Haven, Connecticut; Philadelphia, Pennsylvania; Annapolis, Maryland; Williamsburg, Virginia;

---

America 1625–1742 325 & n.61 (Capricorn Books ed., 1964). An 18th-century English traveler to Boston described the space as a place where "[e]very afternoon, after drinking tea, . . . the gentlemen and ladies walk . . . , and from thence adjourn to one another's houses to spend the evening. . . . [It] is a fine green common . . . with two rows of young trees planted opposite to each other, with a fine footway between, in imitation of St. James Park; and part of the bay . . . forms a beautiful canal, in view of the walk." *Id.* (citation omitted). Put simply, the notion that Boston Common does not serve as an appropriate analogue for *Bruen* purposes because of the plethora of purposes of which it served is counterfactual and nonsensical.

And Boston was not unique among American cities to have designated cross-purpose and recreational green spaces. New York City's Common Council established Bowling Green Park in 1733 as "an early public-private partnership" designated for "the Recreation & Delight of the Inhabitants of [the] City." *The Earliest New York City Parks*, N.Y. City Dep't of Parks & Recreation, https://www.nycgovparks.org/about/history/earliest-parks [https://perma.cc/25VW-8FUY] (last visited Jan. 13, 2026); Bridenbaugh, *supra*, at 325 ("In 1733 New York joined the other northern towns in setting aside a tract of land for its first public park."). And in 1797, the City acquired its first "triangle of land"—Duane Park—"on the condition that it be fenced and landscaped 'as promotive of health and recreation.'" *The Earliest New York City Parks*, *supra*; *see also* Beamish, *supra* at 7–10 (discussing New York's earliest parks).

Additional examples throughout early American cities abound, *see* Beamish, *supra* at 10–15, all with no indication that firearms were regulated therein, *see Wolford v. Lopez*, 125 F.4th 1230, 1242 (9th Cir. 2025) (VanDyke, J., dissenting from the denial of rehearing en banc), *cert. granted*, --- S. Ct. ---, 2025 WL 2808808 (Oct. 3, 2025).

Charleston, South Carolina; and Savannah, Georgia, all included such Founding-Era public green spaces. Rybczynski, *supra*, at 154; *see also* Doreceta E. Taylor, *Conceptualizing Urban Parks*, *in* The Environment and the People in American Cities, 1600s–1900s 226–27 (2009) (providing examples to support the proposition that, in the United States, "gardens, squares, small parks, and commons were beginning to appear in the seventeenth century as forms of urban open space"); *id.* at 230 ("Private and semiprivate open space became more common among elites during the eighteenth century; their interest in open space was fueled in part by their growing interest in gentility and refinement. . . . Participation in outdoor recreational activities, especially by men, was one way to demonstrate refinement."); *see also The Gardens of Colonial Williamsburg*, *supra*, at 9–12 (describing the city's public gardens in the colonial era). Maps from the era further confirm the existence of open, green spaces within cities dedicated to public gathering throughout the colonial era into the early 18th century, as well as the easy access to larger undeveloped land. *E.g.*, Beamish, *supra*, at 3 ("Eighteenth-century maps [of Boston] all show that most residents could be outside of town and in nature within a 15-minute walk."); Michael J. Lombardi, *In Search of the Frenchman's Map*, Colonial Williamsburg, https://research.colonialwilliamsburg.org/Foundation/journal/Autumn07/map.cfm [https://perma.cc/XH4A-2KBK] (last visited Jan. 13, 2026) (linking to copies of the map, which depicts the Palace Green and other commons within Williamsburg, Virginia); *The Earliest New York City Parks*, *supra* (observing that an array of now-extant parks existed, including one that "appeared on Manhattan maps as early as 1797"). And to this day, cities such as Charleston, South Carolina, boast about their oldest public parks in modern

78

accounts of those spaces. *E.g.*, Lynda Edwards, "Charleston's oldest park restored for grand opening," *The Post & Courier* (July 30, 2024), https://www.postandcourier.com/news/hampstead-mall-charleston-park-restoration/article_bfbd70d8-3fb3-11ef-8d10-97688892c475.html [https://perma.cc/56GG-RV3B] (last visited Jan. 13, 2026) ("Created in 1769, Charleston's oldest public park is older than America.").

While these outdoor green spaces may lack the "modern" urban park landscaping envisioned by Frederick William Olmsted and others, their functions and existence are no less relevant to the historical inquiry *Bruen* requires. As Judge Porter recognized in his separate opinion in *Koons*, "[i]n principle, there is no difference between Colonial-era parkgoers fishing, watching cockfighting, or playing whist; Victorian-era park-goers playing tennis, riding horse-drawn carriages, or doing whatever one does to foster solidarity across social classes; and modern park-goers playing pickleball, hiking, or riding hoverboards. Each is engaged in a type of recreation or leisure in a public location that sometimes doubles as a place of public assembly." 156 F.4th at 307 (Porter, J., concurring in part and dissenting in part). The majority opinion suffers from the same problem as the Third Circuit panel majority—"refus[ing] to consider places (and the human activity within those places) at the same level of generality that it uses to evaluate historical firearm regulations in those places." *Id.* Doing so drives an artificial wedge between the historical spaces resembling purpose and kind to modern parks because the record from those Founding-Era spaces firmly demonstrates that firearms were not prohibited in them. *Id.*

As just noted, when it comes to the historical record, it's simply untrue that community-use green spaces did not develop until the mid-19th-century, as numerous examples from the Founding Era exist. There's no indication that firearms were prohibited in such public places and, in fact, the presence of militia training in some of those spaces supports the principle that firearms were authorized there. For this reason, I reject the notion that we have no basis for ascertaining if the Founders understood the Second Amendment to permit governments to restrict firearms on green spaces devoted to public recreation. To the contrary—we have a robust historical record demonstrating that such places existed and that restrictions of the kind or scope of that contained in the challenged Maryland law were not in force. That in itself serves as strong proof of no National tradition restricting firearms in common green spaces or public parks, meaning that "the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26.

The majority opinion compounds its errors by allowing a handful of latter-day restrictions on firearms in city parks to serve as the foundation for satisfying *Bruen*'s exacting step-two inquiry. Five municipal ordinances do not a national tradition make. *Cf. Bruen*, 597 U.S. at 46. Holding otherwise "eviscerate[s]" *Bruen*'s step-two directive and, more importantly, allows outlier laws to dictate the scope of the Second Amendment's "general right to publicly carry arms for self-defense." *Id.* at 31; *see also id.* at 67 (observing, in the context of a handful of territorial restrictions, that "the bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry" and observing that "the miniscule . . . populations that would have lived under them" bolstered that conclusion).

Still more problems with the majority opinion's approach exist, as it ultimately undertakes a factual bait-and-switch. Its too-late and too-sparse "proof" that firearms were kept out of parks reflects—at most—the existence of some regulations when it comes to urban parks. From that, the majority then extrapolates grounds to support a tradition of restricting firearms that justifies a restriction in *all* of Maryland's state parks; a conclusion wholly at odds with the *Bruen* analysis and rebutted by the Founding-Era record.

But a few examples of what parks Maryland's law encompasses reveal the folly of the majority's position. The Maryland park system's "four sub-designations" include "[n]atural resources management areas," which "are generally State parks that feature an undeveloped, agrarian landscape of woodlands, fields and agriculture" "managed for the primary benefit of wildlife habitat, sustainable farming and passive, nature-based recreation[.]" Md. Code. Regs. 08.07.06.02(B)(1). Another sub-division is "[r]ail trails," which are parks featuring "the conversion of a former railroad right-of-way to a recreational trail open to hiking, biking and equestrian uses." Md. Code Regs. 08.07.06.02(B)(4). Among the fifty-three generally designated state parks, Maryland has identified such spaces as:

- Assateague State Park, Md. Code Regs. 08.07.06.02(E)(1), an "oceanfront park" that is located on "a barrier island" with "two miles of ocean beaches," "secluded coves" and "marsh areas," with "a variety of wildlife, including deer, waterfowl and feral horses," *Assateague State Park*, Maryland Department of Natural Resources: Maryland Park Service, https://dnr.maryland.gov/publiclands/Pages/eastern/assateague.aspx [https://perma.cc/7VVG-CGNX] (last visited Jan. 13, 2026);

- Deep Creek Lake State Park, Md. Code Regs. 08.07.06.02(E)(10), a 1,800-acre park offering "swimming beaches, 20 miles of hiking/biking trails, 112 site campground[s], and [a] 6,000 square foot Discovery Center," *Deep Creek Lake State Park*, Maryland Department of Natural Resources: Maryland Park Service, https://dnr.maryland.gov/publiclands/Pages/western/deepcreek.aspx [https://perma.cc/25ZQ-ARVE] (last visited Jan. 13, 2026);

- North Point State Park, Md. Code Regs. 08.07.06.02(E)(31), a "1,310 acre park" "located in Baltimore County" that has picnic grounds, battlefield and hiking trails, and fishing piers, *North Point State Park*, Maryland Department of Natural Resources: Maryland Park Service, https://dnr.maryland.gov/publiclands/Pages/central/northpoint.aspx [https://perma.cc/6PXD-27NM] (last visited Jan. 13, 2026);

- Seneca Creek State Park, Md. Code Regs. 08.07.06.02(E)(42), a park "comprised of 6,300 acres" extending across "14 scenic miles of Seneca Creek," which includes lakes, "forests and fields," *Seneca Creek State Park*, Maryland Department of Natural Resources: Maryland Park Service, https://dnr.maryland.gov/publiclands/Pages/central/seneca.aspx [https://perma.cc/P8T8-RZD3] (last visited Jan. 13, 2026);

- South Mountain State Park, Md. Code Regs. 08.07.06.02(E)(44), a "40-mile long multi-use state park weaving along the South Mountain ridge" that offers "geologic, natural, cultural, and historic experiences" for campers and hikers, *South Mountain State Park*, Maryland Department of Natural Resources: Maryland Park Service, https://dnr.maryland.gov/publiclands/pages/western/southmountain.aspx [https://perma.cc/7XSV-VUV6] (last visited Jan. 13, 2026);

- Wills Mountain State Park, Md. Code Regs. 08.07.06.02(E)(51), which "spans over 500 acres and provides visitors with opportunities for hiking along scenic trails that lead up to the mountain summit," *Wills Mountain State Park*, Maryland State Parks, https://stateparks.com/wills_mountain_state_park_in_maryland.html [https://perma.cc/H6ZS-6UZ6] (last visited Jan. 13, 2026).

These representative samples illustrate what a more thorough review of the remaining covered state parks confirms: they are larger, verdant spaces devoted to a range of recreational activities, bearing little resemblance to smaller "urban parks" or the municipal

82

regulations in city parks that began to emerge in the late 19th century. Put differently, even setting aside all the other problems with relying on the ersatz historical "analogues" the majority opinion uses, the fact that they targeted a substantively different problem in a materially different setting independently eliminates their value in assessing the constitutionality of Maryland's state-park firearms restriction.[15]

At bottom, the relevant historical record confirms that in the Founding Era, governments were not broadly restricting firearms on public lands, urban green spaces, and other locations that could serve as legitimate historical analogues to Maryland's state park system. An "analogue" based on fresh mulch under a jungle gym in a 21st-century park has no legitimate value in assessing Second Amendment rights. Nor has Maryland come forward with other evidence of Founding-Era regulations containing a similar "how" and "why" that would support a restriction of this nature. Thus, the State has not met its burden,

---

[15] The Second Amendment protects a right regardless of the need to exercise it, but it is nonetheless worth observing that self-defense may be particularly important to Marylanders. According to the FBI, in 2024, Maryland ranked fifteenth among the states for violent crime. *What Is the Crime Rate in Maryland?*, USAFacts, https://usafacts.org/answers/what-is-the-crime-rate-in-the-us/state/maryland/ [https://perma.cc/6APM-F7ME] (last visited Jan. 13, 2026). And from September 2020 to 2025, just shy of 2,000 violent offenses (aggravated assault, homicide, rape, and robbery) were reported in Maryland fields, woods, parks, or playgrounds. *Crime Data Explorer*, Fed. Bureau of Investigation, https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/crime-trend [https://perma.cc/B7WQ-S8GY] (last visited Jan. 13, 2026); *see also* Ralph B. Taylor, Cory P. Haberman, & Elizabeth R. Groff, *Urban Park Crime: Neighborhood Context and Park Features*, 64 J. Crim. Just. 13, 13 (2019) (recognizing the link between urban parks and "social problems such as crime and disorder" and exploring whether certain features of such parks "explain why some parks have more crime than others"). These statistics demonstrate that the Maryland statutes impact the ability to engage in self-defense in places where the public may well find themselves needing to exercise this "core" right.

and I would reverse the district court's judgment on this claim. Plaintiffs were entitled to an injunction barring enforcement of the State parks firearms law.

### 2. Forests

With respect to Maryland's restrictions in forests and the Chesapeake Forest Lands, the majority opinion's explanation is even more sparse and unpersuasive. It mostly relies on the same reasoning it gave for upholding the parks restriction, and so is equally flawed for all the reasons already provided. The signers of the Constitution and proponents of the Bill of Rights would surely consider prohibitions on carrying firearms on such expansive and uninhabited public lands ludicrous.

The majority opinion acknowledges, as it must, the existence of "a robust historical tradition of protecting hunting rights in rural lands," but it then says that because the State's forest-oriented restrictions permit hunting, they "do[] not run afoul of, or impede upon, one's Second Amendment rights." Maj. Op. 30. That the State has carved out an exception that adheres to the public's Second Amendment rights—here, hunting rights—says nothing about whether its main act of prohibiting firearms in forests is otherwise consistent with the Second Amendment. As *Heller* recognized, "the inherent right of self-defense has been central to the Second Amendment right" since its enactment. 554 U.S. at 628. *Bruen* confirmed that this right to carry for self-defense includes the right to "carry a handgun for self-defense outside the home." 597 U.S. at 108. Because the "core" of the Second Amendment is self-defense, that Maryland's prohibition carves out possession for hunting says little about its constitutionality under Supreme Court case law.

Because Maryland's forest-related firearms restrictions do not comport with the Nation's history of firearm regulation, I would hold them to be unconstitutional.

### E.  Places of Amusement

Plaintiffs challenge several provisions prohibiting firearms at what the majority opinion labels "places of amusement." With exceptions not challenged here, Maryland prohibits wearing, carrying, and transporting firearms in stadiums (including a special provision prohibiting firearms at Camden Yards), museums, amusement parks, racetracks, casinos, and video lottery facilities. Md. Code, Crim. Law § 4-111(a)(8)(ii)–(vi); Code of Md. Regs. §§ 14.25.02.06, 36.03.10.48.

As it did with parks, the majority opinion deems it unnecessary to look to the Founding-Era record about firearms possession or regulation in analogous contexts because such places "did not exist in modern form in 1791." Maj. Op. 31. But that is patently untrue. "Places of amusement"—and the attendant concerns driving the possibility of regulating firearms in such spaces—most certainly did exist in the Founding Era and were by no means rare. For example, horse and boat racing were popular, as was cockfighting, hunting, and games such as an early form of golf. *Id.* at 120, 435.[16] Live

---

[16] Horse racing is but one example of both sporting and gambling documented in North America well before the Nation's founding, and flourishing in that nascent United States. Lara Otis, *Washington's Lost Racetracks: Horse Racing from the 1760s to the 1930s*, 24 Wash. Hist. 136, 137 (2012) ("Eighteenth- and nineteenth-century Americans had relatively few options for entertainment or legalized gambling, and racetracks provided both."). The first documented race in North America took place in 1665 in present-day Long Island, New York. John Austin Stevens, *Horse-Racing in Colonial New York*, 28 Frank Leslie's Popular Monthly 385, 385 (Oct. 1889). By 1734, America's first jockey club had formed in Charleston, South Carolina. John Eisenberg, *Off to the Races*, Smithsonian (Continued)

theatre performances never ceased to entertain, and "the first structure in America built exclusively to be used for theatrical performances" predates the Revolutionary War: Charleston, South Carolina's Dock Street Theatre opened with a performance of *The Recruiting Officer*" in February 1736. "America's First Theatre," Charleston Stage, https://charlestonstage.com/about-us/dock-street-theatre  [https://perma.cc/R8G5-HZ6L] (last visited Jan. 13, 2026). In the subsequent decades more "crowded houses" arose throughout the nation for local and touring productions. Bridenbaugh, *supra*, at 436, 441; *see generally* Heather S. Nathans, Early American Theatre from the Revolution to Thomas Jefferson Into the Hands of the People (2003); Susanne K. Sherman, Comedies Useful: Southern Theatre History, 1775–1812 (1998). Taverns—which are discussed later in the context of establishments that sell alcohol—flourished as a focal point for relaxation and entertainment alongside business pursuits, and later led to the creation of private clubs. Bridenbaugh, *supra*, at 434–36.

While some states and localities prohibited gambling establishments for different periods of time before the Nation's founding, they were commonplace in other parts of the new Nation. *Cf.* Ed Crews, "Gambling: Apple-Pie American and Older than the Mayflower," Colonial Williamsburg, at 6–7 (Autumn 2008),

---

Mag. (Aug. 2004). Several racecourses existed throughout Virginia, Maryland, and Washington, D.C., for the same amusements such activities provide today. *E.g.*, Otis, *supra*, at 139–52; The Maryland Jockey Club of Baltimore City 7 (C. Edward Sparrow ed., 1924) ("The history of racing in Maryland goes back to Colonial times, and George Washington mentions in his Diary several visits to the Annapolis races, where he states he was a 'consistent and persistent loser.'"). And all with no documented government firearms regulation.

https://research.colonialwilliamsburg.org/Foundation/journal/Autumn08/gamble.cfm

[https://perma.cc/5NRD-RCSV] (last visited Jan. 13, 2026) (tracing the English gaming

tradition across the Atlantic, as American "colonial gaming gained a character all its own"

and "gaming was a centerpiece of colonial life," which was enjoyed by "[e]verybody . . .

men, women, rich, poor, gentry, and slave" who "bet on all sorts of things" at home, at

formal racetracks, in "impromptu contests on public roads," and at taverns); George G.

Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 UNLV Gaming Rsch. & Rev. J. 65,

66–67 (1996); Jay Precht, *Legalized Gambling*, 64 Parishes (Nov. 15, 2011), available at

https://64parishes.org/entry/legalized-gambling [https://perma.cc/WA5Q-JB57]     (last

visited Jan. 13, 2026) ("In 1803, when Louisiana became a US territory, New Orleans had

more places to gamble than New York, Philadelphia, Boston, and Baltimore combined.").

Where gambling was authorized, there's no evidence of accompanying firearms regulations

within their walls.

Museums too began peppering the United States shortly after the Revolutionary War

and ratification of the Bill of Rights.[17] Yet again, Founding-Era failure to regulate in

---

[17] For example, the first art gallery in the country opened in Philadelphia in 1784, the Charleston Museum in South Carolina opening to the public in 1824, and the Boston Athenæum opening its first art exhibition 1827. *E.g.*, A Companion to Museum Studies tbl. 7.1 (Sharon Macdonald ed., 2006); *see also The Founding of America's First Museum*, The Charleston Museum, https://www.charlestonmuseum.org/news-events/the-founding-of-americas-first-museum/ [https://perma.cc/565R-MGF5] (last visited Jan. 13, 2026); Karie Diethorn, *Peale's Philadelphia Museum*, *in* The Encyclopedia of Greater Philadelphia (2015), https://philadelphiaencyclopedia.org/essays/peales-philadelphia-museum/ [https://perma.cc/L8F4-P75Z] (last visited Jan. 13, 2026); John Edward Simmons, *History of Museums*, *in* 4 Encyclopedia of Libr. & Info. Scis. 1812, 1818 (2017), https://www.researchgate.net/publication/266240152 [https://perma.cc/L3F9-DYD7]; (Continued)

87

comparable situations and spaces is meaningful and compelling evidence that a modern prohibition is unconstitutional under *Bruen*.

All this to say, the historical record shows that, at the time of the Founding, governments did not enact sweeping firearms restrictions whenever and wherever people were assembled for amusement. As already discussed, the Founding-Era firearms regulations pertaining to church gatherings regularly *required* carriage rather than banning it. Apart from that, the State has not come forward with any evidence that—at the Founding—states enacted wider prohibitions on firearms carriage based on the mere possibility that people may be gathered together for a good time or the possibility (or even likelihood) that children would be present.

Given this robust historical record, it does not matter whether such places existed "in [their] modern form." Maj. Op. 31. What matters is that these challenged provisions do

---

*History*, Boston Athenæum, https://bostonathenaeum.org/about/ [https://perma.cc/2Z5D-KPVB] (last visited Jan. 13, 2026). The Philadelphia gallery "was among the first in a burgeoning number of museums and historical societies that sprang up during the first fifty years of the Republic, a period in which Americans sought to construct and reconstruct memories of their new nation." *Museums and Historical Societies*, *in* 2 Encyclopedia of the New American Nation, *supra*, at 403. When Charles Wilson Peale opened his museum in Philadelphia in 1786, he envisioned it as a place "'to instruct and amuse' all classes of society, high and low, using his exhibits to [depict] a narrative of the new nation as uniquely virtuous, powerful, and expansive," and the popularity of the museum led more to "proliferate . . . throughout the states." *Id.* While the first museums were private in nature, one notable exception is itself exceptional, as the federal government "inadvertently accepted collecting and displaying as [its] responsibility in the course of implementing the 1835 bequest of French-born Englishman and scientist, James Smithson 'to found in Washington, under the name of the Smithsonian Institution, an Establishment for the increase and diffusion of knowledge.'" Jeffrey Abt, *The Origins of the Public Museum*, *in* A Companion to Museum Studies, *supra*, at 130 (citation omitted). And, yet again, Founding Era firearms regulations are nowhere to be found in such spaces.

not "implicat[e] *unprecedented* societal concerns or *dramatic* technological changes" that "require a more nuanced approach." *Bruen*, 597 U.S. at 27 (emphases added). Instead, Maryland's laws address something that existed at the Founding and well before—what to do when crowds gather for fun, whether it be sporting, learning, gambling, or the like. That's a straightforward *Bruen* step-two inquiry permitting courts only to draw appropriate analogies to regulations at the Founding, but nothing more flexible than that.

Ignoring the impact of that historical record and properly focused timeframe, the majority opinion turns to a handful of laws enacted between 1853 and 1903 to support the general notion that some states and territories prohibited firearms at ballrooms, social gatherings, or public exhibitions. Maj. Op. 32. Yet again, that's too little and too late to demonstrate the sort of historical tradition *Bruen* requires. Judge Porter once again ably describes the absurdity of the notion that the Founding generation was unfamiliar with large crowds gathering for entertainment or that we can discern nothing about the Second Amendment's scope from contemporaneous failure to enact such bans as the one before us. To the contrary,

> [that] generation was familiar with, or could at least imagine, famous historical venues like the Roman Colosseum (capacity 50,000–80,000), the Circus Maximus (capacity 150,000), and contemporaneous venues like London's Hyde Park (350 acres) or Paris's Place de la Concorde (19 acres). Closer to home, Boston's South Meeting House accommodated about 5,000 and hosted that many on the day of the Boston Tea Party. In 1739, Americans heard reports that George Whitefield had preached to audiences of [20,000 to 60,000] in London[, and when he] toured America in 1740, he preached to crowds [between 3,000 and 25,000 throughout the colonies].

*Koons*, 156 F.4th at 311 (Porter, J., concurring in part and dissenting in part) (footnotes omitted). All this to say, "while colonial and early Americans had not yet built fancy NFL

stadiums, that is both anachronistic and irrelevant: they could 'imagine' large crowds and entertainment venues because they knew classical history, consumed international news, and personally attended enormous entertainment spectacles." *Id.* at 312. Critically, they "presented the same types of concerns and dangers in any large public gathering, which might have justified widespread disarmament. But there is no evidence of disarmament in such places." *Id.*

Eschewing *Bruen*'s clear instruction, the majority opinion instead distinguishes modern museums and places of entertainment as "crowded" spaces "frequented by children," deeming these features sufficient to deem them "sensitive." Maj. Op. 32. At the risk of belaboring the obvious, both crowds and children existed in the Founding Era. If either were sufficient to create a Founding era understanding for broadly restricting the presence of firearms consistent with the Second Amendment, surely there would be some contemporaneous evidence to support that conclusion. No such record exists.

Because Maryland has failed to come forward with comparable bans on firearms at public gatherings dedicated to forms of amusement from the Founding Era, it has failed to carry its burden at step two under *Bruen*. I would hold these prohibitions unconstitutional.

## F.  Locations that Sell Alcohol

With exceptions not at issue here, Maryland prohibits individuals from wearing, carrying, or transporting firearms in "a location licensed to sell or dispense alcohol . . . for on-site consumption." Md. Code, Crim. Law § 4-111(a)(8)(i), (e). Because the historical record from the Founding Era demonstrates no tradition of prohibiting firearms simply

based on the sale and consumption of alcohol at that location, this provision does not survive *Bruen*'s step-two inquiry.

At the outset, the State cannot point to these establishments as being in any way analogous to the "sensitive places" already identified by the Supreme Court. Premises that sell alcohol do not serve a uniquely vulnerable population; they serve the public at large.

Digging further, this provision targets a "problem" that existed at the Founding Era and it does so by imposing a much broader restriction than any historical precedent, placing its "how" directly at odds with the Nation's tradition in this field. As has been well documented elsewhere, alcohol consumption is nothing new. The Founders were intimately familiar with its use *and* its potential abuse. *E.g.*, *Koons*, 156 F.4th at 295–96 & nn.69–73, 309–11 nn.101–02 (Porter, J., concurring in part and dissenting in part). Taverns, where alcohol was sold, were "a staple in the social, political, and travel lives of colonial citizens from very early in this country's existence," "foster[ing] activity from morning until night." Steven Struzinski, *The Tavern in Colonial America*, 1 The Gettysburg Hist. J. 29, 29, 31 (2002); *see also* Bridenbaugh, *supra*, at 107 ("The tavern was probably the most important social institution in the little seaports [of the United States]. . . . Here townsfolk came daily to eat and drink, gossip and traffic, to hear the latest news or to post notices on the walls where all might see and read."); *see also id.* at 107–16 (discussing the centrality of the tavern to daily life); Social Life: Rural Life: Places and Occasions of Sociability, *in* 3 *Encyclopedia of the New American Nation*, *supra*, at 209 ("Taverns were perhaps the most widespread rural institutions of all, the centers of an almost exclusively male sociability. They brought men together for heavy drinking, smoking, and alcohol-fueled talk—and

often gambling and fighting."). Despite this familiarity and the widespread presence of firearms at that time, neither the colonies nor the newly formed states enacted statutes broadly targeting the combined presence of firearms and alcohol.

Lacking any similar restrictions from the Founding Era, the majority instead cites a few tangential restrictions from that period, limited to alcohol sales at special places or to specific groups: several states prohibited the sale of alcohol to militiamen while at drill. Maj. Op. 25. But such laws restricted *no one's* right to carry, nor did they address the combined effect of alcohol and firearms writ large. And other Founding-Era restrictions on the use of firearms *while intoxicated* similarly targeted a different type of conduct altogether—the reckless and dangerous act of discharging a deadly weapon while drunk—not the mere possession of arms at a premises where alcohol is sold.[18] These laws cannot serve as viable evidence of a national tradition of restricting firearms in the manner that Maryland has done here. As the district court rightly observed, this Maryland provision "do[es] not impose a 'comparable burden on the right of armed self-defense.'" *Kipke*, 695

---

[18] The other circuit courts to uphold restrictions on firearms at premises that sell alcohol have also principally relied on militia-specific regulations from the Founding Era, further demonstrating the inability of states across the country to marshal evidence that the public understood the scope of the Second Amendment to encompass widespread restrictions on the right to carry in combination with alcohol sales. *Wolford*, 116 F.4th at 985–86; *see Koons*, 156 F.4th at 261;. Grasping for further Founding-era support, the Third Circuit panel majority went so far as to cite a statement of a single signer of the Declaration of Independent, Dr. Benjamin Rush, as a basis for extrapolating "the Founders' disposition towards alcohol and drunkenness." *Koons*, 156 F.4th at 261–62. It does not require much analysis to rebut the notion that this is not the sort of evidence of a "widespread" "nationwide" tradition that *Bruen* deemed necessary to satisfy the Government's burden at step two of the inquiry.

F. Supp. 3d at 656 (quoting *Bruen*, 597 U.S. at 29). Thus, the "why" and "how" of these handful of Founding-Era restrictions cannot serve as proper historical analogues for Maryland's across-the-board prohibition on firearms by anyone based on on-site alcohol consumption. Instead, like the broad prohibition at issue in *Koons*, Maryland's restriction "applies to everyone, including teetotalers and unintoxicated patrons [at] any place where alcohol is sold. The underlying Second Amendment principle cannot simply be 'No guns wherever alcohol is present.' Such a principle is so broad, undiscriminating, and unlimited that it extinguishes the right." 156 F.4th at 310 (Porter, J., concurring in part and dissenting in part).

The rest of the majority opinion's "proof" of a historical tradition fails for the same reasons already fleshed out. A handful of city and state statutes dating well into the late 19th-century cannot serve as confirmation of a Founding-Era understanding that did not exist and come much too late in time to independently establish a "national tradition" concerning the scope of the Second Amendment.

For these reasons, I agree with the district court that this restriction is unconstitutional and would affirm its order enjoining its enforcement. While private establishments selling alcohol are free to prohibit firearms on their premises, the State cannot compel them to do so consistent with the Second Amendment.

## III.

The Supreme Court articulated a narrow exception to allow governments to restrict individuals' Second Amendment rights in "sensitive places." Maryland's laws would

convert that exception into a broad license to prohibit firearms in locations where people gather for almost any purpose so long as those purposes are separately listed to give the appearance of limited scope. I would uphold the restrictions placed on school grounds, government buildings, and healthcare facilities because those are consistent with the Supreme Court's articulated "sensitive places" doctrine. But because there's no historical evidence to support banning firearms in the other challenged locations, I would hold that they are unconstitutional and enjoin their enforcement.

Although the "sensitive places" doctrine has not yet been fully defined, the Supreme Court has made clear that it is a limited exception to the core right of public carriage, an exception grounded in the Nation's history and tradition from the time of Founding. It is not a smokescreen for inclined legislatures or courts to conjure some metaphysical connection so that a handful of localized laws can serve as "analogues" for sweeping regulation of the core Second Amendment right. The Supreme Court should not hesitate to act to clarify this doctrine and prevent its misapplication when that occurs.

For these reasons, I respectfully concur in part and dissent in part.